1   Thomas R. Hogan, Esq., California State Bar No. 042048
    John P. Shinn, Esq., California State Bar No. 175598
2   LAW OFFICES OF THOMAS R. HOGAN
    60 South Market Street, Suite 1125
3   San Jose, CA  95113-2332
    Telephone:  (408) 292-7600
4
    Attorneys for Defendant
5   PUBLIC KEY PARTNERS

6

7

8                   UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  ROGER SCHLAFLY,                )    No. CV 94 20512 SW (PVT)
                                   )
12        Plaintiff,               )    DECLARATION OF THOMAS R.
                                   )    HOGAN SUPPORT OF DEFENDANT
13  v.                             )    PUBLIC KEY PARTNERS' MOTION FOR
                                   )    SUMMARY JUDGMENT, OR, IN THE
14  PUBLIC KEY PARTNERS and        )    ALTERNATIVE, PARTIAL SUMMARY
    RSA DATA SECURITY, INC.,       )    JUDGMENT
15                                 )
          Defendants.              )
16  _____    )    Date:  December 6, 1995
                                        Time:  10:00 a.m.
17

18        I, Thomas R. Hogan, declare:

19        1.    I am an attorney duly licensed to practice law in all the courts of the State of

20  California, and in this District, and I am the counsel of record for defendant Public Key

21  Partners.  I make this declaration based upon personal knowledge, information and belief, and I

22  am competent to so testify if called as a witness.

23        2.    On December 8, 1994, plaintiff Roger Schlafly filed an Amended Complaint in

24  this action.  On January 6, 1994, defendants jointly filed a motion to dismiss that complaint

25  under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

26        3.    On February 7, 1995, after opportunity for briefing and argument, Judge Spencer

27  Williams, of the United States District Court, for the Northern District of California, issued a

28  PKP'S MOTION FOR SUMMARY JUDGMENT
    OR ALTERNATIVELY, PARTIAL SUMMARY
    JUDGMENT

1    issued a ruling granting in part and denying in part defendants' motion to dismiss.  In that

2    order, Judge Williams dismissed plaintiff's causes of action for fraud and libel without

3    prejudice, directing plaintiff to amend his complaint by February 17, 1995.  A true and correct

4    copy of Judge Williams' Order is attached as Exhibit A to this declaration.

5         4.      Plaintiff Schlafly did not amend his complaint to cure the deficiencies in his

6    causes of action, and he has, therefore, waived any right to reallege them or the facts therein.

7         5.      Attached as Exhibit B to this declaration are true and correct copies of relevant

8    portions of Schlafly's deposition testimony that support PKP's Separate Statement of

9    Undisputed Facts.

10        6.      I declare under penalty of perjury that the foregoing is true and correct.

12   DATED: _October 6, 1995_                        _____
                                                       Thomas R. Hogan

28   PKP'S MOTION FOR SUMMARY JUDGMENT
     OR ALTERNATIVELY, PARTIAL SUMMARY
     JUDGMENT                          2

A

REC'D FEB 1 0 1995

*FILED*

FEB 8   1995

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROGER SCHLAFLY, | CIVIL NO. 94-20512 SW |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART PUBLIC KEY PARTNERS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT; GRANTING IN PART AND DENYING IN PART RSA DATA SECURITY, INC.'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STRIKE |
| v. | |
| PUBLIC KEY PARTNERS and RSA DATA SECURITY, INC., | |
| Defendants. | |

        Plaintiff Roger Schlafly, proceeding pro se, filed this action
against Public Key Partners ("PKP") and RSA Data Security, Inc.
("RSA"), alleging a variety of causes of action arising out of
certain actions both Defendants have taken with respect to patents
they own.   PKP moves to dismiss pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure or, in the alternative, for a more
definite statement under Rule 12(e).   RSA moves to dismiss or, in
the alternative, to strike.   For the reasons expressed below, PKP's
motion to dismiss is GRANTED IN PART and DENIED IN PART; and GRANT
IN PART and DENY IN PART RSA's motion to dismiss.

**BACKGROUND**

The following statement of facts has been distilled from the more than 200 pages that comprised the original complaint and accompanying exhibits. In 1987, RSA filed a patent infringement action in the United States District Court for the Northern District of Illinois against Digital Signature and its partners, one of whom was Roger Schlafly. The patent at issue covered data encryption software that RSA licensed to others. Ultimately, Digital Signature and Schlafly entered into a consent judgment in which they agreed to an injunction against their making, using or selling any products implementing the patent.

In 1990, RSA and another corporation formed PKP. In January 1994, PKP learned that Digital Signature's successor in interest, Information Security Corp. ("ISC") was about to sell products to AT&T for resale, violating the terms of the consent judgment. Consequently, PKP wrote to AT&T and demanded that AT&T cease distribution and marketing of the allegedly infringing products.

Several months later, Schlafly wrote to PKP and demanded that PKP refrain from telling others that he had breached the consent judgment or had infringed patents. PKP wrote back, stating that Schlafly's letter was "defectively vague" and that he had admitted to infringing numerous patents.

Apparently unable to resolve the matter to his satisfaction, Schlafly filed this action in July 1994. On November 22, 1994, this Court granted PKP's motion for a more definite statement and granted RSA's motion to quash service of process. Subsequently, Schlafly

2

1 filed an Amended Complaint.  The motions before the Court attack the

2 sufficiency of the Amended Complaint.

3

4 **DISCUSSION**

5 I.   LEGAL STANDARDS

6      A.   Motion to Dismiss Under Rule 12(b)(6)

7      Under the liberal federal pleading policies, a plaintiff need

8 only give defendant fair notice of the claims against it.  Conley v.

9 Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).  A

10 complaint should only be dismissed where, assuming all allegations

11 as true in the light most favorable to plaintiff, it appears beyond

12 doubt that no set of facts could support plaintiff's claim for

13 relief.  Id.; Durning v. First Boston Corp., 815 F.2d 1265, 1267

14 (9th Cir. 1987), cert. denied, 484 U.S. 944, 108 S.Ct. 330, 98

15 L.Ed.2d 358 (1987).  Therefore, all factual questions in doubt are

16 resolved in favor of plaintiff on this motion.

17      In deciding a motion to dismiss, the court is not limited by

18 the allegations contained in the complaint if the complaint is

19 accompanied by attached documents.  Such documents are deemed part

20 of the complaint and may be considered in determining whether the

21 plaintiff can prove any set of facts in support of the claim.

22 Durning, 815 F.2d at 1267.  Finally, federal courts are required to

23 liberally construe the inartful pleading of pro se litigants.  See

24 Ferdik v. Bonzelet, 963 F.2d 1258, 1261 (9th Cir. 1992) (citing Boag

25 v. MacDougall, 454 U.S. 364, 365, 102 S.Ct. 700, 701, 70 L.Ed.2d 551

26 (1982)).

