ORIGINAL

1   MICHAEL M. CARLSON (Bar No. 88048)
    BRYAN J. WILSON (Bar No. 138842)
2   JANA G. GOLD (Bar No. 154246)
    Morrison & Foerster
3   755 Page Mill Road
    Palo Alto, California  94304-1018
4   Telephone: (415) 813-5600
    Facsimile:  (415) 494-0792
5
    PATRICK J. FLINN (Bar No. 104423)
6   ALSTON & BIRD
    One Atlantic Center
7   1201 West Peachtree Street
    Atlanta, Georgia 30309
8   Telephone: (404)881-7000
    Facsimile: (404) 881-7777
9
10  Attorneys for Proposed Intervenor
    CARO-KANN CORPORATION
11

**FILED**

**OCT 0 6 1995**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

12

13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16

17  ROGER SCHLAFLY,                    No.    CV 94 20512 SW

18                   Plaintiff,
                                       **DECLARATION OF BRYAN J.**
19      v.                             **WILSON IN SUPPORT OF MOTION**
                                       **TO INTERVENE**
20  PUBLIC KEY PARTNERS and RSA DATA
    SECURITY, INC.,                    Date:   November 15, 1995
21                                     Time:   10:00 a.m.
                     Defendant.        Ctrm:   14
22

23

24      I, Bryan J. Wilson, declare:

25          1.      I am an attorney with the law firm of Morrison & Foerster, co-counsel for proposed

26  Intervenor in this action, and co-counsel in the arbitration proceeding to which proposed Intervenor

27  and defendant RSA Data Security, Inc. are parties.  In those capacities, I have acquired personal

28

Wilson Declaration
No. CV 94 20512 SW                        1

1   knowledge of the facts stated in this declaration, and I could testify competently to them if called

2   upon to do so.

3       2.    Attached to this declaration as Exhibit 1 is a true and correct copy of the arbitration

4   decree which, among other things, dissolves Public Key Partners ("PKP").

5       3.    Attached to this declaration as Exhibit 2 is a true and correct copy of the license

6   agreement between Caro-Kann Corporation, its parent Cylink Corporation, and Stanford University.

7       4.    Attached to this declaration as Exhibit 3 is a true and correct copy of the lawsuit

8   RSADSI filed seeking a declaration that the Stanford Patents are invalid and unenforceable.

9       5.    Attached to this declaration as Exhibit 4 is a true and correct copy of responses to

10  interrogatories served by defendant PKP in this action.

11      6.    Attached to this declaration as Exhibit 5 is a true and correct copy of the original

12  license agreement between Stanford University and Cylink Corporation.

13      Dated: October 6, 1995

14

15                                _____

16                                    Bryan J. Wilson

17

18

19

20

21

22

23

24

25

26

27

28



IN THE MATTER OF THE ARBITRATION BETWEEN

CYLINK CORPORATION AND CARO-KANN CORPORATION, ON THE ONE HAND

AND

RSA DATA SECURITY, INC., ON THE OTHER HAND

[draft] ORDER AND DECISION REGARDING LIABILITY, DISSOLUTION
OF PKP AND DECISION ON RSA'S MOTION FOR JUDGMENT
AND CYLINK'S CROSS MOTION FOR JUDGMENT

The parties, through their respective counsel, have appeared before the full arbitration panel (the "Panel") at hearings conducted from May 9, 1995 to June 8, 1995 and the Panel has considered the testimony, arguments and evidence regarding liability of the various parties for acts and failures to act under the various agreements connecting the parties. In addition, RSA filed a Motion for Judgment ("Motion for Judgment") on May 18, 1995 and Cylink / Caro-Kann filed an Opposition of Cylink & Caro-Kann to Motion of RSA Data Security, Inc. for Judgment and Cross-motion for Judgment ("Cylink Opposition").

THE PANEL NOW FINDS AND ORDERS as follows:

     1.     In formulating this Order and Decision, the Panel has reviewed the various arbitration demands of the parties and has reviewed the various testimony and positions taken at the closing arguments which occurred on June 8, 1995. The Panel has determined the questions presented fall essentially into the following categories:

     (a)     Should Public Key Partners ("PKP") be dissolved?

(b)        If there is a decision to dissolve PKP, how should the assets of PKP be distributed and how should the winding up of the partnership affairs of PKP be managed?

(c)        Is Cylink entitled to license under the MIT patents and, if so, what should be the extent of any such license? and

(d)        Is either party liable to the other for any damages resulting from breach or lack of performance under the various agreements entered into between the parties?

(e)        Is either party entitled to collect from the other party any of its fees and costs in connection with the arbitration?

2.    Dissolution of PKP:        There are three avenues under which PKP may be dissolved.

(a)    Dissolution by agreement: First, PKP may be dissolved by agreement of the parties. Although this avenue was explored during an earlier hearing, it was clear that the parties were not in agreement on the terms under which PKP should be dissolved. Therefore, the Panel finds that PKP will not be dissolved by agreement of the parties.

(b)    Dissolution as a result of a "Terminating Event": Second, PKP may be dissolved as a result of a "Terminating Event" as that term is used in the General Partnership Agreement. There is only one Terminating Event which has been put forward by either party--the commission of a Material Breach by a Partner. A review of the General Partnership Agreement shows that the only Material Breach which is put forward by either party is a breach of Article 6, Paragraph 12. Both parties are accused by the other party of breaching Article 6, Paragraph 12. Although the Panel has reviewed the various testimony, evidence and arguments put forward by both parties regarding breach of Article 6, Paragraph 12, the Panel does not find

sufficient evidence to hold that either party has breached Article 6, Paragraph 12 or, at least to the extent a party has breached this paragraph, the other party has as well and the Panel would find the parties to be equally at fault for breach. For this reason, the Panel finds that PKP will not be dissolved as a result of a Terminating Event and, in particular, will not be dissolved as a result of a Material Breach of Article 6, Paragraph 12. Therefore, the purchase rights contemplated by Article 9, Paragraph 5(d) are not available to either party. In addition to the above-stated reason for not finding a breach of Article 6, Paragraph 12, the Panel does not find any sufficient evidence of notice by either party to the other party to find compliance with Article 9, Paragraph 4.

> (c)   Dissolution pursuant to the Panel's equitable powrs:

Third, PKP may be dissolved pursuant to the Panel's equitable powers pursuant to Article 12, Paragraph 1. Based on the testimony, evidence and arguments of the parties, it is clear to the Panel that PKP cannot continue as a partnership and, as an matter of equity, should be dissolved. The parties appear to agree that, in any event at the conclusion of this arbitration process, PKP should be dissolved or otherwise wound up. See, e.g., Hearing Transcript, June 8, 1995, pp. 2069-2070:

> ARBITRATOR BUNSOW: . . . What would be the effect of a finding that neither party has committed a material breach? Would it end in a voluntary dissolution?
> MR. FLINN: I believe we then proceed down the path of a voluntary consensual dissolution. Neither party wants to be in a partnership with the other, and whatever the law provides for or the contract provides for, the effect of a consensual dissolution is the result.
> ARBITRATOR BUNSOW: Do you concur?
> MR. BUSSELLE: I know the Panel is going to be shocked, but I absolutely agree.

Therefore, pursuant to the Panel's equitable powers under Article 12, Paragraph 1, the Panel hereby orders that PKP is dissolved effective on the date of this order.

3.     Distribution of Assets of PKP:     Having determined and ordered that PKP is dissolved pursuant to the Panel's equitable powers, the Panel is now faced with the question of how assets of PKP shall be divided. As has been stated above, to the extent the Panel has generally found any evidence of fault on the part of one party, it has also found evidence of fault on the part of the other party. Therefore, the Panel is convinced that liability, if any, resulting from breach of the various agreements can be dealt with through money damages payable from one party to the other. Liability will be dealt with in greater detail below. However, excepting liabilities and damages resulting therefrom, the Panel is of the opinion that the fairest distribution of assets of PKP will be in accordance with the terms of the General Partnership Agreement for dissolution and liquidation of the partnership where there is not a purchase of the assets of the partnership by one party or the other (see, Article 9, Paragraph 6). These are the terms the parties negotiated for and agreed to prior to formation of this PKP and the Panel is, therefore, of the opinion that these terms represent overall fair terms for liquidation of the assets under the present circumstances. Therefore, the Panel orders distribution of the assets of PKP as follows:

a)     Pursuant to Article 9, Paragraph 8 of the General Partnership Agreement, the "Licensed Rights" as that term is used in the General Partnership Agreement shall be distributed to the Partners as provided in the Cylink License Agreement and the RSA License Agreement. RSA will continue to receive 20% of all royalties received by CKC, its Affiliates or assignees (including Cylink) from any sublicenses

covered by the Stanford Agreement entered into after the date of this order. These payments shall be made in quarterly payments on the last day of the month following the end of each calendar quarter for any royalties received in the prior calendar quarter and shall be accompanied by a royalty report detailing the basis on which the payment to RSA has been calculated. RSA shall have a reasonable right to an accounting.

b)       Other assets of PKP shall be distributed in accordance with Article 5, Paragraph 2 of the General Partnership Agreement. For clarification, debts and obligations of PKP to creditors other than the partners including any costs, fees, and settlements for any outstanding litigation to which PKP is a party shall be paid first. No assets of PKP shall be distributed to the parties pursuant to Article 5, Paragraph 2 until all such litigation is settled or until the parties agree on a distribution formula.

c)       In accordance with Article 5, Paragraph 2(d), an agent shall be appointed to collect and distribute any royalties. The parties shall meet and confer regarding appointment of an agreeable agent within ten (10) days from the date of this order and, if they cannot agree, each party shall submit the names and a summary of the qualification of two (2) agents to the Panel within fifteen (15) days from the date of this order. The Panel will then select an agent to act in accordance with Article 5, Paragraph 2(d).

d)       Additionally, the Panel has considered the disposition of the agreement entered into between Dr. Schnorr and PKP, since this agreement is an asset of PKP. Since neither Cylink/Caro-Kann nor RSA is awarded the right to purchase partnership assets, it follows that neither

has superior rights as against the other to acquire rights to the Schnorr patent. Therefore, the Panel orders as follows:

      (i)     Immediately, upon reciept of this order, both parties shall notify Dr. Schnorr that PKP has been dissolved; and

      (ii)    As part of such notification, Dr. Schnorr shall be told that he may, if he desires, terminate his agreement with PKP effective immediately; and

      (iii)   In the absence of Dr. Schnorr terminating the agreement, the agreement shall be considered an asset of PKP subject to management and disposition by the agent discussed above in Paragraph 3(c).

    4.    <u>Cylink's right to a license under the MIT Patent</u>:    Cylink has argued it is entitled to a license under United States Patent Number 4,405,829 (the "MIT Patent") as a result of the Agreement of Intent, Paragraph 4.3(a)(iv). To quote the language of that paragraph:

> "(iv)   To Cylink, an option to sublicense the right to make, use and sell products which would otherwise infringe on the Licensed Rights presently licensed to RSA under the MIT Agreement on terms acceptable to Cylink, which acceptance can not be unreasonably withheld."

This option was to be delivered at closing according to the terms of the Agreement of Intent. At closing a document was executed by both parties (Cylink Ex. 6) which states in pertinent part:

> ". . . as required by Section 4.3(a)(iv) of the Agreement of Intent . . . RSA Data Security, Inc. hereby grants to Cylink Corporation ("CYLINK") an irrevocable option to license the right to make, use and sell products incorporating software provided by RSA practicing methods described in US Patent #4,405,829 by Rivest et al."

The parties are in dispute regarding whether the option provided in Exhibit 6 is the option which RSA was required to deliver under the terms of the Agreement of Intent. The panel has heard testimony, arguments and reviewed evidence regarding this point and the panel finds and orders as follows:

      (a)      The Agreement of Intent was an integrated agreement at least by virtue of the integration clause included at Article 12, Paragraph 12 of the General Partnership Agreement. The integrated agreement includes all written provisions of the General Partnership Agreement, the Agreement of Intent, Exhibit 6, the Cylink License Agreement and the RSA License Agreement.

      (b)      The language of Exhibit 6 unambiguously grants to Cylink an option to license the right to make, use and sell products which would otherwise infringe on the Licensed Rights licensed to RSA under the MIT agreement. This language is an option for a patent license, although a limited one. It is limited in the sense that, should Cylink choose to exercise its option, only products made, used or sold by Cylink incorporating software provided to Cylink by RSA would be licensed. Exhibit 6 was signed by an officer of Cylink and, therefore, must have been reasonably acceptable to Cylink. Therefore, the Panel finds that the option to license granted by Exhibit 6 fulfilled the obligations of RSA under Section 4.3(a)(iv) of the Agreement of Intent. To clarify a point, the parties in the RSA Motion for Judgment and in the Cylink Opposition both appear to base arguments somehow around the question of the effect of Exhibit 6 as a "software license". The Panel has found that Exhibit 6 is an option for a patent license and, therefore, the question of whether the grant of an option for a software license is effective as the delivered required under the Agreement of Intent,

Paragraph 4.3(a)(iv) is moot. The Panel recognizes the argument raised by Cylink in the Cylink Opposition that to change paragraph 4.3(a)(iv) to require a software license would controvert the intention of the parties. *See, Cylink Opposition, page 6.* However, again, the Panel finds what was granted by RSA was an option for a patent license. Cylink, in the Cylink Opposition, makes the statement that "all parties acknowledged that the software license option was ***not*** the patent sublicense option required by the Agreement of Intent." (emphasis original). *See, Cylink Opposition, page 6.* However, the Panel does not find evidence of such agreement and, even if it did, the Panel is of the opinion that the integrated agreements themselves are clear that an option for a patent license was required and an option for a patent license was granted and any parole evidence, even evidence of later agreement that Exhibit 6 was not a patent license, has no substantive effect.

