ORIGINAL

1    MICHAEL M. CARLSON (Bar No. 88048)
     BRYAN J. WILSON (Bar No. 138842)
2    JANA G. GOLD (Bar No. 154246)
     Morrison & Foerster
3    755 Page Mill Road
     Palo Alto, California  94304-1018
4    Telephone: (415) 813-5600
     Facsimile:  (415) 494-0792
5
     PATRICK J. FLINN (Bar No. 104423)
6    ALSTON & BIRD
     One Atlantic Center
7    1201 West Peachtree Street
     Atlanta, Georgia 30309
8    Telephone: (404) 881-7000
     Facsimile:  (404) 881-8777
9
     Attorneys for Proposed Intervenor
10   CARO-KANN CORPORATION

11

12                   UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14

15   ROGER SCHLAFLY,                    No.   CV 94 20512 SW

16          Plaintiff,                  CKC'S OPPOSITION TO
                                        SCHLAFLY'S MOTION FOR
17     v.                               SUMMARY JUDGMENT; AND CROSS-
                                        MOTION FOR SUMMARY JUDGMENT
18   PUBLIC KEY PARTNERS and            ON THE VALIDITY OF THE
     RSA DATA SECURITY, INC.,           STANFORD PATENTS
19
            Defendants.                 Date: December 6, 1995
20                                      Time: 10:00 a.m.
                                        Hon. Spencer Williams
21

22

23

24

25

26

27
     CKC's OPPOSITION TO MOTION
28   AND CROSS MOTION FOR SUMMARY JUDGMENT
     CV 94 20512 SW (PVT)
     49683.3

1

2 **TABLE OF CONTENTS**

Page(s)

3

4 NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . 1

5 MEMORANDUM AND POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . 1

6 STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

7 ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8 I.   SCHLAFLY'S BURDEN ON SUMMARY JUDGMENT REQUIRES CLEAR AND
9        CONVINCING, ADMISSIBLE EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . 7

10 II.  THE DIFFIE-HELLMAN PATENT IS NOT SUBJECT TO A STATUTORY BAR. . 9

11 III. NEITHER DIFFIE-HELLMAN, NOR HELLMAN-MERKLE ARE INVALID
         AS NON-STATUTORY SUBJECT MATTER . . . . . . . . . . . . . . . . . . . . . . . . 14
12

13 IV.  HELLMAN-MERKLE IS NOT INOPERATIVE UNDER ANY LEGAL
         DEFINITION OF OPERABILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

14 CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                    i

1                              **TABLE OF AUTHORITIES**

2                                                                              **Pages**

3

4   Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)..........................................7
    Avia Group Int'l Inc. v. L.A. Gear California, 853 F.2d 1557 (Fed. Cir. 1988)................7
5   Beyene v. Coleman Sec. Services, Inc., 854 F.2d 1179 (9th Cir. 1988)........................8
    Diamond v. Diehr, 450 U.S. 187 (1981).....................................................15, 16
6   Ecolochem, Inc. v. Southern California Edison Co., 863 F. Supp. 1165(C.D. Cal. 1994)........13
    Engle Indus., Inc. v. Lockformer Co., 946 F.2d 1528 (Fed. Cir. 1991)........................18
7   Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464 (Fed. Cir. 1990)...................8
    In re Alappat, 33 F.3d 1526 (Fed. Cir. 1994)..............................................15, 16
8   In re Glass, 492 F.2d 1228 (C.C.P.A. 1974)................................................20
    In re Hall, 781 F.2d 897 (Fed. Cir. 1986)..................................................13
9   In re Hogan, 559 F.2d 595 (C.C.P.A. 1977).................................................20
    In re Iwahashi, 888 F.2d 1370 (Fed. Cir. 1989)...........................................15, 16
10  Massachusetts Institute of Technology v. AB Fortia, 774 F.2d 1104 (Fed. Cir. 1985).......9, 14
    Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261 (Fed. Cir. 1986).......................20
11  Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931 Fed. Cir. 1990).....................14
    Specialty Composites v. Cabot Corp., 845 F.2d 981 (Fed Cir. 1988)..........................19

12

13                                    **RULES**

14
    Fed. R. Evid.
15      901 ................................................... 8. 12 n.6
        901(a) ............................................. 11, 15, 21

16

17                                   **STATUTES**

18  35 U.S.C.
19      § 101 .......................................... 17, 20
        § 102(b) ......................................... 9, 14
        § 112 ....................................... 19, 20 n.11
20      § 282 .......................................... 7

21                                **MISCELLANEOUS**

22
    1 Chisum, Patents 3.04[1] .......................................... 10
23

24

25

26

27

28                                      ii

1          **NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT**

2        PLEASE TAKE NOTICE that on December 6, 1995, (Proposed)

3  intervenor/defendant Caro-Kann Corporation ("CKC") will, and hereby

4  does, cross-move for summary judgment that United States Patents

5  Nos. 4,200,770 ("Diffie-Hellman") and 4,218,582 ("Hellman-Merkle")

6  are not invalid in view of (1) allegations that the Diffie-Hellman

7  patent is subject to a statutory bar; (2) allegations that the

8  Diffie-Hellman and Hellman-Merkle patents are invalid because they

9  claim non-statutory subject matter; (3) allegations that the

10  Hellman-Merkle patent is inoperative because the "trapdoor knapsack"

11  problem described in the specification has been broken.

12

13           **MEMORANDUM OF POINTS AND AUTHORITIES**

14     <u>Introduction</u>.  Until its dissolution on September 6, 1995,

15  defendant Public Key Partners ("PKP") held exclusive sublicensing

16  rights to the four patents that are the subject of Mr. Schlafly's

17  motion for summary judgment.  After PKP was dissolved, control of

18  two of the patents, United States Patent Nos. 4,200,770 ("Diffie-

19  Hellman") and 4,218,582 ("Hellman-Merkle") went to CKC.  Control of

20  the other two patents, United States Patent Nos. 4,405,829 ("RSA")

21  and 4,995,082 ("Schnorr") went to Caro-Kann's partner, RSADSI.

