1       Pages 1-40                    ORIGINAL

2              IN THE UNITED STATES DISTRICT COURT

3            FOR THE NORTHERN DISTRICT OF CALIFORNIA

4        BEFORE THE HONORABLE SPENCER WILLIAMS, SENIOR JUDGE

5

6   ROGER SCHLAFLY,              )
                                )
7              Plaintiff,        ) Case No.  C-94-20512-SW
                                )
8       vs.                     )                    FILED
                                )
9   PUBLIC KEY PARTNERS, et al.,)                    FEB 27 1996
                                )
10             Defendants.       )          RICHARD W. WIEKING
    _____)      CLERK, U.S. DISTRICT COURT
11                                         NORTHERN DISTRICT OF CALIFORNIA
                                           SAN JOSE
12                              December 6, 1995
                                San Jose, California

13           Reporter's Transcript of Proceedings

14  APPEARANCES

15  For the Plaintiff           Dr. Roger Schlafly, In Pro Per
                                P.O. Box 1680
16                              Soquel, California   95073

17  For the Defendant           Law Offices of Thomas R. Hogan
    Public Key Partners         Thomas R. Hogan, Attorney at Law
18                              60 South Market Street, Suite 1125
                                San Jose, California   95113
19

20  For the Defendant           Tomlinson, Zisko, Morosoli & Maser
    RSA Data Security, Inc.     Thomas E. Moore, III,
                                Attorney at Law
21                              200 Page Mill Road, Second Floor
                                Palo Alto, California   94306
22

    Reported By                 Lee-Anne Shortridge
23                              Certified Shorthand Reporter #9595

24           Appearances Continued on Next Page

25           Computerized Transcription by StenoCat

<u>APPEARANCES CON'T</u>

For the Intervenor            Law Offices of Morrison & Foerster
Caro-Kann                     Jana G. Gold, Attorney at Law
                              755 Page Mill Road
                              Palo Alto, California  94304

                              Law Offices of Alston & Bird
                              Patrick J. Flinn, Attorney at Law
                              One Atlantic Center
                              1201 West Peachtree Street
                              Atlanta, Georgia  30309

1    <u>December 6, 1995</u>

2                THE CLERK:  Civil matter C-94-20512-SW, Roger

3    Schlafly vs. Public Key Partners, et al.

4                State your appearances for the record.

5                THE COURT:  I have it here.  Mr. Thomas Moore for

6    defendant RSA.

7                MR. MOORE:  Yes, good morning, Your Honor.  I'm Tom

8    Moore.

9                THE COURT:  And for defense, Tom Hogan for PKP.

10               MR. HOGAN:  Yes, Your Honor.  Good morning.

11               THE COURT:  Patrick Flinn for CKC.

12               MR. FLINN:  Yes, for Caro-Kann.  Good morning, Your

13   Honor.

14               THE COURT:  Good morning, Mr. Flinn.  And the

15   intervener.

16               MS. GOLD:  Jana Gold for CKC.

17               THE COURT:  And Mr. Schlafly.

18               MR. SCHLAFLY:  Yes.Good morning, Your Honor.

19               THE COURT:  Do you feel like you're outnumbered, Mr.

20   Schlafly?

21               MR. SCHLAFLY:  Just a little bit.

22               THE COURT:  In numbers at least, right?

23               THE CLERK:  On for motions.

24               THE COURT:  This is an alphabet soup.  I've been

25   trying to identify all these letters.

1         What I'd like to do is talk a little bit about the

2 patents first, and then the business litigation secondly.  Also,

3 if you stack up all the papers I have and see what I have to

4 work with, it's about like this (indicating).  The cases and

5 facts raise very interesting questions and very interesting

6 motions.

7         I'm not going to decide it today.  I've got a lot of

8 reading to do.  But I think it'll be good to discuss the patent

9 problems first and then the business allegations, and maybe you

10 can summarize it or give me a little feeling for your position,

11 and then I'll take it under submission.  It's going to be very

12 complicated.

13         But we have Mr. Schlafly suing on the two patents,

14 the two Stanford patents, and also on the MIT patent, and he

15 also is suing on the anti-trust unfair business practice and so

16 forth in his complaint.

17         CKC is defending the validity of the Stanford

18 patent, if I understand that.

19         And RSA is defending the MIT patent and also

20 depending on the anti-trust.

21         MR. MOORE:  Yes, Your Honor.  We are also defending

22 on the so-called Schnorr patent.

23         THE COURT:  Okay.  And now I understand there's a

24 parallel action up in the Oakland Federal Court in which CKC is

25 suing RSA on the question; is that correct?

1          MR. FLINN:  Close, but precision matter is a little
2    bit here, Your Honor.  I'll step up.  There are two other cases
3    pending in this court that are connected to this litigation.
4    The one you referred to in Oakland that is now pending before
5    Judge Chesney is brought by Caro-Kann's parent corporation,
6    Cylink, against RSA, but it raises the same patent as Mr.
7    Schlafly is challenging in this case.

8          In addition, as Your Honor may be aware, there is a
9    relatively newly filed lawsuit brought by RSA Data Security in
10   front of Judge Orrick, and the defendants in that case are
11   Cylick, Caro-Kann and Stanford University, and the validity of
12   the Stanford patents are raised in that litigation.

13         THE COURT:  Just the Stanford patents?

14         MR. FLINN:  Just the Stanford patents.

15         THE COURT:  I think we have a lot of judges.

16         Okay.  Now, as I understand it, the facts are that
17   Mr. Schlafly was the subject of litigation at one time and the
18   matter was settled, and then maybe you can just give me a brief
19   summary of the facts, because you can probably do a better job
20   than I can.  I look at my diagrams, I'm organized by colors and
21   arrows, but --

22         MR. FLINN:  Our suggestion, Your Honor --

23         THE COURT:  Mr. Hogan?

24         MR. FLINN:  -- is that Mr. Hogan do that, yes,
25   because although he's adverse to Mr. Schlafly, the partners, Mr.

