

Printed on Recycled Paper
20% Post Consumer Waste

<u>GENERAL PARTNERSHIP AGREEMENT</u>

for

PUBLIC KEY PARTNERS,
a California General Partnership

THIS GENERAL PARTNERSHIP AGREEMENT ("Agreement") is entered into as of this 6th day of April, 1990 by and between CARO-KANN CORPORATION, a California corporation having its principal place of business at 130B Kifer Court, Sunnyvale, California 94086 ("CKC"), and RSA Data Security Inc., a Delaware corporation having its principal place of business at 10 Twin Dolphin Drive, Redwood City, California, 94065 ("RSA").

NOW, THEREFORE, the parties hereto agree as follows:

## <u>ARTICLE 1 - FORMATION</u>

1.  <u>Uniform Partnership Act; The Agreement of Intent</u>. The parties hereby form a general partnership pursuant to the provisions of the Uniform Partnership Act as enacted in the State of California and pursuant to that certain Agreement of Intent, dated as of April 6, 1990 (the "Agreement of Intent") between RSA, Cylink Corporation ("Cylink") and CKC.

2.  <u>Name</u>. The name of the partnership is "PUBLIC KEY PARTNERS," a California general partnership (the "Partnership").

3.  <u>Place of Business</u>. The principal place of business for the Partnership shall be located at 130B Kifer Court, Sunnyvale, California, 94086, with a mailing address of P.O. Box _____, Palo Alto, California, until changed by designation of the Management Committee.

4.  <u>Agent for Service of Process</u>. The initial agent for service of process for the Partnership will be Robert B. Fougner, a resident of San Mateo County, California. The agent for service of process may be changed at any time during the term of the Partnership by the President. The President shall file the Statement by Unincorporated Association of Address of Principal Office and Designation of Agent for Service of Process required by California Corporations Code Section 24003.

5.  <u>Fictitious Business Name Statement</u>. The President shall, on the Partnership's behalf, sign and cause to be filed and published an appropriate fictitious business name statement under Section 17910 of the California Business and Professions Code within forty (40) days after the Partnership begins doing business, within forty (40) days after any subsequent change in its membership, and before the expiration of any previously filed statement.

Final/April 6, 1990 1

DEFENDANT'S EXHIBIT 70

B10205 3·15·95

6.  <u>Purpose</u>.   The business and purpose of the Partnership shall be to engage in the licensing to third parties of the Licensed Rights, and such other means of generating revenue for the Partners as they may elect to pursue upon Unanimous Vote of the Partners and to do all things incidental to or in furtherance of these enumerated purposes.

7.  <u>Compliance with Agreement of Intent</u>.   The Partners acknowledge and agree that the Partnership and the Partners, in their capacity as Partners of the Partnership, shall take all actions reasonably required to comply with the terms, conditions and covenants of the Agreement of Intent.

## ARTICLE 2 – DEFINITIONS

1.  <u>The Agreement of Intent</u>.   Except as provided in Article 2, Paragraph 2 below, or as otherwise provided herein, the definitions set forth in the Agreement of Intent shall apply for the purposes of this Agreement.

2.  <u>Other Definitions</u>.   For the purposes of this Agreement, the following definitions shall apply:

(a)   "Affiliate" shall mean any entity that is directly or indirectly controlled by, controls or under common control with a party hereto through the ownership of more than fifty percent (50%) of the outstanding stock thereof

(b)   "Ancillary Agreements" shall mean the Agreement of Intent, the RSA License Agreement and the Cylink License Agreement.

(c)   "Capital Account" shall mean an account maintained on the Partnership's books for each Partner strictly in accordance with the rules set forth in Treasury Regulations Section 1.704-1(b)(2)(iv).  Subject to the preceding sentence, each Partner's Capital Account shall be increased by:

(1)   the amount of money contributed by that Partner to the Partnership,

(2)   the fair market value of any property contributed by that Partner to the Partnership (net of any liabilities secured by such contributed property that the Partnership is considered to assume or take subject to under Code Section 752), and

(3)   allocations to that Partner of Profit and other items of book income and gain, including

Final/April 6, 1990                              2

income and gain exempt from tax and income and gain described in paragraph (b)(2)(iv)(g) of Treasury Regulations Section 1.704-1, but excluding income and gain described in paragraph (b)(4)(i) of Treasury Regulations Section 1.704-1;

and shall be decreased by:

(4)   the amount of money distributed to that Partner by the Partnership,

(5)   the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by such distributed property that such Partner is considered to assume or take subject to under Code Section 752),

(6)   allocations to that Partner of expenditures of the Partnership of the type described in Code Section 705(a)(2)(B), and

(7)   allocations of Loss and other items of book loss, including items of loss and deduction described in Treasury Regulations Section 1.704-1(b)(2)(iv)(g), but excluding items described in (6) above and paragraphs (b)(4)(i) or (b)(4)(iii) of Treasury Regulations Section 1.704-1,

and shall otherwise be adjusted in accordance with the additional rules set forth in Treasury Regulations Section 1.704-1(b)(2)(iv).

(d)   "Capital Contribution" shall mean the money contributed by the Partners to the Partnership in exchange for their interests in the Partnership in accordance with Article 3, Paragraph 1 below.

(e)   "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(f)   "Cylink License Agreement" shall mean that certain License Agreement entered into among the Partnership, CKC, Cylink Corporation and The Board Of Trustees of the Leland Stanford University.

(g)   "Licensed Rights" shall mean those patent and other industrial property rights which are licensed to the Partnership under the Cylink License Agreement and the RSA License Agreement.

(h)   "Licensing Committee" shall consist of those persons appointed by the Partners pursuant to Article 6, Paragraph 4 hereof and, subject to said Article 6, Paragraph 4,

Final/April 6, 1990                          3

shall be responsible for approval of the terms upon which the Licensed Rights are licensed by the Partnership to third parties.

(i)    "Management Committee" shall mean that committee appointed by the Partners pursuant to Article 6, Paragraph 2 hereof.

(j)    "Material Breach" shall have the meaning set forth in Article 9, Subparagraph 3(g) hereof.

(k)    "MIT Agreement" shall mean the license agreement dated September 23, 1983, between the Massachusetts Institute of Technology and RSA, and the letter amendments thereto dated May 20, 1986 and January 29, 1988.

(l)    "Profit" and "Loss" shall mean, for each taxable year, the Partnership's net taxable income or net taxable loss for such taxable year, as determined under Section 703(a) of the Code with the following adjustments:

(1)    Any tax-exempt income, as described in Section 705(a)(1)(B) of the Code, shall be taken into account in computing such taxable income or taxable loss as if it were taxable income.

(2)    Any expenditures of the Partnership described (or treated as described) in Section 705(a)(2)(B) of the Code for such taxable year, shall be taken into account in computing such taxable income or taxable loss as if they were deductible items.

(3)    Any items allocated under Article 4, Paragraph 2 shall not be taken into account in computing such taxable income or taxable loss.

(4)    In lieu of any depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, the Partnership shall compute such deductions based on the book value in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

(5)    Gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of the property disposed of, notwithstanding that the adjusted tax basis of such property may differ from its book value.

(6)    "Book value" as used herein means, as of any particular date, the value at which any asset of the Partnership is properly reflected on the books of the

Final/April 6, 1990                    4

Partnership as of such date in accordance with the Treasury Regulations Section 1.704-1(b). The book value of all Partnership assets may, if the Partners agree, be adjusted to equal their respective gross fair market values, as determined by independent appraisal, at the times specified in such Treasury Regulations.

(m)   "Partner(s)" shall mean RSA and CKC in their capacities as general partners of the Partnership.

(n)   "President" shall mean Mr. D. James Bidzos, or such other individual as may be hereafter designated by the Management Committee pursuant to Article 6, Paragraph 1 below, to be responsible for the day-to-day operations of the Partnership and for the various actions specifically required herein to be performed by the President.

(o)   "RSA License Agreement" shall mean that certain license agreement entered into among the Partnership, RSA and the Massachusetts Institute of Technology.

