
Printed on Recycled Paper
20% Post Consumer Waste



69

## LICENSE AGREEMENT

Effective as of ___June 5, 1992___ (the "Effective Date")
PUBLIC KEY PARTNERS, a general partnership duly organized under
the laws of the State of California and having its principal
office at 310 North Mary Avenue, Sunnyvale, California, 94086
("PKP"), and TRW INC, a corporation duly organized and existing
under and by virtue of the laws of Ohio having an office located
at One Rancho Carmel, San Diego, California, 92128 ("LICENSEE"),
hereby enter into the following Agreement:

1. BACKGROUND

    1.1.  PKP holds exclusive sublicensing rights to certain
patents in the field of public key cryptography.

    1.2.  LICENSEE requests a sublicense to practice the art of
public key upon the terms and conditions described herein.

    NOW, THEREFORE, in consideration of the mutual
covenants contained herein, the parties agree, as follows:

2. DEFINITIONS

    2.1.  "LICENSEE" shall mean TRW Inc.

    2.2.  "FUTUREX" shall mean Jones Futurex, Inc., a Colorado
Corporation.

    2.3. "Affiliates of FUTUREX" shall mean Jones Intercable,
Inc., and any corporation, company or other entity set forth on

Final

P003602

Public Key Partners
Patent License

Attachment "B".  In addition, Affiliates of FUTUREX shall
include:

> 2.3.1.  any entity acquired after the Effective Date
> by any of the existing Affiliates of FUTUREX, provided
> that such acquired entity was not engaged within one
> year prior to the date of acquisition in the practice
> of public key cryptography, and
>
> 2.3.2.  entities formed after the Effective Date which
> are controlled directly, or indirectly through one or
> more intermediaries, by Glenn R. Jones, Jones
> International, Ltd., Jones Spacelink, Ltd. or Jones
> Intercable, Inc.   For purposes of this subparagraph,
> "controlled" shall mean the ability to elect or
> appoint, or direct the election or appointment of, a
> majority of the members of the board of directors of an
> entity (or, if none, the equivalent thereof) whether
> through the ownership of voting equity interests, by
> contractual provision or otherwise.

2.4.  "License" shall have the meaning ascribed in
Paragraph 3.1.

2.5.  "Licensed Patent" shall mean the following patent
registered in the United States, including all divisions,

Final                              2

p003603

Public Key Partners
Patent License

continuations and re-issues, and all of their foreign
equivalents, if any:

> Cryptographic Apparatus and Method
> ("Hellman-Diffie") U.S. No. 4,200,770

2.6. "Effective Date" shall mean the date stated in the
preamble to this Agreement.

2.7. "Licensed Product" shall mean the device described in
Attachment "A" including any enhancements consistent with its
function as a facsimile encryptor.

2.8. "Licensed Field of Use" means key management.

2.9. "Licensed Territory" means worldwide.

## 3. GRANT

3.1   PKP hereby grants a personal, non-exclusive sublicense
to LICENSEE, in the Licensed Field of Use, for the right to make,
use or sell the Licensed Product in the Licensed Territory (the
"License").

3.2.  Except as provided herein, the License may not be
transferred nor does it convey any rights whatsoever to
sublicense the Licensed Patent.  Notwithstanding the foregoing,
PKP grants all purchasers of the Licensed Products from LICENSEE
or FUTUREX the right to use such Licensed Product without risk of
infringement of the Licensed Patent.

Final                              3

P003604

Public Key Partners
Patent License

4. TERM

Subject to paragraph 10.1, the rights and obligations of this Agreement are irrevocable and shall be effective until expiration of the Licensed Patent.

5. FEE

5.1. In consideration of PKP's agreement with LICENSEE dated May 22, 1992 ("Settlement Agreement") as well as the License granted herein, LICENSEE agrees to make the following payments to PKP:

(a) The sum of One Hundred Twenty-five Thousand Dollars ($125,000) within ten (10) business days after the Effective Date;

(b) The sum of One Hundred Twenty-five Thousand Dollars ($125,000) on or before January 10, 1993;

(c) The sum of One Hundred Twenty-five Thousand Dollars ($125,000) on or before January 10, 1994;

(d) The sum of One Hundred Thousand Dollars ($100,000) on or before January 10, 1995.

5.2. The foregoing sums shall be non-refundable.

6. REPRESENTATIONS AND WARRANTIES

6.1. PKP represents and warrants that (i) it is a partnership duly and validly organized and existing under the laws of the State of California; (ii) it has the sole and

Final                                    4

P003605



Public Key Partners
Patent License

exclusive right to grant the rights stated in Paragraph 3.1, herein; (iii) it has all requisite power, right and authority to enter into this Agreement; (iv) its performance hereunder does not violate any agreement with any third person; (v) this Agreement has been duly authorized by PKP; and (vi) as of the date of this Agreement, PKP has not received any claims by any third parties which allege infringement for use of the Licensed Patent.

6.2.   LICENSEE represents and warrants that (i) it is a corporation duly organized and existing under the laws of the State of Ohio and has all necessary right, power, and authority to enter into and perform this Agreement; (ii) this Agreement has been duly authorized by LICENSEE; and (iii) its performance hereunder does not violate any agreement with any third person.

6.3.   Nothing in this Agreement is or shall be construed as:

(a)   A warranty or representation by PKP as to the validity or scope of the Licensed Patent;

(b)   A warranty or representation that anything made, used, sold or otherwise disposed of under the License is or will be free from infringement of patents, copyrights, and other rights of third parties;

Final                            5

P003606

Public Key Partners
Patent License

        (c)  An obligation to bring or prosecute actions or suits against third parties for infringement, except as provided in Article 9.

6.4.  Except as expressly set forth in this Agreement, PKP MAKES NO REPRESENTATIONS AND EXTENDS NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED.  THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR THAT THE USE OF THE LICENSED PRODUCTS WILL NOT INFRINGE ANY PATENT, COPYRIGHT, TRADEMARK OR OTHER RIGHTS.  PKP SHALL NOT BE LIABLE TO LICENSEE, ITS CUSTOMERS, THE USERS OF ANY LICENSED PRODUCT, OR ANY THIRD PARTIES FOR DIRECT, INDIRECT, CONSEQUENTIAL DAMAGE, INCLUDING, WITHOUT LIMITATION, ANY DAMAGE OR INJURY TO BUSINESS EARNINGS, PROFITS OR GOODWILL SUFFERED BY ANY PERSON ARISING FROM ANY USE OF THE LICENSED PATENT(S) OR LICENSED PRODUCTS, EVEN IF PKP IS ADVISED OF THE POSSIBILITY OF SUCH LOSS.

6.5.  Except for breach of PKP's warranty in paragraph 6.1, herein, PKP shall not be liable to LICENSEE, its customers, users of the Licensed Products or any third parties, under any circumstances whatsoever.

6.6.  In the event of any damage to LICENSEE caused by breach of the representations and warranties in paragraph 6.1, herein, PKP agrees to reimburse LICENSEE for said damages, up to

Final                            6

Public Key Partners
Patent License

the amount of all payments made to PKP under the terms of Article 5 of this Agreement.

6.7.  Any warranty made by LICENSEE to its customers, users of the Licensed Product or any third parties are made by LICENSEE alone and shall not bind PKP or be deemed or treated as having been made by PKP and service of any such warranty shall be the sole responsibility of LICENSEE.

7.  INDEMNITY

7.1.  LICENSEE agrees to indemnify, hold harmless, and defend PKP, its partners and the assignees of the Licensed Patent, their trustees, officers, directors, employees, faculty members, students and agents against any and all claims for death, illness, personal injury, property damage, economic loss of any kind whatsoever, and improper business practices arising out of the exercise of any of the rights granted in Article 3, herein, by LICENSEE, its distributors, customers or anyone acting on its behalf.

7.2.  LICENSEE's liability under paragraph 7.1, herein, is conditioned on prompt notice by PKP of all such claims after PKP receives notice of their existence and, provided further, PKP offers LICENSEE an opportunity, to the extent permissible by the governing law, to assume their defense.  In the event LICENSEE assumes the defense of any such claim, PKP reserves the right to

Final                              7

P003608

Public Key Partners
Patent License

continue to participate in the defense of its interests, at its own cost and expense.  LICENSEE shall not be liable for any settlement or compromise unless, prior to any such agreement, PKP notifies LICENSEE of the proposed settlement or compromise and LICENSEE fails to assume the defense of said claim.

## 8.    MARKING

8.1.  LICENSEE agrees to mark Licensed Products, or in the event their size or configuration makes such marking impractical, their containers or labels, as well as all literature describing the Licensed Product, with the following number of the Licensed Patent:

"U.S. Patent No. 4,200,770"

8.2.  In addition, all references to public key technology or the Licensed Patent in any literature promoting or describing the Licensed Product shall bear the legend, in print no less distinct and in size than the accompanying text, "Licensed Exclusively By Public Key Partners".

8.3.  LICENSEE agrees not to identify, or use any trademark, service mark, trade name, or symbol of PKP's partners, their affiliates, or the assignees of the Licensed Patent, their faculty members, students, employees, agents, officers or directors in any promotional advertising or other promotional materials to be disseminated to the public.

Final                                    8

P003609

Public Key Partners
Patent License

## 9.   INFRINGEMENT AND PROTECTION OF THE PATENTS

9.1.   LICENSEE shall promptly inform PKP of any suspected infringement of any Licensed Patent(s) by a third party.  PKP shall have the sole right to institute an action for infringement of the Licensed Patent against such third party.  At PKP's option, it may add LICENSEE as a party to any such action, at PKP's sole expense.

9.2.   If LICENSEE receives notice of a claim that the exercise of the rights granted in Article 3, herein, infringes any patent, copyright or trade secret of any party, it shall immediately inform PKP in writing.  In such event, LICENSEE agrees to permit PKP, at PKP's option, to appear as a proper party in interest in the defense of any such claim.

## 10.   TERMINATION

10.1   PKP may terminate this Agreement at any time in the event of any of the following:

(a) LICENSEE remains in default of any payment owed to PKP after 30 days written notice from PKP; provided however, that in the event the License has been assigned to FUTUREX or an Affiliate of FUTUREX prior to or during the continuation of such payment default, then PKP shall also give notice of such default to the assignee, and the assignee shall

Final                                9

P003610

Public Key Partners
Patent License

have the right, but not the obligation, to cure such default within 30 days after receiving such notice.

