ORIGINAL

1  KARL J. KRAMER (No. 136433)
   JANA G. GOLD (No. 154246)
2  SHERMAN W. KAHN (No. 168924)
   MORRISON & FOERSTER LLP
3  755 Page Mill Road
   Palo Alto, California  94304-1018
4  Telephone: (415) 813-5600

5  RAOUL D. KENNEDY (No. 40892)
   MORRISON & FOERSTER LLP
6  345 California Street
   San Francisco, California 94104-2675
7  Telephone: (415) 677-7000

8  PATRICK J. FLINN (No. 104423)
   ALSTON & BIRD
9  One Atlantic Center
   1201 W. Peachtree Street
10 Atlanta, Georgia 30306
   Telephone: (404) 881-7000

11

   Attorneys for Defendants/Counter-
12 Claimants CYLINK, CARO-KANN CORPORATION
   AND THE BOARD OF TRUSTEES OF THE
13 LELAND STANFORD JUNIOR UNIVERSITY

14          UNITED STATES DISTRICT COURT

15         NORTHERN DISTRICT OF CALIFORNIA

16

   ROGER SCHLAFLY,                    No.   C-94-20512 SW
17
                Plaintiff,            MARKMAN HEARING BRIEF
18                                    OF STANFORD UNIVERSITY,
       v.                             CYLINK AND CARO-KANN AND
19                                    MEMORANDUM REGARDING
   PUBLIC KEY PARTNERS AND RSA DATA   RSADSI'S ATTEMPT TO READ
20 SECURITY, INC.,                    METHOD CLAIMS AS "STEP FOR"
                                      CLAIMS
21                Defendants,

22 ───────────────────────────────    No.   C-96-20094 SW

23 RSA DATA SECURITY, INC.,           Date:  October 1, 1996
                                      Time:  10:00 a.m.
24                Plaintiff,          Judge: Hon. Spencer Williams

25     v.

26 CYLINK CORPORATION and CARO-KANN
   CORPORATION, et al.
27
                Defendants.
28

MARKMAN HEARING BRIEF OF STANFORD, CYLINK AND
CARO-KANN AND MEMORANDUM RE: "STEP FOR" CLAIMS
C-94-20512 SW/C-96-20094 SW                              130850

FILED
SEP 24 1996
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

1 **TABLE OF CONTENTS**

2 <u>Page</u>

3 INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4 I.  CLAIM INTERPRETATION IS A QUESTION OF LAW FOR
     THE COURT TO DECIDE BASED PRIMARILY ON THE
5    WORDS OF THE CLAIMS, THE PATENT SPECIFICATION
     AND FILE HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
6
     A. Intrinsic Evidence Is The Most Significant
7       Evidence For Defining The Meaning Of
        Patent Claim Terms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
8
     B. Extrinsic Evidence May Be Consulted But
9       Cannot Contradict Or Vary The Meaning Of
        Terms As Expressed In The Intrinsic
10      Evidence In The Public Record. . . . . . . . . . . . . . . . . . . . . . . . 8

11   C. Determinations of Patent Validity and
        Equivalents Are Not Properly At Issue In
12      The <u>Markman</u> Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

13 II.  CLAIMS 1 THROUGH 5 OF THE HELLMAN/MERKLE
        PATENT ARE ORDINARY METHOD CLAIMS, NOT STEP
14      PLUS FUNCTION CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15   A. Section 112 Does Not Apply To Claim
        Elements Unless The Evidence Demonstrates
16      That They Were Intended To Be Expressed As
        A "Step For" Performing A Function. . . . . . . . . . . . . . . . . . . 12
17
     B. None of The Method Claims Of The Hellman-
18      Merkle Patent Contain "Step For" Claim
        Elements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
19
   III.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
20

21

22

23

24

25

26

27

28

1                        **TABLE OF AUTHORITIES**

2                                **CASES**

3  Arrhythmia Research Technology, Inc. v. Corazonix Corp.,
      958 F.2d 1053 (Fed. Cir. 1992) ...................18,19,20
4
   Bio-Technology General Corp. v. Genentech,
5     80 F.3d 1553 (Fed. Cir. 1996) ......................... 18

6  D.M.I., Inc. v. Deere & Co.,
      755 F.2d 1570 (Fed. Cir. 1985) ....................... 16
7
   Electro Medical System, S.A. v. Cooper Life Sciences,
8     34 F.3d 1048 (Fed. Cir. 1994) ......................... 6

9  Exxon Chemical Patents Inc. v. Lubrizol Corp.,
      64 F.3d 1553 (Fed. Cir. 1995) ......................... 8
10
   Fromson v. Advance Offset Plate, Inc.,
11    720 F.2d 1565 (Fed. Cir. 1983) ....................... 21

12 Genentech, Inc. v. Wellcome Foundation Ltd.,
      29 F.3d 1555 (Fed. Cir. 1994) ........................ 18
13
   General Foods Corp. v. Studiengesellschaft Kohle mbH,
14    972 F.2d 1272 (Fed. Cir. 1992) ........................ 4

15 Greenberg v. Ethicon Endo-Surgery, Inc.,
      91 F.3d 1580, 39 U.S.P.Q. 2d 1783,
16    1996 U.S. App. LEXIS 20109 (Fed. Cir. 1996) ...... 12,13,14,15

17 Halliburton Oil Well Cementing Co. v. Walker,
      329 U.S. 1, 67 S. Ct. 6 (1946) ...................... 12
18
   Hilton Davis Chemical Co. v Warner Jenkinson Co.,
19    62 F.3d 1512 (Fed. Cir. 1995) ....................... 10

20 In re Donaldson,
      16 F.3d 1189 (Fed. Cir. 1994) ....................... 17
21
   In re Paulsen,
22    30 F.3d 1475 (Fed. Cir. 1984) ..................... 6,7,10

23 In re Van Geuns,
      988 F.2d 1181 (Fed. Cir. 1993) ....................... 4
24
   Intel Corp. v. United States International Trade Commn,
25    946 F.2d 821 (Fed. Cir. 1991) ........................ 6

26 Intervet America Inc. v. Kee-Vet Labs., Inc.,
      887 F.2d 1050 (Fed. Cir. 1989) ...................19,20,21

27

28

Laitram Corp. v. Cambridge Wire Cloth Co.,
    863 F.2d 855 (Fed. Cir. 1988),
    cert. denied, 490 U.S. 1068 (1989) ......................... 6

Laitram Corp. v. NEC Corp.,
    62 F.3d 1388 (Fed. Cir. 1995) ........................... 18

Lifescan, Inc. v. Home Diagnostics, Inc.,
    76 F.3d 358 (Fed. Cir. 1996) ........................... 18,20

Markman v. Westview Instruments, Inc.,
    116 S. Ct. 1384 (1996) ................................. 4

Markman v. Westview Instruments, Inc.,
    52 F.3d 967 (Fed. Cir. 1995),
    aff'd, 116 S. Ct. 1384 (1996) .......................... passim

Moleculon Research Corp v. CBS, Inc.,
    793 F.2d 1261 (Fed. Cir. 1986),
    cert. denied, 479 U.S. 1030 (1987) ..................... 19

Palumbo v. Don Joy Co.,
    762 F.2d 969 (Fed. Cir. 1985) .......................... 10

Polaroid Corp. v. Eastman Kodak Co.,
    789 F.2d 1556 (Fed. Cir.),
    cert. denied, 479 U.S. 850 (1986) ..................... 20

Quantum Corp. v. Mountain Computer,
    5 U.S.P.Q. 2d 1103 (N.D. Cal. 1987) ................... 13,14

Shamrock Technologies, Inc. v. Medical Sterilization, Inc.,
    903 F.2d 789 (Fed. Cir. 1990) ........................... 19

