# ORIGINAL

1   KARL J. KRAMER (No. 136433)
    JANA G. GOLD (No. 154246)
2   SHERMAN W. KAHN (No. 168924)
    MORRISON & FOERSTER LLP
3   755 Page Mill Road
    Palo Alto, California  94304-1018
4   Telephone: (415) 813-5600

5   RAOUL D. KENNEDY (No. 40892)
    MORRISON & FOERSTER LLP
6   345 California Street
    San Francisco, California 94104-2675
7   Telephone: (415) 677-7000

8   PATRICK J. FLINN (No. 104423)
    ALSTON & BIRD
9   One Atlantic Center
    1201 W. Peachtree Street
10  Atlanta, Georgia 30306
    Telephone: (404) 881-7000

11

    Attorneys for Defendants/Counter-
12  Claimants CYLINK, CARO-KANN CORPORATION
    AND THE BOARD OF TRUSTEES OF THE
13  LELAND STANFORD JUNIOR UNIVERSITY

14                  UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16

    ROGER SCHLAFLY,                    No.   C-94-20512 SW
17
              Plaintiff,              **NOTICE OF MOTION, MOTION AND**
18                                    **MEMORANDUM IN SUPPORT OF**
                                      **MOTION FOR AN ORDER STRIKING**
19      v.                            **RSADSI'S AMENDED JURY**
                                      **INSTRUCTIONS, OR IN THE**
20  PUBLIC KEY PARTNERS AND RSA DATA  **ALTERNATIVE, GRANTING LEAVE**
    SECURITY, INC.,                   **TO FILE A RESPONSE**
21
              Defendants,
22                                     No.   C-96-20094 SW

    RSA DATA SECURITY, INC.,
23                                     Date:  October 1, 1996
              Plaintiff,              Time:  10:00 a.m.
24                                    Judge: Hon. Spencer Williams
        v.
25
    CYLINK CORPORATION and CARO-KANN
26  CORPORATION, et al.

27            Defendants.

28

FILED

SEP 26  3 41 PM '96

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA, S.J.

208

1    PLEASE TAKE NOTICE THAT, pursuant to Local Rule 7-11,

2   Defendants and Counterclaimants Cylink Corporation, Caro-Kann

3   Corporation, and Stanford University (collectively, "defendants")

4   hereby move <u>ex parte</u> for an order striking the Amended Proposed Jury

5   Instructions On Claim Construction, filed and served on

6   September 24, 1996 by RSADSI.  In the alternative, defendants move

7   for leave to file a Response Memorandum.  The basis of this Motion

8   is that RSADSI violated this Court's Scheduling Order and concealed

9   from the defendants the actual jury instructions that it intended to

10  submit to the Court.

11   Pursuant to this Court's Scheduling Order the parties were to

12  and did exchange draft jury instructions on September 10, 1996.  The

13  parties were required under the Scheduling Order, and did in fact,

14  meet and confer extensively on the jury instructions that were

15  exchanged.  On September 17, 1996, the parties served final jury

16  instructions.  In accordance with this Court's Scheduling Order, on

17  September 24, 1996, the parties were to file objections to the

18  opposing party's final jury instructions and supporting memoranda.

19   With virtually no notice and no explanation, RSADSI filed on

20  September 24 submissions that included a brand new set of "Amended

21  Jury Instructions" that were <u>substantively different</u> than its

22  original "final" jury instructions.  The hearing on claim

23  construction issues is scheduled to commence in less than one week.

24  RSADSI's failure to provide the Amended Proposed Jury Instructions

25  prior to the due date for the objections deprived the defendants of

26  any opportunity to object to the Amended Proposed Jury Instructions.

27   RSADSI's Amended Jury Instructions are entirely different in

28  format and substantially different in substance than its original

1   "final" Proposed Jury Instructions.   RSADSI's Amended Jury

2   Instructions offer definitions of nine claim terms.   Only two of

3   those definitions of claim terms, "random numbers" and "directly

4   related," have been left unchanged from the original instructions.

5   All of RSADSI's other definitions have been changed.   The seven

6   other terms defined in the Amended Jury Instructions are either

7   substantially changed in substance[1] or entirely new.[2]

8        Moreover, RSADSI's Amended Jury Instructions and the Memorandum

9   in support of them raise entirely new theories regarding "step for"

10  claim elements.   These new theories conflict with the theories

11  espoused by RSADSI's expert on the construction of 35 U.S.C. § 112,

12  ¶ 6 when his deposition was taken just a little over one week ago.

13  Indeed, many of the expert's theories now appear to have been

14  abandoned completely.   Had RSADSI provided the changed definitions

15  at an appropriate time prior to the due date, the defendants would

16  obviously have had an opportunity to respond to RSADSI's new

17  definitions and new theories.

18       Whether RSADSI's conduct was a result of intentional subterfuge

19  or honest inability to pick among its various contradictory

20  _____

21       [1]  Compare, for example, the definitions in the Amended Jury
    Instructions Nos. 2.0(2) ("authentication"); 2.0(3) and 2.0(9)
22  ("representation of the message"), 2.0(4) ("digital signature"),
    2.0(8) ("computationally infeasible"), 2.0(10) ("redundancy"), and
23  2.0(11) ("message digital signature"), with RSADSI's original
    Proposed Jury Instructions 2.00, 2.12, 3.22 ("authentication"); 3.30
24  ("representation of the message"), 4.30 ("digital signature"), 1.34,
    1.44, 6.27, 6.31 ("computationally infeasible"), 5.20
25  ("redundancy"), and 5.30 ("message digital signature").

26       [2]  RSADSI offers Amended Jury Instruction 2.0(12), a definition
    of "communicating securely" that was never before defined by RSADSI
27  in either its originally filed jury instructions or in drafts
    circulated prior to the original filing of the jury instructions.

28

1   arguments is irrelevant.  Under the Court's Scheduling Order, the

2   defendants had a right to notice and an opportunity to respond to

3   RSADSI's proposed instructions.  RSADSI's tactics have deprived the

4   defendants of that right.

