ORIGINAL

1 | ROBERT T. HASLAM (Bar No. 071134)
ROBERT B. HAWK (Bar No. 118054)
2 | ROBERT D. FRAM (Bar No. 126750)
HELLER EHRMAN WHITE & McAULIFFE
3 | 525 University Avenue, Suite 1100
Palo Alto, California 94301-1900
4 | Telephone: (415) 324-7000

5 | JAMES R. BUSSELLE (Bar No. 75980)
TOMLINSON ZISKO MOROSOLI & MASER
6 | 200 Page Mill Road, Second Floor
Palo Alto, California 94306
7 | Telephone: (415) 325-8666

8 | Attorneys for Plaintiff, Counterclaim-
Defendant, and Counterclaimant
9 | RSA DATA SECURITY, INC.

FILED
SEP 27  2 10 PM '96
RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

214

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA    C-94-20512-SW

RSA DATA SECURITY, INC., a Delaware corporation,

    Plaintiff,

v.

CYLINK CORPORATION, a California corporation, CARO-KANN CORPORATION, a California corporation, and THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY, a California corporation,

    Defendants.

AND RELATED COUNTERCLAIMS.

Case No. C96-20094-SW

**NOTICE OF MOTION, MOTION, AND MEMORANDUM IN SUPPORT OF RSA DATA SECURITY, INC.'S MOTION TO EXCLUDE DEFENDANTS' SURPRISE WITNESSES**

The Hon. Spencer Williams

Hearing: Oct. 1, 1996

PLEASE TAKE NOTICE THAT, pursuant to Local Rule 7-11 Plaintiff, Counterclaim-Defendant, and Counterclaimant RSA Data Security, Inc. ("RSA") hereby moves *ex parte* for an order barring Defendants from calling any witnesses at the *Markman* hearing. RSA further moves for an order barring Defendants from offering the testimony of Dr. Hellman on any topic, including the meaning of the terms of the claims of the patents in suit.

Notwithstanding a Court ordered date for expert witness designation, a Rule 30(b)(6) deposition request on the subject of claim construction, and, finally, repeated inquiries from RSA, Defendants have refused to identify the witnesses that they intend to call at the *Markman* hearing (or indeed state whether they intend to call any such witnesses at all).[1] Defendants' consistent refusal -- including their refusal to designate witnesses under the Court's deadline and under the Federal Rules -- precludes them from calling witnesses to give surprise testimony at the hearing.

Defendants have suggested that they *might* call Dr. Hellman, one of the inventors, but have refused to confirm that they will in fact do so. Fram Decl. ¶ 4. The *Markman* Court itself, however, admonished that "[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995) (en banc)

---

[1] The one witness that Defendants did positively identify, Mr. Aldo Test, the attorney that prosecuted the patents in suit, has been withdrawn by stipulation. See the Consolidated Declaration of Robert D. Fram in Support of RSA's Motion to Exclude Defendants' Surprise Witnesses ("Fram Decl.") and in Opposition to Defendants' Motion to Strike.

*aff'd.*, 116 S. Ct. 1384 (1996). RSA therefore further moves for an order barring Dr. Hellman's testimony.

## I. DEFENDANTS' REFUSAL TO IDENTIFY WITNESSES PRECLUDES THEM FROM CALLING WITNESSES TO PROVIDE SURPRISE TESTIMONY AT THE *MARKMAN* HEARING.

In setting the schedule for the *Markman* hearing, this Court set certain clear disclosure dates. In particular, it set August 30 as the date to designate expert witnesses. Fram Decl. Ex. 1. Defendants, however, designated no expert witnesses on that date.[2]

Faced with the absence of any expert designations, RSA then served 30(b)(6) deposition notices on Defendants on the subject of claim interpretation and/or claim construction. Fram Decl. ¶ 3, Ex. 2. Defendants refused to designate a single witness in response. Fram Decl. Ex. 3.

Noting that Defendants had failed to designate any witnesses, RSA then repeatedly asked Defendants whether they intended to call any witnesses at the hearing. Fram Decl. ¶ 4. RSA thereby went the extra mile in attempting to confirm Defendants' witness list. Defendants nonetheless refused to confirm a single witness. *Id.*

Defendants' refusal to designate an expert witness clearly precludes them from calling any witness to provide, in whole or in part, any expert testimony. *See* FRCP 37(c)(1) (providing that a failure to make a disclosure required by the rules, including the disclosure of experts, shall bar a party from calling such witnesses at a hearing). And Defendants' refusal to designate any witnesses

---

2  By contrast, RSA designated its experts and their depositions were duly taken.

at all in response to RSA's Rule 30(b)(6) deposition notices, on any topic pertaining to claim construction, bars them from calling any fact witness at the *Markman* hearing.

Defendants are clearly attempting to engage in a *Markman*-hearing-by-ambush. Such surprise tactics violate both the letter and spirit of the Federal Rules. RSA therefore respectfully requests that the Court enter the attached proposed Order, barring Defendants from calling any witnesses at the *Markman* hearing.

