1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   BEFORE THE HONORABLE SPENCER WILLIAMS, JUDGE

4   ROGER SCHLAFLY,                    ) NO.  C-94-20512 SW
                                       )
5                      PLAINTIFF,      )
           VS.                         ) SAN JOSE, CA
6                                      ) TUESDAY
    PUBLIC KEY PARTNERS AND RSA        ) OCTOBER 1, 1996
7   DATE SECURITY, INC.,               ) VOLUME 1
                                       ) PAGES 1 - 153
8                      DEFENDANTS.     ) MARKMAN HEARING
    _____)
9                                      )
    RSA DATA SECURITY, INC.,           ) NO. C-96-20094 SW
10                                     )
                       PLAINTIFF,      )
11                                     )
           VS.                         )
12                                     )
    CYLINK CORPORATION  AND CARO-KANN  )
13  CORPORATION, ET AL.,               )
                                       )
14                     DEFENDANTS.     )
    _____)

**ORIGINAL**

**FILED**

MAR 05 1997

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

15

16  APPEARANCES:

17  FOR THE PLAINTIFF           DR. ROGER SCHLAFLY:
    ROGER SCHLAFLY:             P.O. BOX 1680
18                              SOQUEL, CA 95073

19

20

21          APPEARANCES CONTINUED ON NEXT PAGE

22

23  COURT REPORTER:        JEANNETTE L. BUSH, CSR #10572
                           COURT REPORTER
24

25          COMPUTERIZED TRANSCRIPTION BY PREMIER POWER

SOUZA & LERSCHEN   (510) 846-8831

```
 1  APPEARANCES: (CONTINUED)

 2  FOR RSA DATA SECURITY, INC.:    HELLER, EHRMAN, WHITE
                                    & MC AULIFFE
 3                                  525 UNIVERSITY AVENUE
                                    PALO ALTO, CA 94301-1900
 4                                  BY:  ROBERT T. HASLAM
                                    ROBERT D. FRAM
 5                                  BETH MITCHELL
                                    ATTORNEYS AT LAW
 6
    FOR CYLINK CORPORATION,         MORRISON & FOERSTER, LLP
 7  CARO-KANN CORPORATION           755 PAGE MILL ROAD
    AND STANFORD UNIVERSITY:        PALO ALGO, CA 94304-1018
 8                            BY:   KARL J. KRAMER
                                    JANA G. GOLD
 9                                  ATTORNEYS AT LAW

10                                  MORRISON & FOERSTER, LLP
                                    345 CALIFORNIA STREET
11                                  SAN FRANCISCO, CA 94104
                              BY:   RAOUL D. KENNEDY
12                                  ATTORNEY AT LAW

13                                  ALSTON & BIRD
                                    ONE ATLANTIC CENTER
14                                  1201 W. PEACHTREE STREET
                                    ATLANTA, GEORGIA 30306
15                            BY:   PATRICK J. FLINN
                                    ATTORNEY AT LAW

16

17

18

19

20

21

22

23

24

25
```

I N D E X

1

WITNESSES       (FOR THE PLAINTIFFS)                    PAGE

2

3   KONHEIM, ALAN G.                                    19
                                                        76
4   DIRECT EXAMINATION BY MR. HASLAM                    103
    CROSS-EXAMINATION BY MR. KENNEDY                    111
5   CROSS-EXAMINATION BY MR. FLINN                      116
    CROSS-EXAMINATION BY MR. SCHLAFLY
6   REDIRECT EXAMINATION BY MR. HASLAM

7

8   STEVEN DUSSE                                        117
                                                        128
9   DIRECT EXAMINATION BY MR. HASLAM                    147
    CROSS-EXAMINATION BY MR. KRAMER                     149
10  CROSS-EXAMINATION BY MR. SCHLAFLY                   152
    REDIRECT EXAMINATION BY MR. HASLAM
11  RECROSS EXAMINATION BY MR. KRAMER

12

13                  E X H I B I T S

14                                                      PAGE

15  NUMBER                                              18

16  1000                                                18

17  1001                                                18

18  1003                                                18

19  1004

20

21

22

23

24

25

1   <u>TUESDAY, OCTOBER 1, 1996</u>                    <u>9:40 A.M.</u>

2

3         THE COURT:  I APOLOGIZE THAT OUR FAST START

4   WAS NOT SO FAST THIS MORNING.  I'M SURE WE CAN MAKE

5   IT.  NOW, WHERE DO WE GO TODAY?  ANY SUGGESTIONS?

6         MR. FRAM:  YES, YOUR HONOR.  ROBERT FRAM FOR

7   RSA.  WE CONCUR, AND WE HAVE A SUGGESTION THAT WE HOPE

8   WILL DISPOSE OF THE EVIDENTIARY PART OF THE MARKMAN

9   HEARING TODAY EVEN GIVEN THE 3:00 O'CLOCK TERMINATION

10  TIME.

11        THE COURT:  WE'LL BE HERE TOMORROW, TOO.

12        MR. FRAM:  GIVEN THE WITNESSES SCHEDULES AND

13  EVERYTHING ELSE, BY PUTTING THE WITNESSES FIRST, IN

14  FACT, WE WOULD BE ABLE TO GET THE WITNESSES ON AND OFF

15  IN ONE DAY.  OUR THINKING IS AS TO THE DOCUMENTS THE

16  PARTIES WANT TO MOVE INTO EVIDENCE, THAT THE PARTIES

17  WOULD MOVE AT THE END OF THE DAY.  WE'D MARK THEM OF

18  COURSE AS WE GO --

19        THE COURT:  EXCUSE ME.

20             (PAUSE IN PROCEEDING.)

21        MR. FRAM:  OUR PROPOSAL IS REAL SIMPLE.  WHAT

22  WE SUGGEST IS THAT THE WITNESSES WHO ARE HERE TODAY --

23  WE PUT THEM UP.  WE HAVE THE WITNESSES TODAY.  WE MOVE

24  THE DOCUMENTS IN AT THE END OF THE DAY.  WE MARK THEM

25  OF COURSE AS WE GO ALONG, THAT THEY GET MOVED IN AT

1    THE END.

2          TO EXPEDITE MATTERS, THAT THE OBJECTIONS TO

3    THE DOCUMENTS BE ON PAPER.  WE'VE ALREADY SUBMITTED ON

4    A BRIEF, I BELIEVE, A FAIR NUMBER OF THE EVIDENTIARY

5    OBJECTIONS, THIS BEING AN EVIDENTIARY PROCEEDING, THE

6    PARTIES ARE WILLING TO GO THAT WAY.

7          THERE MAY BE SOME ADDITIONAL EVIDENTIARY

8    OBJECTIONS THAT ARE NOT IN THE BRIEF TO DOCUMENTS THAT

9    WERE NOT PRESENT WHERE THERE WAS NO REQUEST FOR

10   NOTICE.  THE PARTIES WILL PROBABLY WANT A FEW DAYS TO

11   PUT IN ANY SUPPLEMENTAL PAPERS ON OBJECTIONS FOR

12   ANYTHING THAT EITHER PARTY HAS TO MOVE AGAINST.

13         SO THE MOVING WILL EITHER BE SUBJECT TO THE

14   PAPERS ALREADY SUBMITTED OR PAPERS TO BE SUBMITTED

15   WITHIN A FEW DAYS.  AND THAT REALLY IN AN EXPEDITIOUS

16   WAY, WE THINK, WILL TAKE CARE OF THE EVIDENTIARY PART

17   OF THE HEARING BECAUSE WE'LL NOT HAVE TO BE DISTRACTED

18   WITH EVIDENTIARY OBJECTIONS ON DOCUMENTS DURING THE

19   COURSE OF THE DAY, AND WE CAN FOCUS ON THE WITNESSES

20   WHO ARE HERE.

21         MR. FLINN:  THE ONLY OTHER THING I WOULD ADD,

22   YOUR HONOR, IS WE WEREN'T QUITE SURE HOW THE COURT

23   WANTED TO HANDLE THE MARKING OF EXHIBITS.  SO WHAT WE

24   HAVE DONE IS DIVIDE UP THE NUMBERS, AND WE WILL

25   PROCEED BASED UPON THE DEPOSITION EXHIBITS THAT HAVE

1   BEEN MARKED SO FAR, AND THEN THE PARTIES WILL DIVIDE

2   UP THE NUMBERS.

3           RSA WILL TAKE THE NUMBERS FROM 500 TO 1000.

4   CYLINK AND CARO-KANN WILL TAKE THE NUMBERS BETWEEN

5   0 AND 499, AND MR. SCHLAFLY WILL TAKE THE NUMBERS

6   ABOVE 1500 I BELIEVE; IS THAT CORRECT?

7           THE DEPOSITION EXHIBITS HAVE ALREADY BEEN

8   MARKED UP THROUGH ABOUT 66, AND WE'LL USE THOSE

9   NUMBERS FROM THE DEPOSITIONS THEMSELVES.  AND THEN I

10  BELIEVE RSA WILL TAKE 1000 ABOVE, AND WE WILL TAKE 500

11  AND ABOVE FOR NEW EXHIBITS, AND MR. SCHLAFLY WILL TAKE

12  1500 AND ABOVE.

