1              RESUMED AT 1:05 P.M.)

2

3         MR. KENNEDY:  GOOD AFTERNOON, YOUR HONOR.

4  I'LL BE EXAMINING ON BEHALF OF CYLINK.  I BELIEVE

5  MR. FLINN MAY THEN HAVE A COUPLE QUESTIONS ON BEHALF

6  OF STANFORD, AND I UNDERSTAND MR. SCHLAFLY WILL HAVE

7  SOME QUESTIONS ON HIS OWN BEHALF.

8                    CROSS-EXAMINATION

9         BY MR. KENNEDY:  Q.   GOOD AFTERNOON,

10  MR. KONHEIM.  YOU'LL NOTICE WE'VE PUT UP HERE A BLOW

11  UP OF CLAIM ONE FROM THE PATENT.  AND JUST TO GET TO

12  BASICS, YOU'D AGREE WITH ME THAT THE WORD

13  CERTIFICATION NOWHERE APPEARS IN THAT CLAIM?

14  A.   THAT'S QUITE CORRECT.

15  Q.   NOR WILL ANY OTHER CLAIMS IF WE PUT THEM UP AS

16  WELL.

17  A.   I AGREE.

18  Q.   AND THAT'S TRUE FOR THE WORD WARANTEE DOES NOT

19  APPEAR IN THE CLAIM?

20  A.   THAT'S TRUE.  IT DOES NOT APPEAR.

21  Q.   AND THE WORD GUARANTEE DOESN'T APPEAR ANYWHERE IN

22  THAT CLAIM, DOES IT?

23  A.   QUITE CORRECT, MR. KENNEDY.

24  Q.   AND BY THE USE OF THE WORD SECURE, THAT DOES

25  APPEAR IN THE CLAIM.  YOU DID NOT INTERPRET THAT TO

1   MEAN AN UNCONDITIONAL SECURE SYSTEM; CORRECT?

2   A.   YES.   WHEN I READ CLAIM ONE IN ITS ENTIRETY, I CAN

3   UNDERSTAND THAT COMMUNICATING SECURELY DOES NOT REFER

4   TO AN UNCONDITIONALLY SECURE SYSTEM.

5   Q.   BECAUSE I THINK YOU TOLD US THIS MORNING ONE TIME

6   PADS ARE THE ONLY RECOGNIZED UNCONDITIONALLY SECURE

7   SYSTEM.

8   A.   ONE TIME PADS AND THEIR VARYINGS ARE THE ONLY

9   UNCONDITIONALLY SECURE SYSTEM.

10  Q.   SO WHAT YOU INTERPRETED SECURE TO MEAN HERE WAS A

11  COMPUTATIONALLY SECURE SYSTEM; CORRECT?

12  A.   THAT'S CORRECT.

13  Q.   AND IT'S YOUR OPINION THAT THE REASONABLE MEANING

14  OF COMPUTATIONALLY SECURE WITHIN THE ART MEANS THAT

15  SOMETHING HAS BEEN SUBMITTED TO THE CRYPTOGRAPHIC

16  COMMUNITY FOR ANALYSIS AND TESTING; CORRECT?

17  A.   THAT IS MY POSITION.

18  Q.   AND THE WAY ONE WOULD GO ABOUT THAT, I ASSUME, IS

19  BY PUBLISHING THEIR ALGORITHM SOMEWHERE THAT

20  CRYPTOLOGISTS ARE LIKELY TO READ IT; CORRECT?

21  A.   THAT'S CORRECT.

22  Q.   AND THEN YOU WAIT FOR AT LEAST TWO YEARS TO SEE IF

23  UNDER SCRUTINY AND EXAMINATION THE SYSTEM CAN BE

24  BROKEN; CORRECT?

25  A.   I WOULD NOT USE THE FIGURE TWO YEARS.   YOU WOULD

1  WAIT.  AND THE LONGER YOU WAIT, THE LONGER THE

2  CONCERTED EFFORT IS, THE MORE CONFIDENT YOU ARE THAT

3  THE SYSTEM HAS BEEN EXAMINED AND NO PARTICULAR BREAK

4  OF THE SYSTEM HAS BEEN FOUND.

5  Q.  WHAT'S THE MINIMUM PERIOD OF TIME --

6  A.  I CAN'T ANSWER THAT QUESTION IN ABSTRACT.  I CAN'T

7  SAY WHETHER IT SHOULD BE TWO YEARS OR FOUR YEARS.  I

8  CAN ONLY JUDGE BY EXAMPLE THAT THE DATE ENCRYPTION

9  STANDARD WAS STUDIED FOR SOME FOUR YEARS BY THE

10 NATIONAL SECURITY AGENCY AND NO FAULT WAS FOUND WITH

11 IT.  AND THEN IT WAS CERTIFIED BY THE NATIONAL BUREAU

12 OF STANDARDS, AND NOW IT'S GOING YEARS HENCE NO

13 ANALYSIS HAS BEEN FOUND OF D.E.S.

14 Q.  SO IT COULD BE AS LITTLE AS TWO, MAYBE FOUR, MAYBE

15 MORE THAN THAT?

16 A.  WELL, I WOULDN'T WANT TO AGREE ON TWO YEARS.  I

17 DON'T WANT TO BE FORCED TO BE PINNED DOWN.  IF I WERE

18 TO HAVE TO CHOOSE A NUMBER OF YEARS, I WOULD CHOOSE

19 THE NUMBER OF YEARS CONSISTENT WITH MY UNDERSTANDING

20 OF WHAT WAS DONE WITH D.E.S., AND SO I WOULD SAY

21 D.E.S. WAS SUBMITTED SOMETIME IN 1970, AND IT WAS

22 STUDIED.

23      AND IN '76, A CERTIFICATION WAS GIVEN.  SO I

24 WOULD SAY A PRUDENT PERSON WOULD STUDY IT FOR BETWEEN

25 ZERO AND SIX YEARS.

1  Q.   BEFORE BEING COMFORTABLE ABOUT MAKING THE CLAIM

2  THAT SOMETHING WAS COMPUTATIONALLY SECURE IN PATENT

3  APPLICATION; RIGHT?

4  A.   BEFORE AGREEING THAT THE PHRASE COMMUNICATING

5  SECURELY IN THE SENSE OF COMPUTATIONALLY SECURE WAS

6  BEING GUARANTEED BY THE SYSTEM.

7  Q.   NOW, I WANT YOU TO ASSUME THAT UNDER AMERICAN

8  PATENT LAW, IF SOMETHING HAS BEEN PUBLISHED MORE THAN

9  ONE YEAR BEFORE SOMEBODY APPLIES FOR THE PATENT,

10 THERE'S A BAR, AND YOU CAN'T GET A PATENT FOR THAT.

11         CAN YOU TELL THE COURT HOW SOMEBODY COULD

12 BOTH COMPLY WITH YOUR TIME PERIOD FOR MAKING SURE THAT

13 SOMETHING'S BEEN PROPERLY VENTED IN THE CRYPTOANALYTIC

14 COMMUNITY AND STILL HAVE SOMETHING THAT'S PATENTABLE

15 AT THE END OF PROCESS?

16 A.   WELL, I COULD IMAGINE THE FOLLOWING, THAT AN

17 ARTICLE DESCRIBING THE SYSTEM IS PUBLISHED, WITHIN 12

18 MONTHS A PATENT IS FILED, BUT NOBODY OFFERS TO USE THE

19 SYSTEM UNTIL THE SYSTEM HAS BEEN CERTIFIED.

20         SO ALTHOUGH A PATENT HAS BEEN GIVEN AND MAYBE

21 ISSUED BY THE PATENT OFFICE, THE SYSTEM IS NOT USED BY

22 ANYONE UNTIL PEOPLE FEEL CONFIDENT THAT THE SYSTEM IS

23 OFFERING WHAT IT WARANTEES TO OFFER.

24 Q.   NOW, CAN YOU POINT US TO A TREATISE, AN ARTICLE, A

25 GOVERNMENT PRONOUNCEMENT, MINUTES OF A

1   CRYPTOANALYTICAL SOCIETY, ANYTHING IN WRITING THAT

2   SAYS THAT'S WHAT YOU SHOULD DO BEFORE YOU CAN CLAIM

3   THAT A SYSTEM IS COMPUTATIONALLY SECURE?

4   A.  WELL, I THOUGHT, MR. KENNEDY, THAT I DID THAT

5   EARLIER TODAY.  EACH OF THESE ARTICLES OVER HERE

6   SUGGEST THAT IN ORDER FOR THE SYSTEM TO BE CONSIDERED

7   COMPUTATIONALLY SECURE OR COMPUTATIONALLY INFEASIBLE

8   TO GET THE KEY, THAT THE SYSTEM HAD TO -- THERE HAD TO

9   HAVE BEEN REPEATED FAILURES OF CONCERTED ATTEMPTS TO

10  BREAK THE SYSTEM.

11          FOR EXAMPLE, ON THE ARTICLE OF TRAP DOORS AND

12  KNAPSACKS AS READ ON PAGE 529.  "FAITH IN THE SECURITY

13  OF THESE SYSTEMS MUST THEREFORE REST ON INTUITION AND

14  THE FAILURE OF CONCERTED ATTEMPTS TO BREAK THEM."

15          SO IT SAYS THE FAITH IN USING THE SYSTEM

16  WHETHER YOU WILL USE THIS IN THE SAME WAY YOU WOULD

17  NOT USE A DRUG WHICH HAD NOT BEEN SUITABLY TESTED

18  BEFORE WOULD DEPEND UPON ANALAYSIS -- THE DRUG

19  ANALYSIS OF THE SYSTEM BEFORE YOU WOULD ATTEMPT TO USE

20  IT.

21  Q.  ASIDE FROM THOSE TWO ARTICLES FROM THE INVENTORS,

22  CAN YOU POINT US TO ANYTHING ELSE IN WRITING THAT

23  DISCUSSES BOTH THE SPECIFIC PROCESS OF APPLYING FOR A

24  PATENT AND WHAT SHOULD BE DONE TO MAKE SURE SOMETHING

25  IS COMPUTATIONALLY SECURE BEFOREHAND?

1    A.   WELL, I HAVE NOT GOT MY WHOLE FILE OF PAPERS ON

2    CRYPTOGRAPHY.   I'M CERTAIN THAT I COULD FIND ONE FOR

3    YOU.   I'M NOT PREPARED TO GIVE AN ANSWER NOW OF PAPERS

4    THAT WOULD DEAL WITH THIS THING.   BUT I'M VERY

5    CONFIDENT THAT THAT IS THE GENERALLY ACCEPTED WAY, AND

6    I KNOW THAT CERTAINLY THAT'S THE WAY THINGS WORK IN

7    THE GOVERNMENT.

8          CRYPTOGRAPHIC SYSTEMS ARE PROPOSED ALL THE

9    TIME BY PEOPLE WHO BELIEVE THAT THEY REPRESENT

10   SECURITY.   JUST BEFORE THE START OF WORLD WAR II, A

11   MAN BY THE NAME OF EDWARD HEPBURN DEVELOPED A ROTOR

12   MACHINE, AND HE GAVE IT TO THE DEPARTMENT OF DEFENSE.

13   HE SAID "HERE, PROVE THAT IT'S GOOD.   PROVE THAT IT'S

14   BAD.   I WANT TO SELL THIS SYSTEM TO YOU."   AND SO HE

15   WENT TO THE PEOPLE WHO WERE COMPETENT TO MAKE THIS

16   EVALUATION, AND HE CHALLENGED THEM TO MAKE THIS, AND

17   THEY CARRIED OUT THE ANALYSIS.

18          I THINK IT'S COMMON PART OF THE PRACTICE IN

19   CRYPTOGRAPHY.   I MAY NOT BE ABLE TO FIND AN ARTICLE

20   THAT SAYS SUBMIT IT TO THE PATENT OFFICE THEN SUPPLY

21   IT TO THE I TRIPLE E AND THE A.M.C., THE AMERICAN

22   MATHEMATICAL COALITION, TRANSACTIONS AND WAIT TWO

23   YEARS AND SEVEN MONTHS.   IF YOU DON'T SEE ANYTHING

24   THAT APPEARS IN PRINT, THEN YOU CAN GO MARKET IT.   I'M

25   SURE I WILL NEVER FIND SUCH AN ARTICLE.

1    Q.  YOU DID, HOWEVER, FIND THE ARTICLES THAT HAVE BEEN

2    MARKED HERE AS PLAINTIFFS' 1000 AND 1004 BY THE

3    INVENTORS THAT WE TALKED ABOUT THIS MORNING; CORRECT?

4    A.  YES.

5    Q.  NOW, FROM THOSE ARTICLES, THE PASSAGES YOU

6    DISCUSSED WITH HIS HONOR THIS MORNING, YOU CONCLUDED

7    THAT MR. HELLMAN AND HIS COLLEAGUES SHARE YOUR VIEW

8    THAT THERE OUGHT TO BE PRE-CERTIFICATION AND

9    PRE-TESTING OF ALGORITHMS; CORRECT?

10   A.  I BELIEVE THAT THE THINGS THAT I READ OVER HERE

11   SUGGEST THAT TO MAKE A CLAIM OF COMPUTATIONAL

12   INFEASABILITY REQUIRED THE INVENTAGE OF A

13   CRYPTOGRAPHIC SYSTEM TO SUBMIT IT IN SOME FORMAL OR

14   INFORMAL WAY TO THE SCRUTINY OF THE CRYPTOGRAPHIC

15   COMMUNITY.

16   Q.  AND YOU'RE AWARE FROM THE STUDY IN THIS CASE THAT

17   THAT WAS NOT DONE WITH REGARD TO THE TRAP DOOR

18   KNAPSACK BEFORE THE PATENT ISSUE; CORRECT?

19   A.  WELL, IT MAY HAVE -- I DISAGREE ENTIRELY.  I

20   BELIEVE THAT, WHEN THIS PAPER APPEARED IN PREPRINT

21   FORM, FOR EXAMPLE, AND WAS CIRCULATED AMONG PEOPLE IN

22   THE CRYPTOGRAPHIC COMMUNITY, PEOPLE BEGAN TO WORK ON

23   THE PROBLEM.  AND SO THE PROCESS OF CERTIFICATION

24   BEGAN THE MINUTE THESE INVENTORS CAME WITH THEIR IDEA.

25   Q.  YOUR TESTIMONY HERE THAT AT THE TIME THE PATENT

1    WAS APPLIED FOR IN 1977, THE TRAP DOOR KNAPSACK

2    ALGORITHM HAD BEEN SUBMITTED TO SUFFICIENT SCRUTINY

3    WITHIN THE CRYPTOGRAPHIC COMMUNITY TO PASS THE

4    COMPUTATIONALLY SECURE TEST.

5    A.   NO, MAY --

6    Q.   YOU'VE ANSWERED THE QUESTION.

7    A.   I'M ANSWERING NO TO IT.   DID IT PASS THE TEST IS

8    WHAT THE QUESTION IS.   NO.   THIS PAPER HIDING TRAP

9    DOOR KNAPSACKS SAYS THE MANUSCRIPT WAS RECEIVED AUGUST

10   5, 1977 BEFORE THE PATENT WAS SUBMITTED.