27

28                                    3

B.   Motion for a More Definite Statement under Rule 12(e)

Rule 12(e) of the Federal Rules of Civil Procedure provides that:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired.  If the motion is granted and the order of the court is not observed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

Fed.R.Civ.P. 12(e).  The Federal Rules of Civil Procedure require all allegations to be "simple, concise and direct."  Fed.R.Civ.P. 8(e)(1).  In addition, the complaint must be clear enough to provide the defendant with a sufficient basis to frame a responsive pleading.  Fed. Savings & Loan Ins. Corp. v. Musacchio, 695 F.Supp. 1053, 1060 (N.D.Cal. 1988).


II.   ANALYSIS

PKP and RSA filed separate motions to dismiss.  However, each joins the other's motion.

A.   Plaintiff's Claim for Libel

Defendants contend that Plaintiff failed to comply with the portion of this Court's Order of November 22, 1994 relating to his libel claim (First Cause of Action).  Specifically, they argue that Plaintiff has failed to identify the words giving rise to the libel claim and has not alleged that any libelous statement was directed at him.

1    Defendants are correct.  The exhibits that appear to form the
2    basis of Plaintiff's libel claim, Exhibits D and E, contain no
3    reference to Plaintiff.  Exhibit D, which is a letter from PKP to
4    AT&T, complains about ISC's breach of the Consent Judgment of
5    November 15, 1988, not Plaintiff's breach.  Exhibit E, which is a
6    letter from Jim Bidzos, RSA president, to the editor of Scientific
7    American Magazine, makes no mention of Plaintiff whatsoever.

8    A review of Plaintiff's Amended Complaint also reveals that he
9    has not identified any libelous statement that can be attributed to
10   RSA.  Plaintiff's Amended Complaint alleges that it is likely that
11   RSA played a part in the creation of Exhibit D.  Amended Complaint,
12   ¶ 18.  However, since nothing in that letter can be construed to
13   libel Plaintiff, Plaintiff's claim against RSA fails.

14

15   B.   Plaintiff's Patent Invalidity Claim

16   PKP moves to dismiss Plaintiff's claim for patent invalidity
17   (Second Cause of Action) on the grounds that (1) none of the
18   exhibits support the claim; and (2) the factual basis of the claim
19   is not credible.  RSA argues that the claim must be dismissed
20   because the patent at issue describes patentable subject matter.

21   PKP's arguments are without merit.  The allegations as to each
22   patent Plaintiff challenges specify both the patent and the basis
23   for the challenge.  See Amended Complaint, ¶¶ 22 (subject matter in
24   Diffie-Hellman patent disclosed more than one year prior to filing
25   application), 24 (same), 25 (Hellman-Merkle patent invalid because
26   it is inoperative as disclosed), 28 (RSA patent fails test for
27   patentability).

28                                    5

RSA's argument is also unpersuasive. Plaintiff's Amended Complaint alleges that the RSA patent preempts a mathematical formula. Amended Complaint ¶ 28. A mathematical formula or algorithm cannot be the subject of a patent. Gottschalk v. Benson, 409 U.S. 63 (1972). Given Gottschalk, Plaintiff's allegation states a claim for patent invalidity.

According to RSA, the patent in question involves a means for encrypting messages using certain mathematical steps and relationships and is not simply a mathematical formula. However, when considering a motion to dismiss, the Court must assume the truth of Plaintiff's allegations. RSA's argument requires the Court to analyze the patent. Because of the complexity of the subject matter described by the patent, the Court cannot rule that, as a matter of law, it is not patentable. This issue is appropriately raised in a motion for summary judgment, not a motion to dismiss.

C.   Plaintiff's Patent Non-Infringement Claim

PKP moves to dismiss Plaintiff's claim for patent non-infringement (Third Cause of Action) on the grounds that (1) nothing in the exhibits accompanying the Amended Complaint supports the claim; (2) his reasoning is "convoluted;" and (3) that he mischaracterizes the facts. RSA contends that the claim must be dismissed because Plaintiff does not have standing to assert the non-infringement of the technologies on which the claim is based.

None of these arguments are persuasive. Because the Court must assume the truth of the allegations, the first two arguments are inappropriate.

6

As to the last argument, the allegations in Plaintiff's Amended Complaint and exhibits thereto are sufficient to confer standing. A federal court cannot consider a claim for declaratory relief involving patent rights and relationships unless (1) the patentee has taken action which creates a reasonable apprehension on the part of the declaratory plaintiff that it will be sued for infringement, and (2) the plaintiff is engaged in infringing activity or has taken concrete steps towards that end. BP Chemicals Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed.Cir. 1993). Whether a declaratory judgment plaintiff has a reasonable apprehension of being sued is evaluated objectively and, in the absence of express charges of infringement, the court is to examine the totality of the circumstances. Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 887 (Fed.Cir. 1992).

RSA argues that Plaintiff has not satisfied the second part of the BP Chemicals test. However, according to the Amended Complaint, Defendants have claimed that ElGamal encryption as implemented in Plaintiff's product, SectretAgent, infringes PKP patents. Amended Complaint, ¶ 36. Thus, there is an allegation that Plaintiff is engaged in infringing activity.

D.   Plaintiff's Claim for Interference With Contractual Relationship

Defendants also argue that Schlafly's claim for interference with contractual relationship (Fourth Cause of Action) must be dismissed because the evidence on which he relies fails to support that theory. According to Defendants, the evidence on which the

1 claim is based, Exhibit D, is nothing more than an effort on the

2 part of PKP to protect its legitimate intellectual property rights.

3     Plaintiff's Fourth Cause of Action states a claim for

4 interference with contractual relationship.  As explained above, the

5 Court must assume the truth of all of the allegations in the Amended

6 Complaint on a motion to dismiss.  Defendants' argument requires the

7 Court to interpret the meaning of Exhibit D in a vacuum, in the

8 absence of a full evidentiary record.  It is not within the Court's

9 province to do so on a motion to dismiss.

10

11     **E.   Plaintiff's Claim for Fraud**

12     Defendants argue that Plaintiff's claim for fraud (Fifth Cause

13 of Action) is fatally defective in that they made no fraudulent

14 promises to Plaintiff.

15     Defendants are correct.   None of the exhibits on which

16 Plaintiff relies contains any promise by PKP or RSA to Plaintiff.

17 Exhibits K, R, X, AG, AH, AN are letters addressed to others.

18 Exhibits F and J contain letters to ISC, which is not a party to

19 this action.  None of the exhibits or any of the allegations in the

20 Amended Complaint provide any indication as to how <u>Plaintiff</u> was

21 defrauded.

22

23     **F.   Plaintiff's Claim for Unfair Business Practices**

24     Defendants contend that the allegations in Plaintiff's Amended

25 Complaint relating to his claim under California's Unfair Business

26 Practices Act (Sixth Cause of Action) are conclusory, vague or

27 contradicted by the exhibits he attached to the Amended Complaint.