(c)         Because the Panel finds the Agreement of Intent is an integrated agreement and the Panel finds the language of the Agreement of Intent and the language of Exhibit 6 is unambiguous, the Panel is not persuaded to consider the various arguments of Cylink relating to verbal statements that may or may not have been made before, during or after execution of the Agreement of Intent. The Panel, in essence agrees with the position of RSA, that "the agreements signed at the April 6, 1990 closing were a 'final, complete and exclusive' statement of the parties' agreement" (see RSA's Motion for Judgment, pp. 6) at least as to this issue.

Cylink argues in its closing brief ( See page 5) that RSA is estopped from refusing to grant to Cylink a patent license because Cylink reasonably relied to its detriment on the undisputed representation that Cylink could always have a patent

license. To the extent it is undisputed that RSA made such a representation, in a light most favorable to Cylink, there is a dispute regarding what the terms of such a patent license would be. To now say that Cylink is entitled to a license because it reasonably relied, to its detriment, on statements of RSA that a patent license would be available to Cylink without having clear agreement as to the terms of such license would be to say that a businessman is entitled to purchase a product, sale of which product typically is the subject of significant negotiation, simply because he was told by the owner of the product that it could be purchased without further discussion of price and other terms. This Panel simply does not find it to have been reasonable for Cylink to have relied to its detriment on statements such as "You can always have a patent license" absent evidence that the parties had also reached agreement as to what the terms of such license would be. The Panel does not find any evidence to show such an agreement was reached and, in fact, the evidence is to the contrary.

Cylink also argues in its closing brief (again, see page 5) that RSA was obligated, as a fiduciary in the PKP partnership, to allow PKP to offer a license under the MIT patent to Cylink. The Panel finds that to the extent there was an obligation on the part of RSA to allow PKP to offer a license to Cylink, PKP did offer such a license when it offered the "LEMCOM type" license to Cylink. The terms of the "LEMCOM type" license were apparently unacceptable to Cylink and Cylink did not accept the license offer. The panel finds that RSA was not obligated to offer terms different than the "LEMCOM type" license to Cylink as a result of any fiduciary obligation of RSA. Today, as a result of the dissolution of PKP, RSA no longer has a fiduciary obligation to offer any license, LEMCOM type or otherwise, to Cylink although it may obviously choose to do so.

We will now briefly touch on the question of whether Cylink is entitled to a license under the MIT patent as a result of any commitments PKP may have made to license the MIT patent on a non-discriminatory or similar basis. There has been

testimony and evidence that PKP did commit to standards organizations (ANSI) that it would license the MIT patent on a non-discriminatory basis if the invention claimed by the patent were adopted as a standard. Cylink has raised the question of whether the LEMCOM type license is non-discriminatory. The Panel does not find a need to address this question because the offer to the standards committee was subsequently withdrawn and, in any event, the invention claimed by the patent was not adopted as a standard. Therefore, at this point in time, PKP is not obligated as a result of agreements with standards organizations to license Cylink under the MIT patent.

To respond and rule on the May 18, 1995 Motion for Judgment and on Cylink's Cross Motion for Judgment, RSA asked this Panel for judgment on the issue of whether Cylink is entitled to a license under the April 6, 1990 agreements that effected the formation of PKP. In its motion, RSA urged this Panel to order that Cylink is not entitled to any license other than the license offered in Exhibit 6. In its opposition, Cylink took the position that RSA's Motion for Judgment could be granted only if paragraph 4.3(a)(iv) of the Agreement of Intent was written out of the contract. See, Cylink Opposition at page 1. Cylink argues and moves in the Cylink Opposition that it is entitled to judgment that RSA must deliver to Cylink an option to sublicense the MIT patent on terms acceptable to Cylink. For all of the reasons stated above, the Panel disagrees with Cylink's position that the Panel would be writing paragraph 4.3(a)(iv) out of the agreement by granting RSA's Motion for Judgment. Therefore, the Panel hereby grants RSA's Motion for Judgment and denies Cylink's Cross Motion for Judgment.

5.    Liabilities of the parties for breach of the agreements:    The Panel is now faced with the question of whether either party is liable to the other for any breach of the various provisions of the integrated agreements. Based on closing hearing transcript at pages 2062-2065, the Panel understands the issues regarding

liability which the parties are now asking for a decision on to be those issues for which relief is requested at page 20 of the Cylink Closing Brief and at page 20 of the RSA closing brief        .

       (a)        <u>Liability on the part of RSA</u>:    The issues which the Panel has been requested to decide by Cylink, and the Panel's findings and orders regarding those issues are as follows:

       (i)      <u>MIT patent license</u>:  Cylink has requested that this Panel find Cylink is entitled to a license in the form submitted with its Closing Brief. As was discussed in some detail above, the Panel has found that to the extent RSA was obligated to offer to grant to Cylink any license under the MIT patent, it has done so both by providing the option to license in Exhibit 6 and by allowing PKP to offer the "LEMCOM type" license to Cylink. Therefore, the Panel does not find Cylink to be entitled to a license in the form submitted and this request is denied.

       (ii)     <u>Breach of the Agreement by failure to deliver an MIT patent license</u>: Cylink has requested that this Panel find a breach of the Agreement of Intent by RSA's failure to deliver a patent license.  As the Panel has concluded that the required patent license was delivered as Exhibit 6, the Panel does not find a breach by RSA of the Agreement of Intent on this grounds.

       (iii)    <u>A finding that RSA materially breached the Partnership Agreement by violating Article 6. ¶12 and an order entitling Caro-Kann to remedies pursuant to Article 9. Paragraph 5(d) and Cal.Corp. Code §15038</u>:    As stated above, the Panel does not find sufficient evidence to hold that either party has breached Article 6, Paragraph 12 or, at least to the extent a party has breached this paragraph, the other party has as well and the Panel would find the parties to be equally at fault for breach. Further, even if there was a material breach, the Panel does not find evidence of the notice with opportunity to cure required by the

agreement. As a result, the request by Caro-Kann for an order entitling it to remedies pursuant to Article 9, Paragraph 5(d) and Cal. Corp.Code §15038 is denied.

As to other alleged breaches by RSA, the Panel does not at this time find it to be necessary to enter a finding of fault. However, if requested by Cylink or Caro-Kann, the Panel will consider the question of specific other alleged breaches and whether or not any such alleged breaches results in liability on the part of RSA.

(iv)    A finding against RSA on all of the claims tendered by it:    These claims and the panels findings will be discussed below.

(v)    A finding that neither Cylink or Caro-Kann committed any material breach of the partnership agreement:    Again, the Panel does not find sufficient evidence to hold that either party has breached Article 6, Paragraph 12 or, at least to the extent a party has breached this paragraph, the other party has as well and the Panel would find the parties to be equally at fault for breach. Further, even if there was a material breach, the Panel does not find evidence of the notice with opportunity to cure required by the agreement. Therefore, the Panel does not find any liability on the part of Cylink or Caro-Kann for any material breach of the partnership agreement.

(vi)    A finding that Cylink and Caro-Kann are not liable for the duties or conduct of each other:    The Panel finds that the corporate veil should not be pierced and that Cylink should not be liable for the liabilities of its subsidiary, Caro-Kann.

(vii)    A decree dissolving Public Key Partners:    The Panel has ordered Public Key Partners dissolved as of the date of this order consistent with the other orders and findings contained herein.

(b)    Liability on the part of Cylink / Caro-Kann: The issues which the Panel has been requested to decide by RSA, and the Panel's findings and orders regarding those issues are as follows:

        (i)    <u>A finding that Cylink has breached both the partnership agreement and its fiduciary duty owed to RSA and PKP and that RSA has been damaged thereby:</u>  As stated above, the Panel does not find sufficient evidence to hold that either party has breached Article 6, Paragraph 12 or, at least to the extent a party has breached this paragraph, the other party has as well and the Panel would find the parties to be equally at fault for breach.  Further, even if there was a material breach, the Panel does not find evidence of the notice with opportunity to cure required by the agreement.  Therefore, the Panel does not find any liability on the part of Cylink or Caro-Kann for any material breach of the partnership agreement.

        As to other alleged breaches by Cylink or Caro-Kann, the Panel does not at this time find it to be necessary to enter a finding of fault.  However, if requested by RSA, the Panel will consider the question of specific other alleged breaches and whether or not any such alleged breaches results in liability on the part of Cylink or Cara-Kann.

        (ii)    <u>A finding that RSA has not breached its contractual or fiduciary obligations owed to Cylink or PKP and that RSA has the right to continue to license software that incorporates both the MIT and Stanford Patented Technology:</u>  Again, the Panel does not find sufficient evidence to hold that either party has breached Article 6, Paragraph 12 or, at least to the extent a party has breached this paragraph, the other party has as well and the Panel would find the parties to be equally at fault for breach.  Further, even if there was a material breach, the Panel does not find evidence of the notice with opportunity to cure required by the agreement.  Therefore, the Panel does not find any liability on the part of RSA for any material breach of the partnership agreement.

As stated above, the Panel does not find it to be necessary to reach a decision at this time regarding any other alleged breaches and will withhold any such findings unless specifically requested to Cylink or Caro-Kann to enter such findings.

With respect to RSA's right to license software that incorporates the MIT and Stanford patented technology, the Panel finds as follows:

a)    Post-partnership formation licenses[1]: The Panel finds that RSA does not have the right to sublicense third-parties under the Stanford patents and has not had such right since entering into the partnership agreement on April 6, 1990. Therefore, after April 6, 1990, RSA has the the right to license its (RSA's) software to third-parties but does not have the right to license such third-parties under the Stanford patents. To the extent RSA provides code to third-parties which causes an infringement of a valid and enforceable claim of the Stanford patents, assuming the third party is not separately licensed under the Stanford patent, nothing in this order shall prevent Cylink from pursuing it rights under the Stanford patents against such third party. However, certain transactions between RSA and third-parties may be subject to the first sale doctrine. Nothing in this order is intended to remove application of that doctrine.

By way of example, if RSA provides a license of a single copy of its software, together with that copy of the software, to a third-party, the first sale doctrine will protect the third-party from any claim under the Stanford patents with respect to that individual copy. However, if RSA provides a license of its software, with right to prepare unlimited copies, to a third-party, the Panel finds that the first sale doctrine will not protect the third-party from suit on the Stanford patents.

b) Existing licensees: The Panel finds that RSA did have the right to sublicense the Stanford patents prior to April 6, 1990. Therefore, the Panel finds that any sublicense granted by RSA prior to April 6, 1990 is

---

[1]Nothing in this order shall effect the order previously issued by the Panel concerning Netscape.

not effected by this order and unless terminated pursuant to the terms of such license, is valid and allows the third-party rights under the Stanford patents as provided in the license.

(iii)   A finding that Cylink is not contractually entitled and RSA is not contractually obligated to provide to Cylink a license to the MIT patent:   As discussed above, except for the option to Cylink given in Exhibit 6, Cylink is not entitled to, contractually or under any of the other theories advanced by Cylink, a license to the MIT patent and RSA is, therefore, not obligated to provide any license to Cylink except the limited patent license afforded by Exhibit 6 if Cylink should choose to exercise its option.

(iv)   A finding that the partnership shall be dissolved:   The Panel has ordered Public Key Partners dissolved as of the date of this order consistent with the other orders and findings contained herein.

(v)   An order that Cylink shall pay to RSA any and all of the costs and expenses incurred by RSA in the Arbitration including actual attorneys fees, as set forth in Article 12, Paragraph 6 of the Partnership Agreement:   The Panel finds that neither party shall be entitled to an award of costs and expenses incurred to date in this arbitration.

IT IS SO ORDERED on this _____ 6<u>th</u> _____ day of _Septendur_,
1995.