22  RSADSI is addressing Schlafly's claims with respect to the RSA and

23  Schnorr patents.  This Memorandum addresses Schlafly's arguments

24  with respect to the Diffie-Hellman and Hellman-Merkle patents.[1]

25    ————————————————————

26     [1] CKC understands that Plaintiff's motion addresses only the
validity of the Schnorr patent, and not the scope of the Schnorr

27  claims, or whether those claims cover practice of DSS.  CKC takes no

                                                        (Continued)

28                         1

1    Those arguments, and the undisputed facts of this case,

2  establish that none of Schlafly's allegations are sufficient, as a

3  matter of law, to support a claim that the Diffie-Hellman and

4  Hellman-Merkle patents are invalid.  Accordingly, CKC opposes and

5  cross-moves for summary judgment on those claims.

6                          **STATEMENT OF FACTS**

7    _Public Key Cryptography._  The patents at issue in this case

8  represent one of the most fundamental advances in the field of

9  cryptography since the invention of the alphabet substitution cipher

10  (Omura Decl. ¶ 2).  Before 1976, all cryptographic code schemes used

11  a single "key" both to encode and decode a message (_Id._).  Two

12  parties who wished to communicate over an open, or insecure, channel

13  needed to find a way to exchange the cryptographic key before a

14  coded message could be sent (_Id._).  Besides being cumbersome, the

15  security of the message depended on the security of the means by

16  which the key was exchanged (_Id._).

17    In 1976, Stanford University Professor Martin Hellman, with the

18  assistance of his graduate student Whitfield Diffie devised systems

19  by which two parties, who could only communicate over an insecure

20  channel, could nonetheless compute a shared secret number without

21  the need to have a secret key delivered to both ends (Omura Decl.

22  ¶ 2).  Later, with the additional help of then-student Ralph Merkle,

23

24  (Continued from previous page)
    position regarding Schlafly's claims regarding the validity of the
25  Schnorr patent.  CKC notes, however, that PKP no longer has any
    rights in the Schnorr patent (Gold Decl. Exh. G), and thus there
26  does not appear to be a justiciable controversy between plaintiff
    and PKP on that subject.  PKP has no infringement counterclaim
27  pending against plaintiff on the Schnorr patent.

28                                    2

    CKC's OPPOSITION TO MOTION
    AND CROSS MOTION FOR SUMMARY JUDGMENT
    CV 94 20512 SW (PVT)

1   Professor Hellman developed a method of encryption in which (1)

2   messages could be encoded with one key, and decoded with a second

3   key, and (2) knowledge of one key would not allow a third party to

4   learn or obtain the other key (Id.).

5       Under the system Hellman and his students envisioned, each user

6   would have two keys: a "public" key associated with the individual

7   and known to all, and a "secret" or "private" key known only to the

8   individual (Omura Decl. ¶ 3).  The public and private key would be

9   related in such a way that it would be easy to generate a public key

10  from the private key, but "computationally infeasible" to derive the

11  private key from the public key (Id.).  Thus, a sender could encrypt

12  a message using the recipient's public key; once the message was

13  encrypted, however, the only way to decrypt the message would be to

14  use the recipient's private key (Id.).

15      The application of the Stanford patents goes far beyond their

16  use in encrypting messages (Omura Decl. ¶ 4).  For example, the

17  techniques associated with the Diffie-Hellman patent make it

18  possible to manage keys for users on an encrypted network without

19  requiring delivery of the secret keys (Id.).  More importantly, the

20  techniques associated with the Hellman-Merkle patent make it

21  possible to verify whether a particular message was actually sent by

22  a particular party by using "digital signatures" (Id.).  If the

23  party sending the message "signs" it by encrypting a signature using

24  her private key, then that person's public key will decrypt it

25  (Id.).  Put another way, if the sender's public key decrypts the

26  signature, then the recipient can be certain that the message was

27  encrypted by that sender's private key (Id.).

28                                      3

CKC's OPPOSITION TO MOTION
AND CROSS MOTION FOR SUMMARY JUDGMENT
CV 94 20512 SW (PVT)

1    Public Key systems—and particularly digital signatures—have

2  come to have important applications with the advent of electronic

3  commerce (Omura Decl. ¶ 5).  Commercial transactions over electronic

4  networks can be signed and verified, obviating the need for paper

5  verification (Id.).

6    The Diffie-Hellman Patent.[2]  The first of the two patents at

7  issue in this memorandum covers what has been called the "Diffie-

8  Hellman" key exchange (Omura Decl. ¶ 6, Exh. A; Gold Decl. Exh. H).

9  The Diffie-Hellman key exchange method was conceived before any

10  complete embodiment of Public Key, and is often called a precursor

11  to Public Key cryptography (Id.).  Diffie-Hellman teaches a way of

12  exchanging numbers over an insecure channel and calculating a

13  shared, secret number from the nonsecret numbers (Id.). This

14  technology is often used in computer communication networks, for

15  example, to electronically obtain keys to secure communications of

16  users who wish to connect to the network (Id.).

17    In its broadest terms, the Diffie Hellman patent claims a

18  system where each party starts out with a secret number (Omura Decl.

19  ¶ 7).  Using a one-way function (that is, a function which is easy

20  to perform but difficult to invert), each party generates a

21  nonsecret number from their secret number (Id.).  The parties then

22  exchange their nonsecret numbers (Id.).  Once the nonsecret numbers

23  are exchanged, each party calculates the key from their retained,

24

_____

25    [2]  Although the patent is popularly referred to as "Diffie-

26  Hellman" and we adopt that term here, the invention was made by (and
     the patent issued to) Hellman, Diffie, and Merkle (Gold Decl. Exh.