1    Moore and I, our clients are obviously feuding substantially.

2    We're in litigation in other cases and I think Mr. Hogan, who's

3    done a marvelous job between Scylla and Charybdis that our

4    clients represent, he ought to be the one.  He's in the best

5    place to do this.

6              MR. HOGAN:  Thank you, Your Honor.  As the court

7    understands, the landscape has changed to some extent so the

8    patents are now being defended by the actual holders, the

9    intervener, Caro-Kann Corporation and RSA Data Security Inc.

10             PKP, the demise of which occurred relatively

11   recently, is still being represented by myself.  And of course

12   in that regard, I'll be addressing the latter part of what Your

13   Honor announced you wanted to hear about the torts, the unfair

14   business practices, et cetera.

15             But historically Your Honor is correct.  What

16   happened was there was litigation in Chicago involving patent,

17   alleged patent infringement by a company that the plaintiff

18   here, Mr. Schlafly, was a member of.

19             THE COURT:  Yeah.

20             MR. HOGAN:  And that resulted in an injunction

21   against those parties, Mr. Schlafly included.  That is simply --

22   that, simply put, prevented them from infringing those patents

23   in the future.

24             This case then arose, I think at least in part,

25   after Mr. Schlafly became aware of a letter that was written by,

1    and on behalf of, the partnership, Public Key Partners, to AT&T.

2             THE COURT:  Yeah.

3             MR. HOGAN:  Remember the letter, Exhibit D to the

4    amended complaint I believe, which basically had discovered that

5    AT&T, in some of the product literature they had sent out, was

6    making use of some material that was subject to the patents, the

7    Stanford patents I believe in particular, and the letter written

8    on behalf of PKP essentially advised AT&T that they were

9    concerned about whether their use of these, of the patents,

10   might be in violation of that judgment out of the Chicago court.

11            THE COURT:  Okay.

12            MR. HOGAN:  When the plaintiff became aware of that

13   letter, and the plaintiff at that time as we now know through

14   discovery, and principally the taking of the deposition of Mr.

15   Schlafly which took place over several days, the plaintiff was

16   involved with that, or was a successor of that organization, and

17   had done a lot of the software design of the product that AT&T

18   was then marketing.

19            THE COURT:  He wrote and said, basically, "You don't

20   say those nasty things about me."

21            MR. HOGAN:  Exactly.  Of course, although he never

22   mentioned it in the letter, nor any entity that he was then

23   involved with, nevertheless, he believed that that caused him

24   harm and so he protested loudly to PKP.  He, of course,

25   requested from PKP some information about their license policy,

1  licensing policies.  You'll recall that PKP was formed, I

2  believe, in April of 1991.

3          MR. MOORE:  '90.

4          MR. HOGAN:  '90, thank you, April of 1990.  And as

5  part of that formation, they had sent a letter to a great many

6  entities announcing that they were the holders of these various

7  patents, the MIT patents and the Stanford patents, and advised

8  the world at large interested in cryptography that they would be

9  more than willing to license these patents on a

10 nondiscriminatory basis.

11         Mr. Schlafly -- among others of course, Mr. Schlafly

12 wrote a letter to PKP in effect saying, "Tell me what your

13 licensing policy is."  He received a response, "We're prepared

14 to discuss the license with you at any time."

15         But he never -- essentially, he never followed up.

16 He was never refused a license.But those two events are

17 connected; that is, his inquiry about getting a license and the

18 infamous letter to AT&T.  That prompted, I believe, his action

19 in this lawsuit.

20         THE COURT:  And he filed this case before this

21 litigation we have, Roger Schlafly versus PKP and RSA Data.

22         MR. HOGAN:  Exactly, Your Honor.  In a nutshell, I

23 believe that's it.  Obviously the core of the case is the patent

24 allegations, but you'll remember, of course, there were numerous

25 allegations, many of which Your Honor dismissed earlier, but

1    there are some, some still remaining.

2               THE COURT:  All right.  And we have before us today

3    the plaintiff's motion for partial summary judgment on the

4    question of patent validity.

5               MR. HOGAN:  Correct.

6               THE COURT:  And then the CKC's cross-motion for

7    summary judgment on the Stanford patent validity.

8               MR. HOGAN:  That's correct, Your Honor.

9               THE COURT:  And RSA and PKP's motions for partial

10   summary judgment on the business and anti-trust claims and so

11   forth.

12              MR. HOGAN:  Exactly, Your Honor.

13              THE COURT:  Okay.  Anyone want to discuss anything

14   on the merits of this first motion, or your motion?  Just

15   summarize what it is.

16              MR. HOGAN:  That's the business torts motion.  Your

17   Honor, of course, as I said, we did take the plaintiff's

18   deposition over several days.  Your Honor had, in your earlier

19   ruling in, I think February, basically said, "Obviously the

20   pleadings are sufficient.  Let's get the facts."

21              We went to Mr. Schlafly and took his deposition and

22   no facts ever came up.  There were no damages.  As I mentioned,

23   he's got a claim in the alleged complaint, I believe, for two

24   million dollars.  We asked him about every way you can possibly

25   ask somebody how he got to that number, and the bottom line

answer was, "It was a number I picked out of the air.  I had to

have a number, so I put it in there."

He never had a product, doesn't have a product

today, never developed a product.  He is essentially a designer,

a software designer, and has business relations, as I understand

it, with a company that provides his designs to AT&T, which then

uses it in a product.  So he's never been in the marketplace,

never tried to be in the marketplace.

Of course, essentially if you cut it away, it seems

to me what he's really saying is that this letter, again the

infamous Exhibit D, in effect chilled the marketplace you might

say.  It discouraged him from doing things that he might

otherwise have done.

But he doesn't allege any facts that he actually did

any of these things.  Whatever his relationship with AT&T or the

corporation that provides the product, or rather the software,

to AT&T, ISC or whatever it is, whether you call it a contract

or a business relationship of any sort, again, there's no

evidence whatsoever that PKP or anybody, any of the defendants,

interfered with that relationship that continues to this day.