(p)   "Stanford Agreement" shall mean that certain license agreement dated August 25, 1989 between Cylink Corporation and the Board of Trustees of the Leland Stanford University.

(q)   "Terminating Event" shall have the meaning set forth in Article 9, Paragraph 3 hereof.

(r)   "Termination by Dissolution" and "Termination by Purchase" shall each have the meaning set forth in Article 9, Paragraph 1 hereof.

(s)   "Unanimous Vote of the Partners" shall mean an affirmative, unanimous written vote by the Partners.

## ARTICLE 3 – PARTNERSHIP INTEREST AND CAPITAL

1.   <u>Capital Contributions of CKC and RSA</u>. CKC and RSA each shall be obligated, severally and not jointly, to contribute the sum of ten thousand dollars ($10,000) to the Partnership for an aggregate Capital Contribution by them of twenty thousand dollars ($20,000) to the Partnership. The Capital Contributions by CKC and RSA shall be made to the Partnership on or before the Closing.

2.   <u>Excess Partnership Debts</u>. Upon liquidation of the Partnership each of the Partners shall make additional capital contributions in an aggregate amount equal to that required to pay any debts and obligations of the Partnership to the extent that application of Partnership assets in accordance with Article 5, Subparagraph 2(a) hereof is insufficient to satisfy all such

Final/April 6, 1990               5

Partnership debts and obligations. Such payments by the Partners shall be equal to the negative balance of their respective Capital Accounts, after valuing all of the Partnership assets and calculating any additional Profits or Losses, until each Capital Account is restored to zero and thereafter in equal amounts until all such debts and obligations are paid.

3.    <u>Interest on and Return of Capital Contributions</u>. No interest shall be paid on any Capital Contribution to the Partnership. Except as otherwise specifically provided in this Agreement, no Partner shall be entitled to a return of any portion of that Partner's Capital Contribution at any time during the term of the Partnership or until the dissolution and liquidation of the Partnership has been completed.

4.    <u>Property of the Partnership</u>. All property originally paid, contributed, or transferred to the Partnership as Capital Contributions of the Partners or subsequently acquired by the Partnership by purchase or otherwise, shall be the sole property of the Partnership.

## ARTICLE 4 - ALLOCATIONS OF PROFITS AND LOSSES

1.    <u>General Allocation</u>. The Profits and Losses of the Partnership shall be allocated amongst the Partners as follows:

(a)    <u>Loss Allocation</u>. Losses of the Partnership shall be allocated 50% to CKC and 50% to RSA.

(b)    <u>Profits Allocation</u>. Profits of the Partnership shall be allocated amongst the Partners in accordance with the following priorities:

(i)    Profits shall first be allocated amongst the Partners in proportion to the deficits in their Capital Accounts until such time as the balance of both Partner's accounts are restored to zero;

(ii)   Profits shall then be allocated 50% to CKC and 50% to RSA until such time as the aggregate Profits allocated to the Partners pursuant to this subparagraph (b)(ii) and subparagraph (b)(i) above equal the aggregate losses allocated to the Partners pursuant to subparagraph (a), above.

(iii)  Thereafter, Profits shall be allocated 65% to RSA and 35% to CKC.

(c)    Profits and Losses of the Partnership shall be determined at least quarterly and at such periodic intervals as the Management Committee shall deem appropriate and upon the Partnership's liquidation. Such determination of Partnership

Final/April 6, 1990

Profits and Losses shall be made in the same manner as for federal income tax reporting purposes by the independent certified U.S. public accountant then retained by the Partnership, whose determination shall be conclusive on both Partners.

2. <u>Allocation of Certain Tax Items</u>. In accordance with Treasury Regulations section 1.704-1(b)(4)(i), if any property of the Partnership is reflected in the Capital Accounts of the Partners and on the books of the Partnership at a book value that differs from the adjusted tax basis of such property, then allocations of items of income, gain, loss and deduction with respect to such property shall, strictly for federal income tax purposes, be shared among the Partners in a manner that takes account of such differences in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Partnership are taken into account in determining the Partners' share of tax items under Code Section 704(c).

3. <u>Allocation Between Assignor and Assignee</u>. The proportion of the income, gain, loss, deductions and credits of the Partnership for any fiscal year of the Partnership during which an interest is assigned by a Partner that is allocable in respect of such interest shall be apportioned between the assignor and the assignee of the interest on the basis of the number of days during such fiscal year that each is the owner thereof, without regard to (a) the results of Partnership operations before or after the effective date of the assignments, or (b) any distributions made to the Partners before or after the date of the assignment.

4. <u>Allocation of Nondeductible and Unamortized Expenditures</u>. Partnership expenditures which must be capitalized or which are not deductible shall be allocated amongst the Partners for accounting purposes in the same fashion as all other expenses of the Partnership would be allocated for the accounting period in which the expenditure was paid.

5. <u>Allocation Of Deferred Taxable Income</u>. Allocation of any deferred taxable income shall be based on the year in which it arose.

## ARTICLE 5 - DISTRIBUTIONS

1. <u>General Distributions</u>. During the term of the Partnership, the Partnership shall make such distributions as shall be approved quarterly by the Management Committee in accordance with Article 6, Paragraph 2 hereof. Any such distribution during the term of the Partnership shall be made 65% to RSA and 35% to CKC.

Final/April 6, 1990                    7

2.   <u>Distributions on Liquidation</u>.  Upon conclusion of the Partnership term and the dissolution of the Partnership, the President shall cause the Partnership to distribute all of the Partnership's assets, properties, proceeds, profits and income in accordance with the following priorities:

(a)   Payment shall first be made to satisfy all debts and obligations of the Partnership to creditors other than Partners;

(b)   Payment shall then be made to satisfy all debts and obligations of the Partnership owing to Partners for other than capital and profits; and

(c)   Distributions shall then be made to the Partners in an amount equal to the positive balances of their Capital Accounts (after taking into account any adjustments for the Partnership taxable year during which such liquidation occurs and after adjusting to reflect allocations that would be made if there were a taxable disposition of the Partnership's property for its fair market value).  The timing and method of the distribution provided for by this Paragraph 2 shall comply with Treasury Regulations section 1.704-1(b) or any similar regulations promulgated in the future, or if no such regulations apply, as soon as possible.

In addition, upon the liquidation of any Partner's interest in the Partnership, such Partner shall be distributed an amount equal to its positive Capital Account balance at such time (after taking into account the adjustments referred to in the previous paragraph) in accordance with Treasury Regulations Section 1.704-1(b).

(d)   In the event any sublicensees of the Partnership continue to owe royalties following dissolution and liquidation, they shall be collected by an agent appointed by the Partnership for this purpose, allocated and then distributed in accordance with Articles 4 and 5.  CKC and RSA shall each use their best efforts to collect any royalty, sublicense payment and other fees that are owed to the Partnership.

## ARTICLE 6 - MANAGEMENT

1.   <u>Authority of President</u>.  Subject to Paragraphs 2, 6, 8, 9 and 10 of this Article 6, the President shall have the authority and duty to manage all day-to-day business operations of the Partnership and the Partnership's ordinary business affairs, to assign duties and to otherwise take such action as the President deems prudent in the administration of the Partnership's affairs. The President shall prepare an annual budget for the Partnership

Final/April 6, 1990                  8

for each fiscal year for the term of the Partnership, which budget must be subject each year to approval by the Management Committee. The President shall be selected by the Management Committee, which shall establish the authority and responsibilities of the President and compensation to be paid to the President by the Partnership. The President may use such other titles in transacting business with third parties as the Partnership, acting through the Management Committee, and the President shall agree. The President shall be Mr. James Bidzos until such time as he resigns, fails to comply with the terms of his employment agreement or the Management Committee appoints a replacement.