(b) LICENSEE breaches Paragraph 3.2 or Article 8; provided, however, that LICENSEE and any permitted assignee of the License shall not be deemed in breach of the provisions of Article 8 if such party cures, or commences and diligently continues to effect a cure, of such breach within thirty (30) days after receipt of notice from PKP that such breach has occurred.

(c) In the event the License is assigned to FUTUREX or an Affiliate of FUTUREX and such assignee ceases to be controlled (as defined in subparagraph 2.3.2) directly, or indirectly through one or more intermediaries, by Glenn R. Jones, Jones International Ltd., Jones Spacelink, Ltd., or Jones Intercable, Inc.

10.2    Surviving any termination are:

(a) Any cause of action or claim of PKP or LICENSEE, accrued or to accrue, because of any breach or default by the other party herein;

(c)  The provisions of Articles 5, 6, 8 and paragraph 9.2.

Final                              10

P003611

Public Key Partners
Patent License

## 11.  ASSIGNMENT

11.1.  This Agreement may not be transferred or assigned to any party without the prior written consent of PKP. Notwithstanding the foregoing, the License may be assigned to FUTUREX or an Affiliate of FUTUREX within fifteen (15) business days after the Effective Date.  PKP acknowledges LICENSEE's intention to assign the License to FUTUREX on or about June 5, 1992.  Thereafter, the License may be reassigned to other Affiliates of FUTUREX at any time without notice to PKP.

11.2.  In the event of assignment of the License pursuant to Paragraph 11.1 to FUTUREX or an Affiliate of FUTUREX, such assignee shall be bound by all of the obligations and responsibilities of LICENSEE set forth herein, except the payment obligations of LICENSEE set forth in Article 5 herein.  Such assignment shall effectively convey to the assignee all of LICENSEE's rights granted under Article 3 herein, and terminate all of LICENSEE's residual rights thereunder.  However, such assignment shall not relieve LICENSEE of any of its obligations and responsibilities under this Agreement and LICENSEE shall remain the sole obligor to make the payments set forth in Article 5.

11.3.  In the event FUTUREX or an Affiliate of FUTUREX wishes to assign or transfer the License to any third party in

Final                                    11

P003612

Public Key Partners
Patent License

connection with the sale or other transfer of substantially all
of the assets of the business to which the Licensed Product
relates, PKP agrees to discuss in good faith any proposal made
for such transfer.  However, it is expressly agreed that PKP is
under no obligation to consent to such transfer.

12.    NOTICES

        All notices under this Agreement shall be deemed sent
when:

        (a) Deposited in the United States mail, registered or
certified, and addressed as follows:

        TO PKP:          Public Key Partners
                         310 North Mary Avenue
                         Sunnyvale, CA 94086

                         Attention: Director of Licensing

        TO LICENSEE:     TRW Space & Defense Sector
                         RC1/3065
                         One Rancho Carmel
                         San Diego, CA 92128

                         Attention: Walter E. Vashak
                                    Senior Counsel

        TO FUTUREX:      Jones Futurex, Inc.
                         9697 East Mineral Avenue
                         P.O Box 3309
                         Englewood, CO 80155-3309

                         Attention: Legal Department/General
                                    Counsel

        Either party may amend its address by written notice to
the other party, sent as provided herein.

Final                         12

P003613

Public Key Partners
Patent License

(b) Sent by overnight courier such as Federal Express or DHL to the address set forth in paragraph (a) above.

(c) In the event of a generally prevailing labor dispute or other condition which will delay or impeded the giving of notice by any such means, in either the place of origin or the place of destination, the notice shall be given by such specified mode as will be most reliable, expeditious and least affected by such dispute or condition.

## 13.   GENERAL CONDITIONS

13.1.   This Agreement sets forth the entire agreement and understanding between the Parties and supersedes and cancels all previous negotiations, agreements, commitments, whether oral or in writing, with respect to the subject matter described herein, and neither Party shall be bound by any term, clause, provision, or condition save as expressly provided in this Agreement or as duly set forth in writing as a subsequent Amendment to this Agreement, signed by duly authorized officers of each Party.

13.2.   This Agreement shall be construed in accordance with the laws of the State of California as they would apply to contracts executed in and covering transactions solely within said State, except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent was granted.

Final                           13

P003614

Public Key Partners
Patent License

13.3.   Failure by either Party to detect, protest, or remedy
any breach of this Agreement shall not constitute a waiver or
impairment of any such term or condition, or the right of such
Party at any time to avail itself of such remedies as it may have
for any breach or breaches of such term or condition.   A waiver
may only occur pursuant to the express written permission of an
authorized officer of the party against whom the waiver is
asserted.

13.4.   The provisions of this Agreement are severable, and
in the event that any provisions of this Agreement are determined
to be invalid or unenforceable under any controllable body of
law, such invalidity or unenforceability shall not in any way
affect the validity or enforceability of the remaining provisions
hereof.   In such event, the Parties agree to negotiate in good
faith a substitute enforceable and legal provision which most
nearly effects the intent of the Parties in entering into this
Agreement.

13.5.   Except as expressly provided herein, the rights and
remedies herein provided shall be cumulative and not exclusive of
any other rights or remedies provided by law or otherwise.

13.6.   LICENSEE is familiar with and agrees to comply with
all Export Administration Regulations of the United States
Department of State, and all other United States government

Final                              14



P003615

Public Key Partners
Patent License

regulations relating to the export of technical data and
equipment and products produced therefrom, which are applicable
to LICENSEE with regard to any distribution of the Licensed
Products.

13.7.  This Agreement shall be binding upon and shall inure
to the benefit of PKP and LICENSEE and their respective
successors and permitted assigns.

IN WITNESS WHEREOF, the parties hereto have executed
this Agreement as of the Effective Date:

PUBLIC KEY PARTNERS                    TRW INC

Name:_____             Name: _Louis T. Petroni_

Signature: _A. James Bidzos_           Signature: _Louis T. Petroni_

Title:_____             Title: _Director, Integrate Operations_
                                       _Avionics + Surveillance Group_

ASSIGNED TO:

Jones Futurex, Inc.

Name: _James Skozci_
Signature: _____
Title: _President_
Date Of Assignment: _6/5/92_

Final                          15

P003616

Public Key Partners
Patent License


<u>ATTACHMENT A</u>

Licensed Product(s):

P003617

MAY 19 '92  12:32PM TRW S&D LAW DEPT.

P.2/8

# TRW



TRW Fax Encryptor 300

# Fax Security

## The next generation is here.

Fax security has been taken to a higher level.

The technology of two decades of TRW encryption experience is now available to business — with an affordable and supremely effective method of protecting your fax communications.

In a very real sense, the fax is locked in a vault that only the sender and receiver can unlock. Patented TRW technology then goes one step further to ensure that fax communications are transmitted from sender to receiver — and only there.

And it's all available in this second generation machine that has been made easier to use with expanded network controls and complete audit records.

## TRW Electronic Products Inc.

P002618

MAY 19 '92  12:34PM  TRW S&D LAW DEPT

P. 3/8

# Only the sender has his key.

**20 Years of Encryption Experience.**
A few decades ago, nobody knew what a fax was. Now, not having one can relegate your company to the Dark Ages.

But there is a problem.

The fax machine has become so common that techniques to remotely monitor and intercept this communication method have also become common.

In fact, there are companies openly and actively selling products that can convert a portable PC into a fax interceptor.

It can be used to monitor your next product introduction, your marketing plans, your strategy in court, or your latest oil and natural gas finds. Or your bank transfers.

Unfortunately, it only takes alligator clips or a probe to gain access to your phone system. Radio, satellite and microwave links are just as vulnerable.

Is this paranoia?  Most of the world's governments and military organizations don't think so.  A growing number of major corporations don't think so either.

Simply stated, an information-based economy will foster the activity of information-seeking spies.  Sending a fax is an open act of displaying your most deeply guarded secrets to the world.

**Fax security: the problem is real.** And TRW Electronic Products Inc. has taken important steps to provide the ultimate in fax security, beyond anything else on the market.

With TRW's second-generation Fax Encryptor 300, you can be assured that you are connected to the right party, that no one else can listen in, and that your message is encrypted with the best techniques available today.

**Invisible to the user.**
Installation of the Fax Encryptor 300 is extremely simple.

It is first connected in series with any Group III fax using common phone cords and modular RJ11 jacks.

The encryptor is then easily programmed with the identity numbers of the fax encryptors it will communicate with.  The desired settings from a choice of transmission and reception options are also set.

Adding to fax security, there is a physical set-up key that is used to set up the device — all identities and controls are permanently set until changed by the physical key holder.

After that, even untrained users can operate the fax normally, with the encryptor doing its job automatically and invisibly.

# Only you have yours.

While the Fax Encryptor 300 is automatically performing its function, it is providing levels of security not available anywhere else.  Once two fax encryptors are connected, the TRW patented technology gives you three unique protective measures:

**Authentication.**
The two communicating encryptors use their identity numbers to unequivocally confirm each other's identity before any information is exchanged.

**Automatic Key Management.**
The key used to encrypt the fax message is created and transmitted automatically, eliminating the need for manual delivery by courier.



P003619



MAY 19 '92  12:55PM TRW S&D LAW DEPT

**Random Key Generation.**
The all-important key is changed for each and every transmission, with an infinite supply of new keys.

Therein lies the brilliance of the system. No one needs to physically pass the key to the formula, and the key changes every time.

With automatic and random key changes, anyone attempting to decode the fax transmissions utilizing supercomputers will find that the whole process takes several years. And the process of decrypting starts over with with every transmission.

In addition, you control the way faxes are sent and received, and to whom. You can lock into transmission to certain sites only or close your network.

And you can eliminate junk faxes, which are an annoyance and a source of extra wear on your machine.

To help you keep track of your security measures, the fax encryptor prints a banner on each page telling you how and where each fax was sent from.

On demand, a complete record of transactions can be printed out — providing the most thorough audit trail available anywhere.

"Fax Pirates" simply connect alligator clips or a Gauss probe to the telephone wiring. TRW Fax Encryptor 300 thwarts every attempt at fax interception.

TRW Fax Encryptor

## Why encrypt?

**The need to protect.**
Two excerpts from business publications follow, both of which indicate the tremendous need for fax encryption.