Southwall Technologies, Inc. v. Cardinal IG Co.,
    54 F.3d 1570 (Fed. Cir. 1995) ........................... 5

Uniroyal, Inc. v. Rudkin-Wiley Corp.,
    837 F.2d 1044 (Fed. Cir.),
    cert. denied, 488 U.S. 825 (1988) ..................... 15

Vitronics Corp. v. Conceptronic, Inc.,
    90 F.3d 1576 (Fed. Cir. 1996) ................... 4,5,6,7,8,9

**STATUTES**

35 U.S.C. § 112, ¶ 6 ................................... passim

**INTRODUCTION**

This brief provides the legal standards to be applied at the claim interpretation hearing scheduled for October 1, 1996.  This brief also addresses the attempt by RSA Data Security, Inc. ("RSADSI") and Mr. Schlafly to imply the words "step for" into the Method Claims of the Hellman-Merkle Patent.  As shown below, there is no precedent for subjecting method claims to such a restriction.  There are also no facts that support or even suggest that the inventors intended to apply 35 U.S.C. § 112, ¶ 6 to the method claims of the Hellman-Merkle Patent.

The claims of a patent measure the invention.  If words are not in the claims, they may not be added by implication, through erroneous legal argument or under the guise of "expert testimony."  The law requires that the Court determine the meaning of specific patent claim terms based upon the objective evidence in the public record, including the explicit terms as used in the claim, the patent specification, and patent prosecution history.

The Court may also rely upon other objective evidence available concerning the terms as used in the patent, including dictionary definitions and literature references, but only if such evidence does not contradict the terms as defined in the patent specification and prosecution history.  As a last resort, expert and inventor testimony may be heard concerning the use of terms in the relevant field of art.  However, such testimony cannot contradict the plain meaning of the claim terms as determined upon a review of the objective evidence from the public record.

At issue in this patent infringement action are the "Stanford Patents," United States Patent Nos. 4,220,770 (the "Diffie-Hellman

1  Patent") and 4,218,582 (the "Hellman-Merkle Patent").  Prior to the

2  inventions of the Stanford Patents, both the sender and receiver of

3  a coded message had to exchange secret keys to encode ("encipher")

4  or decode ("decipher") messages.  Exchange of such secret keys,

5  whether by mail, messenger or other means, was always vulnerable to

6  eavesdropping or interception.  The struggle among opponents was to

7  keep the keys secret at all costs.  The Stanford inventions turned

8  the old regime of cryptography literally on its head by designing

9  cryptographic systems whereby the enciphering key and all of the

10  information needed to encode a message are shared with anyone and

11  everyone, including the enemy.  The Stanford inventors thus

12  eliminated the need to exchange secret keys over insecure channels.

13      In public-key cryptography, as disclosed in the Hellman-Merkle

14  Patent, one of a pair of keys is made public for use by anyone

15  wishing to send a secret message to the person associated with the

16  public key. [Exh. 1]  In Diffie-Hellman Key Agreement, as disclosed

17  in the Diffie-Hellman Patent, two parties wishing to communicate a

18  secret message share public information from which both can derive

19  the same secret key.  [Exh. 2]  In both systems, the enemy is

20  presumed to have all of the information that is communicated between

21  the parties but the enemy cannot learn the content of the secret

22  message.  How that is accomplished will be discussed in great detail

23  during the tutorial for the Court on September 30, 1996.

24      David Kahn, the preeminent historian of cryptography, describes

25  the Stanford invention as "the most revolutionary new concept in the

26  field since polyalphabetic substitution emerged in the Renaissance."

27  [Exh. 5]  In RSADSI's own words, the Stanford inventors "invented

28  public-key cryptography" and the Stanford Patents contain "[t]he

1   basic ideas of public-key cryptography . . . ."   [Exh. 6 (BSAFE

2   User's Manual, Version 2.1, at 44); Exh. 7 (RSADSI's Frequently

3   Asked Questions About Today's Cryptography, at 6)]   The Diffie-

4   Hellman patent covers what has been called "Diffie-Hellman Public

5   Key Agreement."   [Exh. 6, RSADSI's BSAFE User's Manual, Version 2.1,

6   at 52]   As RSADSI admits, "Whitfield Diffie and Martin Hellman

7   invented this, the first true public-key algorithm, in 1976."   [Id.]

8   RSADSI's CEO, Dr. James Bidzos, described Claim 1 of the Hellman-

9   Merkle Patent as having "very broad descriptions that apply to ANY

10  public-key cryptosystem."   [Exh. 8 (November 13, 1991 Memo.)

11  (capitalization in original)]   RSADSI's chief technical expert,

12  Dr. Ronald Rivest (the "R" in RSADSI), has acknowledged that "claims

13  1 to 6 would seem to cover the broad aspects of 'public key

14  cryptography' as it has become known in the literature."   [Exh. 9

15  (August 10, 1983 Memo.)]

16       Despite these prior admissions, RSADSI is now attempting by

17  every possible means to insert or import limitations into the claims

18  that are simply not there.   The claims measure the invention and may

19  not be altered by implying limitations from the patent

20  specification.   Nor may the claims be limited by applying contorted

21  and crimped definitions that contradict the plain meaning of the

22  claim terms, the patent specification and well-understood

23  definitions set forth in dictionaries and literature from the

24  relevant field.   The Stanford Patent claims were reviewed as written

25  by the United States Patent Office and issued as patentable

26  inventions.   That the Patent Office granted broad claims in this

27  case is not surprising, given the pioneering status of the

28  invention.   Of course RSADSI is free to argue at a later stage of

1   these proceedings that some -— or all -— of the claims in the

2   Stanford Patents are invalid.  But the issue now is claim

3   interpretation, not patent validity.  In interpreting the claims,

4   the law does not permit the claims to be rewritten, no matter how

5   great the temptation.

6   **I.   CLAIM INTERPRETATION IS A QUESTION OF LAW FOR THE
          COURT TO DECIDE BASED PRIMARILY ON THE WORDS OF THE**

7   **CLAIMS, THE PATENT SPECIFICATION AND FILE HISTORY.**

8        The claims of a patent define the bounds of a patented

9   invention and are the measure by which patent infringement is

10  determined.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 980

11  (Fed. Cir. 1995) (en banc), aff'd, 116 S. Ct. 1384 (1996) (the

12  function and purpose of claims is to delimit the right to exclude);

13  In re Van Geuns, 988 F.2d 1181, 1184 (Fed. Cir. 1993) ("It is

14  axiomatic that the claims define the invention which an applicant

15  believes is patentable."); General Foods Corp. v.

16  Studiengesellschaft Kohle mbH, 972 F.2d 1272, 1274 (Fed. Cir. 1992).

17  The United States Supreme Court has conclusively held that the

18  interpretation of patent claim terms is a question of law for the

19  Court to decide.  Markman v. Westview Instruments, Inc., 116 S. Ct.

20  1384 (1996).

21       In determining the proper interpretation of a claim term, the

22  court has numerous sources that it may properly utilize for guidance

23  including both intrinsic and extrinsic evidence.  Vitronics Corp. v.

24  Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996).  When, after

25  examining the intrinsic evidence, and any relevant extrinsic

26  evidence, the court arrives at an understanding of the terms used in

27  the patent claim, the court must then pronounce as a matter of law

28  the meaning of those terms.  Markman, 52 F.3d at 981.