5       RSADSI's Amended Jury Instructions should be stricken in their

6   entirety for RSADSI's blatant attempt to preclude the defendants

7   from responding to RSADSI's new jury instructions.[3]  Indeed,

8   RSADSI's failure to comply -- or offer any explanation for its

9   failure to comply -- with this Court's Order respecting the filing

10  of jury instructions is, on its own, ample grounds for striking

11  RSADSI's Amended Jury Instructions.  See Urwyler v. United States,

12  1995 U.S. Dist. LEXIS 11682 (E.D. Cal. Aug. 3, 1995) (striking

13  portions of Plaintiff's trial brief as untimely in violation of

14  Court's scheduling order) (attached as Exhibit A hereto).

15      In the alternative, if the Court declines to strike RSADSI's

16  Amended Jury Instructions, defendants request the opportunity to be

17  heard regarding RSADSI's Amended Jury Instructions.[4]  To respond to

18  _____

19      [3]  See Tovar v. United States Postal Serv., 3 F.3d 1271, 1273
    n.3 (9th Cir. 1993) (striking portions of appellant's reply brief
20  presenting new information because appellee was deprived of
    opportunity to respond); see also Keystone Retaining Wall Sys., Inc.
21  v. Westrock, Inc., 792 F. Supp. 1552, 1559 (D. Or. 1991) (striking
    supplemental affidavit introducing new evidence because opponent had
22  no opportunity to respond), aff'd in rel. part, 997 F.2d 1444 (Fed.
    Cir. 1993).
23

    [4]  As the Ninth Circuit recently stated, where a party submits
24  new material to the court to which the opposing party has not had an
    opportunity to respond, a "district court should not consider the
25  new [material] without giving the [other party] an opportunity to
    respond."  As the Court concluded, "[s]uch a result would be
26  unfair."  Provenz et al. v. Miller et al., 1996 U.S. App. LEXIS
    23905, *4-*5 (9th Cir. Sept. 11, 1996) (citation omitted) (finding
27  that, where district court refused to strike "new" evidence
    contained in defendants' reply brief, the "court erred in not [also]
28                                   (Footnote continues on following page.)

1   the issues newly raised in RSADSI's submissions to the Court, the

2   defendants have prepared and hereby request leave to file Objections

3   to RSADSI's Amended Jury Instructions and a Response Brief in

4   support thereof.

5       Dated: September 26, 1996

6                           MORRISON & FOERSTER LLP
                            ALSTON & BIRD
7

8                           By:_____
9                               Karl J. Kramer

10                              Attorneys for Defendants and
                                Counter-Claimants CYLINK
11                              CORPORATION, CARO-KANN
                                CORPORATION AND THE BOARD OF
12                              TRUSTEES OF THE LELAND STANFORD
                                JUNIOR UNIVERSITY
13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____
     (Footnote continued from previous page)
27   considering plaintiffs' supplemental declaration" responding to
     "new" evidence) (attached as Exhibit B hereto).
28

NOTICE OF MOTION, MOTION AND MEMORANDUM RE ORDER STRIKING
AMENDED JURY INSTRUCTIONS OR GRANTING LEAVE TO RESPONSE
C-94-20512 SW/C-96-20094 SW                    4                    132041

A

1995 U.S. Dist. LEXIS 11682 printed in FULL format.

PETER URWYLER, Plaintiff, v. UNITED STATES OF AMERICA, Defendant.

CIV-F 93 5181 GEB DLB

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

1995 U.S. Dist. LEXIS 11682

August 3, 1995, Decided

COUNSEL: [*1]

For PETER R URWYLER, plaintiff: Henry Dorame Nunez, Law Office of Henry D Nunez, Fresno, CA.

For UNITED STATES OF AMERICA, defendant: Diana P Nowezki, United States Department of Justice, Trial Attorney, Tax Division, Washington, DC.

JUDGES: GARLAND E. BURRELL, JR., UNITED STATES DISTRICT JUDGE

OPINIONBY: GARLAND E. BURRELL, JR.

OPINION: ORDER

Defendant moves to strike Plaintiff's motions in limine on that ground that they are untimely. The Final Pretrial Order states that "the party seeking to preclude the introduction of evidence shall file an in limine motion addressing the issues involved . . . not less than fifteen (15) court days preceding the trial date [August 8, 1995]." See Order filed June 8, 1995. Plaintiff did not file his in limine motions until July 24, 1995. Since Plaintiff failed to comply with the requirements of the Final Pretrial Order, his motions in limine are denied.

Defendant also moves to strike Plaintiff's trial brief as untimely. The Final Pretrial Order states that "trial briefs shall be filed with the court no later than fourteen (14) court days prior to the date of trial [August 8, 1995]" See Order filed June 8, 1995. Plaintiff did not file his trial brief until July 26, 1995. Plaintiff's failure to comply with the Final Pretrial Order disrupted the Court's preparation of this case for trial, and effectively deprived Defendant of the opportunity to file a responsive trial [*2] brief. Plaintiff has not offered any excuse for failing to comply with this Court's deadline for the filing of trial briefs issued under Rule 16 of the Federal Rules Of Civil Procedure.

One consequence of Plaintiff's failure to timely file his trial brief is that he is now deprived of the opportunity to have the Court reconsider its decision granting Defendant's motion for summary adjudication of his wrongful collection claim. See Order filed June 5, 1995. At the final pretrial conference, Plaintiff moved for reconsideration on the ground that he had mistakenly failed to submit certain documents in opposition to the motion. The Court granted the motion for reconsideration and directed Plaintiff to file the referenced documents as trial exhibits in accordance with Section IX of the Final Pretrial Order and to "specifically identify said exhibits in his trial brief under the heading 'Further Motions: Motion For Reconsideration.'" Plaintiff's failure to timely submit his trial brief deprived the Defendant of the opportunity to respond to this issue. Further, since trial commences August 8, 1995, the impending trial date and other cases on the Court's docket leave no time for further [*3] consideration of this issue. Upon reflection, Plaintiff had ample opportunity to litigate this issue at the time he filed his opposition to the motion for summary judgment yet failed to do so. Although he was given limited leave to relitigate the matter, he inexplicably ignored the ambit of that leave and must now suffer the consequences of failing to respond to Defendant's motion for summary adjudication of issues. Considering this issue and the alternatives available to achieve assessment of the sanctions in conformity with fault, *In re Hill, 775 F.2d 1385, 1387 (9th Cir. 1985), Thompson v. Housing Authority of City of Los Angeles, 782 F.2d 829, 831 (9th Cir.), cert. denied, 479 U.S. 829, 93 L. Ed. 2d 60, 107 S. Ct. 112 (1986),* the Court declines to reconsider its grant of summary adjudication on June 5, 1995, and confirms its prior order granting Defendant's motion for summary adjudication. Whether other portions of the trial brief should be stricken will be decided during trial.