## II. DEFENDANTS SHOULD BE BARRED FROM ATTEMPTING TO INTRODUCE EVIDENCE OF SUBJECTIVE INVENTOR INTENT.

While refusing to confirm that they will call a single witness at the *Markman* hearing, Defendants have stated that they "might" call Dr. Hellman as a witness. Fram Decl. ¶ 4. But the combination of Defendants' failure to designate Dr. Hellman as an expert, combined with the Federal Circuit's ban on testimony of subjective inventor intent, makes plain that there is no legitimate topic on which Dr. Hellman can testify at the hearing.

Defendants suggest that inventor testimony may be appropriate to determine the "the use of terms in the relevant field of art." Defendants' *Markman* Brief at 1:22-24. Such testimony, however, is clearly the stuff of expert opinion, for only an expert can opine as to how those in the art use or do not use a particular term.[3]

---

[3] While some opinions do loosely discuss "inventor or expert" testimony on the meaning of terms in the art, see, e.g., *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996), nothing in those opinions suggests that inventors are immune from the Federal Rules of Evidence and applicable rules or orders on expert disclosure and may therefore offer surprise "expert" opinions.

1         Defendants resolutely refused to designate anyone, including any of the inventors, as an expert. Fram Decl. ¶ 3, Ex. 3. They also refused to designate anyone, including Dr. Hellman, on the topic of claim construction in response to RSA's Rule 30(b)(6) deposition notice on the subject. Fram Decl. ¶ 4. They cannot somehow evade the consequences of that decision by now pretending that Dr. Hellman, as an "inventor", is immune from the normal rules of disclosure.

        To the degree that Defendants do not seek to call Dr. Hellman as an "expert" on the meaning of terms in the art, his testimony is no more than a reflection of his subjective understanding of the meaning of the claims. Such testimony, however, has no place at a *Markman* hearing. As the *Markman* Court itself clearly stated:

> No inquiry as to the subjective intent of the applicant or PTO is appropriate or even possible in the context of patent infringement suit. **The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim** (except as documented in the prosecution history) (emphasis added).

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995) (en banc), *aff'd*, 116 S. Ct. 1384 (1996). This pronouncement was hardly dicta, for in the *Markman* case itself the Court rejected any reliance on the inventor's testimony in support of a broad construction of the term "inventory" -- the pivotal issue in that case -- stating that such testimony was entitled to no deference. 52 F.3d at 983. This principle was reaffirmed by the Federal Circuit as recently as this week. *See Engel Industries, Inc. v. Lockformer Co.*, 1996 WL 540097 (Fed. Cir. Sept. 25, 1996) (attached hereto as Exhibit A) (stating that the inventor's "subjective intent

1  is of little or no probative weight in determining the scope of the
2  claims . . .") (citing *Markman*).
3      There is similarly no basis for admitting Dr. Hellman's
4  subjective thoughts on whether the claims of the '582 patent were
5  "intended" to be subjected to 35 U.S.C. § 112 ¶ 6.  The analysis of
6  whether a claim is to be construed subject to § 112 ¶ 6 is like any
7  other claim construction issue and subject to the same prohibition
8  on subjective inventor testimony.
9      Nor does *Greenberg v. Ethicon Endo-Surgery*, 91 F.3d 1580
10 (Fed. Cir. 1996) suggests a different rule.  While the *Greenberg*
11 court did state that the claim language at issue was not "intended"
12 to invoke § 112 ¶ 6, it did so based on its reading of the claim
13 language, the specification, and evidence regarding the meaning of
14 certain terms in the art.  91 F.3d at 1883-84.  Nowhere did the
15 *Greenberg* court look to inventor testimony regarding the inventors'
16 own understanding of the claim language to determine whether the
17 claim was subject to 35 U.S.C. § 112 ¶ 6.

## CONCLUSION

19      For the reasons set forth above, RSA respectfully requests
20 that the Court enter the proposed Order barring Defendants from
21 calling any witnesses at the *Markman* hearing and from calling Dr.
22 Hellman in particular.

24 Dated:  Sept. 27, 1996          HELLER EHRMAN WHITE & McAULIFFE

                                   By: /s/ Robert D. Fram
                                        Robert D. Fram

                                   Attorneys for Plaintiff, Counterclaim-
                                   Defendant, and Counterclaimant RSA
                                   DATA SECURITY, INC.

--- F.3d ----  
(Cite as: 1996 WL 540097 (Fed.Cir.(Mo.)))

Page 1

**ENGEL INDUSTRIES, INC., Plaintiff-Appellant,**  
v.  
**THE LOCKFORMER COMPANY, Iowa Precision Industries, Inc. and Met-Coil Systems Corp., Defendants-Appellees.**

No. 95-1182.

United States Court of Appeals,  
Federal Circuit.

Sept. 25, 1996.