13          THE COURT:  ANYTHING AGREED ON IS AGREEABLE

14  TO ME.

15          MR. FRAM:  APPRECIATED, YOUR HONOR.  WHAT

16  THAT WILL LEAVE IS A QUESTION OF POST HEARING BRIEFING

17  ON THE EVIDENCE OF RECORD AND THE QUESTION OF ARGUMENT

18  OF WHEN THE COURT WOULD LIKE TO HAVE THAT.  WE'RE

19  AVAILABLE TOMORROW.

20          WE HAVE THE MOTION TO REMAND ON CALANDER FOR

21  TOMORROW.  WE COULD PROCEED WITH THAT.  IF THE COURT

22  WANTS ARGUMENT TOMORROW, WE COULD PROCEED AT THAT TIME

23  ON THE MARKMAN ISSUES AS WELL.  IF THE COURT WOULD

24  LIKE TO PUT STALL ON THAT UNTIL AFTER RECEIVING A POST

25  HEARING BRIEF ON THE EVIDENCE OF RECORD, WE'D BE HAPPY

1    TO DO THAT OF COURSE WITH PLEASURE.

2          THE COURT:   WELL, IF WE COULD WRAP UP THIS

3    PORTION TOMORROW, THEN BE CLEAR FOR THE REST OF THE

4    TIME TO DEVELOP THE REST OF THE MATTER FOR PREPARATION

5    OF TRIAL AND SO FORTH.   IF WE CAN, WE'LL DISPENSE WITH

6    THE WITNESSES WHO ARE HERE AND ANYTHING ELSE THAT

7    MIGHT WANT TO BE SUBMITTED.

8          APPARENTLY, THERE ARE SOME WITNESSES YOU WANT

9    TO PRESENT.   WITNESSES THAT ARE SUPPOSED TO BE HERE.

10   ARE THERE SOME WITNESSES THAT SOMEONE WANTS TO PRESENT

11   THAT ARE NOT NAMED AND PREPARED?

12         MR. FRAM:   THERE MAY BE AN ISSUE -- AS TO THE

13   COURT'S QUESTION, THERE MAY BE A QUESTION AS TO ONE

14   WITNESS WHO MIGHT BE CALLED.   MY SUGGESTION IS WE TAKE

15   THAT MATTER UP IF THAT WITNESS IS CALLED AT THAT TIME.

16         THE COURT:   OKAY.

17         MR. FRAM:   BUT THE QUESTION -- I GUESS THE

18   COUNSEL IS CURIOUS AS TO WHAT TOMORROW IF THE COURT

19   WOULD LIKE TO HAVE ARGUMENT BY COUNSEL ON THE CLAIM

20   CONSTRUCTION QUESTIONS AS TO WHICH EVIDENCE IS

21   PRESENTED TODAY OR WHETHER THE COURT WOULD LIKE TO

22   WAIT UNTIL AFTER A POST HEARING PAPER IS PROVIDED.

23   IT'S A QUESTION OF JUST TIMING ON THE ARGUMENT.

24         MR. KENNEDY:   LET ME ADDRESS THAT, YOUR

25   HONOR.   IT'S CYLINK AND CARO-KANN AND STANFORD'S

1   POSITION THAT WE'RE HERE TODAY AND TOMORROW TO ADDRESS

2   THOSE ISSUES, AND WE DON'T WANT TO PUT THEM OFF FOR

3   FURTHER BRIEFING.  WE HAVE BRIEFED THEM.  WE ARE

4   PREPARED TO DISCUSS THEM WITH THE COURT.

5          THE COURT:  IF I WANT TO GET ANY FURTHER

6   ARGUMENT, I'LL ASK TO SUBMIT IT IN WRITING.

7          MR. FRAM:  WE'RE COMPLETELY HAPPY TO GO THAT

8   WAY, YOUR HONOR. I GUESS THE ONE SMALL POINT -- I

9   THINK WE'RE GOING TO HAVE TO DECIDE THIS NOW -- IS I

10  THINK THE PARTIES MAY BE OF DISAGREEMENT IS THAT RSA

11  HAS REQUESTED AN OPPORTUNITY ALSO TO PUT ANY POST

12  HEARING BRIEF TO BE ABLE TO ARGUE THE EVIDENCE OF

13  RECORD, AND THAT'S, I THINK, THE LAST DETAIL, AND

14  WE'RE READY TO GO WITH THE ORAL ARGUMENT TOMORROW.

15         THE COURT:  IF I WANT FURTHER ARGUMENT, I'LL

16  HAVE THE ARGUMENT TOMORROW.  IF I WANT FURTHER

17  BRIEFING, I'LL ASK FOR IT.  IF I DON'T NEED IT, I

18  DON'T NEED IT.

19         MR. FRAM:  FINE, YOUR HONOR.

20         MR. KENNEDY:  THANK YOU, YOUR HONOR.

21         THE COURT:  NOW, ANYTHING ELSE ON OPENING UP

22  RIGHT NOW?

23         MR. KENNEDY:  YES, YOUR HONOR.  RAOUL KENNEDY

24  ON BEHALF OF CYLINK.  I UNDERSTAND THAT PROFESSOR

25  CONHEIM HAS TEACHING OBLIGATIONS TOMORROW, AND THERE'S

1   BEEN A REQUEST THAT HE BE CALLED AS THE FIRST WITNESS

2   IN THE CASE, AND WE HAVE NO OBJECTION WHATSOEVER TO

3   THAT, THAT MAKES TOTAL SENSE.

4          OUR ONLY REQUEST WOULD BE THAT WE TRY TO GET

5   SOME GROUND RULES BECAUSE I'M STILL NEW TO THIS

6   MARKMAN PROCEEDING, AND I'M STILL HAVING TROUBLE

7   REMEMBERING THAT EXPERT TESTIMONY IS TESTIMONY OF LAST

8   RESORT IN THESE KINDS OF A HEARING, THAT THE FEDERAL

9   CIRCUIT TELLS US THAT THE FIRST LEVEL OF EVIDENCE IS

10  INTRINSIC EVIDENCE, THE PATENT, ET CETERA.

11         THE COURT:  THAT'S RIGHT.

12         MR. KENNEDY:  IF FOR ANY REASON THAT DOESN'T

13  DO THE JOB, THEN WE TURN TO WRITTEN EXTRINSIC

14  EVIDENCE -- DICTIONARIES, TREATISES, THAT SORT OF

15  THING AS YOUR HONOR KNOWS.

16         AND AS THE VITRONICS OPINION IN 90 F.3RD,

17  PAGE 1576 TOLD US JUST THIS SUMMER, EXPERT TESTIMONY

18  MAY ONLY BE RELIED UPON IF THE PATENT DOCUMENTS TAKEN

19  AS A WHOLE ARE INSUFFICIENT TO ENABLE THE COURT TO

20  CONSTRUE DISPUTED CLAIM TERMS.  SUCH INSTANCES WILL

21  RARELY IF EVER OCCUR.

22         AND OF COURSE THE COURT IN THIS CASE WENT ON

23  TO REVERSE THE DISTRICT JUDGE FOR HAVING ERRONEOUSLY

24  RELIED ON EXPERT TESTIMONY.  THE VITRONICS OPINION

25  GOES ON TO CAUTION THAT EVEN IN THOSE RARE INSTANCES,

1   WHERE EXPERT TESTIMONY IS APPLICABLE, IT SHOULD BE

2   VIEWED IN THEIR WORDS, NOT MINE, WITH CAUTION BECAUSE

3   IT'S NOT PART OF THE PUBLIC RECORD THAT WAS AVAILABLE

4   BEFOREHAND.  AND TO AGAIN QUOTE, "IT'S NO BETTER THAN

5   OPINION TESTIMONY ON MEANING OF STATUTORY TERMS."

6        NOW, AGAINST THAT BACKGROUND, WE'RE SOMEHOW

7   TOLD THAT THIS, IN FACT, IS ONE OF THOSE RARE

8   OCCURANCES, AND IN FACT IT'S SO RARE THAT WE'RE GOING

9   TO SPEND A FULL DAY ON LAST RESORT TESTIMONY.  NOW,

10  WHAT THAT SAYS IS THE SPONSORS OF LAST RESORT

11  TESTIMONY HAVE BEEN THROUGH THE PATENT, BEEN THROUGH

12  THE PROSECUTION HISTORY, COMBED THE TECHNICAL

13  LITERATURE, AND CAN'T FIND SUPPORT FOR THEIR POSITION

14  AND HAVE SAID, "WOOPS, WE'RE GOING TO HAVE TO GO TO

15  THE LAST RESORT.  LET'S GET SOME EXPERTS."

16       NOW, MAYBE THIS IS ONE OF THOSE RARE

17  SITUATIONS AND IN FACT SO RARE THAT WE HAVE TO LAST

18  RESORT FOR AN ENTIRE DAY.  BUT I SUGGEST THAT AT A

19  MINIMUM, SOME SORT OF OFFER OF PROOF OUGHT TO BE

20  ADVANCED AS TO WHY IT IS THAT THIS FALLS WITHIN THAT

21  RARE SITUATION, AND IN PARTICULAR WHAT IT IS THAT

22  THESE EXPERTS ARE GOING TO DO TO BE OF ASSISTANCE TO

23  THE COURT RATHER THAN TRYING TO BACKDOOR SOME

24  INADMISSIBLE TESTIMONY.

25       WE TOOK PROFESSOR KONHEIM'S DEPOSITION, AND

1   HE'S NOT A PATENT LAWYER, AND I DON'T MEAN TO

2   CRITICIZE HIM OR ACCUSE HIM OF DOING ANYTHING

3   INTENTIONALLY WRONG.   BUT HE CANDIDLY ADMITTED THAT

4   WHAT HE THOUGHT HE WAS SUPPOSED TO DO AND WHAT HE IN

5   FACT DID WAS TO READ THE CLAIMS AGAINST THE LANGUAGE

6   OF THE SPECIFICATIONS AND HAS IMPORTED LIMITATIONS

7   FROM THE SPECIFICATIONS INTO THE CLAIMS WHICH AS WE

8   ALL KNOW FOR A LAWYER OR A COURT IS A NO, NO.

9            NOW PRESUMABLY PROFESSOR KONHEIM HAS BEEN

10   WOODSHEDED SINCE HIS DEPOSITION AND WILL BE UP HERE TO

11   PROVIDE SOMETHING ELSE.   BUT BEFORE WE SPEND A WHOLE

12   DAY ON BOTH RARE AND MINIMAL VALUE TESTIMONY, CAN'T WE

13   GET SOME KIND OF GROUND RULES OR SOME SHOWING FROM THE

14   PROPONENTS AS TO WHY THIS IS THAT HAILEY'S COMET OF A

15   CASE THAT IT IS SO RARE AND THAT WOULD BE MY REQUEST.

16            THE COURT:   I SHOULD HERE THE INTRINSIC

17   EVIDENCE FIRST AND DECIDE WHETHER OR NOT EXTRINSIC

18   EVIDENCE WILL BE COMFORTABLE TO ME, CORRECT.

19            MR. KENNEDY:   ULTIMATELY YES, YOUR HONOR.

20   AND I KNOW THAT'S WHAT THE COURT WILL DO WHEN IT

21   REACHES THE DELIBERATIVE PROCESS.   I RECOGNIZE AS A

22   PRAGMATIC BASIS WITH PEOPLE HERE FROM OUT OF TOWN

23   SITTING IN THE COURTROOM.   IF I WERE IN YOUR POSITION,

24   I WOULD BE INCLINED TO SAY "LET'S GET THE EXPERT

25   TESTIMONY OUT OF THE WAY.   WE CAN ALWAYS DEAL WITH THE

1   INTRINSIC RECORD.  IT'S HERE FOR ALL TIME."

2          SO I'M NOT QUARRELING WITH TAKING THE

3   EXTRINSIC EVIDENCE FIRST.  BUT DO WE REALLY, I

4   QUESTION, HAVE A FULL DAY OF NEED FOR LAST RESORT

5   TESTIMONY?  THIS IS A HIGHLY UNUSUAL CASE IF THAT'S

6   REALLY THE SITUATION.  PERHAPS MR. HASLAM COULD

7   ELUCIDATE ON THAT POINT.

8          MR. HASLAM:  WELL, I THINK THE PRAGMATIC

9   ANSWERS IS THE ONE THAT MR. KENNEDY JUST GAVE.  THE

10  WITNESSES ARE HERE.  THEY HAVE DEPOSED THE WITNESSES,

11  AND EVEN IN THE MOTION SEEKING TO LIMIT OR EXCLUDE,

12  THEY ACKNOWLEDGED THAT THERE WAS SUBJECT MATTER WHICH

13  THEY HAD WHICH WOULD BE PERTINENT.

14          I'D ALSO LIKE TO POINT OUT THAT MARKMAN WAS

15  THE UNBOTCHED DECISION WHICH SAID THAT THE COURT COULD

16  LISTEN TO EXPERT TESTIMONY TO AID IT IN IT'S

17  INTERPRETIVE PROCESS.  IT COULD LISTEN TO OTHER KINDS

18  OF TESTIMONY, AND THE COURT COULD GIVE WEIGHT TO THE

19  VARIOUS ASPECTS OF TESTIMONY AND THAT THE COURT COULD

20  DETERMINE WHICH EVIDENCE, FOR EXAMPLE, OF THE

21  PROSECUTING ATTORNEY OR PERHAPS THE INVENTOR SHOULD BE

22  LOOKED AT WITH CAUTION.

23          BUT MARKMAN IS THE UNBINDED DECISION.  THE

24  VITRONICS CASE IS JUST A PANEL.  IN HOECHST V.

25  CELANESE, 78 F.3RD 1575, I'D COMMEND THAT TO THE COURT

1   WHERE ANOTHER PANEL SPECIFICALLY SAID "BECAUSE JUDGES

2   ARE NOT PEOPLE OF SKILL IN THE ART, THAT THEY SHOULD

3   LISTEN TO TESTIMONY."  IT MAY BE CONFIRMATORY OF AN

4   OPINION THAT THE COURT OTHERWISE REACHES.  IT MAY BE

5   HELPFUL TO THE PROCESS.

6        BUT WE SPENT A WHOE DAY YESTERDAY IN A

7   TUTORIAL BECAUSE, WHEN I CAME TO THIS CASE -- AND I

8   STILL HAVE PROBLEMS WITH THE TECHNOLOGY.  I DON'T WANT

9   TO SPEAK FOR THE COURT -- BUT THERE ARE ASPECTS HERE

10  ABOUT DIGITAL SIGNATURES, WHAT IT MEANS TO PROVIDE

11  SECURE COMMUNICATIONS WITH COMPUTATIONAL

12  INFEASIBLENESS.  ALL OF WHICH THINGS ARE TERMS THAT

13  MAY OR MAY NOT HAVE MEANING IN THE ART, THAT MAY OR

14  MAY NOT BE DEFINED IF SPECIFICATION.  BUT UNTIL YOU

15  HAVE HEARD TESTIMONY TO HELP YOU THROUGH WHAT THEY

16  CALL THE INTRINSIC EVIDENCE, IT SEEMS TO ME --

17        THE COURT:  THEY WEREN'T SWORN.  IT WAS

18  ARGUMENT.

19        MR. HASLAM:  THAT'S TRUE.

20        THE COURT:  THE PRESENTATION WAS ARGUMENT,

21  AND I WAS ACQUAINTED WITH THE GENERALNESS OF HOW IT

22  FUNCTIONS.  I WASN'T REALLY CONCERNED ABOUT THE

23  DETAILS OF THE MATHEMATICAL FORMULA.

24        MR. HASLAM:  AND THAT MAY BE IMPORTANT IN

25  INTERPRETING THESE CLAIMS.  AND IT SEEMS TO ME THAT

1   LISTENING TO THE TESTIMONY THIS COURT, AS I THINK

2   MR. KENNEDY SAID YESTERDAY AT A BENCH TRIAL, COURTS

3   ARE FREQUENTLY PRESENTED WITH EVIDENCE WHICH THEY TAKE

4   IN AND ULTIMATELY GIVE IT THE WAY TO WHICH IT'S

5   ENTITLED OR EXCLUDE IT ALL TOGETHER IF IT'S NOT.

6           I WOULD THINK IN SOMETHING LIKE THIS, I DON'T

7   THINK IT'S AS ANOMALOUS AS MR. KENNEDY SAYS.  I

8   BELIEVE JUDGE WHITE, FOR EXAMPLE, FREQUENTLY SCHEDULES

9   MARKMAN HEARINGS IN WHICH HE LISTENS TO TESTIMONY.

10          THIS IS NOT A LAWYER HERE TO TELL YOU WHAT

11  THE CLAIMS ARE, AND IF HE STRAYS INTO THAT, YOU ARE

12  PERFECTLY CAPABLE OF IGNORING IT, WHEN YOU GET DOWN TO

13  REVIEWING THE EVIDENCE, AND DECIDING THIS IS NOT

14  TESTIMONY THAT IS TESTIMONY ABOUT WHAT THESE TERMS MAY

15  OR MAY NOT MEAN IN THE ART BUT IS REALLY TRYING TO

16  TELL YOU WHAT YOUR JOB IS.

17          I HAVE A VAST AMOUNT OF CONFIDENCE IN THE

18  COURT'S ABILITY TO DO THAT TASK AND TO TRY TO PARSE

19  THIS RIGHT NOW AT THIS STAGE IS I THINK NOTHING BUT A

20  CLEVER, WELL-ORGANIZED TACTICAL PLOY TO CHOP UP THE

21  TESTIMONY.  WE'RE WASTING MORE TIME ARGUING ABOUT IT

22  THAN JUST PUTTING THEM ON AND ASKING THEM THE

23  QUESTIONS, AND THEY CAN CROSS-EXAMINE THEM.  THEY ARE

24  FULLY PREPARED TO CROSS-EXAMINE THEM.

25          AS A MATTER OF FACT, THEY CITED A TREMENDOUS

1  AMOUNT OF HIS TESTIMONY TO YOU IN THEIR JURY

2  INSTRUCTION.  IT SEEMS TO ME WHAT'S SAUCE FOR THE

3  GOOSE IS SAUCE FOR THE GANDER.  LET'S HEAR IT FROM THE

4  HORSE'S MOUTH.

5          THE COURT:  OKAY.  WE SHALL ACCOMPLISH THAT

6  WITHIN THE TIME SET ASIDE FOR THIS.

7          MR. HASLAM:  I BELIEVE WE CAN.

8          MR. KENNEDY:  VERY BRIEFLY, YOUR HONOR,

9  OBVIOUSLY, THE REASON WE HELD THE TUTORIAL YESTERDAY

10  WAS ANY HUMAN BEING IS ENTITLED TO SOME KIND OF AN

11  EXPLANATION BEFORE BEING ASKED TO RULE ON MATTERS OF

12  THIS COMPLEXITY.

13          BUT THE QUESTION FOR TODAY IS WHAT PARTICULAR

14  WORDS, WHAT PARTICULAR LANGUAGE IN THE PATENT CAN'T BE

15  INTERPRETED FROM EITHER THE INTRINSIC RECORD OR FROM

16  DICTIONARIES AND LEGAL METHODS.  SURELY MR. HASLAM HAS

17  HIS DIRECT EXAMINATION READY TO GO AND OUGHT TO BE

18  ABLE TO PROVIDE AN ILLUSTRATION.  I CAN'T IMAGINE WHY

19  HE CAN'T PROVIDE US AHEAD OF TIME WITH A LIST OF THOSE

20  WORDS THAT HE FEELS REALLY REQUIRE LAST RESORT

21  TESTIMONY FROM DR. KONHEIM.  I PREDICT, IF WE DON'T

22  GET THAT TO BEGIN WITH, WE ARE GOING TO QUICKLY BE

23  FALLING INTO DR. KONHEIM TELLING THE COURT HOW THE

24  COURT OUGHT TO INTERPRET THE CLAIMS.

25          AND WITH ALL RESPECT TO DR. KONHEIM, HE'S NOT

1   A LAWYER.  HE'S NOT A JUDGE, AND THAT'S NOT ANY

2   EXPERT'S ROLE, BUT IT'S YOUR HONOR'S PREFERENCE.  BUT

3   I THINK IF WE DON'T GET SOME GROUND RULES, WE'RE

4   QUICKLY GOING TO FIND WE'RE WASTING A LOT OF TIME ON A

5   LOT INADMISSABLE AND INCONSEQUENTIAL EVIDENCE.  I'M

6   PREPARED TO SUBMIT IT, YOUR HONOR.

7          THE COURT:  WELL, IF WE START WITH THE

8   INTRINSIC EVIDENCE, START OPENING THE CLAIMS AND THEN

9   DISCUSS THE CLAIMS, WHAT THEY MEAN AND SO FORTH.  BUT

10  THAT WILL BE BY COUNSEL OR BY WITNESSES, I GUESS WOULD

11  BE BY WITNESSES.

12         MR. HASLAM:  AS TO WHAT SOME OF THE TERMS IN

13  THE CLAIM MEAN, THAT'S WHAT I INTEND TO HAVE

14  MR. KONHEIM TESTIFY TO.  I THINK I AM RATHER STRUCK

15  WITH MR. KENNEDY'S SUGGESTION THAT WE SHOULD HAVE

16  PROVIDED THEM WITH A COPY OF OUR DIRECT EXAMINATION OR

17  SOMETHING OF THAT NATURE BEFOREHAND GIVEN THEIR

18  UNWILLINGNESS TO TELL US WHO THEY WERE GOING TO CALL.

19         IT SEEMS TO ME WE ARE TAKING PRECIOUS TIME

20  WHICH MR. KENNEDY IS CONCERNED ABOUT WASTING ARGUING

21  ABOUT QUESTIONS WHICH HAVEN'T YET BEEN ASKED, AND

22  WHICH I THINK THE COURT IS MORE THAN CAPABLE OF EITHER

23  STOPPING ON THE SPOT OR WHEN IT READS THE RECORDS

24  ALONG WITH THE VOLUMINOUS SUBMISSIONS THAT HAVE BEEN

25  MADE CAN DETERMINE WHETHER PROFESSOR KONHEIM IS

1  STRAIGHT OVER THE LINE AND WHAT WEIGHT TO GIVE IT.