11        THIS PAPER IN ITS PREPRINT FORM WHICH IS THE

12   STANDARD WAY IN WHICH SCIENTIFIC MATERIAL IS

13   DISSEMINATED WAS MADE AVAILABLE TO MANY PEOPLE.   THERE

14   IS NO FORMAL SUBMISSION PROCESS.   THERE IS NO FORMAL

15   CERTIFYING AGENCY.   IT WAS SUBMITTED.   PEOPLE BEGAN TO

16   WORK ON IT.

17   Q.   AND AS OF OCTOBER 6, 1977 WHEN THE PATENT

18   APPLICATION WAS FILED, THERE HAD NOT YET BEEN ADEQUATE

19   OPPORTUNITY FOR THE COMMUNITY TO DETERMINE WHETHER

20   THIS WAS A BREAKABLE SYSTEM OR NOT, HAD THERE?

21   A.   THAT'S CORRECT.

22   Q.   SO IN ARRIVING AT YOUR OPINION AS TO THE

23   REASONABLE MEANING TO ASCRIBE TO COMPUTATIONALLY

24   SECURE IN THIS PATENT, YOU CONCLUDED THAT THE

25   INVENTORS CHOSE A DEFINITION THAT THEY KNEW THEIR

1  PREFERRED EMBODIMENT DID NOT SATISFY; CORRECT?

2  A.  COULD YOU REPEAT THE QUESTION.  I'M CONFUSED AS TO

3  WHAT YOU WERE ASKING.

4  Q.  YOU TRIED IN REVIEWING THE PATENT TO COME UP WITH

5  A REASONABLE INTERPRETATION OF WHAT THE INVENTORS

6  PROBABLY MEANT.

7  A.  YES.

8  Q.  AND THE INTERPRETATION THAT YOU CONCLUDED WAS MOST

9  REASONABLE WAS THAT THEY DEFINED COMPUTATIONALLY

10  SECURE IN A WAY THAT THEY KNEW THE EMBODIMENT IN THEIR

11  PATENT DIDN'T SATISFY; CORRECT?

12  A.  I DON'T KNOW HOW TO ANSWER THAT QUESTION.  THEY

13  ASSERT THAT IT WAS COMPUTATIONALLY INFEASIBLE.  IN THE

14  BOARD THAT YOU HAVE PUT ON THE DISPLAY, THEY ASSERTED

15  THAT IT WAS COMPUTATIONALLY INFEASIBLE.

16       I HAVE GIVEN MY DEFINITION OF WHAT SECURE

17  MEANS.  THEY HAVE USED THE WORD COMPUTATIONALLY

18  INFEASIBLE.  BUT YET IN THE ARTICLE, THEY REALIZE, AND

19  THEY SAY CLEARLY "WE HAVE NOT PROVED IT'S

20  COMPUTATIONALLY INFEASIBLE."

21  Q.  YOU AGREE WITH ME SOMEBODY WOULD HAVE TO BE PRETTY

22  STUPID TO PUT A DEFINITION IN A PATENT AND THEN SAY

23  ELSEWHERE IN THE PATENT "MY PREFERRED EMBODIMENT

24  DOESN'T SATISFY THAT DEFINITION"; CORRECT?

25  A.  WELL, I DON'T WANT TO ACCUSE PROFESSOR HELLMAN IN

1  ANY WAY OF BEING STUPID.  PROFESSOR HELLMAN SAID IN

2  THIS CLAIM IT'S COMPUTATIONALLY INFEASIBLE.  IN THE

3  ARTICLE THAT WAS SUBMITTED BEFORE, HE SAYS "WE HAVE

4  NOT PROVED THAT IT IS COMPUTATIONALLY DIFFICULT FOR AN

5  OPPONENT."  THOSE ARE NOT WORDS THAT I HAVE CHOSEN.

6  THAT'S WORDS THAT THE INVENTOR HAS CHOSEN.

7          I CAN'T BE HELD ACCOUNTABLE NOR WILL I MAKE A

8  JUDGMENT ABOUT HIS MOTIVES OF DOING THIS.  BUT HE SAYS

9  ONE THING IN THE PATENT, AND TWO MONTHS AND ONE DAY

10 BEFORE THE PATENT WAS FILED, HE SAYS SOMETHING WHICH

11 IS CONTRADICTORY TO IT.  NOW, YOU ARRIVE AT A

12 CONCLUSION.

13 Q.  THERE ARE REALLY JUST TWO ALTERNATIVES.  EITHER

14 HE'S JUST PLAIN STUPID OR HE'S TRYING TO PRACTICE

15 FRAUD IN THE PATENT OFFICE.  THAT KIND OF EXHAUSTS IT,

16 DOESN'T IT?

17 A.  LISTEN, I'M NOT A LAWYER AS YOU'VE ALREADY TOLD

18 THE COURT.  HOW AM I TO ARRIVE AT A DECISION?

19 Q.  YOU HOLD A PATENT YOURSELF, DON'T YOU?

20 A.  I DO?

21 Q.  SO YOU'RE NOT TOTALLY UNFAMILIAR WITH THE PATENT

22 PROCESS.

23 A.  I'M NOT UNFAMILIAR WITH THE PATENT PROCESS.

24 Q.  AND BASED ON YOUR ADMITEDLY NOT A LAWYER BUT

25 NONETHELESS FAMILIARITY WITH THE PROCESS, CAN YOU

1   THINK OF WAY THAT MR. HELLMAN COULD HAVE USED THE

2   DEFINITION OF COMPUTATIONALLY SECURE THAT YOU'RE

3   ASKING THIS COURT TO ADOPT UNLESS HE WAS EITHER

4   ABJECTLY STUPID OR TRYING TO DEFRAUD THE PATENT

5   OFFICE?

6   A.  I WILL ABSOLUTELY NOT MAKE EITHER OF THOSE

7   JUDGMENTS.  THAT'S SOMETHING FOR THE COURT TO MAKE.

8   THAT'S SOMETHING FOR THE COURT TO DECIDE AS TO WHETHER

9   HE WAS BEING DUPLICITOUS OR STUPID OR WHATEVER

10  ALTERNATIVE THE COURT WILL HAVE.

11          IT'S NOT A DECISION FOR ME.  I CAN ONLY READ

12  WHAT HE SAYS IN THE ARTICLE, MR. KENNEDY, AND I CAN

13  ONLY LOOK AT WHAT HE SAYS IN THE PATENT.  THERE ARE

14  CONTRADICTORY STATEMENTS.  I THINK I'VE SAID IT.

15  Q.  LET'S MOVE ON.  I AGREE.  CAN YOU POINT US TO

16  ANYTHING IN WRITING AS TO OCTOBER 6, 1977 WHEN THE

17  PATENT APPLICATION WAS FILED THAT DESCRIBED HOW ONE

18  WOULD BREAK A TRAP DOOR KNAPSACK?

19  A.  WELL, I THINK THAT NO ONE BEFORE OCTOBER 6, 1977

20  OR AUGUST 5, 1977 WHICHEVER DATE YOU WISH HAD USED THE

21  TERM TRAP DOOR KNAPSACK.  SO YOU WOULD NOT SEE THE

22  TERM TRAP DOOR KNAPSACK APPEARING IN AN ARTICLE.  THE

23  METHODS USED TO BREAK THE CRYPTOGRAPHIC SYSTEM HAD

24  BEEN PUBLISHED.  VARIOUS METHODS HAVE BEEN PUBLISHED

25  BY PEOPLE BEFORE THEN.

1          THE METHODS THAT ARE USED TO BREAK ACTUALLY

2   THE TRAP DOOR KNAPSACK PROBLEM ARE MATHEMATICAL

3   METHODS THAT HAVE BEEN KNOWN FOR A LONG TIME.  THE WAY

4   THAT YOU PACKAGE THEM TOGETHER, THE WAY THAT YOU PUT

5   THEM TOGETHER TO SOLVE THIS PROBLEM, THAT OF COURSE

6   REPRESENTS THE CREATIVITY OF THE PERSON WHO HAS BROKEN

7   THE KNAPSACK SYSTEM BUT IT'S NOT --

8   Q.  GO AHEAD.

9   A.  I THINK I FINISHED.

10  Q.  ISN'T IT FACT THAT YOU TOLD US YESTERDAY THAT IT

11  WASN'T UNTIL 1982, YEARS AFTER THE PATENT WAS APPLIED

12  FOR AND TWO YEARS AFTER IT WAS ISSUED THAT MR. SHAMIR

13  FIRST PUBLISHED A WAY OF BRAKING THE SIMPLEST

14  KNAPSACK; CORRECT?

15          MR. HASLAM:  OBJECT TO THE QUESTION, YOUR

16  HONOR.  I THINK MR. KENNEDY IS THE ONE THIS MORNING

17  THAT OBJECTED AND SAID THAT THEY WERE NOT AS SECURE

18  AND WHETHER IT HAD BEEN BROKEN WAS A QUESTION THAT

19  WENT BEYOND THE BOUNDS HERE.

20          THE COURT:  REPEAT THE QUESTION, PLEASE.

21          MR. KENNEDY:  IT WASN'T BEFORE 1982 THAT THE

22  FIRST PUBLISHED ARTICLE ABOUT BREAKING A KNAPSACK WAS

23  PUT OUT.

24          THE COURT:  OVERRULED.

25          THE WITNESS:  I AGREE.  IN 1982 THE FIRST --

1          MR. KENNEDY:   Q.   DO YOU HAVE A COPY OF THE

2    PATENT UP THERE IN FRONT OF YOU?

3    A.   YES, I DO.

4    Q.   MAY I DIRECT YOUR ATTENTION TO COLUMN 5, LINES 1

5    THROUGH 15.   OF COURSE THIS WAS PART OF WHAT YOU READ

6    IN ARRIVING AT YOUR OPINIONS IN THIS CASE; CORRECT?

7    A.   YES, I'M FAMILIAR WITH THIS MATERIAL.

8    Q.   AND YOU TOOK THIS INTO ACCOUNT IN ARRIVING AT YOUR

9    DEFINITION?

10   A.   I TOOK THE HI-LIGHTED MATERIAL WHICH DEFINES --

11   GIVES THE INVENTOR'S DEFINITION OF COMPUTATIONALLY

12   INFEASIBLE.

13   Q.   AND FROM READING THAT LANGUAGE, DIDN'T YOU ARRIVE

14   AT THE OPINION THAT BY COMPUTATIONALLY INFEASIBLE,

15   THEY MEANT UNBROKEN GIVEN CURRENT KNOWLEDGE AND

16   METHODS?

17   A.   NO.

18   Q.   AS YOU STARTED READING THAT PARAGRAPH AND YOU GOT

19   TO THE THIRD LINE WHERE IT SAID "BUT TO THE BEST OF

20   CURRENT KNOWLEDGE, FINDING A SOLUTION REQUIRES A

21   NUMBER OF OPERATIONS WHICH GROW EXPONENTIALLY."  DID

22   YOU GIVE THAT STATEMENT ANY WEIGHT IN ARRIVING AT YOUR

23   OPINION IN THIS CASE?

24   A.   NO, BECAUSE I'M LOOKING FOR THE DEFINITION OF

25   COMPUTATIONALLY INFEASIBLE.   AT THE HI-LIGHTED

1   MATERIAL THEY SAY "DEFINITION, A TASK IS

2   COMPUTATIONALLY INFEASIBLE IF."  SO THEY DEFINE

3   COMPUTATIONALLY INFEASIBLE.  BUT WHAT PROFESSOR

4   HELLMAN AND MR. MERKEL DID IS DESCRIBE THE CURRENT

5   STATE OF THE ART AT THE TIME OF ALGORITHMS TO SOLVE

6   THE KNAPSACK PROBLEM.

7   Q.  SO WHAT YOU FOCUSED IN ON WAS THE HI-LIGHTED LAST

8   SENTENCE IN COLUMN 5, LINES 1 THROUGH 15; CORRECT?

9   A.   THAT'S RIGHT.

10  Q.   THE ONE THAT ENDS WITH THE WORDS "EXISTING

11  COMPUTATIONAL METHODS AND EQUIPMENT"; CORRECT?

12  A.   YES.  BUT I BELIEVE YOU ARE READING IT OUT OF

13  CONTEXT.

14  Q.  WELL, LET'S READ THE WHOLE SENTENCE.

15  A.   MAY I READ IT?

16  Q.   SURE, WE'LL LET YOU GO.

17  A.   "A TASK IS COMPUTATIONALLY INFEASIBLE IF ITS COST

18  IS MEASURED BY EITHER THE AMOUNT OF MEMORY USED OR THE

19  COMPUTING TIME IS FINITE BUT IMPOSSIBLY LARGE."

20       WELL, THEY NOW WANT TO SAY WHAT IMPOSSIBLY

21  LARGE IS.  THEY SAY, "FOR EXAMPLE, ON THE ORDER OF

22  APPROXIMATELY 10 TO THE 30TH OPERATIONS."  BUT

23  OPERATIONS IS NOT TIME.  OPERATIONS IS SOME OTHER

24  UNIT.  SO NOW THEY HAVE GOT TO TRANSLATE WHICH MEAN

25  THE WORD OPERATIONS AND TIME, AND THEN THEY TELL US

1  HOW TO DO IT.

2       THEY SAY TAKE THE EXISTING COMPUTATIONAL

3  METHODS AND EQUIPMENT AS OF THE DATE OF FILING OF THE

4  PATENT OCTOBER 6, 1977.  HOW LONG WILL 10 TO THE 30TH

5  OPERATIONS TAKE?  AND I'VE MADE THAT CONVERSION, AND I

6  FIND THE 10 TO THE 30TH OPERATIONS IS A VERY LONG

7  TIME.

8  Q.  YOU DID TAKE EXISTING COMPUTATIONAL METHODS AND

9  EQUIPMENT INTO ACCOUNT?

10  A.  YES, YES.

11  Q.  CAN I ALSO DIRECT YOUR ATTENTION BACK TO COLUMN 2,

12  LINES 43 THROUGH 47.

13       I'M SORRY.  I DON'T HAVE A BLOW UP OF THIS,

14  YOUR HONOR, BUT IT'S COLUMN 2, 43 THROUGH 47.

15       THE COURT:  OKAY.

16       MR. KENNEDY:  Q.  AND THE SENTENCE READING

17  "THE ILLUSTRATED EMBODIMENT DIFFERS FROM PRIOR

18  APPROACHES TO A PUBLIC KEY CRYPTOSYSTEM AS DESCRIBED

19  IN MULTIUSER CRYPTOGRAPHIC TECHNIQUES IN THAT IT IS

20  BOTH PRACTICAL TO IMPLEMENT AND IS DEMONSTRABLY

21  INFEASIBLE TO INVERT USING KNOWN METHODS."

22       DID YOU READ THAT AND TAKE THAT INTO ACCOUNT

23  IN ARRIVING AT YOUR OPINION?

24  A.  I WILL TAKE THAT INTO ACCOUNT IF I KNEW WHAT THE

25  AUTHORS MEANT BY THE WORD "INFEASIBLE,"  AND I HAVE TO

1   READ LATER.   I HAVE TO READ FURTHER ON TO COLUMN 5 TO

2   SEE WHAT INFEASIBLE MEANS, AND THAT'S WHAT I'VE DONE.

3   Q.   AND GOING BACK TO CLAIM ONE, YOU TOLD US THIS

4   MORNING THAT IT'S YOUR OPINION THAT THE WORD

5   GENERATING DOESN'T HAVE A WELL-UNDERSTOOD MEANING IN

6   THE ART; CORRECT?

7   A.   ABSOLUTELY.

8   Q.   IN ARRIVING AT THE OPINION AND GIVING THAT

9   TESTIMONY, WHAT DID YOU DO TO GO TRY TO FIND OUT

10  WHETHER GENERATING DID OR DID NOT HAVE A

11  WELL-UNDERSTOOD MEANING?

12  A.   WELL, I USED MY SKILL IN THE ART, MY KNOWLEDGE OF

13  CRYPTOGRAPHY.   IF YOU TAKE, FOR EXAMPLE, A BOOK LIKE

14  SNEERS AND LOOK AT THE INDEX AND SEE IF CAN I FIND THE

15  WORD GENERATING, I DON'T THINK YOU'RE GOING TO FIND

16  THE WORD GENERATING.   I MIGHT FIND GENERATING THE

17  SYMMETRIC GROUP.   WHEN I LOOK AT THAT WORD, IT'S

18  INDEFINITE.   IT DOESN'T TELL ME.   IT SAYS "GENERATED

19  FROM SAID RANDUM NUMBERS A SECRET DECIPHERING KEY."

20        SO I KNOW WHAT THE AUTHORS INTEND.   THEY

21  INTEND FOR ME TO TAKE THESE RANDUM NUMBERS AND PRODUCE

22  FROM THOSE RANDUM NUMBERS A SECRET DECIPHERING KEY,

23  BUT I DON'T KNOW HOW THEY INTEND TO DO IT.   I HAVE NO

24  WAY.   IT'S TOO INDEFINITE FOR ME TO FIGURE OUT WHAT

25  THE AUTHORS INTENDED JUST UPON THE BASIS OF THOSE

1  WORDS.

2          AND, FOR EXAMPLE, I SEE THE WORD PROCESSING

3  APPEARING TWICE ON THIS CHART OVER HERE.  IT'S

4  PROCESSING THE MESSAGE, AND THE OTHER IS PROCESSING

5  THE ENCIPHERED MESSAGE.  THE WORD PROCESSING IS NOT

6  DOING THE SAME THING BOTH TIMES.  YOU HAVE TO READ THE

7  ENTIRE THING IN CONTEXT TO UNDERSTAND WHAT THE --

8  ATTEMPT TO UNDERSTAND WHAT THE AUTHORS, THE INVENTORS

9  OF THIS PATENT INTEND.

10  Q.  DO YOU REMEMBER WHAT QUESTION YOU'RE ANSWERING?

11  A.  YOU'VE ASKED ME IF I UNDERSTOOD WHAT GENERATING

12  MEANT.

13  Q.  I ASKED YOU WHAT YOU DID TO ARRIVE AT YOUR

14  OPINION.

15  A.  MY TECHNICAL EXPERTISE, MY KNOWLEDGE OF

16  CRYTOGRAPHY.

17  Q.  AND YOU TOLD US YOU LOOKED AT ONE BOOK; CORRECT?

18  A.  I DIDN'T LOOK AT THAT -- I'VE LOOKED AT THAT

19  BOOK.  I DON'T THINK I'VE LOOKED FOR THE WORD

20  GENERATING IN THE INDEX.

21  Q.  DID YOU TRY LOOKING IN A DICTIONARY?

22  A.  OH, YES.  I DON'T THINK I LOOKED AT A DICTIONARY,

23  BUT I LOOKED UP WORDS IN DICTIONARIES.

24  Q.  WELL, BEFORE COMING HERE AND SAYING THAT

25  GENERATING DIDN'T HAVE AN ACCEPTED MEANING IN THE ART,

1  DID YOU DOUBLE CHECK TO SEE, IF MAYBE PEOPLE WENT TO

2  DICTIONARIES, THEY'D FIND OUT IN MATHETMATICS

3  GENERATING DOES HAVE AN UNDERSTOOD MEANING?  DID YOU

4  DO THAT?

5  A.  NO, I DID NOT DO THAT.

6          MR. KENNEDY:  YOUR HONOR, EXHIBIT 50004 --

7  SORRY, I'M THINKING BIG NUMBERS HERE.  504 IS A

8  PORTION OF WEBSTER'S THIRD NEW INTERNATIONAL

9  DICTIONARY, 1981, PAGE 945.

10 Q.  I WOULD DIRECT THE WITNESS'S ATTENTION IN

11 PARTICULAR TO DEFINITION NUMBER THREE OF GENERATE TO

12 DEFINE AS A "MATHEMATICAL OR LINGUISTIC SET OR

13 STRUCTURE BY THE APPLICATION OF ONE OR MORE RULES OR

14 OPERATIONS TO GIVE IN QUANTITIES."  DOES THAT IN ANY

15 WAY AFFECT YOUR OPINION?

16 A.  COULD YOU EXCUSE ME.  I'D LIKE TO GET MY READING

17 GLASSES.

18 Q.   I APOLOGIZE.  SORRY, DOCTOR.

19 A.   OKAY.  NOW, YOU WERE USING DEFINITION --

20 Q.   NUMBER THREE.

21 A.  GENERATING.  I'M LOOKING AT GENERATION.  LET'S

22 LOOK AT GENERATING.

23 Q.  IT'S UNDER GENERATE, PROFESSOR.

24 A.  TO DEFINE THIS "IN MATHEMATICAL OR LINGUISTIC SET