28                               **8**

1   Defendants' argument is unavailing.   California's Unfair
2   Business Practices Act prohibits "unfair, dishonest, deceptive,
3   destructive, fraudulent and discriminatory practices by which fair
4   and honest competition is destroyed or prevented."   Cal. Bus. &
5   Prof. Code § 17001.   This language requires a complainant to allege
6   what the defendant's allegedly unlawful practices are and how they
7   are unlawful.   <u>Khoury v. Maly's of California, Inc.</u>, 14 Cal.App.4th
8   612, 619, 17 Cal.Rptr.2d 708, 712 (1993).   Plaintiff's Amended
9   Complaint alleges that Defendants deceptively exaggerated the scope
10  of their patents, unfairly negotiated with potential licensees in
11  bad faith, fraudulently promised a reasonable and non-discriminatory
12  licensing policy and threatened competitors.   Amended Complaint, ¶¶
13  74, 76, 78, 79.   These allegations, which must be taken as true on
14  a motion to dismiss, state a claim under California's Unfair
15  Business Practices Act.   Furthermore, they are sufficient to put
16  Defendants on notice of Plaintiff's claim.   The details can be
17  fleshed out during the discovery process.

18

19  G.   Plaintiff's Antitrust Claim
20  Defendants also move to dismiss Plaintiff's antitrust claim
21  (Seventh Cause of Action) because Plaintiff has failed to adequately
22  define or otherwise allege the relevant geographical or product
23  markets or the effect of the alleged restraint within such markets.
24  Plaintiff's allegations, liberally construed, state an
25  antitrust claim.   The Amended Complaint alleges two national product
26  markets: cryptography software and public key cryptography.   Amended
27  Complaint, ¶¶ 81, 84.   He further alleges that the PKP partnership

28                                  9

1   agreement is evidence of a conspiracy to control and monopolize the

2   public key cryptography market.  Id. at ¶ 84.  The Amended Complaint

3   also contains allegations that PKP prevented competition between

4   alternative public key technologies.  Id. at ¶ 86.  Several other

5   allegations add factual support, giving Defendants sufficient notice

6   of his claim.  See id. at ¶¶ 87, 90, 91, 92, 95, 96.

7

8                              **CONCLUSION**

9       Plaintiff's claims for libel (First Cause of Action) and fraud

10  (Fifth Cause of Action) are DISMISSED WITHOUT PREJUDICE.   Should

11  Plaintiff wish to amend his complaint to cure the deficiencies in

12  these claims, he must do so by February 17, 1995.   Defendants'

13  motions as to Plaintiff's remaining claims are DENIED.

14      The Court further advises Plaintiff that Rule 11 of the Federal

15  Rules  of  Civil  Procedure  obligates  all  parties  to  conduct  a

16  reasonable inquiry into the law and facts of a case before filing

17  any  court  pleading.    The  rule  also  prescribes  sanctions  for

18  violation of these obligations.  Plaintiff is encouraged to read

19  Rule 11 and to dismiss any of his claims that are untenable.

20      IT IS SO ORDERED.

21

22  DATE: 2/7/95                      _____

23                                   SPENCER WILLIAMS
                                     United States District Judge

24

25

26

27

28                                  10





**Weber & Volzing, Inc.**

*Certified Shorthand Reporters*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROGER SCHLAFLY,            )<br>                           )<br>        Plaintiff,         )<br>                           )<br>vs.                        )<br>                           )<br>PUBLIC KEY PARTNERS        )<br>and RSA DATA               )<br>SECURITY, INC.,            )<br>                           )<br>        Defendants.        )<br>_____) | No. CV 94 20512 SW (PVT)<br><br><br>**CERTIFIED COPY** |

DEPOSITION OF ROGER SCHLAFLY

VOLUME I

Date:        Monday, September 11, 1995

Time:        9:07 a.m.

Location:    Law Offices of Thomas R. Hogan
             60 South Market Street, Suite 1125
             San Jose, California  95113

# CONFIDENTIAL

60 SO. MARKET, SUITE 770
SAN JOSE, CA 95113
TEL.(408) 292-2573
LICENSE NO.  2615

1   letter, Exhibit 4, ever in fact have any impact on

2   your business relationship with either ISC or AT&T?

3   A     I can't be sure of the extent of the effect.

4   Q     Can you tell me what the effect was?

5   A     Well, it -- it -- it caused them to be very

6   cautious in dealing with us.

7   Q     And what did they do that evidenced in your

8   mind some caution?

9   A     Well, as I said before, they asked for the

10  consent judgment and -- and apparently did a review

11  of the legal situation.

12  Q     Okay.  And when you say they apparently did a

13  review of the legal situation, what do you base that

14  on?  Anything other than the fact that they asked for

15  a copy of the consent judgment?

16  A     That's primarily what I base it on.

17  Q     Okay.  In fact, your business relationship with

18  ISC and AT&T was not affected in the slightest by the

19  letter; isn't that true?

20  A     I don't know the extent to which it was

21  affected.

22  Q     All right.  Are you able to point to any impact

23  this letter had on your business relationship with

24  ISC or AT&T, any impact?

25  A     Do you mean -- mean -- well, I -- I told you of

26  impacts.  You want quantifiable impact?  It's hard to

1    second?  We're getting a lot of pronoun problems

2    here.  You're referring to they, they, they a lot

3    with reference to AT&T.  Who at AT&T are you talking

4    about?  What individual?

5              THE WITNESS:  Well, first of all, I

6    should say I didn't personally have very many

7    dealings with AT&T at all.  But the people involved

8    are Bill Franklin, and there was also somebody Greg

9    Ranieri, someone in their legal department.  Yes, his

10   name is CCed on this letter.

11             MR. MOORE:  Go ahead, Tom.

12             THE WITNESS:  He had some involvement,

13   also.

14             Q BY MR. HOGAN:  After you became aware

15   of this letter, Exhibit 4, did you have any

16   conversations or communications at all with anybody

17   from AT&T about the letter?

18   A      Not directly.

19   Q      And did the letter itself in fact have any

20   impact at all in your business relationship with ISC

21   or with AT&T?  I mean as you've described it earlier.

22   A      As I understand it, AT&T eventually came to the

23   conclusion that the -- that the -- the claim that we

24   violated the consent judgment was bogus.

25   Q      Let me repeat my question, if I can.  I don't

26   think you answered it, Mr. Schlafly.  Did this

STATE OF CALIFORNIA          )
                             )          SS.
COUNTY OF SANTA CLARA        )

    I, MELINDA M. MC DONALD, a Certified Shorthand
Reporter in and for the State of California, hereby
certify that the witness in the foregoing deposition,

              ROGER SCHLAFLY,

was by me duly sworn to tell the truth, the whole
truth and nothing but the truth in the
within-entitled cause, that the foregoing is a full,
true and correct transcript of the proceedings had at
the taking of said deposition to the best of my
ability.

                              Melinda M. McDonald
                              CSR #5249

                              Date: September 14, 1995

    The signing of the deposition by the deponent
was conditionally waived at the time of the taking of
the deposition.