By: _____
George C. Limbach, Esq.
Chairman of the Arbitration Panel

By: _____
Henry C. Bunsow, Esq.
Member of the Arbitration Panel

By: _____
David R. Halvorson
Member of the Arbitration Panel

2

FIRST AMENDMENT

TO

LICENSE AGREEMENT

Effective as of April 6, 1990, (the Effective Date) the BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, a body having corporate powers under the laws of the State of California ("STANFORD"), CYLINK CORPORATION, a corporation duly organized and existing under the laws of the State of California with its principal office at 110 South Wolfe Road, Sunnyvale, California 94086 ("CYLINK"), CARO-KANN CORPORATION, a corporation duly organized and existing under the laws of the State of California with its principal office at 130B Kifer Court, Sunnyvale, California, 94086 ("CKC") and PUBLIC KEY PARTNERS, a general partnership duly organized under the laws of the State of California and having its principal office at 130B Kifer Court, Sunnyvale, California, 94086 ("PKP"), agree, as follows:

## 1. BACKGROUND

1.1  Pursuant to a License Agreement effective August 25, 1989, between STANFORD and CYLINK, and all amendments thereto (the "Stanford Agreement"), CYLINK holds a license to United States Patent No. 4,200,770 entitled, "Cryptographic Apparatus and Method," Patent No. 4,218,582 entitled, "Public Key Cryptographic Apparatus and Method," and Patent No. 4,424,414 entitled, "Exponential Cryptographic Apparatus and Method" ("Licensed Patents"), as described in Stanford Dockets S77-012,

Final/April 6, 1990                    1

**EXHIBIT 2**

S77-015, S77-048 and the Stanford Agreement.

1.2   CKC and RSA Data Security Incorporated, a corporation duly organized and existing under the laws of the State of Delaware having its principal place of business at 10 Twin Dolphin Drive, Redwood City California, 94065 ("RSA"), have created PKP pursuant to the terms of their Agreement of Intent dated as of April 6, 1990 ("Agreement of Intent") and their Partnership Agreement dated as of April 6, 1990 (the "Partnership Agreement").   All references in this First Amendment to either the Partnership Agreement or the Agreement of Intent shall mean the provisions of said agreements as they existed at the time of their execution on April 6, 1990.   CKC will provide STANFORD with copies of the executed Partnership Agreement and all agreements referred to therein, as well as all amendments thereto.

1.3   Pursuant to the terms of the Agreement of Intent and the Partnership Agreement, CYLINK now intends to sublicense PKP under the Stanford Agreement, subject to all of its conditions and CYLINK's obligations thereunder, as amended herein, to authorize PKP to grant sublicenses with respect to the Licensed Patents.

1.4   To assist the formation of PKP and the sublicense of CYLINK's rights to PKP as herein provided, STANFORD and CYLINK now intend to amend the Stanford Agreement, as more particularly described herein.

Final/April 6, 1990                    2

1.5   The Licensed Patents are a result of inventions made in the course of research supported by the U.S. Government and may be subject to U.S. Public Law 96-517.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises herein contained, the parties agree as follows:

F I R S T   A M E N D M E N T

## 2.   SCOPE OF AMENDMENT; ADDITIONAL DEFINITIONS

2.1   This First Amendment shall serve to modify and amend those specific provisions of the Stanford Agreement expressly modified and amended herein.   Except as so expressly modified and amended, the Stanford Agreement shall remain in full force and effect and govern the respective rights and obligations of STANFORD and CYLINK thereunder.   Without limitation of the foregoing and except as expressly provided in Article 2 below, those definitions set forth in the Stanford Agreement shall apply to this First Amendment.

2.2   (a) The term "Licensed Field of Use" shall be amended from the original definition set forth in the Stanford Agreement to mean all fields.

(b) The term "Existing Agreement" means any license agreement under the Licensed Patent(s), and amendments thereto, if any, executed by STANFORD prior to August 25, 1989. The only Existing Agreements which have not been canceled by

Final/April 6, 1990            3

STANFORD, or otherwise terminated by law, are those granted to CYLINK, the Massachusetts Institute of Technology ("MIT") and Northern Telecom Limited ("NTL").

(c)   In addition to those defined terms referenced in Paragraph 2.1 and Subparagraphs 2.2(a) and 2.2(b) above, the following definitions shall apply for the purpose of this first Amendment.

(i)  "PKP", the "Stanford Agreement", the "Partnership Agreement" and the "Agreement of Intent" shall have the meanings set forth in the Preamble and Recitals to this Agreement.

(ii)   "PKP Dissolution" shall mean any "Termination by Dissolution" as defined in Article 9, Paragraph 1 of the Partnership Agreement.

(iii)  "Affiliate" shall mean any entity that is directly or indirectly controlled by, controls or under common control with a party hereto through the ownership of more than fifty percent (50%) of the outstanding stock thereof.

(iv)  "Termination by Purchase" shall have the meaning defined in Article 9, Paragraph 1 of the Partnership Agreement.

(v)   "Existing Sublicensee(s)" means any party licensed by CYLINK under the Stanford Agreement prior to December 1, 1989.  The Existing Sublicensees are identified in Attachment "A" annexed hereto.

(vi) "Existing Sublicense Agreements" means

Final/April 6, 1990                4

any sublicense agreement between CYLINK and Existing Sublicensee(s) granting rights to the Licensed Patent(s).

(vii) "Exclusive" means that, subject to Articles 3 and 4, herein, STANFORD and CYLINK shall not grant, as of the Effective Date, further licenses or sublicenses, respectively, to the Licensed Patent(s) in the Licensed Field of Use.

(viii) "PKP Distributions" means those distributions approved by PKP for payment to CKC in accordance with Paragraph 1, Article 5 of the Partnership Agreement.

### 3. GRANT

3.1   STANFORD agrees to amend Articles 1.3 and 2.4 of the Stanford Agreement to now grant to CYLINK the entire Licensed Field of Use, as defined by Paragraph 2.2(a) herein, including font encryption.   Without limitation of the foregoing, the license rights granted to CYLINK (and as sublicensed by CYLINK hereunder) shall extend to font encryption applications as part of the Licensed Field of Use.

3.2   CYLINK, which shall retain the right to make, use and sell the Licensed Products in the Licensed Territory pursuant to Article 4 of the Stanford Agreement, hereby grants to PKP the right to make, use, and sell the Licensed Products in the Licensed Territory.

3.3   STANFORD and CYLINK agree to amend the Stanford Agreement by deleting Subparagraphs 13.1(a) and 13.4, and

Final/April 6, 1990                    5

authorize CYLINK to grant to PKP the exclusive right to sublicense the Licensed Patents as provided in Subparagraph 3.4 below.

3.4   STANFORD and CYLINK grant to PKP the exclusive right, subject to Paragraph 3.8 below, to sublicense the Licensed Patents and to grant the right to make, use or sell the Licensed Products in the Licensed Territory.   STANFORD and CYLINK further grant PKP the right to grant sublicensing rights to Affiliates of PKP, to sublicense the Licensed Patents and to grant the right to make, use, or sell the Licensed Products in the Licensed Territory.

3.5   The rights granted in Paragraph 3.4 shall be Exclusive, for a term beginning on the Effective Date and ending, subject to early termination pursuant to Article 13 below, for each individual patent as defined under Licensed Patent(s), in every country where a patent has issued, as indicated in Attachment "B" annexed hereto, on the expiration date of each patent in such country.

3.6   Subject to MIT's consent, STANFORD agrees to irrevocably assign to PKP all of its right, title and interest in the Existing Agreement dated February 2, 1987, between STANFORD and MIT.   STANFORD further agrees to irrevocably assign to PKP all of its right, title and interest in the Existing Agreement dated August 14, 1979, between STANFORD and NTL.

Final/April 6, 1990                        6

3.7  CYLINK agrees that in the event that any Existing Sublicense has expired by its terms, CYLINK will not grant or extend additional licensing rights.

3.8  Notwithstanding any term or condition hereof, CYLINK shall retain the right to sublicense the Licensed Patents to any Affiliate of CYLINK, which shall also pay to PKP all royalties provided in the Stanford Agreement, as amended herein, provided that CYLINK and any such Affiliate(s) shall be treated as one entity for purposes of determining the amount of royalties owed.

3.9  All right, title and interest in sublicenses of rights covered by the Licensed Patents executed by CYLINK since December 1, 1989, if any, shall be assigned to PKP.

## 4.  GOVERNMENT RIGHTS

This First Amendment may be subject to all of the terms and conditions of Public Law 96-517 as amended, and PKP agrees to take all action necessary on its part as the sublicensee of CYLINK to enable STANFORD and CYLINK to satisfy their obligations thereunder, relating to Licensed Patent(s).

## 5.  ROYALTIES

5.1  For the rights, privileges and license granted hereunder, PKP shall pay to CKC the PKP Distributions as provided in Paragraph 1, Article 5 of the Partnership Agreement.

5.2  STANFORD and CYLINK agree to amend the Stanford

Final/April 6, 1990                 7

Agreement by providing that Article 6.6 shall not apply, except
for Existing Sublicenses, until termination of this First
Amendment pursuant to Paragraph 13.4, herein.  Upon termination
of this First Amendment due to PKP Dissolution, STANFORD agrees
to amend Article 6.6 by providing that the amount of STANFORD's
royalties will be determined after deducting all amounts owed by
CKC to RSA in accordance with the provisions of the Partnership
Agreement.

     5.3   CKC agrees to pay STANFORD a royalty for the
sublicensing rights granted PKP under Article 3 herein in the
amount of 20% of all PKP Distributions received by CKC in
accordance with the terms and conditions of the Partnership
Agreement.  Except as provided in this Paragraph 5.3 and
Paragraph 5.4, herein, no further royalty or other payments shall
be due or payable to STANFORD from CKC, CYLINK or PKP on the
basis of the exercise by PKP of its sublicense rights granted
pursuant to Article 3 hereof or in connection with any
sublicensing of the Licensed Patents or Licensed Products by PKP
in the Licensed Territory or the manufacture, use or sale of the
Licensed Products by PKP in the Licensed Territory.

     5.4   Commencing one year from the Effective Date CKC
guarantees to STANFORD that its share of earned royalties as
provided in Paragraph 5.3, herein, shall be not less than a
minimum of U.S. $15,000 per year until the year following
expiration in the United States of the last Licensed Patent.  All

Final/April 6, 1990                8

amounts paid pursuant to this guarantee shall be fully credited against earned royalties owed by CKC to STANFORD under Paragraph 5.3, herein, regardless of the year in which the earned royalties accrue.

5.5  CKC shall have a credit against all royalties payable to STANFORD under Paragraphs 5.3 and 5.4 herein equal to all credits in favor of NTL under the Existing Agreement dated August 14, 1979, and all amendments thereto, which presently total $180,246.  Such credits may be applied by CKC only to the extent of royalties hereinafter paid or credited by NTL under its Existing Agreement.

5.6  STANFORD and CYLINK agree to amend the Stanford Agreement by providing that all other royalties owed by CYLINK to STANFORD under Article 6 of the Stanford Agreement shall be paid to PKP for distribution in accordance with the terms of the Partnership Agreement.

<u>REPORTS, PAYMENTS AND ACCOUNTING</u>

6.1  Except for Existing Sublicense Agreement(s), Paragraphs 7.1, 7.2 and 7.3 of the Stanford Agreement are deemed amended by providing that CYLINK's obligations under said Paragraphs shall continue to be performed by CKC in favor of PKP.

6.2  The parties agree that the reports and accounting that CYLINK shall be required to provide or otherwise make

Final/April 6, 1990                    9

available pursuant to Article 7 of the Stanford Agreement with respect to PKP's sublicense hereunder shall set forth the amount and date of receipt by CKC of any PKP Distributions paid by PKP to CKC.  PKP shall not be required to provide any reports directly to STANFORD or otherwise make any of its accounting records available to STANFORD except to the extent reasonably requested by STANFORD to substantiate the amount of PKP Distributions owed by PKP to CKC.  Such records necessary to substantiate the amount of PKP Distributions shall be maintained by PKP for a minimum of three (3) years for review by STANFORD's auditors.  The cost of any such audit shall be borne by STANFORD unless discrepancies are discovered which have the net effect of increasing the amounts owed by CKC to STANFORD by at least 10% per annum for each year reviewed.

## 7.  NEGATION OF WARRANTIES

7.1  Nothing in this First Amendment is or shall be construed as:

(a)  A warranty or representation by STANFORD or CYLINK as to the validity or scope of any Licensed Patent(s).

(b)  A warranty or representation that anything made, used, sold, or otherwise disposed of under any license granted in this First Amendment is or will be free from infringement of patents, copyrights, and other rights of third parties;

(c)  An obligation to bring or prosecute actions or suits against third parties for infringement, except to the

Final/April 6, 1990                    10

extent and in the circumstances described in Article 11 herein, or

       (d)   Granting by implication, estoppel, or otherwise any licenses under patents of CYLINK, STANFORD or other persons other than the Licensed Patent(s), regardless of whether such patents are dominant or subordinate to any Licensed Patent(s).

      7.2   Except as expressly set forth in this Agreement, the Partnership Agreement and the Agreement of Intent, CYLINK AND STANFORD MAKE NO REPRESENTATIONS AND EXTEND NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED.   THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR THAT THE USE OF THE LICENSED PRODUCT(S) WILL NOT INFRINGE ANY PATENT, COPYRIGHT, TRADEMARK OR OTHER RIGHTS.