27  H).

28                                    4

CKC's OPPOSITION TO MOTION
AND CROSS MOTION FOR SUMMARY JUDGMENT
CV 94 20512 SW (PVT)

1    secret number, and the other party's exchanged nonsecret number

2    (Id.).  As disclosed in the Diffie-Hellman patent, the exchanged

3    secret/nonsecret numbers will enable the parties to calculate a

4    common key without having to exchange the key over an insecure

5    communications channel (Id.).

6         The Hellman-Merkle Patent.  Hellman-Merkle is the fundamental,

7    patent covering the practice of Public Key cryptography (Omura Decl.

8    ¶ 8, Exh. B; Gold Decl. Exh. I).  Hellman-Merkle includes broad

9    claims (claims 1-6) that cover the use of Public Key regardless of

10   the type of encryption algorithm used to generate the public-private

11   key pairs (Id.).  Thus, the Hellman-Merkle patent discloses and

12   claims the use of two different keys, one for encoding the

13   information, and the second for decoding the information (Id.).

14   Under this system, one who wishes to receive a coded message may

15   publish a "public key" to the world at large (Id.).  Anyone wishing

16   to send this person a coded message uses the individual's public key

17   to encode the message (Id.).  The recipient, using the

18   corresponding, but secret, "private key" decodes the message (Id.).

19   Because the public key only works to encode the message, and only

20   the secret private key can decode the message, the disclosure of the

21   public key does not affect the secrecy of the message; only the

22   holder of the private key (the recipient) can open the message.

23        The particular implementation of Public Key described in the

24   patent specification uses a mathematical function known as the

25   "knapsack problem" (Omura Decl. ¶ 9).  Claims 7-17 cover various

26   implementations of Public Key involving various forms of the

27   knapsack problem (Id.).

28                                    5

1    The "Multiuser Cryptographic Techniques" and "New Directions"

2  Papers.   Professor Hellman and Whitfield Diffie published two papers

3  generally disclosing the concept of Public Key cryptography in 1976.

4  The first was called "Multiuser Cryptographic Techniques" and was

5  published in June 1976 as part of the proceedings of the National

6  Computer Conference (AFIPS Conference Proceedings, Vol. 45 (Omura

7  Decl. Exh. C)).   The second was the paper "New Directions in

8  Cryptography," published in the journal IEEE Transactions on

9  Information Theory, Vol. 22, No. 6 in November, 1976 (Id. Exh. D).

10  Both of these papers were disclosed to and considered by the Patent

11  Office, and the patents were granted over them (Gold Decl. Exhs. H

12  and I).

13    The "Multiuser Cryptographic Techniques" paper suggested the

14  concept of Public Key cryptography by proposing that the problem of

15  key distribution could be solved by giving each user a pair of keys,

16  one public and one private (Omura Decl. ¶ 11, Exh. C at 110).   The

17  paper did not, however, disclose any particular implementation that

18  would enable one skilled in the art to make such a system work (Id.

19  ¶ 11).   Indeed, the paper noted that "[a]t present, we have neither

20  a proof that public key systems exist, nor a demonstration system"

21  (Id., Exh. C at 111).

22    The "New Directions" paper, published by the IEEE in November

23  1976 went only a little bit further toward disclosing the

24  fundamental Public Key invention (Omura Decl. ¶ 12).   In the "New

25  Directions" paper, Diffie and Hellman described two possible

26  solutions to the problem of ensuring secure communications over

27  insecure channels (Id. Exh. D at 647).   The first possible solution

28

6

CKC's OPPOSITION TO MOTION
AND CROSS MOTION FOR SUMMARY JUDGMENT
CV 94 20512 SW (PVT)

1  was the Public Key invention—that is, a system where each user

2  would have a public and a private key (Id. at 648).  Again, however,

3  Diffie and Hellman admitted that their only example of a possible

4  public key cryptosystem was "[a] suggestive, although unfortunately

5  useless example" (Id.).  The second technique suggested in the "New

6  Directions" paper was the public key distribution system set forth

7  in the Diffie-Hellman patent (Id. at 648-49).  This part of the "New

8  Directions" paper did include a complete description of a system

9  that would enable one skilled in the art to put together a key

10  distribution system like the one later claimed in the Diffie-Hellman

11  patent (Id.).

12      Both the Diffie-Hellman and Hellman-Merkle patent applications

13  were filed well within a year of the November 1976 publication of

14  the "New Directions" paper (Gold Decl. Exhs. H and I).

15                          ARGUMENT

16  I.   SCHLAFLY'S BURDEN ON SUMMARY JUDGMENT REQUIRES CLEAR
         AND CONVINCING, ADMISSIBLE EVIDENCE

17

18      The Diffie-Hellman and Hellman-Merkle patents are presumed

19  valid.  35 U.S.C. § 282.  In order to overcome that burden on his

20  motion for summary judgment—or in opposition to this cross-motion,

21  Schlafly will have to present clear and convincing evidence of

22  invalidity.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

23  (1986) (substantive burden carries over to motion for summary

24  judgment); Avia Group Int'l Inc. v. L.A. Gear California, 853 F.2d

25  1557 (Fed. Cir. 1988)(patentee entitled to summary judgment on issue

26  of validity).  The presumption of validity is particularly difficult

27  to overcome where, as here, the Patent Office has considered and

28                              7

1    rejected many of the arguments advanced by the party challenging the

2    patents.  <u>Hewlett-Packard Co. v. Bausch & Lomb, Inc.</u>, 909 F.2d 1464,

3    1467 (Fed. Cir. 1990) (burden of showing the invalidity of patent

4    claims is "especially difficult when the prior art was before the

5    PTO examiner during prosecution of the application").

6         The evidence in support of (or in opposition to) the motion for

7    summary judgment must also be admissible.[3]  <u>Beyene v. Coleman Sec.</u>

8    <u>Services, Inc.</u>, 854 F.2d 1179, 1181 (9th Cir. 1988).