As I think Mr. Schlafly admitted in his opposition, he hasn't

been entirely happy with what AT&T has done in terms of

marketing, et cetera, but he can't blame that on the defendants.

So we think there's simply no facts.  When we went

through his opposition and the way he pled it, the defendants

1   now know what they have to respond to.  We went to him and said,

2   "Tell us.  Give us everything."

3            And I must say, on behalf of PKP, Mr. Schlafly was

4   very forthcoming.  Everything we asked, he answered.  But there

5   simply wasn't any evidence, none.

6            THE COURT:  Thank you.

7            MR. HOGAN:  Thank you.

8            THE COURT:  Mr. Schlafly, in a motion for summary

9   judgment, you have to come forward with all the factual issues

10  which sustain your position.  Do you have anything to add to

11  what you put in your -- I'm not asking you to amend now, but do

12  you have anything to add to the factual situation that you

13  haven't included in your papers?  I'm sure you're just --

14           MR. SCHLAFLY:  I'm a little confused as to what --

15           THE COURT:  I'm sure you have disagreed with the

16  argument that you have nothing to show, but everything you have

17  to show is in your papers, is that correct, evidentiary-wise  to

18  support your allegations of the anti-trust and so forth?

19           MR. SCHLAFLY:  That's correct.  But just -- I'm a

20  little confused as to which motion we're going to talk about

21  right now.  You originally said --

22           THE COURT:  Your motion for partial summary judgment

23  on your claim for anti-trust, and you have a claim for patent

24  validity, patent noninfringement, contractual relationships,

25  unfair business practices, and anti-trust violations.   Those are

1  what I call the business aspects, not the patent aspects of your

2  claims.

3  　　　　MR. SCHLAFLY:  Okay.  That's their motion.  My

4  motion has to do with the patent invalidity, and I thought we

5  were going to talk about that first.

6  　　　　THE COURT:  You can do that too.

7  　　　　MR. SCHLAFLY:  But if we want to talk about --

8  　　　　THE COURT:  Mr. Hogan, I asked him to speak because

9  they all agreed he would do the best job of laying out the facts

10 so I could understand them, and I do understand all this.  So he

11 was speaking primarily to those.He just mentioned the

12 anti-trust, interference with contractual relationship and

13 unfair business practices.

14 　　　　So you, in your response to the motion for partial

15 summary judgment, you have set forth all the information you

16 have that would support those, your claims, right?

17 　　　　MR. SCHLAFLY:  In my opposition to their motion?

18 　　　　THE COURT:  Right.

19 　　　　MR. SCHLAFLY:  That's correct.  We haven't had a

20 discovery cutoff yet, but that's what I have today.

21 　　　　THE COURT:  Everything you know is in there?

22 　　　　MR. SCHLAFLY:  Yes.

23 　　　　THE COURT:  Now, do you want to add anything else?

24 Now that you have the floor, do you want to speak to your patent

25 validity aspect or is there anything else you want to add?  This

1    is just a summary.  I'm not going to decide it today, but I want

2    you to have a chance to express yourself.

3             MR. SCHLAFLY:  Sure, yes.  I'd like to briefly

4    summarize the patent invalidity arguments.

5             THE COURT:  Okay.

6             MR. SCHLAFLY:  There are several patents that I'm

7    arguing are invalid, each on somewhat different grounds.

8             The first patent is the Stanford Diffie-Hellman

9    patent, and I'm arguing that that's invalid based on a prior

10   enabling disclosure that that is more than one year before the

11   filing of the patent.  There were four fully enabling

12   disclosures of the invention.

13            THE COURT:  Public knowledge, right?

14            MR. SCHLAFLY:  And public knowledge, yes.  They

15   were -- the first one was at a National Computer Conference, one

16   of the inventors gave a public talk.  There were thousands of

17   people at the conference.  There were -- his talk was well

18   attended.  There were people there who understood it.  There

19   were -- I have copies of the viewgraphs that the inventor had

20   that explicitly show a disclosure of the invention.

21            THE COURT:  Okay.

22            MR. SCHLAFLY:  Okay.  There was another talk that

23   the same inventor gave at IBM more than a year in advance.

24   There was no confidentiality condition on it.  It was -- there

25   were people there.  People attended.  There were experts there

1    who understood it.  There were -- and again, I have the slides

2    from the talk that explicitly show an enabling disclosure of the

3    invention.

4           Third, I have one of the other inventors, Hellman,

5    went to a conference in Sweden which was a I Triple E

6    conference.  Anyone who's a member of that international

7    organization could sign up and go.  And he testified that he

8    also gave an enabling disclosure of the invention.

9           Finally, I have a copy of a preprint, which is,

10   which gives an enabling disclosure of the invention that is

11   dated more than one year before the filing of the patent.  So

12   there are like four different enabling disclosures.

13          THE COURT:  Okay.  Thank you.

14          Response?

15          MR. FLINN:  I will be very brief.  As I understand

16   the way we're going to proceed, we'll proceed seriatim patent by

17   patent.  That makes sense because the arguments are somewhat

18   different, that is, the argument about the Diffie-Hellman patent

19   is different than the argument about the Hellman-Merkle patent.

20          I did want to begin with one thing.  I think it's

21   appropriate to say I think Mr. Schlafly should be commended on

22   the papers he submitted with respect to the patent questions.  I

23   wish some of the lawyers I deal with wrote as crisply and

24   clearly as he has.  I think the court has -- well, if you look

25   at the papers, the issues are quite squarely presented.

1    THE COURT:  I have heard a lot of nice things today

2    so far.

3    MR. FLINN:  Which is one of the reasons why we made

4    a cross-motion, because I don't believe the underlying facts, or

5    the actual evidentiary record, contains any factual disputes.

6    We may characterize the record a little differently, and I'll

7    address that in a second, but I think the matter is -- I think

8    we agree the matter is ripe for resolution of the application of

9    the questions of the law to the facts.

10    The first question is the printed publication

11    requirement of the statute and whether or not that is a question

12    of law.  There's no dispute about that.