    2.  <u>Management Committee</u>.  The Management Committee shall meet at least quarterly and initially shall consist of four (4) members or such other even number of members as approved by a Unanimous Vote of the Partners. RSA and CKC shall each be entitled to appoint one-half of the members of the Management Committee. The Management Committee shall manage and have ultimate direction over the business and affairs of the Partnership and over the authority and responsibilities of the President.  The Management Committee may act through duly noticed meetings or by its unanimous written consent.  For the purpose of holding a meeting, written notice shall be given to all members not less than four (4) nor more than sixty (60) days in advance, specifying the date, time and subject matter of the meeting.  Meetings of the Management Committee may be called by the President or any Partner.  The Management Committee shall be authorized to act at a meeting only if a quorum is present (personally or by way of telephonic device), and a quorum shall be deemed present if members representing more than 50% of the then authorized positions on the Management Committee are present.  Any action taken by the Management Committee shall require the vote by members representing more than 50% of the then authorized positions on the Management Committee. In the event any member of the Management Committee is absent from a meeting, the members of the Management Committee who are present and who were appointed by the same Partner that appointed the absent member will automatically have the right to vote on behalf of the absent member.  The Management Committee shall have a Chairman duly elected by the members of the Management Committee. Notwithstanding the foregoing, the Management Committee shall not have the authority to:

    (a)  Do any of the acts for which a Unanimous Vote of the Partners is required pursuant to Article 6, Paragraph 6 hereof without previously obtaining such vote;

    (b)  Borrow any funds from or authorize any loans by the Partnership;

    (c)  Do or authorize any act in contravention of this Agreement; or

Final/April 6, 1990         9

(d)   Do any other act which would make it impossible to carry on the ordinary business of the Partnership.

3.   <u>Expansion Of The Management Committee</u>.  The Partners may hereafter unanimously agree to expand the Management Committee to five (5) members for the purpose of appointing a neutral individual unaffiliated with either Partner to serve as President and Chairman of the Management Committee.  After the appointment of such individual, a quorum shall consist of at least four (4) of the then authorized positions on the Management Committee.  This provision is not intended as a restriction on the Management Committee's power to appoint a new President under Paragraph 1, herein, without expanding the number of seats on the Management Committee.

4.   <u>Licensing Committee</u>.  The Licensing Committee shall consist of two members, with one each appointed by RSA and by CKC. The initial appointees of RSA and CKC shall be D. James Bidzos and Robert B. Fougner, respectively.  The Licensing Committee shall act by unanimous consent by both members.  Except as provided below, the Partnership shall not license any third party with respect to the Licensed Rights without prior approval by the Licensing Committee as to the terms and conditions of such licensing to that licensee.  Nor shall any officer of the Partnership or either Partner deny a license to any third party without the approval of the Licensing Committee.  In the event that the two members of the Licensing Committee cannot agree as to whether the Licensed Rights should be licensed by the Partnership to a particular licensee or the material terms of such license, the Management Committee shall then have authority to approve or disapprove such proposed licensing relationship and the terms thereof.

5.   <u>Obligation of Partners to Provide Skill and Time to the Partnership</u>.  Each Partner shall be obligated to apply itself diligently and to utilize its utmost skill for the business of the Partnership and shall devote as much time as is reasonably necessary for the business of the Partnership; <u>provided</u>, <u>however</u>, that no Partner, its officers, directors or employees shall be bound to devote all of their respective business time to the affairs of the Partnership, it being understood that each Partner is and will continue to be primarily engaged in other activities and in other businesses.

6.   <u>Partner Voting Rights</u>.  The Partners shall have the power to vote upon the following Partnership matters affecting, among other things, the basic structure of the Partnership, each of which shall require a Unanimous Vote of the Partners:

(a)   Amendment of the Partnership Agreement;

(b)   Any dissolution and winding up of the Partnership

Final/April 6, 1990            10

other than pursuant to Article 9, Paragraphs 4, 5 and 6 hereof;

(c)   Amendment of the RSA License Agreement or the Cylink License Agreement;

(d)   Any change in the nature of the business conducted by the Partnership including, without limitation, the Partnership engaging in any business activity other than a sublicensing of the Licensed Rights;

(e)   Admission of a new Partner;

(f)   Any agreement or contract between the Partnership and a Partner or its Affiliates or the compromise and settlement of any dispute between the Partnership and a Partner or its Affiliates;

(g)   Subject to Paragraph 7 below, the obtaining of capital by the Partnership in excess of those Capital Contributions of the Partners which are made pursuant to Article 3, Paragraph 1 hereof.

(i)   Expansion of the Management Committee in accordance with Paragraph 3, herein.

(j)   Granting sublicensing rights to any licensee, as authorized under the Cylink License and the RSA License.

7.   <u>Determinations Regarding Additional Capital</u>. In the event that the Management Committee shall determine that the Partnership is to raise capital in excess of the amounts contributed by the Partners pursuant to Article 3, Paragraph 1 hereof, the President shall notify each of the Partners in writing of such determination. In the event the Partners elect to make any additional capital contributions, 50% of the additional capital contribution will be made by RSA and 50% of the additional capital contribution will be made by CKC, or in such other proportions as the Partners shall agree.

8.   <u>Partnership Reserve</u>.

(a)   Without limitation on Article 6, Paragraph 2 hereof, the Management Committee shall have exclusive authority to determine the amount of any cash reserves to be retained by the Partnership. The Management Committee shall cause the Partnership to retain such cash reserves as are reasonably adequate, in combination with anticipated Partnership revenue, to meet existing and contingent obligations of the Partnership.

(b)   Without limitation on the Management Committee's authority to set reserves, as stated in Subparagraph 8(a), above, the partnership shall set aside a minimum of 10% of all net

Final/April 6, 1990                    11

Partnership profits as a reserve for anticipated operating expenses. In addition, a further reserve of 10% of all net Partnership profits shall be set aside for potential legal expenses until such reserve accumulates a total of $500,000. All interest earned by said reserves shall be considered Partnership income.

9. <u>Authority of Partners to Bind Partnership</u>. Notwithstanding California Corporations Code Section 15009(1), no Partner, who is not expressly authorized to do so by the Management Committee or the Licensing Committee, as the case may be, shall be authorized or empowered to bind the Partnership with respect to any licensing or transfer of the Licensed Rights to any person or with respect to any other contractual agreement, undertaking or obligation not in the ordinary course of the Partnership's business.

10. <u>Foreign Entities</u>. The Partnership may establish such foreign entities and in such locations as it deems prudent to collect revenues from foreign licenses and maximize profits; although no such entities will be established without the prior written agreement of both Partners.

11. <u>Compliance With Licenses</u>. The Partners each agree not to cause the Partnership, either directly or indirectly through the Partnership, to breach or default with respect to any of its obligations pursuant to the RSA License Agreement and/or the Cylink License Agreement.

12. <u>Exclusive Licensing Authority</u>. During the term of the Partnership, the Partners will refrain from licensing their respective Licensed Rights to third parties, other than to their Affiliates, to the extent such rights have been conveyed to the Partnership under either the Cylink License or the RSA License, and provided such inaction will not breach any of the agreements specified on Attachment "B" of the RSA License or Attachment "A" of the Cylink License. In any instance when a Partner is required to enter into agreements with third parties concerning the licensing of its respective Licensed Rights to avoid breaching any pre-existing license agreements, such Partner will promptly advise the other Partner and provide sufficient information to demonstrate that it is not in breach of this Paragraph.

13. <u>Dealings with Sublicensees</u>. During the term of the Partnership, the Partners each agree that any contracts, product sales, business dealings or other financial relationships between either Partner and any sublicensee of the Partnership (or Affiliate of such sublicensee) shall be fully and promptly disclosed by such Partner to the other Partner. Furthermore, the Partners agree that all contacts, discussions and negotiations between PKP and any third party shall be promptly disclosed to both Partners.