"Considering that several years ago, enthusiastic hackers began breaking into computer systems worldwide to steal valuable information, it could only have been a matter of time before the same problem surfaced for facsimile machines.

Apparently, anyone with just a little knowledge of electronics can tap fax messages... with the duplication printed out on the pirate's facsimile machine. Both

the sender and receiver of the faxed documents remain completely unaware that they have been bugged."

—"Fax Pirates Find It Easy To Intercept," JOURNAL OF COMMERCE

"While some businesses are willing to take fax as a business risk (faxes being misaddressed occasionally, just like Fed Ex packages, and ending up in the wrong hands), other organizations that send large volumes of sensitive information feel that the risk is becoming too great and must be addressed."

—"Did You Get My Fax?" by Tracey Tucker, TELECONNECT

P003620



For a demonstration or further information, call or write to the phone or address below. Discover a higher level of fax security.

- Identity authentication of transmitting and receiving parties
- Automatic key management and generation
- DES encryption algorithm
- Closed network capability

- Audit trail of all fax traffic
- Broadcast, auto-dial and delayed-dial
- Misdial protection
- Junk fax blocking

- Group III fax compatibility
- RJ11 phone jack connections
- Database/configuration lock
- Transparent operation
- Exportable

**TRW Electronic Products Inc.**
3183 Duncan Lane
San Luis Obispo, CA 93401
(800) 488-2196
(805) 544-2438
(805) 546-9956 (FAX)

## PRODUCT SPECIFICATIONS

### CERTIFICATIONS
- FCC Part 68
- FCC Part 15, Class A
- UL 1459
- DOC, CS-03 (Canada)
- CSA C22.2 (Canada)

### FAX INTERFACE
- Group III
- CCITT T.4, T.30, V.21, V.27, V.29
- Operable speeds of 2400 to 9600 Bps

### PHYSICAL CHARACTERISTICS
- Dimensions: 12x10x2¼"
- Weight: 5½ pounds
- Power: 12 VDC,800mA, UL approved 120 VAC wall adapter
- Connections: (2) RJ11 standard telephone jacks
  (1) 2.1mm power entry jack
- Display: 2x40 liquid crystal display
- Keyboard: 12-digit alphanumeric and function keypad
  5 additional operation and editing keys

### CRYPTOGRAPHICS
- Model #300: DES algorithm
  TRW proprietary algorithm
- Model #400: TRW proprietary algorithm
- TRW patented authentication and automatic key management system



P003621

MAY 19 '92 12:36PM TRW E&D LAW DEPT                    P.6/8

# ⫸ TRW Fax Encryptor
## Specifications



An ID and unique Key Management Message (KMM) are exchanged between fax encryptors. The KMM is used to generate a session key. Security is assured by making one part of the KMM public, and keeping the other part private. The public KMM is derived from the private KMM, and can only be generated by the encryptor with the given ID.



**TRW**

The TRW Fax Encryptor is available for immediate delivery after June 15th, 1989. To place your order, contact us today.

Phone: (805) 544-2438
Fax: (805) 546-9956

**TRW Electronic Products Inc.**
1050 Southwood Drive
San Luis Obispo, CA 93401

**Specifications**

Dimensions: 5 x 12 x 10 inches

Weight: 9.4 lbs.

Power: 110/220 VAC, 50/60 Hz

Display: 2 by 40 LCD

Keypad:
    8 edit keys
    6 operations keys

**Indicators:**
    Ready
    Alarm

**Tamper protection:**
    Audible/visual alarms
    Internal variables erased
    Holographic seal

**Certifications:**
    FCC part 68 and 15J Class A
    UL approved

**Key Management and Authentication:**
    Key generation, exchange and authentication using proprietary public key techniques

    Proprietary and public encryption algorithms

P003622

©TRW Inc. 1989
Printed in U.S.A.
MB 103

MAR 19 '92  10:37PM TRW S&D LAW DEPT                                    P.7/8

𝐴

# TRW

**TRW Electronic
Products Inc.**

## ▌▶ TRW Fax Encryptor
### Convenient And Reliable
### Fax Privacy

The same technology that makes facsimile
possible also makes fax intercept possible.
Information is improperly obtained, shared,
and exploited every day. Your proprietary data
is too important to risk exposure to wire tap
and fax intercept equipment.

Now you can protect sensitive text and image
fax traffic with the TRW Fax Encryptor. It's
compatible with all Group 3 facsimile
machines; there's no need to purchase addi-
tional interface circuits or specialized fax
machines. Installation is simple and only

takes a minute, because the TRW Fax Encryp-
tor connects between your fax and the phone
line, using existing equipment jacks.

Fax privacy doesn't have to increase your
phone costs, require security training or
impose key management programs. The TRW
Fax Encryptor is the first completely auto-
matic encryption system available for
facsimile. When you send a fax, the TRW
Fax Encryptor identifies the receiving party,
exchanges data for generating a unique ses-
sion key, then encrypts and transmits your
fax image at up to 9.6 Kb/s.

The TRW Fax Encryptor's ID list holds up to
one hundred names, phone numbers, and
identification numbers. This feature allows
you to select which fax encryptors can
exchange information. It also ensures that
the number you call has the fax encryptor
it should.

TRW Electronic Products Inc. designs and
manufactures secure communications equip-

ment for government and industry. Twenty
years of cryptographic and security experi-
ence, together with fast, microprocessor-
controlled performance, make the TRW Fax
Encryptor the most convenient and reliable
form of fax privacy available today.

### Features

▶ Automatic fax privacy; no key distribution
   or manual equipment operation required

▶ Compatible with all Group 3 facsimile
   machines (CCITT T.30, T.4)

▶ Authenticates receiving party

▶ Easy installation; connects between phone
   line and fax; no modifications required

▶ Simple, menu-driven configuration menu
   and identification list

▶ Extensive self-test and tamper-proofing
   features

▶ Operates with tone or pulse dial

▶ Operates at the speed of your fax machine

▶ Designed using advanced cryptology
   techniques trusted by government and
   industry



P003623



# Experimenting With Fax Security?

Facsimile machines are fast, convenient and popular. But they have a dark side. Sensitive information you'd never discuss on the phone is sent by fax every day, exposing your proprietary data to even faster and more convenient fax-tapping equipment. You know the risks. How can you stop the invasion of the document snatchers?

You could be inventive and patch something together with retrofits, oddball connectors, and mysterious black boxes. Or you could go to extremes and trade in your fax machines for exotic, government systems. No matter what formula you use, it could add up to a monstrous sum. And a reputation you don't deserve.

Now you can hang up your lab coat and install TRW Fax Encryptors. They're a simple, fast and completely automatic solution to fax security. They connect between any Group 3 fax and your phone line. Your documents are encrypted instantly with unique keys generated for each transmission.

TRW Fax Encryptors operate in the background. That means secur-



ity doesn't depend on training and discipline. Best of all, TRW Fax Encryptors authenticate the receiving party, so your important documents won't disappear in the twisting corridors of the public phone network.

Now that you know the secret of fax security, give us a call. We're ready to take your order.

**Phone (805) 544-2438 or
Fax (805) 546-9956**

**TRW Electronic Products Inc.
1050 Southwood Drive
San Luis Obispo, CA 93401**

Distribution territories are still available.
Inquiries welcome.



P002624

Public Key Partners
Patent License

<u>**ATTACHMENT B**</u>

Affiliates:

Final                                    17

P003625

## AFFILIATES AND SUBSIDIARIES
### OF JONES INTERCABLE, INC.

Jones International, Ltd.
Evergreen Intercable, Inc.
Jones Tri-City Intercable, Inc.
Cable TV Fund 11-A, Ltd.
Colonial Cablevision, Ltd.
Cable TV Fund 11-B, Ltd.
Cable TV Fund 11-C, Ltd.
Cable TV Fund 11-D, Ltd.
Cable TV Joint Fund 11
Cable TV Fund 11-E, Ltd.
Cable TV Fund 11-F, Ltd.
Cable TV Fund 11-E/F Venture
Cable TV Fund 12-A, Ltd.
Cable TV Fund 12-B, Ltd.
Cable TV Fund 12-C, Ltd.
Cable TV Fund 12-D, Ltd.
Cable TV Fund 12-BCD Venture
Cable TV Fund 14-A, Ltd.
Cable TV Fund 14-B, Ltd.
Cable TV Fund 14-A/B Venture
Cable TV Fund 15-A, Ltd.
Jones Intercable of San Diego, Inc.
Jones Intercable of Ft. Myers, Inc.
Saturn Cable TV, Inc.
Jones Cable Income Fund 1-A, Ltd.
Jones Cable Income Fund 1-B, Ltd.
Jones Cable Income Fund 1-C, Ltd.
Jones Cable Income Fund 1-B/C Venture
Jones Intercable Investors, L.P.
Jones Spacelink, Ltd.
Jones Spacelink of Hawaii, Inc.
Jones Spacelink Income Partners 87-1, L. P.
Spacelink of Texas, Inc.
Spacelink of Mission Dorado, Ltd.
Jones Spacelink Fund 4, Ltd.
Jones Spacelink Fund 5, Ltd.
Jones Spacelink Funds, Inc.
Jones Spacelink Management, Inc.
Jones Spacelink Income/Growth Fund 1-A, Ltd.

P003626

Data Transmission, Inc.
The Jones Group, Ltd.
Glenn R. Jones
Christine Jones Marocco
Robert Jones
Suzanne M. Jones
Jones Futura Foundation, Ltd.
Jones International Securities, Ltd.
Jones Performance Products, Inc.
Jones Futurex, Inc.
Jones Information Management, Inc.
Jones Communications, Ltd.
International Aviation, Ltd.
Jones Properties, Inc.
Cable Ads, Ltd.
Jones Capital Markets, Inc.
Jones 21st Century, Inc.
Jones Cable Corporation
Cable ALP, Inc.
IDS/Jones Growth Partners 87-A, Ltd.
IDS/Jones Growth Partners 89-B, Ltd.
IDS/Jones Growth Partners II, L.P.
Jones Galactic Radio, Inc.
Saturn Partners, Ltd.
Jones Lightwave, Ltd.
Starsearch, Ltd.
Jones Space Segment, Inc.
Jones Earth Segment, Inc.
The Mind Extension University, Inc.
Jones Programming Partners 1-A, Ltd.
Jones Programming Services, Inc.
Jones U.K. Holdings, Inc.
Jones Political Action Committee
Jones International, Ltd. Political Action Committee
Jones Global Funds, Inc.
Jones Marina Properties, Inc.
Jones Universal Robots, Inc.
Jones Spanish Holdings, Inc.
Jones Spacelink Cable Corporation
Jones Growth Partners L.P.
Intercable Jerez, S.A.
Intercable Zaragoza, S.A.
Inversiones Dragon, S.A.