## A. Intrinsic Evidence Is The Most Significant Evidence For Defining The Meaning Of Patent Claim Terms.

1

2     A patent is a fully integrated written instrument. <u>Markman</u>, 52

3 F.3d at 978. Thus, the primary evidence used to determine the

4 meaning of the terms of a patent claim is the evidence intrinsic to

5 the patent -- the words of the claim itself, the patent

6 specification and the prosecution history of the application leading

7 to issuance of the patent. <u>Vitronics Corp.</u>, 90 F.3d at 1582. "Such

8 intrinsic evidence is the most significant source of the legally

9 operative meaning of disputed claim language." <u>Id.</u> The intrinsic

10 evidence controls the meaning of the terms in a patent claim because

11 competitors should be able to understand the meaning and scope of

12 the patent owner's rights by reference to the public record.

13 <u>Markman</u>, 52 F.3d at 978-979.

14     The first step in interpreting patent claim terms is an

15 analysis of the claim words. <u>Vitronics Corp.</u>, 90 F.3d at 1582.

16 Words in a claim are generally given their ordinary meaning. <u>Id.</u>

17 The patentee may choose to be his own lexicographer and use terms in

18 a manner other than their ordinary meaning so long as the special

19 definition of the term is stated in the patent specification or the

20 file history of the prosecution before the United States Patent

21 Office. <u>Id.</u> A claim term must be given the same interpretation

22 whenever it is employed in the claims -- the meaning of a claim term

23 should not vary from claim element to claim element or from claim to

24 claim. <u>Southwall Technologies, Inc. v. Cardinal IG Co.</u>, 54 F.3d

25 1570, 1579 (Fed. Cir. 1995).

26     The second step in interpreting patent claim terms is a review

27 of the specification to determine whether the inventor has used any

28 terms in a manner inconsistent with their ordinary meaning.

1  <u>Vitronics Corp.</u>, 90 F.3d at 1582.  The specification acts as a

2  dictionary when it expressly defines terms used in the claims or

3  when it defines terms by implication.  <u>Id.</u>  Usually, the

4  specification is dispositive; it is the single best guide to the

5  meaning of a disputed claim term that is defined in the

6  specification.  <u>Vitronics Corp.</u>, 90 F.3d at 1582.

7      However, the written description in a patent specification does

8  not delimit the right to exclude -- that is the function and purpose

9  of claims.  <u>Markman</u>, 52 F.3d at 979.  The Court may not, under the

10 guise of claim interpretation, read limitations from the

11 specification into the claims.  <u>In re Paulsen</u>, 30 F.3d 1475, 1480

12 (Fed. Cir. 1984).  In particular, references to a preferred

13 embodiment in the patent specification are not limitations on the

14 patent claims.  <u>Laitram Corp. v. Cambridge Wire Cloth Co.</u>, 863 F.2d

15 855, 865 (Fed. Cir. 1988), <u>cert. denied</u>, 490 U.S. 1068 (1989).

16 Where a specification does not explicitly require a claim

17 limitation, such a limitation cannot be read into the claims.

18 <u>Electro Medical Sys., S.A. v. Cooper Life Sciences</u>, 34 F.3d 1048,

19 1054 (Fed. Cir. 1994)  Similarly, a statement of a performance goal

20 from the patent specification does not limit claim language.  <u>Intel</u>

21 <u>Corp. v. United States Int'l Trade Comm'n</u>, 946 F.2d 821, 836 (Fed.

22 Cir. 1991).

23     In sum, the patent specification may be used as a dictionary to

24 help define or assist in the interpretation of claim terms, but may

25 not be used to alter or redefine the claimed invention by importing

26 limitations from the specification into the claim.  Aspects of the

27 embodiments disclosed in the specification cannot be read into the

28

1  claims, even if the claim as written would otherwise be invalid.  In

2  re Paulsen, 30 F.3d at 1480.

3        Finally, the Court may also consider as intrinsic evidence the

4  prosecution history of the patent.  Markman, 52 F.3d at 980.  This

5  record of proceedings in the Patent and Trademark Office, including

6  any express representations made by the applicant regarding the

7  scope of the claims may be of significance in understanding the

8  claim terms.  Vitronics Corp., 90 F.3d at 1582-1583.  As with the

9  patent specification, however, although the prosecution history can

10  and should be used to understand the language used in the claims, it

11  cannot enlarge, diminish or vary the terms in the claims.  Markman,

12  52 F.3d at 980.

13        In most situations, an analysis of the intrinsic evidence alone

14  will resolve any ambiguity in a disputed claim term.  Vitronics

15  Corp., 90 F.3d at 1583.  If the claim terms are clear upon a review

16  of the intrinsic evidence, it is improper to resort to or rely upon

17  extrinsic evidence.  Id.  The claims, specification and file

18  history, rather than extrinsic evidence constitute the public record

19  of the patentee's claim, a record on which the public is entitled to

20  rely.  Id.  Allowing the public record to be altered or changed by

21  extrinsic evidence such as expert testimony, would make this right

22  meaningless.  Id.  As the Federal Circuit has explained:

23              [W]e are not free to read the claims as they
               might have been drafted, even if as drafted they
24              do not accomplish what the inventor may have
               intended. . . . Claim drafting is itself an art,
25              an art on which the entire patent system today
               depends.  The language through which claims are
26              expressed is not a nose of wax to be pushed and
               shoved into a form that pleases and that
27              produces a particular result a court may desire.
               The public generally, and in particular, the
28              patentee's competitors, are entitled to clear

1  and specific notice of what the patentee claims
   as his invention.  That is not an easy
2  assignment for those who draft claims, but the
   law requires it, and our duty demands that we
3  enforce the requirement.

4  Exxon Chemical Patents Inc. v. Lubrizol Corp., 64 F.3d 1553, 1563

5  (Fed. Cir. 1995) (Plager J., concurring); see also Markman, 52 F.3d

6  at 983 ("the extrinsic evidence of record cannot be relied on to

7  change the meaning of the claims").

8          B. Extrinsic Evidence May Be Consulted But Cannot
              Contradict Or Vary The Meaning Of Terms As Expressed
9             in The Intrinsic Evidence In The Public Record.

10     If after a review of the intrinsic evidence a claim term is

11 still unclear to the Court, extrinsic evidence may be consulted.

12 Extrinsic evidence consists of evidence external to the patent and

13 prosecution history, including dictionaries, learned treatises,

14 literature in the relevant field and, when necessary, expert and

15 inventor testimony.  Markman, 52 F.3d at 980.  Such evidence may be

16 helpful to explain scientific principles, the meaning of technical

17 terms and terms of art that appear in the patent and prosecution

18 history, and the state of the prior art at the time of the

19 invention.  Id.

20     The Court may, in its discretion, receive extrinsic evidence in

21 order to aid the Court in coming to a correct conclusion as to the

22 true meaning of the language employed in the patent.  Id.  Extrinsic

23 evidence is to be used for the Court's understanding of the patent,

24 not for the purpose of varying or contradicting the terms of the

25 claims.  Markman, 52 F.3d at 981.  Extrinsic evidence cannot be used

26 to vary or contradict definitions or usage of terms in the

27 specification.  Vitronics Corp., 90 F.3d at 1584.  The Court's

28 interpretation of claim terms, enlightened by such extrinsic

1   evidence as may be helpful, must nonetheless still be based on the

2   patent and prosecution history.  Markman, 52 F.3d at 981.

3        While technical treatises and dictionaries fall within the

4   category of extrinsic evidence, unlike expert testimony, judges may

5   consult such resources at any time in order to better understand the

6   underlying technology.  Vitronics Corp., 90 F.3d at 1584 n.6.