In a separate motion filed July 31, 1995, Defendant seeks a ruling that "findings of fact and legal conclusions made in the Court's March 14, 1995 Order Denying Plaintiff's Summary Judgment [*4] Motion . . . be deemed conclusive for purposes of this trial

 LEXIS·NEXIS ™  A member of the Reed Elsevier plc group

 LEXIS·NEXIS ™  A member of the Reed Elsevier plc group

 LEXIS·NEXIS ™  A member of the Reed Elsevier plc group

without further need of proof" (citing Fed. R. Civ. P. 56(d)). Defendant's request under Rule 56 is untimely. If Defendant desired to have such matters decided "for purposes of trial," it should have made the request contemporaneous with the filing of its opposition to the motion for summary judgment or, at the latest, at the final pretrial conference.

IT IS SO ORDERED.

Dated: August 3, 1995

GARLAND E. BURRELL, JR.

UNITED STATES DISTRICT JUDGE




LEXIS·NEXIS®
A member of the Reed Elsevier plc group

LEXIS·NEXIS®
A member of the Reed Elsevier plc group

LEXIS·NEXIS®
A member of the Reed Elsevier plc group

B

1996 U.S. App. LEXIS 23905 printed in FULL format.

DIANE PROVENZ; AHIKIM EIZENBERG, Plaintiffs-Appellants, v. ROBERT C. MILLER; CHARLES M. BOESENBERG; DAVID G. LUDVIGSON; STEPHEN R. BENNION; WILLIAM D. JOBE; MIPS COMPUTER SYSTEMS, INC., Defendants-Appellees.

Nos. 95-15839, 95-16819

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

1996 U.S. App. LEXIS 23905

June 11, 1996, Argued and Submitted, San Francisco, California

September 11, 1996, Filed

PRIOR HISTORY: [*1] Appeals from the United States District Court for the Northern District of California. D.C. No.   CV-92-20159-RMW. Ronald M. Whyte, District Judge, Presiding.

DISPOSITION: AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

COUNSEL: Jonathan K. Levine, Kaplan, Kilsheimer & Fox, New York, New York and Patrick J. Coughlin, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, California, for the plaintiffs-appellants.

Steven M. Schatz, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California, for the defendants-appellees.

JUDGES: Before:   Alfred T. Goodwin, Harry Pregerson, and Alex Kozinski, Circuit Judges. Opinion by Judge Pregerson

OPINIONBY: HARRY PREGERSON

OPINION: OPINION

PREGERSON, Circuit Judge:

Plaintiffs Diane Provenz and Ahikim Eizenberg, on behalf of themselves and all other similarly situated purchasers of stock of MIPS Computer Systems, Inc. (MIPS), appeal the district court's grant of summary judgment in favor of all defendants. Plaintiffs brought this action against MIPS and MIPS' officers and directors, Charles M. Boesenberg, Robert C. Miller, David G. Ludvigson, Stephen R. Bennion, and William D. Jobe, under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 [*2]

of the Securities Exchange Commission, 17 C.F.R. § 240.10b-5. The plaintiffs also appeal the district court's order awarding costs to defendants. The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.

BACKGROUND

The plaintiffs brought this securities fraud case as a class action. The class period runs from January 31, 1991, through October 9, 1991. Plaintiffs allege that, during the class period, the value of MIPS' stock was artificially inflated because defendants recognized revenue before the revenue was earned and failed to disclose to the market information about MIPS' products and forecasts. At the beginning of the class period, MIPS' stock traded at about $ 11 a share.  At the high end of the class period, MIPS' stock traded at $ 20 5/8 a share. On October 10, 1991, the day that plaintiffs allege the fraudulently withheld information about MIPS' business and prospects entered the market, the price of the MIPS' stock declined to about $ 9 a share.

On June 27, 1994, the district court granted defendants' motion for summary judgment. The district court held that there was insufficient [*3] evidence to hold defendants liable for securities fraud based on scienter. The district court also awarded defendants their costs. This appeal followed.

STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 134 L. Ed. 2d 209, 116 S. Ct. 1261 (1996).  A court must view the evidence in the light most favorable to the non-moving party and draw







any reasonable inferences in the non-moving party's favor. Id. Summary judgment is proper only if no genuine issue of material fact exists and only if the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* Where material factual disputes exist, the court must allow a jury to resolve the factual disputes. *Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1161 (9th Cir. 1992).*

### ANALYSIS

#### I. Procedural Issues

As a preliminary matter, we must resolve two procedural issues. First, after defendants filed their reply brief but before the hearing, plaintiffs filed a motion to strike the "new" evidence contained in defendants' reply. The plaintiffs also filed a supplemental declaration that rebutted [*4] defendants' "new" evidence. The district court denied plaintiffs' motion to strike the defendants' "new" evidence and also refused to consider plaintiffs' supplemental declaration.

We believe the district court erred in not considering plaintiffs' supplemental declaration. In *Marshall v. Gates, 44 F.3d 722, 723-725 (9th Cir. 1995),* we noted that Fed. R. Civ. P. 56(c) states, in relevant part, that a "party prior to the day of hearing may serve opposing affidavits." Although we interpreted this language as allowing a district court to adopt local rules that set time limits for a non-moving party to follow in opposing a motion for summary judgment, our holding in Marshall does not mean that defendants in this case may submit "new" evidence in their reply without affording plaintiffs an opportunity to respond. Such a result would be unfair.

We agree with the Seventh Circuit, which held that "where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond." *Black v. TIC INV. Corp., 900 F.2d 112, 116 (7th Cir. 1990).* Thus, in resolving this appeal, [*5] we have considered both the evidence submitted by defendants in their reply and the evidence submitted by plaintiffs in their supplemental declaration.

As to the second procedural issue we must resolve, plaintiffs contend that the district court abused its discretion in denying plaintiffs' motion for reconsideration that was based on allegedly newly discovered evidence. In their motion, plaintiffs submitted a declaration of a MIPS ex-employee. It appears, however, that plaintiffs learned about this employee well before plaintiffs filed their opposition. In these circumstances, we cannot say that the district court abused its discretion in denying

plaintiffs' motion for reconsideration.

#### II. The Merits

To prevail on their securities fraud claims under § 10(b) and Rule 10b-5, plaintiffs must prove: (1) that defendants made a false statement or failed to disclose information that rendered another statement misleading; (2) that such statement or omission was material; (3) that plaintiffs relied on the statement or omission; and (4) that defendants acted with scienter or an intent to defraud. *Monroe v. Hughes, 31 F.3d 772, 776 (9th Cir. 1994);* In re Apple Computer Securities [*6] *Litigation, 886 F.2d 1109, 1113 (9th Cir. 1989),* cert. denied, *496 U.S. 943 (1990).*

#### A. The Alleged False and Misleading Statements

In a securities fraud case, summary judgment is improper if a plaintiff "shows a genuine issue of fact with regard to a particular statement by the company or its insiders." In re Worlds of Wonder Securities Litigation ("*WOW*"), *35 F.3d 1407, 1412 (9th Cir. 1994)* (quotations and citations omitted), cert. denied, *116 S. Ct. 185 (1995)* and *116 S. Ct. 277 (1995).* As we have explained, "liability depends on the plaintiffs' success in demonstrating that one of the statements made by the company was actually false or misleading." *In Re Convergent Technologies Securities Litigation, 948 F.2d 507, 512 (9th Cir. 1991).* Thus, to determine whether summary judgment was proper in this case, we must examine each false or misleading statement allegedly made by defendants.