Appealed from: U.S. District Court for the Eastern District of Missouri

Melvin L. Moser, Gorr, Moser, Dell & Loughney, of Pittsburgh, Pennsylvania, argued for plaintiff-appellant. With him on the brief was Jerome A. Gross, Jerome A. Gross & Associates, of St. Louis, Missouri.

Clarence J. Fleming, Jones, Day, Reavis & Pogue, of Chicago, Illinois, argued for defendants-appellees.

Before RICH, MAYER, and BRYSON, Circuit Judges.

RICH, Circuit Judge.

*1 Engel Industries, Inc. (Engel) appeals from a judgment of the U.S. District Court for the Eastern District of Missouri holding that Engel's Transverse Duct Flange (TDF) system infringes Met-Coil Systems Corporation's (Met-Coil's) U.S. Patent No. 4,466,641 ('641 patent) under the doctrine of equivalents and that Engel must continue to make royalty payments to Met-Coil under the license agreement between Engel and Met-Coil, which the district court held to be not unlawful. Engel Indus. v. The Lockformer Co., No. 86-0212 C(4) (E.D. Mo. filed 15 December 1994). We affirm-in-part and reverse-in-part.

I  
BACKGROUND

The '641 patent issued 21 August 1984 and is entitled, "Duct Connecting System." The patent includes both apparatus and method claims directed toward a system for connecting the ends of sheet metal duct sections. Fig. 1 is a plane view of a duct blank used to make a duct section, before it has been roll-formed into a ready-to-assemble shape. When a roll-forming machine folds a blank into a duct section using

TABULAR OR GRAPHIC MATERIAL SET AT  
THIS POINT IS NOT DISPLAYABLE

the patented method, it simultaneously creates an integral frame at each duct section end. These frames define flanges that are configured to accept corner pieces, one of which is depicted in Fig. 2. A worker connects two duct sections together by snapping

TABULAR OR GRAPHIC MATERIAL SET AT  
THIS POINT IS NOT DISPLAYABLE

four corner pieces into place in each section's frame and bolting the opposing corner pieces of adjacent duct sections together. Fig. 3 depicts a fragmentary perspective view of a duct assembly according to the '641 patent. An enlarged, fragmentary,

TABULAR OR GRAPHIC MATERIAL SET AT  
THIS POINT IS NOT DISPLAYABLE

cross-sectional view of a duct joint taken on line 2-2 of Fig. 3 is depicted in Fig. 4.

TABULAR OR GRAPHIC MATERIAL SET AT  
THIS POINT IS NOT DISPLAYABLE

The defendants-appellees are Met-Coil, The Lockformer Company (Lockformer), and Iowa Precision Industries, Inc. (IPI). Met-Coil is the present assignee of the '641 patent. Lockformer currently is a wholly-owned subsidiary of Met-Coil and sells three out of every four roll-forming machines sold in the heating, ventilating, and air conditioning (HVAC) industry in the United States. IPI is also currently a wholly-owned subsidiary of Met-Coil and manufactures and sells corner pieces and other items.

Plaintiff-appellant Engel manufactures roll-forming machines for the HVAC industry in competition with Met-Coil. A fragmentary, cross-sectional view of one-half of a duct joint of Engel's

Copr. © West 1996 No claim to orig. U.S. govt. works

--- F.3d ----  
(Cite as: 1996 WL 540097, *3 (Fed.Cir.(Mo.)))

Page  3

magistrate judge entered a judgment that the license agreement was lawful and that Met-Coil had not breached it.

Engel now seeks review of both the holding that its TDF system infringes the '641 patent under the doctrine of equivalents and the holding that the license agreement is not unlawful. Met-Coil asserts that Engel also literally infringes its '641 patent. We first address whether Engel's TDF system infringes any of independent claims 1, 7, 14, or 20 of the '641 patent, either literally or under the doctrine of equivalents. The parties agree that claim 13, the only other independent claim, is not at issue. Dependent claims 2-6, 8-12, 15-19, and 21-25 are of no importance to this appeal since, as discussed below, it is in independent claims 1, 7, 14, and 20 that the significant limitations appear. See Atlanta Motoring Accessories, Inc. v. Saratoga Technologies, Inc., 33 F.3d 1362, 1364, 31 USPQ2d 1929, 1930 (Fed.Cir.1994). Then, we consider the license agreement. We note that the parties currently have a related case pending in Iowa that may be directly affected by our decision in the instant appeal.

II  
INFRINGEMENT

Analysis of patent infringement involves two steps: (1) claim construction to determine what the claims cover, i.e., their scope, followed by (2) determination of whether the properly construed claims encompass the accused structure. On appeal after a bench trial, we review step (1) de novo and step (2) for clear error. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 976, 34 USPQ2d 1321, 1326 (Fed.Cir.) (in banc), aff'd, --- U.S. ----, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996).