2        THE COURT:  WELL, I THINK TO BENEFIT FROM THE

3  TESTIMONY, I'M THE ONE THAT MAKES THE DECISION, AND I

4  CAN ACCEPT OR EXCLUDE WHAT I THINK DIRECTLY OR

5  INDIRECTLY IS PERTINENT.

6        MR. HASLAM:  IT HAPPENS ALL THE TIME IN A

7  BENCH TRIAL.

8        THE COURT:  I'M NOT CONCERNED ABOUT HEARING

9  TESTIMONY.  I'M NOT BOUND BY IT.  I'M NOT BOUND BY

10  DEFINITIONS IN DICTIONARIES.

11        MR. HASLAM:  RIGHT.  AS THE LUBRIZOL CASE

12  SUGGESTS, IT IS THE COURT'S OBLIGATION TO CONSTRUE THE

13  CLAIMS.  THE PARTIES ARGUMENTS MAY ASSIST IT, BUT THE

14  COURT ISN'T BOUND TO COME UP WITH AN INTERPRETATION

15  PROCTORED BY ANY OF THE PARTIES IF IT BELIEVES THAT

16  THAT IS NOT THE CORRECT INTERPRETATION OF THE CLAIM.

17        THE COURT:  IF THERE IS ANY TESTIMONY OFFERED

18  BY AN EXPERT THAT THE OTHER SIDE OBJECTS TO, THEY CAN

19  MAKE THE OBJECTION AT THAT TIME, AND WE CAN DISCUSS

20  IT.

21        MR. HASLAM:  THAT'S FINE WITH ME.

22        THE COURT:  WE'LL PROCEED ON THAT BASIS.

23        MR. HASLAM:  I DON'T MEAN TO INTERRUPT THE

24  FLOW.  I WOULD LIKE TO MARK THE INITIAL FOUR

25  EXHIBITS.  A COPY OF AN ARTICLE "NEW DIRECTIONS IN

1   CRYPTOGRAPHY."  IT'S AN I TRIPLE E TRANSACTION ON

2   INFORMATION THEORY NUMBER SIX, NOVEMBER 1976.  A COPY

3   OF THAT IS IN THE PROSECUTION HISTORY WHICH WAS MARKED

4   AS DEPOSITION EXHIBIT 16, BUT THE COPY IN THERE HAS

5   BEEN REDUCED.  SO I'D LIKE TO MARK A NEW COPY WHICH I

6   THINK IS MORE LEGIBLE.

7           THE COURT:  PLEASE DO.

8           MR. HASLAM:  AS I'VE SAID, WE'VE MARKED THAT

9   AS EXHIBIT 1000.  I'D LIKE TO MARK NEXT ARTICLE

10  ENTITLED "MULTIUSER CRYPTOGRAPHIC TECHNIQUES."  AGAIN,

11  THIS IS AN ARTICLE WHICH IS IN THE PROSECUTION HISTORY

12  BUT AGAIN IS REDUCED.  SO I'D LIKE TO MARK A MORE

13  LEGIBLE COPY.  THIS HAS BEEN MARKED AS EXHIBIT 1001.

14          THE COURT:  OKAY.

15          MR. HASLAM:  NEXT I'D LIKE TO HAVE MARKED AS

16  EXHIBIT 1003 AN ARTICLE ENTITLED "HIDING INFORMATION

17  AND DIGITAL SIGNATURES IN TRAP DOOR KNAPSACKS" BY

18  RALPH MERKLE AND MARTIN HELLMAN.  THAT'S BEEN MARKED

19  AS EXHIBIT 1003.

20          FINALLY, I'D LIKE TO MARK AS EXHIBIT 1004 AN

21  ARTICLE ENTITLED "PRIVACY AND AUTHENTICATION AN

22  INTRODUCTION TO CRYPTOGRAPHY" BY WHITFIELD DIFFIE AND

23  MARTIN HELLMAN.  IT'S A PAPER OF THE I TRIPLE E AND IS

24  DATED MARCH 1979.  THAT WAS MARKED AS EXHIBIT 1004.

25          AT THIS TIME I'D LIKE TO CALL PROFESSOR ALAN

1    KONHEIM TO THE STAND.

2         THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

3              ALAN G. KONHEIM

4    CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFFS, FIRST

5    BEING DULY SWORN, TESTIFIED AS FOLLOWS:

6         THE WITNESS:  I DO.

7         THE CLERK:  BE SEATED.

8         PLEASE STATE YOUR FULL NAME AND SPELL YOUR

9    LAST NAME TO THE COURT.

10        THE WITNESS:  ALAN KONHEIM, K-O-N-H-E-I-M.

11        THE CLERK:  WHAT IS YOUR OCCUPATION, SIR?

12        THE WITNESS:  I'M A PROFESSOR IN THE

13   DEPARTMENT OF COMPUTER SCIENCE IN THE UNIVERSITY OF

14   CALIFORNIA AT SANTA BARBARA.

15        THE CLERK:  THANK YOU.

16              DIRECT EXAMINATION

17        MR. HASLAM:  YOUR HONOR, I'M NOT SURE WHAT

18   YOUR PREFERENCE IS AS TO APPROACHING THE WITNESS.

19        THE COURT:  YOU MAY APPROACH THE WITNESS, AND

20   I'D LIKE YOU TO CROSS-EXAMINE FROM THERE, BUT YOU CAN

21   GIVE THE DOCUMENTS.

22        BY MR. HASLAM:  Q.   PROFESSOR KONHEIM, WHAT

23   I'D LIKE TO DO IS GIVE YOU THE COPIES OF THE EXHIBITS

24   I JUST MARKED.  I THINK YOU JUST TOLD US WHERE YOU

25   WORK.  HOW LONG HAVE YOU BEEN TEACHING AT THE

1   UNIVERSITY OF CALIFORNIA IN SANTA BARBARA?

2   A.   I'VE BEEN TEACHING 14 YEARS.

3   Q.   THAT'S SINCE ABOUT 1982 THEN?

4   A.   JULY 1, 1982.

5   Q.   WHAT COURSES DO YOU TEACH?

6   A.   I TEACH FOUR COURSES DURING THE YEAR WHICH CONSIST

7   OF THREE QUARTERS.  THE FOURTH QUARTER I TEACH A

8   COURSE IN COMPUTER COMPUTATION.  IN THE WINTER

9   QUARTER, I TEACH A COURSE IN ASSEMBLY LANGUAGE, AND IN

10  THE SPRING QUARTER, I TEACH TWO COURSES -- A GRADUATE

11  COURSE IN COMPUTER COMMUNICATION AND A COURSE IN

12  CRYPTOGRAPHY.

13  Q.   WHAT DOES THE COMPUTER NETWORK COURSE COVER?  WHAT

14  TOPICS?

15  A.   THE COMPUTER NETWORK COURSE DESCRIBES WHAT SORT OF

16  FACILITIES YOU HAVE TO PROVIDE IN ORDER FOR -- THEY

17  HAVE TO BE MACHINE TO MACHINE COMMUNICATION.

18  PROTOCOLS, THE OSI-7 MODEL, ERROR CORRECTING CODES,

19  COMPUTER SECURITY ROUTING, AND ALL OF THE BASIC

20  OPERATIONS THAT ARE REQUIRED IN COMMUNICATION.

21  Q.   I BELIEVE YOU ALSO SAID YOU TEACH A COURSE IN

22  CRYPTOGRAPHY.  CAN YOU GIVE US A GENERAL IDEA OF THE

23  KINDS OF THINGS YOU TEACH IN THAT COURSE.

24  A.   YES.  THE COURSE IN CRYPTOGRAPHY DEALS WITH THE

25  MATHMATICAL METHODS TO BREAK SYSTEMS.  FIRST OF ALL,

1   IT BEGINS WITH AN OVERVIEW OF CRYPTOGRAPHY, THE GOAL

2   OF CRYPTOGRAPHY, AND IT'S SCIENCE IS THE LEXICON SIX

3   CRYPTOGRAPHY BUT THEN IMMEDIATELY BEGINS TO EXAMINE

4   THE QUESTION OF THE STRENGTH OF CRYPTOGRAPHIC SYSTEMS,

5   HOW YOU GO ABOUT BREAKING A SYSTEM.  IT BEGINS WITH

6   SYSTEMS IN THE 16TH CENTURY AND GOES UP TO SYSTEMS IN

7   THE 20TH CENTURY.

8   Q.  AND FOR HOW LONG HAVE YOU TAUGHT A COURSE IN

9   CRYPTOGRAPHY?

10  A.  WELL, I'VE TAUGHT IT WHILE AT U.C.S.B FOR 14

11  YEARS, BUT I TAUGHT IT -- I BELIEVE I STARTED TO TEACH

12  CRYPTOGRAPHY BEFORE THAT.  I MAY HAVE TAUGHT IT AT

13  N.Y.U. ONE YEAR.  I THINK I TAUGHT IT INTERNALLY

14  WITHIN I.B.M. FOR SEVEN YEARS.

15  Q.  BY THE WAY, DO YOU -- DOES YOUR COURSE COVER ANY

16  ASPECTS OF CRYPTOGRAPHY RELATED TO TRAP DOOR KNAPSACK?

17  A.  YES, I DESCRIBED THE TRAP DOOR KNAPSACK PROBLEMS,

18  AND I GIVE A HOMEWORK PROBLEM FOR STUDENTS AND ANALYZE

19  THE KNAPSACK PROBLEMS.  I DESCRIBED THE RSA

20  ALGORITHM.  OF COURSE FOR THAT, THERE IS NO VIABLE

21  METHOD FOR BREAKING THE SYSTEM.  SO IT IS MERELY A

22  DESCRIPTIVE HOMEWORK PROBLEM.

23  Q.  IS YOUR COURSE IN CRYPTOGRAPHY SIMILAR TO OTHERS

24  WHICH YOU'RE AWARE?

25  A.  WELL, I'M NOT SURE HOW MANY COURSES ARE DEVOTED IN

1    THE UNITED STATES SOLELY TO CRYPTOGRAPHY.   I KNOW

2    THERE IS ONE GIVEN IN KING COLLEGE IN NEW JERSEY BY

3    SOMEONE WHO IS A FORMER GOVERNMENT EMPLOYEE.

4            AT ONE TIME, I LOOKED AROUND BECAUSE I WAS

5    ASKED TO DO SO BY SOMEONE AT THE UNIVERSITY.   I DON'T

6    THINK THERE ARE MANY COURSES.   MANY COURSES TODAY

7    INCLUDE WITHIN THE MATERIAL COVERED SOME ASPECT OF

8    CRYPTOGRAPHY.   BUT AS FAR AS I KNOW, THERE ARE NOT

9    MANY COURSES THAT ARE DEVOTED SUBSTATIALLY OR ENTIRELY

10   TO CRYPTOGRAPHY.

11   Q.   HAVE YOU WRITTEN ANYTHING IN THE FIELD OF

12   CRYPTOGRAPHY?

13   A.   YES.   AS PART OF MY LEARNING PROCESS THAT STARTED

14   IN 1967, I WROTE A SET OF NOTES ON CRYPTOGRAPHY THAT

15   WAS THE BASIS OF A BOOK THAT I PUBLISHED IN 1980

16   CALLED "CRYPTOGRAPHY OF PRIMER."   IT WAS PUBLISHED BY

17   JOHN WILEY.   AND IN ADDITION I'VE WRITTEN FROM TIME TO

18   TIME PAPERS ON CRYPTOGRAPHY.

19   Q.   LET ME BACK UP NOW.   CAN YOU JUST GIVE US A BRIEF

20   OVERVIEW OF YOUR EDUCATIONAL BACKGROUND.

21           THE COURT:   I THINK WE HEARD THAT YESTERDAY.

22   I THINK YOU CAN PROCEED ABOUT THE QUESTIONS OF THE

23   COURSE TODAY.   I'VE CERTIFIED HE'S AN EXPERT, AND I

24   RECOGNIZE HE'S AN EXPERT.   I THINK THAT'S SUFFICIENT

25   FOR HIM TO GO FORWARD.

1          MR. HASLAM:  I UNDERSTAND, YOUR HONOR.  IF I

2   CAN JUST ASK, BECAUSE IT DOES LAY A CONTEXT FOR SOME

3   SUBSEQUENT TESTIMONY, IF I CAN JUST ASK THE WITNESS TO

4   BRIEFLY COVER SOME OF THE THINGS HE DID IN HIS WORK

5   EXPERIENCE.

6          THE COURT:  OKAY.

7          BY MR. HASLAM:  Q.   TAKING THE COURT'S

8   ADMONITION INTO ACCOUNT, CAN YOU GIVE US A BRIEF

9   OVERVIEW OF YOUR WORK EXPERIENCE AT I.B.M.

10  A.  YES.  WHEN I JOINED I.B.M. IN 1960, I JOINED IN

11  THE MATHEMATICS DEPARTMENT.  MY FIRST RESPONSIBILITIES

12  WERE IN THE EVALUATION OF VARIOUS SCHEMES FOR DOING

13  PATENT RECOGNITION.  AND THEN AT THE ADVICE OF THE

14  PROFESSOR WHO WAS ADVISING ME ON MY POST GRADUATE

15  EDUCATION, I BEGAN TO WORK IN THE AREA OF COMPUTER

16  NETWORKS AND PERFORMANCE EVALUATION.

17         THE COURT:  1960 YOU SAY?

18         THE WITNESS:  I BEGAN TO WORK IN 1960, YOUR

19  HONOR, WHEN I GRADUATED FROM CORNELL.

20         THE COURT:  UPSTATE NEW YORK?

21         THE WITNESS:  YES, UPSTATE NEW YORK.

22         THE COURT:  WHERE IS IT?

23         THE WITNESS:  ITHACA, NEW YORK.  IN 1967 I

24  HAD A NEW RESPONSIBILITY AND CONTINUED ESSENTIALLY

25  LARGELY UNTIL I LEFT I.B.M. IN 1982.  I.B.M. HAD

1   DECIDED THAT IT WANTED TO OFFER ITS CUSTOMERS A

2   PRODUCT WHICH WOULD PROTECT THEIR INFORMATION,

3   INFORMATION NOT ONLY TRANSMITTED BETWEEN MACHINES, BUT

4   INFORMATION STORED IN MEMORY ON A MACHINE.

5        SO I.B.M. -- IN FACT, IT ENGAGED THE SERVICES

6   OF SOMEONE WHO HAD FLED GERMANY IN THE 1930'S, AND IT

7   HAD CONTINUING INTEREST IN CRYPTOGRAPHY.  HE BEGAN TO

8   WORK, AND I HEADED AN EFFORT TO DEVELOP AN I.B.M.

9   PRODUCT IN THIS AREA.  THIS ALGORITHM WAS CALLED

10  LUCIFER, AND THIS ALGORITHM WOULD TAKE EIGHT

11  ALPHABETIC CHARACTERS, THAT IS, TEXT IN GROUPS OF

12  EIGHT AND WOULD ENCIPHER IN GROUPS OF EIGHT.

13       IT'S WHAT WAS REFERRED TO IN CRYPTOGRAPHY AS

14  A BLOCK CIPHER.  ACTUALLY AT THE SAME TIME THAT I.B.M.

15  BEGAN THIS, A CUSTOMER APPROACHED I.B.M. AND ASKED IF

16  IT WOULD DESIGN SECURITY FEATURES FOR A CASH ASSURANCE

17  SYSTEM MUCH LIKE THAT WHAT APPEARS OVER THE UNITED

18  STATES NOW.  THE CONCERNED WAS LLOYDS BANKING OF

19  LONDON.  IT INVOLVED PUTTING A CRYPTOGRAPHIC FEATURE

20  WITHIN THE A.T.M. SYSTEM TO DESIGN THE PROTOCOL FOR

21  HOW THE CUSTOMER WOULD INTERACT WITH THE SYSTEM, AND

22  IT INVOLVED A CRYPTOGRAPHY.

23       AFTER THE SYSTEM BECAME -- WAS IMPLEMENTED BY

24  THE CUSTOMER, WE ESTABLISHED THE RELATIONSHIP WITH THE

25  UNITED STATES GOVERNMENT, AND I.B.M. DESIGNED ANOTHER

1   ALGORITHM TO A FOLLOWING ONTO LUCIFER WHICH BECAME THE

2   DATE ENCRYPTION.   I WAS INVOLVED FROM '67 ON UNTIL I

3   LEFT I.B.M. IN 1982 WITH VARIOUS ASPECTS OF D.E.S.

4   Q.   WAS D.E.S., THE DATA ENCRYPTION STANDARD, EVER

5   ADOPTED OUTSIDE OF I.B.M.?

6   A.   YES, SOMETIME I THINK IN 1970, THE FEDERAL

7   GOVERNMENT SOLICITED FROM INDUSTRIAL GROUPS FROM EVEN

8   INDIVIDUALS ALGORITHMS TO BE SUBMITTED TO THE NATIONAL

9   BUREAU OF STANDARDS, WHICH HAS SINCE BEEN RENAMED.

10  AND THESE ALGORITHMS WOULD BE EXAMINED, TESTED,

11  CERTIFIED BY THE NATIONAL BUREAU OF STANDARDS, AND ONE

12  OR MORE OF THEM WOULD BE DESIGNATED AS A NATIONAL

13  STANDARD CRYPTOGRAPHICAL GEM.   I'M NOT SURE HOW MANY

14  ALGORITHMS WERE SUBMITTED, BUT D.E.S. WAS ONE OF THEM

15  AND CERTIFIED AS A STANDARD IN 1976.

16  Q.   WHEN YOU SAY, "CERTIFIED AS A STANDARD," CAN YOU

17  TELL ME THE PROCESS, AS YOU UNDERSTOOD IT, THAT IT

18  WENT THROUGH PRIOR TO BEING CERTIFIED AS A STANDARD?

19  A.   WELL, I CAN ONLY REALLY GIVE YOU PRECISE

20  INFORMATION ABOUT WHAT I.B.M. DID ALTHOUGH IT'S

21  INFERRED THAT N.B.S. AND ITS AGENT N.S.A. DID THE SAME

22  ACTIVITY.   WE STUDIED THE ALGORITHM, AND WE HIRED

23  EXPERTS.   FOR EXAMPLE, THERE WAS A VERY DISTINGUISHED

24  PROFESSOR ONIC BERLING FROM THE INSTITUTE FOR ADVANCED

25  STUDY THAT WORKED ON THE ANALYSIS OF THE GERMAN GAHEIM

1  STRIGER WHICH WAS ONE OF THE PRINCIPAL GERMAN

2  EXPERTS.  WE HIRED HIM.  WE HIRED OTHER EXPERTS.

3          THE ENTIRE GROUP OF SIX OR SEVEN PEOPLE BEGAN

4  TO STUDY THE ALGORITHM AND EXAMINE IT IN ALL ASPECTS

5  TO DETERMINE WHETHER THIS ALGORITHM COULD BE CRACKED,

6  WHETHER THERE WAS SOME WAY WITHIN SOME PERIOD OF TIME

7  THAT YOU COULD RECOVER WHAT THE KEY WAS, LEARNED WHAT

8  THE PLAIN TEXT WAS.

9          N.B.S. THROUGH ITS SOLICITATION ALSO, I

10  THINK, ENGAGED IN THIS PROCESS.  N.B.S. HELD TWO

11  WORKSHOPS TO SOLICIT AND ENCOURAGE OUTSIDE COMMENTS

12  ABOUT THE DATA ENCRYPTIONS, AND I KNOW THAT MARTY

13  HELLMAN ATTENDED ONE, AND I ATTENDED ONE.  THERE WERE

14  MANY CRITICISMS OF I.B.M. AND MUCH DISCUSSION ABOUT

15  I.B.M.'S D.E.S. ALGORITHM.

16          AND ULTIMATELY AT THE END OF A PERIOD OF

17  PERHAPS FOUR YEARS, THE NATIONAL BUREAU OF STANDARDS

18  DECIDED IT'S CERTIFIED.  IT'S ALSO BEEN RECERTIFIED, I

19  THINK, TWICE AND THERE'S A NEW CERTIFICATION THAT IS

20  COMING UP WITHIN THE NEXT YEAR OR SO.

21  Q.  NOW, I WANT TO TURN TO THE WORK YOU DID IN

22  PREPARATION FOR TESTIFYING HERE TODAY AND FOR THE

23  DECLARATION THAT YOU PROVIDED EARLIER.

24          HAVE YOU REVIEWED WHAT'S BEEN REFERRED TO AS

25  THE '582 PATENT WHICH I BELIEVE IS EXHIBIT 13?

1   A.   YES, I HAVE.

2   Q.   IN THE BINDERS TO YOUR RIGHT, THERE ARE EXHIBITS.

3   IF YOU COULD LOOK AT EXHIBIT 13.

4   A.   YES, I HAVE REVIEWED '582.

5   Q.   IF YOU LOOK AT EXHIBIT 16, WHICH I BELIEVE IS

6   WHAT'S REFERRED TO AS THE FILE WRAPPER OR PROSECUTION

7   HISTORY OF THE '582 PATENT.

8   A.   YES, I HAVE REVIEWED THIS DOCUMENT.

9   Q.   AND HAVE YOU ALSO REVIEWED ANY ARTICLES OR OTHER

10   LITERATURE ABOUT THE ART OR STATE OF THE ART RELATING

11   TO THE '582 PATENT?

12   Q.   YES, I READ -- I ACTUALLY REREAD A NUMBER OF

13   ARTICLES THAT I HAD READ BEFORE I'D READ THE ARTICLE

14   BY WHITFIELD DIFFIE AND MARTY HELLMAN CALLED

15   "MULTIUSER CRYPTOGRAPHIC TECHNIQUES," AND MAYBE I'VE

16   MISSTATED THE TITLED OF -- "MULTIUSE OF CRYPTOGRAPHIC

17   TECHNIQUES."  I READ THEIR PAPER ON "NEW DIRECTIONS IN

18   CRYPTOGRAPHY."

19        I READ THE PAPER OF MARTY HELLMAN AND RALPH

20   MERKLE ON TRAP DOOR KNAPSACK SYSTEMS, AND I READ THE

21   PAPER BY MARTY HELLMAN AND WHITFIELD DIFFIE, THE PAPER

22   ON "PRIVACY IN AUTHENTICATION AND INTRODUCTION INTO

23   CRYPTOGRAPHY."

24   Q.   NOW, I WANT TO TURN TO TERMS THAT ARE USED IN THIS

25   FIELD.  I WANT TO START OFF WITH --

1            THE COURT:  LET'S TAKE A BREAK.

2                  (A RECESS WAS TAKEN.)