25 OR STRUCTURE BY THE APPLICATION OF ONE OR MORE RULES

1  OF OPERATIONS TO GIVE IN QUANTITIES."  FOR EXAMPLE, I

2  JUST READ THAT.

3  Q.  AND THAT DOESN'T IN ANY WAY AFFECT ANY OPINION

4  THAT YOU'VE EXPRESSED HERE THAT GENERATING HAS NO

5  ACCEPTED MEANING WITHIN THE ART; CORRECT?

6  A.  I MAINTAIN WHAT I HAVE SAID.  IT TELLS YOU WHAT

7  YOU WANT TO DO, BUT IT DOESN'T GIVE YOU ANY INDICATION

8  AS TO WHAT YOU WERE TO DO.

9       ALL THIS DEFINITION IS TO SAY THE APPLICATION

10  OF ONE OR MORE RULES OR OPERATIONS THAT IS TO DO

11  SOMETHING TO A GIVEN QUANTITY.  I'M WILLING TO ACCEPT

12  THE DEFINITION OF THIS DICTIONARY OVER HERE, BUT IT

13  DOESN'T TELL ME ANYTHING DIFFERENT THAN WHAT I'VE READ

14  ON THE BOARD.

15       IT SAYS RANDOM NUMBERS ARE TO BE USED TO GET

16  SOMETHING ELSE, A SECRET DECIPHERING KEY.  BUT IT

17  DOESN'T TELL ME, YOU KNOW, ANY SORT OF MATHEMATICAL

18  OPERATION WHICH TAKES INPUT AND PRODUCED AN OUTPUT CAN

19  BE THOUGHT OF AS GENERATING.

20       SO THIS IS DESCRIBING A VERY GENERAL

21  OPERATION WHERE YOU TAKE ANY KIND OF RANDUM NUMBERS

22  AND GET SOMETHING ELSE IS AN EXAMPLE OF GENERATING.

23  THIS DOESN'T TELL ME.  THIS IS A DESCRIPTION OF AN ACT

24  OF WHAT THE INVENTORS INTENDED, BUT IT DOESN'T TELL ME

25  EXACTLY HOW THEY WANTED TO DO IT OR EVEN GIVE ANY

1  GUIDANCE TO THAT.

2  Q.  SO YOUR OPINION IS STILL THE SAME AS IT WAS THIS

3  MORNING?

4  A.   THE SAME AS IT WAS A FEW MINUTES AGO.

5  Q.   AND I ASSUME YOUR OPINION AS TO PROCESS IS THE

6  SAME AS IT WAS THIS MORNING THAT THAT HAS NO

7  RECOGNIZABLE ACCEPTANCE IN THE ART?

8  A.   IN THE CRYPTOGRAPHIC ART, IT HAS NO MEANING.   I'M

9  SURE THAT YOU HAVE FOUND FOR ME THE WORD PROCESSING

10  OVER HERE.

11  Q.   NO.

12  A.   YOU HAVEN'T?

13  Q.   JUST BEAR WITH ME.   I'VE GOT AN EQUALLY GOOD

14  APPROACH ON THIS ONE, BEAR WITH ME.   IT'S GOING TO BE

15  DIFFERENT.

16          IN PREPARING TO COME HERE AND GIVE YOUR

17  TESTIMONY, DID YOU CHECK WITH ANY OF YOUR FELLOW

18  EXPERTS SUCH AS DUSSE FROM RSA, THE GOOD LOOKING

19  GENTLEMAN WITH A CREW CUT SITTING BACK HERE, TO SEE IF

20  HE AGREED WITH YOU THAT PROCESSING DOESN'T HAVE A

21  RECOGNIZED MEANING IN THE ART?   DID YOU DO THAT?

22  A.   NO, I MET MR. DUSSE THIS MORNING.

23  Q.   DID YOU CHECK WITH ANYBODY ELSE THAT YOU

24  CONSIDERED EXPERIENCED IN THE ARTS SUCH AS, FOR

25  EXAMPLE, MR. SCHLAFLY TO SEE IF HE AGREED WITH YOUR

1    VIEW?

2    A.   NO, I DID NOT CHECK WITH HIM.

3    Q.   I WANT YOU TO ASSUME HYPOTHETICALLY THAT, WHEN

4    MR. DUSSE WAS DEPOSED AS AN EXPERT IN THIS CASE A

5    COUPLE WEEKS AGO, HE HAD NO TROUBLE DEFINING

6    PROCESSING AND TOLD US, "IN THE CONTEXT OF A DIGITAL

7    SIGNATURE PROCESSOR, PROCESSING IS THE ACT OF

8    TRANSFORMING DIGITAL SIGNALS OR MANIPULATING DIGITAL

9    SIGNALS."

10           ASSUMING -- AND WE'LL TIE IT UP -- THAT THAT

11   WAS MR. DUSSE'S TESTIMONY, AND HE'LL BE HERE LATER

12   THIS AFTERNOON, DOES THAT AFFECT YOUR OPINION AT ALL

13   THAT PROCESSING DOESN'T HAVE A RECOGNIZED MEANING IN

14   THE ART?

15           MR. HASLAM:   OBJECT TO THE QUESTION AS

16   LACKING FOUNDATION.  I ALSO THINK THE FOUNDATION IS

17   NOT AS TO WHETHER IT WAS TESTIFIED TO.  I DON'T THINK

18   THEY HAVE ESTABLISHED OR CAN ESTABLISH THAT THE '582

19   PATENT DISCLOSED A PROCESS THAT THE WITNESS WAS

20   REFERRING TO.

21           THE COURT:   YOU'RE TALKING ABOUT THE WORD

22   PROCESSING; CORRECT?

23           MR. KENNEDY:   CORRECT.

24           THE COURT:   THE CONTEXT OF --

25           MR. KENNEDY:   MR. DUSSE WAS ASKED ABOUT

1    PROCESSING IN THE CONTEXT OF THE CLAIMS IN THIS CASE.

2    AGAIN, THE DEPOSITION TESTIMONY SPEAKS FOR ITSELF.

3    WE'LL HAVE HIM ON THE STAND HERE THIS AFTERNOON.

4            I'M REPRESENTING AS AN OFFICER OF THE COURT

5    IT WAS GIVEN.  ALL I WANT TO FIND OUT NOW IS WHETHER,

6    EVEN IF ANOTHER OF HIS SAME CLIENT'S EXPERTS HAS A

7    DIFFERENT VIEW, THAT HAS ANY EFFECT ON THIS

8    GENTLEMAN'S OPINION.  I THINK I KNOW HIS ANSWER.

9            THE COURT:  OBJECTION OVERRULED.

10           THE WITNESS:  MY OPINION IS THE SAME.  WHEN I

11   LOOK AT THE WORDS "PROCESSING THE MESSAGE" AS IN THE

12   FIRST, SECOND, THIRD, FOURTH, FIFTH, AND IN THE

13   SEVENTH PART OF THE CLAIM ONE, "PROCESSING THE

14   ENCIPHERED MESSAGE," IT DESCRIBED TO ME WHAT IS TO BE

15   DONE, BUT IT DOESN'T DESCRIBE TO ME HOW IT'S BEING

16   DONE.  IT DESCRIBES THE ACTS BUT NOT THE METHOD AT

17   ALL.

18   Q.  IT WOULDN'T MATTER HOW MANY CRYPTOANALYSTS OR

19   COMPUTER SPECIALISTS OR MATHEMATICIANS GOT UP HERE AND

20   SAY, "YES, IT DOES HAVE AN ACCEPTED MEANING," YOUR

21   OPINION WOULD STILL BE THAT IT DOESN'T; CORRECT?

22   A.  WELL, YOU'VE ONLY OFFERED ONE, MR. DUSSE.  I STAND

23   ON WHAT I SAID.  THAT LANGUAGE OVER THERE IS VAGUE AND

24   INDEFINITE.  IT DOES NOT SAY -- GIVE GUIDANCE TO WHAT

25   THE INVENTION IS.

1  Q.  AND DID YOU DO ANY KIND OF REALITY CHECK IN

2  CONSULTING WITH OTHER PEOPLE BEFORE EXPRESSING THE

3  OPINION TO SEE IF THERE WERE OTHER FOLKS WHO SHARED

4  YOUR VIEW?

5  A.  NO, I DID NOT DO ANY REALITY CHECKS.

6  Q.  I WILL DIRECT YOUR ATTENTION NEXT TO CLAIM TWO OF

7  THE PATENT.  AGAIN, I'M SORRY WE DON'T HAVE A BLOW UP

8  OF THAT.  DO YOU HAVE THE --

9  A.  YES, I DO.

10  Q.  AS I UNDERSTAND IT, YOUR VIEW IS THAT THE WORD

11  AUTHENTICATION AS USED IN THERE MEANS THAT YOU'RE

12  ACTUALLY VERIFYING THE IDENTITY OF THE PERSON WITH

13  WHOM YOU'RE COMMUNICATING.

14  A.  THAT'S CORRECT.

15  Q.  NOW, CAN YOU POINT US TO ANY AGAIN BOOK, TREATISE,

16  ARTICLE, OR WHATEVER THAT SAYS AUTHENTICATION MEANS

17  NOT JUST THAT SOMEBODY HAS STOLEN THE KEY, HAS THE

18  ENCIPHERING MACHINE, HAS SOMEHOW GOTTEN ACCESS TO IT,

19  BUT THAT IT'S ACTUALLY THE LIVE HUMAN BEING THAT YOU

20  THINK YOU'RE TALKING TO?

21  A.  IF YOU WILL GIVE ME A SECOND.  I THOUGHT I GAVE

22  YOU THIS MORNING --

23  Q.  HOW ABOUT COLUMN 18, LINES 46, "THE PUBLIC

24  DEPOSITORY"?

25  A.  WELL, THERE'S -- I'M LOOKING FOR AN EVEN MORE

1   BASIC ROTATION.  IF YOU WILL GIVE ME A MINUTE, I WILL

2   TRY TO FIND IT.  I BELIEVE IT'S IN "NEW DIRECTIONS,"

3   BUT LET ME CHECK.  NO, IN THE PAPER "TRAP DOOR

4   KNAPSACKS," WHICH IS EXHIBIT 1003, ON PAGE 527, THE

5   LAST LINE USES THE WORD "HE COULD IDENTIFY," AND THEN

6   HE PUTS IN PARENTHESIS "AUTHENTICATE."  I INTERPRET

7   THAT TO MEAN THAT AUTHENTICATION IS CONNECTED WITH

8   IDENTIFICATION.

9   Q.   SO IT'S YOUR UNDERSTANDING THAT IN THE ART TO

10  AUTHENTICATE MEANS TO ELIMINATE ANY POSSIBILITY OF AN

11  IMPOSTOR, BUT IT HAS TO BE THE REAL PERSON; IS THAT

12  CORRECT?

13  A.   THAT IS ABSOLUTELY CORRECT.

14  Q.   HOW COULD WE AUTHENTICATE THAT YOU ARE PROFESSOR

15  KONHEIM?

16  A.   YOU COULD AUTHENTICATE THAT I AM PROFESSOR KONHEIM

17  OR ALAN KONHEIM BY ASKING ME TO PRODUCE MY DRIVER'S

18  LICENSE.

19  Q.   HOW DO I KNOW IT'S NOT A FORGERY?  YOU COULD BUY

20  THOSE THINGS FOR 500 BUCKS.

21  A.   WELL, THEN IT'S UP TO YOU TO SAY, "HEY, THAT'S A

22  FORGERY."

23  Q.   OTHER THAN IF YOU COULD TRANSMIT DNA OVER COMPUTER

24  WIRES, CAN YOU THINK OF ANY WAY OF AUTHENTICATING THE

25  IDENTITY OF SOMEBODY IN THE WAY YOU'RE TALKING ABOUT?

1   A.   SUPERMARKETS ACCEPT MY DRIVER'S LICENSE AS PROOF

2   OF MY IDENTITY.   IF YOU WISH, I'LL HAVE MY PASSPORT

3   FEDEXED UP HERE.

4   Q.   YOU TOLD US THIS MORNING THAT HAVING THE SECRET

5   KEY WASN'T ENOUGH FOR AUTHENTICATION.

6   A.   THAT'S RIGHT BECAUSE THE SECRET KEY IS NOT

7   CONNECTED WITH MY IDENTITY.   YOU MUST FIND SOMETHING

8   THAT LINKS THE SECRET KEY AND THE IDENTITY.   AFTER

9   ALL, CLAIM TWO SAYS THAT THE TRANSMITTER USES THE --

10  GETS THE PUBLIC KEY FROM THE RECEIVER AND THEN

11  ENCIPHERS INFORMATION.

12          THE TRANSMITTER DOESN'T KNOW THAT IT'S

13  DEALING WITH ALAN KONHEIM.   IT'S DEALING WITH SOMEONE

14  WHO WAS GIVEN THE PUBLIC KEY.

15  Q.   THE SAME WAY YOU GO INTO SAFEWAY AND SHOW YOUR

16  DRIVER'S LICENSE.   THEY DON'T KNOW FOR SURE THEY'RE

17  DEALING WITH PROFESSOR KONHEIM.   HOW DO THEY KNOW IT'S

18  YOU?

19  A.   THEY SEE MY PICTURE ON IT.

20  Q.   HOW DO THEY KNOW ITS NOT ANOTHER SHORT GOOD

21  LOOKING GUY THAT'S ON THERE?

22  A.   THERE IS NO ONE AS GOOD LOOKING AS ME EVEN IF I'M

23  NOT A LAWYER.

24  Q.   AND DIRECTING YOUR ATTENTION BACK TO COLUMN 18,

25  THE PORTION WE WERE TALKING ABOUT THIS MORNING AGAIN

1  IT WAS LINES 47 -- 46 THROUGH WHERE THE CLAIMS START.

2  A.   YES.

3  Q.   THAT TALKS ABOUT AN ALTERNATIVE VARIATION UNDER

4  WHICH KEYS COULD BE REGISTERED WITH SOME KIND OF A

5  SYSTEM TO INCREASE THEIR RELIABILITY; CORRECT?

6  A.   THAT'S QUITE CORRECT.

7  Q.   AND THAT'S BEING PROPOSED -- AS IT STARTS AT LINE

8  46, "VARIATIONS ON THE ABOVE-DESCRIBED EMBODIMENT ARE

9  POSSIBLE."  IT SAYS THAT, DOESN'T IT?

10 A.   YES, IT DOES.

11 Q.   SO THE IDEA OF FILING SOMETHING IN A DEPOSITORY IS

12 NOT PART OF THE ACTUAL EMBODIMENT THAT'S PROPOSED IN

13 THE PATENT, IS IT.

14 A.   IT IS NOT.

15 Q.   AND ONCE AGAIN, IN ORDER FOR YOUR DEFINITION OF

16 AUTHENTICATION TO BE CORRECT, WE'VE GOT TO ASSUME THAT

17 THE INVENTORS PROPOSED A DEFINITION THAT THEIR OWN

18 PREFERRED EMBODIMENT DID NOT SATISFY; CORRECT?

19 A.   WELL, I THINK YOU HAVE TO READ ON COLUMN ONE "AN

20 AUTHENTICATION SYSTEM PREVENTS THE UNAUTHORIZED

21 INJECTION OF MESSAGES INTO AN INSECURE CHANNEL

22 ASSURING THE RECEIVER OF THE MESSAGE OF THE LEGITIMACY

23 OF THE SENDER."

24         WHAT THEY ARE TALKING ABOUT HERE BY SAYING

25 "VARIATIONS OF," THEY SAY IN ADDITION TO THE SYSTEM

1   THAT WE ARE PROPOSING, YOU CAN DO THE FOLLOWING

2   ADDITIONAL FACTS.  YOU CAN TAKE THE PUBLIC KEY AND

3   REGISTER IT BY GOING IN AND OFFERING THE PUBLIC KEY,

4   YOUR LICENSE, YOUR FINGERPRINTS, MAYBE YOUR DNA AS

5   PROOF THAT THAT PUBLIC KEY BELONGS TO RAOUL KENNEDY.

6           AND THEREFORE, WHEN YOU OFFER YOUR PUBLIC KEY

7   TO BOB FRAM, THEN BOB FRAM CAN CHECK THE DEPOSITORY

8   AND SEE THAT HE HAS RECEIVED THE KEY FROM RAOUL

9   KENNEDY.  THEREFORE, WHEN HE IS IN COMMUNICATION WITH

10  YOU, HE KNOWS HE IS DEALING WITH YOU AND NOT SOME

11  IMPOSTER.

12  Q.  PROFESSOR KONHEIM, UNDER YOUR DEFINITION OF

13  AUTHENTICATION, THE PREFERRED EMBODIMENT IN THE PATENT

14  DOESN'T SATISFY IT, DOES IT.

15  A.  NO, IT DOES NOT SATISFY IT.

16          MR. KENNEDY:  THANK YOU.  I HAVE NO FURTHER

17  QUESTIONS.  THANK YOU VERY MUCH.

18          MR. HASLAM:  YOUR HONOR, I HAVE AN OBJECTION

19  TO MR. FLINN QUESTIONING ON THIS GROUND.  SINCE THE

20  BEGINNING OF THIS CASE, ALL THE DEFENDANTS IN THE CASE

21  HAVE FILED JOINT RESPONSES -- CYLINK, C.K.C., AND

22  STANFORD.  I THINK THIS IS AN ATTEMPT TO TAKE TWO

23  SHOTS AT THE SAME WITNESS.

24          I DON'T SEE ANY REASON WHY, WHY IF THEY HAVE

25  BEEN ABLE TO FILE JOINT PAPERS AT THE BEGINNING OF THE

1  CASE, WE NEED ESSENTIALLY THE SAME SIDE QUESTIONING

2  THE WITNESS.

3        THE COURT:  WELL, ADDITIONAL QUESTIONS, DON'T

4  GO OVER THE SAME QUESTIONS.

5        MR. FLINN:  THEY WILL BE DIFFERENT QUESTIONS,

6  YOUR HONOR.

7        THE COURT:  OKAY.

8                  <u>CROSS-EXAMINATION</u>

9        BY MR. FLINN:  Q.  DR. KONHEIM, HAVE YOU EVER

10 HEARD OF A BOOK CALLED "THE CODE BREAKERS" WRITTEN BY

11 ONE DAVID KANN?

12 A.  YES, I HAVE.

13 Q.  HAVE YOU READ IT?

14 A.  YES, I HAVE.

15 Q.  WHAT IS THE BOOK ABOUT?

16 A.  THE BOOK IS ABOUT THE HISTORY OF CRYPTOGRAPHY.

17 Q.  IS THIS A PRETTY WELL-KNOWN BOOK IN THE ART?

18 A.  YES, IT CERTAINLY IS.

19 Q.  WOULD YOU AGREE THAT THE AUTHOR, DAVID KANN, IS A

20 RECOGNIZED AUTHORITY IN THAT AREA?

21 A.  WELL, I WOULD -- DAVID KANN IS NOT A

22 CRYPTOGRAPHER.  DAVID KANN IS A REPORTER.

23 Q.  I MEAN IN THE HISTORY OF CRYPTOLOGY AS OPOSED TO

24 CRYPTOGRAPHY ITSELF.

25 A.  HE IS A VERY KNOWLEDGEABLE PERSON IN THE HISTORY

1  OF CRYPTOGRAPHY.

2  Q.  NOW, AS OF 1977 YOU WERE ALREADY WELL INVOLVED IN

3  THE FIELD OF CRYPTOGRAPHY; IS THAT RIGHT?

4  A.  THAT'S CORRECT.

5  Q.  SO YOU'D BE PRETTY FAMILIAR WITH THE USE OF THE

6  TERMS IN THE FIELD OF CRYPTOGRAPHY IN 1977; IS THAT

7  CORRECT?

8  A.  I BELIEVE I WOULD BE.

9  Q.  AND YOU'VE BEEN IN A PRETTY GOOD POSITION TO SEE

10  THE FIELD ON A FAIRLY CONSTANT BASIS FROM 1977 TO THE

11  PRESENT.  IS THAT FAIR?

12  A.  THAT'S CORRECT.

13  Q.  NOW, YOU'VE TESTIFIED A LOT TODAY ABOUT HOW

14  VARIOUS TERMS ARE USED IN THE ART.  HAS THERE BEEN A

15  SUBSTANTIAL CHANGE IN THE MEANING OF TERMS FROM 1977

16  TO THE PRESENT?

17  A.  WELL, I'M NOT SURE THAT SOME TERMS MAY HAVE

18  CHANGED THE MEANING.

19  Q.  ANY TERMS THAT WE'VE BEEN USING TODAY THAT YOU CAN

20  IDENTIFY MEAN SOMETHING DIFFERENTLY THAN THEY DID IN

21  1977?