    Upon completion of the foregoing transcript,
the witness was notified it was ready for
signature, but the deposition was not signed by the
witness for the following reason:_____

_____

_____

CONFIDENTIAL



**Weber & Volzing, Inc.**

*Certified Shorthand Reporters*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROGER SCHLAFLY,      ) | |
|             ) | |
|       Plaintiff,   ) | |
|             ) | No. CV 94 20512 SW (PVT) |
| vs.              ) | |
|             ) | |
| PUBLIC KEY PARTNERS  ) | |
| and RSA DATA       ) | |
| SECURITY, INC.,     ) | **CERTIFIED COPY** |
|             ) | |
|       Defendants.  ) | |

DEPOSITION OF ROGER SCHLAFLY

VOLUME II

| | |
|---|---|
| Date: | Tuesday, September 12, 1995 |
| Time: | 10:05 a.m. |
| Location: | Law Offices of Thomas R. Hogan<br>60 South Market Street, Suite 1125<br>San Jose, California 95113 |

**CONFIDENTIAL**

60 SO. MARKET, SUITE 770
SAN JOSE, CA 95113
TEL.(408) 292-2573
LICENSE NO. 2615

1    any interference with your business relationships.

2    Do you see that?

3    A    Yes, I do.

4    Q    All right.  And can you tell us any facts you

5    have that support that allegation, namely, that the

6    letter which is Exhibit 4 interfered with your

7    business relationships?

8    A    Just that it's more difficult to do business

9    when someone else is saying that I'm -- I'm -- I'm

10   violating consent judgments.

11   Q    Do you have any facts to support this

12   allegation?

13   A    Other than that letter?

14   Q    Yes, sir.

15   A    That letter is most of my evidence.

16   Q    Okay.  Do you have any other evidence other

17   than the letter?

18   A    I'm not sure.

19   Q    Okay.  And when you say you're not sure, is

20   that because you don't recall or what?

21   A    No, because I'm not sure of all of the impacts

22   of the defendants' actions.

23   Q    Well, do you have any information that you have

24   not already provided us concerning any impacts?

25   A    No, I think I've provided the information.

26              MR. HOGAN:  Paragraph 15 of your amended

CONFIDENTIAL

STATE OF CALIFORNIA    )
                       )        SS.
COUNTY OF SANTA CLARA  )

I, MELINDA M. MC DONALD, a Certified Shorthand

Reporter in and for the State of California, hereby

certify that the witness in the foregoing deposition,

ROGER SCHLAFLY,

was by me duly sworn to tell the truth, the whole

truth and nothing but the truth in the

within-entitled cause, that the foregoing is a full,

true and correct transcript of the proceedings had at

the taking of said deposition to the best of my

ability.

Melinda M. McDonald
CSR #5249

Date: September 14, 1995

The signing of the deposition by the deponent

was conditionally waived at the time of the taking of

the deposition.

_____

Upon completion of the foregoing transcript,

the witness was notified it was ready for

signature, but the deposition was not signed by the

witness for the following reason:_____

_____

_____

CONFIDENTIAL



**W&V**

**Weber & Volzing, Inc.**
*Certified Shorthand Reporters*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROGER SCHLAFLY,            )
                          )
        Plaintiff,         )
                          )
vs.                        )    No. CV 94 20512 SW (PVT)
                          )
PUBLIC KEY PARTNERS        )
and RSA DATA               )
SECURITY, INC.,            )    CERTIFIED COPY
                          )
        Defendants.        )
_____)

DEPOSITION OF ROGER SCHLAFLY

VOLUME III

Date:        Wednesday, September 13, 1995

Time:        9:35 a.m.

Location:    Law Offices of Thomas R. Hogan
             60 South Market Street, Suite 1125
             San Jose, California  95113

CONFIDENTIAL

60 SO. MARKET, SUITE 770
SAN JOSE, CA 95113
TEL.(408) 292-2573
LICENSE NO. 2615

1    in the area of enhancement or maintenance to -- to

2    SecretAgent or products that I would receive some

3    sort of royalty on.

4    Q    All right.  Actually, that raises another

5    question.  With respect to the assignment of rights

6    in Crypt Master to ISC, were you to receive a

7    royalty, based on those sales?

8    A    Yes.

9    Q    Now, I don't want to -- I mean, I would prefer

10   to use your words, so let's see if we can, you know,

11   put the right tag on this.  At some point, you

12   started doing shall we call it software development

13   for ISC, software development and maintenance?  What

14   shall we call it?

15   A    I was -- software development, improvement,

16   maintenance, some combination.

17   Q    Was this all in the cryptography area?

18   A    Yes.

19   Q    And was this an exclusive relationship with

20   ISC?  In other words -- let me start with this

21   question.  Have you ever done cryptography software

22   development, improvements or maintenance for anyone

23   other than ISC?  And to put it in a time frame, I

24   know your testimony regarding Digital Signature, but

25   I'm now talking about after -- since 1990.

26   A    No.

Deposition of Roger Schlafly - Volume III

1    says: "RSA Data Security's grand scheme is to

2    monopolize the U.S. public key market, promote RSA as

3    an international standard, and to collect a royalty

4    on every key by requiring that licensed software use

5    only keys certified by them."

6            What's the basis for your statement

7    regarding RSA Data Security's grand scheme?

8    A    Okay.  This is my construction of what they are

9    doing, based on what I've put together from observing

10   their actions.

11   Q    All right.  And what actions were those?

12   A    Okay.  Well, let's go through them one at a

13   time.  To monopolize the public key market, I

14   consider the formation of Public Key Partners an

15   attempt to monopolize the U.S. public key market by

16   putting -- by an attempt to put all use of public key

17   technologies under control of one licensing

18   authority.

19   Q    Anything else?

20   A    Promote RSA as an international standard.

21   Q    No, no.

22   A    Oh, you don't want --

23   Q    No, no, no.  Grand scheme to monopolize the

24   U.S. public key market.  You've given me one example,

25   which is the formation of PKP.  Were there any

26   others?

Deposition of Roger Schlafly - Volume III

1   A     Well, it's my impression from the way they do
2   business that they're trying to control the public
3   key market as much as they possibly can.
4   Q     Are you making that statement based on what
5   you've learned subsequent to this letter or on what
6   you knew prior to your having written this letter?
7   A     Well, I --
8   Q     I mean, we're going to go back to your amended
9   complaint and we'll deal with each one of your more
10  recent allegations in turn.  I'm trying to find out
11  at the time you wrote this letter what the basis was
12  for your statement that RSA's grand scheme was to
13  monopolize the U.S. public key market.  You've given
14  me one example, which is the formation of PKP.
15  A     Okay.  At the time I wrote this letter, that
16  was probably the primary example I had in mind.
17  Q     At the time you wrote this letter, what was
18  your understanding of what a licensee of the PKP
19  patents received?
20  A     What a licensee received?
21  Q     Yes.
22  A     A PKP licensee?
23  Q     Right.  Let me ask it in a different way.  What
24  was your understanding -- was a PKP licensee required
25  to practice RSA, or could such a licensee practice
26  any one of a number of different cryptosystems?

CONFIDENTIAL

STATE OF CALIFORNIA      )
                         )      SS.
COUNTY OF SANTA CLARA     )

    I, MELINDA M. MC DONALD, a Certified Shorthand
Reporter in and for the State of California, hereby
certify that the witness in the foregoing deposition,

               ROGER SCHLAFLY,

was by me duly sworn to tell the truth, the whole
truth and nothing but the truth in the
within-entitled cause, that the foregoing is a full,
true and correct transcript of the proceedings had at
the taking of said deposition to the best of my
ability.