## 8.   INDEMNITY

      PKP agrees to indemnify, hold harmless, and defend CKC, CYLINK and STANFORD, including their trustees, directors, officers, employees, students and agents against any and all claims of any kind whatsoever including, without limitation, claims for death, illness, personal injury, property damage, economic losses and improper business practices arising out of the manufacture, use, sale or other disposition of Licensed Product(s) by PKP, its sublicensee(s), Affiliates or customers. Furthermore, CKC and CYLINK also agree to indemnify, hold harmless and defend STANFORD, including its trustees, directors,

officers, employees, students and agents against any and all
claims of any kind whatsoever including, without limitation,
claims for death, illness, personal injury, property damage,
economic losses and improper business practices arising out of
the manufacture, use, sale or other disposition of Licensed
Product(s) by PKP, its sublicensee(s), Affiliates or customers.

## 9.   MARKING

PKP agrees to mark Licensed Product(s) (or their
containers or labels), excluding integrated circuits and products
of similar marking difficulty, made, sold, or otherwise disposed
of by it under the license granted in this First Amendment with
the numbers of the Licensed Patent(s).

## 10.   PROMOTIONAL ADVERTISING

10.1   STANFORD agrees to direct all inquiries
concerning licensing of public key technology or the Licensed
Patents to PKP.

10.2   PKP agrees not to identify CYLINK or STANFORD,
including their faculty members, employees, agents or students,
in any promotional advertising or other promotional materials to
be disseminated to the public, or to use any trademark, service
mark, trade name, or symbol of STANFORD or CYLINK, or the
Stanford University Hospital, or such symbol that is associated
with either of them, without their prior written consent, which
shall not be unreasonably withheld for such purposes.

Final/April 6, 1990                    12

## 11.  INFRINGEMENT BY OTHERS: PROTECTION OF PATENTS

11.1  PKP shall promptly inform CYLINK and STANFORD of any suspected infringement of any Licensed Patent(s) by a third party.  STANFORD, CYLINK and PKP shall each have the right to institute an action for infringement of the Licensed Patent(s) against such third party in accordance with the following:

(a)  PKP may institute suit and, at its option, join CYLINK or STANFORD, or both, as plaintiffs, without cost to STANFORD or CYLINK.  If neither CYLINK or STANFORD notifies PKP in writing, within fifteen (15) days after notice from PKP, that either of them will join in enforcing the patent pursuant to the provisions hereof, this failure shall be deemed conclusively to be CYLINK's and STANFORD's assignment to PKP of all rights, causes of action and damages resulting from any such alleged infringement, and PKP shall be entitled to retain the entire amount of any recovery or settlement.  PKP shall bear the entire cost of such litigation.

(b)  If STANFORD and PKP agree to institute suit jointly, the suit shall be brought in both of their names, the out-of-pocket costs thereof shall be borne equally, and any recovery or settlement shall be shared equally.  STANFORD or PKP may, at their option, also join CYLINK as a plaintiff in which case STANFORD and PKP shall bear the entire cost of such litigation and they shall be entitled to retain the entire amount of any recovery or settlement, subject to CYLINK's right to receive a distribution of the recovery under the terms of the

Final/April 6, 1990                    13

Partnership Agreement.  PKP shall exercise control over such action.  However, STANFORD may, if it so desires, be represented by separate counsel of its own selection, the fees for which counsel shall be paid by STANFORD.

(c)  In the event STANFORD elects not to join in the suit with PKP, CYLINK and PKP may agree to institute suit jointly, The suit shall be brought in both of their names, the out-of-pocket costs thereof shall be borne equally, and any recovery or settlement shall be shared equally.  CYLINK or PKP may, at their option, also join STANFORD as a plaintiff in which case CYLINK and PKP shall bear the entire cost of such litigation and they shall be entitled to retain the entire amount of any recovery or settlement.

(d) In the absence of agreement by PKP, STANFORD may not institute or continue prosecution of any suit concerning infringement of the Licensed Patent(s) by any third party.

(e)  If both STANFORD and PKP decide not to join in or institute a suit, CYLINK may institute suit and, at its option, join STANFORD or PKP, or both, as plaintiffs.  If CYLINK decides to institute suit, it shall notify PKP and STANFORD in writing.  If neither STANFORD or PKP notifies CYLINK in writing, within fifteen (15) days after the date of notice that either of them will join in enforcing the patent pursuant to the provisions hereof, this failure shall be deemed conclusively to be PKP's and STANFORD's assignment of all rights, causes of action and damages resulting from any such alleged infringement, and CYLINK shall be

Final/April 6, 1990                    14

entitled to retain the entire amount of any recovery or settlement.   CYLINK shall bear the entire cost of such litigation.

11.2   Should STANFORD, CYLINK or PKP commence a suit under the provisions of Paragraph 11.1 and thereafter elect to abandon the same, it shall give timely notice to the other parties, who may, if they so desire, continue prosecution of such suit, provided however, that the sharing of expenses and any recovery shall be as agreed upon between the parties appearing in such suit.   An election to abandon such an action shall be deemed conclusively to be an assignment by the abandoning party in favor of those parties who elect to continue prosecution of all rights, causes of action and damages resulting from any such alleged infringement.

11.3   The foregoing Article 11 shall serve to replace and supersede Article 12 of the Stanford Agreement in its entirety.   In the event of termination of this First Amendment or PKP Dissolution for any reason prior to expiration of the Stanford Agreement, as amended herein, this Article 11 shall be terminated and cease to apply, and Article 12 of the Stanford Agreement shall thereafter govern the rights and obligations of CYLINK and STANFORD as to the subject matter thereof.

## 12.   COMMERCIAL APPLICATION, SUBLICENSES

12.1   STANFORD and CYLINK agree to amend the Stanford Agreement by deleting Paragraph 13.4 of said agreement, it being

Final/April 6, 1990                    15

expressly understood by STANFORD that PKP is the only party with the right to sublicense the Licensed Patents upon the terms provided herein.   PKP agrees to diligently exercise its best efforts to promote the recognition and use of the Licensed Patent(s) in the products of CKC, CYLINK, RSA their Affiliates and PKP's sublicensees in all fields.

12.2   Any sublicense granted by PKP under this First Amendment shall be subject and subordinate to the terms and conditions of the Stanford Agreement, as amended by this Agreement.   Any such sublicense of PKP also shall expressly include the provisions of Articles 7, 8, 9 and 10 of this First Amendment for the benefit of both STANFORD and CYLINK.

## 13.   TERMINATION

13.1   In the event of termination of this First Amendment, or upon PKP Dissolution, CKC will continue paying royalties to STANFORD as provided in Paragraph 5.3, herein, and Article 5, Subparagraph 2(d) of the Partnership Agreement.   In such event, all royalties received by CKC from sublicenses executed by PKP shall be deemed PKP Distributions.

13.2   STANFORD and CYLINK agree to amend Paragraph 13.3 of the Stanford Agreement by providing that termination of the Stanford Agreement shall not affect this First Amendment and PKP's rights to enjoyment of the sublicense and all exclusive sublicensing rights, as more particularly described herein.   In the event of termination of the Stanford Agreement while this

Final/April 6, 1990                 16

First Amendment remains effective, the rights of CYLINK, as licensor under this Agreement, shall revert to STANFORD and STANFORD shall continue to receive from CKC all payments it is entitled to receive pursuant to Paragraph 5.3 hereof.

13.3    The Stanford Agreement shall be amended to provide that any inability of CYLINK to perform its obligations under the Stanford Agreement due to a breach by PKP of this First Amendment shall not give rise to a right of termination of the Stanford Agreement by STANFORD.

13.4    Termination of the sublicense between CYLINK and PKP under this Agreement, and all rights attached thereto, shall occur only upon:

> (a)    The mutual consent of CKC and RSA; or
>
> (b)    PKP Dissolution.

13.5    In the event of termination of the sublicense under this First Amendment between CYLINK and PKP:

> (a)    All existing sublicense agreements entered into between PKP and any third parties shall continue until they terminate in accordance with their terms.  All royalties owed to PKP under such agreements shall be paid to CKC and RSA in accordance with the terms of the Partnership Agreement.
>
> (b)    PKP's license and its right to grant additional sublicenses as provided under this First Amendment shall cease immediately.
>
> (c)    PKP's license, and all of its rights under

Final/April 6, 1990                    17

this First Amendment to grant additional sublicenses, to the extent they cover the Licensed Patents, together with all rights as assignee of the Existing Agreements with MIT and NTL, shall be deemed automatically assigned to CKC.

13.6   Surviving any termination of the sublicense between CYLINK and PKP under this First Amendment are:

(a)   PKP's obligation to pay CKC its PKP Distributions as provided under the Partnership Agreement;

(b)   Any cause of action or claim of any party which has accrued or to accrue, because of any breach or default by any other party; and

(c)   The provisions of Articles 8, 10, 11 and 15.

## 14.   ASSIGNMENT

14.1   This First Amendment may not be assigned by either CKC, CYLINK or PKP, without the other parties' consent, except:

(a) As part of a sale or transfer of substantially the entire business of CYLINK or CKC relating to operations pursuant to this license; or

(b)   To an Affiliate of CYLINK or CKC.

14.2   In the event PKP ceases to exist due to a Termination by Purchase, as more particularly described in the Partnership Agreement, the exclusive sublicense and all sublicensing rights in favor of PKP, along with all other rights and obligations of PKP, shall be deemed automatically assigned to

Final/April 6, 1990                18

the purchasing partner, subject to the purchasing partner's agreement to continue satisfying all of CKC's obligations under this First Amendment. Upon the execution of such agreement by a purchasing partner other than CKC, then CKC shall be released from said obligation.

## 15. ARBITRATION

All disputes, controversies or differences between or among the parties arising out of or related to the Stanford Agreement or this First Amendment, which cannot be settled by discussion and mutual accord, shall be finally settled by arbitration. Each party shall be entitled to appoint one arbitrator, who shall not be an affiliate, officer, director, employee, agent, vendor or contractor of that party. The appointed arbitrators shall then appoint a neutral arbitrator who shall serve as Chairman, and the arbitration shall be conducted by the arbitrators so chosen. All arbitrators so appointed shall be experienced in the business of licensing intellectual property rights, and the Chairman shall be a practicing attorney in said field. The arbitration shall be conducted in Santa Clara County, California. Demand for arbitration shall be made in writing and shall be served upon the party or parties to whom the demand is addressed in the manner provided for the tender of notices in Article 16, hereof. If a party receiving a demand for arbitration does not appoint its arbitrator within 30 days after receiving such notice, the arbitrator(s) appointed by the other party or parties shall be further empowered to serve on behalf of

Final/April 6, 1990                    19.

the non-responding party.  The arbitrators are authorized to award any remedy, legal or equitable, as well as any interim relief as they deem appropriate in their discretion.  Application may be made to any court having jurisdiction over the proceedings to assist the arbitrators in performing their arbitral duties, to confirm their award and to enforce any such award as a judgement of said court.

### 16.  NOTICES

All notices under this First Amendment shall be deemed to have been fully given when done in writing and deposited in the United States mail, registered or certified, and addressed as follows:

TO   STANFORD:   Office of Technology Licensing
                 Stanford University
                 857 Serra Street, 2nd Floor
                 Stanford, Ca. 94305-62

                 Attention:      Director
                                 Technology Licensing

TO   CKC:        CKC Corporation
                 130B Kifer Court
                 Sunnyvale, Ca. 94086

                 Attention:      President or Chief
                                 Executive Officer

TO   CYLINK:     Cylink Corporation
                 110 South Wolfe Road
                 Sunnyvale, Ca. 94086

                 Attention:      President or Chief
                                 Executive Officer

Final/April 6, 1990              20

TO   PKP:          Public Key Partners
                   130B Kifer Court
                   Sunnyvale, Ca. 94086

                   Attention:       President

## 17.   WAIVER

The parties covenant and agree that if any party hereunder fails or neglects for any reason to take advantage of any of the terms hereof provided for the termination of this First Amendment heretofore, or if a party, having the right to declare this First Amendment terminated shall fail to do so, any such failure or neglect by such party shall not be or be deemed or be construed to be a waiver of any cause for the termination of this First Amendment theretofore or subsequently arising, or as a waiver of any of the terms, covenants, or conditions of this First Amendment or of the performance thereof.  None of the terms, covenants, and conditions of this First Amendment can be waived except by the written consent of the party waiving compliance.

## 18.   APPLICABLE LAW

This First Amendment shall be construed, interpreted, and applied in accordance with the laws of the State of California.

## 19. SCOPE OF AGREEMENT

This First Amendment, along with all other written agreements referred to herein, constitutes the entire agreement

Final/April 6, 1990                21

among the parties pertaining to the subject matter hereof.   No
representative of STANFORD, CKC, CYLINK or PKP has been
authorized to make any representation, warranty or promise not
contained herein.

IN WITNESS WHEREOF, the parties hereto have executed
this First Amendment in quadruplicate originals by their duly
authorized officers or representatives.