9    Unauthenticated documents are not admissible in a motion for summary

10   judgment any more than they would be at trial. <u>Id.</u>, Fed. R. Evid.

11   901.  Similarly, hearsay statements or opinions cannot be used to

12   support Schlafly's burden on summary judgment.  <u>Horta v. Sullivan</u>, 4

13   F.3d 2, 8 (1st Cir. 1993) (newspaper articles were hearsay and not

14   be used in evidence on motion for summary judgment).  There is no

15   admissible evidence offered in support of Schlafly's arguments, and

16   those arguments must be rejected as a matter of law.[4]

17

18

19

20

21

22

23

---

24        [3] CKC and PKP have filed Objections to Evidence proffered by

25   Schlafly in a separate document.

26        [4] The fact that Schlafly is a pro se litigant does not permit

     him to ignore the rules of evidence or procedure.  <u>Jacobson v.</u>

27   <u>Filler</u>, 790 F.2d 1362, 1364-65 (9th Cir. 1986).

28                                          8

     CKC's OPPOSITION TO MOTION
     AND CROSS MOTION FOR SUMMARY JUDGMENT
     CV 94 20512 SW (PVT)

1

## II.   THE DIFFIE-HELLMAN PATENT IS NOT SUBJECT TO A
## STATUTORY BAR.

2

3   Schlafly argues that the Diffie-Hellman patent is invalid under

4   35 U.S.C. § 102(b) because there was a public disclosure of the

5   invention more than one year prior to the patent application

6   (Schlafly Motion at ¶ 3.1).   Section 102(b) denies patentability if

7   "the invention was . . . described in a printed publication in this

8   or a foreign country . . . more than one year prior to the date of

9   the application for patent in the United States."   It is undisputed

10  that the Diffie-Hellman patent application was made on September 6,

11  1977 (Id., Gold Decl. Exh. H).   There is no admissible evidence in

12  this case, however, that the Diffie-Hellman invention was described

13  in a printed publication more than one year prior to that date.

14  The question of whether a document constitutes a "printed

15  publication" is one of law.   Panduit Corp. v. Dennison Mfg. Co., 810

16  F.2d 1561, 1568 (Fed. Cir. 1987).   The test for whether a disclosure

17  has been "published" turns on the public accessibility of the

18  disclosure, that is, whether:

19          it has been disseminated or otherwise made
            available to the extent that persons interested
20          and of ordinary skill in the subject matter or
            art, exercising reasonable diligence can locate
21          it and recognize and comprehend therefrom the
            essentials of the claimed invention.
22

23  Massachusetts Institute of Technology v. AB Fortia, 774 F.2d 1104,

24  1109 (Fed. Cir. 1985).   In addition, to render the patent invalid

25  under § 102(b), the printed publication must be "enabling"—that is,

26  the publication must be sufficient to allow one of ordinary skill in

27

28                                      9

1   the art to reproduce the claimed invention.   1 Chisum <u>Patents</u> §
2   3.04[1].

3       Schlafly makes several allegations in support of his argument
4   that the invention was disclosed in a printed publication more than
5   one year before the allegation.   The first is that the invention was
6   disclosed when the "New Directions" paper was submitted to the IEEE
7   in June, 1976 (Schlafly Motion at ¶ 3.2).   As this Court has held,
8   however, submission of a paper to the IEEE does not constitute
9   publication.   <u>National Semiconductor Corp. v. Linear Technology</u>
10  <u>Corp.</u>, 703 F.Supp. 845, 847-49 (N.D. Cal. 1988) (IEEE policy does
11  not permit submitted papers to be treated as "publicly available").

12      Second, Schlafly alleges that co-inventor Whitfield Diffie
13  published a paper in 1988 in which he stated that the "New
14  Directions" paper had been distributed and discussed in June 1976
15  (Schlafly Motion ¶ 3.3).   The statement Schlafly presumably refers
16  to actually reports only the following:

17              Marty and I immediately recognized that we had a
                far more compact solution to the key
18              distribution problem [in the Diffie-Hellman key
                exchange] than Merkle's puzzles and hastened to
19              add it to both the upcoming National Computer
                Conference presentation and to "New Directions."
20              The latter not contained a solution to each
                aspect of the public key problem, though not the
21              combined solution I had envisioned.   It was sent
                off to the IEEE TRANSACTIONS ON INFORMATION
22              THEORY prior to my [June 1976] departure for NCC
                and like all of our other papers was immediately
23              circulated in preprint.
24

25

26  Gold Decl. Exh. J ["The First Ten Years of Public-Key Cryptography,"
27  <u>Proceedings of the IEEE</u>, Vol. 76, No. 5, May 1988, p. 563].

28                                    10

1   This statement is, of course, hearsay, and is not admissible to

2   show that copies of the paper were, in fact, "published" prior to

3   September, 1976.  Moreover, the author of the statement, when

4   deposed in the Schlafly litigation, illustrated the risk of relying

5   on hearsay, when he testified that the "First Ten Years" article was

6   simply wrong on this point:

7       Q BY MR. SCHLAFLY:  Okay.  I'm particularly
        interested in the last sentence, where it says:
8       "like all of our papers was immediately
        circulated in preprint."  What did this mean?
9

10      [Objection]

11      Q BY MR. SCHLAFLY:  Okay.  Is that a correct
        statement?
12

13      A  I believed it was at the time I wrote it, no
        longer believe so and found I couldn't defend
14      it.