13    But I wanted to begin before particularly addressing

14    the publication issue, because that is the question about

15    Diffie-Hellman, just to help the court understand a little bit

16    about the relationship of these two patents, and even set a

17    ground work perhaps for the third.

18    The Diffie-Hellman patent is good to think of as the

19    first one, because it's kind of a precursor.  It allows two

20    parties who have no method of secure talking in private to

21    exchange a number and, together, come up with a key that, even

22    if somebody overheard everything they said, they'd never learn

23    the key.  That was part, but not the whole thing, of the

24    equation for how to do this public key cryptography.

25    The second patent, Hellman-Merkle, does two things.

1   It contains a particular way of doing actual public key where

2   you have a public key and a private key.  One locks the message,

3   the other unlocks, and possessing one key is of no use to try

4   and figure out the other key.  It proudly claims the practice of

5   public key, in addition to containing a specific implementation,

6   but I'll reserve my discussion of that until we get to Hellman

7   and Fine P.C.

8         But let's turn to the Diffie-Helman patent.  The

9   only invalidity argument being raised by Mr. Schlafly, or anyone

10  else in this case, is that the publication, that a preprint,

11  this paper, entitled New Directions In Cryptography, Exhibit U,

12  constitutes a statutory bar.

13        Now, in Mr. Schlafly's statement, he spent some time

14  discussing, quote, "public disclosure."  That is not the

15  standard.  Under our patent laws, an inventor is free to tell

16  the world about his or her patent more than a year before the

17  application is filed.  The fact that the public knows of the

18  invention, all the details, enablement and everything else, is

19  not the requirement.

20        The language of the statute is, quote, "printed

21  publication."  And it makes a difference that there are both

22  words, both "printed" and "publication."

23        The way you can have your patent invalidated by the

24  statutory bar is either if there is a printed publication more

25  than a year in advance, or if somebody puts it in a product more

1  than a year in advance.  So if you're out there telling the

2  world about your invention and somebody gets to the market more

3  than a year before you file your application, then you may be in

4  trouble.

5          But we're not dealing with that situation here.

6  Here the issue is was this exhibit, Exhibit U, and particularly

7  the so-called preprint of it, a printed publication?

8          Now, the references in the papers to viewgraphs and

9  thousands of people attending a conference are completely

10  irrelevant.  The evidence, and if you look at the record, is

11  that the viewgraphs are not copies.  They were not distributed

12  and they were not made available.  They were shown, but they

13  were not distributed or available to anyone.  They went back in

14  the inventor's briefcases.

15          That is a different question than the question of

16  actual copies of the paper in manuscript form that were sent

17  out.

18          Now, I want to make one observation as I discuss

19  what the record shows about that.  The paper itself, in its

20  published version, New Directions In Cryptography, and that is

21  the form that appears in Exhibit U, was before the patent

22  office.  On the very first page on the footnote, it specifically

23  recites the facts that Mr. Schlafly has advanced, that there was

24  a manuscript sent out in June 1976 and that portions of the work

25  were presented at the National Computer Conference at Lenox,

Massachusetts and at a conference in Sweden to the patent
examiner to whom this court is required to defer.

Now, the facts about the public presentations of
this and the dates are clearly indicated in the published
version of the paper. This is not anything that was not, that
the patent office didn't know about.

And again, before I discuss the record, I also have
to point out procedurally on summary judgment, the court has to
take into account two facts. The first is Mr. Schlafly has the
burden of proof, and he has to survive a summary judgment, our
cross-motion. He has to have a sufficient quantum of evidence
such that a reasonable juror could find not by a preponderance
of the evidence, but by clear and convincing evidence that in
fact there was a printed publication.

So to the extent that in the 15 or so years that
have elapsed, there is simply an absence of detail here, that
absence of detail must work against Plaintiff in this case, not
the patent owners.

Now let me turn specifically to what the evidentiary
record is. The evidentiary record is that neither of the
inventors, neither Diffie nor Hellman, remember any particular
dissemination of this article to anybody. The testimony that
you see relates to practice and belief that, according to
practice, it was customary to circulate some copies of the
preprints.

1    Now, the one thing that Mr. Schlafly said in his

2    oral statement that I do believe is simply unsupported by the

3    record was he said there were no restrictions.  The record, in

4    fact, is the opposite.  Page 77, line 15 of the Hellman

5    deposition, which is in the rebuttal materials Mr. Schlafly

6    submitted, Dr. Helman specifically said that he did not make the

7    copies available.  He said not unrestricted.

8    So he specifically said that his practice was simply

9    not to make copies of this available to anyone.  He was asked

10   by -- the only evidence that we have is simply that it's some

11   number between 5 and 100, and Mr. Schlafly deliberately chose

12   not to get any more specific about that, would have been given

13   out potentially according to the practice that Dr. Hellman

14   recalled he followed at the time.

15   Now, it turns out that if we look at the case law,

16   the actual number is not the relevant criteria.  And we've all

17   cited the same case, so it's not as if there is an uncertain

18   geography on the case law in this area.

19   The critical issue is public access.  Can someone,

20   on their own, go out and get it with reasonable diligence?  And

21   where the inventor has testified that he does not give this out

22   on an unrestricted basis, someone who doesn't know the inventor,

23   who hasn't convinced the inventor to give him a copy of the

24   paper, does not get access.

25   There is simply no evidence that someone out there

1   -- you couldn't get it in a library.  You couldn't get it on any

2   kind of on-line computer.  You couldn't go into a book store and

3   buy it.  You couldn't go into a library and find it.

4          It was not something that if you knew about it, you

5   could be sure that you could go out and get it.  You had to

6   convince the author of the paper that you had a legitimate

7   reason to get it.

8          That's all the record is on the publication, and the

9   case law does not say that there is a magic number.  Certainly

10  one of the cases involved, I believe, on the order of 50 copies

11  being distributed under conditions that did not allow members of

12  the public to necessarily get access, and that was not held to

13  be a publication, whereas one copy in the library properly

14  indexed can be a publication.  It's not numbers.  It's access.