Final/April 6, 1990          12

14. _Performance Of Licensing Obligations_. CKC shall be responsible for guaranteeing performance of any and all of Cylink Corporation's obligations under the Stanford Agreement and keeping said agreement in full force and effect in accordance with its terms during the term of the Partnership and any sublicenses by the Partnership of the Licensed Rights. RSA shall be responsible for continuing to perform any and all of its obligations under the MIT License Agreement and keeping said agreement in full force and effect in accordance with its terms during the term of the Partnership and any sublicenses by the Partnership of the Licensed Rights. Without limitation on the foregoing, RSA and CKC each agree to do the following during the term of the Partnership and any sublicenses by the Partnership of the Licensed Rights:

(a) CKC will pay all amounts due Stanford under the Cylink License Agreement from the distributions received by CKC from the Partnership. RSA will pay all amounts due MIT under the RSA License Agreement from the distributions received by RSA from the partnership.

(b) CKC will immediately notify the Partnership and RSA in the event of breach of the Stanford Agreement or, upon CKC's receipt of notice of breach by Cylink Corporation, CKC will promptly take all action reasonably required to cure any such breach. RSA will immediately notify the Partnership and CKC in the event of breach of the MIT Agreement or, upon RSA's receipt of notice of breach by RSA, promptly take all action reasonably required to cure any such breach.

15. _Enforcement of the Licensed Rights_. In the event that the Management Committee representatives of CKC and RSA cannot agree as to whether the Partnership shall take legal action concerning infringement of the Licensed Rights by any third party, the Partner whose representatives favored such action may, at its election, take legal action independently of the Partnership at such Partner's sole expense, provided the basis for any such action concerns infringement of the Licensed Rights granted by that Partner to PKP. Furthermore, CKC and its Affiliates cannot take any action which alleges infringement of the Licensed Rights granted under the Cylink License based solely on practice of the Licensed Rights granted under the RSA License. Any damage awards or other payments obtained from such legal action shall be the sole property of the Partner that prosecuted the legal action.

## ARTICLE 7 - ACCOUNTING

1. _Inspection of Partnership Records_. The Partnership shall keep adequate books and records at its place of business setting forth a true and accurate account of all business transactions arising out of or connected with the conduct of the Partnership business. The Partners shall have the right at all

Final/April 6, 1990                    13

times to have access to and to inspect and copy the Partnership books.

2.    <u>Periodic Report</u>.  Within ninety (90) days after the close of each fiscal year, the President shall cause to be prepared a financial report and shall, within said ninety (90) day period, cause a copy of the financial report to be furnished to each Partner.  The copies furnished to the Partners shall include a balance sheet, income statement and cash flow statement for the Partnership as of the last day of the accounting period.  The statement of income or profit and loss shall disclose the amount of any changes in income or loss and shall show in particular the amounts of depreciation, depletion, amortization, interest and extraordinary income or charges whether or not included in operating income.  Within ninety (90) days following the close of the Partnership's fiscal year, the President shall further cause the Partnership's certified public accountant to compile and prepare such information as is necessary for each Partner to file its annual income tax returns and shall, during said ninety (90) day period, cause such information to be forwarded to the Partners.

3.    <u>Bank Account</u>.    The Partnership funds shall be deposited in the name of the Partnership in one or more banks to be designated by the Partners and shall be withdrawn on the signature of an authorized agent of one or more of the Partners, as the Partners shall jointly agree.

4.    <u>Fiscal Year</u>.  The fiscal year of the Partnership shall end on December 31 of each calendar year.

5.    <u>Method of Accounting</u>.  The Partnership shall use the accrual method of accounting for maintaining its financial books and records.

6.    <u>Tax Matters Partner</u>.  CKC shall be the partner responsible, at the Partnership's risk and expense, for administration of the Partnership's tax matters and accounting. All non-ministerial acts, elections and decisions by CKC on the Partnership's behalf, as well as all other non-ministerial tax and accounting decisions of the Partnership, shall be subject to the approval of both Partners.

## <u>ARTICLE 8 - ASSIGNMENT OF INTEREST</u>

1.    <u>Voluntary Transfer of Interest</u>.   In the event a Partner wishes to sell its Partnership Interest, the selling Partner shall give written notice to the other Partner, which notice shall accompany specific evidence of the name and address of the proposed transferee, the consideration or purchase price to be paid for its Partnership Interest and all other material terms

Final/April 6, 1990                    14

of the proposed transfer. Subject to Article 8, Paragraph 2 below, the selling Partner shall not be permitted to sell, transfer or assign its Partnership Interest unless both: (i) the other Partner has given written approval to such sale, transfer or assignment, which approval may be given or withheld in the absolute discretion of such other Partner; and (ii) the selling Partner shall have fully complied with its obligations as to the first refusal rights of the other Partner as set forth in this Article 8, Paragraph 1. Provided the other Partner gives written approval of the sale, as required by (i), above, such other Partner shall then have an option for thirty (30) days following receipt of the selling Partner's notice to purchase all (but only all) of the offered Partnership Interest of the selling Partner at the price and on the terms stated in the notice. If the selling Partner's interest is not purchased by the other Partner and in the event that the other Partner gives its written approval to such transfer, the selling Partner may thereafter sell or transfer its Partnership Interest to the person identified in the notice at not less than the price and on the same terms stated in such notice, provided that the transferee agrees in writing prior to such transfer to become bound by all terms of this Partnership Agreement. Following such sale, the transferee shall become a substituted Partner of the Partnership. If the selling Partner is unable to sell the offered interest to the person identified in the selling Partner's original notice at the same price and on the terms as offered to the remaining Partner, the selling Partner shall, before any attempt to sell at a lower price or on more favorable terms, give the remaining Partner a new notice of election to sell in accordance with the requirements stated above and the procedure for purchase and sale shall again be followed. Following the purchase of the Partnership Interest of the selling Partner by the other Partner pursuant to this Article 8, Paragraph 1, the Partnership shall be terminated by way of a Termination by Purchase pursuant to Article 9, Paragraph 7 hereof.

2. **Transfers to Affiliates**. Each of the Partners shall have the right to transfer all or any portion of its interest in the Partnership to one or more of its Affiliates provided that: (i) such Affiliate agrees in writing, as a condition precedent to such transfer, to be bound by this Agreement; and (ii) following such transfer, such Affiliate and the transferor Partner shall be treated as one Partner for purposes of this Agreement hereof and shall not be permitted to vote, act or transfer their Partnership interests independently of each other for any purpose.

## ARTICLE 9 - TERM AND TERMINATION

1. **Term**. The Partnership shall commence as of the date of this Agreement, and shall continue until expiration of the last patent, whether in the United States or elsewhere, included in the Licensed Rights, unless sooner terminated and dissolved upon the

Final/April 6, 1990                    15

earlier of:

(a)   The date upon which the Partnership interest of one Partner is purchased by the other Partner pursuant to Article 8, Paragraph 1 hereof or this Article 9 ("Termination by Purchase");

(b)   The date upon which the Partnership is dissolved and liquidated pursuant to Article 9, Paragraph 6 hereof or upon a Unanimous Vote of the Partners pursuant to Article 6, Subparagraph 6(b) hereof;

(c)   The date on which the Partnership is dissolved by operation of law; provided, however, if all Partners agree prior to such event that immediately thereafter they shall reconstitute and continue the Partnership as before, then the event giving rise to a termination by operation of law shall not be deemed a Terminating Event and the Partnership shall thereafter continue.

Any termination of the Partnership pursuant to Subparagraphs (b) and (c) above, or upon natural expiration of its term, shall be referred to as a "Termination by Dissolution" for the purposes of this Partnership Agreement.

2.   Withdrawal; Removal.   Prior to dissolution of the Partnership, no Partner shall have the right or ability to withdraw from the Partnership. Any removal of a Partner or involuntary sale of the Partnership Interest shall be permitted only upon those terms set forth in this Article 9.