P003627

Jones Cable Group, Ltd.
Jones Global Group, Inc.
Jones Global Management, Inc.
Jones International Spanish Investments, Inc.
Jones 21st Century Productions, Inc.
Intercable Espana, S.A.
ELT Acquisition Company Limited
East London Telecommunications (Holdings) Limited
East London Telecommunications Limited
Jones Cable Corporation
Jones Spacelink Spanish Investments, Inc.
Comtec, Inc.
Jones Crown Partners
Jones of Wisconsin, Inc.
Gateway/Jones Communications, Ltd.
Jones Education Network, Inc.
The Mind Extension Institute, Inc.
The Mind Extension Regional Network, Inc.
The Business Learning Group, Inc.
Global Education Network
Jones Galactic Sound, Inc.
Jones Galactic Radio Partners, Inc.
IDS/Jones Joint Venture Partners
Jones United Kingdom Fund, Ltd.
Drake-Chenault/Jones Satellite Services
Jones Banana Network, Inc.
Jones Cable Group of South Hertfordshire Limited
Jones Cable Group of Telford Limited
Jones Cable Group of Aylesbury
Jones Cable Group of Leeds Limited
Jones Entertainment Group, Ltd.
Jones Lightwave of Atlanta, Inc.
Jones Universal Music, Inc.
The Education Network, Inc.
Jones Spacelink Funds, Inc.
Jones Growth Partners II L.P.
Jones Programming Partners, Ltd.
Jones Programming Partners 2-A, Ltd.
Global Association of Distance Education
Jones Lightwave of Denver, Inc.
Jones Equipment Company
Jones Spacelink Opportunities, Inc.
Jones Spacelink Acquisition Corporation
Jones Lightwave of Tampa, Inc.
Jones Lightwave of Chicago, Inc.
Jones Satellite Audio, Inc.

66

## LICENSE AGREEMENT

Effective as of *December 20, 1991* PUBLIC KEY PARTNERS, a general partnership duly organized under the laws of the State of California and having its principal office at 310 North Mary Avenue, Sunnyvale, California, 94086 ("PKP"), and LEMCOM SYSTEMS INC., a corporation duly organized and existing under and by virtue of the laws of Delaware having its principal office at 2104 West Peoria Avenue, Phoenix, AZ 85029 ("LICENSEE"), hereby enter into the following Agreement:

## 1. BACKGROUND

1.1.  PKP holds exclusive sublicensing rights to certain patents in the field of public key cryptography.

1.2.  LICENSEE desires a sublicense to practice the art of public key upon the terms and conditions described herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree, as follows:

## 2.  DEFINITIONS

2.1.  "LICENSEE" shall mean Lemcom Systems Inc. and any of its Subsidiaries.

2.2.  "Subsidiaries" shall mean any corporation, company or other entity in which Lemcom Systems Inc. owns or controls more than fifty percent (50%) of the voting stock or interests.

2.3.  "Patent Rights" shall mean the following patent(s) registered in the United States, including all divisions,

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

continuations and re-issues, and all of their foreign

equivalents, as follows:

    Cryptographic Apparatus and Method
    ("Hellman-Diffie")........................ No. 4,200,770

    Public Key Cryptographic Apparatus
    and Method ("Hellman-Merkle")............ No. 4,218,582

    Cryptographic Communications System and
    Method ("RSA") .......................... No. 4,405,829

    Exponential Cryptographic Apparatus
    and Method ("Hellman-Pohlig")............ No. 4,424,414

    Foreign Equivalents: (See Attachment "A")

2.4. "Effective Date" shall mean the date stated in the

preamble to this Agreement.

2.5. "Licensed Product" shall mean devices described in

Attachment "B" which are manufactured by LICENSEE and are covered

by the Patent Rights.  This Attachment "B" may be amended by

mutual agreement of the Parties to include new Licensed Products

and their associated royalties.

2.6.  "Net Sales Price" means the gross selling price of the

Licensed Product in the form in which it is sold by LICENSEE,

whether or not assembled (and without excluding therefrom any

components or subassemblies thereof, whatever their origin and

whether or not all such components and subassemblies are covered

by the Patent Rights), less the following items but only insofar

2

P021427

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

as they actually pertain to the sale of such Licensed Product by

LICENSEE, and are included in the gross selling price, and such

items are separately billed on LICENSEE's invoices:

(a)   Custom duties, import, export, excise, and

sales taxes directly imposed with reference to particular sales;

(b)   Costs of insurance and transportation from

the place of manufacture to the purchaser's or lessee's place of

use;

(c)   Credit for returns, allowances or trades.

No deductions shall be made for commissions paid to individuals

whether they be employed by independent sales agencies or

regularly employed by LICENSEE, or for cost of collections.

2.7.   "Licensed Field of Use" means encryption, digital

signatures, authentication and key management.

2.8.   "Licensed Territory" means the United States and each

country listed on Attachment "A", but each such country shall be

part of the Licensed Territory for each Licensed Product only so

long as valid Patent Rights covering that Licensed Product are

registered and in full force and effect there in accordance with

all applicable laws.

3

PU21428

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

2.9.  "End User" means the party who actually utilizes the
Licensed Product for its intended purpose without selling,
leasing, or transferring it to any third party.

2.10.  "Distributor" means a party who sells Licensed
Products without any modification as packaged by LICENSEE for the
End User.

2.11.  "OEM Customer" means a party who adds significant
functional enhancements to the Licensed Product by bundling it
with other products.

3.  GRANT

3.1.  PKP hereby grants to LICENSEE a personal, non-
exclusive license to the Patent Rights, in the Licensed Field of
Use, for the right to make, use, lease or sell the Licensed
Product in the Licensed Territory to OEM Customers, Distributors
and End Users.

3.2.  This license may not be transferred, nor does it
convey any rights whatsoever to sublicense the Licensed Patents.
Specifically, and without limitation on the generality of the
foregoing:

4

P021429

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

3.2.1.    Except as provided by §3.3 herein, LICENSEE
may not authorize any party to reproduce,
duplicate or copy the Licensed Product.

3.2.2.    In the case of software, LICENSEE may not
transfer any rights to the source code for
the Licensed Product.

3.3.   Notwithstanding the prohibition in §3.2. and §3.2.1.,
LICENSEE may authorize copying of Licensed Products consisting
solely of object code software in the following instances:

3.3.1.    For End Users to make a single copy strictly
for archival purposes;

3.3.2.    For OEM Customers when the Licensed Product's
sole use of this license to the Patent Rights
is limited to implementation of the Federal
Information Processing Standard known as the
Digital Signature Algorithm, provided (i) the
OEM Customer complies with the accounting
requirements for software products stated in
Attachment "C", and (ii) the Licensed Product
adds significant functional enhancements to
the art described by the Patent Rights.

5

P021430

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

3.4.   Provided the royalty has been paid for the Licensed Product in accordance with Article 5 and Attachment "C", PKP grants the End User the right to use such Licensed Product without risk of infringement of the Patent Rights.

## 4.   TERM

This Agreement shall be effective for each individual patent described in the definition of Patent Rights, in each country where it is registered, until the expiration or invalidation of each such patent in its country of registry.

## 5.   ROYALTIES

5.1.   LICENSEE shall pay the sum of $25,000.00 upon the execution of this Agreement.  This sum shall be deemed earned upon the execution of this Agreement by PKP and shall be non-refundable.

5.2.   In consideration of the rights granted in Article 3, LICENSEE agrees to pay PKP, during the term of this Agreement, the following royalties:

(a)   A minimum annual advance royalty of $5,000.00 for 1993, and $10,000 per calendar year for each year thereafter. This minimum royalty will be paid at the commencement of each calendar year.

6

PO21431

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

(b)   A royalty for each Licensed Product made, leased, sold or otherwise disposed of in the Licensed Territory at the rate set forth in the schedule annexed to this Agreement as Attachment "C".   Said royalties are deemed earned when the Licensed Product is leased, sold or otherwise disposed of.

5.3.   In the event any advance royalty paid in accordance with §5.2 is not recovered by LICENSEE by offsetting royalties earned during that year, as provided herein, such advance will be deemed fully earned by PKP and non-refundable to LICENSEE. LICENSEE may recoup the minimum annual advance royalty required by §5.2(a) by offsetting the first $10,000 in royalties that accrue in each calendar year under §5.2(b) against the advance royalty paid for that year.

## 6.   REPORTS, PAYMENTS AND ACCOUNTING

6.1.   LICENSEE shall submit written royalty reports, in accordance with the format annexed hereto as Attachment "D", together with royalty payments to PKP within sixty (60) days after the end of each calendar quarter.   In the event of LICENSEE's failure to make any required payment on or before the required date, a supplemental royalty equal to five percent (5%) of the amount otherwise due, or the maximum amount permitted by law, whichever is less, shall be paid by LICENSEE for each month

7

PP021432

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

or portion thereof that the payment is late by more than five (5) days.

6.2.   The royalty report shall be certified by an authorized representative of LICENSEE and shall state the number of Licensed Products, the Net Sales Price per Licensed Product, and the aggregate sales of all Licensed Products sold, leased or otherwise disposed of.   In the event a Licensed Product is sold at varying Net Sales Prices, then the report shall indicate the number of Licensed Products sold at each Net Sales Price. Further, LICENSEE shall furnish whatever additional information PKP may reasonably request from time to time to enable PKP to verify the calculation of royalties due pursuant to this Agreement.   Concurrent with the submission of each such report, LICENSEE shall make payment of all royalties due for the calendar quarter covered by such report.

6.3.   For purposes of payment and accounting to PKP for royalties due pursuant to this Agreement, a "sale" or "lease" of a Licensed Product shall be deemed to have occurred, as follows:

(a)   A "sale" of any Licensed Product shall be deemed to have occurred as of the date of shipment by LICENSEE or the date of dispatch of a bill or invoice, whichever shall first occur.