7   Judges may always consult and rely upon dictionary definitions when

8   construing claim terms, so long as the dictionary definitions do not

9   contradict any definition found in or ascertained by a reading of

10  the patent documents.  Id.  Such references are more probative than

11  expert testimony of what a person skilled in the art would believe a

12  term means.  Id.[1]  Moreover, by contrast to expert testimony, these

13  sources are immutable and are available to the public for

14  consultation when reading the claims of a patent.  Id.  Once again,

15  however, such sources may not be used to vary claim terms from how

16  they are defined or used in the patent or prosecution file history.

17  Id.

18       As a last resort, if after consulting all prior sources of

19  intrinsic and extrinsic evidence a claim term is unclear, the Court

20  may consult inventor testimony or expert testimony concerning the

21  meaning of certain terms in the art.  Vitronics Corp., 90 F.3d at

22  1584.  Such testimony may not be used to vary or contradict the

23  _____

24       [1]  A court in its discretion may also admit and rely on prior
     art literature to help demonstrate how a disputed term is used by
25   those skilled in the art.  Vitronics Corp., 90 F.3d at 1584.  Such
     references may be more indicative than expert testimony of what a
26   person skilled in the art would believe a term means.  Id.  Once
     again, however, such evidence may not be used to vary claim terms
27   from how they are defined or used in the patent or prosecution file
     history.  Id.

28

1   words of the claim.  Id.  Accordingly, expert testimony that is

2   inconsistent with the specification or prosecution history must be

3   ignored.  Id.  Moreover, expert testimony about the proper

4   interpretation of claim terms amounts to no more than legal opinion

5   and is entitled to no weight as a matter of law.  Markman, 52 F.3d

6   at 983.  Such testimony should be excluded as inappropriate legal

7   testimony.  [See Defendants' Expedited Motion In Limine To Exclude

8   Technical Expert Testimony On Legal Issues Of Claim Construction,

9   filed September 17, 1996]

### C. Determinations of Patent Validity and Equivalency Are Not Properly At Issue In The Markman Hearing.

12   The Markman hearing involves solely the determination of the

13   proper interpretation of the terms of the Stanford Patent claims.

14   The Court is not being asked to resolve issues of patent validity at

15   the Markman hearing.  [See Stipulated Order Regarding Pre-trial and

16   Trial Schedule, entered September 5, 1996]  Moreover, the Court may

17   not vary the interpretation of patent claim terms to save otherwise

18   invalid patent claims.  In re Paulson, 30 F.3d at 1480.

19   The Court also may not resolve at this stage issues of

20   "equivalency," either as a determination of equivalent structures

21   under 35 U.S.C. § 112, ¶ 6 or under the doctrine of equivalents.

22   Palumbo v. Don Joy Co., 762 F.2d 969 (Fed. Cir. 1985); Hilton Davis

23   Chemical Co. v Warner Jenkinson Co., 62 F.3d 1512, 1522 (Fed. Cir.

24   1995) (en banc).  Both issues are questions of fact that cannot be

25   resolved as part of the claim interpretation analysis.  Id.  Thus,

26   evidence or allegations relating to those issues are simply

27

28

1   irrelevant and cannot vary the interpretation of the patent claim

2   terms that is compelled by the objective evidence of record.[2]

3      **II.   CLAIMS 1 THROUGH 5 OF THE HELLMAN/MERKLE PATENT ARE**
            **ORDINARY METHOD CLAIMS, NOT STEP PLUS FUNCTION**
4               **CLAIMS.**

5      RSADSI has adopted the standard accused infringer's approach to

6   claim interpretation:  attempt to mislead the Court into treating

7   the preferred example embodiment -- rather than the claims -- as the

8   invention.  RSADSI and Schlafly both argue that claims 1 through 5

9   of the Hellman-Merkle Patent are subject to provisions of 35 U.S.C.

10   § 112, ¶ 6.  That statute permits a patent claim drafter to draft

11   claims as a "step for" performing a function, but limits such claims

12   to the acts performed by the example embodiments in the patent and

13   equivalents.  While RSADSI concedes that not one of these claims

14   contains the words "step for," RSADSI argues that the claims should

15   be read as if they did contain those words.  RSADSI does not, and

16   cannot, cite to any legal precedent or fact that supports RSADSI's

17   attempt to insert the words "step for" into the claims.  RSADSI's

18   argument both contravenes all applicable legal precedent and

19   contradicts the undisputed facts.

20

21

22

23

24

---

25      [2] There does not appear to be any dispute that validity and
equivalents issues are not properly to be raised at the <u>Markman</u>
26   hearing.  During depositions of RSADSI's experts, RSADSI's counsel
objected to and instructed witnesses not to answer questions on
27   those topics.  RSADSI may not now introduce such topics and any
reference to them should be stricken from RSADSI's Proposed Jury
28   Instructions.

### A. Section 112 Does Not Apply To Claim Elements Unless The Evidence Demonstrates That They Were Intended To Be Expressed As A "Step For" Performing A Function.

Paragraph 6 of section 112 of the patent law allows a patentee to claim his invention in terms of a means or step for performing a specified function:

> An element in a claim for a combination <u>may be</u> <u>expressed</u> as a means or <u>step for</u> performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification or equivalents thereof.

35 U.S.C. § 112, ¶ 6 (emphasis added).  The statute was enacted as a compromise after the Supreme Court ruled that "means for" claims were too indefinite.  <u>Halliburton Oil Well Cementing Co. v. Walker</u>, 329 U.S. 1, 67 S. Ct. 6 (1946).  With paragraph 6 of section 112, Congress permitted the use of "means or step for" language in claims, but limited the breadth of such claim language by restricting its scope to the structure, material, or acts disclosed in the specification and equivalents thereof.  <u>Greenberg v. Ethicon Endo-Surgery, Inc.</u>, 91 F.3d 1580, 39 U.S.P.Q.2d 1783, 1996 U.S. App. LEXIS 20109 (Fed. Cir. 1996) (copy attached at Exh. 10 hereto).

Section 112, paragraph 6 provides that an element in a claim for a combination "<u>may be</u>" expressed as a "means or step for" performing a function, thus granting the patentee the <u>option</u> of using the "means for" or "step for" format.  <u>Greenberg</u>, 39 U.S.P.Q.2d at 1786.  The question, then, is whether, in the selection of claim language, the patentee must be taken to have exercised that option.  <u>Id.</u>

1   As with any claim interpretation issue, the first stop in the
2   determination of whether the § 112, ¶ 6 option applies to a claim is
3   to examine the language of the claim itself.  The question whether a
4   claim element triggers § 112, ¶ 6 is ordinarily not a difficult one.
5   Greenberg, 39 U.S.P.Q.2d at 1785.  Claim drafters conventionally use
6   the preface "means for" or "step for" when they elect to invoke
7   § 112, ¶ 6.  There is, therefore, seldom any confusion about whether
8   § 112, ¶ 6 applies to a particular element.  Id.  Unless the
9   inventors explicitly express an intent to exercise the option of
10  § 112, ¶ 6, in traditional "means for" or "step for" language, a
11  claim will generally be interpreted not to fall within paragraph 6
12  of section 112.  Id.[3]

13  When the patentee does not use the traditional "means for" or
14  "step for" language, there must be some evidence that the patentee
15  in fact intended to exercise the option.[4]  For example, in Greenberg
16  the district court found the claim element "detent mechanism" to be
17  a "means for" element because "detent" does not define a device, but
18  rather the function of "holding one mechanical part in relation to

19  _____

20  [3] Claim 6 of the Hellman-Merkle patent explicitly recites
    "means for" language, demonstrating that the inventors and their
21  patent counsel fully understood how to invoke the provisions of
    35 U.S.C. § 112, ¶ 6.