##### 1. Defendant's Income Recognition Practices

Plaintiffs allege that during the class period in question defendants made false statements in MIPS' quarterly income statements when they recognized revenue before it was earned. According to plaintiffs, under Generally Accepted [*7] Accounting Principles (GAAP) and MIPS' own policies, defendants could not recognize income until a binding agreement existed, until deliverables n1 were shipped, and until material contingencies were satisfied. When revenue can be recognized is what is at issue in this case.

---

n1 "Deliverables" include the computer tape containing programs and databases as well as the documents and manuals describing the technology.

---

Although defendants maintain that during the class period at issue no specific GAAP rules existed governing revenue recognition for technology licensing agreements, defendants do not appear to dispute plaintiffs' contentions that, under GAAP, revenue must be earned

 LEXIS·NEXIS®
A member of the Reed Elsevier plc group

  LEXIS·NEXIS®
A member of the Reed Elsevier plc group

 LEXIS·NEXIS®
A member of the Reed Elsevier plc group

before it can be recognized. Defendants concede that, under GAAP, the earnings process must be substantially completed and an exchange must have occurred before revenue can be recognized. MIPS' own policy, which was in existence during the class period, states that "technology revenue is recognized upon the completion of contract requirements." [*8]

That contract requirements had to be completed before revenue could be recognized as "earned" makes perfect sense given the way that MIPS and its customers structured their deals and given the fact that intellectual property was involved. The purchase orders that were signed by customers contained various contingencies, including the approval of foreign governments and the receipt of deliverables. In some instances, the terms of the licensing agreements had not yet been negotiated or finalized when customers signed the purchase orders. Although the signed purchase orders stated that the licensing fee was nonrecoverable, normally no money exchanged hands until after customers received the deliverables. As a result, MIPS had a policy of not shipping any deliverables until a binding agreement existed. Finally, the technology that customers purchased was not completed or "taped out" until March 1991. Before that date, and until MIPS' customers received the actual technology, MIPS customers had received nothing they could use.

Defendants, however, contend, and the district court agreed, that the bulk of MIPS' technology was transferred during the sales process. As the district court explained: [*9]

The manner by which MIPS recognized revenue appears to have basically been consistent with its own written policy on the subject and GAAP. . . . The evidence indicates that while in some instances partial deliverables remained unshipped after revenue was recognized, the bulk of the terms of the technology transfers (i.e. transfer of sufficient technology to allow the purchaser to begin RISC utilization, payment and acceptances of nonrecoverable fees, etc.) had been substantially satisfied.

(Emphasis added.)

The evidence, however, is not so clear and tells a more complicated story. We have combed through the record and are unable to determine what exactly was transferred to customers during the sales process. The technology, although licensed, had not yet been completed. If any technology was transferred during the sales process, such transfers would have been inconsistent with MIPS' policy of not transferring any technology until a binding

contract had been executed. Thus, we find that plaintiffs have raised genuine issues of material fact as to whether technology transfers in fact occurred during the sales process and whether such transfers were sufficient under [*10] GAAP to support the recognition of revenue. Further, looking at the evidence in the light most favorable to plaintiffs, it appears that, in the transactions described below, defendants recognized revenue before binding agreements existed and before contract requirements were completed.

a. The Fourth Quarter for 1990

Plaintiffs contend that, in the fourth quarter of 1990, defendants recognized nearly $ 3 million in revenue from transactions with Sony, NEC, Control Data, Convex, and Olivetti. According to plaintiffs, had defendants not recognized this revenue, MIPS would have reported a $ 2,576,000 loss rather than the $ 546,000 loss, that was actually reported. n2

n2 Defendants reported a total revenue of $ 43.1 million for the fourth quarter.

i. Sony

In the fourth quarter of 1990, defendants recognized $ 1 million in revenue from Sony based on a letter from Sony stating that it was exercising an option to purchase a license. The letter, however, stated that Sony was "agreeing to discuss, in good faith, [*11] the details and schedule associated with the above option during the first quarter of 1991." The discussions over the licensing agreement appear to have taken place after the income was recognized. An agreement was executed in April 1991 and provided that Sony's obligation to pay was conditioned on its receipt of all deliverables. In May 1991, Sony still had not received all deliverables.

ii. NEC

In the fourth quarter of 1990, defendants recorded $ 250,000 in revenue from NEC based on a signed purchase order. That purchase order contained various contingencies, none of which had been satisfied when the revenue was recognized. In addition, plaintiffs provided evidence that suggests the actual agreement may have been finalized sometime in April 1991.

iii. Control Data

In the fourth quarter of 1990, defendants recognized $ 250,000 in revenue from Control Data. Plaintiffs provided evidence that suggests material terms of the licensing agreement were still being negotiated when defen-





dants recognized the revenue.

### iv. Olivetti

In the fourth quarter of 1990, defendants recognized $ 950,000 in revenue from Olivetti. According to defendants, a binding agreement in the form [*12] of a signed letter of intent existed when the revenue was recognized. However, plaintiffs have provided documentary evidence that suggests that a binding agreement may not have been executed until after the fourth quarter ended and that Olivetti may have signed a backdated agreement. It also appears that the deliverables were not shipped until February 19, 1991.

### v. Convex

In the fourth quarter of 1990, defendants recognized $ 450,000 in revenue from Convex based upon a December 28, 1990 agreement, which gave Convex the right to cancel and receive a full refund if MIPS failed to tape out the R4000 by December 31, 1991. There is evidence in the record that suggests the R4000 microprocessor was behind schedule. In addition, the deliverables had not yet been shipped when the revenue was recognized.

### b. The First Quarter of 1991

According to plaintiffs, in the first quarter of 1991, defendants recognized $ 8 million in revenue from NKK, NEC, and Wang, which had not yet been earned. n3 As a result, MIPS reported a $ 624,000 profit for the quarter. Had defendants not recognized the alleged unearned revenue, MIPS would have recorded a loss of more than $ 4.3 million.

n3 Apparently, for the first quarter of 1991, MIPS recognized about $ 43 million in total revenue.