A. Claim Construction

Claims 1 and 14 of the '641 patent are apparatus claims. Claim 1 provides as follows (emphasis ours, bracketed material added, including reference numerals from the above figures):

1. In a system for connecting the ends [18, 20] of sheet metal ducts wherein a frame [at least the combination of 22 and 24] is provided for each duct end [18, 20], corner connectors [34] defining perpendicularly extending arms are associated with the frames, and means [40] are provided to interconnect the frames of adjacent duct ends [18, 20], the improvement wherein the sheet metal used for the ducts is also employed for forming said frames, each said frame specifically comprising a roll-formed section consisting of an integral part of a duct wall, each said section comprising a first portion [22] extending perpendicularly outwardly from a duct wall [10], and a second portion [24] bent rearwardly into a position opposite an end portion of the duct wall, the distance between said second portion [24] and said end portion substantially corresponding to the width of an arm of a corner connector, the side edges [36, 38] of each such arm being received in engagement with the respective surfaces of a [sic, said] second portion [24] and end portion whereby the corner connectors [34] are held in position relative to a [sic, said] frame, and including retainer means [30] defined by said second portion [24] for receiving a side edge of an arm for thereby securely holding the arm in position.

*4 Claim 14 is similar to claim 1, but also includes as a limitation the channel 32 (see Fig. 4) formed in the end portion of the duct wall 10 for receiving the side edge 36 of an arm of a corner connector.

Claims 7 and 20 of the '641 patent are method claims. Claim 7 provides as follows (emphasis ours, bracketed material added, including reference numerals from the above figures):

7. In a method for connecting the ends [18, 20] of sheet metal ducts wherein a frame [at least the combination of 22 and 24] is provided for each duct end [18, 20], corner connectors [34] defining perpendicularly extending arms are associated with the frames, and means [40] are provided to interconnect the frames of adjacent duct ends [18, 20], the improvement comprising the steps of forming each said frame by roll-forming a section of the duct whereby the frame comprises an integral part of the sheet metal duct, each said roll-formed section comprising a first portion [22] extending perpendicularly outwardly from a duct wall [10], and a second portion [24] bent rearwardly into a position opposite an end portion of the duct wall, the distance between said second portion [24] and said end portion substantially corresponding to the width of an arm of a corner connector, forming a retainer means [30] in said second portion, introducing the arms of the corner connectors between respective second portions and

Copr. © West 1996 No claim to orig. U.S. govt. works

TDF system is depicted in Fig. 5. This figure shows the integral flange at the end of a duct section with its associated corner piece in place.

TABULAR OR GRAPHIC MATERIAL SET AT
THIS POINT IS NOT DISPLAYABLE

In September of 1984, shortly after the '641 patent issued, Lockformer, its initial assignee, threatened to sue Engel's customers for infringement. Although Engel asserts that it was not infringing the '641 patent, it nevertheless signed a license agreement dated 30 January 1985. In late 1985 Engel and Met-Coil met to discuss and renegotiate the license agreement based on Met-Coil's alleged failure to prosecute infringing third parties as paragraph 5.1 of the agreement required. At that time Engel also challenged the validity of the '641 patent based on some European prior art. Met-Coil ignored Engel's validity challenge, refused to renegotiate a lesser royalty for Engel, and continued to require royalty payments under the license agreement.

*2 On 28 January 1986, Engel filed this lawsuit seeking a declaratory judgment of invalidity and noninfringement of the '641 patent. Engel also asked that Met-Coil return the royalties collected by Met-Coil under the agreement, arguing that it was void because the '641 patent was invalid or, in the alternative, that Met-Coil had breached paragraph 5.1 of the agreement by not fulfilling its duty to prosecute other allegedly infringing parties or paragraph 5.2 for failure to renegotiate the terms of the license agreement. Engel also sought damages from Met-Coil based upon various alleged antitrust violations. Met-Coil denied Engel's claims and counterclaimed, seeking a declaratory judgment that the '641 patent was not invalid. Met-Coil also requested a finding that, absent the license agreement, Engel would be infringing the '641 patent and that royalty payments were to continue according to the terms of the license agreement. Engel denied Met-Coil's infringement claims and asserted a patent misuse defense.

After a three-day bench trial beginning 30 May 1989, Judge Cahill issued a Memorandum and Order on 13 July 1990 (the 1990 Order). Judge Cahill held the '641 patent "invalid for failure to comply with the best mode rule and for inequitable conduct by defendants for concealing the best mode." He also held, inter alia, that the license agreement was invalid based upon the invalidity of the patent and the inequitable conduct. The district court ordered Met-Coil to repay Engel $227,935 in royalties, paid between the filing of the complaint and April, 1989, and held that Engel was not obligated to make future royalty payments.

Met-Coil, Lockformer, and IPI (collectively Met-Coil) appealed the 1990 Order to this court, Engel Indus. v. The Lockformer Co., 946 F.2d 1528, 20 USPQ2d 1300 (Fed.Cir.1991) [hereinafter Engel I]. In Engel I, another panel of this court reversed and remanded, holding that the '641 patent was not invalid for failure to comply with the best mode requirement and that no inequitable conduct had occurred. Neither the 1990 Order nor the Engel I opinion addresses whether Engel's TDF system infringes the '641 patent.