3            MR. HASLAM:   Q.    WHAT DO YOU UNDERSTAND IS

4    MEANT BY A SECURE CRYPTOGRAPHIC SYSTEM?

5    A.   WELL, A SECURE CRYPTOGRAPHIC SYSTEM IS A SYSTEM

6    THAT'S TO PROVIDE SECRECY WHETHER THAT SECRECY IS

7    GOING TO BE USED TO HIDE INFORMATION OR USED AS PART

8    OF AUTHENTICATION.  BUT THE PROCESS IS REALLY

9    DESCRIBED BY ITS TWO ATTRIBUTES, AND THE ATTRIBUTES

10   ARE AS FOLLOWS.  IT GUARANTEES TO PROVIDE SECRECY

11   AGAINST ANY AND ALL METHODS THAT PEOPLE CAN BRING TO

12   BEAR AGAINST THE SYSTEM.

13            THE COURT:  FEASIBLE METHOD?

14            THE WITNESS:  FEASIBLE?  WELL, IT GUARANTEES

15   IT.  WHETHER THE GUARANTEE WILL LAST FOR A YEAR OR FOR

16   A WEEK IS GOING TO DEPEND UPON THE METHODS.  SO IN

17   FACT, THE SECOND ATTRIBUTE IS THAT THAT GUARANTEE

18   SHOULD BE FOR AT LEAST SOME TIME.

19            SO IT SAYS I GUARANTEE THAT THIS INFORMATION

20   WILL BE KEPT SECRET FROM EVERYTHING, EVERYONE.  AND

21   SECOND, I GUARANTEE THAT THAT INFORMATION WILL BE KEPT

22   SECRET FOR AT LEAST TWO YEARS.  SO THOSE ARE THE TWO

23   ATTRIBUTES.  IT DOESN'T TELL YOU HOW TO DO IT.  IT

24   ONLY TELLS YOU THE RESULTS OF SECURE COMMUNICATIONS.

25            THE COURT:  SOME DAY THEY'LL GET BACK TO

1    HANDING THE BRIEFCASE OVER.

2              THE WITNESS:  MAY THAT OR CARRIER PIGEONS.

3              MR. HASLAM:  Q.   I BELIEVE THERE WAS SOME

4    DISCUSSION ABOUT THE TIME VALUE OF INFORMATION.  IS

5    THAT WITH THE SECOND ATTRIBUTE?

6    A.  YES.  I THINK PROFESSOR HELMAN POINTED OUT

7    YESTERDAY THAT IN SOME ENVIRONMENT, FOR EXAMPLE,

8    MILITARY COMMUNICATIONS, THE SECRECY DOESN'T HAVE TO

9    BE MAINTAINED FOR A MILLION YEARS.  IT MAY HAVE TO BE

10   MAINTAINED ONLY FOR A MONTH OR FOR TWO MONTHS

11   DEPENDING UPON WHEN THE ACTION IS TO TAKE PLACE.

12             BUT THEN THERE ARE SOME EXAMPLES WHERE THE

13   SECRECY MUST BE MAINTAINED FOR A MUCH LONGER PERIOD OF

14   TIME.  AS I MENTIONED BEFORE, THE WORK FOR LLOYDS

15   BANKING INVOLVES A.T.M.'S.  ONE OF THE THINGS THAT YOU

16   HAVE IN AN A.T.M. IS A PERSONAL INFORMATION NUMBER

17   WHICH TOGETHER WITH THE CARD ENABLES YOU TO GET CASH

18   FROM AN UNATTENDED BANKING TERMINAL.  THAT PIN HAS GOT

19   TO BE PROTECTED AS LONG AS YOU OWN THE CARD.

20             SO IT'S GOT TO BE PROTECTED FOR 10'S OF YEARS

21   OR 50 YEARS.  MY MEDICAL REPORTS I WANT TO BE

22   PROTECTED AS LONG AS I'M ALIVE.  SO DEPENDING UPON

23   WHAT THE APPLICATION IS, THERE HAS TO BE SECRECY

24   MAINTAINED FOR SOME LENGTH OF TIME DEPENDING UPON WHAT

25   THE APPLICATION IS, AND I THINK THAT THAT'S UNDERSTOOD

1    IN THE BUSINESS OF CRYPTOGRAPHIC SYSTEMS BECAUSE THERE

2    ARE SOME SYSTEMS WHICH WOULD BE VALID FOR CLASSIFIED

3    DATA AND SOME SYSTEMS WHICH WOULD BE DATA FOR TOP

4    SECRET DATA.

5            SO THEY ARE SUPPOSED TO PROVIDE SECURITY FOR

6    A CERTAIN AMOUNT OF TIME, AND THAT DEPENDS UPON THE

7    INTRINSIC STRENGTH OF THE ALGAMY.

8    Q.   HOW DO CRYPTOGRAPHERS GO ABOUT DETERMINING WHAT

9    YOU JUST REFERRED TO AS THE INTRINSIC STRENGTH OR

10   SECURITY OF A SYSTEM?

11   A.   THE ANSWER IS VERY COMPLICATED.

12           MR. KENNEDY:   YOUR HONOR, IT'S ALSO

13   IRRELEVANT TO INTERPRETATION OF THIS TERM IN THE

14   PATENT.

15           MR. HASLAM:   THE PATENT REFERS TO PROVIDING A

16   METHOD OF SECURE COMMUNICATION, AND IT SEEMS TO ME HOW

17   YOU DETERMINE WHETHER A COMMUNICATION IS SECURE, AND

18   HOW PEOPLE IN THE ART DEFINE THAT TERM, AND HOW THEY

19   DETERMINE IT IS RELEVANT AS TO HOW THE COURT'S GOING

20   TO CONSTRUE WHAT IT MEANS TO HAVE A SYSTEM WHICH

21   PROVIDES SECURE COMMUNICATION.

22           MR. KENNEDY:   IT SOUNDS LIKE AN INVALIDITY

23   ATTACK TO ME, YOUR HONOR.   IF THEY ARE CLAIMING THE

24   PATENT IS INVALID AND DOESN'T DO WHAT IT PROMISES,

25   THAT'S AN ISSUE FOR ANOTHER DAY.

1    THE QUESTION NOW IS WHAT DID THE WORDS IN THE

2    PATENT MEAN, AND WHY ARE THEY NOT DEFINED OTHERWISE

3    SUCH AS THIS MAN TO HAS TO BE GIVING HIS LAST RESORT

4    OPINION?

5    THE COURT:  REPEAT THE QUESTION, PLEASE.

6    MR. HASLAM:  HOW DO CRYPTOGRAPHERS DETERMINE

7    WHETHER A SYSTEM PROVIDES THE SECURE COMMUNICATION

8    WHICH YOU HAVE TESTIFIED IS INTRINSIC OR INHERENT IN

9    ANY SYSTEM.

10   THE COURT:  OBJECTION OVERRULED.

11   THE WITNESS:  THE ANSWER IS THAT PEOPLE STUDY

12   THE SYSTEM.  IT IS A GROUP OF PEOPLE, FOR EXAMPLE,

13   WITHIN THE GOVERNMENT, ONE GROUP DESIGNS THE

14   ALGORITHM, ANOTHER GROUP BEGINS TO ATTACK THE

15   ALGORITHM.  BASED ON THE EXPERTISE THEY HAVE DEVELOPED

16   OVER A PERIOD OF TIME, THEY BEGIN TO APPLY THAT TO TRY

17   TO FIND THE SOLUTION.

18   IF THEY DON'T FIND THE SOLUTION, IT DOESN'T

19   MEAN THAT THE SYSTEM IS SECURE.  BUT IF THIS IS DONE

20   OVER AN EXTENDED PERIOD OF TIME WITH COMPETENT PEOPLE,

21   THE LESS LIKELY THAT A SOLUTION WILL BE FOUND AND MORE

22   CONFIDENCE THAT YOU GAIN WITHIN THE SYSTEM.

23   IT'S MUCH LIKE THE SAME AS WHEN YOU TEST A

24   DRUG.  YOU TAKE A DRUG.  YOU GIVE IT TO A TEST GROUP

25   OF PEOPLE, AND YOU SEE WHETHER THEY GET BETTER OR

1   WORSE.  IF THEY ALL GET BETTER, IT DOESN'T MEAN THAT

2   THE DRUG IS GOING TO MAKE EVERYONE WELL.  BUT THE MORE

3   LONGER YOU TEST IT, THE MORE EXPERIENCE YOU HAVE WITH

4   THE DRUG, THE MORE CONFIDENCE YOU GAIN THAT THE DRUG

5   IS GOING TO ACT IN A POSITIVE WAY.

6            BUT BEFORE YOU DO THAT, YOU NEVER DISTRIBUTE

7   THE DRUG TO PEOPLE.  THAT'S THE SORT OF PARADIME THAT

8   THE FDA USES.  IT TESTS THE DRUG, SEES THE EFFECT OF

9   THE DRUG ON PEOPLE, AND THEN CERTIFIES THE DRUG AS

10  BEING ACCEPTABLE FOR THE MARKETING WITHIN -- FOR THE

11  GENERAL PUBLIC.  THE SAME IS TRUE OF CRYPTOGRAPHY.

12  YOU STUDY THE ALGORITHM, USE THE BEST SKILLS THAT YOU

13  HAVE TO ANALYZE IT, AND WHEN AFTER A REASONABLE PERIOD

14  OF TIME YOU DON'T FIND ANY METHOD OF ANALYSIS, THEN

15  YOU BEGIN TO FEEL CONFIDENT THAT THE ALGORITHM IS

16  GOOD.

17           THE COURT:  WELL, THE GOVERNMENT CERTIFICATE

18  OF APPROVAL THAT WAS GIVEN -- DOES THAT SORT OF

19  VALIDATE THE I.B.M. SYSTEM?

20           THE WITNESS:  YES, THAT IN FACT WAS PART OF

21  THIS CERTIFICATION PROCESS.

22           THE COURT:  A COMPANY CAN'T MARKET A PRODUCT

23  THEY SAY IS SECURE UNLESS IT GETS CERTIFICATION.

24           THE WITNESS:  I'M NOT SURE.  WE DON'T INSIST

25  WITHIN THE UNITED STATES THAT THE GOVERNMENT CERTIFY

1   EVERY CRYPTOGRAPHIC ALGORITHM.

2          THE COURT:  IF THAT'S TRUE, THE UNITED STATES

3   WOULD GIVE UP.

4          THE WITNESS:  IN THE CASE OF D.E.S., THE

5   ALGORITHM WAS TESTED BY THE NATIONAL SECURITY AGENCY

6   OVER A PERIOD OF CERTAINLY THREE OR FOUR YEARS BEFORE

7   THE NATIONAL BUREAU OF STANDARDS SAID "YES, WE DECLARE

8   THAT THIS ALGORITHM IS ADEQUATE FOR PROTECTING YOUR

9   INFORMATION."

10          THE COURT:  BUT THE INDUSTRY DOESN'T HAVE TO

11   GO TO THE GOVERNMENT AGENCY --

12          THE WITNESS:  NO, NO.  THE INVENTORS OF '582

13   DIDN'T GO TO THE NATIONAL BUREAU OF STANDARDS, WEREN'T

14   REQUIRED TO GO TO IT, NOR THE INVENTORS OF THE RSA GO

15   AND SAY, "WE WANT CERTIFICATION THAT THIS ALGORITHM

16   MEETS THE TESTS THAT YOU WILL PUT INTO PLACE TO TELL

17   THE GENERAL PUBLIC THAT IT'S ALL RIGHT TO USE IT."  IT

18   WILL GUARANTEE SECRECY FOR YOUR INFORMATION.  YOU

19   DON'T HAVE TO DO IT, NOT AT THE PRESENT TIME.

20          MR. HASLAM:  Q.   I THINK WE LEARNED

21   YESTERDAY THAT CRYPTOGRAPHY AT LEAST BORROWS A LOT

22   FROM MATHEMATICS; IS THAT CORRECT?

23   A.   YES, I THINK SO.

24   Q.   WHY CAN'T YOU, GIVEN THAT, SIMPLY PROVE

25   MATHEMATICALLY THE SECURITY OF THE SYSTEM?

A.   WELL, IT'S JUST NOT POSSIBLE IN GENERAL.   THERE IS

ONE SYSTEM THAT WAS INVENTED PROBABLY IN THE 1920'S BY

JOSEPH MORBER AT U.S. CIGNA CORP. CALLED THE "ONE TIME

SYSTEM."   IT'S BEEN USED FOR THE PAST 70 YEARS, AND IT

ABSOLUTELY UNEQUIVOCALLY GUARANTEES THE SECURITY OF

INFORMATION.

IN SPITE OF THAT, YOUR HONOR, THE RUSSIANS,

WHO ALSO USED IT, MADE A MISTAKE DURING THE SECOND

WORLD WAR IN ITS USE NOT IN THE ALGORITHM BUT THE WAY

THEY USED IT, AND IT LED TO A TREMENDOUS DISCOVERY BY

THE UNITED STATES OF RUSSIAN INTELLIGENCE.

BUT THAT SYSTEM IF USED CORRECTLY ABSOLUTELY

GUARANTEES.   IT CAN BE MATHEMATICALLY PROVED.   BUT

EXCEPT FOR THAT SYSTEM, YOU CANNOT PROVE

MATHEMATICALLY THAT A SYSTEM WILL GIVE COMPLETE

SECURITY BECAUSE IT'S ONLY A FINITE NUMBER OF KEYS

THAT YOU HAVE TO TEST.   AND SO IF YOU TEST ALL KEYS,

CERTAINLY YOU WILL FIND SOME ONE KEY WHICH WILL GIVE

YOU READABLE PLAIN TEXT.