22  A.  NO, NONE THAT I CAN POINT TO.

23  Q.  YESTERDAY, YOU USED THE TERM -- AND I WANT TO JUST

24  SEE IF I CAN UNDERSTAND IT -- NUMBER THEORY OR NUMBER

25  THEORIST.  DO YOU RECALL THAT?

1    A.   YES.

2    Q.   WHAT IS THAT?

3    A.   NUMBER THEORY IS A BRANCH OF MATHEMATICS THAT

4    DEALS WITH PROBLEMS WHERE THE SOLUTIONS ARE INDIGES AS

5    OPPOSED TO REAL NUMBERS AND WHERE RATIONAL NUMBERS AND

6    TRANSINDENTIAL NUMBERS LIKE PIE AND E, NUMBER THEORY

7    DEALS WITH THE PROPERTIES OF INDIGES.

8    Q.   IS NUMBER THEORY RELEVANT TO CRYPTOGRAPHY?

9    A.   YES, NUMBER THEORY IS VERY RELEVANT TO CRYPTOLOGY.

10   Q.   IS NUMBER THEORY RELEVANT TO THE SECURITY OF

11   CRYPTOGRAPHY?

12   A.   IT'S RELEVANT TO CRYPTOGRAPHY AND ALL THINGS

13   CONNECTED WITH CRYPTOLOGY.

14   Q.   WOULD AN EXPERT IN NUMBER THEORY IN YOUR VIEW BE

15   AN APPROPRIATE PERSON TO APPLY ON CRYPTOGRAPHIC

16   TECHNOLOGY?

17   A.   WOULD I ACCEPT A DEFINITION FROM SOMEONE WHO IS A

18   NUMBER THEORIST?  I MIGHT.

19   Q.   THIS MORNING YOU TALKED ABOUT SOMETHING CALLED DES

20   OR D.E.S.; IS THAT RIGHT?

21   A.   YES.

22   Q.   NOW, THAT WAS THE NAME THAT WAS GIVEN A

23   CRYPTOGRAPHIC SYSTEM.  IT'S A SYMMETRIC, A NON-PUBLIC

24   E SYSTEM; CORRECT?

25   A.   CORRECT.

1    Q.   AND IT DOMINATED THE ENCRYPTION STANDARD ONCE IT

2    BECAME A FEDERAL STANDARD; RIGHT?

3    A.   I THINK SO.

4    Q.   IT WAS NOT CALLED DIGITAL ENCRYPTION STANDARD

5    UNTIL IT BECAME A DIGITAL ENCRYPTION STANDARD.

6    A.   I DON'T REMEMBER WHAT IT WAS CALLED AT I.B.M.

7    Q.   WERE YOU INVOLVED IN THE DEVELOPMENT OF D.E.S.?

8    A.   I WS INVOLVED INDIRECTLY IN THE DEVELOPMENT, BUT I

9    WAS PRIMARILY INVOLVED IN THE CERTIFICATION PROCESS.

10   Q.   AND D.E.S. IS A VERY WIDELY USED SYMMETRIC

11   NON-PUBLIC E CRYPTOGRAPHIC SYSTEM TODAY; IS THAT

12   RIGHT?

13   A.   YES.

14   Q.   WOULD YOU AGREE WITH ME THAT IN TERMS OF COMMERCE,

15   IT IS PROBABLY THE SINGLE MOST COMMONLY USED SYMMETRIC

16   CRYPTOGRAPHIC SYSTEM?

17   A.   WELL, I COULDN'T GIVE YOU FIGURES TO BACK THAT UP,

18   BUT I WOULD NOT FIND THAT SUPRISING AT ALL.

19   Q.   AND YOU PLAYED A KEY ROLE IN THE DEVELOPMENT OF

20   THAT, ISN'T THAT RIGHT?

21   A.   NO.   I SAID THAT I PLAYED A ROLE IN THE

22   DEVELOPMENT, BUT MY PRIMARY ROLE WAS IN THE

23   CERTIFICATION.

24   Q.   IS THAT SOMETHING -- WHEN YOU SAY THE PRIMARY ROLE

25   WAS IN THE CERTIFICATION IN PROVING TO THE

1  CRYPTOGRAPHIC COMMUNITY OR RESPONDING TO CRITICISMS OF

2  D.E.S.; IS THAT RIGHT?

3  A.  NO.  THE RESPONSIBILITY WAS TO THE I.B.M.

4  CORPORATION TO MAKE SURE THAT THIS STANDARD, THIS

5  CRYPTOGRAPHIC ALGORITHM WAS A HIGH QUALITY ALGORITHM

6  AND THAT IT WOULD BE INFEASIBLE TO RECOVER THE KEY IN

7  THE PLAIN TEXT FROM CIPHER TEXT.

8  Q.  I WANT TO BE A LITTLE MORE CERTAIN THAT I

9  UNDERSTAND THE DISTINCTION YOU'RE DRAWING FROM BEING

10 INVOLVED IN THE DEVELOPMENT OF D.E.S. TO PURSUING ITS

11 CERTIFICATION.  WHAT WAS THE DIFFERENCE?

12 A.  THE DIFFERENCE IS THE FOLLOWING.  I WAS EMPLOYED

13 BY I.B.M. CORPORATION, BUT I WORKED AT THE THOMAS J.

14 WATSON RESEARCH CENTER WITH MARTY HELLMAN FOR SOME

15 TIME.  THE RESEARCH DIVISION NEVER BROUGHT OUT -- AT

16 LEAST IT NEVER BROUGHT OUT UNTIL I LEFT IN 1982 --

17 PROMISE.  THESE WERE ASSIGNED TO SPECIFIC DIVISIONS.

18        THE DIVISION IN KINGSTON, NEW YORK WAS

19 CHARTED WITH THE RESPONSIBILITY OF IMPLEMENTING

20 TESTING AND BRINGING OUT D.E.S. AS A PRODUCT FOR

21 I.B.M. OR AT LEAST EMBEDDING IT WITHIN THE SYSTEM.  WE

22 HAD A COLLABORATION WITH THAT DIVISION WHICH INVOLVED

23 TALKING TO THE PEOPLE THERE AND HELPING THEM.  BUT AT

24 THE SAME TIME, WE BEGAN TO WORK ON OUR OWN IN TRYING

25 TO ASCERTAIN THE STRENGTH OF D.E.S.

1  Q.  IT WAS YOUR POSITION, YOUR PERSONAL AND

2  PROFESSIONAL POSITION AT I.B.M. THAT D.E.S. WAS A

3  STRONG CRYPTOGRAPHIC SYSTEM; IS THAT CORRECT?

4  A.  THAT'S MY POSITION THEN AND NOW.

5  Q.  AND THAT WAS A POSITION THAT YOU ADVOCATED FAIRLY

6  VIGOROUSLY; ISN'T THAT RIGHT?

7  A.  I'M NOT SURE IF I ADVOCATED IT VIGOROUSLY, BUT I

8  ADVOCATED IT.

9  Q.  WAS YOUR VIEW UNIVERSALLY SHARED IN THE

10  CRYPTOGRAPHIC COMMUNITY?

11  A.  I WON'T SAY THAT IT WAS NOT SHARED.  MANY PEOPLE

12  IN THE CRYPTOGRAPHIC COMMUNITY HAD QUESTIONS ABOUT

13  D.E.S.  MARTY HELLMAN WAS ONE WHICH HAD QUESTIONS

14  WHICH WERE LEGITIMATE QUESTIONS AFFECTING THE STRENGTH

15  OF D.E.S., AND THEY VOICED THOSE QUESTIONS TO THE

16  NATIONAL BUREAU OF STANDARDS, HAD TWO WORKSHOPS THAT

17  WERE DEVOTED TO ISSUES CONNECTED WITH THIS BEFORE THE

18  CERTIFICATION OF D.E.S. WAS COMPLETED.

19  Q.  WAS PROFESSOR HELLMAN INVOLVED IN FACT IN MAKING

20  SPECIFIC SUGGESTIONS OF HOW TO CHANGE D.E.S. TO AVOID

21  THE WEAKNESSES HE SAID WERE PRESENT?

22  A.  IF I UNDERSTOOD PROFESSOR HELLMAN'S COMMENT,

23  PROFESSOR HELLMAN FELT THAT A KEY AMP OF 56 BITS WAS

24  NOT SUFFICIENT AND, THEREFORE, WOULD ALLOW AS

25  TECHNOLOGY IMPROVED AN OPONENT TO BUILD THE MACHINE

1   THAT COULD TEST ALL OF THE KEYS AND DETERMINE WHAT THE

2   PLAIN TEXT WAS.  AND HE ADVOCATED THAT THE NATIONAL

3   BUREAU OF STANDARDS AND I.B.M. BRING OUT A PRODUCT

4   WITH A LONGER KEY.

5   Q.  WAS THAT THE ONLY SUGGESTION THAT PROFESSOR

6   HELLMAN HAD?

7   A.  NO.  I DON'T REMEMBER EXACTLY ALL OF THE

8   QUESTIONS, BUT I THINK THAT HE AND OTHERS FELT THE

9   FOLLOWING.  THERE WERE CERTAIN DESIGN PRINCIPLES THAT

10  WERE USED IN THE DESIGN OF D.E.S.  SOME OF THESE

11  PRINCIPLES EVOLVED FROM I.B.M.  SOME OF THESE

12  PRINCIPLES EVOLVED FROM THE NATIONAL SECURITY AGENCY

13  WHICH REQUESTED THAT I.B.M. NOT DIVULGE THEM OUTSIDE

14  OF THE I.B.M. COMMUNITY.  AND I.B.M. AGREED TO DO

15  THIS, AND THESE DESIGN PRINCIPLES WERE NOT MADE

16  PUBLIC.

17          PROFESSOR HELLMAN AND MAYBE OTHERS FELT THAT

18  THERE WAS SOMETHING, A TRAP DOOR IN D.E.S. WHICH WOULD

19  ALLOW PEOPLE, NAMELY THE GOVERNMENT OR PEOPLE WHO KNEW

20  THE TRAP DOOR, TO BREAK THE SYSTEM.  SO HE HAD

21  ADVOCATED A FULL DISCLOSURE OF THIS, BUT I.B.M. HAD

22  AGREED, AND I ABIDED BY I.B.M.'S RULES NOT TO DIVULGE

23  THIS INFORMATION.  I MIGHT ADD THAT IN 20 YEARS, NO

24  ONE HAS FOUND ANYTHING.

25  Q.  SO JUST SO I'M CLEAR, PROFESSOR HELLMAN IN FACT

1   DIDN'T SAY, "OH, YOU SHOULD USE LARGER KEY SIZE."  HE

2   AND OTHERS SAID D.E.S. MAY HAVE A FUNDAMENTAL WEAKNESS

3   THAT MAKES IT INSECURE; ISN'T THAT RIGHT?

4   A.  WELL, I CAN'T -- I CAN'T ATTEST TO THE WORDS HE

5   SAID.  HE SAID 56 WAS NOT LONG ENOUGH.

6   Q.  I'M TRYING TO UNDERSTAND THE DIFFERENCE.  HE HAD

7   ONE COMMENT ABOUT THE KEY SIZE.  BUT I ASKED YOU IF

8   THAT WAS THE ONLY CRITICISM HE HAD, AND YOU SAID THERE

9   WAS ONE AND THAT'S DIFFERENT CRITICISM THAN KEY SIZE.

10  A.  IT'S NOT THAT HE ASSERTED THAT THERE WAS A

11  WEAKNESS BUT THAT HE ASSERTED THAT I.B.M. SOME BE MORE

12  FORTHCOMING AND REVEAL THE DESIGN PRINCIPLE.

13  Q.  DIDN'T PROFESSOR HELLMAN ALSO ADVOCATE A DIFFERENT

14  CRYPTOGRAPHIC SYSTEM INSTEAD OF D.E.S.?

15  A.  I'M NOT FAMILIAR IF HE DID.

16  Q.  ISN'T IT TRUE THAT PROFESSOR HELLMAN AND STANFORD

17  UNIVERSITY ARGUED THAT HIS CRYPTOGRAPHIC SYSTEMS WERE

18  MORE SECURE BECAUSE THEY DIDN'T HAVE THE UNEXPLAINED

19  FEATURES DEVELOPED BY THE M.S.A.?

20  A.  ARE YOU REFERRING TO THE TRAP DOOR KNAPSACK?  IS

21  THAT WHAT YOU MEAN?

22  Q.  ANY OTHER SYSTEM OTHER THAN D.E.S.

23  A.  I'M NOT SURE IF HE ADVOCATED THAT.

24  Q.  ISN'T IT TRUE THAT YOU AND PROFESSOR HELLMAN HAVE

25  BEEN PROFESSIONALLY DISAGREEING ABOUT D.E.S. FOR MORE

1  THAN A DECADE?

2  A.  I WOULD NOT SAY THAT AT ALL.  IF FACT, WHEN I

3  APPLIED FOR MY POSITION AT U.C.S.B., I WROTE MARTY

4  HELLMAN.  AND THIS WAS IN 1982, OVER SIX YEARS AFTER

5  WE'VE HAD THIS DISCUSSION.  AND AS FAR AS I KNOW,

6  MARTY HELLMAN WROTE A LETTER.  OF COURSE HE MAY HAVE

7  SAID BAD THINGS ABOUT ME, BUT I DON'T THINK HE DID

8  BECAUSE I GOT AN APPOINTMENT AT U.C.S.B.

9           SO IF I WERE AT SUCH ODDS WITH HIM, HE

10 CERTAINLY WOULD HAVE NEVER WRITTEN, AND HE WOULD NEVER

11 HAVE WRITTEN THE WONDERFUL THINGS HE SAID ABOUT ME TO

12 THE UNIVERSITY OF CALIFORNIA; SO I DON'T THINK THAT.

13 MARTY HELLMAN AND I DISAGREE.  I DON'T THINK IT WAS A

14 PROBLEM.  IF I HAD MY OWN WAY, MAYBE I WOULD CHANGE MY

15 MIND, BUT I DON'T THINK THIS WAS A PERSONAL

16 DISAGREEMENT WHICH MADE US ENEMIES.  AT LEAST I HOPE

17 NOT.

18          MR. FLINN:  THANK YOU, SIR.

19          THE COURT:  MR. SCHLAFLY?

20                CROSS-EXAMINATION

21          BY MR. SCHLAFLY:  Q.  I HAVE A COUPLE OF

22 QUESTIONS.  I BELIEVE YOU TESTIFIED THAT THE ALGORITHM

23 THAT BECAME THE DATA ENCRYPTION STANDARD WAS DEVELOPED

24 AROUND 1970; IS THAT CORRECT?

25 A.  I'M NOT SURE, MR. SCHLAFLY, OF THE EXACT DATE.  IN

1  '67 AN ALGORITHM CALLED LUCIFER WAS DEVELOPED, AND

2  D.E.S. IS A VARIOUS ON LUCIFER.  IT MAY HAVE OCCURRED

3  OVER A PERIOD OF TWO OR THREE YEARS.  I DON'T KNOW THE

4  EXACT DATES OF THE DEVELOPMENT.

5  Q.  BUT COULD YOU SAY IT WAS WITHIN TWO OR THREE YEARS

6  OF 1970?

7  A.  YES, I BELIEVE SO.

8  Q.  AND IS IT YOUR OPINION THAT THE D.E.S. WAS SECURE

9  IN 1976?

10  A.  YES, IT'S MY OPINION.

11  Q.  DO YOU HAVE AN OPINION AS TO WHETHER OR NOT THAT

12  ALGORITHM WAS SECURE IN 1970?

13  A.  AS FAR AS I KNOW, THE SAME ALGORITHM WAS -- MUST

14  HAVE BEEN THE SAME ALGORITHM IN 1970.  SO I THINK IT

15  WAS SECURE ALSO IN 1970.

16  Q.  HAD IT BEEN CERTIFIED IN 1970?

17  A.  NO, IT HAD NOT BEEN CERTIFIED WITH THE NATIONAL

18  BUREAU OF STANDARDS IN 1970.

19  Q.  SO YOU'RE WILLING TO SAY IN YOUR USE OF THE WORD

20  SECURE THAT THE ALGORITHM THAT BECAME THE DATA

21  ENCRYPTION STANDARD WAS SECURE IN 1970 BUT HAD NOT

22  BEEN CERTIFIED AS SECURE IN 1970?

23  A.  IT'S MY OPINION THAT D.E.S. WAS SECURE IN 1970.

24  AT THAT TIME THE PROCESS WITHIN I.B.M. OF CERTIFYING

25  IT WAS IN PROGRESS, AND THE PROCESS DEVELOPED BY THE

1    GOVERNMENT TO CERTIFY D.E.S. AS A NATIONAL STANDARD

2    WAS SET INTO PLAY EITHER IN 1970 OR 1971.  AND IT WAS

3    COMPLETED AT A TIME WHICH ALLOWED THE NATIONAL BUREAU

4    OF STANDARDS TO MAKE IT A STANDARD IN 1976.

5           IT HAS ALSO BEEN RECERTIFIED SEVERAL TIMES.

6    I DON'T HAVE THE DATES OF THAT RECERTIFICATION.  IT

7    MAY BE EVERY 10 YEARS IT COMES UP FOR

8    RECERTIFICATION.  IT HAS BEEN RECERTIFIED TWICE TO THE

9    BEST OF MY KNOWLEDGE ON THAT MATTER.

10   Q.   ARE YOU AWARE OF A PATENT ON THE DATA ENCRYPTION

11   STANDARD?

12   A.   YES.

13   Q.   ARE YOU LISTED AS AN INVENTOR?

14   A.   NO, I AM NOT AN INVENTOR OF D.E.S.

15   Q.   CAN YOU EXPLAIN WHY YOU'RE NOT LISTED AS AN

16   INVENTOR?

17   A.   WELL, BECAUSE I WAS NOT AN INVENTOR.

18   Q.   BUT YOU DID HAVE AN ACTIVE ROLE IN CERTIFYING IT.

19   A.   I DID HAVE AN ACTIVE ROLE IN CERTIFYING IT, AND I

20   REMEMBER VISITING KINGSTON WITH SOME OF MY COLLEAGUES

21   AND DISCUSSING THE PROCESS OF THE DESIGN OF D.E.S.

22   Q.   WOULD YOU SAY IT'S FAIR TO SAY THAT INVENTING A

23   SECURE CRYPTOSYSTEM IS SOMETHING ENTIRELY DIFFERENT

24   FROM CERTIFYING A SECURE CRYPTOSYSTEM?

25   A.   IT MOST CERTAINLY IS THE CASE.  INVENTING IS

1  DIFFERENT THAN PROVING SECURE OR ATTEMPTING TO CERTIFY

2  A SYSTEM.

3  Q.  SUPPOSE I WERE TO TELL YOU THAT I HAVE ON MY LAP

4  TOP OVER HERE A CRYPTOGRAPHIC PROGRAM THAT I WROTE

5  MYSELF AND HAS NEVER BEEN PUBLISHED.  WOULD YOU SAY

6  IT'S NECESSARILY INSECURE?

7  A.  I DON'T EVEN KNOW WHAT THE ALGORITHMS ARE.  I

8  WOULD CERTAINLY NOT VENTURE AN OPINION BEFORE LOOKING

9  AT IT.

10  Q.  SO YOU COULDN'T SAY WHETHER IT'S SECURE OR NOT

11  BASED ON THE INFORMATION THAT I TOLD YOU?

12  A.  SINCE I HAVE NO IDEA WHAT ALGORITHM YOU HAVE

13  IMPLEMENTED, I WOULD VENTURE NO OPINION AS TO ITS

14  SECURITY.

15  Q.  IT MIGHT POSSIBLY BE SECURE AND MIGHT POSSIBLY BE

16  INSECURE?

17  A.  QUITE CORRECT.