                    Melinda M. McDonald
                    CSR #5249

                    Date: September 15, 1995

    The signing of the deposition by the deponent
was conditionally waived at the time of the taking of
the deposition.

    Upon completion of the foregoing transcript,
the witness was notified it was ready for
signature, but the deposition was not signed by the
witness for the following reason: _____

395

# W&V

## Weber & Volzing, Inc.
### Certified Shorthand Reporters

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROGER SCHLAFLY,                )
                               )
          Plaintiff,           )
                               )
vs.                            )      No. CV 94 20512 SW (PVT)
                               )
PUBLIC KEY PARTNERS            )
and RSA DATA                   )
SECURITY, INC.,                )      **CERTIFIED COPY**
                               )
          Defendants.          )
                               )
_____)

DEPOSITION OF ROGER SCHLAFLY

VOLUME IV

Date:        Monday, September 18, 1995

Time:        9:46 a.m.

Location:    Law Offices of Thomas R. Hogan
             60 South Market Street, Suite 1125
             San Jose, California  95113

## CONFIDENTIAL

60 SO. MARKET, SUITE 770
SAN JOSE, CA 95113
TEL. (408) 292-2573
LICENSE NO. 2615

1   A       Yes.

2   Q       And why did you send it at this time?

3   Actually, let me preface that question with a

4   different question.  Mr. Fougner's letter that you're

5   referring to here was dated almost three months

6   earlier; right?

7   A       Yes.

8   Q       And AT&T had already responded to that letter;

9   correct?

10  A       That appears to be the case, based on the dates

11  of the exhibits that you've handed me.

12  Q       Well, was that your understanding at the time,

13  at the time you wrote this letter, Exhibit 54?

14  A       Well, I'm not sure I knew about AT&T's

15  response, but I -- even if I had known about it, I

16  would have felt that this is something that I should

17  respond to, anyway.

18  Q       All right.  So why did you do this at this time?

19  A       Okay.  You asked me earlier when I received a

20  copy of the letter contained in Exhibit 45.

21  Q       Yes, I did.

22  A       And I said I wasn't sure.  And I'm still not

23  sure, but I think it's likely the case that I

24  received that shortly before writing this letter.

25  Q       All right.  Did you ask anyone at AT&T whether

26  the January 12 letter which we have marked as Exhibit

1    45 -- did you ask anyone at AT&T whether Exhibit 45

2    had had any effect on the relationship between ISC

3    and AT&T?

4    A      No.

5    Q      Did you ask anyone at ISC whether Mr. Fougner's

6    January 12 letter, which again is Exhibit 45, had had

7    any impact on the relationship between AT&T and ISC?

8    A      I may have.  I don't recall.

9               MR. MOORE:  Let's have this marked as

10   Exhibit 55.

11              (Whereupon, Defendant's Exhibit 55 was

12   marked for identification.)

13              THE WITNESS:  Okay.

14              Q BY MR. MOORE:  And not to create any

15   confusion, but while you were reviewing Exhibit 55, I

16   thought of a different question for Exhibit 54.

17   Would you mind switching back to that document?

18   Thank you.

19   A      No problem.

20   Q      The first sentence in Exhibit 54 is that "I

21   have heard that you have been telling people that I

22   have breached a consent judgment or that I have

23   infringed patents."  What people did you hear Mr.

24   Fougner had told?

25   A      I only have heard evidence that he told AT&T.

26   I was concerned that if he had told AT&T, he might

1    have told others, as well.

2    Q    To this day, are you aware of any other persons

3    that Mr. Schlafly (sic) told?

4    A    Mr. Fougner told.

5    Q    I'm sorry, Mr. Fougner told.  A Freudian slip.

6    Other than AT&T and ISC.

7    A    I believe that -- that in -- Venn had told me

8    that in talking to customers, he has a couple of

9    times heard from customers that there was some legal

10   doubt or cloud or question or something about the

11   SecretAgent product.  But I don't know exactly where

12   that came from and I don't have any hard evidence of

13   it.

14   Q    Mr. Venn would be the source of that

15   information?

16   A    Yes.

17   Q    All right.  Let's turn our attention to

18   Exhibit 55.

19   A    Okay.

20   Q    Have you -- had you seen this document prior to

21   its being produced in the course of discovery?

22   A    I don't think so.

23   Q    Around this time frame, April, 1994, did Mr.

24   Ranieri contact you?

25   A    No.

26   Q    Did anyone from AT&T contact you?

STATE OF CALIFORNIA    )
                       )        SS.
COUNTY OF SANTA CLARA  )

    I, MELINDA M. MC DONALD, a Certified Shorthand

Reporter in and for the State of California, hereby

certify that the witness in the foregoing deposition,

               ROGER SCHLAFLY,

was by me duly sworn to tell the truth, the whole

truth and nothing but the truth in the

within-entitled cause, that the foregoing is a full,

true and correct transcript of the proceedings had at

the taking of said deposition to the best of my

ability.

                             _____

                             Melinda M. McDonald
                             CSR #5249

                             Date: September 19, 1995

    The signing of the deposition by the deponent

was conditionally waived at the time of the taking of

the deposition.

                         _____

    Upon completion of the foregoing transcript,

the witness was notified it was ready for

signature, but the deposition was not signed by the

witness for the following reason:_____

_____

_____

# W&V

**Weber & Volzing, Inc.**

*Certified Shorthand Reporters*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ROGER SCHLAFLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CV 94 20512 SW (PVT) |
| | ) | |
| PUBLIC KEY PARTNERS | ) | |
| and RSA DATA | ) | |
| SECURITY, INC., | ) | **ORIGINAL** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

DEPOSITION OF ROGER SCHLAFLY

VOLUME VI

Date:       Friday, September 22, 1995

Time:       8:48 a.m.

Location:   Law Offices of Thomas R. Hogan
            60 South Market Street, Suite 1125
            San Jose, California  95113

CONFIDENTIAL

60 SO. MARKET, SUITE 770
SAN JOSE, CA 95113
TEL.(408) 292-2573
LICENSE NO. 2615

1   clipping is attached to your amended complaint as an

2   exhibit; isn't that right?

3   A       Yes, I believe so.

4   Q       And where did you get it?

5   A       From ISC.

6   Q       Is it ISC's practice to forward press clippings

7   of this nature to you?

8   A       Yes.

9   Q       And what is the purpose of their doing that?

10  A       Just to help keep me informed of the industry,

11  as far as I know.  And when Venn sees an article

12  about SecretAgent or something like that, he often

13  forwards it to me.

14  Q       All right.  Now, I take it that this particular

15  article is attached to your complaint because of its

16  reference in the center article to the headline and

17  the story, "NIST Approves DSS Despite Threat of a

18  Patent Lawsuit."  Is that right?

19  A       Yes.

20  Q       Would you describe for me to the extent you

21  know the controversy with NIST and the DSS, the

22  digital signature standard?