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY

By _Katharine Ku_

Title _Acting Director Technology Licensing_

Date _4-6-90_

CARO-KANN CORPORATION

By _Robert B forgren_

Title _Corporator & President_

Date _4/6/90_

CYLINK CORPORATION

By _Lewis C Morris_

Title _C.E.O & President_

Date _4/6/90_

PUBLIC KEY PARTNERS

By _D James Bidzos_

Title _President_

Date _4-6-90_

Final/April 6, 1990                    22

ATTACHMENT "A"
FIRST AMENDMENT TO LICENSE AGREEMENT
DATED AUGUST 23, 1989

<u>Existing Sublicensees</u>:

Ricoh Company, Ltd.

Copies of the Existing Sublicense Agreements are available from Cylink Corporation at the request of either partner to Public Key Partners.

Final/April 6, 1990

3

JAMES R. BUSSELLE (SBN 75980)
THOMAS E. MOORE III (SBN 115107)
MARY E. O'BYRNE (SBN 121067)
TOMLINSON ZISKO MOROSOLI & MASER
200 Page Mill Road, Second Floor
Palo Alto, California 94306
Telephone:  (415) 325-8666

Attorneys for Plaintiff
RSA Data Security, Inc.

ORIGINAL
FILED

SEP 15 1995

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

C95 - 03256 WHO

RSA DATA SECURITY, INC., a         )   CASE NO.:
Delaware Corporation,              )
                                   )
            Plaintiff,             )   COMPLAINT FOR DECLARATORY
                                   )   JUDGMENT AND INJUNCTIVE
vs.                                )   RELIEF, AND DEMAND FOR JURY
                                   )   TRIAL
CYLINK CORPORATION, a California   )
Corporation, CARO-KANN            )
CORPORATION, a California          )
Corporation and THE BOARD OF       )
TRUSTEES OF THE LELAND STANFORD    )
JUNIOR UNIVERSITY, a California    )
Corporation                        )
                                   )
            Defendants.            )
_____)

For its Complaint against Defendants, Plaintiff, RSA Data

Security, Inc., alleges as follows:

1.    This is an Action for Declaratory Judgment that United

States Patents 4,200,770, 4,218,582, and 4,424,414 (the "Stanford

Patents") are invalid, unenforceable and not infringed by

Plaintiff.  This Action arises under the Declaratory Judgment

1   Act, 28 U.S.C. §§ 2201, 2202, and the Patent Laws of the United

2   States, Title 35, United States Code.

3       2.   This Court has jurisdiction under 28 U.S.C. §§ 1331

4   and 1338.   Venue is proper under 28 U.S.C. §§ 1391(b), 1391(c)

5   and 1400(b).

6       3.   Intradistrict assignment is proper in the San Jose

7   Division because the defendants are found in Santa Clara County

8   and a substantial part of the events which give rise to the claim

9   took place in that county.

10      4.   Plaintiff RSA Data Security, Inc., ("RSA") is, and at

11  all times herein mentioned was, a Delaware corporation with its

12  principal place of business in Redwood City, California.   RSA is

13  in the business of developing, manufacturing and selling data

14  encryption software.

15      5.   Defendant Cylink Corporation ("Cylink") is, and at all

16  times herein mentioned was, a California corporation with its

17  principal place of business in Sunnyvale, California.   Cylink is

18  in the business of developing, manufacturing and selling data

19  encryption software and hardware as well as other products.

20      6.   Defendant Caro-Kann Corporation ("CKC") is, and at all

21  times herein mentioned was, a California corporation with its

22  principal place of business in Sunnyvale, California.   CKC is a

23  wholly-owned subsidiary of defendant Cylink; and CKC's sole

24  business is to hold sub-licensing rights to the Stanford Patents

25  on behalf of Cylink.

26      7.   Defendant, The Board of Trustees of The Leland

27  Stanford Junior University ("Stanford") is, and at all times

28  herein mentioned was, a body having corporate powers under the

TOMLINSON, ZISKO, MOROSOLI & MASER
ATTORNEYS AT LAW
200 PAGE MILL ROAD, SECOND FLOOR
PALO ALTO, CALIFORNIA 94306
(415) 325-8666

RSA'S COMPLAINT FOR          -2-
DECLARATORY RELIEF...

44690.2

TOMLINSON, ZISKO, MOROSOLI & MASER
ATTORNEYS AT LAW
200 PAGE MILL ROAD, SECOND FLOOR
PALO ALTO, CALIFORNIA 94306
(415) 325-8666

laws of the State of California.   Defendants Cylink, Caro-Kann and Stanford University are collectively referred to as "Defendants".

8.   On or about April 29, 1980, U.S. Letter Patent No. 4,200,770 entitled "Cryptographic Apparatus and Method" was issued to inventors Martin E. Hellman, Whitfield Diffie and Ralph C. Merkle (the "Diffie-Hellman Patent").

9.   On or about August 19, 1980, U.S. Letter Patent No. 4,218,582 entitled "Public Key Cryptographic Apparatus and Method" was issued to Martin E. Hellman and Ralph C. Merkle (the "Hellman-Merkle Patent").

10.   On or about January 3, 1984, U.S. Patent 4,424,414, entitled "Exponentiation Cryptographic Apparatus and Method", was issued to Martin E. Hellman and Steven C. Pohlig.

11.   RSA is informed and believes and on that basis alleges that Defendant Stanford is the owner of all right, title and interest and to the Stanford Patents and that Cylink and its wholly-owned subsidiary, Defendant CKC, have licensing rights to the Stanford Patents.

12.   RSA holds license rights to the Stanford Patents to make, have made, use and sell products which implement the technology described and claimed in such patents.

13.   At various times in the past, Cylink and/or CKC have alleged that at least the Diffie-Hellman and Hellman-Merkle Patents cover all known means of practicing what is known as public key cryptography, including the means of practicing public key cryptography as implemented in the data encryption software manufactured and licensed by RSA.

14.   Since on or about March 1995 to the present, Defendants Cylink and CKC have asserted that the rights granted to RSA under the Stanford Patents do not extend to the use by RSA's customers of RSA's software data encryption products for use by end-users.  RSA is informed and believes and on that basis alleges that Cylink and CKC regard RSA's customers as infringers of such patents and that RSA contributed to and/or induced such customers to infringe such patents.

15.   RSA is also informed and believes and on that basis alleges that Cylink, CKC and their agents have threatened, expressly and impliedly, licensees and customers of RSA with actions for infringement of the Stanford Patents.

16.   There is a substantial and continuing justiciable controversy among the parties as to the validity, infringement and enforceability of the Stanford Patent and the scope of RSA's license rights to the Stanford Patents.

17.   The Stanford Patents are not infringed by Plaintiff or its customers and are invalid and void, because they lack novelty as required by Section 102 and/or are obvious under Section 103 of Title 35, United States Code.

18.   The Stanford Patents are invalid and void under 35 U.S.C. 112, because the specifications do not contain a written description of the alleged inventions in such full, clear, concise and exact terms as to enable persons skilled in the art to which such patents pertain or are most nearly connected to practice the alleged inventions, nor set forth the best mode for carrying out the alleged invention, and the claims do not

TOMLINSON, ZISKO, MOROSOLI & MASER
ATTORNEYS AT LAW
200 PAGE MILL ROAD, SECOND FLOOR
PALO ALTO, CALIFORNIA 94306
(415) 325-8666

TOMLINSON, ZISKO, MOROSOLI & MASER
ATTORNEYS AT LAW
200 PAGE MILL ROAD, SECOND FLOOR
PALO ALTO, CALIFORNIA 94306
(415) 325-8666

1    particularly point out and distinctly claim the subject matter

2    which the applicants regard as their alleged inventions.

3        19.   The Stanford Patents are not infringed by Plaintiff or

4    its customers because of Plaintiff's license rights to the

5    Stanford Patents.

6        20.   Defendants are barred by the doctrine of laches from

7    maintaining a claim for the alleged infringement of the Stanford

8    Patents against Plaintiff, due to Defendants' unreasonable and

9    inexcusable delay in bringing suit which operated to the

10   prejudice or injury of Plaintiff.

11       21.   Defendants are estopped from maintaining a claim for

12   the alleged infringement of the Stanford Patents against

13   Plaintiff due to Defendants' inexcusable and unreasonable delay

14   in bringing suit, thereby misleading Plaintiff to rely upon

15   Defendants' inaction and infer reasonably that Defendants did not

16   intend to enforce such patents against Plaintiff, to the material

17   prejudice of Plaintiff.

18       22.   Because of statements, representations, admissions and

19   amendments made to the United States Patent and Trademark Office

20   during the prosecution of the applications which matured into the

21   Stanford Patents, Defendants are estopped to assert that the

22   claims of such patents encompass or are infringed by any product

23   manufactured, used or sold by Plaintiff or its customers.

24       23.   The Stanford Patents are unenforceable because of

25   Defendants' unclean hands in connection with the prosecution and

26   examination of the applications which matured into the Stanford

27   Patents due to the failure to reveal to the United States Patent

28   and Trademark Office information material to the examination of

TOMLINSON, ZISKO, MOROSOLI & MASER
ATTORNEYS AT LAW
200 PAGE MILL ROAD, SECOND FLOOR
PALO ALTO, CALIFORNIA 94306
(415) 325-8666

1  applications and misleading and inaccurate representations during

2  prosecution.

3       WHEREFORE, Plaintiff asks that this Court enter judgment in

4  favor of Plaintiff and against Defendants:

5       (a)  Declaring United States Patents 4,200,770, 4,218,582,

6  and 4,424,414 and each claim thereof invalid, unenforceable and

7  not infringed by Plaintiff;

8       (b)  Declaring the case to be exceptional, in favor of

9  Plaintiff, pursuant to 35 U.S.C. 285;

10      (c)  Awarding Plaintiff its costs, costs in excess of

11  taxable costs; and attorneys' fees in this action;

12      (d)  Enjoining Defendants, their officers, agents,

13  servants, employees, and attorneys, and those persons in active

14  concert or participation with them who receive actual notice

15  thereof, preliminarily and permanently, from enforcing or

16  attempting to enforce or threatening to enforce against Plaintiff

17  and any customer or potential customer or Plaintiff, United

18  States Patents 4,200,770, 4,218,582 and 4,424,414 or any claim

19  thereof; and

20      (e)  Awarding Plaintiff such other and further relief as

21  this Court deems equitable and just.

22

23  DATED:   September 15, 1995        TOMLINSON ZISKO MOROSOLI & MASER

24

25                                     By: _____
26                                         James R. Busselle
                                           Attorneys for Plaintiff
27                                         RSA Data Security, Inc.

28

RSA'S COMPLAINT FOR                    -6-
DECLARATORY RELIEF...

44690.2

1

## DEMAND FOR JURY TRIAL

2      Plaintiff RSA Data Security, Inc. hereby demands trial by

3  jury of all issues triable of right by jury.

4

5  DATED:   September _15_, 1995          TOMLINSON ZISKO MOROSOLI & MASER

6

7                                         By: _James R. Busselle_

8                                         James R. Busselle
                                          Attorneys for Plaintiff
9                                         RSA Data Security, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

1  Thomas R. Hogan, Esq., California State Bar No. 042048
   LAW OFFICES OF THOMAS R. HOGAN
2  60 South Market Street, Suite 1125
   San Jose, CA  95113-2332
3  Telephone:  (408) 292-7600

4
   Attorneys for Defendant
5  PUBLIC KEY PARTNERS

6

7

8                 UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  ROGER SCHLAFLY,                )    No. CV 94 20512 SW
                                   )
12        Plaintiff,               )    DEFENDANT PUBLIC KEY PARTNERS'
                                   )    RESPONSES TO FIRST PLAINTIFF
13  v.                             )    INTERROGATORY
                                   )
14  PUBLIC KEY PARTNERS and        )
    RSA DATA SECURITY, INC.,       )
15                                 )
          Defendants.              )
16  _____)

17

18     PROPOUNDING PARTY:  Plaintiff, ROGER SCHLAFLY

19     RESPONDING PARTY:   Defendant, PUBLIC KEY PARTNERS

20     SET NUMBER:         One

21        Pursuant to Federal Rule of Civil Procedure 33, defendant

22  Public Key Partners ("PKP") does hereby respond to the

23  interrogatories propounded by Plaintiff as follows:

24                      GENERAL OBJECTIONS

25     The following general responses are incorporated by reference

26  into each and every response to interrogatories herein:

27

28
    PKP'S RESPONSE TO PLAINTIFF
    FIRST INTERROGATORY
                            EXHIBIT 4

1  The information provided in these responses is based on a

2  good faith investigation by Defendant PKP.  However, discovery in

3  this case is not complete and Defendant PKP, through investigation

4  and discovery, may learn additional facts responsive to these

5  interrogatories.  Defendant PKP reserves the right to introduce

6  into evidence all additional information responsive to these

7  interrogatories which is discovered after the date of these

8  responses.