15      Q  Do you think that's a false statement?

16      A  I believe it is a false statement.

17   Gold Decl. Exh. K (Diffie Dep. at 84:18-85:3).

18      Schlafly's third allegation, similarly, is both unsupported by

19   admissible evidence and contradicted by the direct testimony of the

20   inventors.  The purported "preprint" offered by Schlafly as Exhibit

21   CA is entirely unauthenticated and cannot be admitted in support of

22   this motion.  Fed. R. Evid. 901(a); Canada v. Blain's Helicopters

23   Inc., 831 F.2d 920, 925 (9th Cir. 1987) ("documents which have not

24   had a proper foundation laid to authenticate them cannot support a

25

26

27

28                              11

1   motion for summary judgment").[5]  More importantly, its status as a

2   "preprint" has been expressly contradicted by Mr. Diffie, who

3   testified that he believed that the August date on the cover

4   indicated that the document was a revision made at the request of

5   the reviewing committee to conform the citation format of the

6   submitted paper (Gold Decl. Exh. K [Diffie Dep. at 41:12-13, 42:24-

7   43:21).  Dr. Hellman, meanwhile, could not authenticate the document

8   at all, much less verify that he had distributed it to anyone (Id.,

9   Exh. L [Hellman Dep. at 164:5-165:2]).

10      Mr. Schlafly's fourth allegation is that Professor Hellman

11  lectured on the invention at a 1976 symposium in Sweden (Schlafly

12  Motion at ¶ 3.5).  Schlafly offers no evidence as to the contents of

13  the presentation, and no evidence that any paper was "published" at

14  the conference.[6]  Indeed, Dr. Hellman has testified that he does not

15  believe that he distributed any printed material at the conference

16  or that he even had the "New Directions" paper with him at the

17  conference(Gold Decl. Exh. L [Hellman Dep. 35:17-25; 36:25-37:3]).

18  _____

19      [5] Schlafly alleges that he obtained this document from an IBM
    engineer.  Even accepting this representation as true, there is no
20  evidence regarding when or how the engineer obtained the paper; to
    the extent that Mr. Schlafly implies that the engineer obtained the
21  article prior to September 6, 1977, the evidence is pure
22  inadmissible hearsay.

23      [6] At Dr. Hellman's deposition, Mr. Schlafly represented that
    Exhibit GH to his motion was an abstract from the conference (Gold
24  Decl. Exh. L [Hellman Dep. at 22:19-23:25, 34:22-35:1]).  Exhibit
    GH, however, appears to be missing over 30 pages, and could not be
25  authenticated as an abstract connected with the Sweden conference by
    Dr. Hellman (Id. [Hellman Dep. at 23:21-25, 34:22-35:1]).
26  Accordingly, the exhibit is inadmissible to the extent that it is
    being offered as an abstract of the presentation made at the Sweden
27  conference.  Fed. R. Evid. 901.

28                                        12

1   Although there may have been a published abstract distributed by the

2   organizers of the conference (Id. [Hellman Dep. 34:22-35:16]), there

3   is no evidence that any such abstract would have been sufficient to

4   enable one skilled in the art to reproduce the invention claimed in

5   the Diffie-Hellman patent.  See Ecolochem, Inc. v. Southern

6   California Edison Co., 863 F. Supp. 1165, 1177 (C.D. Cal. 1994),

7   citing In re Hall, 781 F.2d 897, 899 (Fed. Cir. 1986).

8        In sum, Schlafly has not adduced any admissible evidence that

9   the Diffie-Hellman invention was disclosed in a printed publication

10  more that one year before the application date of September 6,

11  1977.[7]  Rather, the only admissible evidence of record shows that

12  authors of the paper limited access to copies of the "New

13  Directions" paper (Gold Decl. Exhs. L [Hellman Dep. 37:8-17; 38:23-]

14  and K [Diffie Dep. 43:5-13, 45:25-46:3; 84:18-85:3; 86:19-22]).  No

15  member of the public had direct access to a copy of the manuscript

16  and there is no evidence that the paper was catalogued or

17  distributed prior to actual publication in a way that would allow

18  persons of ordinary skill to access the paper.

19       Given these restrictions, the alleged pre-publication

20  disclosures cannot constitute "publication" within the meaning of

21  the statute.  Compare Northern Telecom, Inc. v. Datapoint Corp., 908

22  _____

23       [7] Schlafly further alleges that the PTO was not informed of
    these prior art disclosures (Schlafly Motion at ¶ 3.6).  It is not
24  clear what "disclosures" Mr. Schlafly is referring to.  However, to
    the extent he refers to the National Computer Conference and Sweden
25  conference alleged in ¶¶ 3.4-3.5, the statement is false.  The fact
    that the paper had been discussed at these two conferences is
26  disclosed in the "New Directions" paper, which was before the Patent
    Office during the prosecution of the patent (Gold Decl. Exh. H at
27  102).

28                                    13

1  F.2d 931, 936 (Fed. Cir. 1990) (distribution of 50 copies of

2  document did not constitute publication when the document was

3  distributed under an understanding that copies would not be

4  disseminated and where members of public did not have direct access

5  to the document) and In re Cronyn, 890 F.2d 1158, 1159 (Fed. Cir.

6  1989) (undergraduate thesis in college library was not "publication"

7  even though thesis and index was available to public) with

8  Massachusetts Institute of Technology v. AB Fortia, 774 F.2d 1104,

9  1109 (Fed. Cir. 1985) (dissemination of copies of conference paper

10  at conference "without restriction" held to be publication).  Nor

11  has Schlafly adduced or presented any evidence that any of the

12  alleged "publications" would have enabled the invention claimed in

13  the Diffie-Hellman patent.  Accordingly, the Diffie-Hellman patent

14  is not invalid under the publication bar of 35 U.S.C. § 102(b).