15  There's simply no evidence of access.

16         THE COURT:  On the directions of it, the publication

17  did come in November of '76.

18         MR. FLINN:  That's correct, and that's less than a

19  year before the publication date; that is, the patent was filed

20  within a year of the appearance of the published version of the

21  paper.

22         THE COURT:  Okay.  Thank you.

23         Just a few words, Mr. Schlafly, and then we'll go on

24  to some of the other matters.

25         MR. SCHLAFLY:  Yes, I'd like to respond to a couple

1    of those points.

2              THE COURT:  I'll be deciding this on what I see in

3    the documents, so why don't you emphasize what I should look

4    for?  That's why I'm having oral discussion here.

5              MR. SCHLAFLY:  Yes, okay.  I'll agree that what

6    constitutes a printed publication is a matter of law and that

7    the law does refer to printed, the phrase "printed publication."

8              However, if you look at all the court decisions on

9    this, they don't, never do they key on the exact technology of

10   what constitutes printed or what constitutes publication.  The

11   technology is kind of irrelevant.

12             The question is, was an enabling disclosure made to

13   the public, and that's the issue that all the court decisions

14   that involve this key on.  I think you'll find that if you look

15   at the court decisions.

16             Okay.  Next Mr. Flinn says that the, the disclosures

17   that I talked about were disclosed to the patent office, and

18   were noted in the patent file.

19             I don't think that is true.  If you look at the

20   evidence, that is just simply not true.  What the patent file

21   does disclose is it says that the New Directions article was

22   submitted to the journal in June of 1976, and it also refers to

23   a publication at the National Computer Conference in June of

24   1976.

25             However, neither of those are among the four public

disclosures that I've argued in my brief that constitute

enabling prior art to invalidate the patent; that is, if you

submit something to a journal, normally the journal, the journal

sends it out to an editor or something.  That's not revealed to

the public, and I'm not claiming it is.

The conference publication that occurred was

submitted some number of months in advance, and the actual

publication that appeared does not include the enabling

disclosure.

However, the testimony and slides from the talk

show constitute that there was an enabling disclosure made at

the talk that was given at that conference.

THE COURT:  That's the clear -- that's the evidence

proof requirement, clear and convincing evidence requirement.

MR. SCHLAFLY:  Clear and convincing evidence.  I

think I have clear and convincing evidence of those four

enabling disclosures.

I'd like to respond to a couple of other things.

THE COURT:  Okay.

MR. SCHLAFLY:  As far as Professor Hellman

distributing the preprints, Professor Hellman, he did say he

distributed between 5 and 100 preprints.  Unfortunately, he

could not remember exactly when he distributed them.  He did say

that it was, it was normally his practice to distribute

preprints to whoever asked for them, but he couldn't remember

1    exactly what procedures he followed with this particular paper.

2            However, I have a copy of the paper.  The copy of

3    the paper is dated August 1976, and it's not stamped

4    confidential or anything like that.  And in the lack of any

5    other evidence to the contrary, I think a copy of the paper that

6    has a date stamped on it and is not stamped confidential or

7    anything is clear and convincing evidence.

8            THE COURT:  Is it authenticated?  I mean, where did

9    you get it?  You're saying -- did you -- well, where did it come

10   from?

11           MR. SCHLAFLY:  I did some calling and I found a

12   cryptographer at IBM.  I asked him to go to his files and see

13   what he had.  He pulled it out of his files and sent it to me.

14   He doesn't remember exactly what date he got it or how he got

15   it.  They've been in his files since the '70's and he just

16   didn't remember.

17           But it does clearly say August 1976.  It's clearly a

18   preprinted paper that discloses the enabling embodiment

19   invention, and it's not stamp confidential or anything.

20           THE COURT:  Okay.

21           MR. SCHLAFLY:  Okay.  That's all I have to say about

22   that patent right now.

23           THE COURT:  Any more discussion on the other patent

24   that maybe we should take up at this time?

25           MR. FLINN:  Briefly, Your Honor.  Mr. Schlafly can

1    move right to the Hellman patent and then I'll respond.

2              THE COURT:  Pardon me?

3              MR. FLINN:  Presumably he can go right to the next

4    patent.

5              THE COURT:  All right.  You're on again.

6              MR. SCHLAFLY:  Okay.  The next one is the

7    Hellman-Merkle patent, and this, my argument that this patent is

8    invalid is based on it being inoperative, that it does not work,

9    it does not achieve its stated objectives, and the disclosed

10   embodiments do not enable someone to practice the claims.

11             THE COURT:  Okay.  You say the trap door doesn't

12   work?

13             MR. SCHLAFLY:  The trap door knapsack does not work.

14             THE COURT:  Okay.

15             MR. SCHLAFLY:  Okay.  What I mean by that is that

16   the whole idea of public key cryptography, which we can get into

17   if you want, is that there's one key for encryption and there's

18   one key for decryption.  The encryption key can be made public,

19   disclosed to anybody, but the decryption key you keep secret.

20   Anyone can send you a message because they get the encryption

21   key, but only you can decrypt it because you have the decryption

22   key.

23             That's what the Stanford inventors were trying to do

24   with this patent.  And the concept -- the concept is a good one.

25   There are public key systems that do that.

1    However, the embodiments that are described in the

2  Hellman-Merkle patent do not do that, and that is because the

3  ones they describe are insecure in that it's possible for

4  someone to compute the decryption key from the public encryption

5  key, which means anyone can decrypt the message.

6        THE COURT:  You're saying it works in part, but not

7  totally.  The patent is only half effective?

8        MR. SCHLAFLY:  It's not effective at all.

9        THE COURT:  For what purpose?

10        MR. SCHLAFLY:  Because the purpose is to send secret

11  messages, and you cannot send secret messages with it because

12  it's possible for someone else to take the encryption key and

13  figure it out, and figure out the decryption key and decrypt the

14  messages.