3.   Terminating Events.   RSA and CKC agree that each of the events set forth below shall, upon the election of the Partner(s) that is entitled to give notice with respect to such event pursuant to Article 9, Paragraph 4 below, be treated as a Terminating Event for the purposes of this Article 9:

(a)   The appointment of a trustee, receiver or other custodian for all or substantially all of the property of the other Partner or for any lesser portion of such property if the result materially and adversely affects the ability of such other Partner to fulfill its affirmative or negative obligations hereunder;

(b)   The filing of a petition for liquidation (and not for reorganization) in bankruptcy by the other Partner on its own behalf or the filing of any such petition against such Partner if the proceeding is not dismissed or withdrawn within sixty (60) days thereafter;

(c)   An assignment by the other Partner of a substantial portion of its assets for the benefit of its creditors;

(d)   The dissolution or liquidation of the other

Final/April 6, 1990              16

Partner other than in consequence of a merger, amalgamation or other corporate reorganization to which it is a party;

(e)   In the event a controlling interest in, or substantially all of the assets of, either Partner (or an Affiliate of such Partner that controls such Partner) is purchased or otherwise acquired by a third party.

(f)   The occurrence of any of the events described in Subparagraph (a) through (d) above as to the Partnership itself;

(g)   The commission of a Material Breach by a Partner.

If a Partner should suffer any event described in Subparagraphs (a) through (e), or (g) above, that Partner shall immediately advise the other Partner and the Partnership of the occurrence of such event.

For the purpose of this Agreement, the commission of any of the following acts by a Partner which is not cured within ninety (90) days following notice thereof to the breaching Partner by the other Partner or the Partnership shall constitute a Material Breach:

As to CKC, the failure by CKC to do any of the following:

(1)   Timely pay all of its Capital Contributions to the Partnership in accordance with Article 3, Paragraph 1 hereof;

(2)   Fully comply with its obligations contained in Article 3, Paragraph 2, Article 6, Paragraphs 11, 12 and 14 or Article 8, Paragraph 1, hereof; or

(3)   Fully insure compliance by Cylink Corporation of its obligations of exclusivity contained in Article 3 of the Cylink License Agreement.

As to RSA, the failure by RSA (or its Affiliates, as applicable) to do any of the following:

(1)   Timely pay all of its Capital Contributions to the Partnership in accordance with Article 3, Paragraph 1 hereof;

(2)   Fully comply with its obligations contained in Article 3, Paragraph 2, Article 6, Paragraphs 11, 12 and 14, or Article 8, Paragraph 1, hereof; and

Final/April 6, 1990                17

(3)   Fully comply with its obligations of exclusivity under Article 2 of the RSA License Agreement.

The foregoing shall not be deemed to limit the ability of the Partnership or any Partner to seek such legal and equitable remedies as the Partnership or any such Partner shall be entitled to seek on the basis of a Material Breach by a Partner or the breach or failure of a Partner to perform any other duty or obligation not set forth above which is otherwise contained in this Partnership Agreement or the Ancillary Agreements.

4.  <u>Notice of Termination; Right to Terminate</u>.  The Partners agree that they shall each have the option, upon written notice to the Partnership and the other Partner, to declare the various events described in Article 9, Subparagraphs 3(a) through (g) above a Terminating Event and to terminate the Partnership upon the occurrence of such event as follows:

(a)  As to those Terminating Events described in Article 9, Subparagraph 3(a) through (d) which pertain to the bankruptcy, or other financial problems of a Partner, the other Partner, which is not subject to such bankruptcy, or other proceedings, shall have the right to terminate;

(b)  As to the Terminating Event described in Article 9, Subparagraph 3(e) involving the acquisition of a controlling interest or purchase of a substantial portion of either Partner's assets, the Partner whose interests or assets have not been acquired shall have the right to terminate.

(c)  As to the Terminating Event described in Article 9, Subparagraph 3(f) which pertains to the dissolution, liquidation, bankruptcy, or other financial problems of the Partnership, each Partner shall have the right to terminate;

(d)  As to the Terminating Event described in Article 9, Subparagraph 3(g) involving a Material Breach, the non-breaching Partner shall have the right to terminate.

Following the giving of said notice by a Partner, the Partners agree that the Partnership may be terminated by either a Termination by Purchase in accordance with Article 9, Paragraph 5 below or a Termination by Dissolution pursuant to Article 9, Paragraph 6 below.

5.  <u>Termination by Purchase</u>.  Upon the occurrence of a Terminating Event (other than as described in Subparagraph (b) below), RSA and CKC agree that they shall have the following rights and obligations with respect to their respective Partnership Interests:

(a) As to any Terminating Event described in Article 9, Subparagraph 3(a) through (d) hereof, the Partner which is not subject to the bankruptcy, or other proceedings described in said Article 9, Subparagraph 3(a) through (d), shall have the option to purchase the Partnership Interest of the bankrupt Partner upon the terms set forth in Subparagraph (e) below for an amount equal to the fair market value of such Interest, as determined in accordance with Subparagraph (f) below.

(b) As to any Terminating Event described in Article 9, Subparagraph 3(f), the Partnership Interests of the Partners shall not be purchased by either Partner, but rather each such Partner shall be entitled to receive such distributions, if any, from the Partnership with respect to that Partner's Partnership Interest as is distributable pursuant to Article 5, Paragraph 2 hereof or otherwise in accordance with the terms of such dissolution, liquidation, bankruptcy, or other proceeding.

(c) As to any Terminating Event described in Article 9, Subparagraph 3(e) hereof, the Partner whose interest or assets have not been purchased may, at its option, terminate the Partnership in accordance with Article 5, Paragraph 2, and Article 9, Paragraph 6, herein.

(d) As to any Terminating Event described in Article 9, Paragraph 3(g), the Partner which has not committed the Material Breach, shall have the option to purchase the Partnership Interest of the Partner which has committed the Material Breach for a total amount equal to the fair market value of such Partnership Interest, as determined in accordance with Subparagraph (f) below; provided, however, that the breaching Partner shall only be entitled to receive for its the Partnership Interest the difference between such fair market value purchase price and the amount of damages sustained by the Partnership and the non-breaching Partner as a result of such Material Breach as determined in accordance with this Subparagraph (d). In such event and in the absence of an agreement resolving such issues between the Partners, the amount of damages payable by the breaching Partner to the person to whom they shall be owing shall be determined through the arbitration procedure described in Article 12, Paragraph 1 hereof. Any payment to the breaching Partner with respect to its Partnership Interest shall be deferred until such arbitration is completed and any determination or judgment based on such arbitration has been approved in writing by all Partners or otherwise reduced to a final judgment by a court of competent jurisdiction, after appeals, if any. The amount of such damages shall be withheld by a damaged Partner as an off-set against the purchase price or paid by a purchasing Partner to a damaged Partner or the Partnership, as appropriate, and the breaching Partner shall receive the net payment, as reduced by such off-sets and payments to others, in full satisfaction of its Partnership Interest.

(e)  Any rights of RSA or CKC pursuant to this Paragraph 5 to purchase the Partnership Interest of the other Partner shall be exercised, if at all, within thirty (30) days following the giving of the original notice pursuant to Article 9, Paragraph 4 above.  The purchase price for a Partner's Partnership Interest shall be paid, subject to Subparagraphs (d) and (f) hereof, by a cash payment within ninety (90) days following expiration of the said thirty (30) day period.

(f)  For the purpose of this Paragraph 5, the fair market value of a Partner's Partnership Interest shall be determined by arm's-length agreement between the selling Partner and the purchasing Partner.  If no such agreement can be reached, the fair market value of such Interest shall be determined on the basis of the appraisal procedure as provided in this Subparagraph (f).  The selling Partner and purchasing Partner shall each appoint an appraiser, and the two appraisers appointed shall in turn appoint a third appraiser.  Each such appraiser shall be independent of and not an Affiliate of any of the Partners and shall be qualified to appraise the fair market value of the selling Partner's Partnership Interest.  Any such appraisal shall be based on the value of the business of the Partnership as an ongoing, operational business entity, provided that the value of such interest shall be reduced by the present value of all estimated payments that the purchasing partner becomes obligated to pay, following the purchase, on behalf of the selling Partner pursuant to Subparagraph (h) below.  The three appraisers shall each promptly render a good faith appraisal of the fair market value of the selling Partner's Partnership Interest.  The median of the three appraisals shall be deemed to be the fair market value of such Partnership Interest.  Any time periods set forth in this Paragraph 5 shall be suspended during this appraisal procedure, which shall be completed not later than sixty (60) days following expiration of the thirty (30) day period described in Subparagraph (e) above.  Any such determination of fair market value pursuant to this Subparagraph (f) shall be conclusive and binding on both Partners.