8

P021433

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

(b)  A "lease" of any Licensed Product shall be
deemed to have occurred as of the date of shipment by LICENSEE,
to a lessee thereof, or the date of dispatch of an initial bill
or invoice to any such lessee, whichever shall first occur.   In
the event of any lease, royalties will be calculated on the
prevailing Net Sales Price of the Licensed Product.

6.4.   In all cases, the Net Sales Price employed in the
computation of royalties shall be a genuine and objective selling
price established in a bona fide arm's length transaction between
unrelated and independent parties which have no affiliation or
other interest which might affect such genuine and objective
selling price.   LICENSEE covenants not to engage in manipulative
transfer pricing, distribution of Licensed Products which are not
commercially reasonable, or any other means, to avoid the
intended application of this Article.   In the event Licensed
Products are used or otherwise disposed of by LICENSEE to any
other party at a price which is less than a genuine and objective
selling price, as described herein, then the Net Sales Price
employed in the computation of royalties shall be the prevailing
Net Sales Price of the identical type of Licensed Products sold
or leased by LICENSEE, as the case may be, to independent and
unrelated third parties.   In the event that LICENSEE shall not
have customarily sold or leased the identical type of Licensed

9

P021434

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

Products to independent and unrelated third parties, then the Net
Sales Price employed in the computation of royalties shall be set
at 125% times the full cost of production, including all direct
costs and full overhead established by LICENSEE's standard
practices, for such Licensed Products sold.

6.5.   The royalty on sales in currencies other than U.S.
Dollars shall be calculated using the appropriate foreign
exchange rate for such currency quoted by the Bank of America
foreign exchange desk located in San Francisco, on the close of
business on the last banking day of each calendar quarter.
Royalty payments to PKP shall be in U.S. Dollars and shall be net
of all non-U.S. taxes.

6.6.   It is expressly understood and agreed by the parties
hereto that all computations relating to determination of the
amounts of royalties due and payable pursuant to this Agreement
shall be made in accordance with internationally recognized and
generally accepted accounting principles as reflected in the
practice of certified independent public accountants of
international reputation.   LICENSEE agrees to keep records for a
period of three (3) years which identify the manufacture, sales,
use, lease and other disposition of Licensed Products sold or
otherwise disposed of by LICENSEE under this Agreement in

10

P021435

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

sufficient detail to enable the royalties payable hereunder to be
determined by PKP's auditors, and LICENSEE further agrees to
permit its books and records to be examined by PKP's auditors as
often as PKP deems reasonably necessary, but not more than once a
quarter, to verify the LICENSEE's compliance with this Agreement.
Any errors discovered during such examination shall be corrected
promptly.  Such examination is to be made by PKP, at PKP's
expense, except in the event that any such examination reveals an
increase in PKP's favor of five percent (5%) or more of royalties
owed over that reported by LICENSEE in any one quarter, then the
fees of PKP's auditors shall be paid by LICENSEE.

## 7.  LIMITATION OF WARRANTIES

   7.1.  PKP warrants that it is authorized to enter into this
Agreement and to grant the rights stated in Article 3, herein, to
LICENSEE.  PKP further warrants that, as of the date of this
Agreement, it has no knowledge of any claims by any third parties
which allege infringement for use of the Licensed Patents.

   7.2.  Nothing in this Agreement is or shall be construed
as:

        (a)  A warranty or representation by PKP as to the
validity or scope of any Licensed Patents;

11

P021436

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

(b)   Except as provided in §7.1, any warranty or representation that anything made, used, sold or otherwise disposed of under any license granted in this Agreement is or will be free from infringement of patents, copyrights, and other rights of third parties;

(c)   An obligation to bring or prosecute actions or suits against third parties for infringement, except as provided in Article 10; or

(d)   Granting by implication, estoppel or otherwise any licenses under patents licensed by PKP other than the Licensed Patents defined in this Agreement, regardless of whether such patents are dominant or subordinate to any Licensed Patent.

7.3.   Except as expressly set forth in this Agreement, PKP MAKES NO REPRESENTATIONS AND EXTENDS NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED.   THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR THAT THE USE OF THE LICENSED PRODUCTS WILL NOT INFRINGE ANY PATENT, COPYRIGHT, TRADEMARK OR OTHER RIGHTS.   PKP SHALL NOT BE LIABLE TO LICENSEE, ITS CUSTOMERS, THE USERS OF ANY LICENSED PRODUCT, OR ANY THIRD PARTIES FOR DIRECT, INDIRECT, CONSEQUENTIAL DAMAGE, INCLUDING, WITHOUT LIMITATION, ANY DAMAGE OR INJURY TO BUSINESS EARNINGS, PROFITS OR GOODWILL SUFFERED BY

12

P021437

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

ANY PERSON ARISING FROM ANY USE OF THE LICENSED PATENT(S) OR
LICENSED PRODUCTS, EVEN IF PKP IS ADVISED OF THE POSSIBILITY OF
SUCH LOSS.

7.4.   Except for breach of PKP's warranty in Paragraph 7.1,
herein, PKP shall not be liable to LICENSEE, its customers, users
of the Licensed Products or any third parties, under any
circumstances whatsoever, for any amount greater than that paid
by LICENSEE to PKP during the preceding six (6) months prior to
the assertion of any claim against PKP.

7.5.   In the event of any damage to LICENSEE caused by
breach of the warranty in Paragraph 7.1, herein, PKP agrees to
reimburse LICENSEE for said damages, up to the amount of all
payments made by LICENSEE to PKP under the terms of Article 5 of
this Agreement.

7.6.   Any warranty made by LICENSEE to its customers, users
of the Licensed Product or any third parties are made by LICENSEE
alone and shall not bind PKP or be deemed or treated as having
been made by PKP and service of any such warranty shall be the
sole responsibility of LICENSEE.

13

PU21438

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

## 8.  INDEMNITY

8.1.  LICENSEE agrees to indemnify, hold harmless, and
defend PKP, its partners and the assignees of the Licensed
Patents, their trustees, officers, directors, employees, faculty
members, students and agents against any and all claims for
death, illness, personal injury, property damage, improper
business practices, and economic loss of any kind whatsoever
arising out of the exercise of any of the rights granted in
Article 3, herein, by LICENSEE, its distributors, customers or
anyone acting on its behalf, except for liability arising out of
PKP's intentional misconduct.

8.2.  LICENSEE's liability under Paragraph 8.1, herein, is
conditioned on prompt notice by PKP of all such claims after PKP
receives notice of their existence and, provided further, PKP
offers LICENSEE an opportunity, to the extent permissible by the
governing law, to assume their defense.   In the event LICENSEE
assumes the defense of any such claim, PKP (i) shall, at its
expense, furnish LICENSEE with any information in PKP's
possession or control that LICENSEE reasonably may request for
such defense, and PKP (ii) reserves the right to continue to
participate in the defense of its interests, at its own cost and
expense.   LICENSEE shall not be liable for any settlement or
compromise unless, prior to any such agreement, PKP notifies

14

PO21439

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

LICENSEE of the proposed settlement or compromise and LICENSEE
fails to assume the defense of said claim.

9.   MARKING

9.1.   LICENSEE agrees to mark Licensed Products, or in the
event their size or configuration makes such marking impractical,
their containers or labels, as well as all literature describing
the Licensed Product, with the following numbers of the Licensed
Patents:

"U.S. Patent Nos. 4,200,770, 4,218,582, 4,405,829 and
4,424,414"

9.2.   In addition, all references to public key technology
or any of the Licensed Patents in any literature promoting or
describing the Licensed Products shall bear the legend, "Licensed
Exclusively By Public Key Partners".   Except for advertising and
marketing materials, said legend shall be in print no less
distinct and in size than the accompanying text.

9.3.   LICENSEE agrees not to identify, or use any trademark,
service mark, trade name, or symbol of PKP's partners, their
affiliates, or the assignees of the Licensed Patents, their
faculty members, students, employees, agents, officers or
directors in any promotional advertising or other promotional
materials to be disseminated to the public.

15

PU21440



Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

## 10.  INFRINGEMENT AND PROTECTION OF THE PATENTS

10.1.   LICENSEE shall promptly inform PKP of any suspected infringement of any Licensed Patent(s) by a third party.  PKP and LICENSEE shall each have the right to institute an action for infringement of the Licensed Patent(s) against such third party in accordance with the following:

(a)   PKP, its partners, their affiliates, and the assignees of the Licensed Patents may institute suit.  PKP may, at its option, invite LICENSEE by giving written notice to join in such suit.  If LICENSEE fails to notify PKP in writing, within fifteen (15) days after notice from PKP, that it will join in enforcing the patent pursuant to the provisions hereof, this failure shall be deemed conclusively to be LICENSEE's assignment to PKP of all rights, causes of action and damages resulting from any such alleged infringement, and PKP shall be entitled to retain the entire amount of any recovery or settlement.  At its option, PKP may join LICENSEE as a named plaintiff, without cost to LICENSEE.

(b)   If LICENSEE agrees to join in such a suit, the out-of-pocket costs thereof shall be borne, and any recovery or settlement shall be shared, by all plaintiffs as their respective interests may appear.

16

P021441

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

(c) In the absence of agreement by PKP, LICENSEE may not institute or continue prosecution of any suit concerning infringement of the Licensed Patent(s) by any third party.

10.2.   Should LICENSEE commence a suit under the provisions of Paragraph 10.1 and thereafter elect to abandon the same, it shall give timely notice to PKP who may, if it so elects, continue prosecution of such suit.   An election to abandon such an action shall be deemed conclusively to be an assignment by the abandoning party in favor of PKP of all rights, causes of action and damages resulting from any such alleged infringement.

10.3.   If LICENSEE receives notice of a claim that the exercise of the rights granted in Article 3, herein, infringes any patent, copyright or trade secret of any party, it shall immediately inform PKP in writing.   In such event, LICENSEE agrees to permit PKP, at PKP's option, to appear as a proper party in interest in the defense of any such claim.

## 11.   TERMINATION

11.1.   PKP may terminate this Agreement in the event of any of the following:

(a) LICENSEE is in default in payment of any royalty or submission of any royalty report, and fails to cure such default within thirty (30) days after notice from PKP;

17

P021442

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

(b) LICENSEE submits a materially false royalty report;

(c) LICENSEE breaches Paragraph 3.2, Article 8 or Article 9.

11.2.  Surviving any termination are:

(a) LICENSEE's obligation to continuing submitting reports and making payment of royalties as described in Articles 5 and 6.