22  [4] Although the Federal Circuit recognized in Greenberg that
    there is "no magic language" absolutely required to invoke 35 U.S.C.
23  § 112, ¶ 6, the Court clarified that if the claim drafter did not
    employ the conventional "step for" or "means for" language, the
24  presumption is that the statute is not being invoked.  The Court
    ruled that the presumption can be overcome only if there is some
25  evidence that the drafter intended to invoke the statute, for
    example by employing terms that are indefinite.  Greenberg,
26  39 U.S.P.Q.2d at 1786-1787.  Conversely, claims using the term
    "means" can be interpreted not to invoke § 112, ¶ 6 if the language
27  of the claim itself is sufficiently definite.  Quantum Corp. v.
    Mountain Computer, 5 U.S.P.Q.2d 1103, 1108 (N.D. Cal. 1987).
28

1   another." Greenberg, 39 U.S.P.Q.2d at 1785.   The Federal Circuit

2   reversed, pointing out that use of purely functional terms does not

3   necessarily imply an intent to invoke paragraph 6 of section 112.

4   Greenberg, 39 U.S.P.Q.2d at 1786.

5       The Court in Greenberg held that the test is not solely whether

6   the patent claim terms are expressed in purely functional terms but

7   rather whether devices so described in functional terms bear a

8   meaning that is generally understood in the relevant art.   Id.

9   According to the Federal Circuit, "[w]hat is important is not simply

10  that a "detent" or "detent mechanism" is defined in terms of what it

11  does, but that the term, as the name for structure, has a reasonably

12  well understood meaning in the art."   Id.  This Court has applied

13  the same analysis in Quantum Corp. v. Mountain Computer,

14  5 U.S.P.Q.2d 1103, 1108 (N.D. Cal. 1987), holding that the phrase

15  "sample and hold circuit" must be afforded its broad common meaning

16  and should not be restricted to example embodiments in the patent.

17       **B. None of The Method Claims Of The Hellman-Merkle**
         **Patent Contain "Step For" Claim Elements.**
18

19       Method claims 1 through 5 of the Hellman-Merkle Patent do not

20  contain any "step for" claim elements.[5]  Claims 1 through 5 recite

21  "method" claims that contain a series of acts:  "providing random

22  numbers at the receiver; generating from said random numbers a

23  public enciphering key at the receiver. . . ."   [See Exh. 1]  As is

24  plain from simply reading the claims, the inventors did not include

25  _____

26       [5] RSADSI has offered no jury instruction with the assertion
    that any claims of the Diffie-Hellman contain "step for" claim
27  elements and thus concedes that the method claims of that patent are
    not subject to 35 U.S.C. § 112, ¶ 6.
28

1    the words "step for" in any of the claims of the Hellman-Merkle

2    Patent. [Id.] It is also obvious that the drafter of the Hellman-

3    Merkle patent understood fully how to exercise the option afforded

4    under 35 U.S.C. § 112, ¶ 6: claim 6 of the Hellman-Merkle Patent was

5    explicitly drafted with six "means for" elements that indisputably

6    are subject to § 112, ¶ 6. [Id.] Thus, the absence of any "step

7    for" or "means for" language in claims 1 through 5, combined with

8    the drafter's explicit use of "means for" language in claim 6,

9    demonstrates conclusively that the drafter did not intend to

10   exercise the option afforded by § 112, ¶ 6 in claims 1 through 5.

11   Those method claims should be treated as they are written, simple

12   method claims reciting acts and not "step for" claim elements

13   subject to § 112, ¶ 6. Greenberg, 39 U.S.P.Q.2d at 1786.

14       Nonetheless, in the past, RSADSI has argued that because the

15   words of claim 1 are similar to the words of claim 6, with the

16   exception that claim 6 introduces each phrase with the words "means

17   for," claims 1 through 5 must be limited by § 112, ¶ 6. In fact,

18   this similarity of language proves precisely the opposite. The

19   explicit choice of the words "means for," in claims 6 invokes the

20   provisions of § 112, ¶ 6. Conversely, the explicit omission of

21   those same words in claims 1 through 5 show that § 112, ¶ 6 was not

22   invoked. The explicit choice not to invoke such language clearly

23   shows that there was not an intention to invoke § 112, ¶ 6.[6]

24   Greenberg, 39 U.S.P.Q.2d at 1785.

---

25       [6] RSADSI's theory that Claim 1 should be construed to be
substantively identical to Claim 6 also runs afoul of the

26   fundamental principle of patent law that each claim is presumed to

27   be different. E.g., Uniroyal, Inc. v. Rudkin-Wiley Corp., 837 F.2d
1044, 1054-55 (Fed. Cir.), cert. denied, 488 U.S. 825 (1988).

28                                    (Footnote continues on following page.)

1  Because the words "step for" are not in the claims, RSADSI is

2  forced to argue that those terms should be implied into the elements

3  of the method claims of the Hellman-Merkle Patent.  There is,

4  however, no evidence that the method claims of the Hellman-Merkle

5  were drafted with the intent to invoke the special statutory rule of

6  § 112, ¶ 6.  There is nothing in the patent specification that would

7  suggest that the method claims should be subject to § 112, ¶ 6.  In

8  the descriptions of the inventions contained in the Abstract and

9  Summary of the inventions, there is no mention of any intended

10  restriction upon the inventions.  [Exh. 1, (Abstract and column 2,

11  lines 48 through 59)]  Nor is there any mention of the terms "step

12  for" anywhere in the patent.  [Exh. 1]

13  During the entire prosecution of the Hellman-Merkle Patent, the

14  words "step for" were never used by the applicants or the patent

15  office examiner.  [Exh. 3]  The provisions of § 112, ¶ 6 were never

16  mentioned at all during prosecution and the inventors never relied

17  upon the details of the example embodiments for any arguments to the

18  examiner.  [Id.]  Indeed, the United States Patent Office reviewed

19

(Footnote continued from previous page)
20  Indeed, in <u>D.M.I., Inc. v. Deere & Co.</u>, 755 F.2d 1570, 1574 (Fed.
Cir. 1985), this Court stated:

21

22              [t]he district court said 'as a general rule a
                limitation cannot be read into a claim to avoid
                infringement' . . . . Where, as here, the
23              limitation sought to be 'read into' a claim
                already appears in another claim, the rule is
24              far more than 'general.'  It is fixed.  It is
                long and well established.  It enjoys an
25              immutable and universally applicable status
                comparatively rare among rules of law.  Without
26              it, the entire statutory and regulatory
                structure governing the drafting, submission,
27              examination, allowance, and enforceability of
                claims would crumble.

28

1   claims 1 through 5 of the Hellman-Merkle Patent as method claims,

2   not as "step for" claims subject to § 112, ¶ 6, and found the claims

3   to be definite, novel and patentable.[7]  There is no evidence in the

4   public record to suggest or even hint that the patentees intended

5   Hellman-Merkle claims 1 through 5 to contain implied "step for"

6   language that would subject the claims to 35 U.S.C. § 112, ¶ 6.

7        Nor is there any evidence that any of the claim terms are not

8   reasonably well-understood in the relevant art.  The Patent Office

9   examiner, a person skilled in the art, found the claims to be

10  definite and passed the claims to issue.  RSADSI has not presented

11  any testimony from any of its experts that any of the terms used in

12  the patent claims were not reasonably well understood in the art.

13  Indeed, as is shown in the Appendix A to defendants' Memorandum

14  Regarding Jury Instructions filed concurrently herewith, not only is

15  there uncontradicted evidence that the claim terms are reasonably

16  well understood in the art, there is virtually no disagreement on

17  what the terms mean.  Thus, the only dispute among the parties is

18  whether under the law, claim terms that are agreed to be well-

19  understood in the art can be construed to impliedly contain the

20  words "step for" by implication.  Under the law, those words cannot

21  be added.