[*13]

### i. NKK

In the first quarter of 1991, defendants recognized $ 5 million in revenue from NKK based upon an agreement which was subject to approval from the Japanese government. In addition, plaintiffs contend that this agreement was subject to another material contingency, which was set out in a "side letter," which stated that MIPS was required to ship deliverables by December 31, 1991. Defendants recognized the revenue before the deliverables were shipped and before the Japanese government provided its approval of the agreement.

### ii. NEC

In the first quarter of 1991, defendants recognized $

2.25 million in revenue from NEC based on a purchase order for the extension of an existing licensing agreement. The purchase order, however, indicated that NEC could not formally enter into an agreement at that time. Apparently, the parties may not have reached an agreement until June 26, 1991. The June 26, 1991 agreement provided that it was not effective until executed and the Japanese government's approval obtained.

### c. The Second Quarter for 1991

According to plaintiffs, in the second quarter of 1991, defendants improperly recognized $ 4.5 million revenue from Daewoo, NEC, and Tandem. [*14]

### i. NEC

In the second quarter of 1991, defendants recognized $ 2 million in revenue from NEC based upon a purchase order for a joint venture with NEC called the Advanced Computing Environment ("ACE") initiative. Plaintiffs, however, provided evidence that suggests that at the time the revenue was recognized, NEC and MIPS were just beginning to negotiate the terms of the licensing agreement. In fact, as will be discussed below, ACE had not yet been announced. Thus, there is a question as to whether ACE in fact existed when the revenue was recognized.

### ii. Daewoo

In the second quarter of 1991, defendants recognized $ 2 million in revenue from Daewoo based on an "agreement" which required the Korean government's approval before it could be considered binding. Plaintiffs' evidence shows that when the income was recognized, the terms of the licensing agreement were still being negotiated, and the Korean government had not yet approved the agreement. In fact, the approval was not obtained until the third quarter of 1991, and only after the Korean government sought various changes to the licensing agreement.

### iii. Tandem

In the second quarter of 1991, defendants recognized [*15] $ 600,000 in revenue from Tandem. Plaintiffs contend that a licensing agreement with Tandem was not binding when signed on June 30, 1991, because the agreement had not been finalized. Plaintiffs provided evidence that suggests drafts of the agreement were circulated as late as August and September 1991. An agreement was executed on October 1, 1991. In addition, it appears that Tandem did not execute a purchase order until November 6, 1991.

### 2. The Restructuring Reserve

Plaintiffs contend that MIPS' failure to record a re-



structuring charge of $ 25.5 million before June 30, 1991 violated GAAP. Plaintiffs' experts assert that defendants should have recorded the restructuring by the end of the second quarter of 1991, because at that time defendants knew a restructuring was necessary. In April 1991, MIPS and twenty other companies announced the formation of ACE, the Advanced Computing Environment initiative.

MIPS, however, waited until the third quarter of 1991 to record the restructuring charge. Apparently, defendants waited until then because MIPS had not yet made a formal decision to redirect its new product development around ACE. MIPS made this decision at the end of the second [*16] quarter of 1991. At that time, MIPS warned that a restructuring in the third quarter would be "significant" and would cause "a loss position for the third quarter and for total year 1991."

We fail to see why waiting to record the restructuring charge until the third quarter was unreasonable. In reviewing the whole record, we find nothing that suggests this accounting decision violated GAAP or any of MIPS' policies. Thus, we hold that the defendants' decision to record the restructuring in the third quarter rather than the second quarter is not actionable as a false or misleading statement.

### 3. Defendants' Forecasts

Plaintiffs contend that defendants' forecasts for the second and third quarters of 1991 were false or misleading. The district court rejected plaintiffs' contentions. The district court explained:

Plaintiffs . . . have pulled isolated statements out of context. The overall effect of defendants' statements was cautionary and could not be said to have misled the market. As one analyst wrote in June 1990, "MIPS has a complex business model that is still in the process of maturing . . . . This is not a stock for the fainthearted."

By this explanation, the district [*17] court is alluding to the "bespeaks caution" doctrine and the "truth-on-the-market" doctrine, both of which have been developed by the courts as affirmative defenses to immunize defendants from liability for false and misleading statements. See *WOW, 35 F.3d at 1413-15.* Before we consider these defenses, we must first determine whether defendants' forecasts are actionable as false or misleading statements.

A projection is a "factual" misstatement "if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Kaplan v. Rose, 49 F.3d 1363, 1375 (9th Cir. 1994)* (citing *In re Wells Fargo Securities*

*Litigation, 12 F.3d 922, 930 (9th Cir. 1993)* (emphasis added), cert. denied, *U.S.   , 115 S. Ct. 295 (1994)).* In this case, plaintiffs focus on various statements made during conference calls with analysts.

#### a. The 1991 Second Quarter Projections

In an April 25, 1991 conference call with market analysts, defendant Ludvigson, MIPS' chief financial officer ("CFO"), stated that MIPS expected technology revenues "to decline slightly [*18] from the Q1 levels" but expected "higher technology revenue performance . . . for the total year." Although Ludvigson cautioned that he "would be hesitant to put a total number on it," he suggested that MIPS' earnings for the second quarter would be similar to the $ 624,000 earnings reported for the first quarter. Specifically, Ludvigson stated that his "expectations for Q2 would be bottom line about Q1."

Plaintiffs' claim that these statements were false and misleading is based on a MIPS internal spread sheet which predicted a loss of 17 cents per share. The spread sheet was dated April 17, 1991, eight days before the conference call. The spread sheet showed that MIPS' internal forecasts projected a loss of $ 4,000,000 for the second quarter.

The district court, however, did not think that the internal spreadsheet raised a triable issue of material fact. As the district court explained:

Plaintiffs ignore all of the other documents and testimony that put the spread sheet in context. The spreadsheet was the starting point for the discussion at the April 22-23 quarterly business review, not the quarterly forecast. The entire purpose of the quarterly business review was to develop [*19] a forecast for the quarter, known as the "QBR commitment." The QBR commitment is consistent with the general guidance given during the April 25 conference call, was distributed shortly thereafter, and was presented to the board on May 15, as a second quarter forecast. There is no evidence that the spreadsheet was other than a preliminary worksheet and, as such, was not something that should have been disclosed to the public. Nor does it suggest, given the way it was prepared, that defendants were hiding adverse facts.