Still without addressing infringement, the district court, on remand, entered a series of orders that culminated in a 15 April 1993 judgment in favor of Met-Coil (the 1993 Judgment). Engel subsequently attempted to get a ruling on infringement by filing a motion to alter or amend the 1993 Judgment and for trial before a magistrate judge of undetermined issues. When the district court denied its motion, Engel again appealed to this court, Engel Indus. v. The Lockformer Co., 22 F.3d 1105 (Table), No. 93-1418, 1994 WL 89036 (Fed.Cir.18 March 1994) [hereinafter Engel II]. In a non-precedential opinion, the Engel I panel held in Engel II that the district court had erred as a matter of law in refusing to rule on the question of infringement and in failing to make any findings of fact or conclusions of law on the issues that are the subject of the present appeal. The Engel II panel vacated the district court's order denying Engel's motion to alter or amend the 1993 Judgment, and remanded for the district court to adjudicate issues of infringement, royalties, and breach of the license agreement, and for making findings and conclusions. [FN1]

*3 The district court subsequently entered its 21 July 1994 findings and conclusions on infringement. It held that Engel's TDF system infringes the '641 patent only under the doctrine of equivalents. Then, with the parties' consent, the issues of breach and validity of the license agreement were tried to a magistrate judge, who issued supplemental findings and conclusions on 15 December 1994. The

end portions whereby the side edges [36, 38] of each such arm are received in engagement with the respective surfaces of a[sic] said second portion [24] and end portion to hold the corner connectors [34] in position relative to a [sic, said] frame, said retainer means [30] assisting in the holding by said second portion, and thereafter fastening the respective connectors together to provide an assembly.

Claim 20 is similar to claim 7, but also includes as a limitation "a third portion opposite said second portion" for receiving the side edge 36 of an arm of a corner connector. The third portion is apparently the channel 32 formed in the end portion of the duct wall 10 as may be seen in Fig. 4 above.

1. The "Second Portion"

Met-Coil asserts that the second portion 24 (see Fig. 4) includes the return portion 26. We cannot agree since this assertion contradicts the plain language of the '641 patent. For example, the patent states, "A second portion 24 is bent rearwardly whereby this portion 24 extends opposite a portion of the duct wall. A return portion 26 is also provided...." Since a return portion is "also provided," they logically cannot be one and the same. The metal joining 24 to 26 is described as a bead 28. Also, the second portion 24 is described in several places in the '641 patent as "bent rearwardly" in a direction opposite the end of the duct wall. On the other hand, the return portion 26 is clearly bent forwardly to extend in the same direction as the end of the duct wall.

The second portion also defines the claimed retainer means 30. Although the specification describes the inclusion of the retainer means 30 as a preferred form of the invention, during prosecution, the applicants were required to claim this feature to overcome prior art rejections. In their accompanying remarks, the applicants stated that the rejected claims had been amended to make "specific reference to the presence of retainer means defined by the second portion of the roll-formed section of [applicants'] frame." "Prosecution history is especially important when the invention involves a crowded art field, or when there is particular prior art that the applicant is trying to distinguish." Lemelson v. General Motors, Inc., 968 F.2d 1202, 1206, 23 USPQ2d 1284, 1287-88 (Fed.Cir.1992). Several prior art references were cited during prosecution, and it is clear that this art field is crowded. The prior art depicts the use of integral flanges and corner connectors. It also depicts crimping the flanges to hold the corner connectors in place. The prior art does not, however, depict a means formed as part of the flanges for retaining the corner connectors absent some crimping or fastening step. Therefore, the retainer means 30 defined by the second portion 24 for receiving a side edge of an arm of a corner connector is an important claim limitation that the applicants added to distinguish their claimed invention over the prior art.

*5 For these and other reasons, we first conclude that the claimed second portion 24 is separate and distinct from the return portion 26. We also conclude that when properly construed, the claims of the '641 patent require that the distance between the second portion and the end portion of the duct wall must substantially correspond to the width of an arm of a corner connector. Finally, we conclude that the claimed retainer means 30 defined by the second portion 24 for receiving a side edge of an arm of a corner connector is an important feature of the second portion and an important claim limitation.

2. The "Return Portion"

Engel argues that the '641 patent does not disclose or claim systems wherein the return portion is rolled to the inside (compare Fig. 4 above, depicting part of the patented duct connecting system, having its return portion 26 rolled outside, with Fig. 5 above, depicting part of Engel's accused system, having its return portion 26 rolled inside) as originally contemplated by named inventor McElroy. McElroy admitted that he was surprised to learn for the first time during the litigation that the '641 patent did not disclose or claim rolling the return portion to the inside, but his subjective intent is of little or no probative weight in determining the scope of the claims, except as documented in the prosecution history. Markman v. Westview Instruments, Inc., 52 F.3d 967, 985, 34 USPQ2d 1321, 1334-35 (Fed.Cir.1996) (in banc), aff'd, --- U.S. ----, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). In accord with our above interpretation of the "second portion," we conclude that in the patented system, the arms of the corners do not come into contact with the return portion because the return portion is roll-formed to the

Copr. © West 1996 No claim to orig. U.S. govt. works

outside. The arms only contact the second portion.