AND WHEN YOU SEE THAT, YOU CAN ALWAYS SAY

THAT'S THE KEY WHICH THE USER IS USING.   SO I

INTERCEPT SOME CIPHER TEXT THAT MARTY HELLMAN HAS

TRANSMITTED OR PRESIDENT ROOSEVELT HAS TRANSMITTED TO

GENERAL EISENHOWER.   I TRY ALL POSSIBLE KEYS, AND ONE

OF THEM IS GOING TO GIVE ME SOMETHING THAT I CAN

1   READ.

2          SO THEREFORE, I CAN'T PROVE MATHEMATICALLY

3   THAT YOU CAN'T DO IT BECAUSE I'VE SHOWED HOW TO DO

4   IT.   THE TROUBLE IS, THOSE SYSTEMS MAY STILL BE

5   SECURED IF I CAN'T DO THE ACT THAT I JUST DESCRIBED TO

6   YOU.   THAT IS, I CAN'T TEST ALL KEYS BECAUSE THERE ARE

7   TOO MANY KEYS.

8          IN THIS CASE INSTEAD OF PROVIDING WHAT IN THE

9   FIRST CASE IS CALLED UNCONDITIONAL SECURITY, AN

10  ABSOLUTE GUARANTEE, WE PROVIDE SOMETHING WHICH IS

11  CALLED A COMPUTATIONAL GUARANTEE OF SECURITY.   THAT

12  IS, YOU JUST CAN'T CARRY OUT THE PHYSICAL ACT OF

13  TESTING ALL THESE, BUT YOU CAN'T MATHEMATICALLY PROVE

14  THAT IT'S SECURE BECAUSE IF YOU COULD IN FACT TEST ALL

15  THE KEYS AND FIND THE CORRECT KEY.

16         BUT NEVERTHELESS OUR SYSTEMS MAY BE CERTIFIED

17  IF THE VERY ACT OF DOING THIS THING IS IMPOSSIBLE TO

18  DO, THEN WE'RE CONFIDENT IF THE ONLY WAY OF DOING THIS

19  IS TRYING ALL THE KEYS, AND IF YOU CAN TRY ALL THE

20  KEYS, THEN IT IS SECURE.

21  Q.  DID THE INVENTORS OF THE '582 PATENT PROVE THAT

22  THE TRAP DOOR KNAPSACK SYSTEMS WHICH WERE DISCLOSED

23  THERE WERE SECURE OR PROVIDED A MEANS OF SECURE

24  COMMUNICATION?

25  A.  WELL, THEY WRITE IN THE PATENT THAT THEY ARE

1  DESCRIBING A SECURE COMMUNICATIONS SYSTEM, INDICATED

2  IN THE PATENT IN ONE OF THE CLAIMS, IN CLAIM ONE, THAT

3  THE PROCESS OF BREAKING THE SYSTEM IS COMPUTATIONALLY

4  INFEASIBLE.  THAT'S WHAT WE'VE BEEN DESCRIBING AS

5  NEEDING THE TEST FOR CERTIFICATION.  BUT THEY DID NOT

6  ACTUALLY PARTICIPATE IN ANY CERTIFICATION ACTION AT

7  THE TIME THE PATENT WAS FILED.

8         AUTHORS DID SAY IN THERE THEY CHALLENGED

9  PEOPLE.  THEY WANTED PEOPLE TO STUDY THE PROBLEM

10  BECAUSE THEY WANTED TO DETERMINE WHETHER THIS

11  ENCRYPTION SYSTEM WAS COMPUTATIONALLY INFEASIBLE TO

12  BREAK AS INDICATED.  BUT AT THE TIME THE PATENT WAS

13  ISSUED -- AT THE TIME THE PATENT WAS FILED, IT'S

14  CERTAINLY NOT THE CASE THAT THEY SUBMITTED THIS TO A

15  CERTIFICATION PROCESS.

16  Q.  JUST SO I'M CLEAR, DID THEY MATHEMATICALLY PROVE --

17  IS THIS ONE OF THOSE ALGORITHMS WHICH WAS MATHEMATICALLY

18  PROVED TO PROVIDE A METHOD OF SECURE COMMUNICATION?

19  A.  NO, NOT AT ALL.

20  Q.  SO THIS WAS A SYSTEM, THEN, WHERE SOME SORT OF

21  CERTIFICATION PROCESS WOULD BE NECESSARY TO DETERMINE

22  WHETHER IT PROVIDED A METHOD OF SECURE COMMUNICATION?

23  A.  THAT'S CORRECT.  IT REQUIRED SOME TYPE OF

24  CERTIFICATION.

25  Q.  DO YOU KNOW OR HAVE ANY BASIS FOR TELLING US

1   WHETHER YOUR OPINION THAT THE SECURITY OF THIS, THE

2   TRAP DOOR KNAPSACK CRYPTOGRAPHIC SYSTEM, HAD TO BE

3   CERTIFIED SINCE IT WASN'T PROVEN TO PROVIDE A METHOD

4   OF SECURE COMMUNICATION?

5   A.   WELL, THE AUTHORS THEMSELVES IN ONE OF THEIR

6   ARTICLES, THE ARTICLE BY PROFESSOR HELLMAN AND RALPH

7   MERKLE WHICH I BELIEVE IS EXHIBIT 1003.

8   Q.   CAN YOU GIVE US THE TITLE OF THAT?

9   A.   THE TITLE OF THAT IS "HIDING INFORMATION AND

10  DIGITAL SIGNATURES IN TRAP DOOR KNAPSACKS."  THEY

11  WROTE ON PAGE 529 "WE HAVE NOT PROVED THAT IT IS

12  COMPUTATIONALLY DIFFICULT FOR AN OPPONENT WHO DOES NOT

13  KNOW THE TRAP DOOR TO SOLVE THE PROBLEM."  THEY GO ON

14  TO SAY IN --

15          THE COURT:  WHERE IS THAT?

16          THE WITHESS:  IT'S ON PAGE 529, THE SECOND

17  COLUMN, YOUR HONOR, THE SECOND COLUMN.

18          THE COURT:  WHAT'S THE HEADING OF THE

19  PARAGRAPH?

20          THE WITNESS:  THE HEADING OF THE PARAGRAPH IS

21  "VII DISCUSSION."  THE SECOND PARAGRAPH BEGINS WITH

22  "WE HAVE NOT PROVED THAT IT IS" --

23          THE COURT:  MINE DOESN'T HAVE ANY PAGE

24  NUMBERS ON IT.

25          THE WITNESS:  CAN I GIVE YOU MINE, YOUR HONOR?

1        MR. HASLAM:  IN THE UPPER RIGHT-HAND CORNER I

2   BELIEVE, 529.  IT SHOULD BE THE SECOND TO LAST PAGE IN

3   THE EXHIBIT.  THERE'S A "VII DISCUSSION."

4        THE COURT:  ALL RIGHT.

5        MR. KENNEDY:  YOUR HONOR, I'D OBJECT TO MOVE

6   TO STRIKE ON THE GROUNDS THAT IT SOUNDS AS THOUGH THEY

7   ARE TRYING TO SHOW NOW THE PATENT IS NONENABLING IN

8   SAYING THE TRAP DOOR KNAPSACK SIMPLY DOESN'T DO WHAT

9   THE PATENT CLAIMED.  THAT MIGHT BE A NICE ATTACK

10  BEFORE THE PATENT OFFICE.  IT MIGHT HAVE SOME POINT IN

11  THESE PROCEEDINGS, BUT SUBMIT IT HAS NOTHING TO DO

12  WITH MARKMAN CLAIMS CONSTRUCTION.  AT BEST IT SEEMS TO

13  BE AN ATTACK ON ENABLING.

14        MR. HASLAM:  I BELIEVE THAT THE OBJECTION

15  MR. KENNEDY MADE BEFORE WAS OF THE SAME THING WHICH

16  SOUNDS LIKE IT'S GOING TO VALIDITY, BUT REALLY IF THE

17  PATENT DIDN'T DO WHAT IT PROMISED AND WHAT WE'RE HERE

18  TO DO IS WHAT IT SAYS IT CAN DO AND ONCE WE KNOW WHAT

19  THE TEST IS, THEN WE CAN GO LOOK AND SEE IF IT DOES

20  IT.

21        BUT YOU HAVE TO CONSTRUE THE CLAIMS FOR

22  INFRINGEMENT THE SAME AS YOU DO FOR VALIDITY.  AND YOU

23  HAVE TO CONSTRUE THE CLAIMS, THEN WE KNOW THE TARGET

24  THAT THESE INVENTORS SET UP AND WHETHER WHAT THEY

25  DISCLOSED MET THAT TARGET.  BUT TO SAY THAT WE'RE

1   PUTTING THE CART BEFORE THE HORSE IS WRONG.  YOU HAVE

2   TO CONSTRUE THE CLAIMS THE SAME FOR VALIDITY AND

3   INFRINGEMENT.

4            ONCE WE KNOW WHAT THEY PROMISED, ONCE WE KNOW

5   WHAT THE TERM TO PROVIDE SECURE COMMUNICATION MEANS,

6   THEN WE CAN DETERMINE WHETHER THEY DID IT OR NOT.

7            MR. KENNEDY:  YOUR HONOR, THAT'S NOT WHAT THE

8   LAST LINE OF QUESTIONS HAS GONE TO.  THE LAST LINE OF

9   QUESTIONS RELATED TO DID THE PARTICULAR PREFERRED

10  EMBODIMENT, THE TRAP DOOR KNAPSACK, IN FACT ACCOMPLISH

11  WHAT THE PATENT SET OUT TO DO.

12           THE COURT:  I DON'T THINK HE SAID THAT.

13           MR. HASLAM:  JUST TO REPEAT IF THERE IS ANY

14  MISCOMMUNICATION, THE QUESTION WAS --

15           THE COURT:  LET'S HEAR THE QUESTION AGAIN.

16           MR. HASLAM:  COULD WE HAVE THE QUESTION READ

17  BACK OR WOULD YOU LIKE ME TO RESTATE IT?  I'LL RESTATE

18  IT.

19           THE COURT:  FINE.

20           MR. HASLAM:  Q.  IS THERE ANYTHING WHICH

21  YOU'RE AWARE IN THE ART THAT CONFIRMS OR DOESN'T

22  CONFIRM YOUR VIEW THAT THE SECURITY OF A CRYPTOGRAPHIC

23  SYSTEM AND ITS ABILITY TO PROVIDE A SECURE

24  COMMUNICATION MUST BE CERTIFIED WHEN IT IS NOT

25  MATHEMATICALLY PROVEN?

1    A.   AND MY ANSWER TO THE QUESTION REMAINS YES.

2            THE COURT:   CERTIFIED BY WHO.

3            THE WITNESS:   CERTIFIED BY PEOPLE IN THE

4    CRYPTOGRAPHIC COMMUNITY WHO WORK IN THIS AREA THAT

5    THERE IS NO NATIONAL --

6            THE COURT:   IF IT'S JUST THE USERS, IT'S NOT

7    A GOVERNMENT CERTIFICATION.

8            THE WITNESS:   THAT'S RIGHT.   IT'S NOT A

9    GOVERNMENT CERTIFICATION.   IT'S A CERTIFICATION BY

10   PEOPLE WORKING IN THE AREA OF CRYPTOGRAPHY.   THERE IS

11   NO FORMAL PROCESS BY WHICH CERTIFICATION CAN BE

12   ACHIEVED.   THAT IS, I CAN'T GO TO THE FDA AND SAY,

13   "CERTIFY THIS CRYPTOGRAPHIC ALGORITHM."   THAT'S NOT

14   WITHIN THEIR CHARTER, BUT I CAN PUBLISH THIS ALGORITHM

15   AND CHALLENGE PEOPLE IN THE CRYPTOGRAPHIC COMMUNITY TO

16   STUDY THE ALGORITHM.

17           AND WHEN THEY HAVE STUDIED THE ALGORITHM TO

18   SAY, NO, I'M NOT DOING AN ANALYSIS, IF A NUMBER OF

19   YEARS GO BY WITH NO BREAKS OF THE SYSTEM, THE LONGER

20   THE PERIOD THE MORE CONFIDENT YOU ARE.   BUT THE

21   QUESTION THAT MR. HASLAM IS ASKING ME, IS THERE

22   ANYTHING THAT SUGGESTS THAT THE AUTHORS WERE AWARE OF

23   THAT PROCESS, WHATEVER CERTIFICATION IS.

24           THE COURT:   THAT'S THE LONG ANSWER TO A SHORT

25   QUESTION.

1         THE WITNESS:  I'LL TRY TO BE MORE BRIEF.  ON

2    PAGE 529 --

3         THE COURT:  WHAT PAGE?

4         THE WITNESS:  529 ON THE RIGHT-HAND COLUMN.

5         THE COURT:  DISCUSSION.  IT SAYS WE HAVE

6    SHOWN RESPONSE TO KNAPSACK --

7         THE WITNESS:  MAY I DIRECT YOUR ATTENTION TO

8    THE LAST THREE LINES, SECOND PARAGRAPH OF THAT

9    SECTION.

10        THE COURT:  "FAITH IN THE SECURITY OF THESE

11   SYSTEMS MUST THEREFORE REST ON INTUITION AND THE

12   FAILURE OF CONCERTED ATTEMPTS TO BREAK THEM."

13        THE WITNESS:  AND THAT'S THE POINT.

14        THE COURT:  IT DOESN'T SAY "GUARANTEE"?

15        THE WITNESS:  IT DOESN'T OFFER GUARANTEE.

16   THIS IS OFFERING SECURITY, DEPENDS UPON THE ABILITY OF

17   PEOPLE TO STUDY THE SYSTEM AND TO SEE WHETHER THEY

18   HAVE CRACKED THE SYSTEM.

19        THE COURT:  THE SECOND PARAGRAPH SAYS, "WE

20   HAVE NOT PROVED THAT IT IS COMPUTATIONALLY DIFFICULT

21   FOR AN OPPONENT WHO DOES NOT KNOW THE TRAP INFORMATION

22   TO SOLVE THE PROBLEM.  CONCLUSIVE PROOF OF SECURE

23   COMMUNICATION ARE NOT YET AVAILABLE FOR NORMAL

24   CRYPTOGRAPHIC SYSTEMS.  EVEN THE KNAPSACK PROBLEM HAS

25   NOT BEEN PROVED DIFFICULT TO SOLVE."

1          THE WITNESS:  THE INVENTORS ADMIT THAT

2     IT'S -- THAT IN CONTRARY TO WHAT THEY CLAIM THEMSELVES

3     IN CLAIM ONE, THEY CLAIM THAT IT IS COMPUTATIONALLY

4     DIFFICULT.  AND IN THIS ARTICLE OVER HERE WHICH DEALS

5     WITH THE SAME SYSTEM, THEY NOW CONTRADICT THEMSELVES.

6     THEY ARE SAYING THEY HAVEN'T PROVED IT.

7          MR. KENNEDY:  YOUR HONOR, OBJECT AND MOVE TO

8     STRIKE.  NOW HE HAS JUST TESTIFIED THE PATENT IS

9     NOT --

10         THE COURT:  I'LL STRIKE THAT PORTION.  I

11    ASKED A QUESTION AND GOT A LONGER ANSWER THAN I WAS

12    SEEKING.  THIS IS DISCUSSION IN AN ARTICLE BY THE

13    INVENTORS OF THIS INVENTION AND SAYS CERTAIN THINGS

14    ABOUT IT.

15         MR. HASLAM:  JUST SO THERE IS NO CONFUSION,

16    I'LL TRY TO CLEAR UP IF THERE IS ANY.

17    Q.   IN THE PARAGRAPH WHICH YOU HAVE JUST READ,

18    PROFESSOR KONHEIM, AND JUDGE WILLIAMS HAS JUST READ,

19    THE FIRST SENTENCE THAT SAYS THEY HAVE NOT PROVED IT

20    IS COMPUTATIONALLY DIFFICULT.  WHAT KIND OF PROOF IS

21    IT YOU'RE UNDERSTANDING THAT THE AUTHORS ARE TALKING

22    ABOUT THERE?

23    A.   I THINK THEY ARE TALKING ABOUT MATHEMATICALLY

24    PROVING.

25         THE COURT:  WELL, THEY SAY ALONG THAT LINE

1   SOMEPLACE ELSE THAT I READ -- IT WAS DISCUSSED

2   YESTERDAY.

3           MR. HASLAM:   Q.   DOES THE REMAINDER OF THAT

4   PARAGRAPH AT WHICH YOU DIRECTED OUR ATTENTION

5   DESCRIBE, THEREFORE, THE ABSENCE OF MATHEMATICAL PROOF

6   THE METHOD BY WHICH ONE MUST DETERMINE WHETHER A

7   SYSTEM PROVIDES SECURE COMMUNICATION?

8   A.   YES.   HIS HONOR READ THE LAST THREE SENTENCES

9   WHICH BEGIN "FAITH IN THE SECURITY OF THESE SYSTEMS

10  MUST THEREFORE REST UPON INTUITION AND THE FAILURE OF

11  CONCERTED ATTEMPTS TO BREAK THEM."

12  Q.   WHAT IS YOUR UNDERSTANDING WHAT IS MEANT BY THE

13  REFERENCE TO "CONCERTED ATTEMPTS TO BREAK THEM"?

14  A.   WELL, I --

15          THE COURT:   DOESN'T IT SPEAK FOR ITSELF?

16          THE WITNESS:   I THINK CONSERTED MEANS MANY

17  PEOPLE.

18          MR. KENNEDY:   OBJECT, MOVE TO STRIKE.   BEST

19  EVIDENCE RULE.

20          THE COURT:   I CAN READ AND INTERPRET IT AS I

21  SAID.   FAITH IN THE SECURITY SYSTEM MUST THEREFORE

22  REST UPON INTUITION AND THE FAILURE BY PEOPLE TRYING

23  TO -- FAILURE OF A CONCERTED ATTEMPT TO BREAK THEM.

24          MR. HASLAM:   Q.   WHO IS IT TO YOUR

25  UNDERSTANDING IN THE ART ARE THE PEOPLE WHO ARE TO

1   MAKE THESE CONCERTED ATTEMPTS?

2          THE COURT:  PEOPLE THEY'RE TRYING TO KEEP THE

3   SECRETS FROM, AREN'T THEY?

4          THE WITNESS:  THAT'S RIGHT.  WELL, ACTUALLY

5   IT DOESN'T REFER, YOUR HONOR, TO EAVESDROPPERS BECAUSE

6   THERE IS NO GROUP -- BUT IN THE SENSE THAT PEOPLE IN

7   THE ACADEMIC COMMUNITY -- INDUSTRY, AM SURE ARE

8   CONCERNED WITH SECURITY.

9          THE COURT:  IT'S A PUBLIC TRANSMISSION, BUT

10  IT'S NOT EAVESDROPPING IN A SENSE.  BUT IF SOMEBODY

11  PICKS IT UP AND TRIES TO FIND OUT WHAT IT'S SAYING AND

12  THE SENDER DOESN'T WANT THEM TO KNOW WHAT THEY ARE

13  SAYING.

14         THE WITNESS:  THAT'S RIGHT.

15         THE COURT:  TRYING TO GET THIS INFORMATION

16  THAT THEY DON'T WANT THEM TO HAVE.

17         MR. HASLAM:  IF I COULD JUST GO ON THAT POINT

18  A LITTLE MORE.

19  Q.  THE PURPOSE OF A SECURE CRYPTOGRAPHIC SYSTEM

20  INCLUDING THE ONE THAT WAS PROPOSED IN THE '582 PATENT

21  IS TO PROVIDE PRIVACY OR SECRECY; CORRECT?

22  A.  THAT'S ONE OF THE TASKS OF THE SYSTEM.

23  Q.  IT IS SO THAT, WHEN JUDGE WILLIAMS WANTS TO

24  COMMUNICATE TO SOMEBODY IN A SECURE FASHION, NEITHER

25  YOU OR MR. KENNEDY, NO ONE ELSE CAN LISTENS IN AND

1   EAVESDROP AND DETERMINE WHAT'S BEING SAID BY JUDGE

2   WILLIAMS AND SOMEBODY ELSE?

3   A.   THAT'S THE INTENDED TASK THAT ENCIPHERMENT IS