18  Q.  I HAVE TROUBLE RECONCILING THAT WITH YOUR

19  STATEMENTS EARLIER THAT A CRYPTOSYSTEM CANNOT BE

20  SECURE UNLESS ITS BEEN PUBLISHED AND CERTIFIED

21  SECURE.  CAN YOU EXPLAIN THAT CONTRADICTION?

22  A.  I TOOK AS MY DEFINITION THAT A SECURE SYSTEM TO

23  HIDE INFORMATION IS A SYSTEM WHICH MEETS -- HAS TWO

24  ATTRIBUTES.  ONE, THAT THE SYSTEM OFFERS GUARANTEES IN

25  THE FORM OF REPEATED ATTACKS BY PEOPLE WHO ARE

1  COMPETENT TO MAKE THESE ATTACKS AND THAT THIS PROCESS

2  OFFERS THE GUARANTEE OF SECRECY OVER A CERTAIN PERIOD

3  OF TIME.  SO THAT'S WHAT A SECURE CRYPTOGRAPHIC SYSTEM

4  IS.

5          NOW, YOU'VE SAID TO ME THAT ON YOUR PC THERE

6  YOU'VE GOT A CRYPTOGRAPHIC SYSTEM.  FINE.  I'M NOT

7  GOING TO SAY TO YOU THAT IT'S SECURE, INSECURE UNTIL I

8  STUDY IT.

9  Q.  OKAY.  BUT I ALSO TOLD YOU THAT IT'S UNPUBLISHED

10  AND HAS NOT BEEN SUBJECTED TO THESE CRYPTOGRAPHIC

11  ATTACKS BY EXPERTS IN THE FIELD.

12  A.  I'M NOT GOING TO SAY THAT IT IS SECURED.

13  Q.  BUT IT MIGHT BE SECURE?

14  A.  IT MIGHT BE SECURE, QUITE CORRECT.

15  Q.  YOU MIGHT SAY IT MIGHT BE SECURE.  YOU WOULD

16  PROBABLY HAVE NO FAITH IN ITS SECURITY, BUT IT MIGHT

17  STILL BE SECURE ANYWAY.

18  A.  I'M NOT GOING TO VENTURE A GUESS.  I HAVEN'T EVEN

19  LOOKED AT IT.  HOW CAN I MAKE A JUDGMENT UPON

20  SOMETHING WHICH I HAVEN'T EVEN LOOKED AT?

21  Q.  ARE YOU PREPARED TO SAY THAT YOU HAVE NO FAITH IN

22  ITS SECURITY UNLESS IT HAS BEEN SCRUTINIZED?

23  A.  ABSOLUTELY CORRECT.  I WOULD NOT SAY THAT THE

24  SYSTEM -- THAT YOU CAN USE THE WORD COMMUNICATING

25  SECURELY UNTIL YOU HAVE TAKEN WHATEVER ALGORITHM

1   YOU'VE PROPOSED AND SUBJECT IT TO SCRUTINY AS THE

2   AUTHORS OF THIS INVENTION HAVE SAID IN THEIR PAPER

3   REPEATEDLY, NOT ONCE BUT THREE TIMES.

4   Q.  SO IT WOULD BE FAIR TO SAY THAT CRYPTOSYSTEM MIGHT

5   BE SECURE, BUT YOU HAVE NO FAITH IN ITS SECURITY.

6   A.  IT MIGHT BE SECURE, AND I HAVE NO WAY OF KNOWING

7   IF IT'S SECURE.  I'M NOT GOING TO TELL YOU WHETHER I

8   HAVE FAITH IN IT OR NOT.  YOU'VE ASKED ME A QUESTION.

9   I DON'T CONSIDER IT SECURE UNTIL SOMEBODY HAS LOOKED

10  AT IT, NOT ONLY ONE PERSON BUT SEVERAL PEOPLE AND MADE

11  A PRUDENT INVESTIGATION OF ITS SECURITY.

12          MR. SCHLAFLY:  NO FURTHER QUESTIONS.

13          THE COURT:  ANY FURTHER WITNESSES?

14          MR. HASLAM:  I JUST HAVE TWO QUESTIONS FOR

15  THIS WITNESS.

16                REDIRECT EXAMINATION

17          BY MR. HASLAM:  Q.  WE'VE GOT CLAIM ONE UP

18  HERE.  THIS IS WHAT YOU UNDERSTAND AT LEAST TO

19  CORRESPOND TO ONE OF THE EMBODIMENTS IN THE PATENT?

20  A.  YES, MR. HASLAM.

21  Q.  IS THERE ANY LANGUAGE IN CLAIM ONE THAT SPEAKS TO

22  THE ISSUE OF AUTHENTICATION?

23  A.  THERE IS NOTHING IN CLAIM ONE THAT TALKS ABOUT

24  AUTHENTICATION.

25  Q.  AND THE REFERENCE TO AUTHENTICATION IS IN A

1   DIFFERENT CLAIM WHICH MAY SPEAK TO A DIFFERENT

2   EMBODIMENT?

3   A.   IT'S IN A DIFFERENT CLAIM.

4            MR. HASLAM:   I HAVE NO FURTHER QUESTIONS.

5            MR. KENNEDY:   NOTHING FURTHER HERE, YOUR

6   HONOR.

7            MR. FLINN:   NOTHING HERE, YOUR HONOR.

8            THE COURT:   WE CAN TAKE A 15-MINUTE RECESS

9   AND GO TO 3:15.   IS THAT SATISFACTORY?

10           MR. HASLAM:   I BELIEVE THAT WE COULD GET THE

11  WITNESS ON AND OFF ON DIRECT.   I DON'T KNOW WHAT THE

12  CROSS IS GOING TO BE.   I WOULD THINK WE COULD GET DONE

13  WITH 45 MINUTES OR AN HOUR OF GETTING THIS WITNESS ON

14  AND OFF AND COMPLETED.   IT DEPENDS ON HOW FAR RANGE WE

15  WANT TO GO AGAIN ON CROSS.

16           THE COURT:   LET'S SAY THE 15 MINUTES.   IN 15

17  MINUTES WE'LL RESUME.

18           (A RECESS WAS TAKEN.)

19           THE COURT:   NEXT WITNESS.

20           MR. HASLAM:   I'D LIKE TO CALL STEVEN DUSSE.

21                    STEVEN DUSSE

22  CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, FIRST

23  BEING DULY SWORN, TESTIFIED AS FOLLOWS:

24           THE WITNESS:   I DO.

25           THE CLERK:   PLEASE STATE YOUR NAME AND SPELL

1    YOUR LAST FOR THE COURT.

2           THE WITNESS:  MY NAME IS STEVE DUSSE,

3    D-U-S-S-E.

4           THE CLERK:  WHAT IS YOUR OCCUPATION, SIR?

5           THE WITNESS:  MY OCCUPATION IS CHIEF

6    TECHNOLOGY OFFICER.

7           THE COURT:  PROCEED.

8                    DIRECT EXAMINATION.

9           BY MR. HASLAM:  Q.  YOU INDICATED YOU'RE A

10   CHIEF TECHNOLOGY OFFICER.  FOR WHOM DO YOU WORK?

11   A.  RSA DATA SECURITY.

12   Q.  WHAT WERE YOU ASKED TO DO PRIOR TO COMING HERE

13   TODAY?

14   A.  I WAS ASKED TO READ THE CLAIM NUMBER SIX OF

15   PATENT '582 IN ORDER TO COME TO AN UNDERSTANDING FROM

16   THE CLAIM AND SPECIFICATIONS OF THE PATENT AND HOW TO

17   DESIGN HARDWARE CIRCUITRY TO IMPLEMENT THE INVENTION

18   SPECIFIED.

19   Q.  AND AS A RESULT OF YOUR REVIEW OF THE PATENT, DID

20   YOU COME TO A CONCLUSION AS TO WHAT THE CIRCUIT

21   ELEMENTS DESCRIBED OR SHOWN IN THE PATTERN ARE

22   PERFORMING THE FUNCTIONS STATED IN CLAIM SIX?

23   A.  YES, I DID.

24   Q.  CAN YOU VERY BRIEFLY JUST GIVE US AN OVERVIEW OF

25   YOUR BACKGROUND AND EDUCATION IN SO FAR AS IT RELATES

1  TO CIRCUIT DESIGN OR HARDWARE ELEMENTS.

2  A.  YES.  FROM 1981 TO 1985, I ATTENDED M.I.T.  I

3  RECIEVED A BACHELOR OF SCIENCE DEGREE IN ELECTRICAL

4  ENGINEERING IN A CONCENTRATION IN HARDWARE DESIGN AND

5  TOOK SEVERAL COURSES IN HARDWARE DESIGN AND TRANSISTOR

6  AND SEMICONDUCTOR THEORY AS WELL AS SOME MATHEMATIC

7  COURSES.

8       UPON GRADUATING FROM M.I.T., MY FIRST JOB WAS

9  WITH FORD AEROSPACE CORPORATION IN PALO ALTO.  WHILE

10  AT FORD AEROSPACE, I DESIGNED HIGH SPEED DIGITAL

11  COMMUNICATION CIRCUITRY FOR SATELLITE COMMUNICATIONS.

12  I JOINED RSA IN MAY OF 1987.  MY RESPONSIBILITIES WERE

13  VARIED BECAUSE AS THE FIRST FULL-TIME ENGINEER AT RSA,

14  HAD A NUMBER OF RESPONSIBILITIES.

15       PERTINENT TO MY HARDWARE DESIGN EXPERIENCE, I

16  DESIGNED A PC CARD AT RSA AROUND 1990 WHICH PERFORMED

17  OPERATIONS FOR ACCELERATING CRYPTOGRAPHIC OPERATIONS

18  IN CONJUNCTION WITH A PC.  THIS WAS A CARD THAT I

19  DESIGNED USING DIGITAL CIRCUITRY.

20  Q.  COULD YOU LOOK FOR A MOMENT AT EXHIBIT 61 WHICH IS

21  IN THE WHITE BINDERS WHICH I THINK WAS A DEPOSITION

22  EXHIBIT AT YOUR DEPOSITION.

23  A.  I HAVE MY COPY OF THAT.

24  Q.  IS THAT IN THE BINDER?  LET ME ASK YOU, IS THE

25  COPY YOU HAVE THERE THE COPY THAT YOU PRODUCED AT YOUR

1   DEPOSITION?

2   A.   YES, IT IS.

3   Q.   AND CAN YOU JUST BRIEFLY TELL US WHAT -- THERE'S

4   SOME HANDWRITING OR NOTATIONS ON EXHIBIT 61.   CAN YOU

5   TELL ME, DID YOU PUT THOSE THERE?

6   A.   YES, I DID.

7   Q.   CAN YOU JUST TELL US WHAT IT IS THAT YOU DID --

8   HOW YOU WENT ABOUT PUTTING THOSE NOTATIONS ON THERE?

9   A.   DURING THE COURSE OF MY INVESTIGATION IN ORDER TO

10  COME TO AN UNDERSTANDING, I MADE SOME HANDWRITTEN

11  NOTES ON SOME OF THE FUNCTIONS ASSOCIATED WITH SOME OF

12  THE FIGURES.   AND ALSO IN SPECIFICATION LANGUAGE, I

13  ANNOTATED FOR MYSELF WHERE PARTICULAR DESCRIPTIONS OF

14  HARDWARE CIRCUITRY BEGAN AND ENDED.

15  Q.   AND JUST FROM -- YOU CAN LOOK AT THEM NOW IF YOU

16  NEED TO TO ANSWER THIS QUESTION.   BUT BASED ON YOUR

17  REVIEW OF THE EXHIBIT 61 WHICH IS THE '582 PATENT,

18  HAVE YOU IN YOUR EDUCATIONAL WORK EXPERIENCE ACTUALLY

19  WORKED WITH COMPONENTS OR CIRCUIT ELEMENTS SUCH AS

20  THOSE DESCRIBED IN THE '582 PATENT?

21  A.   YES, I HAVE.

22  Q.   IF I COULD, LET ME ASK YOU TO LOOK AT RSA DATA

23  SECURITY INC.'S AMENDED PROPOSED JURY INSTRUCTIONS ON

24  PLAIN CONSTRUCTION.   AND IN PARTICULAR IF YOU COULD

25  LOOK AT THE APPENDIX, I'M GOING TO BE ASKING YOU

1   QUESTIONS ABOUT PROPOSED INSTRUCTIONS A.61 THROUGH

2   A.64.

3          I HAVE AN EXTRA COPY HERE IF THE COURT

4   WOULD --

5          THE COURT:  YOU'VE GOT ONE?  OKAY.  PLEASE

6   SEND IT UP.

7          MR. HASLAM:  I PUT A YELLOW MARKER, YOUR

8   HONOR, AT THE BEGINNING OF A.61.

9          MR. HASLAM:  Q.   IF YOU'LL LOOK AT

10  INSTRUCTION A.61 WHICH RELATES TO THE MEANS FOR

11  PROVIDING RANDUM INFORMATION AS A RECEIVER, YOU'LL SEE

12  A REFERENCE THERE TO A COLUMN IN LINE SITE, COLUMN 6,

13  LINE 1 THROUGH 5.  DO YOU SEE THAT?

14  A.  YES, SIR.

15  Q.  DO YOU HAVE AN OPINION AS TO WHETHER THAT

16  REFERENCE ACCURATELY SETS FORTH WHAT THE PATENT

17  DISCLOSES AS THE MEANS FOR PROVIDING RANDUM

18  INFORMATION AT THE RECEIVER?

19  A.  I DO HAVE AN OPINION.  MY OPINION IS THAT THE

20  ELEMENTS OUTLINED IN JURY INSTRUCTION A.61 DO

21  ACCURATELY DESCRIBE THE STRUCTURES PROVIDED AS THE

22  MEANS FOR PROVIDING RANDUM INFORMATION AT THE

23  RECEIVER.

24  Q.  IN AN EFFORT TO EXPEDITE THIS, HAVE YOU PRIOR TO

25  TODAY REVIEWED PROPOSED INSTRUCTIONS A.62 THROUGH A.64

1  WITH RESPECT TO THE REFERENCES IN EACH OF THOSE

2  INSTRUCTIONS TO THE FIGURES AND REFERENCES TO THE

3  SPECIFICATION?  HAVE YOU DONE THAT?

4  A.  YES, I HAVE.

5  Q.  AND BASED ON THAT, HAVE YOU COME TO AN OPINION OR

6  CONCLUSION AS TO WHETHER THE FIGURES AND CITATIONS IN

7  THOSE INSTRUCTIONS, A.61 THROUGH A.64, ACCURATELY SET

8  FORTH THE MEANS WHICH ARE DISCLOSED FOR CARRYING OUT

9  THE STATED FUNCTIONS IN EACH OF THOSE INSTRUCTIONS?

10          MR. FLINN:  OBJECTION, YOUR HONOR.  I WANT TO

11  MAKE CLEAR THAT THE OBJECTION IS INSTRUCTED TO THE

12  STRUCTURES OF THE PATENT BECAUSE THIS WITNESS CANNOT

13  TALK ABOUT THE HARDWARE, AND THAT'S WHAT I WANT TO

14  MAKE SURE THE QUESTION GETS AT.

15          MR. HASLAM:  THE QUESTION IS WITH REFERENCE

16  TO THE FIGURES AND THE CITATIONS TO THE SPECIFICATION

17  IN THE INSTRUCTIONS ACCURATELY SET FORTH A DESCRIPTION

18  OF THE STRUCTURES DISCLOSED OR THE MEANS DISCLOSED FOR

19  CARRYING OUT THE FUNCTION.

20          THE COURT:  OKAY.

21          THE WITNESS:  WITH TWO MINOR CORRECTIONS,

22  THAT IS MY OPINION.

23          MR. HASLAM:  Q.   WHAT CORRECTIONS?

24  A.  ON A.62 THERE ARE SOME CITATIONS WHICH I FEEL ARE

25  MISSING, COLUMN 7, LINE 44 THROUGH COLUMN 9, LINE 4

1    SHOULD BE INCLUDED IN THE FIRST PARAGRAPH ON A.62

2    UNDER THE TITLE "PUBLIC ENCIPHERING KEY."

3    Q.   WHAT WAS THAT?

4    A.   THE ADDITION OF COLUMN 7, LINE 44 THROUGH COLUMN

5    9, LINE 4 AT THE END OF THE FIRST PARAGRAPH UNDER THE

6    HEADING "PUBLIC ENCIPHERING KEY."

7    Q.   CAN YOU TELL US WHAT'S BEING DESCRIBED IN THOSE.

8    A.   YES.   COLUMN 7, LINE 44 THROUGH COLUMN 9, LINE 4

9    DISCLOSES SOME OF THE SPECIFICATIONS FOR THE KEY

10   GENERATOR FOR GENERATING THE PUBLIC ENCIPHERING KEY IN

11   WHAT'S KNOWN AS THE FIRST EMBODIMENT.

12   Q.   AND I BELIEVE YOU SAID YOU HAD ONE OTHER

13   CORRECTION THAT YOU THOUGHT WAS NECESSARY?

14   A.   THAT'S CORRECT.

15   Q.   WHERE IS THAT?

16   A.   ON THE NEXT PAGE, AJ 21 UNDER THE HEADING "SECRET

17   DECIPHERING KEY," THE SECOND PARAGRAPH.

18          THE COURT:   OKAY.   THE SECOND PARAGRAPH

19   STARTING WITH THE "MEANS DISCLOSED"?

20          THE WITNESS:   CORRECT.

21          THE COURT:   OKAY.

22          THE WITNESS:   THAT PARAGRAPH ENDS IN A

23   CITATION FOR COLUMN 12, LINE 33 THROUGH COLUMN 13,

24   LINE 6.   I BELIEVE THAT SHOULD GO THROUGH COLUMN 13,

25   LINE 8.

1          MR. HASLAM:   Q.    AND THAT WOULD BY EXTENDING

2    THOSE TWO LINES WOULD PICK UP THE REFERENCE TO THE

3    BASE B WHICH IS USED IN GENERATING THE SECRET KEY IN

4    THE SECOND EMBODIMENT?

5    A.   IN THE SECOND EMBODIMENT, THAT'S CORRECT.

6    Q.   LET ME JUST ASK YOU FOR A MOMENT TO GO TO FIGURE

7    11 IN THE PATENT, EXHIBIT 61.   DO YOU HAVE THAT IN

8    FRONT OF YOU?

9    A.   YES, I DO.

10          THE COURT:   WHAT SHEET IS THIS?

11          MR. HASLAM:   FIGURE 11.   IT'S EITHER IN

12   EXHIBIT 61 OR EXHIBIT 13.   THEY ARE BOTH COPIES OF

13   THE '582 PATENT.

14          THE COURT:   THE TABLE?

15          MR. HASLAM:   YES.

16   Q.   CAN YOU TELL US WHAT'S BEING DEPICTED IN FIGURE

17   11?