23  A       Well, there were several controversies.  The

24  one in particular that's mentioned in this article is

25  the claim that PKP apparently views the practice of

26  the DSS as an infringement of PKP patents.  And the

1    government, specifically NIST, approved the DSS as a

2    standard, with a statement that use of the standard

3    is -- is royalty-free and in their opinion, free of

4    patents, except for their own patent, which they're

5    not charging a royalty on.

6    Q    This article -- oh, strike that.  What's your

7    understanding of which PKP patents form the basis of

8    the dispute with NIST, if you have such an

9    understanding?

10   A    My understanding is that it's based on the

11   Diffie-Hellman patent, the Hellman-Merkle patent and

12   the Schnorr patent.

13   Q    Not the RSA patent, correct, to your knowledge?

14   A    That is my understanding.

15   Q    All right.  The focus of this article appears

16   to be that NIST went ahead and approved DSS as a

17   federal information processing standard, despite the

18   controversy with PKP.  Is that a correct reading of

19   this article?

20   A    Yes.

21   Q    What's your understanding of the present status

22   of that?

23   A    It hasn't changed since this article, as far as

24   I know.

25   Q    So NIST is proceeding, despite PKP's patent

26   threats; is that right?

1   A      Well, it is -- it is still a -- a FIPS

2   standard.   FIPS stands for Federal Information

3   Processing Standard.

4   Q      You designed software for ISC which

5   incorporated the DSS some time ago; isn't that right?

6   A      Yes.

7   Q      Has ISC to your knowledge ever refrained from

8   selling any of its DSS products because of the

9   controversy with -- between NIST and PKP?

10  A      I don't know.

11  Q      These DSS products are now part of the products

12  that AT&T is selling to end users; is that right?

13  A      Yes.

14  Q      To your knowledge, has AT&T ever refrained from

15  selling any DSS products because of the controversy

16  between NIST and PKP?

17  A      I'm not sure.   There -- there -- there was a

18  point where AT&T was -- was doing some sort of --

19  well, I think they were doing some sort of legal

20  investigation of the DSS patent issues.   It's

21  possible they delayed some sales somewhat.   I'm not

22  sure.

23  Q      You don't know; is that your testimony?

24  A      Yes.

25  Q      What is your understanding or impression of the

26  impact of the dispute between NIST and PKP on the

1  cryptography market?

2  A    I think it's likely that the -- the threat of a

3  lawsuit that's mentioned in this article deterred

4  others from using the DSS.

5  Q    But it did not deter you; is that right?

6  Because you designed products that featured DSS.

7  A    That's correct.

8  Q    As a matter of fact, when NIST approved DSS,

9  despite the threat of the lawsuit, you, ISC and AT&T

10  were in the unique position of already having

11  products that it could sell; correct?

12  A    Unique that we were the only ones --

13  Q    Yes.

14  A    -- that had products?

15  Q    Well, let me revise the question.  One of only

16  a few other companies in the cryptography market that

17  had DSS products.

18  A    Yes, that's correct.

19  Q    Would it be fair to say that the patent

20  controversy because NIST disregarded PKP's patent

21  threats actually gave ISC and AT&T and you a jump on

22  the competition?

23  A    Well, first of all, I wouldn't say that NIST

24  disregarded the threats.  I mean, they apparently

25  took them seriously and negotiated with PKP for some

26  period of time.

1    Q      Right.  And then NIST went ahead, despite the

2    patent threats; correct?

3    A     .Eventually, yes, after -- after a couple of

4    years or so.

5    Q      And to the best of your knowledge, isn't the

6    fact that ISC and AT&T are one of the few companies

7    that has DSS products prominently featured in AT&T

8    marketing literature?

9    A      Yes.

10             MR. MOORE:  All right.  Let's move on to

11   Clipper.  And just to give ourselves a point of

12   reference here, I'd like to have this marked as

13   Exhibit 66.

14             (Whereupon, Defendant's Exhibit 66 was

15   marked for identification.)

16             THE WITNESS:  Okay.

17             Q BY MR. MOORE:  Mr. Schlafly, again,

18   this is one of the documents that's attached to your

19   amended complaint; isn't that right?

20   A      Yes.

21   Q      And where did you get a copy?

22   A      I believe I got it from RSA Data Security.

23   Q      How did you go about doing that?

24   A      I believe they mailed it to me.

25   Q      Did you call and ask for a copy?

26   A      No.

1  the original complaint, did you discuss the

2  possibility of bringing a lawsuit with anyone?

3  A    Yes, I believe I discussed it with my brothers

4  and with ISC.

5  Q    Who at ISC?

6  A    I believe it came up in connection with Venn,

7  Markowitz and DeVita.

8  Q    Whose idea was it that you would be the

9  plaintiff?

10  A    My idea.

11  Q    Is that the way you and ISC discussed it, that

12  you would be the plaintiff?

13  A    They're not a party to the lawsuit.

14  Q    Oh, I understand that.  Was there ever any

15  discussion that they would be a party to the lawsuit?

16  A    They had no interest in being a party to the

17  lawsuit.

18  Q    Did they tell you their reasons?

19  A    Yes.

20  Q    What were their reasons?

21  A    I'm trying to think if this is confidential.

22  Can we say attorneys' eyes only?

23  Q    Yes, by all means, if you wish.

24  A    Okay.

25  Q    We'll put it that way and we can argue about it

26  later if I have a problem with it?

STATE OF CALIFORNIA     )
                        )       SS.
COUNTY OF SANTA CLARA   )

    I, MELINDA M. MC DONALD, a Certified Shorthand Reporter in and for the State of California, hereby certify that the witness in the foregoing deposition,

ROGER SCHLAFLY,

was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause, that the foregoing is a full, true and correct transcript of the proceedings had at the taking of said deposition to the best of my ability.

Melinda M. McDonald
CSR #5249

Date: September 23, 1995

    The signing of the deposition by the deponent was conditionally waived at the time of the taking of the deposition.

_____

    Upon completion of the foregoing transcript, the witness was notified it was ready for signature, but the deposition was not signed by the witness for the following reason:_____

_____

_____



**Weber & Volzing, Inc.**
*Certified Shorthand Reporters*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROGER SCHLAFLY,     )
                  )
      Plaintiff,   )
                  )
vs.               )   No. CV 94 20512 SW (PVT)
                  )
PUBLIC KEY PARTNERS  )
and RSA DATA         )
SECURITY, INC.,     )   **CERTIFIED COPY**
                  )
      Defendants.  )
_____)

DEPOSITION OF ROGER SCHLAFLY

VOLUME VII

Date:         Thursday, September 28, 1995

Time:         9:42 a.m.

Location:    Law Offices of Thomas R. Hogan
             60 South Market Street, Suite 1125
             San Jose, California  95113

1    A      I think those -- well, those products are now

2    being --

3    Q      That is sold by AT&T.

4    A      They're sold by AT&T.

5    Q      All right.  I can change the question.  Are you

6    involved in AT&T's pricing decisions?