9  Defendant PKP objects to each and every interrogatory to

10  the extent that it purports to call for the production of matters

11  protected by the attorney work product doctrine, the attorney-

12  client privilege, and to the extent it seeks confidential

13  financial and business information.  Defendant PKP further objects

14  to these interrogatories to the extent they are burdensome,

15  oppressive, vexatious, vague, ambiguous, and not calculated to

16  lead to the discovery of admissible evidence.

17  Notwithstanding and without waiving the general objections

18  set forth above, Defendant PKP responds as follows:

19  INTERROGATORY NO. 1

20  Please identify all persons answering and assisting in the

21  answering of this interrogatory.

22  RESPONSE TO INTERROGATORY NO. 1

23  Robert B. Fougner, Caro-Kann Corporation, 910 Hermosa,

24  Sunnyvale, California  94087; PKP's attorney, Thomas R. Hogan and

25  his legal assistant, Leslie Holmes.

26  ////

27

28

1  INTERROGATORY NO. 2

2      Please identify all persons known to have knowledge of the

3  facts regarding PKP licensing policy and validity of PKP patents.

4  RESPONSE TO INTERROGATORY NO. 2

5      Objection:  Defendant PKP objects to this interrogatory on

6  the ground that it is vague, ambiguous and unintelligible as

7  defendant PKP has to speculate as to the meaning of "policy" as

8  used in this interrogatory.  Defendant PKP further objects on the

9  ground that this interrogatory is not limited in time and is

10  therefore burdensome and oppressive.

11      Without waiving said objection, and assuming that "policy"

12  refers to PKP's policy for granting patent licenses, defendant PKP

13  responds as follows:

14      Robert B. Fougner and D. James Bidzos

15

16  INTERROGATORY NO. 3

17      Please identify expected expert witnesses, if any, and the

18  corresponding subject matter.

19  RESPONSE TO INTERROGATORY NO. 3

20      Unknown at this time.

21

22  INTERROGATORY NO. 4

23      What is PKP's current policy for granting patent licenses?

24  RESPONSE TO INTERROGATORY NO. 4

25      Objection:  Defendant PKP objects to this interrogatory on

26  the ground that it is vague, ambiguous and unintelligible as

27  defendant PKP has to speculate as to the meaning of "policy" as

28

PKP'S RESPONSE TO PLAINTIFF
FIRST INTERROGATORY                    3

1  used in this interrogatory.  Defendant PKP further objects on the
2  ground that this interrogatory is not limited in time and is
3  therefore burdensome and oppressive.

4      Without waiving said objections, and assuming that "policy"
5  refers to PKP's policy for granting patent licenses, defendant PKP
6  responds as follows:

7      License terms typically include a signing fee and a minimum
8  annual royalty payment.  Terms and conditions are negotiated on a
9  case by case basis.

10

11  INTERROGATORY NO. 5
12      What has the policy been in the past?
13  RESPONSE TO INTERROGATORY NO. 5
14      Objection:  Defendant PKP objects to this interrogatory on
15  the ground that it is vague, ambiguous and unintelligible as
16  defendant has to speculate as to the meaning of "policy" as used
17  in this interrogatory.  Defendant PKP further objects on the
18  ground that this interrogatory is not limited in time and is
19  therefore burdensome and oppressive.

20      Without waiving said objection, and assuming that "policy"
21  refers to PKP's policy for granting patent licenses, defendant PKP
22  responds as follows:

23      The same as set forth in Response to Interrogatory No. 4.

24

25  INTERROGATORY NO. 6
26      How are royalties and license fees negotiated?

27

28

PKP'S RESPONSE TO PLAINTIFF                    4
FIRST INTERROGATORY

1   RESPONSE TO INTERROGATORY NO. 6

2       Objection:  Defendant PKP objects to this interrogatory on

3   the ground it is vague, ambiguous and unintelligible in that

4   defendant has to speculate as to the meaning of the words

5   "royalties" and "license fees".  Defendant PKP further objects on

6   the grounds that this interrogatory is not limited in time and is

7   therefore burdensome and oppressive.

8       Without waiving said objections, and assuming that

9   "royalties" and "license fees" are meant to be payment for use of

10  a patent license, defendant responds as follows:

11      These are negotiated on a case by case basis during

12  discussions with prospective licensees.

13

14  INTERROGATORY NO. 7

15      On RSADSI products such as BSAFE, how is a determination made

16  as to what portion of fees is for patent license?

17  RESPONSE TO INTERROGATORY NO. 7

18      Objection:  Defendant PKP objects to this interrogatory on

19  the ground that it is vague, ambiguous and unintelligible in that

20  defendant has to speculate as to the meaning of the word

21  "determination."

22      Without waiving said objection, Defendant PKP responds as

23  follows:

24      Defendant PKP lacks sufficient information to respond to this

25  interrogatory and believes it is directed to Defendant RSA Data

26  Security, Inc.

27

28

1  INTERROGATORY NO. 8

2      Identify all parties receiving royalties on PKP patents.

3  RESPONSE TO INTERROGATORY NO. 8

4      Objection:  Defendant PKP objects to this interrogatory on

5  the ground that it is not limited in time or scope and is

6  therefore burdensome and oppressive.  Without waiving said

7  objection and limiting this response only to the patents in which

8  Plaintiff has stated that he has originally inquired into,

9  defendant responds as follows:

10      Public Key Partners

11

12  INTERROGATORY NO. 9

13      Did Fougner, Bidzos, or any of their representatives ever

14  tell anyone that ISC would not be getting a PKP license?  If so,

15  state particulars.

16  RESPONSE TO INTERROGATORY NO. 9

17      Objection:  Defendant PKP objects to this interrogatory on

18  the ground that it is vague, ambiguous and unintelligible in that

19  defendant has to speculate as to the meaning of the word

20  "representatives."

21      Without waiving said objection, Defendant PKP responds as

22  follows:

23      Defendant PKP is unaware of any information responsive to

24  this interrogatory other than information already disclosed to

25  Plaintiff, specifically, the Exhibits to Plaintiff's Complaint and

26  the documents previously produced.  Discovery is continuing.

27

28

1   INTERROGATORY NO. 10

2       Did Fougner, Bidzos, or any of their representatives ever

3   tell anyone that SecretAgent infringes PKP patents, or is

4   otherwise illegal?  If so, state particulars.

5   RESPONSE TO INTERROGATORY NO. 10

6       Objection:  Defendant PKP objects to this interrogatory on

7   the ground that it is vague, ambiguous and unintelligible in that

8   defendant has to speculate as to the meaning of the word

9   "representatives."

10      Without waiving said objection, Defendant PKP responds as

11  follows:

12      Defendant PKP is unaware of any information responsive to

13  this interrogatory other than information already disclosed to

14  Plaintiff, specifically, the Exhibits to Plaintiff's Complaint and

15  the documents previously produced.

16

17  INTERROGATORY NO. 11

18      Does PKP claim that the DSA (as specified in the Digital

19  Signature Standard) infringes PKP patents?  If so, what is the

20  basis?  Which patents?  Which claims?

21  RESPONSE TO INTERROGATORY NO. 11

22      Yes.  Defendant PKP believes the DSA reads on one or more

23  claims of the Diffie-Hellman, Hellman-Merkle patents.  Discovery

24  is continuing.

25

26

27

28

PKP'S RESPONSE TO PLAINTIFF                    7
FIRST INTERROGATORY

INTERROGATORY NO. 12

Does PKP regard ElGamal public key technology, as specified in Exhibit AE of the Amended Complaint, an infringement of its patents?  If so, what is the basis?  Which patents?  Which claims?

RESPONSE TO INTERROGATORY NO. 12

Yes.  Defendant PKP believes the ElGamal public key technology reads on one or more claims of the Diffie-Hellman, Hellman-Merkle patents.  Discovery is continuing.


INTERROGATORY NO. 13

Does PKP regard elliptic curve public key technology (for encryption, signatures, or key exchange) as an infringement of its patents?  (An elliptic curve specification is in Exhibit AF of the Amended Complaint.)  If so, what is the basis?  Which patents? Which claims?

RESPONSE TO INTERROGATORY NO. 13

Yes.  Defendant PKP believes the elliptic curve public key technology reads on one or more claims of the Diffie-Hellman, Hellman-Merkle patents.  Discovery is continuing.


INTERROGATORY NO. 14

How did PKP obtain the rights to the Schnorr?  How was the inventor compensated?

RESPONSE TO INTERROGATORY NO. 14

Defendant PKP entered into a license agreement with Dr. Schnorr.  Dr. Schnorr is compensated by a distribution of a portion of PKP's revenues.

1 | INTERROGATORY NO. 15

2 |     Do some patent licensees pay royalties at different rates?

3 | RESPONSE TO INTERROGATORY NO. 15

4 |     Objection:  Defendant PKP objects to this interrogatory on

5 | the ground that it is vague, ambiguous and unintelligible in that

6 | Defendant PKP has to speculate as to the meaning of the words

7 | "different" and "rates" as used in this interrogatory.

8 |     Without waiving said objections, Defendant PKP responds as

9 | follows:

10 |     Yes.

11 |

12 | INTERROGATORY NO. 16

13 |     Is the licensing of the Stanford patents handled differently

14 | from the licensing of the MIT (RSA) patent?  What is the

15 | difference?  Why?

16 |

17 | RESPONSE TO INTERROGATORY NO. 16

18 |     Objection:  Defendant PKP objects to this interrogatory on

19 | the ground that it is vague, ambiguous and unintelligible in that

20 | defendant has to speculate as to the meaning of "handled" as used

21 | in this interrogatory.

22 |     Without waiving said objection, Defendant PKP responds as

23 | follows:

24 |     Licensing is on a case by case basis.

25 |

26 | INTERROGATORY NO. 17

27 |     What is the lowest royalty being paid for PKP licenses?

28 |

PKP'S RESPONSE TO PLAINTIFF
FIRST INTERROGATORY                    9

1  RESPONSE TO INTERROGATORY NO. 17

2      Objection:  Defendant PKP objects to this interrogatory on

3  the ground that it is unintelligible.

4

5  INTERROGATORY NO. 18

6      Why are some rates different (if they are)?

7  RESPONSE TO INTERROGATORY NO. 18

8      Objection:  Defendant PKP objects to this interrogatory on

9  the ground that it is vague, ambiguous and unintelligible in that

10  defendant PKP has to speculate as to the meaning of the words

11  "rates" and "different" as used in this interrogatory.

12      Defendant PKP further objects on the ground that the

13  information sought is confidential.

14      Without waiving said objections, and assuming that the word

15  "rates" means the amount of royalties paid, defendant PKP responds

16  as follows:

17      Licenses are negotiated on a case by case basis.

18

19  INTERROGATORY NO. 19

20      Does RSADSI use the Hellman-Merkle knapsack algorithm in any

21  of its products?  If not, why not?

22

23  RESPONSE TO INTERROGATORY NO. 19

24      Defendant PKP lacks sufficient information to respond to this

25  interrogatory and believes it is directed to Defendant RSA Data

26  Security, Inc.

27

28

PKP'S RESPONSE TO PLAINTIFF                10
FIRST INTERROGATORY

1  INTERROGATORY NO. 20

2      When did PKP gain knowledge which convinced it that Schlafly

3  is infringing PKP patents, as asserted in the counterclaims?

4  RESPONSE TO INTERROGATORY NO. 20

5      Objection:  Defendant PKP objects to this interrogatory on

6  the ground that it is vague, ambiguous and unintelligible in that

7  Defendant PKP has to speculate as to the meaning of the word

8  "convince" as used in this interrogatory.

9      Without waiving said objection, defendant PKP responds as

10  follows:

11      Prior to January 12, 1994, PKP obtained material referred to

12  in its letter of that date (Exhibit D to Plaintiff's Complaint)

13  which led it to believe that Plaintiff was infringing PKP patents.

14

15  INTERROGATORY NO. 21

16      Does Fougner have a "smoking gun" to invalidate the RSA

17  patent?  What is it?

18  RESPONSE TO INTERROGATORY NO. 21

19      Objection:  Defendant PKP objects to this interrogatory on

20  the ground that it is vague, ambiguous and unintelligible in that

21  Defendant PKP has to speculate as to the meaning of the words

22  "smoking gun" as used in this interrogatory.  Mr. Fougner has

23  never referred to a "smoking gun" and would not likely make any

24  such statement.

25  ////

26

27

28

PKP'S RESPONSE TO PLAINTIFF                    11
FIRST INTERROGATORY

1    Defendant PKP further objects to this interrogatory on the

2  ground that it seeks information protected by the attorney-client

3  and the attorney work-product privileges.