15

16  **III. NEITHER DIFFIE-HELLMAN, NOR HELLMAN-MERKLE, ARE
       INVALID AS NON-STATUTORY SUBJECT MATTER**

17      Schlafly alleges that the Diffie-Hellman and Hellman-Merkle

18  patents are invalid because they claim non-statutory subject matter

19  (Schlafly Motion ¶¶ 3.7 and 4.10).  According to Schlafly, both

20  patents can be "readily seen" to consist purely of "mathematical

21  formulas" (Id.).  The question of whether the patents claim

22  nonstatutory subject matter can be resolved as a matter of law

23      In point of fact, none of the claims of either patent consists

24  of a purely mathematical formula (Omura Decl. ¶ 13).  Indeed, in the

25  Diffie-Hellman patent, the only claim that includes a mathematical

26  formula is claim 8, which claims "an apparatus for generating a

27  secure cipher key, comprising ..." (Id.).  In the Hellman-Merkle

28                                    14

CKC's OPPOSITION TO MOTION
AND CROSS MOTION FOR SUMMARY JUDGMENT
CV 94 20512 SW (PVT)

1    patent, similarly, the first six claims do not include any

2    mathematical formula at all, and claims 7-17 all claim either an

3    "apparatus" or "a method" (Id.).  Nor does the inclusion of a

4    mathematical formula in the claims render them invalid.  As the

5    Supreme Court has observed, "a claim drawn to subject matter

6    otherwise statutory does not become nonstatutory merely because it

7    uses a mathematical formula."  Diamond v. Diehr, 450 U.S. 175, 187

8    (1981).

9         Rather, "the proper inquiry in dealing with the so called

10   mathematical subject matter exception to § 101 . . . is to see

11   whether the claimed subject matter as a whole is a disembodied

12   mathematical concept . . .."  In re Alappat, 33 F.3d 1526, 1544

13   (Fed. Cir. 1994) (emphasis in original) (in bank); see also In re

14   Iwahashi, 888 F.2d 1370, 1374-75 (Fed. Cir. 1989) ("Freeman-Walter"

15   test developed by Court of Appeals looks at whether claim as a whole

16   preempts an algorithm or whether algorithm is merely implemented in

17   a specific manner).  Thus

18           When a claim containing a mathematical formula
             implements or applies that formula in a
19           structure or process which, when considered as a
             whole, is performing a function which the patent
20           laws were defined to protect, (e.g. transforming
             or reducing an article to a different state or
21           thing), then the claim satisfies the
             requirements of §101.
22

23   Diamond v. Diehr, 450 U.S. at 192 (emphasis added).

24

25        In this case, there cannot be any dispute that the claims of

26   both patents are directed to methods (and apparatus) for

27   transforming messages from one state to another, and from one party

28                                    15

CKC's OPPOSITION TO MOTION
AND CROSS MOTION FOR SUMMARY JUDGMENT
CV 94 20512 SW (PVT)

1   to another (Omura Decl. ¶ 13). The fact that these messages are

2   comprised of information bits rather than some more transparently

3   physical phenomenon does not, contrary to Mr. Schlafly's contention,

4   render them any less patentable.  See Alappat, 33 F.3d at 1544

5   ("fact that the four claimed means elements function to transform

6   one set of data to another through what may be viewed as a series of

7   mathematical calculations" does not justify rejection of claims);

8   Iwahashi, 888 F.2d at 1375 (claim of apparatus for processing

9   signals for patter-recognition directed to statutory subject

10  matter).[8]

11      The Diffie-Hellman patent does not preempt Mr. Schlafly or

12  anyone else from using the discrete logarithm problem incorporated

13  in claim 8, except when they use it in "an apparatus for generating

14  a secure cipher key" and where the algorithm is used as a means for

15  generating the "third" and "fourth" signals described by the patent

16  (Omura Decl. ¶ 14).  Diamond v. Diehr, 450 U.S. at 187.  Similarly,

17  Hellman-Merkle does not preempt the use of knapsack algorithms

18  unless it is being used to generate a public key from a private

19  number in a system or apparatus for communicating securely over

20  insecure channels (Id.).  Rather, the patents seek "only to

21  foreclose from others the use of that equation in conjunction with

22  ───────────────────

23      [8] Schlafly contends that any hardware associated with the
    patents is "not novel" and thus, presumably cannot rescue the
24  claims.  Apart from being factually wrong, this contention is
    irrelevant as a matter of law.  In Diamond v. Diehr, the Court held
25  unequivocally that "the 'novelty' of any element or steps in a
    process, or even the process itself, is of no relevance in
26  determining whether the subject matter of a claim falls within the §
    101 categories of possibly patentable subject matter."  450 U.S. at
27  188-189.

28                                    16

1  all of the other steps in their claimed process." 450 U.S. at 187.

2  Accordingly, CKC is entitled to judgment as a matter of law that the

3  claims of the Diffie-Hellman and Hellman-Merkle patents are not

4  invalid for failure to claim statutory subject matter under 35

5  U.S.C. § 101.

6    **IV.   HELLMAN-MERKLE IS NOT INOPERATIVE UNDER ANY LEGAL**
           **DEFINITION OF OPERABILITY.**
7

8      Schlafly contends that the Hellman-Merkle knapsack system was

9  "broken" by attacks made on the system after its first publication

10  in 1978 and that the patent is, therefore, invalid.  It is

11  undisputed that in 1982, Dr. Merkle paid $100 to a researcher who

12  attacked a class of knapsacks, called "single iteration" knapsacks,

13  and in 1984, Dr. Merkle paid $1000 to another researcher who

14  attacked so-called "low density multiple iteration knapsacks"

15  (Schlafly Motion ¶¶ 4.2-4.4).  According to Schlafly, these facts

16  prove that the knapsack problem has been "broken" and means that the

17  Hellman-Merkle patent is invalid because it is inoperative as

18  disclosed.[9]  Schlafly is wrong on both counts and PKP and CKC are

19  entitled to judgment on this claim.

20

21

_____

22     [9] Although there is no dispute that Professor Merkle paid $100
23  and $1000 bets, the only evidence Schlafly produces on this point is
    a series of newspaper and journal articles (Exhs. CB, CC, CD, and
24  CK.  Each of these documents is hearsay and cannot be admitted for
    the truth of the matters asserted therein.  See, e.g. Horta v.
25  Sullivan, 4 F.3d at 8-9 (newspaper article inadmissible as evidence
    supporting summary judgment motion); Joiner v. General Elec. Co.,
26  864 F.Supp. 1310, 1317 (N.D. Ga. 1994) (learned treatises are
    inadmissible hearsay on motion for summary judgment unless they are
27  relied upon by expert).