15        THE COURT:  Okay.

16        MR. SCHLAFLY:  Okay.  Now, my evidence for this is

17  that it has to do with a series of public papers that were

18  published in the '80's in which several cryptographers did a

19  thorough analysis of this and, in a series of papers, they

20  published very specific algorithms, or methods, that can be used

21  to, in cryptography jargon, break it; that is, they published

22  papers that said, "Here, if you use this trap door knapsack

23  method, we can use this method and decode your messages."

24        There's a whole series of papers that are published

25  on this, and they were in respected referee journals.  Nobody

1    questions the validity of that analysis.  That analysis shows
2    the trap door knapsack embodiments that are disclosed in the
3    Hellman-Merkle patent don't work.
4            And it's a fundamental principal of patent law that
5    you have to, you have to describe -- you have to describe, if
6    you invent something, you have to describe an embodiment that
7    works, and you have to enable somebody to practice the invention
8    in a way that achieves the objectives and satisfies the claims.
9            Now, I should say I also have some, a couple of
10   other arguments that have something to do with this.  For one
11   thing, the Helman-Merkle patent also claims to have a method of
12   signatures, and for their method of signatures, they say that,
13   they say, "Well, provided this trap door knapsack has high
14   density, you can do signatures."
15           However, they don't give any clue as to how to
16   produce a trap door knapsack of high density, so I say also it's
17   not enabling for signatures on those grounds.
18           And also, I have an invalidity argument based on the
19   patenting of a mathematical formula or mathematical algorithm,
20   which is an argument against, argument for the invalidity of
21   both of the Stanford patents, as well as the RSA patent.  Maybe
22   we'll get to that argument in more detail when we talk about the
23   RSA patent.
24           THE COURT:  Okay.  But you're saying it has no --
25   this patent has no beneficial use?  Even though it may be not

1    insecure to everybody, it serves no purpose.

2              MR. SCHLAFLY:  It serves no purpose.  Nobody uses

3    it.  It's insecure.

4              THE COURT:  It provides a way for transmitting

5    messages that may be not totally secret, but does it provide a

6    system for transmitting and receiving messages?

7              MR. SCHLAFLY:  It does provide a system for sending

8    and receiving messages, that's correct.

9              However, it states in its objectives -- it states,

10   as its objective, to do this securely, and the method it

11   describes is not secure.

12             Furthermore, all of the claims refer to a certain

13   computational infeasibility, okay?  Now, what that means is that

14   if you wanted to break it, you know, maybe you could if you had

15   millions of years of computer time or something, but there's no

16   feasible way to break it with some reasonable amount of computer

17   time, and that's specifically said right in the claims.

18             However, these papers that were published in the

19   '80's showed that, in fact, it is feasible to break it, that

20   with fairly small amounts of computer time, you can.  You can

21   decode the messages and make the system worthless.

22             THE COURT:  Okay.  Thank you.  Response to that?

23             MR. FLINN:  I wanted to -- not to disrupt the flow

24   of things, but I want to make one brief comment on the

25   publication issue on the Diffie-Hellman that was raised, because

1    I think it illustrates the burden of proof problem Mr. Schlafly

2    has.   Mr. Schlafly points to an August paper dated August 1976

3    for the proposition that there was disclosure.

4            Now the patent was filed in September.   If that

5    paper was sent in October, then the paper has got nothing to do

6    with this.   It has no bearing on the validity of the patent, and

7    he cannot find a witness who says, "I got it in October as

8    opposed to August."   He needs a witness who says, A), "I got it

9    in August," and B), "I got it with no restrictions."   The person

10   he got the paper from simply couldn't recall back that far.

11           The paper, unfortunately, is illustrative of the

12   fact that he simply cannot get the facts that he needs to

13   support this theory.

14           Let me turn directly to the Hellman-Merkle patent

15   and recall its place in the development of this field of public

16   key cryptography.   It is, I think all the people in the room

17   would agree, perhaps some more grudgingly than others, that it

18   is the pioneering patent.

19           It was the patent which broadly claimed the

20   discovery of the concept of public key, and in its specification

21   it disclosed a public key way of doing public key cryptography,

22   the so-called trap door knapsack.

23           It's important to bear in mind the difference

24   between the specifications of the patent and the claims of the

25   patents.   The claims of the patents measure what you're entitled

1   to when it comes to infringement.

2           The specification requirements have two elements to

3   them.  You have to have an enabling disclosure; that is, you

4   have to disclose one way which works.  You can claim in your

5   patent all the ways.  If you are the pioneering patent, you only

6   have to disclose one way that it works.

7           And secondly, you have to disclose the so-called

8   best mode of those.  And it's very, very important, and

9   dispositive in this case, that the measurement of both

10  requirements, enablement and best mode, are measured at the time

11  the application is filed.  The law could not be clearer on this.

12  In Re: Hogan is the leading case on that and it is cited in our

13  papers.

14          And with regard to best mode, that was raised in the

15  reply papers, not inappropriately because we certainly did make

16  our cross-motion, but I wanted to call the court's attention to

17  a case that establishes the identical principal for best mode as

18  it does for enablement, which is that it is measured at the time

19  the application is filed.  One of many cases is Glaxo

20  Incorporated, G-l-a-x-o, versus Novopharm, N-o-v-o-p-h-a-r-m.

21  It is a Federal Circuit case from 1995, and the citation is 52,

22  Federal Reporter3rd, 1043, and the relevant language comes at

23  page 1050 of that decision.

24          Let me first talk about enablement.  Beginning --

25  the first thing I'm going to say.

1          THE COURT:  Who wrote the opinion?

2          MR. FLINN:  Beg your pardon?

3          THE COURT:  Who wrote the opinion?

4          MR. FLINN:  I think it was en banc.  No, it's not en

5    banc.  It was by Judges Archer, Rich and Mayer of the Federal

6    Circuit Court of Appeals.

7          THE COURT:  Okay.

8          MR. FLINN:  But this is not a controversial issue.

9    It appears in the Chisum Treatis on patents and is a well

10   establish issue of law.

11         But let me look to enablement, because that is fully

12   discussed in the briefs.  At first, the first part of -- the

13   first observation I will make will assume something that the

14   record does not support.  It will assume that all trap door

15   knapsacks are broken, and that is not true, but we will assume

16   it for purposes of the argument.