(g)  During any period in which a Partner has the right to purchase or is purchasing the Partnership Interest of the other Partner pursuant to this Paragraph 5, RSA and CKC shall use their best and reasonable efforts to maintain and preserve the business of the Partnership pending the consummation of such purchase.

(h)  As a condition to the purchase of a selling Partner's interest pursuant to this Paragraph 5, the purchasing Partner shall assume in writing the continuing obligations of the selling Partner pursuant to the Cylink License Agreement or the RSA License Agreement, as the case may be, to make royalty, license and other payments that are payable with respect to the Licensed Rights on the basis of distributions by the Partnership.

Final/April 6, 1990                20

6.   <u>Dissolution and Liquidation of the Partnership</u>.  In the event the Partners do not resolve their respective rights and obligations following the occurrence of a Terminating Event through a purchase and sale of the Partnership Interests pursuant to Paragraph 5 herein, at the option of the Partner having the right to terminate under Article 9, Paragraph 4, herein, the Partnership shall be terminated by way of a Termination by Dissolution, and RSA and Cylink shall promptly dissolve the Partnership in accordance with Article 5, Paragraph 2 hereof.

7.   <u>Effect of Termination by Purchase</u>.  Upon the purchase of one Partner's Partnership Interest pursuant to Article 9, Paragraph 5 or Article 8, Paragraph 1 above and in the event that only one Partner remains following such purchase, the Partnership shall be deemed terminated by way of a Termination by Purchase, and the one remaining Partner shall succeed to all of the properties, assets and liabilities of the Partnership, including without limitations, all rights to the Partnership's name and business operations and all rights and obligations of the Partnership pursuant to the RSA License Agreement and the Cylink License Agreement.  Following such purchase, the remaining Partner shall indemnify, defend and hold the other Partner harmless with respect to any liabilities, debts and obligations of the Partnership, whether existing at the date of purchase or incurred after such date, except any such liability, debt, or obligation created as a result of the breach by the other Partner of this Agreement, the Joint Venture Agreement or any of the other Ancillary Agreements.

8.   <u>Distribution Of Licensed Rights</u>.  In the event of Termination By Dissolution pursuant to Article 6, Paragraph 2 herein, or pursuant to Paragraph 6, herein, the Licensed Rights shall be distributed to the Partners as provided in the Cylink License Agreement and the RSA License Agreement.  In addition, in the event of Termination By Dissolution under said Paragraphs, RSA will continue to receive 20% of all royalties received by CKC, its Affiliates or assignees from any sublicenses covered by the Stanford Agreement entered into after the effective date of dissolution shall be paid to RSA.

## ARTICLE 10 - SIGNATURES

Except as may otherwise be agreed in writing between the Partners, any agreement, instrument, bill of sale or other document shall be executed on behalf of the Partnership by such persons as are designated by the Management Committee, and no other signature shall be permitted or required to bind the Partnership.

## ARTICLE 11 - CONFIDENTIALITY

1.  Each Partner acknowledges and agrees that certain information it receives from one or both of the other parties constitutes the confidential and proprietary trade secrets of the disclosing Partner, and that the receiving Partner's protection thereof is essential to this Agreement and a condition of the receiving Partner's use and possession thereof. Each Partner shall retain in strict confidence any and all such confidential information marked by the disclosing Partner as confidential (collectively "Confidential Information") and use such Confidential Information only as expressly authorized herein. A Partner will under no circumstances distribute or in any way disseminate Confidential Information to third parties without the prior written permission of the disclosing Partner.

2.  Notwithstanding the above, the receiving Partner shall have no liability to the disclosing Partner with regard to any information which:

(a)  was generally known and available in the public domain at the time it was disclosed or becomes generally known and available in the public domain through no fault of the receiving Partner;

(b)  was known to the receiving Partner at the time of disclosure as shown by the files of the receiving Partner in existence at the time of disclosure;

(c)  is disclosed with the prior written approval of the disclosing Partner;

(d)  was independently developed by the receiving Partner without any use of Confidential Information, and by employees or other agents of the receiving Partner who have not been exposed to such Confidential Information;

(e)  becomes known to the receiving Partner from a source other than the disclosing Partner without breach of this Agreement by the receiving Partner and otherwise not in violation of the disclosing Partner's rights; or

(f)  is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, that the receiving Partner shall provide prompt, advance notice thereof to enable the disclosing Partner to seek a protective order or otherwise prevent such disclosure.

(3)  Each Partner will enter into a confidentiality agreement with each employee who is given access to the Confidential Information of the other Partner which incorporates

Final/April 6, 1990                     22

the protections and restrictions substantially as set forth herein.

(4) Each Partner agrees to notify the other Partner in the event of any breach of its security under conditions in which it would appear that Confidential Information was prejudiced or exposed to loss. Each Partner shall, upon request of the disclosing Partner, take all other reasonable steps necessary to recover any compromised Confidential Information disclosed to or placed in its possession by virtue of this Agreement. The cost of taking such steps shall be borne solely by the receiving Partner.

(5) Each Partner acknowledges that any breach of any of its obligations under this Article 11 is likely to cause or threaten irreparable harm to the other Parties, and, accordingly, each Partner agrees that in such event the disclosing Partner shall be entitled to equitable relief to protect its interests, including but not limited to preliminary and permanent injunctive relief, as well as money damages.


## ARTICLE 12 - MISCELLANEOUS

1. **Arbitration.** All disputes, controversies or differences arising out of or in relation to or in connection with this Agreement, which cannot be settled by discussion and mutual accord, shall be finally settled by arbitration. Each Partner shall be entitled to appoint one arbitrator, who shall not be an Affiliate, officer, director, employee, agent, vendor or contractor of that Partner. The two appointed arbitrators shall then appoint a third arbitrator, and the arbitration shall be conducted by the three arbitrators so chosen. All arbitrators so appointed shall be experienced in the business of licensing intellectual property rights, and the third arbitrator shall be a practicing attorney in said field. The arbitration shall be conducted in Santa Clara County, California. Demand for arbitration shall be made in writing and shall be served upon the Partner to whom the demand is addressed in the manner provided for the tender of notices in Article 12, Paragraph 2 hereof. If the Partner receiving the demand for arbitration does not appoint its arbitrator within 30 days after receiving such notice, the arbitrator appointed by the Partner demanding arbitration shall be further empowered to serve as the sole arbitrator with all of the rights, duties and powers granted hereunder without the necessity of a three person panel. The arbitrators are authorized to award any remedy, legal or equitable, as well as any interim relief as they deem appropriate in their discretion. Application may be made to any court having jurisdiction over the proceedings to assist the arbitrators in performing their arbitral duties, to confirm their award and to enforce any such award as a judgement of said court.


Final/April 6, 1990                    23

2. <u>Notices and Other Communications</u>. Every notice or other communications required or contemplated by this Agreement by either Partner shall be delivered in writing either by (i) personal delivery, or (ii) postage prepaid return receipt requested certified mail addressed to the Partner for whom intended at the address for such Partner specified above, or at such other address as the intended recipient previously shall have designated by written notice to the other Partner. Notice by certified mail shall be effective on the date it is officially recorded as delivered to the intended recipient by return receipt or equivalent, and in the absence of such record of delivery, the effective date shall be presumed to have been the fifth (5th) business day after it was deposited in the mail. All notices and other communication required or contemplated by this Agreement delivered in person shall be deemed to have been delivered to and received by the addressee and shall be effective on the date of personal delivery. Notice not given in writing shall be effective only if acknowledged in writing by a duly authorized representative of the Partner to whom it was given.

3. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and each counterpart shall constitute an original instrument, but all such separate counterparts shall constitute only one and the same instrument.

4. <u>Law to Govern</u>. This validity, construction and enforceability of this Agreement shall be governed in all respects by the law of California applicable to agreements negotiated, executed and performed in California between California corporations, whether one or more of the parties shall now be or hereafter become a resident of another state or country.

5. <u>No Waiver of Rights</u>. All waivers hereunder must be made in writing, and failure at any time to require the other Partner's performance of any obligation under this Agreement shall not affect the right subsequently to require performance of that obligation. Any waiver of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision or a waiver or modification of the provision.

6. <u>Attorneys' Fees</u>. If either Partner hereto fails to perform any of its obligations under this Agreement, or if a dispute arises concerning the meaning or interpretation of any provision of this Agreement, the defaulting Partner or the Partner not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other Partner in resolving such dispute or in enforcing or establishing its rights hereunder, whether by arbitration, litigation, negotiation by the parties or otherwise, including, without limitation, court costs, arbitration costs and actual attorneys' fees. In the event suit or arbitration is brought to enforce or interpret any part of this

Agreement, the prevailing Partner shall be the Partner which is entitled to recover its costs, whether or not the proceeding reaches a final judgment.

7.   **Severability**.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement should be prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

8.   **Subject Headings**.   The subject headings of the Articles and Sections of this Agreement are included for the purpose of convenience of reference only, and shall not affect the construction or interpretation of any of its provisions.

9.   **Further Assurances**.   The parties hereto shall each perform such acts, execute and deliver such instruments and documents, and do all such other things as may be reasonably necessary to accomplish the transactions contemplated in this Agreement.

10.   **Expenses**.   Except as otherwise agreed, the parties hereto shall each bear their own costs and expenses (including attorneys' fees) incurred in connection with the negotiation and preparation of this Agreement and consummation of the transactions contemplated hereby.

11.   **Omissions or Delays**.   No omission or delay on the part of any Partner hereto in requiring a due and punctual fulfillment by any other Partner hereto of the obligations of such other Partner hereunder shall be deemed to constitute a waiver by the omitting or delaying Partner of any of its rights to require such due and punctual fulfillment of any other obligations hereunder, whether similar or otherwise, or a waiver of any remedy it might have.

12.   **Entire Agreement; Amendments**.   The terms and conditions contained in this Agreement and in the various other agreements contemplated herein constitute the entire agreement between the parties hereto and supersede all previous communications, either oral or written, between the parties hereto with respect to the subject matter hereof, and no agreement or understanding varying or extending the same shall be binding upon any Partner hereto unless in writing signed by a duly authorized officer or representative thereof in which this Agreement is expressly referred to.

13.   **Assignment and Succession**.   This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.   Except as provided in Article

Final/April 6, 1990                      25

8, Paragraph 2, this Agreement shall not be assignable by any Partner except with the written consent of both of the other parties. In the event of any such assignment the transferor or assignor shall remain obligated to perform its own obligations and in addition shall be jointly and severally liable for the proper performance of the obligations of the transferee or assignee pursuant to this Agreement.

14. **Adjustment of Basis**. The Partnership shall, if either Partner so requests, elect pursuant to U.S. Internal Revenue Code Section 754, to adjust the basis of Partnership property under the circumstances and in the manner provided in U.S. Internal Revenue Code Sections 754 and 743. The Partners shall, in the event of such an election, take all necessary steps to effect the election.

15. **Exculpation**. Except in case of gross negligence or willful misconduct, the doing of any act or failure to do any act by either Partner, the effect of which may cause or result in loss or damage to the Partnership, if done pursuant to advice of legal counsel employed by the Partnership, or if done in good faith to promote the best interests of the Partnership, shall not subject such Partner to any liability to the other Partners or the Partnership.

16. **Indemnification**.

(a) **General**. The Partnership, its receiver or its trustee, shall indemnify and defend each Partner, their employees, agents, Affiliates, officers, directors, and assigns, against and hold them harmless from any and all losses, costs, damages, liabilities, claims and expenses arising out of the business of the Partnership (including, but not limited to, attorneys' fees and court costs, which shall be paid by the Partnership as incurred), which may be made or imposed upon such persons by reason of any (1) act performed for or on behalf of the Partnership or in furtherance of the Partnership business, (2) inaction on the part of such persons, or (3) liabilities arising under federal and state securities laws; so long as said conduct shall not constitute gross negligence or willful misconduct.

(b) **Partnership Assets Must First be Used**. All judgments against the Partnership and the Partners or their employees, agents, Affiliates, officers, directors and assigns wherein the Partners or such other persons or entities are entitled to indemnification, must first be satisfied from Partnership assets before the Partners or such other persons or entities are responsible for these obligations.

Final/April 6, 1990          26

IN WITNESS WHEREOF, each Partner hereto has executed this Agreement on the date set forth opposite the name of each.

"CKC"     CARO-KANN CORPORATION

By _____

Title _____

"RSA"     RSA DATA SECURITY, INCORPORATED

By _____

Title _____

Final/April 6, 1990                    27


Printed on Recycled Paper
20% Post Consumer Waste

6

MAR 2 7 1992

WILLIAM S. KLEIN, ESQ.
LIZA K. TOTH, ESQ.
HOPKINS & CARLEY
150 Almaden Boulevard, 15th Floor
San Jose, California 95113-2089
Telephone:  (408) 286-9800

ROBERT B. FOUGNER, ESQ.
310 North Mary Avenue
Sunnyvale, California 94086
Telephone: (408) 735-6779

Attorneys for Plaintiff
PUBLIC KEY PARTNERS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PUBLIC KEY PARTNERS,
a partnership,

         Plaintiff,

  vs.

TRW INC., an Ohio Corporation,
TRW ELECTRONIC PRODUCTS, INC.
a Delaware corporation, and
DOES 1-10

         Defendants.

Case No. C -92 20184 JW

COMPLAINT

JURY DEMANDED

(PVT)

    Plaintiff, PUBLIC KEY PARTNERS (hereinafter referred to as

"PKP"), for its complaint against defendants TRW INC. and TRW

ELECTRONIC PRODUCTS, INC., demands a jury and states as follows:

## I.  THE PARTIES

    1.   Plaintiff, PUBLIC KEY PARTNERS, is a partnership duly

formed and existing under the laws of the State of California with

COMPLAINT

CYL STAN CY
026425

P009392

HOPKINS & CARLEY
A CORPORATION

its principal place of business at 310 North Mary Avenue, Sunnyvale, California.

2.   On information and belief, defendant TRW INC. is a corporation duly organized and existing under the laws of Ohio.

3.   On information and belief, defendant TRW ELECTRONIC PRODUCTS, INC. is a corporation duly organized and existing under the laws of Delaware, and is a branch or subsidiary of TRW INC.

4.   On information and belief, TRW ELECTRONIC PRODUCTS, INC. is wholly owned and controlled by TRW INC. and is an agent through which TRW conducts business in this district and throughout the United States and through which TRW INC. commits the acts of infringement herein complained of.  TRW ELECTRONIC PRODUCTS, INC. and TRW INC. are hereinafter collectively referred to as "TRW".

5.   DOES 1-10 are persons whose identities are presently unknown, but who on information and belief have engaged in the infringement alleged herein.

## II.   JURISDICTION AND VENUE

6.   This action arises under the patent laws of the United States and, more particularly, under 35 U.S.C. §§ 271 and 281 et seq.  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

7.   On information and belief, TRW has sufficient contacts with this district to subject it to personal jurisdiction in this district.  In addition, on information and belief, TRW has a

COMPLAINT                         2

CYL STAN CY
026426

P009593

KINS & CARLEY
A CORPORATION

regular and established place of business in this district and has committed acts of infringement in this district.  Accordingly, venue lies in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c) and/or 1400(b).