(b) Any cause of action or claim of PKP or LICENSEE, accrued or to accrue, because of any breach or default by the other party herein;

(c)  The provisions of Articles 5, 6, 8 and Paragraph 10.3.

## 12.  ASSIGNMENT

12.1.  This Agreement may not be assigned by LICENSEE, without the prior written consent of PKP, which consent may be withheld for any reason whatsoever.

## 13.  ARBITRATION

13.1.  All disputes, controversies or differences between PKP or LICENSEE arising out of or related in any way whatsoever to this Agreement shall be submitted to arbitration.  Each party shall be entitled to appoint one arbitrator, who shall not be an

18

P021443

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

affiliate, officer, director, employee, agent, vendor or
contractor of that party.  The appointed arbitrators shall then
appoint a neutral arbitrator who shall serve as Chairman, and the
arbitration shall be conducted by the arbitrators so chosen.  All
arbitrators so appointed shall be experienced in the business of
licensing intellectual property rights, and the Chairman shall be
an attorney practicing litigation in said field.  The arbitration
shall be conducted in Santa Clara County, California.  Demand for
arbitration shall be made in writing and shall be served upon the
party or parties to whom the demand is addressed in the manner
provided for the tender of notices in Article 14, hereof.  If the
party receiving the demand for arbitration does not appoint its
arbitrator within 30 days after receiving such notice, the
arbitrator appointed by the party serving the demand for
arbitration shall be further empowered to serve as the sole
arbitrator.

13.2.  The arbitrators are authorized to award any remedy,
legal or equitable, as well as any interim relief as they deem
appropriate in their discretion.  However, notwithstanding the
foregoing, the arbitrators shall have no power to add to,
subtract from, or modify any of the terms or conditions of this
Agreement.  Application may be made to any court having
jurisdiction over the proceedings to assist the arbitrators in

PO21444

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

performing their arbitral duties, to confirm their award and to
enforce any such award as a judgement of said court.

13.3.  Claims, disputes or controversies concerning the
validity, construction or effect of any Patent Rights shall be
resolved in any Court having jurisdiction thereof.  In the event
that, in any arbitration proceeding, any issue shall arise
concerning the validity, construction or effect of any Patent
Rights, the arbitrators shall assume the validity of all claims
as set forth in such Patent Rights.  The arbitrators shall not
delay the arbitration proceeding for the purpose of obtaining or
permitting either party to obtain judicial resolution of such
issue, unless an order staying the arbitration proceeding shall
be entered by a Court of competent jurisdiction.  Neither party
shall raise any issue concerning the validity, construction or
effect of any Patent Rights in any proceeding to enforce any
arbitration award hereunder or in any proceeding arising out of
any such arbitration award.

13.4.  In the event LICENSEE institutes a proceeding to
contest the validity of, construction or effect of any Patent
Rights before the Court having jurisdiction over such disputes,
all royalties owed by LICENSEE under Article 5 of this Agreement
shall continue to be paid by LICENSEE into an escrow account

20

PU21445

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

maintained by PKP's counsel, or their designees, until such

proceeding is resolved, after appeals if any.

13.5.   The prevailing party in any action or arbitration to

enforce or interpret this Agreement or for relief of its breach

shall be entitled to recover its costs, including its share of

arbitration fees, and its reasonable attorneys fees incurred in

such proceeding.

## 14.   NOTICES

All notices under this Agreement shall be deemed sent

when:

(a) Deposited in the United States mail, registered or

certified, and addressed as follows:

        TO PKP:          Public Key Partners
                         310 North Mary Avenue
                         Sunnyvale, Ca. 94086

                         Attention: Director of Licensing

        TO LICENSEE:     Lemcom Systems Inc.
                         2104 West Peoria Avenue
                         Phoenix, AZ 85029

                         Attention: President

                         Brown & Bain
                         2901 North Central Ave.
                         Phoenix, AZ 85012-2788

                         Attention: Charles Van Cott

21

PU21446 - 4H

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

Either party may amend its address by written notice to the other party, sent as provided herein.

(b) Sent by overnight courier such as Federal Express or DHL to the address set forth in Subparagraph (a) above.

(c) In the event of a generally-prevailing labor dispute or other condition which will delay or impede the giving of notice by any such means, in either the place of origin or the place of destination, the notice shall be given by such specified mode as will be most reliable, expeditious and least affected by such dispute or condition.

15.  GENERAL CONDITIONS

15.1.  This Agreement, including all attachments (such as the Non-Disclosure Agreement annexed hereto as Attachment "E"), all of which the Agreement incorporate by reference, sets forth the entire agreement and understanding between the Parties and supersedes and cancels all previous negotiations, agreements, commitments, whether oral or in writing, with respect to the subject matter described herein, and neither Party shall be bound by any term, clause, provision, or condition save as expressly provided in this Agreement or as duly set forth in writing as a subsequent Amendment to this Agreement, signed by duly authorized officers of each Party.

22

PO21447

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

15.2.   This Agreement shall be construed in accordance with the laws of the State of California as they would apply to contracts executed in and covering transactions solely within said State, except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent was granted.

15.3.   Failure by either Party to detect, protest, or remedy any breach of this Agreement shall not constitute a waiver or impairment of any such term or condition, or the right of such Party at any time to avail itself of such remedies as it may have for any breach or breaches of such term or condition.  A waiver may only occur pursuant to the express written permission of an authorized officer of the party against whom the waiver is asserted.

15.4.   The provisions of this Agreement are severable, and in the event that any provisions of this Agreement are determined to be invalid or unenforceable under any controllable body of law, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions hereof.  In such event, the Parties agree to negotiate in good faith a substitute enforceable and legal provision which most

23

P021448

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

nearly effects the intent of the Parties in entering into this
Agreement.

15.5.   Except as expressly provided herein, the rights and
remedies herein provided shall be cumulative and not exclusive of
any other rights or remedies provided by law or otherwise.

15.6.   Time is of the essence for performance under this
Agreement.   In determining any time period herein, the day upon
which action is taken to start the period shall not be counted
and the period shall end on the last designated day of the
period.

15.7.   LICENSEE is familiar with and agrees to comply with
all Export Administration Regulations of the United States
Department of State, and all other United States government
regulations relating to the export of technical data and
equipment and products produced therefrom, which are applicable
to LICENSEE with regard to any distribution of the Licensed
Products.

15.8.   The terms of this Agreement shall not be disclosed by
LICENSEE without the written consent of PKP, except to LICENSEE's
attorneys, auditors, investment advisors or when otherwise
required by law.

24

PU21449

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992


　　　　　IN WITNESS WHEREOF, the parties hereto have executed

this Agreement as of the Effective Date:



PUBLIC KEY PARTNERS                    LEMCOM SYSTEMS INC.
By: _____                 By: _____
Title: _____                 Title: ___President___


25

PU21430

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

### ATTACHMENT A

#### Foreign Equivalents Of Patent Rights

| Patent | Country | Number |
|---|---|---|
| Cryptographic Apparatus and Method ("Hellman-Diffie") | Canada | 1,121,480 |
| Public Key Cryptographic Apparatus and Method ("Hellman-Merkle") | | |
| | Australia | 40 418/78 |
| | Belgium | 871039 |
| | Canada | 1 128 159 |
| | France | 78 28474 |
| | Germany | DE 28 43 583 C2 |
| | Italy | 1099780 |
| | Japan | 1,270,888 |
| | Spain | 474.539 |
| | Sweden | 78 10478-3 |
| | Switzerland | 634161 |
| | United Kingdom | 2 006 580 B |
| Exponential Cryptographic Apparatus and Method ("Hellman-Pohlig") | Canada | 1,152,592 |

26

P021451

Patent License
Public Key Partners
Lemcom Systems, Inc.
November 25, 1992

<u>ATTACHMENT B</u>

Licensed Product(s):

[Lemcom's product description dated November 10, 1992]

27

"PU21452



## ATTACHMENT B

1.  Licensed Products consist of a group of products which
    will incorporate technology of one or more of the
    patents licensed by this agreement.  These Licensed
    Products may be offered under various individual
    designations as part of the ViaCrypt (Trademark applied
    for) family of cryptographic products.

2.  The ViaCrypt family of products is aimed at a wide
    variety of computer and workstation-based applications
    that require cryptographic capability.  Some examples
    are applications that need to employ cryptographic
    techniques for such capabilities as data privacy,
    message authentication, non-repudiation, key
    management, user authentication, access control, and
    digital signatures.

3.  Software implementations of these capabilities will be
    common and inexpensive.  In many cases software-only
    solutions will be adequate.  In other cases, the secret
    key component will not be considered secure enough in
    software and a physical tamper-proof security perimeter
    (herein called a "security module") will be required.
    It is Lemcom's intention to provide solutions for all
    of these requirements for OEMs, Systems Integrators,
    VARS, and end-users.

4.  The security modules will consist of one or more
    microprocessors, ROM, RAM, possibly specialized
    hardware such as a DES chip, and control logic.  There
    will be a reasonably robust program in the ROM.  The
    security modules will be contained in a tamper-proof
    enclosure and be designed to be mounted on PCBs.

5.  Lemcom's ViaCrypt product line will therefore consist
    of three classes of products:

    a.  Several software-only products which can be
        seamlessly upgraded to include a security
        module at some later date.  Software-only
        products will be offered to OEMs, or sold
        through Distributors, Systems Integrators,
        VARs, or directly to end-users.

    b.  A number of security module types that will
        be sold on an OEM basis.  These security
        modules will be integrated into other
        products by the OEM and then sold by the OEM
        to end-users.

*CONFIDENTIAL TO LEMCOM SYSTEMS, INC.*  .P021453

November 10, 1992

100991

AGREEMENT dated as of October 1, 1991 between INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation (hereinafter called LICENSEE), and PUBLIC KEY PARTNERS, a California partnership (hereinafter called LICENSOR).

WHEREAS, LICENSOR has the right to license others under certain patents, and LICENSEE desires to acquire a nonexclusive license under such patents;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, LICENSEE and LICENSOR agree as follows:

Section 1.      Definitions

1.1 "Licensed Patents" shall mean those U.S. patents listed in Attachment B; any foreign counterpart, if any, describing and/or claiming the invention recited in any of said patents; and any patent which is related to any of said patents as a division, continuation, reissue or extension.

1.2 "Licensed Product" shall mean any product or apparatus covered by any claim or claims of the Licensed Patents.