22

23  _____

24      [7] Prior to 1994, the Patent Office reviewed all claims without
    regard to § 112, ¶ 6 and only issued claims if the claims as written
25  (without resort to an analysis of the purported distinguishing
    features of the disclosed embodiments) were definite, novel over the
26  prior art and patentable subject matter.  In re Donaldson, 16 F.3d
    1189, 1194 (Fed. Cir. 1994).  In 1994, the Federal Circuit Court of
27  Appeals ruled that the Patent Office must apply § 112, ¶ 6 in its
    patentability review of all "means for" and "step for" claims.  Id.

28

1   Rather than address the existing law and undisputed facts,

2   RSADSI apparently will rely upon an unprecedented interpretation of

3   35 U.S.C. § 112, ¶ 6.   RSADSI will argue that any method claim

4   element recited as a single verb phrase, such as "providing random

5   numbers at the receiver," is a "function" and not an "act"   In

6   addition to being grammatically counterintuitive, there is nothing

7   in 35 U.S.C. § 112, ¶ 6 that supports RSADSI's assertion.   RSADSI

8   can also not point to any case law that would support its novel

9   interpretation of 35 U.S.C. § 112, ¶ 6.   Indeed, the law is all to

10  the contrary.

11      If RSADSI's novel theory were correct, then virtually every

12  method claim reciting a series of acts would be a "step for" claim.

13  The courts, however, have routinely interpreted method claims of the

14  form at issue in this case, but have never found that such claims

15  are "step for" claims under 35 U.S.C. § 112, ¶ 6.   See, e.g., Bio-

16  Technology General Corp. v. Genentech, 80 F.3d 1553, 1558-60 (Fed.

17  Cir. 1996) (interpreting as ordinary method claim, claim which the

18  Federal Circuit itself described as using "broad and generic

19  language to define the steps of isolating and purifying. . ."};

20  Lifescan, Inc. v. Home Diagnostics, Inc., 76 F.3d 358, 360-61 (Fed.

21  Cir. 1996) (refusing to limit single-verb-phrase method elements by

22  reference to the preferred embodiment); Laitram Corp. v. NEC Corp.,

23  62 F.3d 1388, 1389-95 (Fed. Cir. 1995) (interpreting single-verb-

24  phrase elements as ordinary method elements and refusing to import

25  limitations from the specification); Genentech, Inc. v. Wellcome

26  Foundation Ltd., 29 F.3d 1555 (Fed. Cir. 1994) (interpreting method

27  claims not to be limited by preferred embodiment); Arrhythmia

28  Research Technology, Inc. v. Corazonix Corp., 958 F.2d 1053, 1055,

1058-61 (Fed. Cir. 1992) (holding method claims drawn to patentable

subject matter without reference to § 112, ¶ 6 although court

treated § 112, ¶ 6 with regard to apparatus claims drafted in

explicit means plus function format); Shamrock Technologies, Inc. v.

Medical Sterilization, Inc., 903 F.2d 789, 791-93 (Fed. Cir. 1990)

(affirming summary judgment of infringement of method claim without

reference to § 112, ¶ 6); Intervet Am. Inc. v. Kee-Vet Labs., Inc.,

887 F.2d 1050, 1052-56 (Fed. Cir. 1989) (construing single-verb-

phrase method claim without reference to § 112, ¶ 6); Moleculon

Research Corp v. CBS, Inc., 793 F.2d 1261, 1263-64, 1271-73 (Fed.

Cir. 1986), cert. denied, 479 U.S. 1030 (1987) (interpreting method

claims without reference to § 112, ¶ 6).  As demonstrated in

Appendix A hereto, which is a list of exemplary method claims that

have been interpreted by the Federal Circuit Court of Appeals, the

Federal Circuit has never implied the words "step for" into any

method claim, even where that claim would otherwise be invalid.

The Federal Circuit's treatment of the claim at issue in

Arrhythmia Research Technology is instructive.[8]  The court analyzed

---

[8] Claim 1 of the patent at issue in Arrhythmia Research
Technology, 958 F.2d at 1055, reads:

   1.   A method for analyzing electrocardiograph
signals to determine the presence or absence of a
predetermined level of high frequency energy in the late
QRS signal, comprising the steps of:

      converting a series of QRS signals to time
      segments, each segment having a digital value
      equivalent to the analog value of said signal
      at said time;

      applying a portion of said time segments in reverse
      time order to high pass filter means;

(Footnote continues on following page.)

1   whether the claimed method steps were within the scope of statutory

2   subject matter without any reference to § 112, ¶ 6.  Arrhythmia

3   Research Technology, 958 F.2d at 1058-60.  The court analyzed the

4   claimed method steps of "converting," "applying," "determining," and

5   "comparing" without reference to any acts from the specification.

6   Id.  The Court determined that the steps were statutory because they

7   were physical process steps that transformed one physical electrical

8   signal into another.  In marked contrast, the court used § 112, ¶ 6

9   to interpret a set of apparatus claims that the drafter had

10  explicitly written in "means for" format.  Arrhythmia Research

11  Technology, 958 F.2d at 1060-61.  The Federal Circuit had no

12  difficulty finding that, although the method claim was recited as a

13  series of single-verb phrases, the Arrhythmia method claim was just

14  that -- a simple method claim and not a "step for" claim.

15      In fact, when faced with method claim elements, the Federal

16  Circuit has uniformly held that it is legal error to import aspects

17  of the example embodiments in the patent specification into the

18  method claims.  See, e.g., Lifescan, Inc. v. Home Diagnostics, Inc.,

19  76 F.3d 358, 360-61 (Fed. Cir. 1996) (refusing to limit single-verb-

20  phrase method elements by reference to the preferred embodiment);

21  Intervet Am. Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 1054-55

22  (Fed. Cir. 1989); Polaroid Corp. v. Eastman Kodak Co., 789 F.2d

23  1556, 1562 (Fed. Cir.), cert. denied, 479 U.S. 850 (1986)

24  ("apparatus distinctions not claimed are not controlling in

25  _____

(Footnote continued from previous page)

26              determining an arithmetic value of the amplitude of
                the output of said filter; and

27

28              comparing said value with said predetermined level.

1    determining infringement of process claims"); <u>Fromson v. Advance</u>

2    <u>Offset Plate, Inc.</u>, 720 F.2d 1565, 1568 (Fed. Cir. 1983) ("[W]e

3    caution that the asserted claims contain no temperature or time

4    limitations, and that no basis appears on the record for limiting

5    the claimed inventions to preferred embodiments or specific examples

6    in the specification.").

7         In <u>Intervet Am. Inc.</u>,[9] the Federal Circuit reiterated that

8              courts cannot alter what the patentee has chosen
               to claim as his invention, that limitations
9              appearing in the specification will not be read
               into claims, and that interpreting what is <u>meant</u>
10             by a word <u>in</u> a claim "is not to be confused with
               adding an extraneous limitation appearing in the
11             specification, which is improper."

12   887 F.2d at 1053 (citations omitted).

13        Method claims 1 through 5 of the Hellman-Merkle patent do not

14   contain "step for" claim elements subject to 35 U.S.C. § 112, ¶ 6.

15   There is no evidence that would authorize or permit the Court to

16   imply that the drafter intended to include the words "step for" in

17

18   _____

19        [9]    Just as in this case, the method claim in <u>Intervet</u>,
     887 F.2d at 1052, recited a series of steps:
20
               In a method for the preparation of a live vaccine that
21             protects poultry against Infectious Bursal Disease virus
               which comprises: a. growing an Infection Bursal Disease
22             virus on a culture medium selected from the group
               consisting of embryonated eggs, chicken embryo cells, a
23             culture of bursal cells and newborn mice, b. subsequently
               arresting the cultivated virus material, and  c.
24             subjecting the material obtained from step b. to at least
               one of the following treatments: i. clarifying by
25             centrifugation and/or filtration; ii. adding a stabilizing
               agent; iii. putting the material in a vessel; iv. freeze-
26             drying, the improvement comprising that the Infectious
               Bursal Disease virus grown in step a. is the virus of the
27             strain deposited in the ATCC under No. VR-2041.