The district court is partially correct. There is no duty to disclose internal forecasts to the public. As this court has explained, "it is just good general business practice to make . . . projections for internal corporate use." *Convergent Technologies, 948 F.2d at 516* (quoting *Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1221 (9th Cir. 1980)).* But we also have recognized that a company has a duty to disclose to the public inter-


LEXIS·NEXIS
A member of the Reed Elsevier plc group


LEXIS·NEXIS
A member of the Reed Elsevier plc group


LEXIS·NEXIS
A member of the Reed Elsevier plc group

nal forecasts that "are made with reasonable certainty."
*Convergent Technologies, 948 F.2d at 516.* We further
have recognized that a company has a duty to disclose the
financial data and other material information upon which
an internal [*20] forecast is based. See *In re Verifone
Securities Litigation, 11 F.3d 865, 869 (9th Cir. 1993)*
("absent allegations that [the issuer] withheld financial
data or other existing facts from which forecasts are typ-
ically derived, the alleged omissions are not of material,
actual facts").

In this case, Ludvigson predicted a profit when MIPS
had information that the company would suffer a loss.
We found no evidence in the record that the defen-
dants disclosed to analysts the financial information upon
which the internal forecast was based. Further, accord-
ing to the deposition testimony of MIPS' employees,
the internal forecast represented "the best, most accu-
rate representation as of the time it was prepared of what
the company's financial results [would] be like for the
prospective quarter." Based on this evidence, we find
that plaintiffs have raised a genuine issue of material
fact as to whether defendants' projections for the second
quarter made during the April 25, 1991 conference call
were false or misleading.

b. The 1991 Third Quarter Projections

In a July 30, 1991 press release, MIPS announced that
it was going to take a "significant" restructuring charge
in the third quarter. [*21] In a conference call with
market analysts that same day, Ludvigson said that "the
restructuring charge would be significant enough to put
[MIPS] in a loss position for the third quarter and for
total year 1991." Ludvigson, however, represented that,
without the restructuring charge, the loss of revenue for
the third quarter would be small.

Plaintiffs contend that these statements were mislead-
ing because defendants knew that there would be a huge
loss without the restructuring charge. In fact, only five
days before the conference call, at the MIPS' Board of
Directors meeting, defendants predicted a loss of more
than $ 4.3 million without the restructuring charge.

The district court, however, rejected plaintiffs' evi-
dence and found "that MIPS' forecasts were not incon-
sistent with the financial information they had concern-
ing product and service revenue." Though not inconsis-
tent, we believe that a jury could reasonably find that
defendants' representation that the loss would be "small"
without the restructuring charge was false or misleading
given that the defendants were projecting a $ 3 million
loss without the restructuring charge.

4.   Defendants' Omissions About the R6000 [*22]
Line

Plaintiffs also allege that defendants failed to disclose
that MIPS was having serious technical problems with
its R6000 line. The district court, however, did not
find defendants' failure to disclose this information to
be misleading because the defendants had already dis-
closed that MIPS was having problems with its supplier.
Defendants identified sourcing and cost problems with
the R6000 line in their SEC Form 10-K and 10Q filings.

But a jury may find that such disclosures were not
sufficient. As we have explained:

There is a difference between knowing that any product-
in-development may run into a few snags, and knowing
that a particular product has already developed problems
so significant as to require months of delay.

*Convergent Technologies, 948 F.2d at 515, n.2* (citing
*Apple Computer, 886 F.2d at 1113-14).*

Here, plaintiffs have provided evidence suggesting the
R6000 line was experiencing more than simply sup-
ply problems. The R6000 line was plagued with de-
lays and performance problems so severe that MIPS
was losing orders and constantly cutting sales forecasts.
Defendants, however, continued to represent to analysts
that there was "pretty significant [*23] demand" and that
shipment levels would increase in the third quarter of
1991. Based on this evidence, we believe that a jury
could reasonably find that defendants' statements about
the R6000 line were false or misleading.

B. Reliance

Plaintiffs contend that defendants' alleged false and
misleading statements defrauded the market by causing
the price of MIPS' stock to be overvalued during the
class period in question. Thus, plaintiffs' case is based
on a "fraud on the market" theory. This court has rec-
ognized that where a "fraud on the market" is alleged,
plaintiffs are not required to "show that they themselves
actually relied on any particular misrepresentation or
omission." *Convergent Technologies, 948 F.2d at 512,
n.2* (citing *Apple Computer, 886 F.2d at 1113-14).* To
show reliance, plaintiffs simply must "show that they
relied on the integrity of the price of the stock as es-
tablished by the market, which in turn is influenced by
information or the lack of it." *Id.* Thus, in a "fraud on
the market" case, "an investor's reliance on the market
. . . is equivalent to reliance upon statements made
to the market, or the nondisclosure of material informa-
tion." *Id.* Defendants [*24] do not dispute plaintiffs'
allegations of reliance.

C. Materiality

In "a fraud on the market" case, a plaintiff must still

        

establish that the false or misleading statements are material. Materiality is established by "showing that a reasonable shareholder would consider the misrepresentation or omission important, because it altered the total mix of available information." *Kaplan, 49 F.3d at 1381* (quotations and citations omitted).

Defendants do not appear to dispute that the alleged false and misleading statements were material. Nor do we think that defendants can establish that the alleged false and misleading statements were not material as a matter of law. As we recently stated: "Whether an omission is 'material' is a determination that 'requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.'" *Fecht v. Price, 70 F.3d 1078, 1080 (9th Cir. 1995)* (quoting *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)).* Thus, only if materiality is "so obvious that reasonable minds [could] not differ" [*25] is summary judgment appropriate. *Id.* at 1081 (quotations and citations omitted). Based on the evidence in this case, we believe that a jury could reasonably find that defendants' allegedly false and misleading statements were material and affected the total mix of information upon which a reasonable investor would have relied.

D. Scienter

Generally, scienter should not be resolved by summary judgment. As we have explained:

Cases where intent is a primary issue generally are inappropriate for summary judgment unless all reasonable inferences that could be drawn from the evidence defeat the plaintiff's claim . . . . However, in opposing a motion for summary judgment the plaintiff must present significant probative evidence relevant to the issue of intent, e.g. the time, place or nature of the alleged fraudulent activities; mere conclusionary allegations are insufficient to require the motion for summary judgment be denied.

*Vaughn, 628 F.2d at 1220* (emphasis added). Thus, summary judgment on the scienter issue is appropriate only where "there is no rational basis in the record for concluding that any of the challenged statements was made with requisite [*26] scienter." *In re Software Toolworks, 38 F.3d 1078, 1088 (9th Cir. 1994)* (quotations and citations omitted).