B. Literal Infringement

Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly. Johnston v. IVAC Corp., 885 F.2d 1574, 1580, 12 USPQ2d 1382, 1384 (Fed.Cir.1989) (citing cases). Whether the properly construed claims in issue read on the devices accused of infringing is a question of fact, which we review for clear error. Hilton Davis Chem. Co. v. Warner-Jenkinson Co., 62 F.3d 1512, 1520, 35 USPQ2d 1641, 1647 (Fed.Cir.1995) (in banc) ("Infringement, whether literal or under the doctrine of equivalents, is a question of fact.") (citing Winans v. Denmead, 56 U.S. (15 How.) 330, 338, 14 L.Ed. 717 (1853)); SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1125, 227 USPQ 577, 589 (Fed.Cir.1985) (in banc)), cert. granted, 116 S.Ct. 1014 (1996). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

*6 As interpreted above, each of the independent claims at issue (claims 1, 7, 14, and 20) does not read on Engel's accused TDF system. For example, Engel's TDF system does not literally meet the claim limitation that requires the distance between the second portion and end portion to substantially correspond to the width of an arm of a corner connector. In Engel's TDF system, the width of the arms of each corner connector is less than the distance between the duct wall and the rearwardly-extending second portion. As may be seen in Fig. 5 above, the corner connectors in the accused TDF system do not extend all the way between the duct wall 10 and the second portion 24. Rather, the corner connectors extend between the duct wall 10 and the return portion 26. Thus, in the TDF system, the distance between the second portion and end portion is larger than the width of an arm by at least the thickness of the return portion 26 plus the gap between the second portion and the return portion.

Since the configuration of Engel's TDF system does not literally meet all of the claim limitations, we hold that the TDF system does not literally infringe any of independent claims 1, 7, 14, or 20. On the entire evidence, we are not left with a definite and firm conviction that the district court committed a mistake in finding no literal infringement. Therefore, the district court's finding of no literal infringement is not clearly erroneous.

C. Infringement Under the Doctrine of Equivalents

"[I]nfringement under the doctrine of equivalents is an issue of fact. When infringement is tried to the court, ... an appellate court reviews the trial court's infringement finding for clear error." Hilton Davis Chem. Co. v. Warner-Jenkinson Co., Inc., 62 F.3d 1512, 1521, 35 USPQ2d 1641, 1647 (Fed.Cir.1995), cert. granted, --- U.S. ----, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). "[T]he application of the doctrine of equivalents rests on the substantiality of the differences between the claimed and accused products or processes, assessed according to an objective standard." Hilton Davis, 62 F.3d at 1518, 35 USPQ2d at 1645. "In applying the doctrine of equivalents, it is often enough to assess whether the claimed and accused products or processes include substantially the same function, way, and result." Hilton Davis, 62 F.3d at 1518, 35 USPQ2d at 1645.

We agree with Engel's assertion that its TDF system performs in a way that is not substantially the same as the way the patented system performs. In Engel's TDF system, the continuous spring force of the return portion bears on the arms of the corner connector once a worker inserts the corner connector into a flange, which holds the corner connector in place. In contrast, the claimed invention does not generate a spring force. The corner connectors in the claimed system are only held in place by the retainer means (i.e., channel 30) formed in the second portion and, at times, by crimping. Thus, although both duct connecting systems may perform substantially the same function (i.e., permit a worker to connect duct sections without having to use rivets or spot welds to secure flanges or corner connectors in position) and may achieve substantially the same result (i.e., adjacent duct sections may be attached in an efficient manner), they do not perform in substantially the same way. It is not enough if both devices perform the same

Copr. © West 1996 No claim to orig. U.S. govt. works

--- F.3d ----
(Cite as: 1996 WL 540097, *6 (Fed.Cir.(Mo.)))

Page 6

function when it is apparent from the patent drawings that the devices are differently constructed and perform that function in different ways. See Atlanta Motoring Accessories, Inc. v. Saratoga Technologies, Inc., 33 F.3d 1362, 1366, 31 USPQ2d 1929, 1932 (Fed.Cir.1994). In the instant case, the return portion of Engel's TDF flange is constructed differently (it is rolled to the inside of the rearwardly extending portion) and performs differently (it acts as a spring seat for the corner connectors).