4   SUPPOSED TO SOLVE.

5   Q.   AT THE TIME IF I CAME UP WITH A SYSTEM THAT I

6   THOUGHT WOULD BE BETTER THAN ANY PREVIOUSLY PROPOSED

7   TO PROVIDE THAT SECURITY, I COULD WRITE IT UP AND

8   PUBLISH IT; CORRECT?

9   A.   THAT'S RIGHT.

10  Q.   AND I COULD IN MY ARTICLE PROVIDE A MATHEMATICAL

11  PROOF THAT THIS SYSTEM WILL IN FACT GUARANTEE THE

12  PRIVACY OF COMMUNICATION BETWEEN TWO PEOPLE; CORRECT?

13  A.   SUPPOSE YOU COULD.

14  Q.   YOU'VE ALREADY TOLD US THAT THERE IS ONE SYSTEM

15  WHICH DOES THAT.

16  A.   YES.

17  Q.   AS I UNDERSTAND WHAT YOU'RE SAYING IS IS THAT AT

18  THE TIME THAT I PROPOSED MY SYSTEM, IF I CAN'T OR

19  DON'T OFFER MATHEMATICAL PROOF, THAT IN ORDER FOR

20  PEOPLE IN THE FIELD TO GAIN CONFIDENCE THAT WHAT I'VE

21  PROPOSED WILL IN FACT PROVIDE A METHOD OF SECURE

22  COMMUNICATION, IT WOULD BE ONLY AFTER THE SYSTEM I

23  PROPOSED WITHSTOOD CONCERTED ATTEMPTS TO BREAK IT; IS

24  THAT CORRECT?

25          MR. KENNEDY:   OBJECTION, YOUR HONOR.   I KNOW

1  LEADING IS PERMITTED WITH WITNESSES, BUT MR. HASLAM IS

2  TESTIFYING AT THIS POINT.  HE'S ALSO ASSUMING FACTS

3  NOT IN EVIDENCE.

4          THE COURT:  IT'S A QUESTION I THINK IT WILL

5  ANSWER ITSELF.

6          MR. HASLAM:  I APOLOGIZE, YOUR HONOR, BUT I

7  WAS CONCERNED THAT -- I'M TRYING TO DRAW THE

8  DIFFERENCE BETWEEN AT THE TIME A SYSTEM IS PROPOSED

9  HOW IT GETS ACCEPTED OR DEMONSTRATED THAT IT IS

10  SECURE.

11          THE COURT:  DIDN'T WE HEAR IN YESTERDAY'S

12  DISCUSSIONS?

13          MR. HASLAM:  THAT'S AFTER IT'S OUT THERE IN

14  USE.

15          THE COURT:  HOW IT WORKS.

16          MR. HASLAM:  Q.  IS THIS TALKING ABOUT AT

17  THE TIME IN WHICH IT'S USED, PROFESSOR KONHEIM, OR

18  SOME METHOD WHEREBY PEOPLE IN THE CRYPTOGRAPHIC

19  COMMUNITY ATTEMPT TO ATTACK IT TO DETERMINE WHETHER IT

20  PROVIDES SECURE COMMUNICATIONS OR NOT?

21  A.  SINCE YOU'VE BEEN INTERRUPTED, PERHAPS YOU COULD

22  RESTATE.  ARE YOU ASKING ME A QUESTION WHEN THE PAPER

23  IS WRITTEN, WHEN THE PATENT IS SUBMITTED, IF YOU DON'T

24  SUBMIT A PROOF OF -- A MATHEMATICAL PROOF OF SECURITY

25  DO YOU HAVE TO WAIT TO GAIN CONFIDENCE WHEN PEOPLE

1    ANALYZE THE SYSTEM?  IS THAT THE QUESTION?

2    Q.  THAT'S A BETTER QUESTION THAN THE ONE I'VE BEEN

3    TRYING TO FORMULATE.

4    A.  AND NOW YOU HAVE TO ANSWER IT.  WELL, THE ANSWER

5    IS YES.  THAT IS THE CASE.  IF YOU DON'T SUPPLY PROOF,

6    IF THE DRUG MANUFACTURER DOESN'T GIVE AN ABSOLUTE

7    PROOF THAT THIS DRUG IS GOING TO WORK ON THE BASIS OF

8    PHYSICS AND CHEMISTRY, THEN WE'VE GOT TO TEST IT.  THE

9    SAME IS TRUE OF A CRYPTOGRAPHIC SYSTEM.  JUST SAYING

10   THAT I THINK THE SYSTEM IS VERY HARD IS NOT ENOUGH.

11              THE COURT:  YOU MEAN THE PATENT OFFICE WON'T

12   PATENT IT --

13              THE WITNESS:  THE RULES THAT THE PATENT

14   OFFICE USES MAY BE DIFFERENT.  I'M SAYING THAT FOR

15   CRYPTOGRAPHY THAT WHEN YOU WARANTEE THAT A SYSTEM IS

16   GOING TO PROTECT YOUR INFORMATION, THERE'S GOT TO BE

17   SOME EVIDENCE YOU OFFER.  ONE OF THE EVIDENCE IS

18   MATHEMATICAL PROOF.  THE OTHER EVIDENCE IS THAT PEOPLE

19   IN THE FIELD HAVE EXAMINED THIS AND HAVE FOUND NO

20   METHOD TO BREAK IT.

21              IF THAT OCCURS AT THE END OF SIX MONTHS,

22   THERE IS SOME CONFIDENCE.  IF IT OCCURS AFTER 20 YEARS

23   THAT NO ONE HAS FOUND A METHOD, YOU ARE MUCH MORE

24   CONFIDENT THAT THE INVENTORS OF THE SYSTEM HAVE

25   ACTUALLY FULFILLED THEIR WARANTEE.

1          THE COURT:  FOR A PERIOD OF TIME.

2          THE WITNESS:  FOR A CERTAIN PERIOD OF TIME.

3          THE COURT:  LIKE THE PATENT?

4          THE WITNESS:  PERHAPS FOR THE LENGTH OF THE

5    PATENT, PERHAPS FOR THE INTERVAL OF TIME BETWEEN WHEN

6    IT WAS ISSUED AND WHEN THE PEOPLE BEGAN TO FEEL THAT

7    THERE WAS NO METHOD OF ANALYSIS.  BUT THERE'S GOT TO

8    BE SOMETHING IN ABSENCE OF MATHEMATICAL PROOF TO SHOW

9    THAT WHAT YOU ARE OFFERING MEETS THE TEST OF WHAT YOU

10   CLAIM IT TO BE.

11          SINCE YOU CAN'T PROVE IT MATHEMATICALLY,

12   IT'S GOT TO BE AN EXPERIMENTAL PROCESS.  IT'S GOT TO

13   BE AS A RESULT OF PEOPLE STUDYING THE PROBLEM, LOOKING

14   AT IT WITH THEIR EXPERTISE AND DECIDING, YES, THIS

15   SYSTEM I DON'T SEE A WAY OF DOING IT.  WELL, IF ONE

16   PERSON DOESN'T SEE IT, THAT'S ONE THING.  IF 50 PEOPLE

17   DON'T SEE HOW TO DO IT, IF 50 INDEPENDENT

18   INVESTIGATORS CANNOT FIND OF A WAY OF ANALYZING IT,

19   YOU'RE CERTAINLY MUCH MORE CONFIDENT THAN IF ONE

20   PERSON ANALYZES IT.

21          MR. HASLAM:   Q.   ARE THERE ANY OTHER

22   REFERENCES OF WHICH YOU'RE AWARE IN THE ART THAT

23   EITHER AGREE OR DISAGREE OF WHAT YOU'VE JUST TOLD US?

24   AND IN THE INTEREST OF GRAVITY, IF PERHAPS THERE ARE,

25   YOU COULD JUST TELL US THE ARTICLE AND POINT US TO

1    IT.   AND IF THERE ARE ANY QUESTIONS, WE CAN TAKE THEM

2    FROM THERE.

3    A.   I'D BE DELIGHTED TO.   EXHIBIT 1000 "NEW DIRECTIONS

4    OF CRYPTOGRAPHY" AGAIN BY WHITFIELD DIFFIE AND

5    PROFESSOR HELLMAN ON PAGE 552 -- EXCUSE ME.   I THINK

6    IT'S PAGE 653 NEAR THE TOP OF THE LEFT-MOST COLUMN

7    BEGINNING WITH THE THIRD LINE THE WORDS "AS SYSTEMS."

8            YOUR HONOR SEES IN THE LEFT-MOST COLUMN THE

9    THIRD LINE.   THE SENTENCE THAT BEGINS WITH "AS

10   SYSTEMS"?

11           THE COURT:   "AS SYSTEMS WHOSE STRENGTH HAD

12   BEEN SO ARGUED WERE REPEATEDLY BROKEN, NOTATION OF

13   GIVING MATHEMATICAL PROOFS FOR THESE SECURITY SYSTEMS

14   FELL INTO DISPUTE AND WAS REPLACED BY CERTIFICATION BY

15   WAY OF CRYPTOANALYTIC ASSAULT."   THIS IS AN ARTICLE BY

16   WHITFIELD DIFFIE AND MARTY HELLMAN.

17           MR. HASLAM:   Q.   CAN YOU JUST TELL US WHAT

18   CRYPTOANALYTIC ASSAULT MEANS?

19   A.   CRYPTOANALYSIS IS THE PROCESS OF TESTING A SYSTEM

20   OF TRYING TO ANALYZE IT.

21   Q.   IS THERE ANYTHING ELSE?

22   A.   OH, YES.   THERE ARE OTHER ARTICLES.   EXHIBIT 1004,

23   AN ARTICLE ENTITLED "PRIVACY AND AUTHENTICATION" AND

24   "INTRODUCTION TO CRYPTOGRAPHY" BY WHITFIELD DIFFIE

25   AND MARTIN HELLMAN AN INVITED PAPER IN THE PROCEEDINGS

1   OF THE I TRIPLE E.

2           DIRECT YOUR HONOR'S ATTENTION TO PAGE 399,

3   THE RIGHT-MOST COLUMN, IT'S THE SECOND PARAGRAPH FROM

4   THE BOTTOM.   IT BEGINS WITH THE WORDS "WHILE SOME,"

5   PAGE 399, YOUR HONOR.

6           THE COURT:   399?

7           THE WITNESS:   YOU SEE IN THE RIGHT-HAND

8   COLUMN AT THE VERY BOTTOM, "WHILE SOME."

9           THE COURT:   "THE UNCONDITIONAL COMPUTATIONAL

10  SECURITY"?

11          THE WITNESS:   YES.   THAT AGAIN STATES WHAT

12  THE INVENTORS FULLY WELL KNEW.

13          THE COURT:   "TWO FUNDAMENTALLY DIFFERENT WAYS

14  IN WHICH CRYPTOGRAPHIC SYSTEMS MAY BE SECURE"?

15          THE WITNESS:   I'M LOOKING ACTUALLY BELOW

16  THAT, YOUR HONOR.

17          THE COURT:   THAT'S JUST THE FIRST PARAGRAPH?

18          THE WITNESS:   THAT'S IN SECTION D.   I WANT

19  THE PARAGRAPH WHICH BEGINS ALMOST AT THE BOTTOM OF THE

20  PAGE, "WHILE SOME UNCONDITIONALLY SECURE."

21          THE COURT:   HOW ABOUT READ THE WHOLE

22  PARAGRAPH INSTEAD OF SOMETHING OUT OF CONTEXT.   THIS

23  SAYS "WHILE SOME UNCONDITIONALLY SECURE SYSTEMS CAN BE

24  PROVEN SECURE" -- WE'VE TALKED ABOUT THE DEFINITIONS

25  OF SECURE BEFORE.

1          THE WITNESS:  YES.

2          THE COURT:  "THE THEORY OF COMPUTATIONS

3   COMPLEXITY IS AT PRESENT INADEQUATE DEMONSTRATE THE

4   COMPUTATIONALLY INFEASIBILITY OF ANY CRYPTOANALYTIC

5   PROBLEM.  CRYPTOGRAPHY IS THEREFORE FORCED TO RELY ON

6   THE LESS FORMAL CERTIFICATION PROCESS OF SUBJECTING A

7   PERSPECTIVE SYSTEM TO CRYPTOANALYTICAL ASSAULT UNDER

8   THE CIRCUMSTANCES CONSIDERED FAVORABLE TO THE

9   CRYPTOANALYSTS."

10         THE WITNESS:  THAT'S THE PHRASE THAT I WANT

11   TO ADDRESS THE COURT'S ATTENTION.

12         MR. HASLAM:  Q.   GOING BACK UP TO THE

13   BEGINNING OF THAT PARAGRAPH, THE SECTION D THAT THE

14   COURT INITIALLY FOCUSED ON, THE SENTENCE SAYS, "THERE

15   ARE TWO FUNDAMENTALLY DIFFERENT WAYS IN WHICH

16   CRYPTOGRAPHIC SYSTEMS MAY BE SECURE."  IS THAT BASED

17   ON YOUR REVIEW OF EXHIBIT 1000?

18   A.   REVIEW OF WHAT?

19   Q.   1004.  IS THAT CONSISTENT WITH THE METHOD OF

20   EITHER CERTIFICATION OR MATHEMATICAL PROOF?

21   A.   YES, THAT'S WHAT I THINK THEY REFER, EITHER

22   MATHEMATICAL PROOF OR CERTIFICATION.

23         THE COURT:  THIS ARTICLE IS REFERRED TO AS

24   ONE MARCH 1979.  DOES THAT PRECEDE --

25         THE WITNESS:  NO, THAT FOLLOWS THE SUBMISSION

1   OF THE PATENT.

2        THE COURT:   THE PATENT WAS SUBMITTED BACK

3   WHEN?

4        MR. HASLAM:   OCTOBER 1977.

5        THE WITNESS:   OCTOBER 6, 1977.

6        MR. HASLAM:   EXHIBIT 1004 ON ITS FACE

7   INDICATES THAT THE MANUSCRIPT WAS RECEIVED ON MAY 22,

8   1978 WHICH IS AGAIN AFTER THE PATENT.

9        THE COURT:   AND THE OTHER ARTICLE WAS 1976.

10        MR. HASLAM:   "NEW DIRECTIONS" WAS -- AT LEAST

11   THIS VERSION WAS NOVEMBER '76.  AND EXHIBIT 1000 --

12        THE WITNESS:   1000, "NEW DIRECTIONS," WAS

13   SUBMITTED JUNE 30, 1976, THAT WAS BEFORE THE FILING

14   DATA.

15        MR. HASLAM:   AND EXHIBIT 1003 WHILE PUBLISHED

16   IN 1978 WAS ON ITS FACE AUGUST 5, 1977, WHICH MEANS

17   THE MANUSCRIPT WAS WRITTEN PRIOR TO THE PATENT BEING

18   FILED.

19   Q.  LET ME ASK YOU JUST TO TAKE A QUICK MOMENT TO TAKE

20   A LOOK AT EXHIBIT 22 TO YOUR DEPOSITION WHICH IS, I

21   BELIEVE, AN EXHIBIT THAT MR. KRAMER SHOWED YOU AT HIS

22   DEPOSITION AND ASKED YOU SOME QUESTIONS ABOUT.

23   A.  EXHIBIT 22.  YES, I HAVE THAT IN FRONT OF ME.

24   Q.  AND I BELIEVE IN YOUR DEPOSITION, MR. KRAMER

25   DIRECTED YOUR ATTENTION TO PAGE EIGHT OF THAT EXHIBIT --

1    AND I APOLOGIZE.

2         BEFORE WE GET TO PAGE EIGHT, CAN YOU JUST

3    TELL THE COURT BRIEFLY WHAT EXHIBIT 22 IS.

4    A.   EXHIBIT 22 IS A XEROX COPY OF CERTAIN PAGES FROM

5    THE SECOND EDITION OF A BOOK BY BRUCE SNEER.   IT'S

6    CALLED "APPLIED CRYPTOGRAPHY," AND IT'S AN OVERVIEW OF

7    CRYPTOGRAPHY WITH EMPHASIS UPON THINGS THAT HAVE TAKEN

8    PLACE IN THE LAST 25 YEARS.

9    Q.   NOW, IF YOU COULD, LOOK AT PAGE EIGHT WHICH IS THE

10   PAGE THAT MR. KRAMER DIRECTED YOUR ATTENTION TO.

11   A.   YES.

12   Q.   THERE'S A HEADING "SECURITY OF ALGORITHMS."

13   A.   YES, I SEE THAT.

14   Q.   AND IS WHAT'S SET FORTH ON THAT PAGE AND IN THAT

15   SECTION CONSISTENT OR INCONSISTENT WITH YOUR TESTIMONY

16   ABOUT HOW ONE GOES ABOUT OR THE METHOD OF DETERMINING

17   WHETHER A CRYPTOGRAPHIC SYSTEM PROVIDES A METHOD OF

18   SECURE COMMUNICATIONS?

19   A.   MAY I JUST TAKE SOME TIME TO LOOK AT THIS?

20   Q.   YES.

21   A.   YES, I THINK THAT THIS IS CONSISTENT WITH WHAT

22   I'VE SAID.

23   Q.   NOW, THERE AT THE BOTTOM OF PAGE EIGHT, THERE'S A

24   REFERENCE TO UNCONDITIONALLY SECURE.   VERY BRIEFLY CAN

25   YOU TELL US WHAT THAT IS --

1   A.   UNCONDITIONALLY SECURE -- IT MEANS THAT NO MATTER

2   HOW MUCH CIPHER TEXT THE CRYPTOANALYST HAS, YOU CAN'T

3   EVER RECOVER THE KEY OR THE TEXT OF THE MESSAGE.

4   Q.   BASED ON --

5        THE COURT:   THE NEXT PARAGRAPH "REPORTED FACT

6   ONLY A ONE TIME PASS IS UNBREAKABLE GIVEN INFINITE

7   RESOURCES.   ALL OTHER CRYPTOSYSTEMS ARE BREAKABLE IN A

8   CIPHER TEXT ONLY SPECIFIC BY TRYING EVERY POSSIBLE KEY

9   ONE BY ONE AND CHECKING WHETHER RESULTING IN PLAIN

10  TEXT IS MEANINGFUL.   THIS IS CALLED A PRUDENT FORCE

11  ATTACK."

12       MR. HASLAM:   Q.   DO YOU HAVE AN OPINION AS

13  TO WHETHER THE METHOD OF SECURE COMMUNICATION BEING IN

14  THE '528 PATENT WAS INTENDED BY THE AUTHORS TO BE ONE

15  WHICH WAS UNCONDITIONALLY SECURE?

16  A.   YES, IT WAS NOT INTENDED TO BE UNCONDITIONALLY

17  SECURE.

18       THE COURT:   IT WAS NOT.

19       THE WITNESS:   IT WAS NOT INTENDED NOR IS IT

20  UNCONDITIONAL.

21       MR. HASLAM:   Q.   IS THERE ONE, THEN, THAT A

22  METHOD OF SECURE COMMUNICATION PROPOSED IN THE '582

23  PATENT ONE WHICH YOU BELIEVE WAS INTENDED TO BE

24  COMPUTATIONALLY SECURE?

25  A.   YES.   CRUCIAL WORD THE BOOK USES THE

COMPUTATIONALLY SECURE.  THAT'S ALSO USED, YOUR HONOR,

1  IN AT LEAST ONE OF THESE ARTICLES THAT WE HAVE LOOKED

2  AT.  PROFESSOR HELLMAN AND MR. MERKLE IN THEIR PATENT

3  ALSO USE THE WORD COMPUTATIONALLY INFEASIBLE AS

4  SOMETHING WHICH WOULD PROVE SOMETHING IS

5  COMPUTATIONALLY SECURE.  COMPUTATIONALLY SECURE MEANS

6  YOU CAN'T DO ENOUGH COMPUTATION TO BREAK THE SYSTEM.

8           THE COURT:  INFEASIBLE TO --

9           THE WITNESS:  INFEASIBLE TO DO THE

10  COMPUTATION TO BREAK IT.

11          THE COURT:  CONSIDER THE TIME AND COSTS?

12          THE WITNESS:  TIME, COSTS, WHATEVER

13  EQUIVALENT MEASURE THAT YOU WANT TO DO.

14          THE COURT:  WHY DON'T WE TAKE OUR MORNING

15  RECESS AT THIS TIME.

16          (A 15 MINUTE RECESS WAS TAKEN.)