18   A.   WHAT'S BEING DEPICTED IN FIGURE 11 IS A CIRCUIT

19   DIAGRAM FOR A KEY GENERATER WHICH IS DESCRIBED IN THE

20   SPECIFICATION AS THE SECOND EMBODIMENT FOR GENERATING

21   A SECRET DECIPHERING KEY AND A PUBLIC ENCIPHERING KEY.

22   Q.   I NOTICE THERE ARE VARIOUS BLOCKS THAT ARE LABLED

23   ON THE TABLE, EXPONENTIATOR, MULTIPLIER, ET CETERA.

24   IS THERE ANYTHING IN THE PATENT WHICH DESCRIBES OR

25   DEPICTS WHAT CIRCUIT ELEMENTS GO IN THOSE BOXES?

1  A.  YES.  IN A NUMBER OF CASES, THERE ARE DESCRIPTIONS

2  OF EACH BOX AND MORE DISCRETE CIRCUIT ELEMENTS WHICH

3  ARE USED TO CONSTRUCT THOSE.  AN EXAMPLE OF THAT IS

4  EXPONENTIATOR UP IN THE UPPER RIGHT CORNER OF THAT

5  FIGURE WHICH IS FURTHER DEFINED BY FIGURE 10 ON THE

6  PRECEDING PAGE TO BE CONSTRUCTED OF THREE REGISTERS

7  AND A MULTIPLIER.

8  Q.  IN OTHER WORDS, FIGURE 10 WOULD BE PUT IN THE BOX

9  WHERE THE EXPONENTIATOR IS?

10  A.  THAT'S CORRECT, THAT'S MY OPINION.

11  Q.  AND I NOTICE IN FIGURE 10, THERE'S A BOX 124 THAT

12  SAYS "MULTIPLIER."

13  A.  THAT'S CORRECT.  THAT MULTIPLIER IS FURTHER

14  DEFINED IN ANOTHER FIGURE EARLIER, FIGURE 3.

15  Q.  FIGURE 3 THEN SHOWS AN EXAMPLE OF THE MULTIPLIER?

16  A.  THAT'S CORRECT.

17  Q.  SO FIGURE 3 WOULD GO INTO THE BOX LABELED 124 IN

18  FIGURE 10?

19  A.  THAT'S CORRECT.

20  Q.  I NOTICE ON FIGURE 3 THERE'S A REFERENCE TO AN

21  ADDER, SUBTRACTOR, AND A COMPARITOR -- BOXES 55, 56

22  AND 57.  DO YOU SEE THOSE?

23  A.  YES.

24  Q.  IS THERE ANYTHING IN THE PATENT WHICH DESCRIBES

25  WHAT THE INVENTORS DISCLOSED AS BEING CONTAINED IN

1   THOSE BOXES?

2   A.   YES, THERE IS.   THE ADDER IS DESCRIBED AS A SERIES

3   OF GATES IN FIGURE 4.   THE COMPARATOR IS DESCRIBED IN

4   FIGURE 5, AND SUBTRACTOR IS DESCRIBED IN FIGURE 6, ALL

5   ON THE SAME PAGE.

6   Q.   NOW, ARE THE CIRCUIT ELEMENTS WHICH ARE DESCRIBED

7   IN THESE VARIOUS FIGURES YOU POINTED OUT CONFIGURED AS

8   DESCRIBED AND SHOWN IN THE PATENT IN ANY PARTICULAR

9   WAY?

10   A.   WELL, THE GATES ARE WIRED IN SUCH A WAY AS TO

11   PERFORM THE FUNCTIONS THAT ARE DESCRIBED.   IN OTHER

12   WORDS, THE CONNECTIONS THAT ARE MADE FROM ONE GATE TO

13   ANOTHER ACTUALLY DICTATE THE FUNCTION THAT'S PERFORMED

14   BY THE COLLECTION OF GATES IN THAT PARTICULAR

15   CONFIGURATION.

16        A GOOD WAY TO ILLUSTRATE THIS POINT IS TO

17   LOOK AT BOTH FIGURE 4 AND FIGURE 6.   IF YOU NOTICE,

18   THEY HAVE ROUGHLY THE SAME NUMBER AND TYPE OF GATES.

19   HOWEVER, THE ADDITION AND SUBTRACTION FUNCTIONS WHICH

20   THEY PERFORM ARE VERY DIFFERENT BASED LARGELY ON THE

21   DIFFERENT CONNECTIONS THAT ARE MADE BETWEEN THOSE

22   GATES.

23   Q.   SO IN OTHER WORDS, YOU CAN TAKE THE SAME ELEMENTS

24   THAT ARE IN FIGURE FOUR AND IN FIGURE SIX AND,

25   DEPENDING ON HOW YOU CAN FIGURE THEM, END UP

1  PERFORMING A DIFFERENT FUNCTION?

2  A.   THAT'S CORRECT.

3  Q.   GOING BACK TO FIGURE 11 FOR A MOMENT.   ARE THE

4  CIRCUIT ELEMENTS IN FIGURE 11 CONFIGURED TO PERFORM

5  ANY SPECIFIC FUNCTION?

6  A.   YES, THEY ARE CONFIGURED TO PERFORM KEY GENERATION

7  FUNCTION IN THE SECOND EMBODIMENT WHICH IS DESCRIBED

8  IN TEXTUAL AND MATHEMATIC TERMS IN THE SPECIFICATION

9  OF THE PATENT BEGINNING ON COLUMN 12, LINE 33 AND

10  ENDING ON COLUMN 16, LINE 23.

11  Q.   ARE THE CIRCUIT ELEMENTS WHICH ARE DESCRIBED IN

12  FIGURE 11 INTERCHANGEABLE IN THE SENSE THAT, IF I

13  MODIFY THE WAY IN WHICH THEY WERE INTERCONNECTED, THEY

14  WOULD PERFORM THE SAME FUNCTION THAT THEY DO AS

15  DESCRIBED?

16  A.   IT'S NOT VERY LIKELY THAT, IF ANY OF THE

17  INTERCONNECTIONS OR ANY OF THE CIRCUIT ELEMENTS WERE

18  INTERCHANGED THAT IT WOULD PERFORM THE SAME

19  MATHEMATICAL FUNCTION.   A GOOD EXAMPLE MIGHT BE

20  SWITCHING THE ADDER AND MULTIPLIER IN FIGURE 11.

21          RATHER THAN TAKING A MULTIPLICATIVE

22  CUMULATION OF A BUNCH OF TERMS, IT WOULD TAKE AN

23  ADDATIVE CUMULATION.   AND RATHER THAN ADDING BY ONE

24  WHICH INCREMENTS A NUMBER IT WOULD MULTIPLY BY ONE

25  WHICH WOULD COME OUT AS THE SAME NUMBER.   SO IT'S VERY

1    UNLIKELY THAT THE SAME RESULT WOULD BE ACHIEVED BY

2    EITHER REARRANGING THE INFORMATION OR INTERCHANGING

3    THE PARTS.

4    Q.  ARE THE CIRCUIT ELEMENTS DESCRIBED IN THE '582

5    PATENT AND SHOWN IN THE FIGURES OF THE '582 PATENT

6    SPECIFICALLY CONFIGURED TO PERFORM SPECIFIC

7    MATHEMATICS?

8    A.  YES, THEY ARE.

9    Q.  WHAT MATHEMATICS IS THAT?

10   A.  THOSE ARE THE MATHEMATICS DESCRIBED IN THE

11   SPECIFICATION FOR THE FIRST AND SECOND EMBODIMENT.

12   Q.  AND ARE THE CIRCUIT ELEMENTS DESCRIBED AND SHOWN

13   IN THE AMENDED JURY INSTRUCTIONS WE SAW DIRECTED BY

14   YOU SPECIFICALLY CONFIGURED TO PERFORM THE STATED

15   FUNCTION OF CLAIM SIX BY PERFORMING THOSE SPECIFIC

16   MATHEMATICS?

17   A.  YES, THEY ARE.

18           MR. HASLAM:  I HAVE NO OTHER QUESTIONS.

19           MR. KRAMER:  KARL KRAMER ON BEHALF OF

20   CARO-KANN AND CYLINK.

21                 CROSS-EXAMINATION

22           BY MR. KRAMER:  Q.   MR. DUSSE, WE'VE TALKED

23   TOGETHER BEFORE ABOUT THIS CASE AT THE DEPOSITION.  DO

24   YOU REMEMBER THAT?

25   A.  YES.

1   Q.   DO YOU RECALL IN THAT DEPOSITION I ASKED YOU

2   WHETHER YOU HAD IDENTIFIED IN YOUR ANALYSIS THE

3   STRUCTURES IN THE PATENT?

4   A.   NO, I DON'T RECALL.

5   Q.   DO YOU RECALL IN YOUR DEPOSITION EXPLAINING TO ME

6   THE STRUCTURES IN THE PATENT THAT ALIGNED WITH THE

7   VARIOUS MEANS ELEMENTS OF CLAIM SIX?

8   A.   YES, I DO.

9   Q.   IN YOUR TESTIMONY TODAY, I'M A LITTLE UNCLEAR AS

10  TO WHAT THE EFFECT OF YOUR TESTIMONY IS INTENDED TO

11  BE.   ARE YOU ADOPTING WORD-FOR-WORD THE DESCRIPTION IN

12  EACH OF JURY INSTRUCTIONS A.62 THROUGH A.64?

13  A.   NO.   IT'S MY OPINION THAT THOSE JURY INSTRUCTIONS

14  ACCURATELY REFLECT THE SPECIFICATIONS AND FIGURES FOR

15  THE PARTICULAR CLAIMS THAT ARE LISTED AT THE TOP OF

16  THE JURY INSTRUCTIONS FOR THE PERFORMING -- FOR

17  PERFORMING THE INVENTION THAT'S DESCRIBED.

18  Q.   FOR EXAMPLE, IS IT YOUR TESTIMONY THAT THE

19  STRUCTURES INVOLVE THE KNAPSACK EMBODIMENT THAT'S

20  DISCLOSED IN THE PATENT?   IS THAT YOUR TESTIMONY

21  TODAY?

22  A.   IT IS.

23          MR. KRAMER:   YOUR HONOR, I'M GOING TO

24  APPROACH THE WITNESS AND PRESENT HIM WITH SEVERAL

25  DOCUMENTS, THE FIRST OF WHICH IS HIS TRANSCRIPT.

1   Q.   MR. DUSSE, CAN YOU SHOW ME WHERE IN THERE IN

2   RESPONSE TO ANY QUESTION I ASKED ABOUT IDENTIFICATION

3   OF STRUCTURES IN THE PATENT DID YOU USE THE WORD

4   "KNAPSACK"?

5   A.   I DON'T RECALL USING THE WORD KNAPSACK IN MY

6   DEPOSITION.

7   Q.   DO YOU RECALL IN THERE TESTIFYING THAT THE

8   STRUCTURES WERE LIMITED IN ANY WAY BY ANY MATHEMATICAL

9   OPERATION?

10  A.   I DON'T UNDERSTAND YOUR QUESTION.

11  Q.   WHAT DON'T YOU UNDERSTAND ABOUT THE QUESTION?

12  A.   CAN YOU REPEAT THE QUESTION, PLEASE.

13  Q.   WELL, I GUESS WE'LL HAVE TO GO AT IT ONE MEANS AT

14  A TIME HERE.  YOU'LL NOTE THE SECOND MEANS IDENTIFIED,

15  THE MEANS FOR GENERATING FOR RANDUM INFORMATION A

16  PUBLIC ENCIPHERING KEY.  DO YOU SEE THAT?

17  A.   YES.

18  Q.   COULD YOU TURN TO PAGES 53 AND 54 OF YOUR

19  TESTIMONY, PLEASE.

20          THE COURT:  WHERE IS IT LOCATED?  WHAT

21  NUMBER?

22          MR. KRAMER:  THAT WOULD BE PAGES 53 AND 54.

23          THE COURT:  OKAY.

24          MR. KRAMER:  BEGINNING ON PAGE 53, LINE 15.

25          THE COURT:  15.  OKAY.  QUESTION.

1          MR. KRAMER:  Q.   DO YOU RECALL THIS LINE,

2  THE QUESTIONING WHERE WE WERE --

3          THE COURT:  "COULD YOU TELL ME BY COLUMN AND

4  LINE AND NUMBER THE HARDWARE ELEMENTS THAT YOU BELIEVE

5  ARE THE STRUCTURES FOR ELEMENT 1,B?"

6          THE WITNESS:  YES, I DO RECALL.

7          MR. KRAMER:  Q.   YOU IDENTIFIED FOR ME THE

8  MULTIPLIER, CORRECT, WHICH IS IN FIGURE 3.

9  A.  YES.

10  Q.  DID YOU SAY ANYTHING IN THAT TESTIMONY ABOUT THE

11  KNAPSACK?

12  A.  NO, SIR.

13  Q.  NOW, I UNDERSTAND THAT THE NEXT MEANS ELEMENT, THE

14  MEANS FOR COMMUNICATING THE PUBLIC ENCIPHERING KEY,

15  YOU DID NOT ADDRESS AT ALL, CORRECT, IN YOUR TESTIMONY

16  AT THE DEPOSITION, MEANS FOR COMMUNICATING THE PUBLIC

17  ENCIPHERING KEY?

18  A.  THAT'S CORRECT.  I DID NOT ADDRESS THAT IN MY

19  DEPOSITION.

20  Q.  LET'S MOVE ON TO MEANS FOR ENCIPHERING A MESSAGE

21  AT THE TRANSMITTER.  DO YOU SEE THAT UP THERE?

22  A.  YES.

23  Q.  LET'S TURN TO PAGE 61 OF YOUR TESTIMONY.  I

24  BELIEVE WE CALLED THAT ELEMENT 1,D WHEN WE WERE

25  DISCUSSING THE CLAIM; IS THAT CORRECT?

1    A.   YES.

2    Q.   I ASKED YOU AT LINE 10 "WHAT ARE THE STRUCTURAL

3    ELEMENTS OF THE PATENT THAT CORRESPONDS TO THE ELEMENT

4    1,D?"  DO YOU SEE THAT?