7    A      No.

8    Q      Does --

9    A      I'm not.

10   Q      I'm sorry.  Does AT&T set the prices for --

11   A      Yes, they do.

12   Q      That question and answer is not going to make

13   sense, Mr. Schlafly, because I didn't quite finish

14   the question.  Does AT&T set the prices for the

15   software that you license to ISC and ISC licenses in

16   turn to AT&T?

17   A      I'm not sure what you mean by that.  I get paid

18   a royalty on sales.

19   Q      Right.

20   A      So the sales price of the product is determined

21   by AT&T.

22   Q      Right.  That is what I was getting at.

23          When you say that RSA has the power to

24   fix prices, do you mean prices are fixed artificially

25   high or artificially low?  Actually, that's almost

26   two questions.  Does RSA set prices artificially

1    high, in your view?

2    A    To say that a company has monopoly power means

3    as I understand it that they have the capacity or the

4    ability to set prices above or below what would

5    otherwise be the market price, but doesn't

6    necessarily mean that they do it.

7    Q    All right.  Do you have any understanding one

8    way or the other as to whether RSA sets prices

9    artificially high?

10    A    No, I don't.

11    Q    Do you have an understanding as to whether RSA

12    sets the prices artificially low?

13    A    No, I don't.

14    Q    Okay.  Let's turn to paragraph 83.  One thing

15    that I'd like probably to clarify first, it says:

16    "Defendant PKP has pooled patents in an attempt to

17    monopolize public key technologies," but later in

18    paragraph 84, you state that PKP was formed by RSA

19    and Cylink.

20         So going back to paragraph 83, which

21    entities in your view have pooled patents?  Is it

22    defendant PKP or is it RSA and Cylink, who formed PKP?

23    A    Well, I'm not sure there's a distinction.  It

24    was RSA and Cylink that decided to pool the patents

25    in forming PKP, and then it was PKP that then had

26    control of the patent pool.

1    you can keep the encryption key public and the

2    decryption key can be secret.  In symmetric or secret

3    key or whatever, a non-public key cryptography

4    system, the decryption key also has to be secret, but

5    it's the same as the encryption key, so the

6    encryption key has to be kept secret, also.

7    Q    In April, 1990, when PKP was formed, how

8    prevalent was public key cryptography in the

9    cryptography market, if you know?

10   A    If you're asking in dollar share of the market

11   or something, I don't know.  Certainly everyone was

12   convinced that public key cryptography was the wave

13   of the future and what everyone would eventually go

14   to.

15   Q    At the time, that is, April, 1990, public key

16   cryptography was viewed as the wave of the future;

17   does that properly characterize your testimony?

18   A    Yes, yes.

19   Q    Where is it now?

20   A    Well, I'd say it's still on the increase.  I

21   mean, it hasn't taken over completely.  Not everyone

22   has switched to it.  I don't know.  You're asking me

23   if it's still the wave of the future?

24   Q    No, I think you answered my question.  Do you

25   have anything else to add to that answer?  Let me ask

26   you this.  Has the cryptography market itself changed

1  from April, 1990 to the present?

2  A    I don't have any hard figures for you.  I'd

3  say that the cryptography market as a whole has been

4  growing for thirty years.  It's -- it's -- and the

5  importance of the market that's been devoted to

6  public key cryptography is also growing.  Currently

7  it seems to be driven largely by increased use of

8  networks among computers.  And a lot of people, more

9  and more people see that cryptography is the way to

10  solve certain network security problems.

11  Q    Has the emergence of the so-called Information

12  Superhighway impacted the cryptography at all?

13  A    As I was just saying, the information -- the

14  increased use of networks creates greater demand for

15  cryptography.  The Information Highway is a broad

16  term for various computer networks that -- that

17  connect all of the computers.

18  Q    Let's go to paragraph 85, the last sentence of

19  which states: "In the alternative, plaintiff argues

20  that the patent pool is unlawful under the rule of

21  reason, because of its anticompetitive intent and

22  effect."  What is the basis for your statement that

23  the patent pool was the result of anticompetitive

24  intent?

25  A    My basis is that it appears to me that the

26  whole purpose of forming Public Key Partners was to

1    put the public key patents under one licensing

2    authority.

3    Q      And how is that anticompetitive?

4    A      It's anticompetitive because I think it's ended

5    up restricting the usage of different public key

6    technologies.  I think if it weren't for that, we

7    would have seen more use of -- of -- of say ElGamal

8    type cryptography, which could have been licensed

9    directly by Cylink or Stanford or whomever, and that

10   ElGamal technologies would have had -- would have

11   given more competition for RSA.

12   Q      Why?

13   A      Why?

14   Q      Why would ElGamal have given more competition

15   to RSA if ElGamal could be licensed directly from

16   Cylink or Stanford?

17   A      Well, I think there would have been a healthy

18   competition between RSA and ElGamal, that -- that --

19   that -- that if most people were using RSA, Stanford

20   or Cylink or whoever's controlling those patents

21   would -- would -- would have been able to say to

22   customers, look, we have this competitive technology.

23   You can license these patents and then do ElGamal

24   cryptography.  We'll license them on better terms or

25   cheaper or something else, whatever -- whatever would

26   make the -- such a license more palatable to

1   customers.  And that would have made some competition
2   between ElGamal and RSA.
3   Q      Have you ever sold any cryptography software
4   directly to a customer?
5   A      No.
6   Q      Do you have any understanding of the factors
7   that go into a cryptography customer's decision to
8   buy a particular software product, cryptography
9   software product?
10  A      Well, I have a general idea.
11  Q      All right.  And what factors are those?
12  A      They're interested in security, reliability,
13  ease of use, price, compatibility with other software
14  or hardware, speed and efficiency of the software.
15  Those are the main issues.
16  Q      Is ElGamal perceived to be as secure as RSA?
17  A      Perceived by --
18  Q      Customers.
19  A      -- users, experts?
20  Q      Users, not experts.
21  A      Well, I don't think very many users are
22  familiar with ElGamal.
23               MR. MOORE:  Let's take a break.
24               THE WITNESS:  Okay.
25               (Whereupon, a recess was taken from 10:45
26  to 10:55 a.m.)

1    received --

2    A       Yes.

3    Q       -- from ISC?

4            Do you have an estimate of the extent to

5    which ISC's sales were diminished as a result of this

6    particular restraint?

7    A       No.

8    Q       Is there a reason -- and the reason that you

9    don't have such an estimate is that it's hard to say,

10   because there's -- because no one that you're aware

11   of had a similar product in the marketplace?

12   A       Yes, that's correct.

13   Q       All right.  Are there any other reasons that

14   make it difficult to make that estimate?

15   A       Well, it's hard for me to estimate this market

16   because I wasn't actively selling to end users,

17   anyway.  Maybe ISC could give an estimate of that.

18   Q       All right.  We may have gone through this last

19   Friday, and I apologize if I'm repeating myself.  But

20   ISC declined to join the lawsuit --

21   A       Yes.

22   Q       -- for a variety of reasons; right?

23   A       Yes.

24   Q       At the time that you filed this complaint, the

25   AT&T and ISC arrangement was in place; right?

26   A       Yes.

1   Q.   And AT -- and so that permitted ISC to sell

2   software through AT&T and under the auspices of the

3   AT&T -- of AT&T's PKP patent license; right?

4   A.   Yes.

5   Q.   And now AT&T is selling ISC software under its

6   own name in competition with RSA; true?