4

5  Dated: *April 27, 1995*

THOMAS R. HOGAN

6

7  Attorneys for Defendant
   PUBLIC KEY PARTNERS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PKP'S RESPONSE TO PLAINTIFF                12
FIRST INTERROGATORY

TOTAL P.13

5

S77-012,-015,-048:JMK
9/25/89
Exclusive Patent and Technology
License Agreement

## LICENSE AGREEMENT

Effective as of August 25, 1989, THE BOARD OF
TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, a body having
corporate powers under the laws of the State of California
("STANFORD"), and CYLINK CORPORATION, having a principal place of
business at 110 South Wolfe Road, Sunnyvale, California  94086
("CYLINK"), agree as follows:

## 1.  BACKGROUND

1.1 -- STANFORD has an assignment to the United
States Letter Patent Nos. 4,200,770 entitled, "Cryptographic
Apparatus and Method," and 4,218,582 entitled, "Public Key
Cryptographic Apparatus and Method," and 4,424,414 entitled,
"Exponential Cryptographic Apparatus and Method" ("Licensed
Patent[s]"), as described in Stanford Dockets S77-012, S77-015,
and S77-048, respectively.

1.2 -- CYLINK was formerly known as Omnet. Omnet
and STANFORD are parties to a June 24, 1985, License Agreement
amended September 26, 1985, and December 13, 1985, and modified by
Letter Agreements dated July 6, 1987, and August 4, 1987
("Original Agreement")

1.3 -- CYLINK and STANFORD wish to restructure the
existing license under the Licensed Patent(s) for the purpose of
undertaking development; to manufacture, use, and sell Licensed

Confidential Business
Information Protected By
Court Order

-1-

EXHIBIT 5

CYL-A-044788

Product(s); and sublicense the Licensed Patent(s) in all fields of use except font encryption.

      1.4 -- The Licensed Patent(s) are a result of inventions made in the course of research supported by the U.S. Government and are subject to U.S. Public Law 96-517.

## 2.  DEFINITIONS

      2.1 -- "Licensed Patent(s)" means United States Letter Patent Nos. 4,200,770 entitled, "Cryptographic Apparatus and Method," and 4,218,582 entitled, "Public Key Cryptographic Apparatus and Method," and 4,424,414 entitled, "Exponential Cryptographic Apparatus and Method," and all foreign patents corresponding thereto as detailed in Attachment A, and/or any divisions, continuations, or reissue thereof.

      2.2 -- "Licensed Product(s)" means any product or part thereof in the Licensed Field of Use and the Licensed Territory, the manufacture, use, or sale of which is covered by a valid claim of an issued, unexpired Licensed Patent(s). A claim of an issued, unexpired Licensed Patent(s) shall be presumed to be valid unless and until it has been held to be invalid by a final judgement of a court of competent jurisdiction from which no appeal can be or is taken.

      2.3 -- "Net Sales" means the gross selling price of the Licensed Product(s) in the form in which it is sold, whether or not assembled (and without excluding therefrom any components or subassemblies thereof, whatever their origin and whether or not

Confidential Business
Information Protected By
Court Order

-2-

CYL-A-044789

patent impacted), less the following items but only insofar as they actually pertain to the sale of such Licensed Product(s) by CYLINK or its sublicensee(s) or any of its affiliates, and are included in such gross selling price, and such items (except Items [a] and [f]) are separately billed:

        (a)   Usual trade discounts actually allowed (other than cash discounts, advertising allowances, fees, or commissions to any employees);

        (b)   Packing costs;

        (c)   Import, export, excise, and sales taxes, plus custom duties;

        (d)   Costs of insurance, packing, and transportation from the place of manufacture to the customer's premises or point of installation;

        (e)   Costs of installation at the place of use; and

        (f)   Credit for returns, allowances, or trades.

    2.4 -- "Licensed Field of Use" means all fields except font encryption.

    2.5 -- "Licensed Territory" means worldwide.

    2.6 -- "Existing Licensee(s)" means any party licensed by STANFORD under the Licensed Patent(s) before August 25, 1989. Existing Licensee(s) include Massachusetts Institute of Technology, Northern Telecom, Public Key Systems, and Harris Corporation.

Confidential Business
Information Protected By
Court Order

CYL-A-044790

2.7 -- "Existing Agreement(s)" means any license agreement between STANFORD and Existing Licensee(s) granting rights to the Licensed Patent(s).

2.8 -- "Exclusive" means that STANFORD shall not grant, as of August 25, 1989, further licenses to the Licensed Patent(s) in the Licensed Field of Use, subject to Article 5.

2.9 -- "Legal Expenses" means expenses incurred in determining the validity and scope of non-STANFORD encryption patents that may hinder or limit CYLINK's ability to sublicense the Licensed Patent(s) or expenses neccessary for CYLINK to obtain sole exclusive rights to the Licensed Patent(s).

2.10 -- "Substantial Competition" means that, in each country where competition exists, Existing Licensee(s)'s total sales, or Existing Licensee(s)'s sublicensee(s)'s total sales of Licensed Product(s) in the Licensed Field of Use, is twenty percent (20%) or more of the total sales in such country.

### 3.   ORIGINAL AGREEMENT

STANFORD and CYLINK agree that the previous Original Agreement between STANFORD and Omnet (now known as CYLINK) dated June 24, 1985, is hereby terminated and superseded in its entirety by this Agreement except as provided in Paragraph 6.9.  However, CYLINK may, at any time, terminate this license, and STANFORD agrees to issue a new license containing identical terms to the Original Agreement provided that any royalties due under this Agreement are paid and/or any breach of this Agreement

Confidential Business
Information Protected By
Court Order

-4-

CYL-A-044791

is rectified within ninety (90) days of notice of termination to STANFORD by CYLINK.

## 4.  GRANT

4.1 -- STANFORD hereby grants and CYLINK hereby accepts an Exclusive license, including the right to sublicense, in the Licensed Field of Use, to make, use, and sell Licensed Product(s) in the Licensed Territory.

4.2 -- Said license shall be Exclusive for a term beginning August 25, 1989, and  ending, for each individual patent as defined under Licensed Patent(s), in every country where a patent has issued, as indicated in Attachment A, on the expiration date of each patent in such country.

4.3 -- STANFORD agrees to negotiate the exclusion of sublicensing rights with any Existing Licensee(s) within thirty (30) days of execution of this Agreement.  If any Existing Licensee(s) refuses to surrender its sublicensing rights, STANFORD agrees to terminate the Existing Agreement(s), when possible, for lack of compliance.  Specifically, STANFORD shall terminate, if necessary, as provided under this Paragraph 4.3, Harris Corporation and Northern Telecom for not making a reasonable effort to promote the Licensed Patent(s) as the industry standard in the United States of America as required under their respective license agreements.  Said termination, if necessary, shall take place within sixty (60) days of the date of execution of this Agreement.

Confidential Business
Information Protected By
Court Order

CYL-A-044792

STANFORD further agrees that in the event that any Existing Agreement(s) has lapsed, STANFORD will not grant or extend additional licensing rights.

### 5. GOVERNMENT RIGHTS

This Agreement is subject to all of the terms and conditions of Public Law 96-517 as amended, and CYLINK agrees to take all action necessary on its part as Licensee to enable STANFORD to satisfy its obligation thereunder, relating to Licensed Patent(s).

### 6. ROYALTIES, INCLUDING SUBLICENSING ROYALTIES

6.1 -- In consideration of the increased rights granted by STANFORD to Omnet, now known as CYLINK, by the Original Agreement, CYLINK agreed to pay to STANFORD a noncreditable, nonrefundable license issue royalty fee of Twenty-Eight Thousand Dollars ($28,000) per the following schedule:

(a)   Three Thousand Dollars ($3,000) upon signing of the Original Agreement;

(b)   Five Thousand Dollars ($5,000) upon sale of first two hundred (200) integrated circuits;

(c)   Ten Thousand Dollars ($10,000) upon sale of next two thousand (2,000) integrated circuits; and

(d)   Ten Thousand Dollars ($10,000) upon sale of next twenty thousand (20,000) integrated circuits.

6.2 -- CYLINK has paid Three Thousand Dollars ($3,000) upon the signing of the Original Agreement and Five

Confidential Business
Information Protected By
Court Order

-6-

CYL-A-044793

Thousand dollars ($5,000) upon the sale of the first two hundred (200) integrated circuits as provided in subparagraphs 6.1(a) and (b), respectively. CYLINK agrees to pay STANFORD the remaining royalties as provided in subparagraphs 6.1(c) and (d).

6.3 -- Until the provisions of Paragraph 6.4 are met, earned royalties shall be payable to STANFORD on the Net Sales of Integrated Circuits that utilize the concepts of the Licensed Patent(s) (IC[s]) of one and one-half percent (1.5%) or a minimum per IC per the following schedule, whichever is greater:

| VOLUME OF ICs | MIMIMUM ROYALTY PER CHIP |
|---|---|
| First two hundred (200) | $3.75 |
| Next two thousand (2,000) | 0.75 |
| Next twenty thousand (20,000) | 0.30 |

Once sales of ICs have passed twenty-two thousand two hundred (22,200) ciruits, the earned royalty shall be one and one-half percent (1.5%) of the Net Sales, unless the total number of ICs sold for any given calendar year is less than three thousand five hundred (3,500) integrated circuits, in which case the earned royalty shall be Fifteen Cents ($0.15) per integrated circuit.

6.4 -- If CYLINK has no Substantial Competition, or all Existing Agreement(s) have been terminated, CYLINK agrees that earned royalties shall be payable to STANFORD on the Net Sales of ICs of two percent (2%) or a minimum per IC per the following schedule, whichever is greater:

Confidential Business Information Protected By Court Order

-7-

CYL-A-044794

|                                 | MINIMUM ROYALTY |
| VOLUME OF ICs                   | PER CHIP        |
|---------------------------------|-----------------|
| Above two thousand (2000)       | $1.50           |
| Above twenty thousand (20,000)  | 0.60            |

Once sales of integrated ciruits have passed twenty-two thousand two hundred (22,200) cicuits, the earned royalty shall be two percent (2%) of Net Sales, unless the total number of ICs sold for any given calendar year is less than three thousand five hundred (3,500) integrated circuits, in which case the earned royalty shall be Thirty Cents ($0.30) per integrated circuit.

6.5 -- In addition to Paragraphs 6.3 and 6.4, CYLINK agrees to pay earned royalties on Licensed Product(s) made, sold, or otherwise disposed of by CYLINK which incorportate the concepts of the Licensed Patent(s) as follows:

(a) CIDEC-HS (high speed): Three Dollars ($3); and

(b) CIDEC-LS (low speed): One Dollar and Fifty Cents ($1.50).

6.6 -- In consideration of the Exclusive sublicensing rights granted under this Agreement, CYLINK also agrees to pay to STANFORD royalties as follows:

(a) If CYLINK has Substantial Competition, and CYLINK has incurred but not yet recovered all its Legal Expenses from its share of income generated from sublicensing the Licensed Patent(s), CYLINK agrees to pay STANFORD twelve percent

Confidential Business
Information Protected By
Court Order

-8-

CYL-A-044795

(12%) of all gross royalties received by CYLINK from its sublicensee(s);

(b)   If CYLINK has Substantial Competition, and CYLINK has not incurred any, or has recovered all its Legal Expenses from its share of income generated from sublicensing the Licensed Patent(s), CYLINK agrees to pay STANFORD fifteen percent (15%) of all gross royalties received by CYLINK from its sublicensee(s);

(c)   If CYLINK has no Substantial Competition or all Existing Agreement(s) have been terminated, and CYLINK has incurred but not yet recovered all its Legal Expenses from its share of income generated by sublicensing the Licensed Patent(s), CYLINK agrees to pay STANFORD twenty percent (20%) of all gross royalties received by CYLINK from its sublicensee(s); and

(d)   If CYLINK has no Substantial Competition or all Existing Agreement(s) have been terminated, and CYLINK has not incurred any Legal Expenses, or has recovered all its Legal Expenses from its share of income generated by sublicensing the Licensed Patent(s), CYLINK agrees to pay Stanford twenty-five percent (25%) of all gross sublicensing royalties received by CYLINK from its sublicensee(s).

Attachment B displays graphically the royalty structure provided in Paragraph 6.6.

6.7 -- CYLINK agrees to negotiate in good faith a royalty structure for any condition that is not specifically addressed under subparagraphs 6.6(a), (b), (c), and (d), and

Confidential Business
Information Protected By
Court Order

-9-

CYL-A-044796

further agrees to negotiate an earned royalty for any new Licensed
Product(s) or system utilizing the Licensed Patent(s) which CYLINK
subsequently decides to make and which is not specifically
addressed by this Agreement.  Said royalty structure and earned
royalties will be similar to those of this Agreement.

6.8 -- CYLINK further agrees to pay, if there is no
Substantial Competition or all Existing Agreement(s) have been
terminated, and CYLINK has no outstanding Legal Expenses, a
minimum annual royalty of Ten Thousand Dollars ($10,000) each
March 1, beginning March 1, 1991, for the life of this Agreement.
This minimum annual payment shall be one hundred percent (100%)
creditable toward earned royalties and sublicensing royalties due
until the entire credit is exhausted.

6.9 -- For the special case of CYLINK sublicensing
Ricoh, STANFORD shall receive ten percent (10%) of the income
which CYLINK receives from Ricoh. All other conditions specified
in the August 4, 1987, Letter Agreement between STANFORD and
CYLINK regarding Ricoh shall be honored under this Agreement.