28                                    17

CKC's OPPOSITION TO MOTION
AND CROSS MOTION FOR SUMMARY JUDGMENT
CV 94 20512 SW (PVT)

1    Preliminarily, as a matter of fact, there is no evidence that

2  the knapsack problem as disclosed and claimed in the patent has been

3  "broken."  The Hellman-Merkle specification teaches the use of

4  multiple iteration knapsacks as the best mode of practicing the

5  invention (Gold Decl. Exh. M [Merkle Dep. 98:2-100:19; 102:6-15];

6  Omura Decl. Exh. B at Col. 16, lines 46-53).  Even the winner of the

7  $1000 prize did not claim to have broken all types of multiple

8  iteration knapsacks; rather, he only claimed to have attacked some

9  kinds of "low density" multiple iteration knapsacks (Gold Decl. Exh.

10  M [Merkle Dep. 135:5-23]; Exh. N [Merkle Dep. Exh. M-13).  Moreover,

11  those multiple iteration knapsacks which the author did claim to

12  have attacked required as much as 347,000 hours (about 40 years) of

13  Cray computer time (Id.).  In short, even the use of low density

14  multiple iteration knapsacks would protect the user from attack by

15  all but those few individuals possessed of extraordinary encryption

16  resources.  See Engle Indus., Inc. v. Lockformer Co., 946 F.2d 1528

17  (Fed. Cir. 1991) ("The enablement requirement is met if the

18  description enables any mode of making and using the claimed

19  invention").[10]

20    More importantly, Schlafly's attack on the Hellman-Merkle

21  patent fails as a matter of law for at least three reasons, even if

22  one assumes that the knapsack problem has been "broken."  First, the

23  _____

24    [10] Dr. Merkle testified that he did not believe that the
   claimant of the $1000 prize had, in fact, broken the multiple

25  interated knapsack program.  He paid the prize, however, because it
   would have taken him a substantial effort to disprove the attack,

26  because he could not justify that effort, and because, under such
   circumstances, he considered that it would be "unsportsmanlike" to

27  withhold the award (Gold Decl. Exh. M [Merkle Dep. 131:11-132:24]).

28                                18

1    first six claims of the Hellman-Merkle patent read broadly on the

2    practice of Public Key technology, regardless of the algorithm used

3    to generate the public private key pair (Omura Decl. ¶ 8).   The

4    specification makes it clear that the use of the knapsack problem is

5    "an example system" (Omura Decl. Exh. B, Col. 4, line 48).   As a

6    matter of black-letter patent law, "[w]here a specification does not

7    <u>require</u> a limitation, that limitation should not be read from the

8    specification into the claims."   <u>Specialty Composites v. Cabot</u>

9    <u>Corp.</u>, 845 F.2d 981, 987 (Fed Cir. 1988) (emphasis in original); <u>see</u>

10   <u>also</u>, <u>E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.</u>, 849

11   F.2d 1430, 1433 (Fed. Cir. 1988) (improper to read limitation from

12   specification into claim); <u>Loctite Corp. v. Ultraseal, Ltd.</u>, 781

13   F.2d 861, 867 (Fed. Cir. 1985).   The broad claims of the Hellman-

14   Merkle do not require the key pair to be generated using the

15   knapsack problem, but rather, cover any implementation of the system

16   where "the secret key is directly related to and computationally

17   infeasable to generate from the public key" (Omura Decl. Exh. B at

18   Col. 19, lines 5-8, 42-44, Col. 19, line 67-Col. 20, lines 2, 27-

19   29).

20        Second, Schlafly's charge that Hellman-Merkle is "inoperative"

21   because knapsacks are insecure is meaningless under the patent law.

22   To the extent that Schlafly is claiming that the patent is invalid

23   for failure to meet the enablement requirement of 35 U.S.C. § 112,

24   then the charge must fail even if one assumes, as Schlafly does,

25   that all knapsacks have been proven to be insecure.   Schlafly does

26   not allege that knapsacks were insecure in 1977, when the

27   application was filed.   Compliance with the enablement requirement

28                                                 19

CKC's OPPOSITION TO MOTION
AND CROSS MOTION FOR SUMMARY JUDGMENT
CV 94 20512 SW (PVT)

of the patent statute is measured at the time the application is made. In re Glass, 492 F.2d 1228, 1232 (C.C.P.A. 1974).  Advances in art made after the filing date cannot render the disclosure non-enabling.  If the enablement requirement is met when the application is filed, "then the fact of that enablement was established for all time and a later change in the state of the art cannot change it." In re Hogan, 559 F.2d 595, 604 (C.C.P.A. 1977); see also United States Steel Corp. v. Phillips Petroleum Co., 865 F.2d 1247, 1251-52 (Fed. Cir. 1989).[11]

Finally, to the extent that Schlafly is asserting that the patent violates the utility requirement of 35 U.S.C. § 101, his argument also fails as a matter of law.  A patented device does not need to accomplish all of the objectives stated in the specification in order to meet the requirements of § 101.  Stiftung v. Renishaw PLC, 945 F.2d 1173, 1180 (Fed. Cir. 1991).  In order to meet his burden on a non-utility defense, Schlafly would have to "prov[e] total incapacity by clear and convincing evidence." Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1269 (Fed. Cir. 1986) (rejecting charge that patent claims were invalid because claims "would not work").  In this case, Schlafly has not provided any admissible evidence, much less evidence of "total incapacity."  Even Schlafly's allegations about the inoperability of the knapsack

---

[11] This rule is specifically intended to preserve the right to obtain broad claims for pioneering inventions.  "As pioneers . . . they would deserve broad claims to the broad concept. . . . If later states of the art could be employed as a basis for rejection under 35 U.S.C. 112, the opportunity for obtaining a basic patent upon early disclosure of pioneer inventions would be abolished." In re Hogan, 559 F.2d at 606.