17         If you look at every single one of the publications

18   that Mr. Schlafly sites in support of the proposition that they

19   are broken, they date from the 1980's.  In 1977, no one knew how

20   to break trap door knapsacks.  From 1977 until 1982, you could

21   use a trap door knapsack and no one, because the attack had not

22   been invented yet, could break your code.  So there was no

23   question that at the time the patent application was filed, trap

24   door knapsacks were secure.  It just so happened that advances

25   in mathematics allowed people to discover a way to attack them.

1    I would note that with one exception, no

2    cryptography system is proven secure.  People simply don't know

3    how to break them, and they are secure as long as A), computers

4    aren't fast enough, or B), people aren't smart enough to break

5    them.  And the court is probably aware that quite recently,

6    within the last few years, the notorious Fermat's Last Theorem,

7    which remained unsolved for hundreds of years, was finally

8    proven.  I don't think anyone would say if Fermat's Last Theorum

9    had some cryptographic use that a system that was secure for

10   hundreds of years was not useful.

11   The same principal applies.  The In Re: Hogan case

12   is absolutely dispositive on its motion.  Even if trap door

13   knapsacks were completely broken in the 1980's, the disclosure

14   nonetheless meets the enabling requirement.

15   Now let me turn to specifically what the record is,

16   because the record is a little bit different than the popular

17   myth that was floating around, and the myth exists because

18   cryptography bears a certain relationship to banking in that

19   bankers rely as much on the perception of security as opposed to

20   the reality of security.

21   There's no question that some categories of trap

22   door knapsacks were broken.  The perception of the security of

23   trap door knapsacks was weakened, and even one the co-inventors,

24   Dr. Merkle, said he wouldn't use them.  I can't prove to you

25   that the ones that haven't been broken are immune.  I'm going to

1    use what's out there.  So the fact that, quote, "nobody uses it"

2    is certainly not evidence that all of them were broken.

3          The documents that we submitted with our papers

4    remained part of an uncontradicted record.  The recipient of the

5    $1,000 prize admitted that he couldn't break all knapsacks.  The

6    high density multiplicative knapsacks remain secure today.

7    There's no evidence that they particularly were broken, ever,

8    and it is simply not a preferred method of implementation.

9          But there remains currently an enabling disclosure,

10   so even if the law were not as crystal clear that it doesn't

11   matter what happened earlier, the record here does not allow Mr.

12   Schlafly to prevail simply because all there is remaining are

13   enabling modes.

14         Now let me turn to the best mode issue, because I

15   believe that fails for all the reasons I said.  There was

16   another one.  This is also supported by the same citation to the

17   Glaxo decision.  The best mode requirement requires evidence

18   that the inventor at the time of the application subjectively

19   believed that there was a better mode than was disclosed.  It

20   requires actual evidence of subjective belief.

21         Now, people often satisfy that by showing that there

22   was a product that was sold at the time the application was made

23   which was manufactured with a different technique.  That's how

24   one tends to prove these.

25         But that is not in some writing or internal

1    memoranda, and we don't have that here.  We simply have evidence

2    because certain ones were broken later, the inventor doesn't

3    emphasize or disclose or make sure to make them absolutely

4    secure.  You do multiplicatives at high density.

5              Now, there's a reason -- there's an illustration why

6    the best mode requirement is a subjective one.  There are

7    tradeoffs in the implementation of any technology, and

8    cryptography is no excuse.  As the plaintiff concedes in his

9    reply papers, the more security you get, the bigger numbers you

10   have to use, and that requires more computer time to generate.

11   You may need a number so big that it's impractical to use that

12   method.

13             There's a faster way of achieving the same security.

14   The inventor might say, "In my own mind, I would not use the

15   biggest possible number.  I would use a smaller number because

16   it takes less time to do the encryption."  The inventor makes

17   the tradeoff in terms of what's the best way of implementing the

18   technology.

19             So even if there was a more secure way that the

20   inventor did not emphasize in the patent application, a good

21   reason would be the inventor did not subjectively believe at the

22   time that that was the best way.  We have no evidence, and we

23   have cited none from the depositions of any of the inventors,

24   that they subjectively, at the time the invention was made,

25   believed that.

1     So I believe that ends the inquiry on the

2   Hellman-Merkle patent.  I believe Mr. Schlafly is correct in his

3   argument respecting statutory subject matter.  Are we patenting

4   on algorithm or not is the principal argument he raises with

5   regard to the RSA patent, and I'm sure my colleague, Mr. Moore,

6   will ably respond to that issue.

7     So unless there is something, and I cannot believe

8   it would happen, that he would ever forget, I would defer to his

9   argument, because I believe it would apply equally.

10     THE COURT:  Thank you.  If you talk the way you

11   testify, this case is going to take awhile.

12     This has been very, very helpful to me and I have a

13   much better flavor for what the big issues are.

14     MR. SCHLAFLY:  I'd like to add a little more before

15   we wrap up.  There are a couple points I'd like to make in

16   direct response.

17     THE COURT:  Very briefly, and then if anyone else

18   would like to put a plug for their position, I understand.

19     MR. SCHLAFLY:  I'd like to say a couple things.

20     First of all, I don't know why Mr. Flinn makes such

21   a big deal of the best mode.  Sure, it's whatever the inventor

22   says is the best mode.  It does not disclose the best mode.  It

23   doesn't say anywhere in the specification what the best mode is.

24     Okay.  Secondly, there has to be -- there has to be

25   some enabling embodiment.  There has to be some mode disclosed

1    that works.  You can't say, "Well, I disclosed my best mode and

2    it doesn't work, but there may be some other mode which I may or

3    may not have known about."

4            THE COURT:  He said it did work for 10 or 15 years,

5    didn't he?

6            MR. SCHLAFLY:  I'd like to get to that.  No, it

7    didn't.  And this is -- there's kind of a general perception

8    that the strength of some cryptography systems depend on

9    outsmarting the person at the other end, that any cryptography

10   system can be broken with just enough smarts or something.