### III.   THE UNITED STATES LETTERS PATENT OF PKP

8.    On April 29, 1980, United States Patent Number 4,200,770 by inventors Martin E. Hellman, Bailey W. Diffie, and Ralph C. Merkle, entitled, CRYPTOGRAPHIC APPARATUS AND METHOD ("the Patent"), was duly and lawfully issued.  A copy of the Patent is annexed hereto as Attachment "A."

9.    The Patent was assigned to the Board of Trustees of the Leland Stanford Junior University ("The University").  Pursuant to a written agreement dated April 6, 1990 ("the Agreement"), The University granted PKP exclusive rights to license the Patent, including the right to prosecute claims for infringement of the Patent.

### IV.   PATENT INFRINGEMENT

10.  On information and belief, TRW has directly infringed the Patent by making, using and selling equipment, including facsimile encryptors, which reads on claims of the Patent literally and/or under the doctrine of equivalents.

11.  On information and belief, TRW has also contributorily infringed the Patent, and has induced others to infringe the Patent.

COMPLAINT                                3

CYL STAN CY
026427

P009394

12. On information and belief, TRW will continue to directly and contributorily infringe the Patent, and will continue to induce infringement of the Patent, unless enjoined by this Court.

13. Prior to instituting this action, PKP gave TRW written notice of the Patent and invited it to discuss the allegations set forth herein. PKP did not receive any response to its notice of infringement.

14. On information and belief, such infringement has been carried out with knowledge of the Patent, and has been willful, deliberate and intentional.

WHEREFORE, PKP PRAYS:

A. That the Patent be adjudged valid in law and infringed by TRW.

B. That defendants, their officers, directors, agents, servants, employees and attorneys, and all those persons in active concert or participation with them, be first preliminarily, and then permanently, enjoined and restrained from: infringing the Patent; from making, using, selling, offering for sale, distributing or advertising any products that contributorily infringe the Patent; and from actively inducing infringement of the Patent or advising customers that the Patent is invalid.

C. That defendants, their officers, directors, agents, servants, employees and attorneys, and all those persons in active concert or participation with them, be ordered to deliver to this

COMPLAINT                    4

CYL STAN CY
026428

P003395

KINS & CARLEY
.W CORPORATION

Court for destruction all equipment infringing upon, or the use of which would infringe upon, directly or indirectly, any claim of the Patent.

D.   That an accounting be had for plaintiff's damages arising out of defendants' infringement of the Patent, and that the damages so ascertained be awarded to PKP.

E.   That PKP be awarded damages adequate to compensate it for defendants' acts of infringement, and that such damages be trebled because of the willful and deliberate character of the infringement, as provided by 35 U.S.C. §284.

F.   That PKP be awarded attorneys' fees, as provided by 35 U.S.C. §285, prejudgment interest, and the costs of this action.

G.   That PKP be granted such other and further relief as the Court may deem just and equitable.

Dated: _____        ROBERT B. FOUGNER, ESQ.

By _____
Attorneys for Plaintiff

Dated: 3-27-92

HOPKINS & CARLEY
A Law Corporation

By _____
William S. Klein
Attorneys for Plaintiff

COMPLAINT                    5

CYL STAN CY
026429

P003596

Printed on Recycled Paper
20% Post Consumer Waste

1

1              IN THE MATTER OF THE ARBITRATION BETWEEN

2

3

COPY

4

5      CYLINK CORPORATION, and CARO-KANN
       CORPQRATION, On the One Hand,
6
                        and
7
       RSA DATA SECURITY, INC., On the
8      Other Hand.

9      _____/

10

11              Reporter's Transcript of Proceedings

12                       May 9, 1995

13

14

15

16     Reported By:
       ERIC BRODY
17     CSR No. 7558
       SHARI MOSS
18     CSR No. 5443

19

20                   SHARI MOSS & ASSOCIATES
21               Certified Shorthand Reporters
                 5175 Diamond Heights Boulevard
22             San Francisco, California  94131
                        (415) 282-4040
23

24

25

                                                            1

1      possibility of granting a license to IBM in a

2      conversation I had with him on the telephone,

3      which was primarily about his recent software

4      license to Microsoft.

5          Q.    We'll come back to that conversation.

6                Was TRW the next PKP license that was

7      granted?

8          A.    I think so.  There might have been a

9      small license for a company called Gilbarco (ph.)

10     around that time.  It was a single product

11     license.  It was not a very big license, but TRW

12     was the next one that was in the PKP story that

13     was of any real significance.

14         Q.    Did TRW initiate the contact or did PKP

15     initiate the contact?

16         A.    Well, I knew that they had a fax

17     encryptor and they were using Diffie-Hellman, and

18     I had sent them at least one and probably more

19     than one letter inviting them to negotiate a

20     license agreement and I had received no response

21     from them.

22         Q.    Was Mr. Bidzos aware of the situation

23     with TRW?

24         A.    He was aware the TRW was out there

25     using the technology and had shunned apparently

243

1    all my invitations to come talk about a license.

2         Q.    Was Mr. Bidzos that the particular

3    technology that TRW was using Diffie-Hellman?

4         A.    Yes.

5         Q.    How do you know he was aware of that?

6         A.    Well, PKP discussed it quite a bit.

7         Q.    Did PKP ultimately make a decision to

8    sue TRW?

9         A.    Yes, it did.

10        Q.    How did that decision come about?

11        A.    Well, that was part of a broader

12   strategy that we had at the time.

13        Q.    What was the time period, by the way?

14             THE WITNESS:  This occurred in March of

15   1992, and it wasn't just bringing a case again

16   TRW.  It fit into the broader business plan that

17   we had in the fall of 1991, summer and fall of

18   1991.  The federal government had announced what

19   was going to be the federal Digital Signature

20   Standard or DSS, and they have an algorithm called

21   the DSA for that standard, and the federal

22   government, without talking to us, had taken the

23   position that this Digital Signature Standard was

24   going to be royalty-free for both government and

25   commercial use.  So that then set in play a

                                              244

1    dynamic that went on for some time between the
2    government and PKP over whether PKP was ever going
3    to get any renumeration from the promotion of this
4    Digital Signature Standard.
5        Q.    Was this again something and you
6    Mr. Bidzos discussed?
7        A.    We discussed this quite a bit very
8    extensively.
9        Q.    Did you reach a decision based on these
10   conversations regarding what you would do with
11   respect to TRW?
12       A.    Well, the government was taking the
13   position they were sort of ignoring us, and we had
14   written some letters and one or two statements had
15   been made about this, and the government was
16   taking the view that there was nothing to worry
17   about our patents or PKP, and both Mr. Bidzos and
18   I agreed that in order to get some credibility, we
19   had licensed a few significant people by this time
20   we had licensed IBM, for example and Northern
21   Telecom, and we needed to establish the fact that
22   PKP was willing to enforce the patents, and
23   particularly the Stanford patents, because those
24   were the patents needed to read the DSS, so we
25   needed to set a precedent that these patents had

                                                    245

1    some teeth to them.

2         Q.    What did you do to set a precedent?

3         A.    Well, we began looking at the

4    opportunities that were out there to do that, and

5    TRW appeared to be a prime candidate, for a number

6    of reasons.

7         Q.    Can you tell me just very briefly what

8    the reasons were, just in bullet form.

9         A.    Okay.   In bullet form, No. 1, I had

10   very good documentary evidence that they were

11   using Diffie-Hellman.   That was pretty convincing

12   to me.   No. 2, TRW was on the cusp of dealing with

13   -- they were selling that business to another

14   company, so I appreciated the fact that it would

15   be -- they would be very vulnerable to a sudden

16   patent suit that might disrupt that transaction,

17   and that might motivate them to settle quickly.

18        Q.    Did you in fact sue?

19        A.    Yes.

20        Q.    How was that suit resolved?

21        A.    It was resolved very fast, within a few

22   weeks.   TRW came in and negotiated the settlement.

23   I think they paid 475 thousand dollars for the

24   right to just continue using Diffie-Hellman and to

25   sell only that to the future buyer.