1.3  "Subsidiary" shall mean a corporation, company or other entity:

1.3.1     more than fifty percent (50%) of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are, now or hereafter, owned or controlled, directly or indirectly, by LICENSEE, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control exists; or

1.3.2     which does not have outstanding shares or securities, as may be the case in a partnership, joint venture or unincorporated association, but more than fifty percent (50%) of whose ownership interest representing the right to make the decisions for such corporation, company or other entity is now or hereafter, owned or controlled, directly or indirectly, by LICENSEE, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control exists.


Section 2.    <u>License</u>

2.1  Subject to Sections 2.3 and 5.5, LICENSOR hereby grants to LICENSEE a nonexclusive, irrevocable, worldwide license under the Licensed Patents to make, have made, use, have used, lease, sell



-2-

P005820

and/or otherwise transfer any Licensed Product and to practice and/or have practiced any new and useful process.

Except as provided in Sections 3.1 and 11.1, the rights granted under this agreement cannot be sublicensed or otherwise transferred.

2.2  No license is granted to LICENSEE by LICENSOR, either directly or by implication, estoppel or otherwise, under any patents other than the Licensed Patents.

2.3  Subject to Section 5.5, LICENSOR hereby grants to LICENSEE, its sublicensed Subsidiaries and users of any Licensed Product an irrevocable, nonexclusive, paid-up immunity from suit and freedom from infringement liability under the Licensed Patents for the use of such Licensed Product, either alone or in combination with any other product or apparatus obtained by such user directly or indirectly from LICENSEE or any of its Subsidiaries at any time prior to or during the term of this Agreement; provided, however, that, subject to Section 2.4, no license or immunity is granted hereunder for the formation or use by such user of any combination of such Licensed Product with any product or apparatus not furnished by LICENSEE or any of its sublicensed

-3-

P005621

Subsidiaries, if such combination of itself results in infringement of any claim of a Licensed Patent.

2.4   The parties recognize that a customer of LICENSEE or its sublicensed Subsidiaries may interconnect Licensed Products via transmission apparatus provided, in whole or in part, by parties other than LICENSEE or its sublicensed Subsidiaries to form a complete data transmission system.   Such a data transmission system shall be deemed a Licensed Product(s); _provided_, _however_, that no license is granted or conveyed pursuant to this Agreement in respect of such transmission apparatus per se.

Section 3.        Extension of License to Subsidiaries

3.1   The license herein granted shall include the right of LICENSEE to grant revocable and irrevocable sublicenses, of or within the scope of the license granted to it herein, to its Subsidiaries, and each such sublicensed Subsidiary shall have the right correspondingly to grant sublicenses, of or within such scope, to other Subsidiaries of LICENSEE.   Each Subsidiary so sublicensed shall be bound by the terms and conditions of this Agreement (other than the provisions relating to payment in Section 6).

-4-



Section 4.      <u>Release</u>

4.1   LICENSOR hereby irrevocably releases LICENSEE and its
Subsidiaries, which are Subsidiaries as of the date of this
Agreement, and its and their respective customers, mediate and
immediate, of and from any and all claims of infringement of the
Licensed Patents, which claims have been or might have been made
by LICENSOR before the date of this Agreement with respect to any
machine, manufacture or composition of matter made, used, leased,
sold or otherwise transferred by or for LICENSEE or any of its
Subsidiaries and also with respect to any process practiced by or
for LICENSEE or any of its Subsidiaries, which would have been
licensed had the same been made, used, leased, sold and/or
otherwise transferred or practiced after the date of this
Agreement.

Based upon LICENSEE's present knowledge, no grounds exist for any
such claim of infringement.

Section 5.      <u>Term and Termination</u>

5.1   The term of this Agreement shall be from the date first
written above and until the expiration of the last to expire of
the Licensed Patents.

5.2   In the event that LICENSEE makes any election pursuant to
Section 6.2 to pay royalties in lieu of making the installment

-5-

P005623



payments under Section 6.1, LICENSEE may convert the license granted herein to a royalty bearing arrangement by giving notice in writing to LICENSOR.  Such conversion shall be effective as of the date the next installment payment would otherwise be due under Section 6.1.

5.3  No conversion pursuant to this Section 5 shall relieve LICENSEE of any obligation or liability accrued hereunder prior to such conversion, or rescind or give rise to any right to rescind anything done by LICENSEE or any payments made or other consideration given to LICENSOR hereunder prior to the time such conversion becomes effective, and such conversion shall not affect in any manner any rights of LICENSEE arising under this Agreement prior to such conversion, except as specifically provided in this Section 5.

5.4   LICENSEE shall have the right to revert to installment payments in accordance with Section 6.1 by giving notice in writing to LICENSOR.  Such reinstatement shall be deemed effective as of the date of the next scheduled installment payment required under Section 6.1.  It shall be a condition of such reversion that LICENSEE shall, in accordance with Section 8, pay the royalties provided for in this Agreement on all Licensed

-6-

P005624

Products which LICENSEE and its sublicensed Subsidiaries have manufactured, used, leased, sold or otherwise transferred between the date of such reversion and the commencement of the royalty bearing arrangement pursuant to Section 5.2.

5.5   If LICENSEE shall, at any time, fail to make any report, pay any royalties or permit the inspection of its books and records as required under Section 8.4, and such failure shall not be cured, and any interest due pursuant to Section 13.1 paid, within sixty (60) days after written notice from LICENSOR to LICENSEE specifying the nature of such failure, LICENSOR shall have the right to terminate this Agreement, or the license granted hereunder, by giving written notice to LICENSEE, and such termination shall be effective on the fifteenth day after the giving of such notice.

5.6   In the event this Agreement or the license granted hereunder, in whole or as to any specified patent, claim or product, shall be terminated pursuant to this Section 5, the corresponding sublicenses granted to Subsidiaries of LICENSEE pursuant to Section 3 shall likewise terminate, but no notices need be given by LICENSOR to such sublicensees.

-7-



P005625

Section 6.      <u>Payments</u>

6.1  Subject to Section 6.2 and as full consideration for the license and release granted hereunder, LICENSEE agrees to pay to LICENSOR the sum of two hundred thousand dollars ($200,000) upon signing of this Agreement by both parties and to make the following payments, as indicated:

> $500,000 on or before November 1, 1992
>
> $500,000 on or before November 1, 1993
>
> $500,000 on or before November 1, 1994
>
> $500,000 on or before November 1, 1995
>
> $500,000 on or before November 1, 1996
>
> $300,000 on or before November 1, 1997

Each installment payment, when made, shall not be refundable by LICENSOR to LICENSEE for any reason.  In the event that LICENSEE should terminate this Agreement pursuant to Section 5.2 or 16.5, for any reason, or elects to convert the license to a royalty-bearing arrangement pursuant to Section 5.2, then any installment payments unmade as of the date such notice is mailed shall not be deemed to be due or owing by LICENSEE to LICENSOR.

6.2  At any time after November 1, 1992, and provided that the installment payment due on November 1, 1992, has been made, LICENSEE may, at least sixty (60) days prior to any installment payment date of November 1, elect to pay LICENSOR, in lieu of the installment payment due on such payment date pursuant to Section 6.1 and applicable to the next subsequent twelve (12) month

-8-



P005626

period, a royalty in respect of Licensed Products sold or
otherwise transferred by LICENSEE or any of its Subsidiaries
during such twelve (12) month period.  If no election is made,
such installment payment shall be due and payable on such payment
date.  Any such royalties shall be payable under terms and
conditions, including royalty rates, which the parties agree to
promptly negotiate upon LICENSEE having first elected to pay
royalties in respect of any twelve (12) month period specified in
Section 6.1.  In the event that such negotiations are delayed,
for any reason, beyond the end of any subsequent accounting
period specified in Section 8.2, LICENSEE shall be obligated to
submit a royalty report for any such accounting period within
sixty (60) days following completion of such negotiations.  In
the event negotiations are delayed beyond the end of any such
accounting period, LICENSEE shall pay the amount due under
Section 6.1 and said payment shall be credited against any
royalties owed for this period.  In no event shall such terms and
conditions, including royalty rates, be less favorable than the
terms and conditions set forth in Attachment A hereto.  Any such
royalty payments shall be made pursuant to Section 8 of this
Agreement.

6.3  The license granted to LICENSEE under Section 2.1 shall be
fully paid-up upon payment under Section 6.1 by LICENSEE of all

-9-

P005647

of the installments due to LICENSOR on or before November 1, 1997, or upon payment by LICENSEE of a total of three million dollars ($3,000,000) under Sections 6.1 and 6.2 to LICENSOR.

Section 7.      Immunities

7.1  LICENSOR grants LICENSEE and its customers, mediate and immediate, a royalty-free immunity from suit with respect to any Licensed Product covered by any claim or claims of a Licensed Patent in any country upon which royalty has accrued or payment has been made pursuant to Section 6.1 or 6.2.  Said immunity shall be under any Licensed Patent of any other country which corresponds to said Licensed Patent if LICENSEE pays such accrued royalty or payment on said Licensed Product pursuant to Section 6.

Section 8.      Accruals, Records and Reports

8.1  In the event LICENSEE makes an election to pay royalties pursuant to Section 6.2, such royalties shall accrue when a Licensed Product with respect to which royalty payments are required by this Agreement is first sold or otherwise transferred, or first used or leased in each country of use or lease, by or for LICENSEE, or when a newly issued or acquired Licensed Patent covers any portion of Licensed Product in use or

-10-



P005648

on lease by or for LICENSEE on which portion the royalties provided for in Section 6.2 have not previously accrued.

8.2  A semiannual accounting period shall end on the last day of each February and August during the term of this Agreement. Within sixty (60) days after the end of each such period, LICENSEE shall furnish to LICENSOR a written report, specifying the royalties accrued during such period and the basis for such royalties.  LICENSEE shall pay to LICENSOR all unpaid royalties accrued hereunder to the end of each such period.  LICENSEE's semiannual report shall be certified by an officer of LICENSEE or his designee.

8.3  LICENSEE shall pay all royalties and other payments due hereunder in United States dollars.  All royalties for an accounting period computed in other currencies shall be converted into United States dollars at the exchange rate for bank transfers from such currency to United States dollars as quoted by the head office of Citibank N.A., New York, at the close of banking on the last day of such accounting period (or the first business day thereafter if such last day shall be a non-business day).