28

1  the claims.  Claims 1 through 5 mean what they say -- nothing more

2  and nothing less.

3  **III. CONCLUSION.**

4  The Court must examine the objective evidence of record to

5  interpret the claims of the Stanford Patents.  RSADSI's main

6  premise, underscored throughout its Proposed Jury Instructions, is

7  flawed:  the method claims of the Hellman-Merkle Patent were never

8  intended to be covered by the option provided under 35 U.S.C. § 112,

9  ¶ 6.  There is no fact or legal precedent to support such a claim

10  construction.

11  Dated: September 24, 1996

12  MORRISON & FOERSTER LLP
   ALSTON & BIRD

13

14

15  By:_____
       Karl J. Kramer

16  Attorneys for Defendants and
   Counter-Claimants CYLINK

17  CORPORATION, CARO-KANN
   CORPORATION AND THE BOARD OF

18  TRUSTEES OF THE LELAND STANFORD
   JUNIOR UNIVERSITY

19

20

21

22

23

24

25

26

27

28

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996).

Method claim:

    1.  A method for reflow soldering of surface mounted devices to a printed circuit board comprising:

        moving a printed circuit board having solder and devices disposed on a surface thereof through a first zone and in close proximity to a first emitting surface of at least one nonfocused infrared panel emitter, said first emitting surface being at a first panel temperature;

        moving said board through a second zone and in close proximity to a second emitting surface of at least one nonfocused infrared panel emitter, said second emitting surface being at a second panel temperature lower than said first panel temperature; and

        moving said board through a third zone and in close proximity to a third emitting surface of at least one nonfocused infrared panel emitter, said third emitting surface being at a third panel temperature higher than said second panel temperature, said third emitting surface heating said board and said solder to a solder reflow temperature for a period of time sufficient to cause said solder to reflow and solder said devices to said board while maintaining the temperature of said devices below said solder reflow temperature.

1

**APPENDIX A:**
## Cases Construing Method Claims Without Resort to Section 112(6)

*Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558 (Fed. Cir. 1996).

Representative method claim:

14.   A process for encapsulating a semiconductor device comprising:

> providing electrical connections [52 and 54] between electrical terminals of the device and a plurality of conductors [10, 12, and 14] arranged in a substantially common plane, said device [40] and the thusly provided electrical connections [52 and 54] thereto being disposed on one side of said plane,

> disposing the device and portions of the conductors in a mold cavity [64 and 66], and

> holding the conductors [10, 12, and 14] while injecting a fluid insulating material into the mold cavity for subsequently solidifying and embedding said device,

the fluid insulating material being injected into a portion of the cavity on the opposite side of said plane [88] to preclude direct high velocity engagement between the fluid and the device [40] and the electrical connections [52 and 54] thereto.

2

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Litton Sys., Inc. v. Honeywell, Inc.*, 87 F.3d 1559 (Fed. Cir. 1996).

Method Claim:

1.  A method of fabricating multiple layer optical films, said multiple layer optical films comprising optical layers having different indices of refraction comprising:

> bombarding targets obliquely with an ion beam produced by or derived from a Kaufman-type ion beam source in a vacuum chamber to sputter deposit a plurality of optical film layers on a base;

> controlling the atmosphere inside the vacuum chamber to provide sufficient gas to sustain the ion beam and the proper amount of oxygen to accomplish proper stoichiometry of the thin films; and

> depositing multiple layers of different materials on said base by varying the targets being bombarded by the ion beam; and

> continuously rotating said base during the deposition of said multiple optical layers.

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Bio-technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553 (Fed. Cir. 1996).

Method claim:

2.  A method for producing human growth hormone which method comprises [1] culturing bacterial transformants containing recombinant plasmids which will, in a transformant bacterium, express a gene for human growth hormone unaccompanied by the leader sequence of human growth hormone or other extraneous protein bound thereto, and [2] isolating and purifying said expressed human growth hormone.

4

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Lifescan, Inc. v. Home Diagnostics, Inc.*, 76 F.3d 358 (Fed. Cir. 1996).

Method Claim:

1.  A method of causing an analytical measurement to be made in a reflectance-reading device at the end of a predetermined time period after an analyte reacts with a reagent in a porous, reflectance-reading matrix located in said device, which comprises:

taking a first reflectance reading from a dry first surface of said porous matrix prior to application of a sample of body fluid suspected of containing said analyte to a second surface of said porous matrix from which said sample can travel to said first surface by capillary action and react with said reagent in said porous matrix if said analyte is present in said sample;

applying said sample to said second surface of said porous matrix;

taking an additional reflectance reading from said first surface after said sample is applied to said porous matrix;

comparing said additional reflectance reading to said first reflectance reading;

initiating said predetermined time period upon a predetermined drop in reflectance sufficient to indicate that said sample has reached said first surface; and

taking a measurement reflectance reading at the end of said predetermined time period without having determined the time at which said sample was initially applied to said porous matrix.

5

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Lateral Corp. v. NEC Corp.*, 62 F.3d 1388 (Fed. Cir. 1995).

Method claim:

2. A method of electro-optically printing type quality alpha-numeric characters at high speed on the recording surface of a photosensitive material, said method comprising the steps of:

arranging a plurality of rapidly reacting radiation emitters in a straight line array, each of the said emitters being capable of emitting radiation at wavelengths to which said photosensitive material is sensitive,

selectively energizing for predetermined periods of time each of the said emitters,

transmitting the emitted radiation from each of the said emitters to a different area on said surface,

providing relative movement along a single coordinate substantially perpendicular to said array at substantially constant speed between said recording surface and said emitters, and

coordinating the predetermined periods of time in which each of said plurality of emitters is selectively energized with said constant speed of said relative movement between said emitters and recording surface so that the alpha-numeric character images are recorded on said recording surface by exposure of selected areas of said recording surface by said emitted radiation, said step of coordinating including the steps of synchronously generating a first data signal which programs the order of energization of said emitters and a second data signal which determines the duration of the energization period of said emitters, and employing said first and second data signals to effect energization of said emitters so as to record said alpha-numeric character images of said type quality at said high speed.

6

## APPENDIX A:
### Cases Construing Method Claims Without Resort to Section 112(6)

*In re Warmerdam*, 33 F.3d 1354 (Fed. Cir. 1994).

Representative method claims:

1.  A method for generating a data structure which represents the shape of [a] physical object in a position and/or motion control machine as a hierarchy of bubbles, comprising the steps of:  first locating the medial axis of the object and then creating a hierarchy of bubbles on the medial axis.

2.  The method of Claim 1 wherein the step of creating the hierarchy comprises a top-down procedure of:

first placing a root bubble which is centered at the center of gravity of the object and has a radius equal to the maximum distance from the center of gravity to the contour of the object;

next, if the medial axis has a plurality of branch lines, placing a plurality of first successive bubbles each of which encompasses a distinct part of the object which is described by one of said branch lines; and

then successively dividing each line of the medial axis into two new line parts and placing a pair of next successive bubbles each of which encompasses a distinct part of the object which is described by one of said new line parts.

7

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Genentech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555 (Fed. Cir. 1994).