To establish scienter, plaintiffs must show that defendants had "'a mental state embracing an intent to deceive, manipulate, or defraud.'" *WOW, 35 F.3d at 1424*

(quoting *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976)).* Plaintiffs can "establish scienter by proving either actual knowledge or recklessness." *Software Toolworks, 38 F.3d at 1088.* As we have explained, "reckless" conduct involves "'not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (quoting *Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir. 1990)* (en banc), cert. denied, *499 U.S. 976, 113 L. Ed. 2d 719, 111 S. Ct. 1621 (1991)).*

Scienter can be established by direct or circumstantial evidence. See *WOW, 35 F.3d at 1425.* Plaintiffs in this case do not have any direct evidence that defendants acted with scienter. Rather, plaintiffs contend that defendants' allegedly false [*27] and misleading statements, combined with the evidence of insider trading, is sufficient to raise a reasonable inference of scienter.

The district court, however, disagreed and held that summary judgment in favor of defendants was appropriate here because plaintiffs' evidence was insufficient to establish scienter. As the district court explained:

If plaintiffs' [sic] papers are stripped of their harsh rhetoric they illustrate, at most, a difference of opinion as to when revenue should have been recognized. The facts do not justify a reasonable inference of fraudulent intent.

Further, according to the district court, defendants' good faith is evidenced by the fact that defendants allowed their accountant to audit MIPS' revenue recognition practices in January 1991 and January 1992. Both audits found that MIPS' accounting practices complied with GAAP. In addition, as the district court noted, MIPS regularly consulted with their accountant each quarter to confirm that transactions were completed or sufficiently completed to allow the recognition of revenue. Thus, the district court found that MIPS' reliance on outside auditors was inconsistent with an intent to defraud.

At [*28] first glance, the district court appears to be correct. As we recently stated, "'the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.'" *Software Toolworks, 38 F.3d at 1089* (quoting *WOW, 35 F.3d at 1426).* But here defendants appear to have violated MIPS' own policies when recognizing revenue for certain transactions.

  

In addition, we agree with plaintiffs that the district court was wrong in resolving the factual disputes which exist as to the underlying transactions. Not only have plaintiffs provided documentary evidence that suggests that defendants may have recognized revenue before it was earned, they also provided expert testimony in support of their contentions. This evidence is sufficient to overcome summary judgment.

"As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case." *WOW, 35 F.3d at 1425* (citing *Apple Computer, 886 F.2d at 1116*). Here, plaintiffs' two experts have explained in great detail how defendants' recognition of revenue for various transactions violated GAAP and MIPS' own internal policy for recognizing revenue. [*29] See *In re GlenFed, Inc. Securities Litigation, 42 F.3d 1541, 1549 (9th Cir. 1994)* (stating that under Rule 9(b) a plaintiff must "explain[ ] why the difference . . . is not merely the difference between two permissible judgments").

Defendants, however, assert that our WOW decision compels an affirmance in this case. In Wow, the court held that plaintiffs' expert testimony was insufficient to raise a reasonable inference of scienter. *35 F.3d at 1425-1426.* As the court explained, "an expert's conclusory allegations that a defendant acted with scienter are insufficient to defeat summary judgment where the record clearly rebuts any inference of bad faith." *Id. at 1426.*

But WOW is distinguishable. In WOW, defendants provided unrebutted evidence showing that their accountants had full knowledge of the disputed transactions. *35 F.3d at 1426.* Here, there is evidence suggesting defendants failed to disclose material information to their accountant. If it is true that defendants withheld material information from their accountants, defendants will not be able to rely on their accountant's advice as proof of good faith. See *C.E. Carlson, Inc. v. SEC, 859 F.2d [*30] 1429, 1436 (10th Cir. 1988)* (stating that full disclosure to professional must be established to support the defense of reliance on expert opinion).

Plaintiffs also point to defendants' stock sales during the class period as evidence of defendants' bad faith. We have held that "insider trading in suspicious amounts or at suspicious times is probative of scienter." *Apple Computer, 886 F.2d at 1117.* We, however, also have recognized that "credible and wholly innocent explanations for stock sales, ranging from long-standing programs of periodic divestment, to the need to free cash to meet matured tax liabilities, [if]

. . . unrebutted . . . are sufficient to defeat any inference of bad faith." Id. (emphasis added).

According to plaintiffs, the individual defendants and other corporate insiders sold over $ 8.8 million of their individual holdings during the class period. The district court, however, found that "neither the time nor the amount of the sales support a finding of scienter and are consistent with defendants' innocent explanations." We agree that this observation applies to some defendants but not as to other defendants.

The district court incorrectly concluded [*31] that the sales of stock by Miller and Boesenberg did not support a finding of scienter. There is evidence that Miller, MIPS' chairman and CEO, and Boesenberg, MIPS' president, traded their stock in large amounts at sensitive times. Miller sold about 20% of his stock for $ 1,340,000. Boesenberg sold about 90,000 shares during the class period - almost six times more stock than he had sold during the twelve months preceding the class period - for $ 1,479,650. Both Miller and Boesenberg sold their stock shortly after the April 25, 1991 conference call but before the $ 4 million loss and the restructuring charge were disclosed to the public.

However, we believe the district court was correct in granting summary judgment in favor of defendants Bennion and Jobe. Bennion, MIPS' vice president and treasurer, and Jobe, MIPS' president of the technology group, provided unrebutted evidence that they sold their stock for innocent reasons. Apparently, Bennion sold some shares to purchase a new home and sold the remainder of his stock when he resigned. Jobe also sold his shares to buy a new home. Jobe sold more stock before the class period than during it.

Whether defendant Ludvigson, MIPS' CFO, [*32] was entitled to summary judgment presents a more difficult question. Although Ludvigson sold only 3,265 shares during the class period, Ludvigson made many of the allegedly false and misleading statements to the analysts during the April 25, 1991 and July 31, 1991 conference calls. In addition, Ludvigson was personally involved in and approved each decision to record revenue for the licensing agreements entered into during the class period. Thus, even though we find that Ludvigson's stock sales were too minimal to suggest insider trading, we still believe a genuine issue of material fact exists as to whether Ludvigson acted with scienter. See *Software Toolworks, 38 F.3d at 1089* (holding that evidence that defendants participated in the drafting of documents containing false projections and that defendants knew or should have known of alleged fraud in quarterly financial statements was sufficient to defeat summary judgment on scienter issue).

E. Causation





Defendants assert that the district court's grant of summary judgment can be affirmed on a separate ground, namely that plaintiffs failed to establish "loss causation" or proximate cause. The district court rejected the "loss [*33] causation" defense in this case. We agree with that decision.

"Loss causation" is a defense for which defendants have a "heavy" burden of proof. *WOW, 35 F.3d at 1422.* To establish a "loss causation" defense at the summary judgment stage, the defendants must prove, as a matter of law, that the depreciation of the value of MIPS' stock resulted from factors other than the alleged false and misleading statements. *WOW, 35 F.3d at 1422.* Defendants have not provided enough evidence to establish as a matter of law that they are entitled to a "loss causation" defense.