*7 The record contains ample evidence to support our conclusion that the spring force of the accused system is substantially different from the claimed retainer means. For example, the claimed retainer means at times requires crimping to hold the corner connectors in place after they have been snapped into position and before adjacent duct sections are fastened together. Although the parties dispute how tightly the corners are held in the patented system without crimping, there is testimony that crimping avoids the problem of loose corners, and Lockformer sold a crimping tool for this purpose. No similar problem is encountered by users of Engel's TDF system. Once a corner connector is installed in the flange of Engel's TDF system, the spring force presses on the corner connector, which then cannot be removed without a crowbar or similar flange-destroying device. HVAC contractors do not need and never use crimping to install or secure corner connectors in Engel's duct connecting system. Thus, we conclude that the inwardly-rolled return portion of Engel's TDF system is not the equivalent of the outwardly-rolled return portion claimed in the '614 patent.

Our finding here with regard to crimping does not conflict with the Engel I panel's holding that the '641 patent is not invalid for failure to disclose the best mode or for lack of enablement. The Engel I panel concluded that since the inventors discovered the need for crimping after filing the '641 patent application, their discovery never triggered a duty to disclose crimping to the PTO for a valid patent. The properties of a patented device that are discovered after the patent application has been filed (here that crimping improves the commercial use of the patented system) are irrelevant to best mode analysis and may not play a role in enablement analysis. Such properties, nevertheless, may be pertinent to a function-way-result analysis when considering infringement under the doctrine of equivalents. Here, the crimping evidence of record supports our finding that Engel's TDF system and the patented system perform in substantially different ways. This is true even though, as the Engel I panel held, disclosure of crimping was not required to satisfy the best mode requirement for the '641 patent.

On the entire evidence, we are left with a definite and firm conviction that the district court committed a mistake in finding infringement under the doctrine of equivalents. If the accused device performs a substantially different function or performs in a substantially different way or obtains a substantially different result, it does not infringe under the doctrine of equivalents. See, e.g., Spectra Corp. v. Lutz, 839 F.2d 1579, 1582, 5 USPQ2d 1867, 1869-70 (Fed.Cir.1988). Since we hold that Engel's system performs in a substantially different way, we hold that Engel's TDF system does not infringe the '641 patent under the doctrine of equivalents, and we reverse the district court's contrary holding.

III
THE LICENSE AGREEMENT

*8 On appeal, we have been asked to decide whether the license agreement unlawfully requires royalty payments on staple articles of commerce (i.e., the corner connectors). Curiously, however, Engel does not seek any relief from us based upon the license agreement.

The magistrate judge held that the license agreement was valid although the royalties were calculated in part based on the unpatented corners. In particular, he held that Met-Coil's licensing activity falls within 35 U.S.C. § 271(d)(1) and (2) and cannot, as such, constitute patent misuse. Aside from § 271(d), the magistrate judge held that royalties may be based upon unpatented components of a patented system if done for the convenience of the parties in determining the value of the patented invention.

Paragraphs 2.2 and 2.3 of the license agreement provide in pertinent part as follows:
2.2 ENGEL hereby undertakes to make royalty payments on all future roll forming equipment sold by ENGEL for use in the practice of the ['641] patent .... [sic., practice of the patented

Case 5:94-cv-20512-SW  Document 214  Filed 09/27/96  Page 14 of 16

invention.]

....

2.3 As further consideration for the grant of the license to ENGEL, and to provide a convenient means for measuring the value of the license, ENGEL agrees to compensate MET-COIL with respect to corners designed for use in the practice of the [patented] invention.

Another portion of paragraph 2.3 expressly gave Engel the option of purchasing its corners from Met-Coil, producing the corners itself, or having them produced by a third party. If Engel elected not to purchase corners from Met-Coil, the license agreement provides that the royalties paid to Met-Coil for each corner produced was to serve "as a measure of the value of the use of the [patented] invention." Engel never purchased corners from Met-Coil.

We agree with the magistrate judge's statement that royalties may be based on unpatented components if that provides a convenient means for measuring the value of the license. See, e.g., Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, 85 USPQ 378 (1950) [FN2]; Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 138, 89 S.Ct. 1562, 23 L.Ed.2d 129, 161 USPQ 577, 592 (1969) (While distinguishing Automatic Radio, the Court stated, "If convenience of the parties rather than patent power dictates the total-sales royalty provision, there are no misuse of the patents and no forbidden conditions attached to the license."). As expressly stated in paragraph 2.3 of the license agreement, this is exactly what Met-Coil and Engel did. Engel, however, asserts that the royalties provisions are illegal because Met-Coil coerced Engel into agreeing to pay royalties on unpatented parts of the patented system. Engel suggests that it only entered into the license agreement because of Met-Coil's market power and its threats to sue Engel's customers.