17          THE COURT:  I DON'T FIND THE LAST EXAMINATION

18  HAS BEEN TOO PRODUCTIVE.  YOU'RE NOT FOCUSING ON THE

19  CLAIMS THAT HAVE ANY DIFFERENT MEANING THAN I DO TO

20  IT; SO I'D LIKE AN EXAMINATION OF ANY FURTHER

21  WITNESSES TO POINT TO THE CLAIM.  GET RIGHT ON IT

22  BECAUSE WE'VE BEEN TALKING ABOUT SOME THINGS WHICH ARE

23  NOT SERIOUS PROBLEMS.

24          MR. HASLAM:  I APOLOGIZE, YOUR HONOR.  I WAS

25  ABOUT TO GO ON.  I HAVE THIS BOARD HERE WITH A PORTION

1  OF CLAIM ONE.  PREAMBLE CLAIM ELEMENTS 1,C AND 1,E.

2  THE PREAMBLE STARTS AT "THE METHOD OF COMMUNICATING

3  SECURELY OVER AN INSECURE COMMUNICATION CHANNEL," AND

4  I'VE ELLIPSED THE REST THERE.

5      THE COURT:  THE FACT THAT IT WAS

6  COMMUNICATING A MESSAGE FROM A TRANSMITTER TO A

7  RECEIVER --

8      MR. HASLAM:  Q.   PROFESSOR KONHEIM, THERE'S

9  A REFERENCE HERE IN CLAIM ONE TO A METHOD OF

10  COMMUNICATING SECURELY.  DO YOU SEE THAT?

11  A.  YES, I DO.

12  Q.  DO YOU HAVE AN OPINION AS TO WHETHER THAT

13  REFERENCE THERE TO A METHOD OF COMMUNICATING SECURELY

14  MEANS A METHOD WHICH IS UNCONDITIONALLY SECURE?

15  A.  AT THIS POINT, IT'S NOT POSSIBLE TO TELL WHETHER

16  THEY ARE REFERRING TO A METHOD OF UNCONDITIONAL

17  SECURITY OR A METHOD OF COMPUTATION INFEASIBILITY.

18  Q.  AND BASED ON YOUR REVIEW OF THE PATENT, THE

19  PROSECUTION HISTORY, DO YOU HAVE AN OPINION AS TO

20  WHETHER THE INVENTORS MEANT TO PROPOSE A METHOD OF

21  COMMUNICATING SECURELY?

22      THE COURT:  THAT DOESN'T HAVE C OR D?

23      MR. HASLAM:  NO, YOUR HONOR.  I'VE ADDED

24  THOSE JUST FOR --

25      THE COURT:  IT WOULD BE THE THIRD PARAGRAPH?

1          MR. HASLAM:   THE THIRD PARAGRAPH AND THE

2    FIFTH PARAGRAPH.

3          THE COURT:   PROCESS THE MESSAGE AND THE

4    PUBLIC ENCIPHERING KEY AND THE TRANSMITTER AND

5    GENERATING AN ENCIPHERED MESSAGE.

6          MR. HASLAM:   Q.   BASED ON YOUR REVIEW OF THE

7    MATERIALS YOU'VE DESCRIBED FOR US, DO YOU HAVE AN

8    OPINION AS TO WHETHER THE INVENTORS OF THE '582 PATENT

9    WERE PROPOSING A METHOD OF COMMUNICATING SECURELY

10   WHICH WAS UNCONDITIONALLY SECURE AS OPPOSED TO OR

11   COMPUTATIONALLY SECURE?

12         MR. KENNEDY:   OBJECTION, YOUR HONOR.   ONE,

13   CALLING FOR SPECULATION.   TWO, CALLS FOR A LEGAL

14   CONCLUSION.   HE ISN'T BEING ASKED WHAT DO PEOPLE IN

15   THE ART UNDERSTAND.   HE'S ASKING THE FACT HOW DOES

16   JUDGE WILLIAMS INTERPRET THIS CLAIM.

17         THE COURT:   WHAT DID YOU HAVE IN MIND?   WHAT

18   DOES IT SAY?

19         MR HASLAM:   Q.   BASED ON YOUR ANALYSIS, WHAT

20   DO YOU BELIEVE PEOPLE IN THE ART WOULD UNDERSTAND WAS

21   MEANT IN CLAIM ONE BY A METHOD OF COMMUNICATING

22   SECURELY?

23   A.   IN WHAT YOU HAVE LABELED E, IT SAYS "SUCH THAT THE

24   ENCIPHERING TRANSFORMATION IS EASY TO EFFECT BUT

25   COMPUTATIONALLY INFEASABLE TO CONVERT WITHOUT THE SAME

1   ENCIPHERING KEY."   I WOULD READ THAT AS REFERRING TO A

2   SYSTEM WHICH WAS COMPUTATIONALLY SECURE BUT NOT

3   UNCONDITIONALLY.

4            THE COURT:   IT SAYS "COMPUTATIONALLY

5   INFEASIBLE TO CONVERT."

6            THE WITNESS:   THAT MEANS, YOUR HONOR, AT

7   LEAST WHEN I READ IT, IT MEANS IT'S IMPOSSIBLE TO FIND

8   THE SECRET INFORMATION FROM KNOWING JUST THE PUBLIC

9   INFORMATION, AND IT IS INFEASIBLE TO BREAK THE SYSTEM

10  IF I WERE TO PARAPHRASE IT.

11           THE COURT:   OKAY.   NEXT QUESTION.

12           MR. HASLAM:   Q.     THE METHOD OF

13  COMMUNICATING SECURELY WHICH IS SET FORTH IN CLAIM

14  ONE -- DOES THAT IN YOUR VIEW PROPOSE A METHOD WHICH

15  MEANT -- WOULD THAT BE UNDERSTOOD BY PEOPLE IN THE ART

16  AS PROPOSING A SYSTEM WHICH MEANT THE TWO GOALS THAT

17  YOU SET FORTH AT THE BEGINNING, THAT IT WOULD HIDE

18  INFORMATION AND HIDE IT FOR A PERIOD OF TIME?

19  A.   I THINK AS THEY USE THE WORD "COMMUNICATING

20  SECURELY," THEY MEAN SOMETHING THAT WOULD HIDE THE

21  INFORMATION, OFFER GUARANTEE OF IT FOR SOME PERIOD OF

22  TIME.

23           THE COURT:   NOT INFINITE BUT A CERTAIN

24  PERIOD.

25           THE WITNESS:   NOT INFINITE BUT THE FACT THAT

1    THE FINITE COMES FROM MEANING -- WHAT MR. HASLAM HAS

2    SECTION E, THE WORDING "COMPUTATIONALLY INFEASIBLE"

3    MEANS THAT THEY HAVE FORMULATED SOMEWHERE THE CONCEPT

4    OF WHAT TIME IS, AND THEY HAVE MADE THE TIME SUCH THAT

5    THIS ALGORITHM WOULD OFFER GUARANTEE OF SECURITY FOR

6    AT LEAST THAT PERIOD OF TIME.

7            MR. HASLAM:  Q.   DOES THE PATENT AT ANYWHERE

8    ADDRESS THAT PERIOD OF TIME?

9    A.   YES, THE PATENT DOES.

10   Q.   CAN YOU POINT OUT TO US WHERE IT DOES.

11   A.   LET ME JUST FIND THE REFERENCE.   YOUR HONOR, IN

12   COLUMN 5 BEGINNING WITH LINE 10.

13   Q.   THAT'S OF EXHIBIT 13?

14   A.   YES, THE 582 EXHIBIT, COLUMN 5, LINE 10 BEGINNING

15   WITH THE WORDS "A TASK."  NOW, I READ THIS AS

16   FOLLOWING --

17           THE COURT:  I HAVE THE PATENT HERE.   GO

18   AHEAD.

19           THE WITNESS:  IT READS "A TASK IS CONSIDERED

20   COMPUTATIONALLY INFEASIBLE IF IT'S COST IS MEASURED

21   EITHER BY TIME, THE AMOUNT OF MEMORY USED, OR THE

22   COMPUTING TIME IS FINITE OR IMPOSSIBLY LARGE."  THEN

23   THE AUTHOR GOES BY IMPOSSIBLY LARGE THEY SAY, FOR

24   EXAMPLE --

25           THE COURT:  ARE YOU READING FROM THE PATENT

1    OR THE ARTICLE?

2          THE WITNESS:  I'M READING FROM THE PATENT,

3    BUT I'M SUPPLYING SOME INTERPRETATION AS I GO ALONG.

4          MR. HASLAM:  Q.   WHERE ARE YOU AGAIN?

5    A.  I'M ON COLUMN 5.

6          THE COURT:  THERE ARE SOME HOLES IN MY

7    DOCUMENT TO PUT THE THINGS THROUGH, AND 5 HAS GOT A

8    HOLE RIGHT IN THE MIDDLE OF IT.  OKAY.  I'VE GOT

9    COLUMN 5.

10          THE WITNESS:  I SAID, "A TASK IS CONSIDERED

11    COMPUTATIONALLY INFEASIBLE" --

12          THE COURT:  OKAY.  "A TASK IS CONSIDERED

13    COMPUTATIONALLY INFEASIBLE IF IT IS COST" -- WE TALKED

14    ABOUT THAT.

15          THE WITNESS:  RIGHT.  AND NOW THEY ARE GOING

16    TO TELL ME WHAT THE COST IS, AND THEY SAY THE COST --

17    THEY ARE GOING TO TELL ME WHAT IMPOSSIBLY LARGE

18    MEANS.  AND THEY SAY 10 TO THE 30TH OPERATIONS, BUT

19    OPERATIONS IS NOT TIME NOR IS IT MEMORY.

20          SO THEY NOW ARE GOING TO TELL ME HOW DO I

21    TRANSLATE TIME, OPERATIONS AT THE TIME.  THEY SAY

22    WELL, LOOK AT THE EXISTING COMPUTATIONAL METHODS AND

23    EQUIPMENT IN 1977.  HOW LONG ON THE BEST EQUIPMENT

24    WOULD IT TAKE TO PERFORM 10 TO THE 30TH OPERATIONS,

25    AND I'VE MADE A ROUGH CALCULATION.

1          I MAY BE OFF BY EVEN A FACTOR OF 100, BUT I

2     SHOW 10 TO THE 16TH YEARS WAS THE TIME NEEDED TO DO 10

3     TO THE 30TH OPERATIONS.  SO EVEN IF WE MAKE A VERY

4     GENEROUS ESTIMATE FOR THE AUTHORS, THEY ARE TALKING IN

5     TERMS OF MANY, MANY LIFE TIMES.

6          THE COURT:  SO ON THE ORDER OF APPROXIMATELY

7     10 TO THE 30TH OPERATIONS EXISTING COMPUTATIONAL

8     METHODS OF EQUIPMENT?

9          THE WITNESS:  YES.

10         THE COURT:  THAT'S PLAIN LANGUAGE, ISN'T IT?

11         THE WITNESS:  YES.

12         THE COURT:  AND IF YOU'VE GOT THE FORMULA,

13    YOU'LL KNOW HOW LONG THEY ARE TALKING ABOUT.

14         THE WITNESS:  THAT'S RIGHT, AND THAT'S

15    SOMETHING LIKE 10TH TO THE 16TH YEARS.

16         THE COURT:  HOW MANY THOUSAND IS THAT?

17         THE WITNESS:  NEITHER ONE OF US WILL BE

18    AROUND, YOUR HONOR, AT THAT TIME, BUT IT'S A LONG

19    TIME, MANY MORE THAN THOUSANDS OR MILLIONS OF YEARS.

20         MR. HASLAM:  Q.   SINCE THE -- I'LL WITHDRAW

21    THAT.

22         THE COURT:  THE SECOND WAS AUTHENTICATING.

23         MR. HASLAM:  Q.   IF I COULD, WHILE I'VE GOT

24    THE BOARD UP HERE, CLAIM NUMBER 1,C STATES "GENERATING

25    FROM SAID RANDUM NUMBERS A SECRET DECIPHERING KEY AS

1   THE RECEIVER SUCH THAT THE SECRET DECIPHERING KEY IS

2   DIRECTLY RELATED TO AND COMPUTATIONALLY INFEASIBLE AS

3   TO GENERATE FROM THE PUBLIC ENCIPHERING KEY."

4        SEE THE WORD GENERATING, IN THE PHRASE

5   "GENERATING FROM SAID RANDOM NUMBERS A SECRET

6   DECIPHERING KEY"?  DOES THE WORD GENERATING HAVE A

7   WELL-UNDERSTOOD MEANING IN THE ART?

8   A.   IN THE CRYPTOGRAPHIC ART, NO IT DOESN'T HAVE ANY

9   WELL-DEFINED MEANING.

10  Q.   AND DOES "GENERATING FROM SAID RANDUM NUMBERS A

11  SECRET DECIPHERING KEY AT THE RECEIVER" HAVE A

12  WELL-UNDERSTOOD MEANING IN THE ART?

13  A.   NO.   WHAT IT SPECIFIES IS SOME SORT OF PROCESS,

14  THE RESULT OF SOME SORT OF PROCESS, BUT IT DOESN'T

15  TELL ME HOW TO DO IT.

16  Q.   LIKEWISE, IF I LOOK AT THE CLAIM ELEMENT 1,E WHICH

17  IS GENERALLY SPEAKING, I BELIEVE, RELATES TO THE

18  ENCIPHERING STEP?

19  A.   YES, THAT REFERS TO ENCIPHERING.

20  Q.   IT REFERS TO "PROCESSING THE MESSAGE IN THE PUBLIC

21  ENCIPHERING KEY AT TRANSMITTER AND GENERATING AN

22  ENCIPHERED MESSAGE BY ENCIPHERING TRANSFORMATION SUCH

23  THAT THE ENCIPHERING TRANSFORMATION IS EASY TO EFFECT

24  BUT COMPUTATIONALLY INFEASIBLE TO INVERT WITHOUT THE

25  SECRET DECIPHERING KEY."  DO YOU SEE THAT?

1  A.  YES, I DO.

2  Q.  DOES THE WORD PROCESSING HAVE A MEANING IN THE

3  ART?

4  A.  IT DOESN'T HAVE A PRECISE DEFINED OR EVEN SHARPLY

5  DEFINED MEANING IN CRYPTOGRAPHY.

6  Q.  DOES THE WORD "PROCESSING THE MESSAGE IN THE

7  PUBLIC DECIPHERING KEY AT THE TRANSMITTER" HAVE A

8  WELL-UNDERSTOOD MEANING IN THE ART?

9  A.  NO, IT DOES NOT HAVE A WELL-UNDERSTOOD MEANING.

10  IT'S TOO INDEFINITE, TOO VAGUE.

11          THE COURT:  THE CONTEXT OF WHAT THEY ARE

12  TALKING ABOUT ENCIPHERING A TRANSMITTED MESSAGE,

13  RIGHT?

14          MR. HASLAM:  THAT'S WHAT IT'S TALKING ABOUT.

15  THE QUESTION IS WHETHER THOSE TERMS HAVE WELL-DEFINED

16  MEANINGS IN THE ART AS TO WHAT IS TO BE ESTABLISHED.

17          THE COURT:  IN VIEW OF THE CONTEXT IT PUTS IT

18  TO BETTER USE.

19          MR. HASLAM:  Q.  WE'VE TALKED ABOUT

20  PROCESSING.  DOES THE CLAIM AS A WHOLE HAVE A

21  WELL-UNDERSTOOD PRECISE MEANING IN THE ART?

22  A.  WELL, THE WAY I READ THE ENTIRE CLAIM ONE IN

23  PARTICULARLY THE SECTION OVER HERE, I CAN GLEAN WHAT

24  THE INVENTORS WANTED TO ACHIEVE.  THEY WANTED TO DO AN

25  ENCIPHERED ALGORITHM WITH CERTAIN PROPERTIES, AND

1   THOSE PROPERTIES, THOSE ATTRIBUTES ARE THE WORDS SUCH

2   THAT YOU HI-LIGHTED.

3          THOSE ATTRIBUTES ARE IT'S EASY TO ENCIPHER,

4   BUT IT'S VERY DIFFICULT TO INVERT THE EFFECT OF

5   ENCIPHERING, THAT IS, TO DECIPHER WITHOUT THE SECRET

6   DECIPHERING KEY.  HOW IT'S TO BE DONE.  ANYTHING MORE

7   SPECIFIC IS LEFT UP IN THE AIR.

8   Q.   IS THERE, IN YOUR OPINION, A WELL-UNDERSTOOD

9   MEANING IN THE ART AS TO HOW YOU WOULD ACCOMPLISH THE

10  STEPS SET FORTH IN CLAIM ELEMENT 1,E, DECIPHERING

11  STEP?

12  A.   NO.  IN MY OPINION, THERE IS NO WELL-DEFINED

13  UNDERSTOOD INTERPRETATION IN CRYPTOGRAPHY OF THAT.

14  Q.   LIKEWISE, WITH CLAIM ELEMENT 1,C WHICH IS THE STEP

15  THAT GENERALLY RELATES TO GENERATING THE SECRET

16  DECIPHERING KEY, IS THERE A WELL-UNDERSTOOD MEANING IN

17  THE ART AS TO HOW ONE WOULD ACCOMPLISH THAT RESULT?

18  A.   NO.

19  Q.   I WANT TO TURN NOW TO THE --

20          THE COURT:  WE KNOW WHAT A SECRET DECIPHERING

21  KEY IS IN THE ART?

22          THE WITNESS:  YES.  WE KNOW WHAT A SECRET

23  DECIPHERING KEY IS, BUT HOW THOSE THINGS INTERACT, WE

24  DON'T HAVE ANY IDEA.

25          THE COURT:  GENERATING DOES NOT MEAN

1  ESTABLISHING, SPECIFYING?

2        THE WITNESS:  YES, IT CERTAINLY MUST MEAN

3  THAT.  YOU DO CERTAIN THINGS TO ACHIEVE CERTAIN

4  RESULTS, BUT IT DOESN'T SAY ANYTHING MORE THAN THAT.

5        THE COURT:  DIRECTLY RELATED TO

6  COMPUTATIONALLY INFEASIBLE TO GENERATE A KEY RELATED

7  TO THE DECIPHERING KEY, COMPUTATIONALLY INFEASIBLE

8  GENERATING.

9        THE WITNESS:  IF I MAY ADD, YOUR HONOR, THE

10  WAY I LOOK AND SEE, FOR EXAMPLE --

11        THE COURT:  I'M TALKING ABOUT C.

12        THE WITNESS:  YOU SAID IN ONE HAND I WANT YOU

13  TO TAKE SOME RANDOM NUMBERS.  I WANT YOU TO TAKE IN

14  THE OTHER HAND A SECRET DECIPHERING KEY.  I WANT YOU

15  TO PUT THEM TOGETHER, MIX THEM UP.  AND OUT OF THIS

16  MIXTURE IS TO COME A PUBLIC ENCIPHERING KEY.  AND

17  WHATEVER THE MIXING PROCESS GOES ON, THE PUBLIC

18  ENCIPHERING KEY HAS GOT TO BE DIRECTLY RELATED, TOO,

19  THAT IS, IT MUST HAVE--

20        THE COURT:  THE PUBLIC DECIPHERING KEY

21  DESCRIBED ANYPLACE ELSE?

22        THE WITNESS:  IT'S DESCRIBED IN THE

23  SPECIFICATION AND PART OF THE COMMON LANGUAGE OF

24  CRYPTOGRAPHY IN 1977.

25        MR. HASLAM:  THERE IS A PRIOR CLAIM ELEMENT,