5    A.   YES.

6    Q.   COULD YOU READ YOUR RESPONSE FOR ME.

7    A.   "STRUCTURAL ELEMENTS ARE DEFINED IN FIGURE 2."

8    Q.   AND THEN I ASKED YOU "IS THAT THE ONLY PLACE THEY

9    ARE?"  WHAT DID YOU SAY IN YOUR RESPONSE?

10   A.   I SAID, "YES."

11   Q.   NOW, IF WE MOVE ON TO THE NEXT MEANS ELEMENT,

12   MEANS FOR TRANSMITTING THE ENCIPHERED MESSAGE, YOU

13   DIDN'T TESTIFY ABOUT THAT ELEMENT AS WELL, DID YOU.

14   A.   THAT'S CORRECT.

15   Q.   FINALLY, LET'S MOVE ON TO THE FINAL ELEMENT AND

16   MEANS FOR DECIPHERING SET ENCIPHERED MESSAGE AT THE

17   RECEIVER.  IN YOUR DEPOSITION AT PAGE 63, YOU

18   TESTIFIED ABOUT THAT ELEMENT, DIDN'T YOU.

19   A.   YES.

20   Q.   AND I ASKED YOU AT LINE THREE, "WHAT STRUCTURAL

21   ELEMENTS IN THE '582 HELLMAN-MERKLE PATENT CORRESPONDS

22   TO ELEMENT 1?"  DO YOU SEE THAT?

23   A.   YES.

24   Q.   YOU FIRST POINTED TO FIGURE 7; CORRECT?

25   A.   THAT'S CORRECT.

1  Q.   AND THEN AT LINE 11 OF PAGE 64, I ASKED YOU "IS

2  THERE ANY OTHER STRUCTURE ELEMENT THAT YOU BELIEVE

3  CORRESPONDS TO ELEMENT ONE?"  DO YOU SEE THAT?

4  A.   YES.

5  Q.   AND YOU IDENTIFIED FIGURE 9; CORRECT?

6  A.   THAT'S CORRECT.

7  Q.   SO FOR NONE OF THE ELEMENTS THAT YOU COVERED IN

8  YOUR DEPOSITION DID YOU REFER TO THE KNAPSACK; ISN'T

9  THAT CORRECT?

10  A.   NOT BY TERM, NO.

11  Q.   MR. DUSSE, HOW LONG HAVE YOU BEEN INVOLVED IN

12  CRYPTOGRAPHY?

13  A.   I'VE BEEN INVOLVED IN CRYPTOGRAPHY SINCE JOINING

14  IN THE EMPLOYMENT OF RSA DATA SECURITY IN MAY OF 1987.

15  Q.   SO NINE YEARS?

16  A.   NINE-AND-A-HALF YEARS.

17  Q.   WHILE YOU WERE AT RSA, YOU HAVE WORKED ON A

18  PROJECT CALLED BSAFE; IS THAT CORRECT?

19  A.   THAT'S CORRECT.

20  Q.   IN FRONT OF YOU I THINK IS A MANUAL ENTITLED

21  "BSAFE USERS MANUAL VERSION 2.1."  COULD YOU LOOK AT

22  THAT FOR A SECOND, PLEASE.  NOW, IS THIS A DOCUMENT

23  THAT YOU ARE FAMILIAR WITH?

24  A.   I AM FAMILIAR WITH IT.

25  Q.   DID YOU PARTICIPATE IN THE CREATION OF THIS

1    DOCUMENT?

2    A.   I PARTICIPATED IN THE REVIEW OF THIS DOCUMENT BUT

3    NOT THE CREATION.

4    Q.   AND DID YOU PARTICIPATE IN THE REVIEW IN THE SENSE

5    THAT YOU REVIEWED IT FOR ACCURACY?

6    A.   THAT'S CORRECT.

7    Q.   LET'S LOOK TO PART TWO OF THIS DOCUMENT ENTITLED

8    CRYPTOGRAPHY -- AND I BELIEVE IT BEGINS ON PAGE 37.

9    IF YOU LOOK AT THE TABLE OF CONTENTS -- WHY DON'T WE

10   JUST LOOK AT THE TABLE OF CONTENTS HERE WHICH IS

11   PAGE THREE OF THE DOCUMENT UNDER THE HEADING

12   "CRYPTOGRAPHY TERMONOLOGY."  IS THAT A SECTION WHERE

13   YOU INTRODUCE THE READER TO BASIC TERMS USED IN MODERN

14   CRYPTOGRAPHY?

15   A.   YES, IT SEEMS TO BE.

16   Q.   WHILE AT RSA DID YOU BECOME FAMILIAR WITH A

17   DOCUMENT ENTITLED "FREQUENTLY ASKED QUESTIONS ABOUT

18   TODAY'S CRYPTOGRAPHY"?

19   A.   ONLY VERY PERIPHERALLY.

20   Q.   EXHIBIT 512 -- WOULD YOU TURN TO IT PLEASE

21   AND TELL ME WHETHER YOU'RE FAMILIAR WITH THIS

22   DOCUMENT.

23   A.   I'M FAMILIAR WITH ITS EXISTING.

24           THE COURT:  WHERE IS THIS?

25           MR. KRAMER:  ANOTHER DOCUMENT, EXHIBIT 512.

1    IT SHOULD BE IN THE STACK THAT WAS HANDED UP TO YOU.

2         MR. HASLAM:   I REALIZE AT THIS TIME HE'S

3    ASKING TO LOOK AT IT.   I'LL OBJECT AS BEING BEYOND THE

4    SCOPE OF DIRECT EXAMINATION, AND IT'S RATHER CLEAR, I

5    BELIEVE, IN LAW THAT YOU CONSTRUE THE CLAIMS WITHOUT

6    RESORTING TO WHAT IS THE ACCUSED PRODUCT WHICH IS WHAT

7    THIS MANUAL BSAFE DEALS WITH.

8         I MEAN, IF THE ARGUMENT IS WE GO TO THE

9    INTRINSIC AND EXTRINSIC EVIDENCE, I'M NOT SURE WHAT

10   THE DEFENDANTS WOULD CALL THIS EVIDENCE THAT WE'RE

11   GOING INTO NOW.   I'LL OBJECT TO THAT ON GROUNDS ON

12   RELEVANCE.

13        MR. KRAMER:   THE RELEVANCE WILL BECOME

14   APPARENT QUICKLY.   IT GOES TO THE USAGE OF

15   TERMINOLOGY.

16        THE COURT:   OVERRULED.   "FREQUENTLY ASKED

17   QUESTIONS"?

18        MR. KRAMER:   Q.   PLEASE TURN TO PAGE 39.

19   THERE'S AN ACKNOWLEDGMENT FOR YOUR PROVISION OF

20   INFORMATION AND HELPFUL SUGGESTIONS.   DO YOU SEE THAT,

21   PAGE 39 OF FREQUENTLY ASKED QUESTIONS?

22   A.   YES.

23   Q.   IS THAT ACCURATE?   DID YOU PROVIDE INFORMATION AND

24   HELP WITH SUGGESTIONS FOR THIS DOCUMENT?

25   A.   YES.

1   Q.   AND YOU'VE CERTAINLY REVIEWED IT BEFORE; CORRECT?

2   A.   NO.

3   Q.   YOU'VE NEVER SEEN THIS DOCUMENT BEFORE?

4   A.   I HAVE SEEN IT BEFORE BUT HAVE NEVER REVIEWED IT,

5   NO.

6   Q.   IS IT A DOCUMENT THAT'S PRODUCED BY RSA?

7   A.   IT'S PRODUCED BY RSA LABS.

8   Q.   WHY IS IT PRODUCED?

9   A.   I SUPPOSE IT'S MEANT TO BE INFORMATIVE.

10   Q.   ON THE COVER IT SAYS IT'S AN "INTRODUCTION TO

11   MODERN CRYPTOGRAPHY."  DO YOU SEE THAT, THE FIRST

12   SENTENCE ON THE FIRST PAGE?

13   A.   YES, I DO.

14   Q.   ON PAGE NINE IT IDENTIFIES SOMEONE NAMED

15   MR. BIDZOS, PARAGRAPH NINE, PAGE 39.  WHO IS HE?

16   A.   THE MAN WHO SIGNS MY PAYCHECK.  HE'S THE PRESIDENT

17   AND CEO OF RSA DAVIS.

18   Q.   AND ALSO AT PAGE SEVEN OF THIS DOCUMENT, CAN YOU

19   LOOK AT THE DESCRIPTION OF WHAT IS RSA.  IT IDENTIFIES

20   THREE GENTLEMEN -- RON RIVET, ADIR SHAMIR, AND LEONARD

21   ADDLEMAN.  DO YOU SEE THAT?

22   A.   YES.

23   Q.   ARE THE R, S, AND A OF RSA?

24   A.   YES.

25   Q.   ARE THEY FOUNDERS OF RSA?

1   A.   THEY ARE THE INVENTORS OF THE RSA PUBLIC E

2   CRYPTOSYSTEM.

3   Q.   WOULD YOU TURN TO EXHIBIT 23 IN THE BINDER SET IN

4   FRONT OF YOU.   THERE'S A BINDER IN THE BOX THERE THAT

5   HAS EXHIBIT 23 IN IT.

6            THE COURT:   WHAT'S THE EXHIBIT NUMBER?

7            MR. KRAMER:   EXHIBIT 23.

8            THE COURT:   NOTES ON THE VALIDITY OF THE

9   STANDARD.

10           MR. KRAMER:   Q.   IS THIS A DOCUMENT PREPARED

11  BY RON RIVET?

12  A.   IT PURPORTS TO BE.

13  Q.   WOULD YOU TURN TO EXHIBIT 24, PLEASE.   THIS IS A

14  MEMO DATED NOVEMBER 13, 1991 FROM JIM BIDZOS.   DO YOU

15  SEE THAT?

16  A.   YES, I DO.

17  Q.   IS THAT THE MR. BIDZOS WHO IS YOUR BOSS?

18           MR. HASLAM:   OBJECTION, LACKS FOUNDATION IF

19  HE'S TRYING TO ESTABLISH A FOUNDATION TO THE WITNESS

20  BY THIS QUESTION.

21           THE COURT:   EXHIBIT NO. 24?

22           MR. KRAMER:   YES.

23           THE COURT:   ARE YOU OPPOSING THE USE OF THIS

24  EXHIBIT?

25           MR. HASLAM:   I'M OBJECTING TO THAT QUESTION

1   AS LACKING IN FOUNDATION.  HE HASN'T ESTABLISHED A

2   FOUNDATION THAT THE WITNESS KNOWS THIS DOCUMENT WAS

3   PREPARED BY MR. BIDZOS.

4          THE COURT:  DO YOU HAVE ANY QUESTIONS THAT

5   WILL HELP?

6          MR. KRAMER:  Q.   WERE YOU TOLD BY ANYONE AT

7   RSA THAT YOUR BOSS HAD PREPARED A MEMO IN WHICH YOUR

8   BOSS CONCLUDED AT THE THIRD TO THE LAST PARAGRAPH OF

9   THE DOCUMENT, "THESE QUESTIONS ARE IMPORTANT BECAUSE

10  CLAIM ONE HAS A VERY BROAD DESCRIPTION THAT APPLY TO

11  ANY PUBLIC E CRYPTOSYSTEM"?

12  A.  I WAS NOT TOLD THAT, NO.

13  Q.  LET'S TURN BACK TO EXHIBIT 23 WHICH, I BELIEVE, IS

14  THE "FREQUENTLY ASKED QUESTIONS."  I GUESS WE'LL CALL

15  IT EXHIBIT 512, PAGE SIX OF THAT DOCUMENT.

16         THE COURT:  WHICH DOCUMENT?

17         MR. KRAMER:  THIS IS 512, "FREQUENTLY ASKED

18  QUESTIONS ABOUT TODAY'S CRYPTOGRAPHY."

19         THE COURT:  ALL RIGHT.  WHAT PAGE?

20         MR. KRAMER:  PARAGRAPH 1.5 ON PAGE SIX.

21  Q.  DO YOU SEE THE SENTENCE BEGINNING "THE BASIC IDEAS

22  OF PUBLIC KEY CRYPTOGRAPHY ARE CONTAINED IN U.S.

23  PATENT," AND THEN IT MENTIONS THE DIFFIE-HELLMAN

24  PATENT, AND THE HELLMAN-MERKLE PATENT.  DO YOU SEE

25  THAT?

1   A.   YES.

2   Q.   DID YOU REVIEW THAT AT ALL IN COMING TO YOUR

3   CONCLUSION THAT THE STRUCTURES ARE SOMEHOW LIMITED TO

4   THE KNAPSACK?

5   A.   NO.

6   Q.   DO YOU UNDERSTAND WHAT DIGITAL SIGNALS ARE?

7   A.   EXCUSE ME?

8   Q.   DO YOU UNDERSTAND WHAT DIGITAL SIGNALS ARE?

9   A.   IN SPECIFIC CONTEXT, YES.

10   Q.   WHAT SPECIFIC CONTEXT DO YOU UNDERSTAND DIGITAL

11   SIGNALS IN?

12   A.   IN THE CONTEXT OF MUSIC, DIGITAL SIGNALS ARE

13   SIGNALS OF SOUND THAT HAVE BEEN DIGITIZED SO THEY CAN

14   MANIPULATE DIGITALLY.

15   Q.   DO YOU UNDERSTAND THAT TO HAVE ANYTHING TO DO WITH

16   THE CASE?

17   A.   NO.

18   Q.   IN THE CONTEXT OF CRYPTOGRAPHY IN THE WORK THAT

19   YOU DO, WHAT DOES DIGITAL SIGNALS MEAN?

20   A.   I DON'T THINK THERE IS ENOUGH CONTEXT TO COME UP

21   WITH AN ACCURATE DESCRIPTION.

22   Q.   WHAT IS -- YOU DON'T KNOW WHAT A DIGITAL SIGNAL

23   IS?

24   A.   IN SPECIFIC CONTEXT, YES.

25   Q.   WELL, I TRIED TO GIVE YOU A CONTEXT WHICH IS THE

1   WORK THAT YOU DO.

2   A.   THAT'S NOT SPECIFIC ENOUGH.   DIGITAL SIGNALS CAN

3   APPLY TO MANY DIFFERENT --

4           THE COURT:   HAVE YOU USED THAT TERM IN ANY

5   WORK YOU DO SPECIFICALLY, ANY WORK WITH DIGITAL

6   SIGNALS?

7           THE WITNESS:   NO.

8           MR. KRAMER:   Q.   WASN'T YOUR UNDERGRADUATE

9   DEGREE IN DIGITAL HARDWARE DESIGN?

10  A.   YES, IT WAS.

11  Q.   WHAT DID THE WORD DIGITAL MEAN IN GETTING YOUR

12  DEGREE IN HARDWARE DESIGN?

13  A.   DIGITAL REFERRED TO THE BINARY NATURE OF THE

14  REPRESENTATION OF THE SIGNALS -- ONE'S AND ZERO'S.

15  Q.   DO YOU KNOW WHAT SIGNALS MEANS IN THE CONTEXT OF

16  HARDWARE?   DOES IT MEAN ELECTRICAL IMPULSE?

17  A.   IN SOME CONTEXT, YES, IT MEANS ELECTRICAL IMPULSE.

18  Q.   IN WHAT CONTEXT WOULD IT NOT BE?

19  A.   THERE HAVE BEEN SIGNALING SCHEMES WHICH USE LIGHT.

20  Q.   DO YOU UNDERSTAND THAT THOSE SORTS OF SIGNALING

21  MEANS HAVE ANYTHING TO DO WITH THE CASE, THIS CASE?

22  A.   NO.

23  Q.   SO IN MOST CIRCUMSTANCES RELATING TO YOUR WORK,

24  DIGITAL SIGNALS MEANS ONE'S AND ZERO'S SENT AS

25  IMPULSES, ELECTRICAL IMPULSES; ISN'T THAT CORRECT?

1    A.   IN THE CONTEXT OF HARDWARE DESIGN, THAT'S CORRECT.

2    Q.   DO YOU KNOW WHAT A PROCESSOR IS?

3    A.   I KNOW WHAT SEVERAL DEFINITIONS FOR PROCESSOR,

4    YES.

5    Q.   IN THE CONTEXT OF CRYPTOGRAPHY, WHAT IS A

6    PROCESSOR?

7    A.   I DON'T THINK THAT THERE'S A SPECIFIC ENOUGH

8    CONTEXT FOR THE DEFINING OF PROCESSOR.

9    Q.   IN THE '582 PATENT, THE DISCLOSURE THAT YOU LOOKED

10   AT IN THIS CASE, WHAT IS A DIGITAL PROCESSOR?

11   A.   I DON'T THINK THAT THAT'S SPECIFIC ENOUGH CONTEXT

12   EITHER BECAUSE I BELIEVE THAT THERE HAVE BEEN

13   DIFFERENT USES OF THE TERM PROCESSOR FOR DIFFERENT

14   TRANSFORMATIONS OR PROCESSES.

15   Q.   HAVE YOU EVER HEARD THE PHRASE CPU?

16   A.   YES, I HAVE.

17   Q.   WHAT DOES THE P IN CPU STAND FOR?

18   A.   PROCESSING.

19   Q.   HAVE YOU EVER HEARD THE PHRASE SPECIAL PURPOSE

20   PROCESSOR?

21   A.   NO.

22   Q.   YOU'VE NEVER HEARD OF SPECIAL PURPOSE PROCESSOR?

23   A.   NO.

24   Q.   DO YOU AGREE THAT IN THE CONTEXT OF A DIGITAL

25   SIGNAL PROCESSOR, PROCESSING IS THE ACT OF

1    TRANSFORMING DIGITAL SIGNALS FOR MANIPULATING DIGITAL

2    SIGNALS?

3    A.   YES, I DO.

4    Q.   DO YOU BELIEVE WHAT'S DISCLOSED IN THE PATENT, THE

5     '582 PATENT THAT YOU REVIEWED IS NOT A DIGITAL SIGNAL

6    PROCESSOR?

7    A.   THAT'S CORRECT.

8    Q.   WHY IS IT NOT A DIGITAL SIGNAL PROCESSOR?

9    A.   A DIGITAL SIGNAL PROCESSOR IS A TERM WELL-KNOWN IN

10   THE ART OF HARDWARE DESIGN TO MEAN A CHIP WHICH TAKES

11   AS INPUT DIGITAL SIGNAL PROCESSES AND UNDER A FIRM

12   LAYER OF SOFTWARE CONTROL MANIPULATES OR TRANSFORMS

13   THESE SIGNALS.

14   Q.   WHAT ABOUT THE HARDWARE DISCLOSED IN THE PATENT

15   THAT IS NOT A PROCESSOR?

16   A.   I'M SORRY.  I DON'T UNDERSTAND THE QUESTION.

17   Q.   DO YOU UNDERSTAND WHAT'S DISCLOSED IN THE PATENT

18   PROCESSES DATA?

19   A.   YES, I DO.

20   Q.   IS THAT DATA DIGITAL DATA?

21   A.   YES, I BELIEVE IT IS.

22   Q.   AND IS THE DIGITAL DATA SENT AS SIGNALS?

23   A.   I SUPPOSE THEY ARE.

24   Q.   WHEN YOU WERE GIVEN THE TASK OF PREPARING FOR YOUR

25   TESTIMONY IN THIS CASE, YOU DID READ THE CLAIMS,

1   DIDN'T YOU?

2   A.   YES, I DID.

3   Q.   AND WHEN YOU FIRST READ THOSE CLAIMS, YOU

4   UNDERSTOOD THEM, DIDN'T YOU?

5   A.   NO, I DID NOT.

6   Q.   WOULD YOU TURN TO YOUR TESTIMONY AT PAGE 36, LINE

7   7 THROUGH 13 OF YOUR TRANSCRIPT.