7   A.   That AT&T is?

8   Q.   Yes.

9   A.   Yes.

10   Q.   To the extent that the defendants have

11   succeeded in restraining competition, doesn't that

12   benefit AT&T in selling ISC software?

13   A.   Because AT&T has a -- a license to the PKP

14   patents?

15   Q.   Right.

16   A.   And -- and -- and whatever limitations on

17   patent licenses might deter other competitors from

18   getting into the market?

19   Q.   Right.

20   A.   That's possible.

21   Q.   Okay.  Let's turn to paragraph 87.  The first

22   sentence says: "Defendant PKP acquired the Schnorr

23   patent in a willful attempt to maintain its monopoly

24   over public key technology, in violation of section 2

25   of the Sherman Antitrust Act."  What monopoly power

26   did PKP have?

1  A     It controlled the three Stanford patents and

2  the one MIT patent, and it collectively alleged that

3  set of patents controls all public key technology,

4  and therefore, since they were the exclusive

5  licensing authority on those patents, that they had a

6  monopoly over public key technology.

7  Q     Did PKP sell any products?  I realize it sold

8  sublicenses to patents.

9  A     Right.

10  Q     Did it sell any cryptography products?

11  A     PKP itself was only a patent licensing agency.

12  Q     Did RSA have a monopoly power over public key

13  technology?

14  A     Well, you're getting into the issue of who is

15  the real monopolist here, PKP or RSA Data Security.

16  Q     Right.  You might recall that briefs were filed

17  in this case because we were having trouble

18  understanding your antitrust allegations, and that is

19  really what all of these questions are directed to.

20  We're trying to understand your allegations.  Who's

21  the real monopolist with respect to a section 2

22  Sherman Act claim?  What are your allegations?

23  A     Well, what it says here is PKP.

24  Q     I realize that.  And is that your position as

25  you sit here today?

26  A     Well, it's admittedly somewhat confusing in

1  the patent problem; correct?

2  A      Yes.

3  Q      Were there any other reasons?

4  A      Yes.  There's also the reason that I'm

5  primarily a developer and not a marketer.  And

6  there's also the reason that I have a relationship

7  with ISC and AT&T that -- that I wouldn't want to

8  interfere with.

9  Q      All right.  What steps did you take to resolve

10  the patent problem?  Actually, strike that.  Because

11  I think I know the problem.  The steps that you took

12  -- the steps that you took to resolve the patent

13  problem was your inquiry regarding PKP's patent

14  licensing policies in -- in the end of 1990; right?

15  A      Well, I say this lawsuit's an attempt to

16  resolve the patent problem.

17  Q      That may be true.  Prior to this lawsuit, your

18  attempt to resolve the patent problem was your

19  attempt -- your inquiries about licensing at the end

20  of 1990?

21  A      I think an inquiry -- inquiry is a more

22  accurate description than an attempt to resolve it.

23  Q      Yes, inquiry is the word that I meant to use,

24  if that's not the word I used.  And we've already

25  covered your inquiry about PKP's licensing policies

26  at that time in this deposition, haven't we?

1    A       Correct.

2    Q       Do you have any economics training?

3    A       I've read a couple books on the subject.

4    Q       And which books are those?

5    A       I don't remember.  I'm not claiming to have any

6    special expertise in economics.  I mean, it's a

7    subject I try to be generally knowledgeable of,

8    but --

9    Q       Fair enough.  How did you estimate two million

10   dollars in damages?

11   A       I just --

12   Q       Actually, let me ask you a different question

13   before we get to the two million dollar question.

14   These damages, is it your contention that they were

15   essentially caused by the various antitrust

16   allegations that -- starting with paragraph 81?

17   A       No, not entirely.  I think it's --

18   Q       All right.  In your view, what caused the two

19   million dollars of damages?  Which aspects of the

20   antitrust cause of action caused it?

21   A       How much of the two million is due to antitrust

22   assertions?

23   Q       That's right.

24   A       I -- I -- I don't know.  I never made a

25   detailed analysis of which -- of -- of which

26   allegations lead to which damages.  There -- there is

1   some overlap among the allegations.

2   Q     All right.  Maybe we should go back to the two

3   million dollar question.  How did you estimate two

4   million dollars?

5   A     I just -- that's just kind of a raw number I

6   came up with.  I kind of thought I needed of some

7   number in here.

8   Q     Did you just pull it out of thin air?

9   A     Well, pretty much.

10  Q     All right.  Did you have something in mind as

11  to the source of the damages?  Would it be lost

12  royalties from ISC, for example, as is referenced

13  here?

14  A     No, I think I sort of had in mind what my

15  software could be sold for if there's -- the market

16  for such software had been more favorable to me.

17  That is, if there weren't these patent problems and

18  these other problems.

19  Q     Then what elements contribute to your estimate

20  of damages?

21  A     I just -- you know, I just -- it's just a

22  number that I thought was reasonable.

23  Q     Well, I understand that you thought the number

24  was reasonable.  But what I want to get is whatever a

25  more accurate number might be, I want to know the

26  factors that would contribute to a more exact

1   estimate of that number.  For example, is lost

2   royalties from ISC a part of what you consider to be

3   your damages?

4   A     Yes.

5   Q     Is lost sales in the form of sales of your

6   software to end users a part of what you consider to

7   be your damages?

8   A     Well, there were some lost opportunities

9   there.  How much that contributes to the damages, I

10  don't know.

11  Q     All right.  What lost opportunities?

12  A     Well, just that if there weren't these patent

13  problems, I could have -- I could have gone after

14  other possible sales.

15  Q     Would those sales have been to end users of

16  your software?

17  A     It's possible.

18  Q     Would those lost opportunities have been to

19  other companies like ISC, who would in turn sell your

20  software to end users?

21  A     I think it's possible.

22  Q     Is any other source of damages possible?

23  A     That's the bulk of it.

24  Q     I don't think I've ever asked this question,

25  but what is the royalty rate that you are paid by

26  ISC?

STATE OF CALIFORNIA       )
                          )       SS.
COUNTY OF SANTA CLARA     )

    I, MELINDA M. MC DONALD, a Certified Shorthand

Reporter in and for the State of California, hereby

certify that the witness in the foregoing deposition,

                 ROGER SCHLAFLY,

was by me duly sworn to tell the truth, the whole

truth and nothing but the truth in the

within-entitled cause, that the foregoing is a full,

true and correct transcript of the proceedings had at

the taking of said deposition to the best of my

ability.

                          Melinda M. McDonald
                          CSR #5249

                    Date: September 29, 1995

    The signing of the deposition by the deponent

was conditionally waived at the time of the taking of

the deposition.

    Upon completion of the foregoing transcript,

the witness was notified it was ready for

signature, but the deposition was not signed by the

witness for the following reason:_____

_____

_____