6.10 -- CYLINK agrees to pay to STANFORD royalties
which CYLINK receives from sublicensee(s) sales of products which
utilize technology or know-how based on the Licensed Patent(s) for
as long as CYLINK is receiving royalties on such basis.

6.11 -- If this Agreement is not terminated in
accordance with other provisions hereof, CYLINK's obligation to
pay royalties hereunder shall continue for so long as CYLINK, by
its activities would, but for the license granted herein, infringe

Confidential Business
Information Protected By
Court Order

CYL-A-044797

a valid claim of an unexpired Licensed Patent(s) of STANFORD covering said activity.

6.12 -- The royalty on sales in currencies other than U.S. Dollars shall be calculated using the appropriate foreign exchange rate for such currency quoted by the Bank of America (San Francisco) foreign exchange desk, on the close of business on the last banking day of each calendar quarter. Royalty and payments to STANFORD shall be in U.S. Dollars and shall be net of all non-U.S. taxes.

## 7.  REPORTS, PAYMENTS, AND ACCOUNTING

7.1 -- Quarterly Sublicensing and Earned Royalty Payment and Report -- CYLINK shall make written reports and earned royalty payments of it and its sublicensee(s) to STANFORD within ninety (90) days after the end of each calendar quarter.  This report shall state the number, description, and aggregate Net Sales of Licensed Product(s) made, sold, or otherwise disposed of, and the total gross income received by CYLINK from leasing, sublicensing, renting, or otherwise making Licensed Product(s) available to others without sale or other disposition transferring title, during such completed calendar quarter, and resulting calculation pursuant to Article 6, of earned royalty payment due STANFORD for such completed calendar quarter.  Concurrent with the making of each such report, CYLINK shall include payment due STANFORD of royalties for the calendar quarter covered by such report.

Confidential Business
Information Protected By
Court Order

CYL-A-044798

7.2 -- <u>Termination Report</u> -- CYLINK also agrees to make a written report to STANFORD within ninety (90) days after the date of termination of this Agreement, stating in such report the number, description, and Net Sales of all products made, sold, or otherwise disposed of and upon which royalties are payable hereunder but which were not previously reported to STANFORD. CYLINK also shall continue to make quarterly reports pursuant to the provisions of Paragraph 7.1 of all gross income received from leasing, sublicensing, renting, or otherwise making products available to others without sale or other disposition transferring title in the case of transactions entered into prior to such termination.   Concurrent with all such reports, CYLINK shall pay STANFORD the royalties due for the period covered by such report.

7.3 -- <u>Accounting</u> -- CYLINK agrees to keep records for a period of three (3) years showing the manufacturing, sales, use, and other disposition of products sold or otherwise disposed of by it or its sublicensee(s) under the license herein granted in sufficient detail to enable the royalties payable hereunder by CYLINK to be determined, and further agrees to permit its books and records to be examined by STANFORD from time to time to the extent necessary, but not more than once a year, to verify reports provided for in Paragraphs 7.1 and 7.2.   Such examination is to be made by STANFORD, at the expense of STANFORD, except in the event that the results of the audit reveal a discrepancy in CYLINK's favor of ten percent (10%) or more, then the audit fees shall be paid by CYLINK.

Confidential Business
Information Protected By
Court Order

CYL-A-044799

## 8.  NEGATION OF WARRANTIES

8.1 -- Nothing in this Agreement is or shall be construed as:

(a)   A warranty or representation by STANFORD as to the validity or scope of any Licensed Patent(s);

(b)   A warranty or representation that anything made, used, sold, or otherwise disposed of under any license granted in this Agreement is or will be free from infringement of patents, copyrights, and other rights of third parties;

(c)   An obligation to bring or prosecute actions or suits against third parties for infringement, except to the extent and in the circumstances described in Article 12; or

(d)   Granting by implication, estoppel, or otherwise any licenses under patents of STANFORD or other persons other than Licensed Patent(s), regardless of whether such patents are dominant or subordinate to any Licensed Patent(s).

8.2 -- Except as expressly set forth in this Agreement, STANFORD MAKES NO REPRESENTATIONS AND EXTENDS NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED.  THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR THAT THE USE OF THE LICENSED PRODUCT(S) WILL NOT INFRINGE ANY PATENT, COPYRIGHT, TRADEMARK, OR OTHER RIGHTS.

Confidential Business
Information Protected By
Court Order

-13-

CYL-A-044800

### 9.   INDEMNITY

CYLINK agrees to indemnify, hold harmless, and defend STANFORD and its trustees, officers, employees, students, and agents against any and all claims for death, illness, personal injury, property damage, and improper business practices arising out of the manufacture, use, sale, or other disposition of Licensed Product(s) by CYLINK, its sublicensee(s), Affiliates, or customers.

### 10.   MARKING

CYLINK agrees to mark Licensed Product(s) (or their containers or labels), excluding integrated circuits and products of similar marking difficulty, made, sold, or otherwise disposed of by it under the license granted in this Agreement with the numbers of the Licensed Patent(s).

### 11.   PROMOTIONAL ADVERTISING

CYLINK agrees not to identify STANFORD, STANFORD faculty members, employees, agents, or students in any promotional advertising or other promotional materials to be disseminated to the public, or to use any trademark, service mark, trade name, or symbol of STANFORD or the Stanford University Hospital, or such symbol that is associated with either of them, without STANFORD's prior written consent. STANFORD agrees to not unreasonably withhold the use of STANFORD's name for such purposes.

-14-

Confidential Business
Information Protected By
Court Order

CYL-A-044801

## 12.   INFRINGEMENT BY OTHERS:   PROTECTION OF PATENTS

12.1 -- CYLINK shall promptly inform STANFORD of any suspected infringement of any Licensed Patent(s) by a third party.  STANFORD and CYLINK each shall have the right to institute an action for infringement of the Licensed Patent(s) against such third party in accordance with the following:

(a)   If STANFORD and CYLINK agree to institute suit jointly, the suit shall be brought in both their names, the out-of-pocket costs thereof shall be borne equally, and any recovery or settlement shall be shared equally.  CYLINK and STANFORD shall agree to the manner in which they shall exercise control over such action.  STANFORD may, if it so desires, also be represented by separate counsel of its own selection, the fees for which counsel shall be paid by STANFORD;

(b)   In the absence of agreement to institute a suit jointly, STANFORD may institute suit, and, at its option, join CYLINK as a plaintiff.  STANFORD shall bear the entire cost of such litigation and shall be entitled to retain the entire amount of any recovery or settlement;

(c)   In the absence of agreement to institute a suit jointly and if STANFORD notifies CYLINK that it has decided not to join in or institute a suit, as provided in (a) or (b) above, CYLINK may institute suit and, at its option, join STANFORD as a plaintiff.  CYLINK shall bear the entire cost of such

Confidential Business
Information Protected By
Court Order

-15-

CYL-A-044802

litigation and shall be entitled to retain the entire amount of any recovery or settlement; and

(d)   If STANFORD decides to institute suit, then it shall notify CYLINK in writing.  CYLINK's failure to notify STANFORD in writing, within fifteen (15) days after the date of the notice, that it will join in enforcing the patent pursuant to the provisions hereof, shall be and be deemed conclusively to be CYLINK's assignment to STANFORD of all rights, causes of action, and damages resulting from any such alleged infringement, and STANFORD shall be entitled to retain the entire amount of any recovery or settlement.  Furthermore, at its option, STANFORD may join CYLINK as plaintiff.

12.2 -- Should either STANFORD or CYLINK commence a suit under the provisions of Paragraph 12.1 and thereafter elect to abandon the same, it shall give timely notice to the other party who may, if it so desires, continue prosecution of such suit, provided, however, that the sharing of expenses and any recovery in such suit shall be as agreed upon between STANFORD and CYLINK.

## 13.  COMMERCIAL APPLICATION, SUBLICENSES

13.1 -- Any sublicense granted by CYLINK under this Agreement shall be subject and subordinate to terms and conditions of this Agreement, except:

(a)   Sublicense terms and conditions shall reflect that any sublicensee(s) shall not further sublicense; and

Confidential Business
Information Protected By
Court Order

-16-

CYL-A-044803

(b)   The earned royalty rates of Article 6 may be at higher rates than of this Agreement.

Any such sublicense also shall expressly include the provisions of Articles 7, 8, 9, 10, and 11 for the benefit of STANFORD.

13.2 -- CYLINK and STANFORD shall divide sublicensing income as provided under Article 6 of this Agreement.

13.3 -- Any sublicense shall expressly include the provision for said sublicense to revert directly to STANFORD in case of termination of this Agreement by either STANFORD or CYLINK for any reason.

13.4 -- If CYLINK is unable or unwilling to serve or develop a potential market or market territory for which there is a willing sublicensee(s), CYLINK will, at STANFORD's request, negotiate in good faith a sublicense hereunder.

## 14.   TERMINATION

14.1 -- CYLINK may terminate this Agreement by giving STANFORD notice in writing at least thirty (30) days in advance of the effective date of termination selected by CYLINK but may retain rights to the Licensed Patent(s) as provided in Article 3.

14.2 -- STANFORD may terminate this Agreement if CYLINK:

(a)   Is in default in payment of royalty or providing of reports;

Confidential Business
Information Protected By
Court Order

-17-

(b)   Is in breach of any provision hereof; or

(c)   Provides any materially false report;

and CYLINK fails to remedy any such default, breach, or false report within thirty (60) days after written notice thereof by STANFORD.

14.3 -- Surviving any termination are:

(a)   CYLINK's obligation to pay royalties accrued or accruable;

(b)   Any cause of action or claim of CYLINK or STANFORD, accrued or to accrue, because of any breach or default by the other party; and

(c)   The provisions of Paragraph 7.2 and Articles 9, 11, and 12.

## 15.  ASSIGNMENT

This Agreement may not be assigned except:

(a)   With advance written consent of STANFORD;

(b)   As part of a sale or transfer of substantially the entire business of CYLINK relating to operations pursuant to this license; or

(c)   To a wholly owned subsidiary of CYLINK.

## 16.  ARBITRATION

16.1 -- Any controversy arising under or related to this Agreement, or any disputed claim by either party against the other under this Agreement excluding any dispute relating to patent validity or infringement arising under this Agreement,

Confidential Business
Information Protected By
Court Order

-18-

CYL-A-044805

shall be settled by arbitration in accordance with the Licensing Agreement Arbitration Rules of the American Arbitration Association.  Upon request of either party, arbitration will be by:

      (a)   A third party arbitrator mutually agreed upon in writing by CYLINK and STANFORD within thirty (30) days of such arbitration request; or

      (b)   A member of the American Arbitration Association.

      Judgement upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof.

      16.2 -- The parties shall be entitled to discovery in like manner as if the arbitration were a civil suit in the California Superior Court.

      16.3 -- Any arbitration shall be held at Stanford, California, or San Francisco, California, unless the parties hereto mutually agree in writing to another place.

## 17.  NOTICES

      All notices under this Agreement shall be deemed to have been fully given when done in writing and deposited in the United States mail, registered or certified, and addressed as follows:

Confidential Business
Information Protected By
Court Order

CYL-A-044806

```
         To STANFORD:      Office of Technology Licensing
                           Stanford University
                           857 Serra Street, 2nd Floor
                           Stanford, CA  94305-62

                           Attention:      Director,
                                           Technology Licensing

         To CYLINK:        Cylink Corporation
                           110 South Wolfe Road
                           Sunnyvale, CA  94086

                           Attention:      President or Chief
                                           Executive Officer
```

Either party may change its address upon written notice to the other party.

### 18. WAIVER

The parties covenant and agree that if either party hereunder fails or neglects for any reason to take advantage of any of the terms hereof provided for the termination of this Agreement heretofore, or if a party, having the right to declare this Agreement terminated shall fail to do so, any such failure or neglect by such party shall not be or be deemed or be construed to be a waiver of any cause for the termination of this Agreement theretofore or subsequently arising, or as a waiver of any of the terms, covenants, or conditions of this Agreement or of the performance thereof, none of the terms, covenants, and conditions of this Agreement can be waived except by the written consent of the party waiving compliance.

Confidential Business
Information Protected By
Court Order

-20-

CYL-A-044807

## 19.   APPLICABLE LAW

This Agreement shall be construed, interpreted, and applied in accordance with the laws of the State of California.

## 20.   SCOPE OF AGREEMENT

This Agreement constitutes the entire Agreement between the parties pertaining to the subject matter hereof.  No representative of STANFORD or CYLINK has been authorized to make any representation, warranty, or promise not contained herein.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in duplicate originals by their duly authorized officers or representatives.

THE BOARD OF TRUSTEES OF THE LELAND
STANFORD JUNIOR UNIVERSITY

By _Katharine Ku_

Title _Associate Director Technology Licensing_

Date _9-25-89_

CYLINK CORPORATION

By _Lewis C Morris_

Title _President_

Date _9-25-89_

Confidential Business
Information Protected By
Court Order

CYL-A-044808