20

1    implementation do not suggest that the broad claims of Hellman-

2    Merkle do not work.

3                              <u>CONCLUSION</u>

4         Schlafly has not presented any admissible evidence—much less

5    clear and convincing evidence—that the Hellman-Merkle and Diffie-

6    Hellman patents are invalid for any of the reasons asserted.

7    Indeed, the facts and the law associated with these claims establish

8    that CKC is entitled to judgment on these claims as a matter of law.

9         Dated: November 15, 1995

10

11                              MICHAEL M. CARLSON
                                BRYAN J. WILSON
12                              JANA G. GOLD
                                Morrison & Foerster
13

14

                                By:
15                                  Jana G. Gold
                                    Attorneys for
16                                  Intervenor/Defendant
                                    CARO-KANN CORPORATION
17

18

19

20

21

22

23

24

25

26

27

28                                   21

1

**PROOF OF PERSONAL SERVICE**
(FRCivP 5(b))

2

3       I am employed with the law firm of Morrison & Foerster, whose address is 755 Page Mill Road, Palo Alto, California 94304; I am not a party to the within cause; I am over the age of eighteen years and I am readily familiar with Morrison & Foerster's practice for the collection and processing

4   of documents for hand delivery and know that in the ordinary course of Morrison & Foerster's business practice the document(s) described below will be taken from Morrison & Foerster's

5   mailroom and hand delivered to the document's addressee (or left with an employee or person in charge of the addressee's office) on the same date that it is placed at Morrison & Foerster's mailroom.

6

7       I further declare that on the date hereof I served a copy of:

8   **CKC'S OPPOSITION TO SCHLAFLY'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT ON THE VALIDITY OF THE STANFORD PATENTS**

9

10   **CKC'S OBJECTIONS TO EVIDENCE SUBMITTED BY SCHLAFLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

11   **DECLARATION OF JANA G. GOLD IN OPPOSITION TO SCHLAFLY'S MOTION AND IN SUPPORT OF CKC'S CROSS-MOTION FOR**

12   **SUMMARY JUDGMENT ON THE VALIDITY OF THE STANFORD PATENT**

13

14   **DECLARATION OF DR. JIMMY OMURA IN OPPOSITION TO SCHLAFLY'S MOTION AND IN SUPPORT OF CKC'S CROSS-MOTION FOR SUMMARY JUDGMENT ON THE VALIDITY OF THE STANFORD PATENTS**

15

16   **[PROPOSED] ORDER RE SCHLAFLY MOTION FOR SUMMARY JUDGMENT AND CKC CROSS-MOTION FOR SUMMARY JDUGMENT ON THE VALIDITY OF THE STANFORD PATENTS**

17

18   on the following by placing a true copy thereof enclosed in a sealed envelope addressed as follows for collection and delivery at the mailroom of Morrison & Foerster, 755 Page Mill Road, Palo Alto,

19   California 94304, in accordance with Morrison & Foerster's ordinary business practices:

20   James R. Busselle, Esq.                          Thomas R. Hogan, Esq.
   Thomas E. Moore III, Esq.                   Law Offices of Thomas R. Hogan

21   Tomlinson, Zisko, Morosoli & Maser       60 South Market Street, Suite 1125
   200 Page Mill Road                         San Jose, CA 95113-2332

22   Palo Alto, CA 94306

23       I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

24

25       Executed at Palo Alto, California, on November 15, 1995.

26

27       Frances Macias Sagapolu                              
             (typed)                               (signature)

28

1                 **PROOF OF SERVICE BY OVERNIGHT DELIVERY**
                           (CCP 1013(c), 2015.5)

2

3        I declare that I am employed with the law firm of Morrison & Foerster, whose address is 755 Page Mill Road, Palo Alto, California 94304; I am not a party to the within cause; I am over the age of eighteen years and I am readily familiar with Morrison & Foerster's practice for collection and processing of correspondence for overnight delivery and know that in the ordinary course of Morrison & Foerster's business practice the document described below will be deposited in a box or other facility regularly maintained by **U.S. Express Mail** or delivered to an authorized courier or driver authorized by **U.S. Express Mail** to receive documents on the same date that it is placed at Morrison & Foerster for collection.

       I further declare that on the date hereof I served a copy of:

**CKC'S OPPOSITION TO SCHLAFLY'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT ON THE VALIDITY OF THE STANFORD PATENTS**

**CKC'S OBJECTIONS TO EVIDENCE SUBMITTED BY SCHLAFLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

**DECLARATION OF JANA G. GOLD IN OPPOSITION TO SCHLAFLY'S MOTION AND IN SUPPORT OF CKC'S CROSS-MOTION FOR SUMMARY JUDGMENT ON THE VALIDITY OF THE STANFORD PATENT**

**DECLARATION OF DR. JIMMY OMURA IN OPPOSITION TO SCHLAFLY'S MOTION AND IN SUPPORT OF CKC'S CROSS-MOTION FOR SUMMARY JUDGMENT ON THE VALIDITY OF THE STANFORD PATENTS**

**[PROPOSED] ORDER RE SCHLAFLY MOTION FOR SUMMARY JUDGMENT AND CKC CROSS-MOTION FOR SUMMARY JUDGMENT ON THE VALIDITY OF THE STANFORD PATENTS**

on the following by placing a true copy thereof enclosed in a sealed envelope with delivery fees provided for, addressed as follows for collection by **U.S. Express Mail** at Morrison & Foerster, 755 Page Mill Road, Palo Alto, California 94304, in accordance with Morrison & Foerster's ordinary business practices:

Mr. Roger Schlafly
P.O. Box 1680
Soquel, California  95073

       I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

       Executed at Palo Alto, California, on November 15, 1995.


Frances Macias Sagapolu
      (typed)                               (signature)