11           However, that's just not true.  The whole point of

12   this public key cryptography system is to get something which is

13   infeasible to break; that is, there are some problems which are

14   just hard and no matter how clever you are, there are limits to

15   breaking it.  It doesn't matter how smart you are.  There's some

16   very large number of calculations that have to be done to break

17   it, and if the problem is set up right, that number of

18   calculations is just so many that it's millions of years of

19   computer time and no one will ever be able to do it.

20           THE COURT:  Isn't that on a variable term?  I mean,

21   infeasible for some person might be feasible for someone else.

22           MR. SCHLAFLY:  Yeah.  The inventors gave a precise

23   definition.  They said, "It's infeasible if it takes 10 to the

24   power of 30 computer operations to break it," and that makes it

25   a very precise thing.  You have to look at it that way, that

1   their invention is either, I mean, it's either feasible to break

2   or it's infeasible.  That's the precise thing.

3            This wording appears in the patent claims, and if it

4   appears in the patent claims, it's supposed to be something

5   precise, and that's the precise meaning they gave to it.  If it

6   takes fewer than 10 to the power of 30 operations to break, and

7   if it took those operations, if it were possible to do it in

8   1977, then it's insecure, even if nobody knew how to do it in

9   1977,  because --

10            THE COURT:  Impossible or infeasible in 1977?

11            MR. SCHLAFLY:  If there is a method, if there is a

12   feasible method for breaking the cryptography system in 1977,

13   then it's not secure, even if people haven't figured out that

14   method yet.

15            THE COURT:  Even if the method doesn't exist, it's

16   feasible?

17            MR. SCHLAFLY:  Even if someone hasn't worked it out

18   and published it.

19            THE COURT:  With the rapid development of

20   technology, something that seems infeasible today is routine

21   tomorrow.

22            MR. SCHLAFLY:  That could happen.  But there are

23   other things like, for example, the MIT patent that's based on

24   multiplying prime numbers.  It's still the case that what they

25   said in 1977 about multiplying together two prime numbers, and

1    the difficulty of factors, it is still infeasible to factor

2    that.  There are problems which are difficult.

3            Let me give an analogy on this sort of problem that

4    Mr. Flinn gets these citations that say that enablement and best

5    mode is based on what's there at the time.  Those cases are

6    talking about something completely different; that is, they're

7    talking about -- they're talking about whether or not the

8    inventor has provided enough information for somebody to

9    practice it, and then there are issues about whether the

10   inventor kept out details or whatever.

11           Let's consider a hypothetical.  Suppose I invented a

12   drug that I claim cures cancer, and I have some theoretical

13   reason for why it cures cancer and I apply for a patent on it.

14   I give the patent office this theoretical reason as to why it

15   cures cancer, and let's say the examiner is convinced.  He says,

16   "Sure, it cures cancer."

17           Then let's say five years later, people do

18   experiments and they give the drugs to people and everybody

19   dies.  Then I think it would be fair to say that the invention

20   didn't work.

21           If somebody went in to break it, it would be fair to

22   take those studies from five years later and say, "Look, we

23   tried this.  It doesn't work."

24           You couldn't come back and say, "Back when I filed

25   for this patent, I had this reason for thinking that it would

1   work and it's unfair to cite this later study."  The later study

2   shows that the invention doesn't work, then it never worked.  I

3   mean, maybe people don't know that it never worked, but it never

4   worked, and therefore it is improper subject matter for a

5   patent.

6            Okay.  I just want to make one other point, and that

7   is that Mr. Flinn also has some questions about whether trap

8   door knapsacks are broken and claims that some high density trap

9   door knapsacks have not been broken.  I think this is flatly

10  disputed by the record.

11           First of all, the Hellman-Merkle patent does not

12  disclose any high density knapsacks.  The embodiments in that

13  patent are all extremely low density knapsacks.

14           And secondly, if you look at those exhibits, there's

15  paper after paper published, referee journals, respected

16  authors, respected publications, and paper after paper says the

17  trap door knapsack has been broken, and there is no variation of

18  the Hellman-Merkle trap door knapsack which is secure.

19           This has been broken to the extent of -- it's rare

20  that any invention is shown to be invalid to the extent that

21  something like this is.  These papers, they not only say it's

22  invalid, they give a step-by-step algorithm.  It says, "You

23  follow these steps and you can decode the message."  It's

24  explicit.

25           You don't have to take their word for it.  You can

1   go read the paper.  You follow the steps and it's broken.  It's

2   been published.  It's been published in the '80's.  There's been

3   plenty of time for people to analyze it.  People agree that the

4   analysis is sound and that the trap door knapsacks have been

5   broken.

6          In fact, you have the inventor himself.  He paid off

7   a $100 bet when one embodiment got broken, and then he paid off

8   a $1,000 bet when another embodiment got broken.

9          THE COURT:  Thank you, very much.

10         I'll conclude the hearing now.  We may ask for

11  further argument.  I'm not sure, but if I feel we can use it, we

12  will do so.  This has been very helpful to me to have the

13  argument this morning.  Thank you very much.

14         (Proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF CALIFORNIA    )
                          ) ss.
2  COUNTY OF SANTA CLARA  )

3

4        I, the undersigned, a Certified Shorthand Reporter of

5  the State of California, hereby certify that the above

6  proceedings were held at the time and place herein stated; that

7  the statements by Counsel, The Court and other parties were

8  reported by me, a Certified Shorthand Reporter and disinterested

9  person, and were thereafter transcribed under my direction into

10  typewriting, and that the foregoing is a full, complete and true

11  record of said proceedings.

12

13       I further certify that I am not of counsel or attorney

14  for either or any of the parties in the foregoing proceedings

15  and caption named, nor am I in any way interested in the outcome

16  of the cause named in said caption.

17

18       IN WITNESS WHEREOF, I have hereunto set my hand this

19  27th day of February 1996.

20

21

22                          _Lee Anne Shortridge_

23                          LEE-ANNE SHORTRIDGE, CSR #9595

24

25