-11-



P005049

8.4   LICENSEE shall keep records in sufficient detail to permit
the determination of royalties payable hereunder and at the
request and expense of LICENSOR will permit an independent
auditor selected by LICENSOR, or any other person acceptable to
both LICENSEE and LICENSOR, to examine, during ordinary business
hours once in each calendar year, such records and other
materials as may be required by the auditor to verify or
determine royalties paid or payable under this Agreement.   Such
auditor or other person shall be instructed by LICENSOR to report
to LICENSOR only the amount of royalties due and payable, unless
the amount determined by the auditor is disputed by LICENSEE, in
which case the auditor shall be permitted to communicate the
basis for its determination.   In the event the audit report
reveals a discrepancy greater than five percent (5%) of the
amount reported by LICENSEE, the reasonable cost of the audit
shall be borne by LICENSEE.   If no request for examination of
such records and materials for a particular semiannual accounting
period has been made by LICENSOR within six (6) years after the
end of said period, the right to examine such records and
materials for said period, and the obligation to keep such
records and materials for said period shall terminate.

-12-

Section 9.     <u>Warranty</u>

9.1  LICENSOR represents and warrants that it has the full right and power to grant the license set forth in Section 2 and the release set forth in Section 4 with respect to Licensed Patents and that there are no outstanding agreements, assignments or encumbrances inconsistent with the provisions of such license and release or with any other provision of this Agreement.

9.2  LICENSOR makes no other representations or warranties, express or implied, nor does LICENSOR assume any liability in respect of any infringement of any patents or other rights of third parties arising from LICENSEE's operation under the license herein granted.

Section 10.     <u>Payments and Other Communications</u>

10.1 Any installment payment, notice or other communication required or permitted to be made or given to either party hereto pursuant to this Agreement shall be sufficiently made or given on the date of mailing if sent to such party by registered or certified mail, postage prepaid, addressed to it at its address set forth below, or to such other address as it shall designate by written notice given to the other party:

-13-



P005631

10.1.1    In the case of LICENSEE,

IBM Director of Commercial Relations
International Business Machines Corporation
2000 Purchase Street
Purchase, New York 10577

10.1.2    In the case of LICENSOR,

Public Key Partners
10 Twin Dolphin Drive
Redwood City, CA 94065
Attention:  President

Section 11.    <u>Assignments</u>

11.1 LICENSEE shall have the right, without prior written approval of LICENSOR, to assign its license hereunder to a successor in ownership of all or substantially all of the assets of LICENSEE.  Except as provided in this Section 11.1, this Agreement may not be assigned by LICENSEE and any such attempted assignment shall be deemed void.

11.2 LICENSOR shall not assign any of the Licensed Patents unless such assignment is made subject to the terms and conditions of this Agreement.  Any attempted assignment in derogation of any of such terms and conditions shall be null and void.

Section 12.    <u>Most Favored Licensee</u>

12.1 In the event that LICENSEE makes an election pursuant to Section 6.2 and LICENSOR shall thereafter grant a license within the scope of the licenses granted herein under any of the Licensed Patents  at more favorable royalty rates than those

-14-



P005632

provided in this Agreement, LICENSOR shall notify LICENSEE thereof, and LICENSEE shall be entitled to receive the same favorable royalty rates specified with respect to those Licensed Patents, subject to the terms and conditions under which such more favorable rates have been granted, provided that this Agreement shall be modified accordingly by written amendment, which amendment shall be effective only for the period such more favorable royalty rates are in effect under such license. The foregoing provisions shall not apply where:

12.1.1    LICENSOR receives a grant of patent rights, a license or immunity or other than only a monetary consideration for such license; or

12.1.2    where the more favorable royalty rates apply only to apparatus for which there is a claim of past infringement and are given in consideration of settlement of such claim.


Section 13.    <u>Interest on Overdue Royalties</u>

13.1 LICENSEE shall be liable for interest on any overdue royalty or other payment under this Agreement commencing on the date such royalty or other payment becomes due, at an annual rate which is the greater of nine percent (9%) or one percentage point higher than the prime interest rate as quoted by the head office of Citibank N.A., New York, at the close of banking on such date, or on the first business day thereafter if such date falls on a

-15-



non-business day.  If such interest rate exceeds the maximum
legal rate in the jurisdiction where a claim therefor is being
asserted, the interest rate shall be reduced to such maximum
legal rate.

Section 14.    <u>Applicable Law</u>

14.1 This Agreement shall be construed, and the legal relations
between the parties hereto shall be determined, in accordance
with the law of the State of New York.

Section 15.    <u>Know-How and Trade Secrets</u>

15.1 The parties understand and agree that no license or other
right is granted herein, directly or by implication, estoppel or
otherwise, with respect to any trade secrets or know-how, and
that no such license or other right shall arise from the
consummation of this Agreement or from any acts, statements or
dealings leading to such consummation.  In addition, neither
party is required hereunder to furnish or disclose to the other
any technical or other information whatsoever, except as
specifically provided for herein.

Section 16.    <u>Miscellaneous</u>

16.1 Nothing contained in this Agreement shall be construed as:

-16-



P003634

16.1.1    a warranty or representation by LICENSOR as to the
validity or scope of any of the Licensed Patents;

16.1.2    a warranty or representation by LICENSOR that any
manufacture, use, lease, sale and/or transfer and/or
practice of any invention disclosed and/or claimed in any of
the Licensed Patents will be free from infringement of any
patent(s) other than the Licensed Patents;

16.1.3    a warranty or representation by LICENSOR as to the
technical or commercial viability of any invention(s), or
any embodiment(s) thereof, described and/or claimed in any
of the Licensed Patents;

16.1.4    imposing on LICENSEE any obligation, or conferring on
LICENSEE any right, to institute any action or suit against
a third party for infringement or to defend any action or
suit brought by a third party which challenges or concerns
the validity of any of the Licensed Patents;

16.1.5    restricting the right of LICENSEE or any of its
Subsidiaries to make, have made, use, have used, lease, sell
and/or to transfer any machine, manufacture or composition
of matter and/or to practice any process not herein
licensed;

16.1.6    conferring any license or right with respect to any
trademark, trade or brand name, the corporate name or other
designation (including the contraction or simulation of any

-17-



P003635

of the foregoing) of either party or any of its
Subsidiaries; and each party hereto agrees not to use the
existence of this Agreement or the rights granted hereunder
in any promotional activity without the express written
approval of the other party.

16.1.7     restricting the right of LICENSOR to nonexclusively
license any third party under one or more of the Licensed
Patents.

16.2 LICENSOR shall have no obligation hereunder to institute any
action or suit against a third party for infringement of any of
the Licensed Patents or to defend any action or suit brought by a
third party which challenges or concerns the validity of any of
the Licensed Patents.

16.3 This Agreement will not be binding upon the parties until it
has been signed hereinbelow by or on behalf of each party, in
which event it shall be effective as of the date first written
above.  No amendment or modification hereof shall be valid or
binding upon the parties unless made in writing and signed as
aforesaid.  This Agreement sets forth the entire agreement and
understanding between the parties with respect to the Licensed
Patents and merges all prior discussions between them, and
neither of the parties shall be bound by any conditions,

-18-



P003636

definitions, warranties, understandings, or representations with respect to the Licensed Patents other than as expressly provided herein or as duly set forth on, or subsequent to, the date hereof in writing and signed by the party bound thereby or its duly authorized representative.

16.4 If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions shall in no way be affected or impaired thereby.

16.5 LICENSEE may terminate this Agreement on any October 15th upon ninety (90) days prior written notice to LICENSOR, in the event of judicial determination of the invalidity of U.S. Patent No. 4,405,829, after all appeals, if any.

16.6 Failure by a party to detect or protest any breach of this Agreement shall not constitute a waiver or impairment of the right of such party at any time to avail itself of such remedies as it may have for any such breach.  A waiver may only occur pursuant to the express written permission of an authorized officer of the party against whom the waiver is asserted.

-19-



16.7 The headings of the several Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed on their behalf as of the date first above written.

INTERNATIONAL BUSINESS
MACHINES CORPORATION

Witness:

By _____
    H. G. Figueroa
    Vice President

PUBLIC KEY PARTNERS

Witness:

By _____

-20-

P005638

ATTACHMENT A

Royalty to be paid pursuant to Section 6.2 shall not exceed the
following:

    i.   for an apparatus where data entry is limited to a
         single person at any one time, a one-time payment not
         to exceed ten dollars ($10).

   ii.   for a system which serves more than one person at any
         one time, a one-tine payment not to exceed ten dollars
         ($10) for each simultaneous service capability,
         provided that no royalty has been paid or becomes due
         under item (i) which would duplicate payment specified
         in item (ii).

 iii. where the simultaneous service capability in (ii) is
         not established at the time of manufacture or sale,
         then a typical simultaneous service capability may be
         designated for such system and the royalty paid based
         on such number.  In the absence of any facts, such
         simultaneous service capability may be construed as the
         midpoint between the maximum and minimum number of
         persons such system can accommodate simultaneously.

-21-

ATTACHMENT B


Cryptographic Apparatus and Method
("Diffie-Hellman")                          No. 4,200,770


Public Key Cryptographic Apparatus and Method
("Hellman-Merkle")                          No. 4,218,582


Cryptographic Communications System and Method
("RSA")                                     No. 4,405,829


Exponential Cryptographic Apparatus and Method
("Hellman-Pohlig")                          No. 4,424,414


-22-



10 TWIN DOLPHIN DRIVE
R E D W O O D   C I T Y.
C A     9   4   0   6   5

October 14, 1991

RSA Data Security, Inc. represents and warrants that:

(1)     the statement made in the first paragraph of the letter from Public Key Partners to the National Institute of Standards (stating that Public Key Partners has been granted exclusive sublicensing rights from the Massachusetts Institute of Technology and the Board of Trustees of the Leland Stanford Junior University to US and corresponding foreign patents of US patents 4,200,770; 4,218,582; 4,424,414; and 4,405,829) dated April 20, 1990 (copy attached),   are true, correct and complete; and

(2)     the statements, representations and warranties made in the Agreement between Public Key Partners and International Business Machines Corporation dated October 1, 1991 are true, correct and complete.

RSA DATA SECURITY, INC.

By. _James Bidzos_____

Print Name:_____

Title:_____

Date:_____

TEL 415/595-8782
FAX 415/595-1873