Method claims:

1. A process which comprises expressing a DNA sequence encoding human tissue plasminogen activator in a recombinant host cell, said recombinant host cell being a microorganism or cell culture transformed with an expression vector containing said DNA sequence.

8. A process for producing recombinant human tissue plasminogen activator comprising:

   (a) growing recombinant cells in a growth medium, said cells being a microorganism of cell culture transformed with an expression vector containing DNA encoding human tissue plasminogen activator; and

   (b) simultaneously expressing said DNA, thereby producing recombinant human tissue plasminogen activator.

12. A process for producing recombinant human tissue plasminogen activator comprising:

   (a) transforming a microorganism or cell culture with a replicable vector containing DNA encoding human tissue plasminogen activator; and

   (b) expressing said DNA in said transformed microorganism or cell culture.

8

**APPENDIX A:**

**Cases Construing Method Claims Without Resort to Section 112(6)**

*Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834 (Fed. Cir. 1992).

Method claim:

1. In a method of manufacturing a shock-absorbing, molded innersole for insertion in footwear, which method comprises:

    (a) introducing an expandable, polyurethane into a mold; and

    (b) recovering from the mold an innersole which comprises a contoured heel and arch section composed of a substantially open-celled polyurethane foam material, the improvement which comprises:

        (i) placing an elastomeric insert material into the mold, the insert material having greater shock-absorbing properties and being less resilient than the molded, open-celled polyurethane foam material, and the insert material having sufficient surface tack to remain in the placed position in the mold on the introduction of the expandable polyurethane material so as to permit the expandable polyurethane material to expand about the insert material without displacement of the insert material; and

        (ii) recovering a molded innersole with the insert material having a tacky surface forming a part of the exposed bottom surface of the recovered innersole.

9

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Arrhythmia Research Technology, Inc. v. Corazonix Corp.*, 958 F.2d 1053 (Fed. Cir. 1992).

Method claim:

1.  A method for analyzing electrocardiograph signals to determine the presence or absence of a predetermined level of high frequency energy in the late QRS signal, comprising the steps of:

> converting a series of QRS signals to time segments, each segment having a digital value equivalent to the analog value of said signals at said time;

> applying a portion of said time segments in reverse time order to high pass filter means;

> determining an arithmetic value of the amplitude of the output of said filter; and

> comparing said value with said predetermined level.

10

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Standard Havens Prods. v. Gencor Indus.*, 953 F.2d 1360 (Fed. Cir. 1991).

Representative method claim:

1. A method for continuously producing an asphaltic composition from asphalt and aggregates, the steps of said method comprising:

introducing aggregate material interiorly of a first end of an inclined, horizontal rotating drum to flow generally from said first end to the second end of said drum;

generating a hot gas stream within said drum to flow through said drum to said first end in countercurrent relation to said aggregate material;

isolating a zone of said rotating drum from said hot gas stream;

delivering said heated and dried aggregate material to said zone isolated from said hot gas stream;

mixing said aggregate material with liquid asphalt within said zone isolated from said hot gas stream to produce an asphaltic composition; and

discharging said asphaltic composition from said rotating drum.

11

pa-131324

# APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Shamrock Technologies v. Medical Sterilization*, 903 F.2d 789 (Fed. Cir. 1990).

Method claim:

1.  A method for processing flowable solid polytetrafluoroethylene material by radiation, to degrade said material to lower its molecular weight and render it grindable into a powder, comprising

(a) supplying said material to a processing vessel,

(b) supplying radiation to a selected region of said processing vessel,

(c) agitating said material in said processing vessel during said processing thereby to repeatedly move said material into and out of said selected region whereby said material is uniformly irradiated, and,

(d) cooling said material to maintain a temperature below 500° F. during said processing.

12

**APPENDIX A:**
**Cases Construing Method Claims Without Resort to Section 112(6)**

*Intervet Am. v. Kee-Vet Labs.*, 887 F.2d 1050 (Fed. Cir. 1989).

Method claim:

7.  In a method for the preparation of a live vaccine that protects poultry against Infectious Bursal Disease virus which comprises:

   a.  growing an Infection Bursal Disease virus on a culture medium selected from the group consisting of embryonated eggs, chicken embryo cells, a culture of bursal cells and newborn mice,

   b.  subsequently arresting the cultivated virus material, and

   c.  subjecting the material obtained from step b. to at least one of the following treatments:

   i.  clarifying by centrifugation and/or filtration;

   ii.  adding a stabilizing agent;

   iii.  putting the material in a vessel;

   iv.  freeze-drying,

The improvement comprising that the Infectious Bursal Disease virus grown in step a. is the virus of the strain deposited in the ATCC under No. VR-2041.

13

pa-131324

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627 (Fed. Cir. 1987).

Representative method claim:

1.  A method for detecting cancer comprising:

   a.   measuring and establishing standard NMR spin-lattice relaxation times and spin-spin relaxation times for both normal and cancerous tissue of the type under analysis using as an indicator nuclei at least one nuclei which exhibits deviant behavior in cancerous tissue;

   b.   measuring the NMR spin-lattice relaxation times and spin-spin relaxation times for the suspected tissue to determine the extent of deviant behavior of the indicator nuclei; and

   c.   comparing the values obtained in (b) against the standards obtained in (a).

14

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986).

Representative method claim:

3.  A method for restoring a preselected pattern from sets of pieces which pieces have constantly exposed and constantly nonexposed surfaces, the exposed surfaces adapted to be combined to form the preselected pattern, which sets when in random engagement fail to display said preselected pattern which comprises:

    a.    engaging eight cube pieces as a composite cube;

    b.    rotating a first set of cube pieces comprising four cubes about a first axis;

    c.    rotating a second set of four cubes about a second axis; and

    d.    repeating steps (b) and (c) until the preselected pattern is achieved.

**APPENDIX A:**
## Cases Construing Method Claims Without Resort to Section 112(6)

*Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556 (Fed. Cir. 1986).

Method claim:

    1.  In a process of forming color transfer images wherein a photosensitive element is exposed, an alkaline processing composition is applied to said photosensitive element to effect development thereof and imagewise diffusion transfer of a dye image-forming substance from said photosensitive element to an image-receiving layer in superposed relationship therewith to form a positive dye image, the improvement wherein said photosensitive element contains a layer of a nondiffusible polymeric acid positioned between the support and the innermost layer containing said dye image-forming substance, said layer containing said polymeric acid containing sufficient acid groups to effect a reduction in the pH of the surface of said image-receiving layer of at least 2 pH units, as compared with the initial pH of said alkaline precessing composition, prior to completion of the inhibition period.

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565 (Fed. Cir. 1983).

Method Claim:

12. The process of making a sensitized photographic plate comprising the steps of applying to an aluminum sheet having a coating of aluminum oxide, a water-solution of an alkali metal silicate to cause the silicate to react with the aluminum oxide to form a water-insoluble, hydrophilic, organophobic layer on said sheet, drying the layer, and applying over the dry layer a light-sensitive coating having one solubility in relation to a solvent in a state before exposure to light and another solubility in relation to said solvent in another state after exposure to light, said light-sensitive material being soluble in said solvent in one of said states and being insoluble in said solvent and in water, hydrophobic and organophilic in its other state.

17

## APPENDIX A:
## Cases Construing Method Claims Without Resort to Section 112(6)

*In re Arbeit*, 206 F.2d 947 (C.C.P.A. 1953).

Method claim:

33.  The method of manufacturing glass that includes the steps of melting, fining and working the glass, the glass proceeding from a melting zone to a fining zone to a working zone and being withdrawn from the working zone, fining the glass by Joule effect, and flowing the glass from zone to zone in small, submerged streams impermeable to wandering currents in the zones, said streams constituting the sole connections between the zones.

pa-131324