Plaintiffs can establish "loss causation" by simply alleging that the false and misleading statements "'touch[ ] upon the reasons for the investment's decline in value.'" Id. (quoting *McGonigle, 968 F.2d at 821*). Plaintiffs allege that the stock price was overvalued during the class period because defendants recognized revenue before it was earned and because defendants failed to disclose material information about MIPS. Plaintiffs correctly allege that soon after this information was disclosed, the price of the stock fell. Plaintiffs introduced expert testimony to establish that MIPS' revenue recognition practices [*34] "touched upon" the alleged overvalued price of the stock and that the public disclosures of the company also "touched upon" the fall in the price of the MIPS stock. Given the record before us, we believe the district court was correct in refusing to grant summary judgment on the "loss causation" defense.

### F. Affirmative Defenses

The district court found that defendants' cautionary statements undercut an inference of scienter. As the district court explained: "A review of the analysts statements on MIPS through the class period show that the outlook for MIPS reflected in the market was far from overly optimistic." But as suggested above, the district court appears to have merged the "bespeaks caution" doctrine with the "truth-on-the-market" doctrine. These doctrines represent distinct affirmative defenses. In this appeal, the defendants argue that these doctrines provide separate grounds for affirming the district court's grant of summary judgment. We disagree.

#### 1. The "Truth-on-the-Market" Defense

In a "fraud on the market" case "an omission is materially misleading only if the information has not already entered the market." *Convergent Technologies, 948 F.2d at 513* (citing [*35] *Apple Computer, 886 F.2d*

*at 1114*). As we have explained, "if the market has become aware of the allegedly concealed information, 'the facts allegedly omitted by the defendant would already be reflected in the stock's price' and the market 'will not be misled.'" Id. However, before the "truth-on-the-market" defense can be applied, the defendants must prove that the information that was withheld or misrepresented was "'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations.'" *Kaplan, 49 F.3d at 1376* (quoting *Apple, 886 F.2d at 1116*).

The defendants bear a heavy burden of proof. Summary judgment is proper only if they show that "no rational jury could find" that the market was misled. *Kaplan, 49 F.3d at 1376.* If "the evidence presents a sufficient disagreement to require submission to the jury," summary judgment should be denied. Id.

Here, defendants claim that information about the risky nature of MIPS' stock entered the market. In support of their position, defendants submitted 31 analyst reports and articles. According to defendants' [*36] evidence, as early as October 1990, one analyst rated the stock as "SELL." Another analyst, on February 13, 1991, recommended that MIPS be "avoided" because "technology revenues are only partially predictable."

We do not think that these reports "effectively counterbalanced" defendants' false and misleading statements. *Kaplan, 49 F.3d at 1376.* There is no mention in the reports of defendants' allegedly improper revenue recognition practices, negative forecasts, or sales decline with the R6000 line. Most of the analysts link MIPS' riskiness with the "unusual" business model n4 adopted by MIPS and the unsuccessfulness of alliances like ACE. In these circumstances, we cannot say as a matter of law that defendants have established the "truth-on-the-market" defense.

---

n4 Under its business model, MIPS designs workstations for its microprocessors and licenses its microprocessor design to larger corporations, who develop their own computer products and workstations that compete with MIPS.

---

#### 2. The "Bespeaks Caution" [*37] Defense

In granting summary judgment in this case, the district court also held that the "overall effect of defendants' [April 25 and July 31, 1991] statements was cautionary and could not be said to have misled the market." We disagree.





LEXIS·NEXIS®
A member of the Reed Elsevier plc group

Summary judgment based on the "bespeaks caution" doctrine is only appropriate "when reasonable minds could not disagree as to whether the mix of information in the document is misleading." *Fecht, 70 F.3d at 1082* (emphasis added). As we have explained:

The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.

*WOW, 35 F.3d at 1413* (quotations and citations omitted).

But as we have recognized, the "bespeaks caution" doctrine is not new but a reformulation of two fundamental concepts in securities fraud law: reliance and materiality. *WOW, 35 F.3d at 1414.* "To put it another way, the 'bespeaks caution' doctrine reflects [*38] the unremarkable proposition that statements must be analyzed in context." Id. (citations and quotations omitted).

Thus, to determine whether the "bespeaks caution" doctrine immunizes defendants' allegedly false and misleading statements, we must analyze what, if any, cautionary statements defendants made. The cautionary statements must be "precise" and "directly address[ ] . . . the [defendants'] future projections." *WOW, 35 F.3d at 1414* (quotations and citations omitted). "Blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim." Id.

In this case, the alleged cautionary statements appear to be too general to trigger the "bespeaks caution" doctrine. For example, when MIPS reported its loss in the fourth quarter of 1990, MIPS warned that it "lacked visibility and . . . [was] living in an uncertain economic environment so . . . [it was] approaching the next six months with a very conservative outlook and conservative management posture." MIPS predicted that its technology licensing fees would "remain fairly flat on a year to year basis." MIPS, however, did not disclose to the market that [*39] it was recognizing revenue before the terms of certain contracts had been negotiated, before the deliverables were shipped, and before certain contingencies were satisfied. In fact, the opposite is true. Defendants represented in its Form 10-K that "technology revenue is recognized upon the completion of contract requirements."

Defendants also contend that Ludvigson made cautionary statements during the April 25 and July 31, 1991 conference calls. Ludvigson's statements, however, were too general to trigger the "bespeaks caution" doctrine. Ludvigson simply stated that second quarter technology revenue was expected to "decline," that gross margin would be "flat to slightly down," and that technology revenue for 1991 "looked a lot like last year" but "he would be hesitant to put a total number on loss of revenue." Although these statements referred to MIPS' projections, there is no evidence that defendants disclosed the information that was relied upon to arrive at the internal forecast of a $ 4 million loss. If anything, Ludvigson's "cautionary" statements led the analysts to believe that the second quarter earnings would be similar to the first quarter earnings.

III. Costs [*40]

The plaintiffs also appeal the district court's order awarding costs to defendants. Because we have reversed in part the district court's grant of summary judgment, we find that plaintiffs' appeal of the district court's order awarding costs is now moot.

CONCLUSION

As set forth above, we affirm the grant of summary judgment in favor of defendants Bennion and Jobe and reverse the grant of summary judgment in favor of defendants MIPS, Boesenberg, Miller, and Ludvigson. Because of this ruling, we find plaintiff's appeal of the district court's award of costs to be moot. Each side shall bear its own costs on appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