\*9 It is clear from Zenith Radio that the voluntariness of the licensee's agreement to the royalty provisions is a key consideration. See 395 U.S. at 138-39, 89 S.Ct. 1562, 23 L.Ed.2d 129, 161 USPQ at 592-93. Although the record in the instant case indicates that Met-Coil aggressively enforced its rights under the '641 patent, there is nothing per se illegal about doing that. Further, it appears from the record that Engel voluntarily agreed to the royalties provisions, at least initially. Met-Coil was doing nothing more than what the '641 patent grant gave it a statutory right to do, and Engel predictably was not excited to relinquish profit to its competitor. Nothing is unusual about this scenario. We do not, therefore, find support for Engel's assertion that Met-Coil used its market power to shoehorn Engel into a license agreement that forced Engel to purchase unpatented items from Met-Coil.

Engel also cites Zenith Radio for the proposition that "[a] patentee is not allowed to condition a license on the payment of royalties on unpatented products over the protests of the licensee that some of the products are unsuited for the patent or that he has no need or desire for the products." The relevancy of this statement is a mystery to us, as that is not what occurred in the instant case. The corners that Engel produced or had produced for use in its TDF system were certainly suited for their intended use, and Engel unquestionably desired them. The only corners that Engel did not desire or that were unsuited for its use were those manufactured by Met-Coil. The license agreement, however, was not conditioned on the purchase of corners from Met-Coil. It gave Engel the option to purchase its corners from Met-Coil, but Engel, in fact, never did so.

We hold that the disputed royalties provisions do not inappropriately extend the patent monopoly to unpatented parts of the patented system. As noted above, Engel was not required to purchase unpatented parts from Met-Coil and, in fact, never did. Engel was not required to refrain from manufacturing competing duct-connecting systems. We thus find no patent misuse by Met-Coil and affirm the magistrate judge's holding that the royalties provisions are not illegal.

## IV
## CONCLUSION

For the above reasons, we affirm the district court's holding of no literal infringement and reverse its holding of infringement under the doctrine of equivalents. We also affirm the magistrate judge's holding that the license agreement did not unlawfully require payments on staple articles of commerce.

Copr. © West 1996 No claim to orig. U.S. govt. works

--- F.3d ----
(Cite as: 1996 WL 540097, *9 (Fed.Cir.(Mo.)))

Page 8

V
COSTS

Each party shall bear its own costs.

AFFIRMED-IN-PART and REVERSED-IN-PART

> FN1. We are also aware of the following related appeal: Met-Coil Sys. v. Engel Indus., 22 F.3d 1104, No. 93-1416, 1994 WL 87086 (Fed.Cir.16 March 1994) (non-precedential opinion by the Engel I panel).

> FN2. In Automatic Radio, the licensee agreed to pay royalties measured by a percentage of the licensee's sales regardless of use of the inventions patented. 339 U.S. at 833, 70 S.Ct. 894, 94 L.Ed. 1312, 85 USPQ at 380. The district court sustained the royalty provision "on the theory that it was a convenient mode of operation designed by the parties to avoid the necessity of determining whether each type of [the licensee's] product embodies any of the [licensor's numerous] patents." Id. The court of appeals and the Supreme Court affirmed. The Court stated that this method of calculating royalties may represent "the most convenient method of fixing the business value of the privileges granted by the licensing agreement." Id. at 834, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, 85 USPQ at 381. That portion of Automatic Radio holding that a licensee cannot challenge the validity of the licensed patents was overruled in Lear, Inc. v. Adkins, 395 U.S. 653, 671, 89 S.Ct. 1902, 23 L.Ed.2d 610, 162 USPQ 1, 8 (1969).

END OF DOCUMENT

Copr. © West 1996 No claim to orig. U.S. govt. works

*START*START*START*START*START*START*START*START*START*START*START*START*

1309256-MITCHELL,SARAH

| | |
|---|---|
| NUMBER OF REQUESTS IN GROUP: | 1 |
| APPROXIMATE NUMBER OF LINES: | 510 |
| DATE AND TIME PRINTING STARTED: | 09/26/96    11:25:42 pm (Central) |

Copyright (C) 1996 by West Publishing Company.  Copyright is not claimed as to any part of the original work prepared by a U.S. government officer or employee as part of that person's official duties.  All rights reserved.  No part of a WESTLAW transmission may be copied, downloaded, stored in a retrieval system, further transmitted or otherwise reproduced, stored, disseminated, transferred or used, in any form or by any means, except as permitted in the WESTLAW Subscriber Agreement or with West's prior written agreement.  Each reproduction of any part of a WESTLAW transmission must contain notice of West's copyright as follows:  "Copr. (C) West 1996  No claim to orig. U.S. govt. works."  Registered in U.S. Patent and Trademark Office:  WESTLAW, WIN, WESTNET, EZ ACCESS and Insta-Cite.  WIN natural language is protected by U.S. Patent Nos. 5,265,065, 5,418,948 and 5,488,725 and other patents pending.

CLIENT IDENTIFIER:  22364-0001-1349
DATE OF REQUEST:   09/26/96
THE CURRENT DATABASE IS   CTAF
YOUR TERMS AND CONNECTORS QUERY:

(INTENT SUBJECTIVE) /P INVENTOR

*START*START*START*START*START*START*START*START*START*START*START*START*