1   YOUR HONOR, THAT TALKS ABOUT THE PUBLIC KEY.

2           THE COURT:  IT'S NOT THE FIRST TIME IT'S

3   USED.  YOU KNOW WHAT A PUBLIC DECIPHERING KEY IS?

4           THE WITNESS:  WE KNOW THAT IS AND WHAT A

5   SECRET DECIPHERING KEY IS.

6           THE COURT:  IT DOESN'T MEAN --

7           THE WITNESS:  MIXING THEM TOGETHER IN SOME

8   WAY TO CREATE THEM, AND IT SAYS WHAT THE ATTRIBUTES OF

9   THAT PROCESS MEANS.  IT MEANS THAT THE PUBLIC ONE HAS

10  GOT TO DEPEND UPON THE PRIVATE ONE AND THE RANDUM

11  NUMBERS.  AND IF YOU LOOK AT WHAT HAS HAPPENED AFTER

12  YOU'VE DONE THIS PROCESS, YOU CAN'T GO BACKWARDS AND

13  SEE WHAT THE PRIVATE KEY WAS.

14          THE COURT:  THAT GOES LATER ON, NOT IN THIS

15  PARTICULAR PARAGRAPH.

16          THE WITNESS:  COMPUTATIONALLY INFEASIBLE IS

17  REFERRED TO IN TWO PLACES.  IF YOU LOOK -- GO

18  BACKWARDS, YOU CAN'T SEE WHAT YOU PUT INTO THIS BOX.

19          THE COURT:  GO AHEAD.

20          MR. HASLAM:  Q.   THE LANGUAGE AFTER THE

21  "SUCH THAT" IN CLAIM ELEMENT 1,C, I THINK YOU SAID

22  DESCRIBES SOME ATTRIBUTES THAT THE SECRET DECIPHERING

23  KEY SHOULD HAVE?

24  A.   YES.

25  Q.   IS THERE IN YOUR VIEW A WELL-UNDERSTOOD MEANING IN

1  THE ART AS TO HOW ONE IS TO BRING ABOUT THE RESULT

2  WHICH IS DESCRIBED WHICH IS THAT THE SECRET

3  DECIPHERING KEY IS DIRECTLY RELATED TO AND

4  COMPUTATIONALLY INFEASIBLE TO GENERATE FROM THE PUBLIC

5  ENCIPHERING KEY?

6  A.  NO.

7          MR. KENNEDY:  OBJECT AND MOVE TO STRIKE AS

8  LEGALLY INCOMPETENT.  SO FAR THE MAN HAS -- IN

9  FAIRNESS TO THE WITNESS, WHO IS NOT A PATENT

10 LAWYER -- HE'S DESCRIBED A CLAIM FOR WHAT IT IS.  IT

11 DESCRIBES THE INVENTION; IT EXPLAINS THE ATTRIBUTES.

12 BUT UNFORTUNATELY YOU HAVE TO GO TO THE SPECIFICATION

13 TO FIND OUT HOW TO PERFORM THE INVENTION.

14         AND WE CONFESS, THAT'S TRUE IN THIS CASE AS

15 IT'S TRUE OF EVERY PATENT THAT'S EVER BEEN ISSUED IN

16 THE UNITED STATES.  HIS CRITICISM IS APPARENTLY THE

17 WAY PATENTS HAVE BEEN WRITTEN.  MR. HASLAM KNOWS

18 BETTER THAN THIS.

19         MR. HASLAM:  THEY HAVE CONTENDED, YOUR HONOR,

20 IN THEIR INSTRUCTIONS THERE IS A WELL-UNDERSTOOD

21 MEANING IN THE ART FOR THESE VAGUE INDEFINITE TERMS,

22 GENERATING AND PROCESSING.  WHAT I'VE ASKED THE

23 WITNESS IS DO THEY HAVE WELL-UNDERSTOOD MEANINGS IN

24 THE ART?

25         YOUR HONOR CAN DETERMINE WHETHER THE

1   WITNESS'S TESTIMONY ON THIS SUBJECT IS OR IS NOT

2   IRRELEVANT, BUT IT GOES DIRECTLY TO A POINT THAT THEY

3   SAY THERE IS A PRECISE, WELL-UNDERSTOOD DEFINITION OF

4   GENERATING AND PROCESSING.

5        MR. KENNEDY:   YOUR HONOR, I DON'T KNOW IF THE

6   FAULT IS WITH THE QUESTIONER OR THE RESPONDENT.   WE'RE

7   NOT GETTING ANSWERING ABOUT UNDERSTANDING ABOUT

8   WORDS.   THE WITNESS IS TELLING US FROM READING THIS

9   CLAIM, I UNDERSTAND WHAT THE INVENTION SEEKS TO DO,

10  BUT I CAN'T FIGURE OUT HOW TO DO IT, WHICH WE CAN

11  CONCEDE IS ABSOLUTELY TRUE.   BUT THAT ISN'T TAKING US

12  ANYPLACE IN TERMS OF A MARKMAN HEARING.   THAT'S WHY WE

13  HAVE CLAIMS AND SPECIFICATIONS BOTH IN PATENTS.

14        I DON'T UNDERSTAND THE RELEVANCE THAT HE'S

15  DESCRIBING OUR PATENT ACCURATELY.   IF YOU LOOK AT THE

16  CLAIM, IT WON'T TELL YOU HOW TO DO IT.   IF YOU LOOK AT

17  THE SPECIFICATION, IT WON'T TELL YOU WHAT TO CLAIM.

18  WE COULDN'T HAVE GOTTEN A PATENT ISSUED EXCEPT BY

19  PLAYING BY THE RULES IN THAT WAY.

20        THIS HAD NOTHING TO DO WITH WHETHER WORDS

21  HAVE A MEANING THAT'S UNDERSTOOD.   THAT'S A WHOLE LOT

22  DIFFERENT FROM SAYING "CAN YOU BUILD ONE BY LOOKING AT

23  THE CLAIM."

24        THE COURT:   WE ARE SUPPOSED TO FIND THE

25  MEANING, THE LANGUAGE IN THE CLAIMS.   AND THE WITNESS

1  FEELS THAT MEANING OR LACK OF MEANING AND OTHERS MAY

2  BE DIFFERENT.  I'LL DECIDE ACTUALLY WHAT THE MEANING

3  SEEMS IN VIEW OF THE WHOLE CONTEXT OF THE PATENT AND

4  THE WHAT WE'RE TRYING TO ACCOMPLISH --

5          MR. KENNEDY:  YES, YOUR HONOR.

6          THE COURT:  -- WHAT WAS SPECIFICALLY SAID.

7          MR. HASLAM:  JUST BRIEFLY TO COMMENT TO THE

8  ARGUMENT THAT WAS MADE.  THERE ARE RULES.  WE ALL PLAY

9  BY THEM, AND IT SEEMS TO ME THE LAST TIME I LOOKED THE

10  SUPREME COURT WAS THE FINAL ARBITOR OF THE RULES IN

11  THIS AREA.  AND IN THE HALBURTON CASE, THE SUPREME

12  COURT INDICATED THAT LANGUAGE WHICH WAS FUNCTIONAL

13  PARTICULARLY AT THE TIME OF NOVALTY WAS EITHER INVALID

14  BECAUSE IT WAS INDEFINITE.

15          AND THE CONGRESS CHANGED THAT RESULT WHEN IT

16  PASSED SECTION 112 PARAGRAPH THREE NOW PARAGRAPH SIX

17  WHICH SAID YOU CAN SAVE SUCH CLAIMS BUT ONLY YOU CAN

18  SAVE THEM IF YOU SPECIFY ACTS EITHER IN THE CLAIM OR

19  IN THE SPECIFICATION.  AND WHAT MR. KENNEDY SAID IS

20  PRECISELY OUR POINT.  YOU CAN'T DETERMINE HOW TO

21  ACCOMPLISH THIS RESULT IN THE CLAIMS.  HAVING SAID

22  THAT, I'M PREPARED TO MOVE ON.

23          THE COURT:  OKAY.

24          MR. HASLAM:  Q.  I'D LIKE TO NOW TURN TO

25  CLAIM TWO, AND IN THERE YOU'LL SEE THE WORD, I

1    BELIEVE, "AUTHENTICATING" AND THE PHRASE

2    "AUTHENTICATING THE RECEIVER'S IDENTITY TO TRANSMITTER."

3    DO YOU SEE THAT?

4    A.   YES, I DO.

5    Q.   DO YOU HAVE AN UNDERSTANDING FROM READING THE '582

6    PATENT AND BASED ON YOUR BACKGROUND AS TO HOW ONE OF

7    ORDINARY SKILL IN THE ART WOULD UNDERSTAND CLAIM TWO'S

8    REFERENCE TO AUTHENTICATING A RECEIVER'S IDENTITY?

9    A.   YES.   I BELIEVE AUTHENTICATING THE RECEIVER'S

10   IDENTITY IS A WELL-KNOWN TERM USED IN COMPUTER

11   SECURITY.

12   Q.   WHAT DOES IT MEAN?

13   A.   IT MEANS VERIFYING THE IDENTITY OF THE RECEIVER.

14   Q.   WHAT DO YOU MEAN BY "VERIFYING THE IDENTITY"?

15   A.   FINDING SOME METHOD OF PROOF THAT YOU'RE DEALING

16   WITH THE PERSON WHO CLAIMS TO BE THE RECEIVER.

17   Q.   DOES IT MEAN ANYTHING MORE THAN ESTABLISHING THAT

18   THE PERSON WITH WHOM YOU'RE COMMUNICATING HAS THE

19   SECRET DECIPHERING KEY?

20   A.   I'M NOT SURE IF I UNDERSTAND THE QUESTION.   I SAID

21   THAT I THINK AUTHENTICATING MEANS VERIFYING THE

22   IDENTITY.   IF YOU'RE ASKING ME IF I HAVE THE SECRET

23   DECIPHERING KEY, IS THAT PROOF OF THE IDENTITY?   AND

24   THE ANSWER IS NO.

25   Q.   WHY NOT?

1   A.   WELL, ANYONE CAN HAVE A SECRET DECIPHERING KEY.

2   THE WAY IN WHICH THE AUTHENTICATING IS TO BE USED AS

3   DESCRIBED IN THIS CLAIM IS, IF YOU WANT TO SEND ME,

4   YOUR HONOR, A MESSAGE, YOU HAVE RECEIVED FROM MY CLAIM

5   ONE MY PUBLIC ENCIPHERING KEY.   YOU'VE RECEIVED THAT

6   IN CLAIM ONE IN PARAGRAPH FOUR, "COMMUNICATING THE

7   PUBLIC ENCIPHERING KEY FROM THE RECEIVER TO THE

8   TRANSMITTER"; SO YOU'VE RECEIVED SOMETHING FROM ME.

9           I HAVE THAT PRIVATE DECIPHERING KEY, BUT YOU

10  DON'T KNOW THAT YOU'RE TALKING TO ME.   YOU KNOW THAT

11  YOU HAVE RECEIVED FROM SOMEONE WHO CALLS HIMSELF ALAN

12  KONHEIM A KEY.   YOU'RE GOING TO SEND INFORMATION TO ME

13  ENCIPHERED IN THAT KEY, AND I'M GOING TO OBVIOUSLY BE

14  ABLE TO DECIPHER IT BECAUSE I'VE SENT YOU THE KEY.

15          BUT YOU DON'T KNOW THAT YOU'RE DEALING WITH

16  ALAN KONHEIM.   YOUR CLERK DID NOT ASK ME TO SHOW MY

17  DRIVER'S LICENSE BEFORE I WAS SWORN IN.   THIS

18  GENTLEMAN OVER HERE DOESN'T EVEN KNOW IF I'M ALAN

19  KONHEIM.   MAYBE I'M MARTIN HELLMAN.   SO I MIGHT BE

20  SOMEONE ELSE.

21          WHAT SHOULD HAVE BEEN DONE IS I SHOULD HAVE

22  OFFERED PROOF THAT I WAS ALAN KONHEIM.   AND SO THIS

23  CLAIM OVER HERE DOES NOT AUTHENTICATE THE RECEIVER'S

24  IDENTITY.   IT AUTHENTICATES NOTHING.   IT JUST USES THE

25  KEY THAT THE RECEIVER HAS DELIVERED TO THE SENDER AND

1   NOTHING MORE.

2   Q.  IS THERE ANYTHING IN THE SPECIFICATION OF THE '582

3   PATENT WHICH ADDRESSES THE ISSUE OF VERIFYING THE

4   IDENTITY OF THE PERSON?

5   A.  YES.  ON COLUMN 18, BEGINNING IN LINE 46, IT SAYS

6   "VARIATIONS ON THE ABOVE DESCRIBED INVOLVEMENT" -- IT

7   GOES ON TO SAY WHAT WE WOULD DO IS GO TO A PUBLIC

8   CERTIFYING AUTHORITY.  WE WOULD IDENTIFY OURSELVES.

9   THAT IS, I WOULD SHOW MY DRIVER'S LICENSE, AND I WOULD

10  DEPOSIT MY KEY AT THAT CERTIFYING OFFICE.  THE

11  CERTIFYING OFFICE WOULD SAY YES, I'VE RECEIVED THE KEY

12  FROM ALAN KONHEIM.

13          THEN WHEN YOU WERE TO AUTHENTICATE MY

14  IDENTITY, YOU WOULD LOOK IN THAT PUBLIC CERTIFYING

15  DIRECTORY AND TO VERIFY THE KEY THAT I GAVE YOU WAS

16  THE KEY WHICH IS ASSOCIATED WITH MY NAME.  SO WE PROVE

17  SO IT WOULD PROVIDE THE CHECK THAT SOMEONE ELSE IS NOT

18  TRYING TO IMPERSONATE ME.

19  Q.  IS THERE ANYTHING THAT YOU'VE REVIEWED

20  CONTEMPORANEOUS WITH THE FILING OF THE APPLICATION OF

21  THE '582 PATENT WHICH CONFIRMS OR DOES NOT CONFIRM

22  YOUR VIEW OF THAT'S HOW AN AUTHENTICATION WOULD BE

23  UNDERSTOOD IN THE ART?

24  A.  WELL, I THINK IN SEVERAL OF THE PAPERS, THE

25  AUTHORS REPEAT IN ESSENCE THESE THINGS IN -- LET ME

1  JUST SEE IF I CAN FIND THE APPROPRIATE CITATION.  I'M

2  NOT SURE -- OUTSIDE OF THE PATENT THEY HAVE REPEATED

3  SOME OF THESE IDEAS.

4         ANYWAY, I THINK THIS IDEA OF HAVING AN

5  OUTSIDE AUTHORITY PROVIDE A CHECK ON THE KEY IS

6  SOMETHING THAT'S VERY WELL UNDERSTOOD IN CRYPTOGRAPHY

7  TODAY.  FOR EXAMPLE, IN THE PAPER "HIDING INFORMATION

8  AND SIGNATURES IN TRAPDOOR KNAPSACKS," EXHIBIT 1003,

9  ON PAGE 527, THEY IN ESSENCE -- FIRST OF ALL, THEY --

10        THE COURT:  WHAT EXHIBIT WAS THAT?

11        THE WITNESS:  EXHIBIT 1003 ON PAGE 527, YOUR

12  HONOR, IN PARAGRAPH FIVE, THE BOTTOM OF PAGE 527 IN

13  THE RIGHT-HAND COLUMN.  IT FIRST OF ALL --

14        MR. HASLAM:  Q.   WAIT A MINUTE.

15  A.  THEY FIRST OF ALL -- FIRST OF ALL SAYING THE LAST

16  LINE, THEY GIVE A SYNONYM FOR AUTHENTICATE.  THEY SAY

17  "VERIFY (AUTHENTICATE)," AND THEN THEY DESCRIBE IN

18  SOMEWHAT MORE DETAIL THAT WAS DONE IN COLUMN 18 HOW

19  THEY WOULD HAVE A SYSTEM WHICH WOULD VERIFY

20  (AUTHENTICATE) THE IDENTITY IN AUTHENTICATION.

21  Q.  IS THE METHOD DESCRIBED IN EXHIBIT 1003 SIMILAR TO

22  OR CONSISTENT WITH THAT DESCRIBED IN THE PATENT FOR

23  IDENTIFYING OR AUTHENTICATING A PERSON'S IDENTITY?

24  A.  YES, IT IS.  I MIGHT ADD IF I MAY --

25        THE COURT:  IS THERE A QUESTION?

1    THE WITNESS:  THERE IS A PROBLEM WITH CLAIM

2  ONE OVER HERE.  YOU OMITTED THE PART B WHICH REFERS TO

3  THE GENERATING USING RANDOM NUMBERS TO GENERATE A

4  PUBLIC ENCIPHERING KEY.

5    MR. HASLAM:  Q.   THAT'S THE STEP THAT

6  PRECEDES CLAIM ELEMENT 1,C?

7  A.   YES.  I CAN'T SEE HOW IT'S POSSIBLE TO DO B

8  BEFORE C.

9  Q.  BY THAT DO YOU MEAN THAT YOU CANNOT FOLLOW THE

10  STEPS IN THE ORDER LAID OUT IN CLAIM ONE?

11  A.  ABSOLUTELY NOT.  YOU CANNOT GET THE PUBLIC KEY

12  FIRST AND THEN THE PRIVATE KEY.  IT MUST ALWAYS BE

13  DONE IN THE REVERSE DIRECTION.

14  Q.  IS THERE ANYTHING IN CLAIM ONE WHICH SUGGESTS THAT

15  THERE IS AN ORDER IN WHICH THE STEPS WERE TO BE DONE?

16  A.  WELL, I MEAN IT'S CERTAINLY TRUE THAT YOU'VE FIRST

17  GOT TO ENCIPHER THE MESSAGE BEFORE YOU TRANSMIT IT.

18  SO THERE ARE CERTAIN ACTUAL THINGS THAT COME IN THE

19  ORDER.  AND SO THESE STEPS THAT ARE WRITTEN DOWN HERE

20  ARE IN ORDER EXCEPT FOR THE SECOND AND THIRD APPEAR TO

21  BE INVERTED.

22    FIRST OF ALL, YOU HAVE TO HAVE THE RANDOM

23  NUMBERS BEFORE YOU USE THEM.  THEN AFTER YOU HAVE THE

24  RANDOM NUMBERS, IF YOU GET AN ENCIPHERING KEY, YOU

25  HAVE TO HAVE THE KEY BEFORE YOU ENCIPHER.  SO THAT

1   CERTAINLY HAS GOT TO COME BEFORE LATER SECTIONS OF

2   CLAIM ONE.  BUT TWO AND THREE APPEAR TO ME TO BE

3   INVERTED.

4   Q.  BY TWO AND THREE YOU MEAN PUBLIC KEY AND PRIVATE

5   KEY?

6   A.  YES.  AND WHAT MAKES IT EVEN MORE CURIOUS IS THAT

7   IN CLAIM SEVEN THEY GOT THE ORDER CORRECT.

8           MR. KENNEDY:  YOUR HONOR, OBJECT AND MOVE TO

9   STRIKE.  ONE, HE'S WRONG.  BUT EVEN IF HE WERE

10  CORRECT, IT HAS NOTHING TO DO WITH MARKMAN.

11          THE COURT:  OVERRULED.

12          MR. HASLAM:  I HAVE NO FURTHER QUESTIONS.

13          THE COURT:  THAT'S ALL?  ANY QUESTIONS?

14          MR. KENNEDY:  OH, YES.

15          THE COURT:  HOW LONG DO YOU THINK YOU'D BE?

16          MR. KENNEDY:  MORE THAN SEVEN MINUTES.

17          THE COURT:  MY QUESTION WAS DO YOU WANT TO

18  PROCEED NOW OR WAIT UNTIL AFTER LUNCH?  IT'S UP TO

19  YOU.

20          MR. KENNEDY:  IT WOULD BE SIMPLER IF WE

21  RELEASED AND PROBABLY BE MORE EXPEDITIOUS.

22          THE COURT:  LUNCH IN AN HOUR.  IS ONE HOUR

23  ENOUGH FOR LUNCH?

24

25          (A LUNCH RECESS WAS TAKEN AT 11:55 A.M. TO BE