8           THE COURT:   WHAT PAGE?

9           MR. KRAMER:   PAGE 36, 7 THROUGH 13, LINES 7

10  THROUGH 13.

11          THE COURT:   OKAY.   THE QUESTION ASKED INTO

12  CLARIFICATION, THAT PART?

13          MR. KRAMER:   YES.

14  Q.   "DID YOU ASK FOR ANY CLARIFICATION OF MR. HASLAM'S

15  OPINION OF THE TERMS IN THE CLAIMS?"   WHAT DID YOU

16  ANSWER?

17  A.   "NO."

18  Q.   "NO."   I ASKED YOU IS THAT BECAUSE YOU READ THEM

19  AND UNDERSTOOD THEM.   WHAT DID YOU SAY?

20  A.   I SAID "YES."

21  Q.   HAVE YOU HEARD THE WORD GENERATING USED IN THE

22  SENSE OF GENERATING A KEY BEFORE?

23  A.   I HAVE HEARD IT USED, YES.

24  Q.   DID YOU NOT UNDERSTAND WHAT PEOPLE MEANT WHEN THEY

25  SAID GENERATING THE KEY?

1  A.  TYPICALLY, THAT PHRASE IS USED WITHIN THE CONTEXT

2  OF A SPECIFIC ALGORITHM.  IN THIS SENSE, YES, I DO

3  UNDERSTAND WHAT THEY MEAN.

4  Q.  WOULD YOU TURN TO EXHIBIT 512, "FREQUENTLY ASKED

5  QUESTIONS."  THIS IS A DOCUMENT CREATED AND

6  DISSEMINATED BY RSA, IS IT NOT?

7  A.  YES, IT IS.

8  Q.  LET'S TURN TO PAGE 16, PARAGRAPH 3.3 BEGINS "HOW

9  DOES ONE GET A KEY PAIR?"  DO YOU SEE THAT?

10  A.  YES.

11  Q.  AND THE NEXT, "EACH USER SHOULD GENERATE HIS OR

12  HER OWN KEY PAIR."  DO YOU SEE THAT?

13  A.  YES, I DO.

14  Q.  DO YOU SEE THE WORD GENERATED IN THE NEXT

15  PARAGRAPH?  DO YOU SEE THAT?

16  A.  YES, I DO.

17  Q.  IS THERE ANY DESCRIPTION AT ALL ABOUT A PARTICULAR

18  ALGORITHM?

19  A.  NO, THERE IS NOT.

20  Q.  YOU BELIEVE THAT RSA WOULD USE SUCH TERMS PEOPLE

21  WOULD NOT UNDERSTAND IN THEIR LITERATURE?

22  A.  I DON'T FEEL COMFORTABLE TO GIVE AN OPINION ON

23  WHAT --

24  Q.  WHAT THE WORDS MEAN?

25  A.  WHAT OUR COMPANY BELIEVES AS A WHOLE.

1   Q.   LET'S LOOK AT BSAFE 2.1, WHICH IS MARKED AS

2   EXHIBIT 511.   LET'S TURN TO PAGE 56 OF THAT DOCUMENT.

3            THE COURT:   WHAT PAGE?

4            MR. KRAMER:   PAGE 56.

5   Q.   WHAT'S THE TITLE AT THE TOP OF THAT PAGE?

6   A.   "KEY GENERATION."

7   Q.   CAN YOU READ THAT PARAGRAPH FOR ME.

8   A.   "TECHNIQUES FOR GENERATING PUBLIC PRIVATE KEY

9   PAIRS AND SYMMETRIC KEYS ARE QUITE DIFFERENT.

10  SYMMETRIC KEY ALGORITHMS GENERALLY REQUIRE AN

11  ARBITRARY RANDUM BYTE SEQUENCE WHILE A PUBLIC PRIVATE

12  KEY PAIR MUST SATISFY A MATHEMATICAL FORMULA.

13           KEY GENERATION DEPENDS ON THE AVAILABILITY OF

14  A GOOD RANDUM NUMBER GENERATOR AND THE SECURITY OF A

15  RANDUM NUMBER GENERATOR DEPENDS ON THE SEED.   SEE THE

16  SECTION ON SEED GENERATION, PSEUDO AND RANDUM NUMBER

17  AND SEED GENERATION FOR THE DISCUSSIONS OF THAT."

18  Q.   DO YOU SEE WHERE IT SAYS "KEY MANAGEMENT"?

19  A.   YES.

20  Q.   THE FIRST THING LISTED IT SAYS "GENERATING KEYS".

21  A.   YES.

22  Q.   DO YOU THINK PEOPLE -- HAVE YOU EVER HEARD OF

23  ANYBODY READING THAT SECTION OF RSA'S BSAFE USER'S

24  MANUAL AND SAYING "OH, MY GOSH, I DON'T KNOW WHAT THAT

25  MEANS"?

1   A.   NO, I HAVE NOT HEARD.

2   Q.   LET'S LOOK AT THAT WHICH IS THE FREQUENTLY ASKED

3   QUESTIONS, 512 AT PAGE 10, PARAGRAPH 2.7.

4          THE COURT:  PAGE AGAIN, PLEASE.

5          MR. KRAMER:  PAGE 10, PARAGRAPH 2.7.

6   Q.   SEE THE BOTTOM OF THE PAGE, RSA IS SAYING THAT YOU

7   MUST KEEP CERTAIN SIZE KEYS, AND THEN IT SAYS AT THE

8   VERY LAST SENTENCE, "ALTHOUGH THE SECURITY OF AN

9   INDIVIDUAL KEY IS STILL STRONG, WITH SOME FACTORY

10  METHODS, THERE IS ANOTHER SMALL CHANCE THAT THE

11  ATTACKER MIGHT GET LUCKY AND FACTOR IT QUICKLY"?

12  A.   YES, I SEE THAT.

13  Q.   DO YOU UNDERSTAND THAT TO BE A GUARANTEE OR A

14  WARANTEE THAT THE RSA CRYPTOSYSTEM IS SECURE?

15  A.   NO.

16  Q.   DO YOU KNOW OF ANYONE AT RSA WHO HAS EVER WARANTED

17  THAT THE RSA CRYPTOSYSTEM WILL NEVER BE BROKEN?

18  A.   NO.

19  Q.   LET'S TURN TO PAGE 26, PARAGRAPH 4.7 OF

20  "FREQUENTLY ASKED QUESTIONS."  DO YOU AGREE THAT

21  ALTHOUGH FACTORING IS STRONGLY BELIEVED TO BE A

22  DIFFICULT MATHEMATICAL PROBLEM, IT HAS NOT BEEN PROVED

23  SO?

24  A.   I DON'T HAVE ANY OPINION.

25  Q.   SO IT THEREFORE REMAINS A POSSIBILITY THAT ANY

1   FACTOR OR ALGORITHM WILL BE DISCOVERED.  DO YOU AGREE

2   WITH THAT?

3   A.  I DON'T HAVE AN OPINION.  IT'S NOT AN AREA WHICH

4   I'VE BEEN ASKED TO STUDY.

5   Q.  HAVE YOU EVER HEARD THE TERM COMPUTATIONALLY

6   INFEASIBLE BE USED BY RSA?

7   A.  YES, I HAVE.

8   Q.  HAVE YOU EVER HEARD IT USED IN THE CONTEXT OF RSA

9   GUARANTEEING THAT ITS SYSTEM IS SECURE?

10  A.  NO.

11  Q.  THAT'S BECAUSE THEY GIVE NO SUCH GUARANTEE;

12  CORRECT?

13  A.  I DON'T HAVE AN OPINION.

14          MR. KRAMER:  I HAVE NO FURTHER QUESTIONS.

15          MR. FLINN:  I HAVE NO QUESTIONS, YOUR HONOR.

16          MR. SCHLAFLY:  I JUST HAVE A FEW QUESTIONS.

17  I TAKE IT YOU'RE GOING TO WANT TO ADJOURN SHORTLY.

18          THE COURT:  YES, ABOUT 10 MINUTES.

19                    CROSS-EXAMINATION

20          BY MR. SCHLAFLY:  Q.   IN CLAIM 6, WHICH IS

21  ON THE SIGN HERE, DO YOU SEE THE SECOND MEANS CLAUSE?

22  A.  YES, I DO.  IT MEANS FOR GENERATING FOR SET RANDUM

23  INFORMATION, THAT ONE?

24  Q.  YES.

25  A.  YES, I DO.

1  Q.   IS THERE -- IS THERE A DISCLOSURE IN THE

2  HELLMAN-MERKLE PATENT FOR THAT MEANS CLAUSE?

3  A.   YES, THERE IS.

4  Q.   AND IS THERE DISCLOSED A SECRET DECIPHERING KEY

5  THAT IS DIRECTLY RELATED TO AND COMPUTATIONALLY

6  INFEASIBLE TO GENERATE FROM THE PUBLIC DECIPHERING

7  KEY?

8  A.   THERE IS DISCLOSED A MEANS FOR GENERATING THE

9  SECRET DECIPHERING KEY.

10  Q.   AND IS IT DIRECTLY RELATED TO AND COMPUTATIONALLY

11  INFEASIBLE TO GENERATE FROM THE PUBLIC DECIPHERING

12  KEY?

13  A.   THOSE SEEM TO ME TO BE ATTRIBUTES OF A SECRET

14  DECIPHERING KEY.  WHAT I WAS ASKED TO DO WAS FORM AN

15  OPINION AS TO WHETHER THE MEANS FOR GENERATING THAT

16  KEY WERE DISCLOSED.  I FEEL I'VE COME TO AN

17  UNDERSTANDING OF HOW THOSE MEANS ARE DESCRIBED, BUT I

18  HAVE NO OPINION AS TO WHETHER OR NOT THOSE ATTRIBUTES

19  ARE APPLICABLE GIVEN THE MEANS.

20  Q.   SO YOU DON'T KNOW WHETHER OR NOT THERE ARE MEANS

21  DISCLOSED IN THE SPECIFICATION HAVING ALL THE

22  NECESSARY ATTRIBUTES?

23  A.   THERE ARE MEANS DISCLOSED IN THE SPECIFICATION FOR

24  GENERATING THE SECRET DECIPHERING KEY.  I HAVE NO

25  OPINION WHETHER OR NOT THOSE ATTRIBUTES HAVE BEEN MET.

1  Q.  DO YOU HAVE OPINION AS TO WHETHER OR NOT THIS

2  CLAIM, HELLMAN-MERKLE CLAIM SIX IS LIMITED TO THE

3  DISCLOSED HARDWARE?

4  A.  NO, I DON'T.

5  Q.  DO YOU HAVE AN OPINION WHETHER SOFTWARE WOULD BE

6  INTERCHANGEABLE WITH THE DISCLOSED HARDWARE THAT YOU

7  DESCRIBED?

8          MR. HASLAM:  OBJECT TO THE QUESTION AS BEYOND

9  THE SCOPE OF THIS HEARING.

10          THE COURT:  SUSTAINED.

11          MR. SCHLAFLY:  THAT'S ALL I HAVE.

12          MR. HASLAM:  YOUR HONOR, I JUST HAVE A FEW.

13          THE COURT:  YES.

14                REDIRECT EXAMINATION

15          BY MR. HASLAM:  Q.   MR. KRAMER ASKED YOU A

16  SERIES OF QUESTIONS OR POINTED OUT A SERIES OF

17  QUESTIONS HE ASKED YOU ABOUT HARDWARE OR STRUCTURAL

18  ELEMENTS.  DO YOU RECALL MR. KRAMER EVER ASKING YOU

19  HOW THOSE WERE CONFIGURED OR WHAT FUNCTIONS THOSE WERE

20  INTENDED TO PERFORM?

21  A.  I'M SORRY.  I DON'T UNDERSTAND.

22  Q.  IF YOU LOOK AT PAGE 53, I BELIEVE, IS ONE OF THE

23  QUESTIONS THAT MR. KRAMER POINTED YOU TO.

24  A.  YES.

25  Q.  HE ASKED YOU -- THE QUESTION WAS "TELL HIM WHERE

1   THE HARDWARE ELEMENTS WERE PERFORMED."

2   A.   YES.

3   Q.   DID MR. KRAMER EVER ASK YOU WHAT FUNCTIONS OR

4   OPERATIONS THOSE HARDWARE ELEMENTS PERFORMED?

5   A.   NO.

6   Q.   DO YOU RECALL HIM DOING THAT ELSEWHERE?

7   A.   IF YOU MEAN THE SPECIFIC FUNCTIONS WITHIN EACH OF

8   THE BOXES, NO, I DON'T RECALL HIM DOING THAT.

9   Q.   NOW, YOU ANSWERED SOME QUESTIONS ABOUT SOME TERMS

10  IN CONNECTION WITH EXHIBIT 511, WHICH IS BSAFE.

11  THAT'S A MANUAL ABOUT RSA PRODUCT, ISN'T IT?

12  A.   THAT'S CORRECT.

13  Q.   IT'S YOUR UNDERSTANDING THAT CUSTOMERS WOULD

14  UNDERSTAND THOSE QUESTIONS TO BE IN THE CONTEXT OF THE

15  RSA PRODUCT?

16  A.   THAT'S CORRECT.

17          MR. KRAMER:   OBJECTION, THAT CALLS FOR

18  SPECULATION ALSO IS AMBIGUOUS BECAUSE THE REFERENCES

19  IN THE BEGINNING ARE OBVIOUSLY NOT DIRECTED TO BE WITH

20  EMPLOYMENT IN GENERAL.

21          THE COURT:   I'LL OVERRULE THE OBJECTION.

22          MR. HASLAM:   Q.   MR. KRAMER ALSO IN EXHIBIT

23  512 POINTED YOU TO PAGE 16, 3.3, "HOW DOES ONE GET A

24  KEY PAIR." DO YOU RECALL THAT?  DO YOU HAVE THAT IN

25  FRONT OF YOU?

1   A.   YES, I DO.

2   Q.   IF YOU LOOK AT THE PAGE BEFORE AT THE VERY BOTTOM

3   OF THE PAGE, IT SAYS "ALTHOUGH MOST OF THESE KEY

4   MANAGEMENT ISSUES ARISE IN ANY PUBLIC KEY

5   CRYPTOSYSTEM.  FOR CONVENIENCE, THEY ARE DISCUSSED

6   HERE IN THE CONTEXT OF RSA."  DO YOU HAVE A BELIEF AS

7   TO WHETHER SOMEONE READING THAT WOULD UNDERSTAND THAT

8   THE FOLLOWING DISCUSSION WAS IN THE CONTEXT OF THE RSA

9   SYSTEM?

10  A.   IF THEY HAD READ THAT STATEMENT IN ORDER, YES, I

11  DO.

12  Q.   DOES THE WORD SIGNALS APPEAR ANYWHERE IN CLAIM

13  SIX?

14  A.   NOT THAT I CAN SEE, NO.

15  Q.   DOES THE WORD DIGITAL SIGNALS APPEAR ANYWHERE IN

16  CLAIM SIX?

17  A.   NO, NOT THAT I CAN SEE.

18  Q.   DOES DIGITAL SIGNAL PROCESSOR APPEAR ANYWHERE IN

19  CLAIM SIX?

20  A.   NO, NOT THAT I CAN SEE.

21  Q.   DOES THE DISCLOSURE OF THE '582 REFERRING TO A CPU

22  OR CENTRAL PROCESSING UNIT?

23  A.   NOT TO MY KNOWLEDGE.

24  Q.   IS THE MEANS IN THE '582 FOR CARRYING OUT THE

25  STATED FUNCTIONS IN CLAIM SIX SPECIFIC DISCRETE

1   ELEMENTS COMPRISED TO PERFORM THESE FUNCTIONS?

2   A.   THE SPECIFICATION AND FIGURES DEFINED DISCRETE

3   ELEMENTS TO PERFORM THOSE FUNCTIONS.

4           MR. HASLAM:  I HAVE NO FURTHER QUESTIONS.

5           THE COURT:  ANYTHING ELSE.

6           MR. KRAMER:  I HAVE ONE FOLLOW-UP QUESTION.

7                   RECROSS EXAMINATION.

8           BY MR. KRAMER:   Q.   YOU TESTIFIED EARLIER

9   THAT YOU ASSISTED IN THE DEVELOPMENT OF HARDWARE FOR

10  CYLINK; CORRECT?

11  A.   NO.

12  Q.   DID YOU DEVELOP A PC ADD-ON BOARD; IS THAT

13  CORRECT?

14  A.   THAT'S CORRECT.

15  Q.   IS THAT PC ADD-ON BOARD CALLED A PROCESSOR?

16  A.   NO.

17  Q.   WHAT DOES P AND C STAND FOR?

18  A.   EXCUSE ME?

19  Q.   WHAT DOES P AND C STAND FOR?

20  A.   PERSONAL COMPUTER.

21  Q.   DO YOU UNDERSTAND THAT THE PERSONAL COMPUTER IS A

22  PROCESSOR?

23  A.   THE PERSONAL COMPUTER CONTAINS A CENTRAL

24  PROCESSING UNIT, ONE OF THE ELEMENTS YOU REFERRED TO

25  EARLIER.

1    Q.   BUT YOU DON'T THINK THE SPECIAL PIECE OF HARDWARE

2    YOU DEVELOPED SHOULD BE CALLED A PROCESSOR?

3    A.   IT CONTAINED A PROCESSOR.   THAT WOULD BE VERY

4    CONFUSING IF BOTH THE BOARD AND ONE OF THE ELEMENTS ON

5    THE BOARD WERE BOTH CALLED PROCESSORS.

6    Q.   BUT IT CONTAINS THEM?

7    A.   IT CONTAINS A DIGITAL SIGNAL PROCESSOR.

8            MR. KRAMER:   THANK YOU.

9            THE COURT:   THAT CONCLUDES THE TESTIMONY FOR

10   TODAY.   WE'LL RECONVENE AT THIS TIME, AND IT'S

11   SUGGESTED THAT WE MEET AT 9:30 TOMORROW MORNING SO WE

12   GET THE EQUIPMENT OUT AND THEN PROCEED.

13           (COURT SESSION ENDED FOR THE DAY AT 3:12 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7          <u>REPORTER'S CERTIFICATE</u>

8

9   I, THE UNDERSIGNED COURT REPORTER FOR THE UNITED

10  STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

11  CALIFORNIA, DO HEREBY CERTIFY THAT THE FOREGOING IS A

12  FULL, TRUE AND CORRECT TRANSCRIPT OF PROCEEDINGS HAD

13  IN THE WITHIN-ENTITLED AND NUMBERED CAUSE ON THE DATE

14  HEREINBEFORE SET FORTH; AND I DO FURTHER CERTIFY THAT

15  THE FOREGOING TRANSCRIPT HAS BEEN PREPARED BY ME.

16

17

18

19        _Jeannette L. Bush_____

20                  JEANNETTE L. BUSH

21

22

23

24

25

26