1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    BEFORE THE HONORABLE SPENCER WILLIAMS, JUDGE

4    ROGER SCHLAFLY,                )    NO. C-94-20512 SW
                                    )
5                    PLAINTIFF,     )
                                    )
6              VS.                  )    SAN JOSE, CA
                                    )    WEDNESDAY
7    PUBLIC KEY PARTNERS AND RSA    )    OCTOBER 2, 1996
     DATA SECURITY, INC.,           )    VOLUME 2
8                                   )    PAGES 148-296
                     DEFENDANTS.)       MARKMAN HEARING
9    _____)
                                    )
10   RSA DATA SECURITY, INC.,       )    NO. C-96-20094 SW
                                    )
11                   PLAINTIFF,     )
                                    )
12             VS.                  )
                                    )    ORIGINAL
13   CYLINK CORPORATION AND CARO-KANN )
     CORPORATION, ET AL.,           )
14                                  )    FILED
                     DEFENDANTS.)
15   _____)
                                         MAR 05 1997
16
                                         RICHARD W. WIEKING
17   APPEARANCES:                        CLERK, U.S. DISTRICT COURT
                                         NORTHERN DISTRICT OF CALIFORNIA
                                         SAN JOSE
18   FOR THE PLAINTIFF           DR. ROGER SCHLAFLY
     ROGER SCHLAFLY:             P.O. BOX 1680
                                 SOQUEL, CA  95073
19

20

21         APPEARANCES CONTINUED ON NEXT PAGE

22

23

     COURT REPORTER:           SARA LERSCHEN, CSR #6213, RMR, CRR
24                             COURT REPORTER

25        COMPUTERIZED TRANSCRIPTION BY XSCRIBE

```
 1   APPEARANCES: (CONTINUED)

 2   FOR RSA DATA SECURITY, INC.:   HELLER, EHRMAN, WHITE
                                    & MC AULIFFE
 3                                  525 UNIVERSITY AVENUE
                                    PALO ALTO, CA  94301-1900
 4                            BY:   ROBERT T. HASLAM
                                    ROBERT D. FRAM
 5                                  BETH MITCHELL
                                    ROBERT B. HAWK
 6                                  ATTORNEYS AT LAW

 7   FOR CYLINK CORPORATION,        MORRISON & FOERSTER, LLP
     CARO-KANN CORPORATION          755 PAGE MILL ROAD
 8   AND STANFORD UNIVERSITY:       PALO ALTO, CA  94304-1018
                              BY:   KARL J. KRAMER
 9                                  JANA G. GOLD
                                    ATTORNEYS AT LAW
10
                                    MORRISON & FOERSTER LLP
11                                  345 CALIFORNIA STREET
                                    SAN FRANCISCO, CA  94104
12                            BY:   RAOUL D. KENNEDY
                                    ATTORNEY AT LAW
13
                                    ALSTON & BIRD
14                                  ONE ATLANTIC CENTER
                                    1201 W. PEACHTREE STREET
15                                  ATLANTA, GEORGIA   30306
                              BY:   PATRICK J. FLINN
16                                  ATTORNEY AT LAW

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2    WITNESSES:                                          PAGE

3    SCHLAFLY, ROGER
     DIRECT TESTIMONY                                    155
4    CROSS-EXAMINATION BY MR. FLINN                      166
     CROSS-EXAMINATION BY MR. KRAMER                     197
5    CROSS-EXAMINATION BY MR. FRAM                       199
     REDIRECT TESTIMONY                                  210
6

7

     RSA'S EXHIBITS                      IDEN.   EVD.   VOL.
8    1002                                152            2
     1005                                152            2
9    1006-A                              152            2
     1006-B                              152            2
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    WEDNESDAY-OCTOBER 2, 1996                          9:48 A.M.

2              THE COURT:  OKAY.  WHAT'S UP?

3              MR. FRAM:  GOOD MORNING, YOUR HONOR.  WE HAVE

4    ONLY A COUPLE OF HOUSEKEEPING ITEMS FOR OUR EVIDENTIARY

5    PRESENTATION, OUR WITNESSES HAVING BEEN CALLED AND

6    EXAMINED FOR RSA.  AND I'D JUST LIKE TO MARK A FEW

7    ADDITIONAL EXHIBITS.

8              THE FIRST EXHIBIT I'D LIKE TO MARK IS

9    PLAINTIFF'S EXHIBIT 1005.  IT IS AN EXCERPT FROM CYLINK

10   AND CARO-KANN'S SUPPLEMENTAL RESPONSES TO RSA'S FIRST SET

11   OF INTERROGATORIES.  IT'S BEING MARKED WITH THE

12   UNDERSTANDING THAT DEFENDANTS MAY WANT TO PROVIDE THE

13   COMPLETE DOCUMENT.  WE HAVE PROVIDED EXCERPTS, TRYING TO

14   SAVE SOME PAPER IN THIS CASE.

15             WE'RE ALSO MARKING AT THIS TIME PLAINTIFF'S

16   EXHIBITS 1006-A AND B.  AND THESE ARE EXCERPTS OF

17   DEPOSITION TESTIMONY OF LAWRENCE C. WASHINGTON.

18             1006-A SETS FORTH FOUNDATION TESTIMONY FROM

19   MR. WASHINGTON, ESTABLISHING THAT HE IS, IN FACT, OUTSIDE

20   THE JURISDICTION IN HIS ORDINARY PROFESSIONAL RESIDENCE,

21   AND THAT HE WAS SPONSORED BY DEFENDANTS IN THE CASE OF

22   CYLINK V. RSA.

23             AND 1006-B CONTAINS SUBSTANTIVE --

24             THE COURT:  "B," AS IN "BOY"?

25             MR. FRAM:  "B," AS IN "BOY," CONTAINS

1    SUBSTANTIVE TESTIMONY FROM MR. WASHINGTON REGARDING THE

2    MEANING OF TERMS DISCUSSED YESTERDAY, SUCH AS "SECURE" AND

3    "COMPUTATIONALLY SECURE."

4         FINALLY, YOUR HONOR, WE'D LIKE TO MARK AS

5    EXHIBIT 1002, THAT WAS SKIPPED OVER AND OVER YESTERDAY, A

6    DOCUMENT THAT WAS DISCUSSED IN THE TESTIMONY, WHICH IS A

7    DRAFT, A 1977, MAY 7, 1977 DRAFT OF A DOCUMENT ENTITLED

8    "HIDING INFORMATION AND RECEIPTS IN TRAP DOOR KNAPSACKS,"

9    BY RALPH MERKLE AND MARTIN HELLMAN.

10                   (WHEREUPON, RSA'S EXHIBITS 1002,

11                    1005, 1006-A AND 1006-B WERE

12                    MARKED FOR IDENTIFICATION.)

13        MR. FRAM:  WE WERE GOING TO MOVE THESE INTO

14    EVIDENCE, YOUR HONOR, ALONG WITH THE OTHER EXHIBITS MARKED

15    AT THE CLOSE OF THE HEARING, AS PREVIOUSLY DISCUSSED WITH

16    THE COURT AND AS PER AGREEMENT WITH OPPOSING COUNSEL, THE

17    THOUGHT BEING AT THAT TIME, THE PARTIES WOULD NOT ARGUE

18    EVIDENTIARY OBJECTIONS BUT WOULD RATHER SUBMIT A SHORT

19    PAPER ON THEM TO THE COURT, SO AS TO BE ABLE TO STREAMLINE

20    THIS HEARING.

21        THE COURT:  ALL RIGHT.  YES, SIR?

22        MR. KRAMER:  KARL KRAMER ON BEHALF OF CYLINK AND

23    CARO-KANN.  I CONCUR THAT WE WILL ARGUE ABOUT THESE

24    MATTERS WHEN WE ARE DONE WITH THE ARGUMENT TODAY.  BUT I

25    DID NOTE THAT --

1    THE COURT:  ARGUE WITH YOURSELF OR ARGUE WITH

2 ME?

3    MR. KRAMER:  ARGUE AMONG OURSELVES.

4    THE COURT:  OKAY.

5    MR. KRAMER:  HOPEFULLY IN A WAY THAT IS HELPFUL

6 FOR YOU.

7    BUT I DO KNOW THAT MR. FRAM'S CHARACTERIZATION

8 OF THE TESTIMONY OF MR. WASHINGTON IS INCORRECT, AND I

9 THINK IT WAS INAPPROPRIATE ARGUMENT NOW.  AND WE'LL RAISE

10 THAT LATER.  OKAY?

11    THE COURT:  OKAY.  THANK YOU.

12    MR. FRAM:  I'M SURE THEY WILL.

13    SO WITH THAT, YOUR HONOR, THAT CONCLUDES OUR

14 EVIDENTIARY PRESENTATION.  AND I THINK WE'RE READY FOR, I

15 SUPPOSE, DEFENDANTS' WITNESSES OR PRESENTATION, IF ANY, OR

16 THE OTHER PARTIES.

17    THE COURT:  OKAY.

18    MR. KENNEDY:  YOUR HONOR, ON BEHALF OF CYLINK

19 AND CARO-KANN, WE HAVE NO LIVE TESTIMONY, YOUR HONOR.

20    THE COURT:  ALL RIGHT.

21    MR. FLINN:  STANFORD UNIVERSITY HAS NO LIVE

22 TESTIMONY, YOUR HONOR.

23    THE COURT:  OKAY.  ANY DEAD TESTIMONY?

24      (LAUGHTER.)

25    THE COURT:  GO AHEAD.  ARE YOU GOING TO PRESENT

1    DEPOSITIONS?

2        MR. FLINN:  YES, YOUR HONOR.  I BELIEVE THAT ALL

3    OF THE DEFENDANTS HAVE, WITH THEIR VARIOUS PAPERS,

4    SUBMITTED DEPOSITION EXCERPTS AND TREATISES AND THE LIKE.

5    THERE MAY BE A FEW MORE DOCUMENTS THAT WILL COME IN.  BUT

6    IN TERMS OF HAVING A WITNESS GET UP AND EXPRESS AN

7    OPINION, THERE IS NO SUCH WITNESS.

8        THE COURT:  FINE.  ALL RIGHT.  OKAY.  NEXT?

9        MR. SCHLAFLY:  I'D JUST LIKE TO SAY I DON'T KNOW

10   WHO LAWRENCE WASHINGTON IS, SO I'D LIKE TO RESERVE MY

11   RIGHT TO OBJECT TO THAT EVIDENCE.

12       THE COURT:  ALL RIGHT.

13       MR. SCHLAFLY:  AND I'D LIKE TO TESTIFY ON MY

14   BEHALF IN THIS CASE NOW.

15       THE COURT:  AT THIS TIME?

16       MR. SCHLAFLY:  YES.

17       MR. KRAMER:  YOUR HONOR, ON BEHALF OF CYLINK AND

18   CARO-KANN, I DON'T WANT TO DELAY THE PROCEEDINGS AT ALL,

19   BUT I WANT TO MAKE SURE THAT THE NORMAL OBJECTIONS WE

20   WOULD MAKE TO QUESTIONS AND ANSWERS WOULD BE RESERVED FOR

21   THE END, BECAUSE TYPICALLY, WE HAVE AN OPPORTUNITY TO

22   OBJECT TO A QUESTION AND ANSWER BEFORE THE ANSWER COMES.

23   I DON'T KNOW HOW IT'S GOING TO WORK.

24       THE COURT:  IS THIS THE SITUATION WHERE THE

25   WITNESS ASKS HIMSELF A QUESTION?

1          MR. KRAMER:  I THINK WE COULD DISPENSE WITH

2   THAT, AS LONG AS WE UNDERSTAND AT THE END WE MAY HAVE SOME

3   OBJECTIONS TO THE TESTIMONY.

4          THE COURT:  FINE.

5          WILL YOU SWEAR THE WITNESS, PLEASE?

6                  ROGER SCHLAFLY

7   CALLED AS A WITNESS BY THE PLAINTIFF ROGER SCHLAFLY, FIRST

8   BEING DULY SWORN, TESTIFIED AS FOLLOWS:

9          THE WITNESS:  YES.

10         THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

11  RECORD.

12         THE COURT:  HOW LONG DO YOU EXPECT TO BE,

13  MR. SCHLAFLY?  IT'S JUST A QUESTION OF INFORMATION.  YOU

14  CAN TESTIFY THERE, IF YOU LIKE.

15         THE WITNESS:  FIFTEEN MINUTES.

16         THE COURT:  EITHER WAY.

17         THE CLERK:  WHAT IS YOUR OCCUPATION, SIR?

18         THE COURT:  OCCUPATION?

19         THE WITNESS:  I'M A FREELANCE MATHEMATICIAN.

20         THE CLERK:  THANK YOU.

21         THE COURT:  OKAY.  HOW LONG DO YOU THINK YOU'LL

22  BE?

23         THE WITNESS:  10 TO 15 MINUTES.

24         THE COURT:  OKAY.

25                  DIRECT TESTIMONY

1          THE WITNESS:  OKAY.  I'D LIKE TO TESTIFY WITH

2     REGARD TO TWO ISSUES, TWO TECHNICAL ISSUES OF DISPUTE IN

3     THIS CASE.

4          ONE IS THE MEANING OF THE TERMS.  I THINK THE

5     MOST CRUCIAL TERM THAT NEEDS TO BE CONSTRUED IN THESE

6     PATENT CLAIMS IS THE TERM "COMPUTATIONALLY INFEASIBLE."

7     AND CLOSELY RELATED TO THAT IS THE TERM "SECURE."

8          THE COURT:  OKAY.  WE COVERED A DISCUSSION ON

9     THAT, SO I'D LIKE TO HEAR WHAT YOU HAVE TO SAY ABOUT IT.

10         COMPUTATIONALLY INFEASIBLE; RIGHT?

11         THE WITNESS:  CORRECT.

12         THE COURT:  OKAY.

13         THE WITNESS:  I THINK THE TERM "COMPUTATIONALLY

14    INFEASIBLE" IS DEFINED IN THE PATENT, BUT THERE IS A

15    CONFUSING ASPECT ABOUT THE DEFINITION THAT I WOULD LIKE TO

16    ADDRESS.

17         THAT IS, IN THE PATENT --

18         THE COURT:  CAN YOU TELL ME -- FROM WHAT I'VE

19    HEARD, WHAT MY THINKING IS RIGHT NOW ON THE SUBJECT --

20    IT'S BEEN DISCUSSED, ALTHOUGH THIS IS NOT CONCLUSIVE --

21    BUT THAT THE INTERCEPTOR OF THE MESSAGE DOES NOT HAVE

22    ENOUGH TIME TO COMPUTE AND DECODE THE MESSAGE DUE TO THE

23    TIME THAT WOULD BE FEASIBLE TO DO SO.

24         IN OTHER WORDS, WE TALKED ABOUT HOW LONG IT

25    TAKES NOW AND THEN PREVIOUSLY, OR IT MIGHT IN THE FUTURE.

1    SO THAT THE COMPUTATIONALLY SECURE DEPENDS ON THE PERIOD

2    OF TIME IN WHICH IT'S COMPUTATIONALLY INFEASIBLE, WHEN IT

3    CAN'T ACTUALLY USE ENOUGH TIME TO TRY ALL THE VARIOUS

4    THINGS TO SEE WHAT THE REAL MESSAGE IS.  THAT'S IN

5    LAYMAN'S TERMS.

6            THE WITNESS:  I THINK THAT'S A GOOD DEFINITION,

7    YOUR HONOR, AND IT'S CONSISTENT WITH THE PATENT.

8            THE COURT:  THANK YOU.

9            THE WITNESS:  I WOULD JUST LIKE TO ADDRESS ONE

10   THING THAT I THINK IS CONFUSING ABOUT THE DEFINITION IN

11   THE PATENT.  SO LET ME REFER TO EXHIBIT 13, THE

12   HELLMAN-MERKLE PATENT, COLUMN FIVE.

13           IT SAYS:  "A TASK IS CONSIDERED COMPUTATIONALLY

14   INFEASIBLE IF ITS COST AS MEASURED BY EITHER THE AMOUNT OF

15   MEMORY USED OR THE COMPUTING TIME IS FINITE BUT IMPOSSIBLY

16   LARGE."

17           THE COURT:  OKAY.

18           THE WITNESS:  THAT'S A DEFINITION WHICH I THINK

19   IS OKAY, AND COMPLETELY CONSISTENT WITH WHAT YOU SAID.

20           THEN IT SAYS:  "FOR EXAMPLE, ON THE ORDER OF TEN

21   TO 30 OPERATIONS WITH EXISTING COMPUTATIONAL METHODS AND

22   EQUIPMENT."

23           NOW, IF THAT'S JUST AN EXAMPLE, MAYBE WE DON'T

24   NEED TO TAKE IT TOO SERIOUSLY.  BUT I THINK WE NEED TO

25   ANALYZE EXACTLY WHAT IS MEANT BY THIS SENTENCE.

1      AND THE SENTENCE SAYS TWO THINGS -- WELL, IT

2   SAYS ABOUT THREE THINGS.  I MEAN, IT SAYS APPROXIMATELY

3   TEN TO 30 OPERATIONS.  WELL, I DON'T THINK WE HAVE ANY

4   SERIOUS QUIBBLES ABOUT THAT.  IT'S TEN TO THE 20

5   OPERATIONS, TEN TO THE 40 OPERATIONS.  I DON'T THINK WE'RE

6   GOING TO HAVE A BIG DISAGREEMENT THERE.

7      AND THEN IT REFERS TO EXISTING COMPUTATIONAL

8   METHODS AND ALSO EXISTING COMPUTATIONAL EQUIPMENT.

9   "COMPUTATIONAL EQUIPMENT" REFERS TO COMPUTERS.  COMPUTERS

10  TODAY ARE PRETTY MUCH THE SAME AS THEY WERE 20 YEARS AGO.

11  THEY'VE GOTTEN FASTER AND CHEAPER, BUT I DON'T THINK WE

12  HAVE ANY SERIOUS DISPUTES ABOUT THAT.

13      THE TRICKY THING TO INTERPRET IS THE PHRASE

14  "EXISTING COMPUTATIONAL METHODS."  AND I THINK THERE ARE

15  TWO WAYS TO INTERPRET THAT.

16      ONE WAY TO INTERPRET THAT IS TO REFER TO THE

17  LOW-LEVEL COMPUTER OPERATIONS THAT A COMPUTER DOES WHEN --

18      THE COURT:  IT'S ALL MATHEMATICAL; RIGHT?

19  EVERYTHING IS MATHEMATICAL?

20      THE WITNESS:  IT'S ALL MATHEMATICAL, YES.

21      THE COURT:  OKAY.

22      THE WITNESS:  BUT THERE ARE LOW-LEVEL METHODS

23  AND THERE ARE HIGH-LEVEL METHODS.

24      WHEN A COMPUTER DOES A CALCULATION AT THE LOWEST

25  LEVEL, YOU COULD LOOK AT ITS METHODS AS BEING THINGS SUCH

1   AS STORING NUMBERS IN MEMORY, RANDOMLY ACCESSING CERTAIN

2   PARTS OF MEMORY, LOADING NUMBERS INTO REGISTERS, ADDING

3   NUMBERS IN THE REGISTERS, MULTIPLYING NUMBERS IN THE

4   REGISTER, WRITING THOSE OUTPUT.

5          THE COURT:  THEY'RE ALL EXISTING METHODS?

6          THE WITNESS:  THOSE WOULD ALL BE CONSIDERED

7   EXISTING COMPUTATIONAL METHODS.

8          HOWEVER, ONE COULD ALSO INTERPRET THAT PHRASE

9   "EXISTING COMPUTATIONAL METHODS" IN TERMS OF HIGHER-LEVEL

10  ALGORITHMS.  FOR EXAMPLE, IF SOMEONE FINDS A NEW METHOD

11  FOR, WELL, IN THIS CASE, IT'S GOING TO BE FOR BREAKING THE

12  KNAPSACK.  IF SOMEBODY FINDS SOME NEW METHOD, SOME CLEVER

13  ALGORITHM FOR MAKING SOME CRYPTOSYSTEM, IS THAT TO BE

14  INTERPRETED AS ONE OF THE EXISTING COMPUTATIONAL METHODS

15  OR NOT?

16         SO, I THINK THIS SENTENCE, THIS PHRASE IN THE

17  PATENT, "EXISTING COMPUTATIONAL METHODS" TO REFER TO THESE

18  LOW-LEVEL METHODS OR THE HIGH-LEVEL METHODS, I DON'T

19  ACTUALLY KNOW FOR A FACT WHICH IS INTENDED.  I THINK IT'S

20  A LITTLE BIT AMBIGUOUS.  IT COULD BE INTERPRETED EITHER

21  WAY.

22         HOWEVER, IT IS MY BELIEF, BASED ON THE CONTEXT

23  OF THE INVENTION AND THE SUPPORTING SPECIFICATION AND

24  DOCUMENTS, THAT WHAT WAS MEANT BY THAT IS THE EXISTING --

25  THE LOW-LEVEL METHODS, OR THE EXISTING COMPUTATIONAL

1    METHODS.

2            THE COURT:   OKAY.

3            THE WITNESS:   AND HERE IS MY REASON FOR THINKING

4    SO.

5            THE INVENTORS WERE INSPIRED TO THIS INVENTION

6    LARGELY BY COMPUTER COMPLEXITY THEORY.   AND COMPUTER

7    COMPLEXITY THEORY IS CONCERNED WITH WHAT TYPES OF

8    COMPUTATIONS ARE POSSIBLE AND HOW MANY OPERATIONS ARE

9    NECESSARY TO DO A PARTICULAR COMPUTATION.

10           NOW, LET ME GIVE YOU AN ANALOGY HERE THAT MIGHT

11   MAKE THINGS A LITTLE SIMPLER.   LET'S SUPPOSE YOU'RE TRYING

12   TO FIGURE OUT HOW FAR IT IS TO DRIVE TO NEW YORK.   NOW,

13   IT'S ABOUT 3,000 MILES, IF YOU GO DIRECTLY.   IF YOU GO A

14   LONG ROUTE, IT MIGHT BE FOUR- OR 5,000 MILES.   BUT SINCE

15   THERE ARE A LOT OF DIFFERENT ROADS YOU COULD TAKE, YOU

16   COULD CONSIDER THAT A PROBLEM IN COMPUTATIONAL COMPLEXITY

17   THEORY.

18           AND SOMEONE IN COMPLEXITY THEORY MIGHT WANT TO

19   SAY -- MIGHT WANT TO ASK THE QUESTION, "WHAT IS THE

20   SHORTEST ROUTE TO NEW YORK?"

21           AND SOMEONE IN COMPLEXITY THEORY MIGHT

22   REASONABLY SAY, "WELL, I DON'T KNOW EXACTLY THE SHORTEST

23   ROUTE, BUT WE CAN GET THERE IN 3,000 MILES, BUT THERE IS

24   NO WAY TO GET THERE IN 2,000 MILES.   IT'S JUST

25   IMPOSSIBLE."

1          AND WHEN HE SAYS THAT, ABOUT GETTING TO NEW YORK

2    IN 2,000 MILES, HE MEANS IT'S IMPOSSIBLE.  HE DOESN'T MEAN

3    THAT, WELL, ACCORDING TO THE ROUTES THAT ARE POPULARLY

4    LOOKED AT AND POPULARLY TRAVELED, IT MEANS THERE IS NO

5    ROUTE LESS THAN.  HE MEANS IT IS IMPOSSIBLE TO GET THERE

6    IN LESS THAN 2,000 MILES.

7          AND THAT IS WHAT PEOPLE IN COMPUTER COMPLEXITY

8    THEORY ARE CONCERNED WITH.  WHEN THEY SAY SOME PROBLEM IS

9    DIFFICULT, THEY USUALLY MEAN THAT -- THEY USUALLY MEAN

10   THAT IT'S IMPOSSIBLE TO SOLVE THE PROBLEM IN SOME SHORT

11   NUMBER OF STEPS.  NOW, THEY CAN'T ALWAYS --

12          THE COURT:  MILEAGE IS A CONSTANT; ISN'T IT?

13   THERE IS NO FLEXIBILITY OF THE MILES YOU'RE TALKING ABOUT.

14          THE WITNESS:  WELL, YOU CAN TAKE DIFFERENT

15   ROADS.

16          THE COURT:  WELL, THE MINIMUM, WORKING WITH THE

17   QUICKEST TIME AND SHORTEST ROUTE, IT'S IMPOSSIBLE TO GO

18   THERE IN LESS THAN 3,000 MILES, AS YOU SAID.

19          THE WITNESS:  THAT'S RIGHT.

20          THE COURT:  WHEN YOU'RE TALKING ABOUT TIME

21   ELEMENT, IF YOU INCREASE THE SPEED, THE WAY THIS COMPUTER

22   WORKED, THEN THAT'S POSSIBLE.

23          THE WITNESS:  WELL, IF YOU MEASURE IT IN

24   TERMS -- IF YOU MEASURE THE COMPLEXITY IN TERMS OF THE

25   NUMBER OF OPERATIONS, THEN THE SPEED OF THE COMPUTER

1   DOESN'T MAKE ANY DIFFERENCE.  IT WILL DO THOSE OPERATIONS

2   FASTER, BUT IT WON'T MAKE ANY DIFFERENCE.

3       NOW, THERE IS AN INHERENT -- IF YOU INVENT SOME

4   COMPUTER THAT'S ABLE TO DO MORE WORK IN ONE OPERATION,

5   THEN THERE WILL BE SOME DIFFERENCE, AND YOU'LL HAVE TO

6   MAKE SOME ASSUMPTIONS AS TO WHAT KIND OF COMPUTERS YOU'RE

7   USING, AND WHAT KIND OF LOW-LEVEL COMPUTATIONAL METHODS

8   YOU'RE USING.

9       BUT THE COMPUTER COMPLEXITY THEORISTS WILL WANT

10  TO SAY THAT THERE IS -- THAT TO SAY THAT SOME PROBLEM IS

11  HARD, THAT THERE IS NO METHOD -- THERE IS NO ALGORITHM FOR

12  SOLVING THAT PROBLEM, JUST LIKE THERE IS NO WAY TO GET TO

13  NEW YORK IN LESS THAN 2,000 MILES.

14      AND I THINK THE EVIDENCE THAT THE INVENTORS WERE

15  INSPIRED BY COMPLEXITY THEORY IS IN THEIR PAPERS THAT THEY

16  WROTE, PAPERS -- IN THE NEW DIRECTIONS PAPER, DIFFIE AND

17  HELLMAN TALK ABOUT COMPLEXITY THEORY.  AND BASED ON THAT,

18  I INTERPRET THE PHRASE "EXISTING COMPUTATIONAL METHODS" TO

19  MEAN THE LOW-LEVEL METHODS, NOT THE HIGH-LEVEL METHODS.

20  OKAY?

21      THE COURT:  OKAY.

22      THE WITNESS:  OKAY.  THERE IS ONE OTHER POINT I

23  WANTED TO MAKE, AND THAT HAS TO DO WITH THE INTERPRETATION

24  OF THE BROAD HELLMAN-MERKLE CLAIMS, SUCH AS CLAIM 6, WHICH

25  IS OVER ON THE BOARD THERE, AND CLAIM 1.

1          A CENTRAL ISSUE IN THIS CASE IS, OF COURSE,

2     WHETHER OR NOT THESE CLAIMS COVER THE WHOLE CONCEPT OF

3     PUBLIC KEY CRYPTOGRAPHY.  AND I -- MOST OF THESE ARGUMENTS

4     ARE LEGAL ARGUMENTS, WHICH WE'LL MAKE LATER WHEN WE START

5     ARGUING LEGAL THINGS.

6          BUT I JUST WANTED TO MAKE THE POINT THAT IF THE

7     INVENTORS REALLY INTENDED TO COVER THE WHOLE CONCEPT OF

8     PUBLIC KEY CRYPTOGRAPHY, THERE ARE A COUPLE OF THINGS THAT

9     I THINK NEED TO BE EXPLAINED.

10          THE MAIN THING BEING THAT THE CONCEPT OF PUBLIC

11     KEY CRYPTOGRAPHY IS EXPLAINED AND IS DISCLOSED IN THE

12     DIFFIE-HELLMAN MULTIUSER PAPER, WHICH IS CITED AS PRIOR

13     ART IN THE PATENT, AND BECAUSE THE INVENTORS WERE LATE

14     FILING THEIR PATENT APPLICATION, IT IS PRIOR ART, AND

15     THERE IS NO DISPUTE ABOUT THAT.  IT IS PUBLISHED AND IS

16     PRIOR ART, AND IT DOES DISCLOSE THE CONCEPT OF PUBLIC KEY

17     CRYPTOGRAPHY, AND IT DOES IT VERY NICELY AND EXPLAINS THE

18     WHOLE CONCEPT.

19          THE COURT:  AND THE PART IN THE PATENT DISCLOSES

20     LESS THAN THAT, OR CLAIMS LESS THAN THAT?

21          THE WITNESS:  WELL, I'LL LET CYLINK EXPLAIN JUST

22     WHAT THE DIFFERENCE IS.  BUT THE MULTIUSER PAPER EXPLAINS

23     THE CONCEPT OF PUBLIC KEY CRYPTOGRAPHY.

24          THE PATENT SPECIFICATIONS OF HELLMAN-MERKLE AND

25     DIFFIE-HELLMAN -- HELLMAN-MERKLE IS WHAT WE'RE CONCERNED

1    WITH TODAY -- EXPLAINS THE TRAP DOOR KNAPSACK.   THE TRAP

2    DOOR KNAPSACK IS NOT DESCRIBED IN THE MULTIUSER PAPER.

3              SO THE MULTIUSER PAPER DESCRIBES THE CONCEPT OF

4    PUBLIC KEY CRYPTOGRAPHY, COMPLETE WITH PUBLIC KEYS,

5    PRIVATE KEYS, ONE-WAY FUNCTIONS, AND DIGITAL SIGNATURES;

6    AND STANFORD LOOKED AT PAPERS SLIPPED INTO THE PUBLIC

7    DOMAIN BEFORE FILING FOR THIS PATENT.

8              AND THEN THIS PATENT DISCLOSES THE TRAP DOOR

9    KNAPSACK AND A COUPLE OF VARIATIONS OF THE TRAP DOOR

10   KNAPSACK.

11             AND THEN THIS PATENT HAS VERY BROAD CLAIMS.   AND

12   THESE VERY BROAD CLAIMS SEEM TO CLAIM THE WHOLE FIELD OF

13   PUBLIC KEY CRYPTOGRAPHY, IF YOU READ THEM LITERALLY.   AND

14   I'M ARGUING HERE TODAY THAT I THINK IT'S QUESTIONABLE --

15             THE COURT:   YOU'RE TESTIFYING.

16             THE WITNESS:   I'M TESTIFYING; YES, I'M

17   TESTIFYING.

18             THE COURT:   OKAY.

19             THE WITNESS:   I'M TESTIFYING AT THE MOMENT, AND

20   I'LL BE ARGUING A SIMILAR POINT LATER ON.

21             MR. FLINN:   ACTUALLY, YOUR HONOR, WHERE HE SAID

22   MULTIUSER PAPER DESCRIBES THE BROAD CONCEPT OF PUBLIC KEY,

23   THAT'S LEGITIMATE TESTIMONY.

24             BUT TO ARGUE FROM THE WITNESS STAND WHAT THE

25   LEGAL CONSEQUENCES OF THAT ARE IS REALLY GOING BEYOND

1   TESTIMONY.  HE'S FREE TO MAKE THAT, JUST FROM A DIFFERENT

2   SPOT IN THE COURTROOM.

3          THE WITNESS:  THANK YOU.  THANK YOU.

4          THE COURT:  OKAY.

5          THE WITNESS:  HE'S QUITE CORRECT, AND I'LL TRY

6   TO AVOID THAT.

7          THE ONLY POINT I WANT TO MAKE IS THAT THE

8   MULTIUSER PAPER DOES DESCRIBE THE BROAD CONCEPT.  IT'S

9   VERY NICELY DESCRIBED.  IT'S MY PROFESSIONAL OPINION THAT

10  SOMEONE READING THE MULTIUSER PAPER CAN UNDERSTAND THE

11  BROAD CONCEPT OF PUBLIC KEY ENCRYPTION AND ONE-WAY

12  FUNCTIONS AND DIGITAL SIGNATURES AND ALL THAT STUFF.

13         AND I REGARD THAT AS EVIDENCE THAT THE INVENTORS

14  IN THE HELLMAN-MERKLE PATENT WERE NOT INTENDING TO BE

15  CLAIMING THE ENTIRE SUBJECT OF PUBLIC KEY CRYPTOGRAPHY,

16  BECAUSE IT WAS ALREADY DISCLOSED IN ANOTHER PAPER THAT

17  SLIPPED INTO THE PUBLIC DOMAIN.  AND FURTHERMORE, THE

18  LISTED INVENTORS ON THE HELLMAN-MERKLE PATENT ARE JUST

19  HELLMAN AND MERKLE, WHEREAS, DIFFIE WAS A CO-AUTHOR OF THE

20  MULTIUSER PAPER, AND EVIDENTLY, A CO-INVENTOR OF THE

21  CONCEPT OF PUBLIC KEY CRYPTOGRAPHY.

22         AND IF, INDEED, THE HELLMAN-MERKLE PATENT WERE

23  INTENDING TO COVER THE WHOLE CONCEPT OF PUBLIC KEY

24  CRYPTOGRAPHY, THEN I DON'T UNDERSTAND WHY DIFFIE WAS NOT

25  LISTED AS AN INVENTOR ON THE HELLMAN-MERKLE PATENT.

1    THAT'S ALL I HAVE TO SAY --

2    THE COURT:  THANK YOU.

3    THE WITNESS:  -- RIGHT NOW.

4    THE COURT:  OKAY.

5    MR. FRAM:  RSA HAS NO QUESTIONS FOR THIS WITNESS

6 AT THIS TIME BUT RESERVES THE RIGHT, IF THERE IS ANYTHING

7 FURTHER, IN LIGHT OF MR. FLINN'S QUESTIONS.

8    THE COURT:  FINE.  THANK YOU.

9    MR. FLINN:  I'VE GOT A FEW, YOUR HONOR.  IF I

10 COULD HAVE A MINUTE?

11    THE COURT:  YES, PLEASE, MR. FLINN.

12     CROSS-EXAMINATION

13    BY MR. FLINN:  Q.  MR. SCHLAFLY, YOU WERE

14 PLEASANT ENOUGH TO JUMP RIGHT TO THE MEAT OF YOUR

15 TESTIMONY VERY QUICKLY, BUT YOU OMITTED A FORMALITY THAT I

16 ACTUALLY THINK WOULD BE VERY HELPFUL FOR US, WHICH IS

17 TRADITIONAL, THAT AN EXPERT WITNESS LISTS HIS OR HER

18 CREDENTIALS.  AND I THINK YOU HAVE SOME SUBSTANTIAL ONES

19 THAT WOULD BE HELPFUL FOR US.

20    COULD YOU TELL US A LITTLE BIT MORE ABOUT YOUR

21 EDUCATION, YOUR EXPERIENCE IN WRITING COMPUTER PROGRAMS

22 THAT DO CRYPTOGRAPHY, YOUR EXPERIENCE IN WRITING COMPUTER

23 PROGRAMS THAT DO PUBLIC KEY CRYPTOGRAPHY?

24 A.  SURE.  I RECEIVED A PH.D. IN MATHEMATICS FROM THE

25 UNIVERSITY OF CALIFORNIA AT BERKELEY IN 1980.

1      I'VE WORKED IN CRYPTOGRAPHY ON AND OFF FOR TEN

2  OR 15 YEARS, AND IN THAT PROCESS, I'VE DEVELOPED SOME

3  COMPUTER SOFTWARE, WHICH IMPLEMENTS CRYPTOGRAPHY AND

4  PUBLIC KEY CRYPTOGRAPHY, SOME OF WHICH HAS BEEN SOLD ON

5  MICROCOMPUTERS.

6  Q.  YOU'VE HEARD OF A COMPUTER PROGRAM KNOWN AS PKZIP; IS

7  THAT RIGHT?

8  A.  YES.

9       THE COURT:  PKZIP?

10      MR. FLINN:  Q.  COULD YOU DESCRIBE FOR US VERY

11  BRIEFLY WHAT PKZIP IS?

12  A.  PKZIP IS A FILE COMPRESSION PROGRAM FOR MOSTLY

13  PERSONAL COMPUTERS.  IT TAKES A COLLECTION OF FILES AND IT

14  COMPRESSES THEM INTO A SMALLER SPACE AND PUTS THEM NEATLY

15  TOGETHER IN ONE FILE WHERE THEY CAN BE CONVENIENTLY MOVED

16  AROUND OR STORED OR BACKED UP.

17  Q.  WOULD YOU AGREE WITH ME THAT THIS IS THE SINGLE MOST

18  COMMON DATA COMPRESSION FILE COMPRESSION SOFTWARE IN USE

19  IN PERSONAL COMPUTERS TODAY?

20  A.  YES.

21  Q.  AND IT'S DISTRIBUTED AS SHAREWARE, OR FORMS OF IT ARE

22  DISTRIBUTED AS SHAREWARE?

23  A.  YES.

24  Q.  AND WHAT IS THAT, SHAREWARE?

25  A.  SHAREWARE IS A MEANS OF DISTRIBUTING SOFTWARE.  AND IT

1   WORKS BY DISTRIBUTING FREE SAMPLE VERSIONS, OR FULLY

2   FUNCTIONAL, WORKING VERSIONS IN A FREELY AVAILABLE MANNER.

3   AND THEN THE USER IS EXPECTED TO PAY FOR IT OR LICENSE IT

4   IN SOME OTHER WAY IF HE DECIDES HE LIKES IT, AFTER SOME

5   TRIAL USE.

6   Q.  AND THE USER IS ON AN HONOR SYSTEM, TO SEND THE MONEY

7   INTO THE DEVELOPER OF THE SHAREWARE, IN MOST CASES?

8   A.  WELL, THAT'S THE WAY IT WORKS OUT.  TECHNICALLY -- I

9   MEAN, IN PRACTICE, THAT'S THE WAY IT WORKS OUT.

10  TECHNICALLY, THE AUTHOR DOES HAVE A COPYRIGHT AND IS

11  LEGALLY IN A POSITION TO ENFORCE THE COPYRIGHT.

12  Q.  THAT'S FINE.

13         NOW, THE REASON I BRING THIS UP IS THAT PKZIP

14  HAS A ENCRYPTION UTILITY IN IT OR FEATURE IN IT; DOESN'T

15  IT, THE MORE RECENT VERSIONS OF IT?

16  A.  YES, IT DOES.

17  Q.  AND YOU WERE INVOLVED IN THE DEVELOPMENT OF THAT

18  UTILITY; ISN'T THAT RIGHT?

19  A.  YES, I WAS.

20  Q.  AND WOULD YOU AGREE WITH ME THAT THAT ENCRYPTION

21  UTILITY IS SOMETHING THAT IS USED WITH SOME FREQUENCY BY

22  USERS OF PKZIP?

23  A.  YES, I WOULD.

24  Q.  SINCE YOU INSERTED PKZIP -- IT'S STILL TODAY, PEOPLE

25  STILL USE THE ENCRYPTION UTILITY; DON'T THEY?

1    A.  YES, THEY DO.

2    Q.  BUT SINCE YOU DEVELOPED IT, PEOPLE, AS DR. KONHEIM

3    SAID, IN THE CRYPTO COMMUNITY, LOOKED FOR WEAKNESSES IN

4    YOUR UTILITY?

5    A.  YES, THEY DID.

6    Q.  AND SOME WERE FOUND?

7    A.  YES.

8    Q.  BUT PEOPLE STILL USE IT, EVEN THOUGH THERE WERE SOME

9    WEAKNESSES FOUND IN IT?

10    A.  PEOPLE USE PKZIP PRIMARILY FOR ITS COMPRESSION

11    FEATURES, NOT ITS ENCRYPTION FEATURES.

12    Q.  BUT PEOPLE STILL USE PKZIP ENCRYPTION; DON'T THEY,

13    NOTWITHSTANDING THE FACT THAT WEAKNESSES HAVE BEEN FOUND?

14    A.  THAT'S CORRECT.

15    Q.  AND FOR A LOT OF USES, YOU'D AGREE WITH ME THAT THE

16    PKZIP ENCRYPTION UTILITY THAT YOU DEVELOPED IS USEFUL?

17    A.  YES.

18    Q.  NOW, YOU HAVE ADDRESSED THE DEFINITION OF

19    "COMPUTATIONALLY INFEASIBLE" IN YOUR EXPERT TESTIMONY.

20    BUT I WANTED TO ASK YOU A LITTLE BIT ABOUT SOME OF THE

21    OTHER TERMS IN THE CLAIMS.

22         YOU WERE HERE YESTERDAY DURING DR. KONHEIM'S

23    TESTIMONY; IS THAT RIGHT?

24    A.  YES, I WAS.

25    Q.  AND YOU RECALL WHERE -- OTHER THAN THE TERMS "SECURE"

1   AND "COMPUTATIONALLY INFEASIBLE," YOU RECALL HIS TESTIMONY

2   ABOUT NOT BEING ABLE TO UNDERSTAND THE MEANING OF ALL THE

3   OTHER TERMS?  DO YOU RECALL THAT TESTIMONY?

4   A.  YES.

5   Q.  DO YOU AGREE WITH HIM?

6   A.  YOU'RE ASKING ME WHETHER OR NOT HE UNDERSTOOD THE

7   TERMS?

8   Q.  NO, NO.

9         DO YOU AGREE WITH HIM THAT ONE OF ORDINARY SKILL

10  IN THE ART WOULDN'T KNOW WHAT ANY OF THOSE OTHER WORDS

11  MEAN?

12        MR. HASLAM:  OBJECTION.  THAT MISCHARACTERIZES

13  THE WITNESS' TESTIMONY.

14        THE COURT:  PARDON ME?

15        MR. HASLAM:  THAT MISCHARACTERIZES

16  PROFESSOR KONHEIM'S TESTIMONY.  IT WAS THAT THEY HAD NO

17  WELL-UNDERSTOOD MEANING IN THE ART AND THAT HE NEEDED TO

18  GO TO THE SPECIFICATION TO DETERMINE HOW TO ACCOMPLISH

19  THAT.  HE DIDN'T SAY HE DID NOT UNDERSTAND ANY OF THE

20  PARTICULAR WORDS IN THE CLAIM.  AS A MATTER OF FACT, I

21  BELIEVE HE WAS ASKED THAT QUESTION YESTERDAY.

22        THE COURT:  ALSO, I THINK YOU SHOULD SPECIFY

23  THOSE TERMS INDIVIDUALLY.

24        MR. FLINN:  WELL, IT MAY BE -- I'M TRYING TO

25  SIMPLIFY THIS.

1    Q.   BUT YOU RECALL DR. KONHEIM'S TESTIMONY ABOUT THE LACK

2    OF A WELL-UNDERSTOOD MEANING ABOUT TERMS SUCH AS

3    "PROCESS," "COMMUNICATE," "GENERATE," "TRANSFORM,"

4    "ENCIPHER," ET CETERA?   DO YOU RECALL THAT TESTIMONY?

5    A.   YES.

6    Q.   DO YOU AGREE WITH THAT TESTIMONY, THAT THERE IS NO

7    WELL-UNDERSTOOD MEANING OF THOSE TERMS IN THE ART?

8    A.   WELL, HE HAD HIS OWN QUALIFICATIONS, THAT HE'S BETTER

9    ABLE TO MAKE THAN I AM.   I'D RATHER YOU JUST ASK ME -- IF

10   YOU'RE ASKING ME SIMPLY WHETHER OR NOT THOSE TERMS HAVE A

11   WELL-UNDERSTOOD MEANING IN THE ART, I WOULD SAY YES.

12   Q.   DID YOU EVER GET A COPY OF DR. KONHEIM'S SLIDES THAT

13   HE GAVE FROM HIS TUTORIAL?

14   A.   YES, I RECEIVED A COPY AT THE BEGINNING OF HIS

15   PRESENTATION.

16   Q.   DO YOU HAVE A COPY WITH YOU NOW?

17   A.   I BELIEVE IT'S ON MY TABLE OVER THERE JUST NEXT TO THE

18   LAPTOP.

19   Q.   DO YOU MIND IF MR. KRAMER GETS THAT FOR YOU?

20   A.   NO, NOT AT ALL.

21        YES, I BELIEVE THAT'S IT.

22   Q.   AND I WAS WONDERING IF THE COURT HAD ITS COPY.

23        THE COURT:   I DO.   I DO.

24        YES, I DO.   OKAY.   I HAVE IT.   OKAY.

25        MR. FLINN:   Q.   DO YOU RECALL, GENERALLY, THE

1    ORDER OF DR. KONHEIM'S PRESENTATION?

2    A.   YES.

3    Q.   MORE SPECIFICALLY, HE TALKED ABOUT ENCRYPTION

4    GENERALLY, AND THEN HE GOT INTO PUBLIC KEY CRYPTOGRAPHY,

5    AND THEN HE BEGAN TO TALK ABOUT KNAPSACKS AND THE RSA

6    METHOD AFTER THAT.   DO YOU RECALL THAT?

7    A.   YES.   AND I'M LOOKING AT HIS OUTLINE IN FRONT OF ME.

8    Q.   OKAY.   AND IF YOU LOOK, THE DISCUSSION OF PUBLIC KEY

9    BEGINS AT TAB THREE, AND THE DESCRIPTION OF KNAPSACK IS

10   TAB FOUR, AND THEN RSA IS TAB SIX?

11   A.   YES.

12   Q.   AND YOU RECALL THAT HE DISCUSSED PUBLIC KEY GENERALLY

13   IN HIS DISCUSSION OF TAB THREE AND THE SLIDES THERE

14   WITHOUT DISCUSSING ANY PARTICULAR IMPLEMENTATION.   DO YOU

15   RECALL THAT?

16   A.   YES.

17   Q.   AND YOU RECALL IN HIS DISCUSSION, HE USED TERMS LIKE

18   "PUBLIC KEY," "PRIVATE KEY," "MESSAGE," "ENCRYPT,"

19   "DECRYPT," IN HIS GENERAL DISCUSSION ABOUT PUBLIC KEY

20   CRYPTOGRAPHY?

21   A.   YES.

22   Q.   AND WHEN HE USED THOSE WORDS IN HIS GENERAL

23   DESCRIPTION ABOUT PUBLIC KEY CRYPTOGRAPHY, DID YOU

24   UNDERSTAND WHAT HE MEANT?

25   A.   I SHOULD SAY THAT WHILE HE WAS GIVING HIS

1    PRESENTATION, I WAS BUSY PREPARING MY SLIDES FOR MY

2    SUBSEQUENT PRESENTATION.  AND I DIDN'T PAY ATTENTION TO

3    EVERY WORD HE SAID.

4          BUT I THINK I CAN ANSWER, YES, THAT WHAT I PAID

5    ATTENTION TO, I UNDERSTOOD.

6    Q.  YOU MENTIONED -- AND WE'RE GOING TO TALK NOW ABOUT

7    YOUR DEFINITION OF -- OR THE DEFINITION YOU BELIEVE IS THE

8    APPROPRIATE ONE FOR "COMPUTATIONALLY INFEASIBLE," BUT LET

9    ME ASK A FUNDAMENTAL QUESTION OR A FOUNDATION QUESTION.

10   YOU MENTIONED SOMETHING CALLED COMPLEXITY THEORY?

11   A.  YES.

12   Q.  DO YOU KNOW SOMEONE NAMED DONALD KNUTH, KNOW OF

13   SOMEONE NAMED DONALD KNUTH?

14   A.  I'VE NEVER MET HIM.  I KNOW OF HIM.

15   Q.  IS HE INVOLVED IN COMPLEXITY THEORY, AS IT INVOLVES

16   COMPUTERS?

17   A.  YES.

18   Q.  IN WHAT WAY IS HE INVOLVED?

19   A.  WELL, HE'S A STANFORD PROFESSOR, OR AN EMERITUS

20   PROFESSOR.  HE WROTE THAT BOOK THAT'S RIGHT IN FRONT OF

21   YOU.  AND HE WROTE -- HE'S WRITTEN A -- MANY PAPERS IN

22   COMPUTER SCIENCE.  AND I WOULD CONSIDER HIM AN AUTHORITY

23   IN COMPUTER SCIENCE.

24   Q.  WOULD YOU CONSIDER HIM AN AUTHORITY IN COMPLEXITY

25   THEORY, AS IT APPLIES TO COMPUTER SCIENCE?

1    A.  YES.

2    Q.  WOULD YOU CONSIDER HIM A PRE-EMINENT AUTHORITY IN THAT

3    AREA?

4    A.  I WOULD CERTAINLY CONSIDER HIM AN AUTHORITY.

5    Q.  NOT A PRE-EMINENT ONE?

6    A.  WELL, WHAT DO YOU MEAN BY "PRE-EMINENT"?

7            THE COURT:  HOW MANY LEVELS ABOVE HIM ARE THERE?

8            MR. FLINN:  Q.  AMONG THE TOP TEN IN HIS FIELD

9    IN THE LAST 20 YEARS.

10   A.  I'M NOT SURE I WOULD SAY THAT.

11           HE SPENT MUCH OF HIS TIME IN THE LAST 20 YEARS

12   DEVOTED TO THE DEVELOPMENT OF PRACTICAL SYSTEMS THAT ARE

13   PROBABLY NOT OF GREAT THEORETICAL IMPORTANCE IN COMPLEXITY

14   THEORY.

15   Q.  AS OF 1977, WOULD YOU PUT HIM IN THAT CLASS?

16   A.  IN THE CLASS OF TOP TEN?

17           AGAIN, I DON'T KNOW.  HE'S CERTAINLY A VERY

18   AUTHORITATIVE PERSON AND DONE A LOT OF VERY IMPORTANT

19   WORK.  I MEAN, THE MOST EXCITING WORK IN THE '70S IN

20   COMPLEXITY THEORY WAS DONE IN CONNECTION WITH THE N-P

21   PROBLEM, WHERE THE BIGGEST CONTRIBUTIONS WERE DONE BY

22   OTHERS.

23           I'M NOT PREPARED TO SAY THAT HE WOULD BE IN THE

24   TOP TEN.

25   Q.  THAT'S FINE.

1    A.   AGAIN, ALSO, I MEAN, IT DEPENDS ON HOW YOU RANK

2    PEOPLE.   I MEAN, ARE YOU RANKING PEOPLE BASED ON THE

3    SIGNIFICANCE OF THEIR RESEARCH CONTRIBUTIONS, OR ARE YOU

4    RANKING PEOPLE BASED ON, YOU KNOW, THE OVERALL QUALITY OF

5    THEIR SCHOLARLY WORK?   ARE YOU RANKING -- I JUST CAN'T

6    ANSWER THAT QUESTION.

7    Q.   THAT'S FINE.   I'M NOT GOING TO PRESS THE ISSUE ANY

8    LONGER, DR. SCHLAFLY.

9         I WANT TO NOW TRY TO UNDERSTAND A LITTLE BIT

10   ABOUT YOUR DEFINITION OF "COMPUTATIONALLY INFEASIBLE" AND

11   SEE IF I CANNOT BE -- HAVING NEVER TAKEN A COURSE IN

12   COMPLEXITY THEORY OR ANYTHING LIKE THAT, I JUST WANT TO

13   TRY TO UNDERSTAND IT.

14        AND WHAT I'D LIKE TO DO, IF I COULD, IS PUT UP

15   THAT EXCERPT FROM THE PATENT THAT YOU READ FROM, THAT

16   DEFINITION OF "COMPUTATIONALLY INFEASIBLE," IF I COULD

17   HAVE JUST A MOMENT TO DO THAT.   I THINK IT'S HERE.

18        AND WHAT I WOULD LIKE TO DO IS PUT IT UP OVER

19   HERE SO THERE IS MORE OF A CHANCE ALL OF US IN THE

20   COURTROOM CAN SEE IT.   BUT DR. SCHLAFLY, IF YOU CAN'T SEE

21   IT, WE HAVE THE SAME DOCUMENT HERE.

22        WE'RE NOT GOING TO HAVE ONE FOR THE COURT, THAT

23   IS, THE SAME DOCUMENT.

24        CAN YOU READ THAT FROM THERE WHERE YOU SIT,

25   DR. SCHLAFLY?

1    A.   YES, YES.  I HAVE IT IN THE PATENT IN FRONT OF ME

2    ANYWAY.

3    Q.   AND WHAT I WANT TO FOCUS --

4    A.   BUT BEFORE YOU ASK, YOU KEEP REFERRING TO MY

5    DEFINITION.  I BELIEVE I'M JUST INTERPRETING -- TRYING TO

6    INTERPRET THE DEFINITION WHICH IS IN THE PATENT.

7    Q.   I UNDERSTAND THAT.  AND WHEN I REFER TO YOUR

8    DEFINITION, WHAT I MEAN IS THE DEFINITION THAT IS YOUR

9    OPINION AS THE CORRECT DEFINITION.

10   A.   YES.

11   Q.   THAT'S ALL.

12         AND YOU HAVE FOCUSED ON THE LAST CLAUSE,

13   "EXISTING COMPUTATIONAL METHODS AND EQUIPMENT"; IS THAT

14   RIGHT?

15   A.   I JUST TESTIFIED ABOUT THAT PHRASE, YES.

16   Q.   OKAY.  NOW, "EQUIPMENT" YOU HAVE REFERRED TO AS

17   HARDWARE; RIGHT?

18   A.   YES.

19   Q.   AND SO, IF I UNDERSTAND, JUST LOOKING AT THAT

20   DEFINITION CORRECTLY, SOMETHING MIGHT MEET THE DEFINITION

21   OF "COMPUTATIONALLY INFEASIBLE" IF, GIVEN EXISTING

22   HARDWARE, IT WOULD BE IMPOSSIBLY LONG TO COMPUTE IT;

23   RIGHT?

24   A.   YES.

25   Q.   OKAY.  AND THE INVENTORS WERE AWARE THAT COMPUTERS

1  MIGHT GET VERY, VERY FAST IN THE FUTURE; RIGHT?

2  A.  I'M SURE THE INVENTORS WERE AWARE OF THAT.

3  Q.  AND YOU UNDERSTAND THAT'S WHY THEY LIMITED THE

4  DEFINITION TO "EXISTING COMPUTATIONAL EQUIPMENT"; IS THAT

5  RIGHT?

6  A.  WELL, YOU'RE ASKING ME ABOUT THE INVENTOR'S INTENT.

7  HE'S SITTING RIGHT OVER THERE.  YOU COULD ASK HIM.

8  Q.  WELL, YOU'VE OPINED, SIR, AS TO THE INVENTOR'S INTENT,

9  AND I'M TRYING TO EXPLORE THAT A LITTLE BIT.

10        YOU'D AGREE WITH ME THAT THE INVENTORS, IN

11  LIMITING IT, AT LEAST WITH RESPECT TO EXISTING

12  COMPUTATIONAL EQUIPMENT, IS:  THEY RECOGNIZED THE

13  POSSIBILITY THAT FASTER COMPUTERS MIGHT BE INVENTED IN THE

14  FUTURE, AND THEY WEREN'T GOING TO MAKE ANY REPRESENTATION

15  THAT ANY SYSTEM WOULD BE INFEASIBLE FOR ALL COMPUTERS, NO

16  MATTER WHAT ADVANCES IN SPEED MAY HAPPEN IN THE FUTURE;

17  ISN'T THAT FAIR?

18  A.  YES.  AND THEY PRESUMABLY WANTED TO ADD SOME

19  SPECIFICITY TO THEIR EXAMPLE.

20  Q.  OKAY.  AND ON COMPUTATIONAL METHODS, YOU SAID THAT

21  THERE WERE TWO ALTERNATIVES.  ONE MEANT EXISTING

22  ALGORITHMS, AND THE OTHER, EXISTING LOW-LEVEL COMPUTER

23  OPERATIONS, HOW THE ONES AND ZEROS ARE PASSED BACK AND

24  FORTH INSIDE THE HARDWARE; IS THAT RIGHT?

25  A.  AND THE WAY THE MEMORY AND THE REGISTERS AND THE

1    PROCESSOR WORKS, YES.

2    Q.  WOULD IT BE FAIR TO SAY, TO SORT OF RESTATE THE

3    DEFINITION YOU ARE PROPOSING, AS HAVING THREE ELEMENTS:

4    TO BE COMPUTATIONALLY INFEASIBLE, IT'S GOT TO BE

5    IMPOSSIBLY LARGE USING EXISTING EQUIPMENT, USING EXISTING

6    ALGORITHMS, OR USING AS YET UNDEVELOPED ALGORITHMS.  IS

7    THAT ANOTHER FAIR WAY OF RESTATING YOUR DEFINITION?

8    A.  AS THOSE BEING -- I'M NOT SURE WHAT YOU MEAN.  DO YOU

9    MEAN THREE ALTERNATIVES TO BE THERE?

10   Q.  NO, NO.  THERE ARE THREE REQUIREMENTS FOR THE

11   DEFINITION OF COMPUTATIONALLY INFEASIBLE THAT YOU ARE

12   PROPOSING.  THE SYSTEM MUST BE COMPUTATIONALLY INFEASIBLE

13   USING EXISTING COMPUTERS, AS OF 1977; IT MUST BE

14   COMPUTATIONALLY INFEASIBLE USING EXISTING COMPUTERS USING

15   KNOWN ALGORITHMS IN 1977; BUT IT ALSO MUST BE

16   COMPUTATIONALLY INFEASIBLE USING EXISTING COMPUTERS

17   RUNNING AS YET UNKNOWN ALGORITHMS?

18   A.  OH, YEAH, YEAH.

19   Q.  AND THE ALTERNATIVE DEFINITION, IF THE WORD "EXISTING

20   COMPUTATIONAL METHODS" MEANS EXISTING ALGORITHMS, THEN

21   THERE WERE ONLY TWO ELEMENTS THAT A SYSTEM MUST MEET IN

22   ORDER TO FULFILL THE DEFINITION OF "COMPUTATIONALLY

23   INFEASIBLE."  THE SYSTEM MUST SIMPLY BE INFEASIBLE USING

24   1977-ERA EQUIPMENT AND 1977-ERA ALGORITHMS; IS THAT RIGHT?

25   A.  WELL, I'M NOT SURE, BECAUSE, FOR ONE THING, THAT

1    LATTER PHRASE, ABOUT EXISTING COMPUTATIONAL METHODS AND

2    EQUIPMENT, OCCURS IN AN EXAMPLE AFTER THE DEFINITION.  AND

3    HOW THAT LIMITS THE DEFINITION IS A MATTER OF SOME DEBATE.

4              SO THAT EVEN IF I AGREED -- EVEN IF I AGREED

5    WITH YOU -- WELL, EVEN STATING THE POSITION, I GUESS --

6    EVEN IF WE CAME TO AN OPINION AS TO WHAT IS MEANT BY

7    "COMPUTATIONAL METHODS," WE WOULD STILL HAVE TO DISCUSS

8    HOW THAT EXAMPLE LIMITS THE DEFINITION.

9    Q.  ALL RIGHT.  LET ME ASK YOU TO ASSUME IT IS A

10   HYPOTHETICAL QUESTION, BECAUSE WHAT MY REAL PURPOSE IS IS

11   TO ILLUSTRATE THE DIFFERENCES BETWEEN THE DEFINITION YOU

12   ARE PROFFERING AND AN ALTERNATIVE DEFINITION.

13             LET ME ASK YOU TO ASSUME, FOR PURPOSES OF

14   ARGUMENT ONLY, A DEFINITION OF "COMPUTATIONALLY

15   INFEASIBLE" WHICH ONLY HAS TO MEET THOSE TWO REQUIREMENTS:

16   1977-ERA EQUIPMENT, AND 1977-ERA ALGORITHMS.

17             DOES THAT MAKE SENSE TO YOU, SIR?  IS THAT

18   SOMETHING YOU CAN UNDERSTAND AS AN ASSUMPTION FOR FURTHER

19   QUESTIONS?

20   A.  IT'S VERY DIFFICULT TO SAY WHAT A 1977-ERA ALGORITHM

21   IS.

22             ALGORITHMS GET DEVELOPED, AND USING -- I MEAN,

23   IT'S EASY TO SAY WHAT A 1977 COMPUTER IS BECAUSE YOU CAN

24   GO PULL IT OFF THE SHELF IN A STORE.  WHAT A 1977

25   ALGORITHM IS IS MUCH HARDER, BECAUSE IT'S JUST NOT SO

1   EASILY DEFINED.

2   Q.  I UNDERSTAND THAT.  BUT LET'S USE THE EXAMPLE THAT YOU

3   PROFFERED IN YOUR TESTIMONY, THE TRAP DOOR KNAPSACK.

4           YOU'D AGREE WITH ME THAT THE ALGORITHM FOR

5   BREAKING THE SIMPLEST OF THE KNAPSACKS TAUGHT IN THE

6   PATENT WAS NOT PUBLISHED UNTIL 1982?

7   A.  YES, THAT'S CORRECT.  I MEAN, IT'S HARD TO SAY EXACTLY

8   HOW MUCH OF THAT ALGORITHM WAS BRAND NEW AND HOW MUCH OF

9   IT USED PREVIOUS TECHNIQUES.

10  Q.  LET'S, JUST SO THAT WE CAN ILLUSTRATE THE DIFFERENCE,

11  ASSUME THAT A KNOWN ALGORITHM IS ONE THAT ACTUALLY

12  EFFECTIVELY BREAKS THE SYSTEM OR SOME EMBODIMENT OF IT AND

13  IS PUBLISHED, SO THAT PEOPLE KNOW ABOUT IT.  CAN WE NOW

14  WORK WITH THAT ALTERNATIVE DEFINITION FOR SOME FURTHER

15  QUESTIONS?

16  A.  TO BE A KNOWN ALGORITHM TO BE PUBLISHED?

17  Q.  YES.

18  A.  WELL, I MEAN, I GUESS I CAN USE THAT AS A WORKING

19  DEFINITION FOR SOME PURPOSES.

20          HOWEVER, I THINK THERE ARE A LOT OF AMBIGUITIES

21  THERE.  I MEAN, LIKE, FOR EXAMPLE, IF YOU ASKED ME WHEN

22  WAS THE FAST FOURIER TRANSFORM PUBLISHED, I WOULD SAY,

23  WELL, THE FIRST PAPER THAT EXPLICITLY SET THAT OUT IN

24  DETAIL WOULD HAVE BEEN ABOUT 1965.

25          ON THE OTHER HAND, THERE ARE PAPERS, YOU KNOW,

1   50 YEARS EARLIER THAT HAVE ALMOST THE EXACT SAME FORMULAS

2   THAT, YOU KNOW, THAT -- AND HAVE ALMOST THE EXACT SAME

3   IDEAS.   THEY JUST DIDN'T LAY IT OUT IN THAT MANNER AND

4   CALL IT THAT.

5   Q.  I PROMISE YOU, SIR, THAT I WON'T EVEN ASK YOU ABOUT

6   THAT, BECAUSE I DON'T THINK I CAN PRONOUNCE IT.  I'VE GOT

7   SOME OTHER QUESTIONS FOR YOU.

8        YOU WOULD AGREE WITH ME, WOULD YOU NOT, THAT THE

9   INVENTORS DID NOT CLAIM THAT THE TRAP DOOR KNAPSACK WAS

10  INVULNERABLE TO UNKNOWN ALGORITHMS IN 1977?

11  A.  NO, I DON'T THINK I WOULD.

12  Q.  AND WHY NOT?

13  A.  I THINK THE INVENTORS BELIEVED THAT THE KNAPSACK

14  PROBLEM WAS SOMETHING THAT IS COMPUTATIONALLY DIFFICULT,

15  IN THE SENSE THAT THERE ARE NO ALGORITHMS FOR BREAKING IT,

16  KNOWN OR UNKNOWN.

17  Q.  WHERE DID THEY SAY THERE ARE NO ALGORITHMS FOR

18  BREAKING IT, KNOWN OR UNKNOWN?

19  A.  WELL, THOSE ARE MY WORDS.  BUT LET ME -- LET ME LOOK

20  AT THE DOCUMENTS FOR A MOMENT.

21        OKAY.  IF YOU TURN TO EXHIBIT 13 --

22  Q.  ARE YOU REFERRING TO THE PATENT?

23  A.  YES, THE HELLMAN-MERKLE PATENT.

24  Q.  YES.

25  A.  AND COLUMN TWO, THE SENTENCE STARTING AT LINE 43, IT

1   SAYS:

2              "THE ILLUSTRATED EMBODIMENT DIFFERS FROM

3              PRIOR APPROACHES TO A PUBLIC KEY CRYPTOSYSTEM,

4              AS DESCRIBED IN MULTIUSER CRYPTOGRAPHIC

5              TECHNIQUES, IN THAT IT'S BOTH PRACTICAL TO

6              IMPLEMENT AND IS DEMONSTRABLY INFEASIBLE TO

7              EMBARK USING KNOWN METHODS."

8   Q.  NOW, IF "KNOWN METHODS" MEANS ALGORITHMS, AREN'T THEY

9   SAYING THAT IT'S INFEASIBLE ONLY WITH RESPECT TO KNOWN

10  ALGORITHMS, AND THEY ARE NOT MAKING ANY PROMISES ABOUT

11  UNKNOWN ALGORITHMS?

12  A.  I CAN SEE WHERE YOU WOULD INTERPRET THAT WAY.  BUT IF

13  YOU DID, I DON'T KNOW WHAT THEY WOULD MEAN BY

14  "DEMONSTRABLY INFEASIBLE."

15  Q.  IF THE FASTEST KNOWN ALGORITHM TAKES TEN TO THE 30TH

16  OPERATIONS, ISN'T THAT DEMONSTRABLY INFEASIBLE, SIR?

17  A.  WELL, WHAT IS BEING DEMONSTRATED, THOUGH?

18              THE COURT:  WHICH COLUMN ARE WE ON NOW?

19              MR. FLINN:  IT'S COLUMN TWO, YOUR HONOR, LINE

20  43, IN WHICH --

21              THE COURT:  I HAVE IT.  I HAVE IT.

22              "PUBLICLY KNOWN TRANSMISSION OF THE MESSAGE SENT

23  BY..."

24              MR. FLINN:  YES.  OH.  IT'S 43:  THE ILLUSTRATED

25  EMBODIMENT DIFFERS FROM PRIOR APPROACHES TO A PUBLIC KEY

1  CRYPTOSYSTEM IN THAT IT, MEANING THE SYSTEM HERE, IS

2  PRACTICAL TO IMPLEMENT AND DEMONSTRABLY INFEASIBLE USING

3  KNOWN METHODS.

4  Q.  YOU RECALL THE TESTIMONY YESTERDAY ABOUT THE PROOF OF

5  IMPOSSIBILITY AND THE ONE-TIME PAD BEING THE ONLY

6  CRYPTOSYSTEM THAT COULD BE PROVEN TO BE IMPOSSIBLE TO

7  BREAK?  DO YOU RECALL THAT TESTIMONY?

8  A.  YES.

9  Q.  DO YOU AGREE WITH IT?

10        MR. FRAM:  OBJECTION, YOUR HONOR, VAGUE.  I,

11  FRANKLY, DON'T KNOW WHAT TESTIMONY MR. FLINN'S REFERRING

12  TO.

13        MR. FLINN:  I'LL WITHDRAW THE QUESTION AND BE

14  MORE PRECISE.

15  Q.  DO YOU AGREE WITH THE PROPOSITION THAT THE ONLY PROVEN

16  CRYPTOSYSTEM TO BE IMPOSSIBLE TO BREAK IS THE ONE-TIME PAD

17  SYSTEM?

18  A.  THE TESTIMONY YESTERDAY MAY HAVE SAID IT A LITTLE MORE

19  ACCURATELY.

20        THE ONLY -- THE ONLY KNOWN SYSTEM WHICH IS --

21  OFFERS SOME UNCONDITIONAL SECURITY AND PROOF OF

22  UNBREAKABILITY IS THE ONE-TIME PAD AND VARIANCE OF IT.  I

23  THINK THERE PROBABLY ARE SOME OTHER CRYPTOSYSTEMS THAT MAY

24  BE PROVEN UNBREAKABLE UNDER VARIOUS OTHER ASSUMPTIONS.

25  Q.  YOU'D AGREE WITH ME THAT NO ONE, IN 1977, HAD PROVED

1   OR EVEN PURPORTED TO PROVE THAT TRAP DOOR KNAPSACKS WERE

2   IMPOSSIBLE TO BREAK?

3   A.  IN 1977?  I WOULD AGREE WITH THAT.  BUT IN THE CONTEXT

4   OF THE SPECIFICATION, I WOULD SAY "PROVE" AND

5   "DEMONSTRATE" MEAN SLIGHTLY DIFFERENT THINGS.

6        I MEAN, IF THE INVENTORS HAD USED THE WORD

7   "PROVE" HERE, I WOULD TAKE THAT TO BE PROVED IN A

8   MATHEMATICAL SENSE.  IF THEY SAID "DEMONSTRATE," I WOULD

9   INTERPRET THAT AS SOME WEAKER, SCIENTIFIC SENSE.

10  Q.  WOULD YOU RETURN TO COLUMN FIVE AGAIN, THE PARAGRAPH

11  BEGINNING AT LINE 15?  YES.

12       DO YOU SEE THE PHRASE THERE, BEGINNING "THEORY

13  SUGGESTS THE DIFFICULTY OF THE KNAPSACK PROBLEM"?  DO YOU

14  SEE THAT?

15  A.  YES.

16  Q.  THAT'S PRETTY DIFFERENT LANGUAGE THAN "THEORY PROVES."

17  ONCE YOU'VE PROVEN IT, IT'S NO LONGER A THEORY; IS IT?

18  A.  THAT'S CORRECT.  THAT'S CORRECT.  BUT --

19  Q.  I'VE GOT ANOTHER QUESTION FOR YOU, ABOUT WHY IT IS NEW

20  ALGORITHMS CAN BREAK CODES THAT COULDN'T BE BROKEN BEFORE.

21       WOULD YOU AGREE WITH ME THAT NEW ALGORITHMS CAN

22  BREAK CODES THAT COULDN'T BE BROKEN BEFORE BECAUSE THE

23  ALGORITHMS REDUCE THE NUMBER OF OPERATIONS IT TAKES OR CAN

24  REDUCE THE NUMBER OF OPERATIONS IT TAKES IN ORDER TO GUESS

25  OR BREAK THE CODE?

1   A.   I WOULDN'T AGREE THAT NEW ALGORITHMS CAN BREAK CODES

2   THAT COULDN'T BE BROKEN BEFORE.

3   Q.   THAT'S NOT MY QUESTION.

4        THE REASON WHY A NEW ALGORITHM CAN BREAK A

5   PREVIOUSLY UNBREAKABLE CODE IS BECAUSE THE ALGORITHM CAN

6   REDUCE THE NUMBER OF OPERATIONS IT TAKES IN ORDER TO LEARN

7   THE CODE?

8   A.   I DON'T AGREE WITH YOUR PREMISE.

9   Q.   DID THE ALGORITHM PUBLISHED BY DR. SHAMIR IN 1982,

10  THAT BROKE THE SIMPLE VERSION OF KNAPSACKS, REDUCE THE

11  NUMBER OF OPERATIONS THAT IT TOOK BEYOND WHAT HAD BEEN

12  KNOWN BEFORE?

13  A.   YES.

14  Q.   NOW, LET'S LOOK BACK UP HERE AT THE TOP OF COLUMN

15  FIVE, THE LANGUAGE WE'VE BLOWN UP.  AND YOU'LL SEE THAT WE

16  BEGIN OUR BLOWUP WITH THE WORDS "TO THE KNAPSACK PROBLEM"

17  IN BRACKETS.  THAT'S ACTUALLY, OF COURSE, NOT IN THE

18  ACTUAL TEXT.

19        BUT YOU'D AGREE WITH ME THAT THE SOLUTION THAT

20  THEY'RE TALKING ABOUT IS A SOLUTION TO THE KNAPSACK

21  PROBLEM?

22  A.   I'M SORRY.  I DON'T SEE THE BRACKETS.

23  Q.   DO YOU SEE THE FIRST LINE, "A SUPPOSED SOLUTION"?

24  A.   OH, YES, YES.

25  Q.   DO YOU SEE THE WORDS IN BRACKETS, "TO THE KNAPSACK

1    PROBLEM"?

2    A.  YES.

3    Q.  AND IF YOU LOOK IN THE ACTUAL TEXT OF THE PATENT,

4    THOSE WORDS DON'T APPEAR THERE.  BUT TO PUT THEM IN

5    CONTEXT, WOULD YOU AGREE WITH ME THAT IT'S FAIR TO SAY

6    THAT WHAT THEY'RE TALKING ABOUT IS A SOLUTION TO THE

7    KNAPSACK PROBLEM?

8    A.  YES.

9    Q.  OKAY.

10   A.  BUT -- ACTUALLY, LET ME -- I'M NOT SURE IF IT'S

11   REFERRING TO THE KNAPSACK OR THE TRAP DOOR KNAPSACK.  LET

12   ME CHECK.

13          YES, I'D SAY IT REFERS TO THE KNAPSACK PROBLEM.

14   Q.  OKAY.  THE NEXT CLAUSE REFERS TO CHECKED IN AT MOST N

15   ADDITIONS.  IS THAT THE NUMBER OF OPERATIONS WE'RE

16   REFERRING TO?  "N" IS THE NUMBER OF OPERATIONS?

17   A.  "N" IS DEFINED AS THE NUMBER OF LENGTHS IN THE

18   KNAPSACK.  IT THEN OCCURS IN THAT SENTENCE AS THE NUMBER

19   OF OPERATIONS, YES.

20   Q.  AND THEN THE NEXT CAUSE SAYS:  "BUT TO THE BEST OF

21   CURRENT KNOWLEDGE."

22          YOU'D AGREE WITH ME THAT THAT WOULD INCLUDE

23   CURRENTLY KNOWN ALGORITHMS?

24   A.  BUT CURRENTLY KNOWN ALGORITHMS AS APPLIED TO THIS

25   PROBLEM, YES.

1   Q.   AND THE NEXT SENTENCE SAYS:   "EXHAUSTIVE TRIAL AND

2   ERROR SEARCH OVER ALL TWO TO THE N POSSIBLE X'S IS

3   COMPUTATIONALLY INFEASIBLE IF N IS LARGER THAN ONE OR

4   200."

5            DO YOU SEE THAT, SIR?

6   A.   YES.

7   Q.   NOW, IN THAT SENTENCE, THE USE OF THE WORD

8   "COMPUTATIONALLY INFEASIBLE" IN THAT SENTENCE IS NOT TRUE,

9   IF ONE APPLIES YOUR DEFINITION TO THIS SENTENCE; ISN'T

10  THAT RIGHT?

11  A.   NO, I DON'T THINK IT IS RIGHT.

12  Q.   YOU'D AGREE WITH ME THAT NO ONE HAS PROVED THAT THERE

13  IS NO ALGORITHM THAT CAN BREAK KNAPSACKS IN FEWER THAN TWO

14  TO THE N OPERATIONS?

15  A.   THAT'S NOT WHAT IT SAYS.

16  Q.   LET ME REPHRASE THE QUESTION.

17           YOU WOULD AGREE WITH ME THAT IT IS THEORETICALLY

18  POSSIBLE THAT TOMORROW, OR NEXT MONTH OR NEXT YEAR, SOME

19  BRIGHT MATHEMATICIAN IS GOING TO INVENT A WAY TO SOLVE THE

20  KNAPSACK PROBLEM FASTER THAN WAS KNOWN IN 1977?

21  A.   YES.

22  Q.   OKAY.  BUT THAT THERE MIGHT BE SOME UNKNOWN ALGORITHM

23  THAT COULD BREAK THE KNAPSACK; ISN'T THAT RIGHT?

24  A.   YES.

25  Q.   BUT YOUR DEFINITION OF "COMPUTATIONALLY INFEASIBLE"

1  REQUIRES, TO BE COMPUTATIONALLY INFEASIBLE, WE MUST BE

2  PROTECTED AGAINST 1977-ERA EQUIPMENT, BUT KNOWN AND

3  UNKNOWN ALGORITHMS; RIGHT?

4  A.  YES.

5  Q.  SO, THE KNAPSACK PROBLEM DOES NOT MEET YOUR DEFINITION

6  OF "COMPUTATIONALLY INFEASIBLE"; DOES IT?

7  A.  THE TRAP DOOR KNAPSACK?

8  Q.  THAT'S RIGHT.  NO, EXCUSE ME.  THE KNAPSACK PROBLEM

9  DOES NOT MEET YOUR DEFINITION OF "COMPUTATIONALLY

10  INFEASIBLE"?

11  A.  NO, I DON'T AGREE WITH THAT.

12  Q.  YOU JUST TOLD US THAT IN ORDER TO MEET THE DEFINITION,

13  IT HAS TO BE SECURE AGAINST UNKNOWN ALGORITHMS, AND YOU

14  TOLD US THAT SOMEBODY MIGHT INVENT AN ALGORITHM TO BREAK

15  KNAPSACKS.

16       HOW CAN IT MEET YOUR DEFINITION OF

17  "COMPUTATIONALLY INFEASIBLE" IF SOME UNKNOWN ALGORITHM

18  COULD BREAK IT AT SOME LATER TIME?

19  A.  WELL, I THINK IT'S ALSO POSSIBLE THAT NO ALGORITHM --

20  WELL, FIRST OF ALL, LET'S DISTINGUISH THE KNAPSACK AND THE

21  TRAP DOOR KNAPSACK.

22       BY THE KNAPSACK, I REFER TO THE PROBLEM -- I

23  REFER TO WHAT'S DEFINED AS THE KNAPSACK PROBLEM IN THE

24  PREVIOUS PARAGRAPH IN THE SPECIFICATION, AS BEING THE

25  GENERAL PROBLEM OF PUTTING BOXES IN A KNAPSACK, OR HOWEVER

1    YOU WANT TO DEFINE IT, AND THE TRAP DOOR KNAPSACK BEING

2    THE CRYPTOSYSTEMS THAT'S DISCLOSED IN THE HELLMAN-MERKLE

3    SPECIFICATION.

4         SO NOW IS YOUR QUESTION ABOUT THE KNAPSACK

5    PROBLEM OR ABOUT THE TRAP DOOR KNAPSACK PROBLEM?

6    Q.  MY QUESTION IS ABOUT THE KNAPSACK PROBLEM, AND IT IS

7    THIS:  YOU PREVIOUSLY TESTIFIED THAT THERE MAY BE AS YET

8    UNKNOWN ALGORITHMS THAT COULD BREAK THE KNAPSACK PROBLEM.

9    AND YOU TOLD US THAT PROTECTION AGAINST THAT IS ONE OF THE

10   ELEMENTS OF COMPUTATIONALLY INFEASIBLE.

11        SO DOESN'T IT NECESSARILY FOLLOW THAT THE

12   KNAPSACK PROBLEM DOES NOT MEET YOUR DEFINITION OF

13   "COMPUTATIONALLY INFEASIBLE"?

14   A.  I'D SAY IT'S AN UNKNOWN PROBLEM IN COMPUTER SCIENCE,

15   WHETHER OR NOT THE KNAPSACK PROBLEM IS COMPUTATIONALLY

16   INFEASIBLE.

17   Q.  WAS IT AN UNKNOWN PROBLEM IN 1977, WHETHER THE TRAP

18   DOOR KNAPSACK PROBLEM WAS COMPUTATIONALLY INFEASIBLE?

19   A.  IT WAS -- YES, THAT'S CORRECT; IT WAS NOT KNOWN TO THE

20   INVENTORS AND TO LEADING EXPERTS, AS FAR AS ANYBODY HERE

21   KNOWS, WHETHER OR NOT THE TRAP DOOR KNAPSACK WAS

22   COMPUTATIONALLY INFEASIBLE IN 1977.

23   Q.  IN YOUR OPINION, IN 1977 -- STRIKE THAT.

24        YOU'VE GOT YOUR OWN PATENTS; DON'T YOU?

25   A.  YES.

1  Q.  AND YOU'RE ADMITTED TO THE U.S. PATENT BAR; AREN'T

2  YOU?

3  A.  YES.

4  Q.  SO YOU'RE PRETTY FAMILIAR WITH HOW PATENTS ARE

5  PROSECUTED AND OBTAINED?

6  A.  YES.

7  Q.  AND ARE YOU FAMILIAR WITH THE PROPOSITION THAT A

8  INVENTOR CAN BE HIS OR HER OWN LEXICOGRAPHER?

9  A.  YES.

10  Q.  THAT THE INVENTOR IS FREE TO DEFINE THE TERMS IN A

11  PATENT CLAIM HOWEVER HE OR SHE WANTS; ISN'T THAT RIGHT?

12  A.  YES.

13  Q.  SO THE INVENTORS HERE WERE ALLOWED TO COME UP WITH

14  THEIR OWN DEFINITION OF "COMPUTATIONALLY INFEASIBLE"; IS

15  THAT RIGHT?

16  A.  YES.

17          MR. FRAM:  OBJECTION, YOUR HONOR.  I BELIEVE THE

18  LAST QUESTION JUST CROSSED THE LINE TO ASKING THE WITNESS

19  TO APPLY HIS UNDERSTANDING OF PATENT LAW AS A MEMBER OF

20  THE PATENT BAR.

21          THE COURT:  YES.

22          MR. FRAM:  I BELIEVE WE'VE GOT SOME SUBSTANTIAL

23  BRIEFS FROM DEFENDANT SUGGESTING THAT'S NOT THE WAY TO GO.

24          MR. FLINN:  I'LL WITHDRAW THE QUESTION AND

25  REPHRASE IT THIS WAY:

1    Q.  LET ME ASK YOU TO ASSUME, FOR PURPOSES OF MY

2    QUESTIONS, THAT DR. HELLMAN AND DR. MERKLE WERE FREE TO

3    DEFINE "COMPUTATIONALLY INFEASIBLE" IN AT LEAST SOME

4    REASONABLE MANNER.

5             DO YOU BELIEVE IT WOULD BE REASONABLE FOR THEM

6    TO DEFINE "COMPUTATIONALLY INFEASIBLE" IN A WAY THAT THEY

7    KNEW THEIR EMBODIMENT DID NOT FULFILL THE DEFINITION?

8    A.  NO.  IF THE INVENTORS KNEW THAT THEIR OWN DEFINITION

9    FAILED THE DEFINITION, THEN THAT WOULD NOT BE REASONABLE,

10   BUT I'M SURE THE INVENTORS DID NOT KNOW.

11   Q.  THE INVENTORS KNEW, AT LEAST ACCEPTED THE POSSIBILITY,

12   DIDN'T THEY, THAT SOMEONE MIGHT SOMEDAY INVENT AN

13   ALGORITHM THAT WOULD REDUCE THE NUMBER OF OPERATIONS IT

14   TOOK TO BREAK THE TRAP DOOR KNAPSACK; ISN'T THAT RIGHT?

15             THE COURT:  I THINK IT GOES PRETTY FAR FROM THE

16   POINT.

17             MR. FLINN:  I'LL --

18             THE COURT:  DO YOU WANT TO TAKE A RECESS AND

19   THINK ABOUT IT AND WRAP IT UP IN ANOTHER HALF HOUR?

20             MR. FLINN:  I HAD JUST ONE LINE OF QUESTIONING.

21   IF IT'S AN APPROPRIATE TIME TO TAKE A BREAK, IT'S A NEW

22   SUBJECT.  THAT WOULD BE FINE.

23             THE COURT:  HOW LONG ARE YOU GOING TO BE WITH

24   THE WITNESS?

25             MR. FLINN:  ANOTHER TEN MINUTES.

1        THE COURT:  FIVE?

2        MR. FLINN:  FIVE MINUTES; THAT'S FINE.

3        THE COURT:  OKAY.  EXCUSE ME.

4        MR. FLINN:  OH, I'M SORRY.  I THOUGHT WE WERE

5   TAKING A RECESS NOW.

6   Q.  I WANT TO ASK YOU ABOUT AUTHENTICATION.

7        THE COURT:  THEN YOU CAN REDIRECT YOURSELF

8   AFTERWARDS.

9        THE WITNESS:  YEAH, YEAH.  WELL, ACTUALLY, I DO

10  HAVE SOME THINGS TO RESPOND TO, BUT I DON'T KNOW WHETHER

11  TO --

12       THE COURT:  LET HIM FINISH THE CROSS, AND THEN

13  YOU CAN CONTINUE YOUR TESTIMONY, FROM WHAT HE RAISED, AND

14  YOU CAN RESPOND TO IT.

15       MR. FLINN:  Q.  DO YOU RECALL DR. KONHEIM'S

16  TESTIMONY ABOUT AUTHENTICATION YESTERDAY; DO YOU?

17  A.  YES.

18  Q.  RATHER THAN CHARACTERIZING IT MYSELF AND MAKING AN

19  ERROR FOR SOMETHING THIS TECHNICAL, CAN YOU BRIEFLY GIVE

20  US YOUR UNDERSTANDING OF WHAT HIS TESTIMONY WAS ON THAT

21  SUBJECT?

22       THE COURT:  THE SUBJECT --

23       MR. FLINN:  OF THE AUTHENTICATION QUESTION AND

24  PROVING IDENTITY.

25       THE COURT:  GO AHEAD.

1          THE WITNESS:  I'M SURPRISED I'M NOT HEARING AN

2     OBJECTION ON THAT, BUT --

3          MR. FRAM:  PERHAPS MR. FLINN WOULD LIKE TO FOCUS

4     THE AREA OF THE AUTHENTICATION TESTIMONY?  IF NOT,

5     OBJECTION, OVERBROAD.

6          THE COURT:  YES, OKAY.

7          MR. FLINN:  Q.  DO YOU RECALL HIS TESTIMONY

8     ABOUT YOUR REQUIREMENT FOR SOME IDENTITY PROOF ATTACHING,

9     LIKE THROUGH A DRIVER'S LICENSE OR SOME OTHER MECHANISM,

10    ATTACHING SOME ADDITIONAL PROOF TO POSSESSION OF A SECRET

11    KEY?  IS THAT MORE SPECIFIC FOR YOU, SIR?

12    A.  WELL, DO YOU WANT ME TO CHARACTERIZE WHAT HE SAID?

13    Q.  VERY BRIEFLY, BECAUSE I'VE GOT SOME --

14    A.  I MEAN, YOU KNOW, HE BELIEVED YOU IDENTIFY PEOPLE WITH

15    DRIVERS' LICENSES.  THAT'S THE WAY HIS GROCERY STORE

16    IDENTIFIES HIM AND...

17    Q.  DO YOU BELIEVE THAT IS AN ESSENTIAL REQUIREMENT FOR

18    AUTHENTICATION IN A PUBLIC KEY SYSTEM?

19    A.  DRIVERS' LICENSES?

20    Q.  YES.

21    A.  ESSENTIAL?  NO.  I THINK THERE ARE LOTS OF WAYS OF

22    IDENTIFYING PEOPLE.

23    Q.  ISN'T IT COMMON, IN A WIDE RANGE OF COMPUTER-RELATED

24    ACTIVITIES, THAT PEOPLE ARE IDENTIFIED OR AUTHENTICATED

25    MERELY BY POSSESSION OF SOME KEY OR PASSWORD?

A.   WELL, OKAY, I'LL SEE IF I CAN ANSWER WHAT YOU'RE

GETTING AT HERE.

PROFESSOR KONHEIM TESTIFIED, WITH REGARD TO THE

CLAIM 2 OF THE HELLMAN-MERKLE PATENT AND THE CLAUSE THAT

REFERS TO RECEIVING -- AUTHENTICATING THE RECEIVER'S

IDENTITY.

AND AS I UNDERSTAND HIS TESTIMONY, HE SAID THAT

THE AUTHENTICATION THAT THE HELLMAN-MERKLE PATENT IS

AIMING AT IS THE AUTHENTICATION -- IS THAT OF LINKING THE

RECEIVER TO THE POSSESSOR OF THE SECRET KEY.  AND THAT --

AND THAT HIS OPINION THAT LINKING THE RECEIVER TO BEING --

TO THE POSSESSOR OF THE SECRET KEY IS NOT TRULY

AUTHENTICATING THE RECEIVER UNLESS YOU HAVE A DRIVER'S

LICENSE OR SOME OTHER PROOF OF THE PERSON'S IDENTITY.

Q.   LET ME ASK IT THIS WAY.

YOU'RE FAMILIAR WITH THE VERY ROUTINE AND COMMON

PROCEDURE WHEREBY PEOPLE LOG ONTO COMPUTERS OR COMPUTER

NETWORKS?

A.   YES.

Q.   AND THEY DO THAT BY ENTERING A PASSWORD?

A.   YES.

Q.   AND UPON VERIFICATION OF THE PASSWORD, THE COMPUTER

ALLOWS THE USER ACCESS TO RESOURCES INSIDE THE COMPUTER

NETWORK; IS THAT RIGHT?

A.   YES.

1   Q.  HAVE YOU EVER SEEN A COMPUTER, IN THE AVERAGE SYSTEM,

2   ASK FOR SOMEONE'S DRIVER'S LICENSE?

3   A.  NO, BUT I WOULD SAY IT'S SOMETIMES THE CASE THAT WHEN

4   YOU SET UP THE COMPUTER ACCOUNT AND YOU GO MEET SOME

5   ADMINISTRATORS OR CLERKS TO SET UP THE ACCOUNT, THAT YOU

6   MIGHT HAVE TO PRESENT SOME IDENTIFICATION AT THAT TIME,

7   AND YOU MIGHT HAVE TO PRESENT A DRIVER'S LICENSE AT THAT

8   TIME.

9           AND IF THE COMPUTER SYSTEM MANAGEMENT HAS

10  REQUIRED DRIVER'S LICENSES OF ALL THEIR USERS AT ONE TIME

11  AND MADE RECORDS OF THAT IN THEIR BOOKS, THEN YOU COULD

12  VIEW ENTERING THAT PASSWORD ON THE COMPUTER SYSTEM AS, IN

13  SOME SENSE, A VERIFICATION OF THAT PERSON'S DRIVER'S

14  LICENSE, BECAUSE THE DRIVER'S LICENSE AND THE PASSWORD

15  WERE LINKED AT THE TIME OF THE ACCOUNT SETUP.

16  Q.  BUT SOMEONE ELSE COULD HAVE GOTTEN THE PASSWORD AT ANY

17  TIME THEREAFTER; ISN'T THAT RIGHT?

18  A.  IF THAT USER WERE TO GIVE OUT HIS PASSWORD TO OTHERS,

19  IT WOULD DEFEAT SOME OF THE PURPOSE OF THE AUTHENTICATION,

20  YES.

21          THE COURT:  AUTHENTICATION IS SOMETHING, IS IT

22  NOT?  YOU RECEIVE A MESSAGE AND YOU WANT TO AUTHENTICATE

23  THE SENDER; IT'S ALMOST IMMEDIATE, OR VICE-VERSA?

24          THE WITNESS:  USUALLY, BUT THERE MIGHT BE SOME

25  DELAY.

1        BUT YEAH, TO DEFEAT THE SYSTEM, JUST AS IF YOU

2   GAVE OUT YOUR, YOU KNOW, YOUR DRIVER'S LICENSE TO

3   SOMEBODY, THAT WOULD DEFEAT THE PURPOSE OF USING DRIVER'S

4   LICENSE AS AUTHENTICATION.

5        MR. FLINN:  Q.  UNLESS YOU WERE THE BEST LOOKING

6   PERSON IN THE WORLD.

7        I'M SORRY.  I WITHDRAW THE QUESTION.  I'M DONE.

8   THANK YOU.

9        THE COURT:  OKAY.

10       MR. KRAMER:  YOUR HONOR, I JUST HAVE ONE OR TWO

11  QUESTIONS I WANT TO FOLLOW UP BECAUSE THE WITNESS SAID

12  SOMETHING VERY SURPRISING TO ME.

13       MR. FRAM:  YOUR HONOR, IF DEFENDANTS WANT TO

14  KEEP GANG-TACKLING WITNESSES, I SUPPOSE THAT'S THEIR

15  PREROGATIVE --

16       MR. KRAMER:  IF --

17       MR. FRAM:  IF I COULD, MR. KRAMER, I'M SURE HE

18  HAS NEW QUESTIONS, YOUR HONOR.  THAT'S NOT OUR CONCERN.

19  IT'S SIMPLY THE FACT THAT THEY ARE CLEARLY PRESENTING

20  JOINT SUBMISSIONS.

21       MR. KRAMER REPRESENTS STANFORD; MR. FLINN

22  REPRESENTS CARO-KANN; MR. KENNEDY REPRESENTS CKC.  I'M

23  SURE MS. GOLD REPRESENTS ALL OF THEM.  BUT THEY CHOOSE NOW

24  TO WEAR VARIOUS HATS BECAUSE THEY WANT TO HAVE A STREAM OF

25  LAWYERS EXAMINING WITNESSES.

1        WE DID IT YESTERDAY WITH THE OTHER WITNESSES.

2   NOW WE'RE DOING IT WITH MR. SCHLAFLY.  WE THINK IT'S

3   REALLY CROSSING THE LINE.

4        THE COURT:  THAT WILL BE THE RULE FROM

5   HENCEFORTH.

6        MR. KRAMER:  YOUR HONOR --

7        THE COURT:  BUT FROM NOW ON, ONE ATTORNEY DOES

8   THE EXAMINATION FOR A PARTY.

9        MR. KRAMER:  I'LL MAKE AN OFFER OF PROOF, IF THE

10  COURT IS INTERESTED.

11       THE COURT:  I'LL ACCEPT YOUR WORD THAT IT'S

12  IMPORTANT, BUT THE PROCEDURE IS THAT WE'LL HAVE ONE LAWYER

13  REPRESENT THE CLIENT FOR CROSS-EXAMINING OF THE WITNESS,

14  SO WE DON'T HAVE THREE LAWYERS EXAMINING THE SAME WITNESS

15  FOR THE SAME CLIENT.

16                  CROSS-EXAMINATION

17       BY MR. KRAMER:  Q.  MR. SCHLAFLY, YOU SAID

18  SOMETHING THAT SURPRISED ME ABOUT DR. KNUTH'S BOOK.  YOU

19  AND I HAD A CONVERSATION ABOUT THIS VERY BOOK AND

20  DR. KNUTH AFTER PROFESSOR KONHEIM'S DEPOSITION.  DO YOU

21  RECALL THAT?  DO YOU RECALL TELLING ME THAT DR. KNUTH

22  WROTE THE BIBLE IN COMPUTER SCIENCE?

23  A.  NO, BUT I'LL TAKE YOUR WORD FOR IT.

24  Q.  SO YOU'RE NOT DENYING THAT WE HAD THAT CONVERSATION;

25  CORRECT?

1    A.  NO.  IF YOU -- --

2    Q.  IT IS COMMONLY --

3    A.  NO.

4    Q.  IT IS COMMON -- EXCUSE ME.

5              THE COURT:  EVEN THE BIBLE HAS FLAWS.

6              MR. KRAMER:  UNDERSTOOD.

7              THE WITNESS:  IF YOU ASK ME WHETHER OR NOT THAT

8    BOOK IS THE BIBLE, GO AHEAD AND ASK IT.

9              MR. KRAMER:  Q.  IS THIS BOOK COMMONLY KNOWN AS

10   THE BIBLE IN COMPUTER SCIENCE?

11             THE COURT:  AT WHAT TIME?

12             MR. KRAMER:  PRESENTLY, SINCE IT WAS PUBLISHED.

13             THE WITNESS:  THAT BOOK IS THE MOST

14   AUTHORITATIVE BOOK ON THE SUBJECT.

15             MR. KRAMER:  THANK YOU.

16             THE WITNESS:  I'LL GRANT YOU THAT.  HOWEVER, I

17   DON'T THINK THAT CONTRADICTS WHAT I SAID.

18             FLINN ASKED ME A QUESTION ABOUT WHETHER KNUTH

19   WAS ONE OF THE LEADERS IN COMPLEXITY THEORY, AND THAT'S A

20   DIFFERENT QUESTION.

21             THE COURT:  THANK YOU VERY MUCH.  WE'LL RECESS

22   FOR 15 MINUTES.

23                  (RECESS TAKEN AT 11:05 A.M.)

24                 (PROCEEDINGS RESUMED AT 11:22 A.M.)

25             MR. FRAM:  YOUR HONOR?

1        THE COURT:  YES, SIR?

2        MR. FRAM:  RSA HAS A FEW QUESTIONS, IN LIGHT OF

3   THE RATHER EXTENSIVE CROSS ON THE TOPICS RAISED IN THAT

4   CROSS-EXAMINATION.

5        THE COURT:  FINE.

6        MR. FRAM:  I'LL TRY AND KEEP IT BRIEF, IN LIGHT

7   OF THE TIME.

8        THE COURT:  PARDON ME?

9        MR. FRAM:  WE'LL TRY AND KEEP IT BRIEF, IN LIGHT

10   OF THE TIME.

11        THE COURT:  THANK YOU.

12                    CROSS-EXAMINATION

13        BY MR. FRAM:  Q.  MR. SCHLAFLY, I THINK YOU

14   MENTIONED THAT THE BROAD CONCEPT OF THE PUBLIC KEY SYSTEM

15   WAS IN THE PRIOR ART, AND YOU MENTIONED SOME ARTICLES.  I

16   BELIEVE THE MULTIUSER ARTICLE WAS ONE OF THEM?

17   A.  YES.

18   Q.  I'D LIKE TO DRAW YOUR ATTENTION TO THAT.  IT'S BEEN

19   MARKED AS PLAINTIFF'S EXHIBIT 1001.  DO YOU HAVE A COPY UP

20   THERE WITH YOU?  IF NOT, I'D BE HAPPY TO GIVE YOU ONE.

21   A.  IT'S NOT ON ME.  I PROBABLY HAVE ONE AT MY TABLE.

22        MR. FRAM:  WITH THE COURT'S PERMISSION?

23        THE COURT:  YES.

24        MR. FRAM:  Q.  NOW, DURING THE EXAMINATION BY

25   MR. FLINN, THERE WAS A DISCUSSION OF THE TERM "GENERATING"

1    IN THE CONCEPT OF GENERATING KEYS, GENERATING PUBLIC KEYS,

2    SO FORTH.  DO YOU RECALL THAT TESTIMONY, JUST BEFORE THE

3    BREAK?

4    A.  YES.

5    Q.  AND I BELIEVE YOU TESTIFIED, AFTER SOME BACK AND

6    FORTH, THAT, IN YOUR VIEW, THE TERM "GENERATING" DOES HAVE

7    A MEANING IN THE ART OF CRYPTOGRAPHY.  HAVE I

8    MISCHARACTERIZED YOUR ANSWER?

9    A.  NO.

10   Q.  OKAY.  I'D LIKE YOU TO TURN, IF YOU WOULD, PLEASE, TO

11   THE MULTIUSER ARTICLE.  THAT'S THE ARTICLE BY MR. DIFFIE

12   AND PROFESSOR HELLMAN MARKED AS EXHIBIT 1001.

13          I'D LIKE YOU TO TURN TO THE DISCUSSION OF PUBLIC

14   KEY CRYPTOGRAPHY THAT'S ON PAGE 110.  IT'S THE SECOND PAGE

15   HERE IN THE EXHIBIT.  IN THE SECOND COLUMN, YOU'LL SEE THE

16   HEADING ON PUBLIC KEY CRYPTOGRAPHY.  DO YOU SEE THAT?

17   A.  YES.

18   Q.  AND YOU'LL SEE THAT IN THE FIRST PARAGRAPH, THERE IS A

19   DISCUSSION OF A PAIR OF KEYS, E AND D, WITH E BEING THE

20   ENCIPHERING KEY, AND D BEING THE DECIPHERING KEY.  DO YOU

21   SEE THAT PARAGRAPH?

22   A.  YES.

23   Q.  NOW, LOOKING TO THE NEXT PARAGRAPH, FIRST SENTENCE, DO

24   YOU SEE THE SENTENCE THAT SAYS, "FOR REASONS OF SECURITY,

25   GENERATION OF THIS E-D PAIR IS BEST DONE AT THE USER'S

1    TERMINAL, WHICH IS ASSUMED TO HAVE SOME COMPUTATIONAL

2    POWER."

3              DO YOU SEE THAT?

4    A.  YES.

5    Q.  SO THERE IS A DISCUSSION THERE OF GENERATING

6    ENCIPHERING AND DECIPHERING KEYS; IS THERE NOT?

7    A.  YES.

8    Q.  AND THIS IS THE DISCUSSION IN ONE OF THE PIECES OF THE

9    PRIOR ART THAT YOU WERE REFERRING TO BEFORE, IS THAT

10   CORRECT, THE GENERAL CONCEPT OF THE PUBLIC KEY INTO THE

11   PRIOR ART; IS THAT RIGHT?

12   A.  YES, YES.  IT'S CITED AS PRIOR ART IN THE PATENT.

13             TO BE FAIR, IT'S WRITTEN BY DIFFIE AND HELLMAN.

14   BUT, YES, IT DOES GO INTO PRIOR ART.

15   Q.  OKAY.  LOOKING AT THAT SENTENCE THAT I JUST READ TO

16   YOU REGARDING THE GENERATION OF THE E-D PAIR, CAN YOU

17   TELL, FROM READING THAT SENTENCE, HOW TO GENERATE A PUBLIC

18   KEY?

19   A.  NOT SPECIFICALLY, NO.  I MEAN --

20   Q.  IN FACT --

21   A.  I MEAN --

22   Q.  I THINK YOU ANSWERED MY --

23   A.  OH, OKAY.

24   Q.  GO AHEAD.  IF YOU HAVE SOMETHING TO ADD TO YOUR

25   ANSWER, THAT'S FINE.  YOU HAVE ANSWERED THE QUESTION.  BUT

1   IF YOU'VE GOT SOMETHING MORE, GO AHEAD.

2         I GUESS MY QUESTION IS --

3   A.  I MEAN, I CAN'T TELL FROM READING THE HELLMAN-MERKLE

4   CLAIM 1 OR CLAIM 6 EXACTLY HOW TO READ -- TO GENERATE THE

5   PUBLIC/PRIVATE KEY EITHER.  BOTH THAT CLAIM AND THIS PAPER

6   BOTH TALK ABOUT THE GENERAL IDEA OF PUBLIC KEY

7   CRYPTOGRAPHY WITHOUT GOING INTO SPECIFICS.

8   Q.  AND, IN FACT, AT THE TIME THIS PAPER WAS WRITTEN, ITS

9   AUTHORS DID NOT KNOW, ACTUALLY, HOW TO GENERATE A PUBLIC

10  KEY; DID THEY?

11  A.  WELL, YES AND NO.  AT THE END OF THIS PAPER ARE -- IS

12  DESCRIBED THREE HYPOTHETICAL PUBLIC KEY SYSTEMS.

13  Q.  AND THOSE SYSTEMS ARE THEN CHARACTERIZED, AREN'T THEY,

14  AT THE TOP OF PAGE 111, FIRST COLUMN?  DO YOU SEE THAT?

15  A.  "AT PRESENT, WE HAVE NEITHER A PROOF THAT PUBLIC KEY

16  SYSTEMS EXIST, NOR A DEMONSTRATION SYSTEM."

17  Q.  AND THEN THEY GO ON TO DISCUSS SOME SUGGESTED

18  EXAMPLES.  I THINK THOSE ARE THE ONES YOU WERE REFERRING

19  TO JUST BEFORE; ISN'T THAT RIGHT?

20  A.  YES.

21  Q.  SO, IN FACT, WHEN THEY WROTE THIS PAPER, NOT ONLY DID

22  THEY NOT KNOW HOW TO GENERATE A PUBLIC KEY, AS THEY SAY

23  HERE, THEY DID NOT EVEN KNOW IF ONE EXISTED; ISN'T THAT

24  RIGHT?  AND THOSE ARE THEIR WORDS; ISN'T IT?

25  A.  NO.  I WOULD SAY, BASED ON THIS, THE INVENTORS WERE

1    PRETTY SURE ONE EXISTED.  YOU KNOW, THEY WEREN'T SURE

2    EXACTLY HOW TO BEST GO ABOUT IT, BUT THEY WERE PRETTY SURE

3    THAT ONE EXISTED.

4    Q.  BUT THEY HAD NO PROOF THAT ONE EXISTED?

5    A.  THEY HAD NO -- THEY HAD NO PROOF THAT ONE EXISTED --

6    WELL, I'M NOT SURE TO THIS DAY THEY HAVE A PROOF THAT ONE

7    EXISTS.

8    Q.  DID THEY HAVE A WORKABLE SYSTEM OF PUBLIC KEYS AT THE

9    TIME THEY PUBLISHED THIS PAPER?  THEY CERTAINLY DIDN'T

10   HAVE A DEMONSTRATION SYSTEM; DID THEY?

11   A.  YOU MEAN --

12   Q.  WE CAN MAYBE SIMPLIFY THIS.  THEY DIDN'T HAVE A

13   DEMONSTRATION SYSTEM; DID THEY?  THEY SAID THEY DIDN'T, SO

14   I TAKE IT THEY DIDN'T HAVE ONE THAT THEY WEREN'T TALKING

15   ABOUT HERE, THAT YOU KNOW OF?  DO YOU KNOW OF ANY

16   DEMONSTRATION SYSTEM THEY HAD, GIVEN THEY SAID IN THEIR

17   PAPER THEY DIDN'T HAVE ONE?

18   A.  I HAVE TO INTERPRET THOSE TERMS VERY CAREFULLY.  I

19   MEAN, I WOULD SAY THAT THE PUBLIC KEY CONCEPT, THE

20   ABSTRACT CONCEPT, IS DEMONSTRATED IN THIS PAPER.

21   Q.  OKAY.

22   A.  BUT IT'S NOT -- BUT A DEMONSTRATION SYSTEM, A SYSTEM

23   THAT REALLY, REALLY, DEFINES ALL THE NITTY-GRITTY THAT YOU

24   WOULD NEED A PATENT DISCLOSURE OR SOMETHING LIKE THAT, NO.

25   Q.  OKAY.  SO ONE CAN TALK ABOUT GENERATING PUBLIC KEY IN

1   THE ART WITHOUT HAVING A WORKABLE PUBLIC KEY SYSTEM?

2   A.   YES.

3   Q.   AND ONE CAN TALK ABOUT, IN THE ART, THE GENERAL IDEA

4   OF PUBLIC KEY SYSTEMS WITHOUT NECESSARILY HAVING ONE THAT

5   CONSTITUTES A WORKABLE DEMONSTRATION SYSTEM?

6   A.   YES.

7   Q.   SO, WHEN YOU SAY THERE IS A MEANING IN THE ART FOR

8   GENERATING A PUBLIC KEY, I TAKE IT THAT'S A VERY BROAD

9   TERM?

10  A.   YES.   WELL, THE HELLMAN-MERKLE CLAIMS ARE BROAD

11  CLAIMS.

12  Q.   AND, IN FACT, THAT BROAD CONCEPT OF GENERATING PUBLIC

13  KEYS WAS ALREADY IN THE PRIOR ART, AND, IN FACT, IT'S IN

14  THIS PAPER?

15          MR. FLINN:  AT SOME POINT, YOUR HONOR, WE'RE

16  GETTING INTO A VALIDITY ARGUMENT AND NOT --

17          MR. FRAM:  I'M JUST TRYING TO UNDERSTAND WHAT

18  THE WITNESS MEANS WHEN HE SAYS THAT THE TERM "GENERATING A

19  PUBLIC KEY" HAS A MEANING IN THE ART.  I WANT TO SEE WHERE

20  HE PLACES THAT.  I THINK HE SAID IT'S A BROAD CONCEPT.

21  Q.   I THINK YOU WOULD AGREE IT WAS ALREADY IN THE PRIOR

22  ART, BEING IN THIS PAPER; IS THAT RIGHT?

23  A.   I WOULD SAY THE WHOLE CONCEPT OF PUBLIC KEY AND

24  DIGITAL SIGNATURE ARE DESCRIBED IN THIS PAPER, TOGETHER

25  WITH GENERATING KEYS AND ENCIPHERING.  FOR THE MOST PART,

1    IT'S ALL DESCRIBED IN KIND OF A GENERAL WAY, BUT IT'S ALL

2    DESCRIBED IN THE PAPER.

3    Q.   TO THE DEGREE THE PATENT USES THE TERM "GENERATING A

4    PUBLIC KEY," DOES IT USE IT THE SAME WAY AS IT'S IN THIS

5    PAPER, OR DOES IT PROVIDE A NARROWER USAGE OF THE TERM?

6    A.   WELL, YEAH, I THINK YOU'RE ASKING A LEGAL QUESTION

7    NOW.   I MEAN, THAT DEPENDS ON OUR 112, SECTION 6 --

8    Q.   GIVEN WHAT YOU SAID, ISN'T IT THE CASE THAT THE ONLY

9    THING THE PATENT ADDS TO THE TERM "GENERATING KEYS" IS THE

10   REFERENCE TO THE TRAP DOOR KNAPSACK?

11   A.   THE ONLY THING THE PATENT SPECIFICATION ADDS TO THIS

12   PRIOR ART PAPER?

13   Q.   THE ONLY THING THE PATENT ADDS TO THAT, THE CONCEPT OF

14   GENERATING KEYS, THAT WASN'T ALREADY IN THE PRIOR ART IS

15   THE FACT THAT AT LEAST THE PATENTEES THOUGHT YOU COULD DO

16   IT WITH THE TRAP DOOR KNAPSACK SYSTEM?

17   A.   YES.

18   Q.   NOW, MOVING TO THE TOPIC OF THE KNAPSACK BRIEFLY.

19   THERE WAS SOME DISCUSSION OF THE SECURITY OF THE KNAPSACK,

20   AND TURNING YOUR ATTENTION TO THE BOARD THAT WAS PUT UP

21   THERE.   THERE WAS A LOT OF DISCUSSION ABOUT WHAT IT WOULD

22   TAKE TO BREAK THE KNAPSACK.   DO YOU RECALL THAT

23   CONVERSATION AND TESTIMONY BEFORE THE BREAK?

24   A.   MY TESTIMONY, YES.

25   Q.   THE DISCUSSION, THOUGH, I TAKE IT, HAVING TO DO WITH

1    THE BREAKING OF A KNAPSACK PROBLEM, THAT'S SOMETHING

2    DIFFERENT THAN BREAKING A TRAP DOOR KNAPSACK; ISN'T THAT

3    RIGHT?

4    A.  YES.

5    Q.  AND, IN FACT, IT CAN BE THE CASE THAT, WHILE A

6    KNAPSACK CAN REMAIN HARD AND UNBREAKABLE, ONE CAN BREAK A

7    TRAP DOOR KNAPSACK SYSTEM BY FINDING OUT THE INFORMATION

8    ABOUT THE TRAP DOOR; ISN'T THAT RIGHT?

9    A.  YES.  THE TRAP DOOR KNAPSACK IS A PARTICULAR KIND OF

10   KNAPSACK.

11            SOME TRAP DOOR KNAPSACKS ARE EASY TO SOLVE, AND

12   SOME ARE, AS FAR AS WE KNOW, DIFFICULT.  THE TRAP DOOR

13   KNAPSACK REPRESENTS A PARTICULAR KIND OF KNAPSACK, AND IT

14   COULD BE BREAKABLE WITHOUT OTHER KINDS OF KNAPSACKS BEING

15   BREAKABLE.

16   Q.  SO IF THERE IS DISCUSSION IN THE PATENT ABOUT THE

17   DIFFICULTY OF BREAKING A KNAPSACK PROBLEM, THAT DOESN'T

18   NECESSARILY TELL US ANYTHING ABOUT THE DIFFICULTY OF

19   BREAKING A TRAP DOOR KNAPSACK; DOES IT?

20   A.  WELL, I WOULD SAY THE INVENTORS CLEARLY THOUGHT IT

21   TOLD THEM SOMETHING.  I MEAN, IT DIDN'T GIVE A CONCLUSIVE

22   MATHEMATICAL PROOF.

23   Q.  ALL I'M SUGGESTING IS THAT IF THE INVENTORS DESCRIBED

24   WHAT THEY THOUGHT WERE SOME OF THE CHARACTERISTICS OF THE

25   KNAPSACK AND WHAT MADE IT HARD TO BREAK, THAT DOESN'T

1   NECESSARILY CONSTITUTE A STATEMENT ABOUT WHAT THEY THOUGHT

2   ABOUT THE TRAP DOOR WAS HARD TO BREAK?

3   A.  BASED ON MY READING OF THE INVENTOR'S PAPER, THE

4   INVENTORS THOUGHT -- CLEARLY THOUGHT THAT THE KNAPSACK

5   PROBLEM BEING HARD TO BREAK, WOULD BE EVIDENCE TO SUGGEST

6   THAT THE TRAP DOOR KNAPSACK MIGHT ALSO BE HARD TO BREAK.

7   Q.  I'M NOT ASKING --

8   A.  BUT IT IS NOT A CONCLUSIVELY LOGICALLY DRAWN

9   INFERENCE, NO.

10  Q.  I DIDN'T ASK THE QUESTION OF WHAT THEY ACTUALLY

11  THOUGHT.

12          WHAT I ASKED, SIMPLY, IS:  IF I PROVIDED YOU A

13  WRITTEN STATEMENT AND SAY THIS TELLS ME ABOUT THE

14  DIFFICULTY OF BREAKING A KNAPSACK, AND THAT'S ALL I TELL

15  YOU, THE KNAPSACK PROBLEM, A HARD KNAPSACK PROBLEM, I

16  HAVEN'T NECESSARILY GIVEN YOU ENOUGH INFORMATION, HAVE I,

17  ABOUT WHETHER IT'S POSSIBLE TO BREAK A TRAP DOOR KNAPSACK

18  SYSTEM?

19  A.  NOT NECESSARILY.

20  Q.  OKAY.

21  A.  IF YOU COULD BREAK ALL KNAPSACK PROBLEMS, YOU COULD

22  ALSO BREAK ALL TRAP DOOR KNAPSACK PROBLEMS.  BUT IT'S

23  POSSIBLE YOU COULD BREAK TRAP DOOR KNAPSACK PROBLEMS

24  WITHOUT BREAKING OTHER KINDS OF KNAPSACKS.

25  Q.  YES.

1            FINALLY, JUST A QUESTION ABOUT AUTHENTICATION.

2    IF I WERE TO GET A HOLD OF MR. FLINN'S PASSWORD AND TYPE

3    IT IN AT HIS LAW FIRM, AT THAT POINT, WOULD I HAVE

4    AUTHENTICATED MYSELF AS BEING MR. FLINN?

5    A.   IT WOULDN'T MAKE YOU MR. FLINN.  I --

6    Q.   LET ME PERHAPS REPHRASE THE QUESTION.

7    A.   I DON'T KNOW.  I MEAN, YOU COULD ASK THE SAME

8    QUESTION:  IF YOU STOLE MR. FLINN'S DRIVER'S LICENSE AND

9    USED IT TO CASH A CHECK, WOULD YOU HAVE AUTHENTICATED

10   YOURSELF AS MR. FLINN?  AND, YOU KNOW, I WOULD SAY IT'S A

11   SIMILAR ANSWER.  I MEAN, YOU KNOW, YOU FOOLED SOMEBODY

12   INTO THINKING YOU'RE MR. FLINN, MAYBE, BUT --

13   Q.   SO, IN BOTH CASES, OF THE LICENSE THEFT OR

14   IMPERSONATING SOMEONE, I, IN FACT, COULD TRY AND BREAK THE

15   SYSTEM, AND PRETEND I WAS SOMEBODY ELSE.

16           IN FACT, IF I JUST SHOWED UP AT MR. FLINN'S LAW

17   FIRM -- I'LL GIVE YOU A HYPOTHETICAL -- AND SAID, "I JUST

18   WANT TO LOG IN AND PRETEND I'M SOMEBODY ON THEIR COMPUTER

19   SYSTEM," IT'S YOUR UNDERSTANDING, I TAKE IT, FROM YOUR

20   TESTIMONY BEFORE, THAT THAT ISN'T DONE?  I'D HAVE TO GO TO

21   HIS MIS DEPARTMENT AND SOMEHOW OR OTHER VERIFY THAT I

22   COULD HAVE A PASSWORD TO BE WHO I AM?

23   A.   IF YOU WANTED TO GET A NEW ACCOUNT, YOU'D PRESUMABLY

24   HAVE TO GO TO THEIR MIS DEPARTMENT AND GET AN ACCOUNT AND

25   A PASSWORD.  IF YOU HAPPEN TO KNOW OR STEAL OR WHATEVER

1   SOMEONE'S PASSWORD, YOU COULD, HOWEVER, SHORTCUT THAT.

2   Q.   ACCEPTING THAT MALFEASANCE IS ALWAYS POSSIBLE, AND

3   PUTTING ASIDE THE QUESTION OF MALFEASANCE, THE SIMPLE

4   QUESTION IS:   IF I WANT TO AUTHENTICATE MYSELF ON A

5   PASSWORD SYSTEM, I TAKE IT IN THE ORDINARY COURSE, I NEED

6   TO GO THROUGH PROPER PROCEDURES AND IDENTIFY THAT I AM WHO

7   I SAY I AM, AS PART OF USING THAT SYSTEM; ISN'T THAT

8   RIGHT?

9   A.   NORMALLY, YES.   I'M SURE MR. FLINN'S LAW FIRM WOULD

10  NOT GIVE YOU AN ACCOUNT ON THEIR COMPUTER SYSTEM UNLESS

11  YOU PROVIDED SOME EVIDENCE OF WHO YOU ARE.

12  Q.   AND WITHOUT GETTING INTO THE KIND OF EVIDENCE OR

13  WHETHER A DRIVER'S LICENSE IS GOOD ENOUGH OR FINGERPRINTS

14  OR DNA OR WHATEVER, I TAKE IT SOME NOTION THAT I HAVE TO,

15  IN FACT, SHOW WHO I AM IS PART OF WHAT IT MEANS TO USE AN

16  AUTHENTICATION SYSTEM?

17  A.   THAT IS CERTAINLY A DESIRABLE ATTRIBUTE OF AN

18  AUTHENTICATION SYSTEM, YES.

19          MR. FRAM:   THANK YOU, YOUR HONOR.   NO FURTHER

20  QUESTIONS.

21          THE COURT:   OKAY.

22          WELL, NOW YOU HAVE YOUR RESPONSE.

23          THE WITNESS:   NOW I GET TO CROSS-EXAMINE MYSELF?

24          THE COURT:   THAT'S RIGHT.

25          THE WITNESS:   AND IT'S --

1          THE COURT:  JUST ON MATTERS BROUGHT UP DURING

2   THE CROSS-EXAMINATION THAT YOU HAVEN'T COVERED IS ALL.

3                    REDIRECT TESTIMONY

4          THE WITNESS:  OKAY.  AND HERE'S WHERE IT GETS

5   EVEN HARDER FOR ME TO DISTINGUISH BETWEEN THE LEGAL

6   ARGUMENTS AND FACT ARGUMENTS, BUT I'LL TRY MY BEST.

7          OKAY.  BUT I'LL GO OVER A FEW POINTS BRIEFLY.

8   IF YOU THINK THEY'RE LEGAL, I'LL JUST SKIP OVER THEM OR

9   SOMETHING.

10          OKAY.  I WAS ASKED ABOUT EVIDENCE IN THE

11   INVENTORS' WRITINGS ABOUT INTERPRETATIONS THAT I GAVE FOR

12   THE TERM "COMPUTATIONAL INFEASIBLE."  AND I GAVE A

13   SENTENCE, ON COLUMN TWO, THAT USED THE PHRASE

14   "DEMONSTRABLY INFEASIBLE TO INVERT USING KNOWN METHODS."

15          I'D LIKE TO ALSO SAY THAT I THINK IT'S EVIDENCE

16   THAT THE INVENTORS USED -- WERE INTENDING TO USE

17   COMPLEXITY THEORY AND TO APPLY TO THEIR NOTION OF PUBLIC

18   KEY CRYPTOGRAPHY IS THAT IN THE DIFFIE-HELLMAN NEW

19   DIRECTIONS PAPER, THEY HAVE A SECTION ON COMPLEXITY

20   THEORY, AND THEY CLEARLY TALK ABOUT COMPLEXITY THEORY

21   THERE.

22          OKAY.  IF I INTERPRET THE WORD "METHODS" THE WAY

23   MR. FLINN SEEMS TO WANT ME TO INTERPRET THE WORD

24   "METHODS," THEN THE SENTENCE ON COLUMN TWO THAT SAYS,

25   "DEMONSTRABLY INFEASIBLE TO INVERT USING KNOWN METHODS," I

1    FIND IT VERY HARD TO ASSIGN MEANING TO THAT.

2         IF THE STATEMENT IS, DEMONSTRABLY INFEASIBLE --

3    IF THAT SENTENCE IS TO BE INTERPRETED AS MEANING

4    DEMONSTRABLY INFEASIBLE TO INVERT USING PUBLISHED

5    ALGORITHMS, THEN JUST ABOUT ANY NEW METHOD WILL BE,

6    BECAUSE ONCE YOU PUT OUT A NEW METHOD, IT'S UNLIKELY THAT

7    THERE IS GOING TO BE A PUBLISHED ATTACK ON EXACTLY THAT

8    METHOD.  AND SO, ALMOST ANYTHING WOULD BE DEMONSTRABLY

9    INFEASIBLE TO INVERT USING KNOWN METHODS.

10        SO, IF I USE THE INTERPRETATION OF "METHOD" THAT

11   FLINN WANTED ME TO TAKE, I HAVE A HARD TIME MAKING SENSE

12   OUT OF THAT PHRASE.  I UNDERSTAND THAT'S A BIT LEGALISTIC

13   AND ARGUMENTATIVE, BUT I'M SAYING IT NOW TO GIVE THEM A

14   CHANCE TO CROSS-EXAMINE ME ON THAT POINT, IF THEY WANT TO.

15        OKAY.  THE NEXT POINT I WANT TO MAKE IS THAT I

16   WAS ASKED SOME QUESTIONS THAT TOUCHED ON WHAT IS PROVEN

17   AND WHAT IS DEMONSTRATED AND WHAT IS KNOWN FOR A FACT.

18   AND I THINK TO UNDERSTAND MY ANSWERS ON THAT, I COME FROM

19   A MATHEMATICAL BACKGROUND WHERE "PROVE" MEANS SOMETHING

20   VERY PRECISE.  AND WHAT "PROVE" MEANS TO ME IS NOT -- IS

21   NOT THE SAME AS WHAT "DEMONSTRATE," FOR THE PURPOSES OF

22   OBTAINING A PATENT, WOULD BE.  AND THOSE ARE DIFFERENT

23   NOTIONS.

24        AND, YOU KNOW, WE CAN ARGUE THAT IN LEGAL

25   ARGUMENTS.  BUT I JUST WANT TO SAY I DRAW THAT

1    DISTINCTION.

2         AND WHEN YOU ASKED ME A QUESTION ABOUT THE WORD

3    "PROOF," I USE IT IN THE SENSE OF A MATHEMATICAL PROOF.

4    WHEN SOMEONE APPLIES TO THE PATENT OFFICE WITH SOME, YOU

5    KNOW, DRUG THAT THEY PURPORT TO CURE SOME DISEASE, THEY

6    DON'T HAVE A MATHEMATICAL PROOF THAT IT CURES THAT

7    DISEASE.  THEY HOPE TO HAVE SOME SORT OF DEMONSTRATION,

8    THE STANDARDS OF WHICH ARE COMPLETELY DIFFERENT FROM

9    MATHEMATICS.

10        OKAY.  FINALLY, I WANT TO SAY SOME ADDITIONAL

11   REMARKS ABOUT PKZIP ENCRYPTION.  PKZIP HAS AN ENCRYPTION

12   FEATURE IN IT WHICH, I ADMITTED THAT THERE WERE ATTACKS ON

13   IT, WHICH ALLOW IT TO BE BROKEN UNDER CERTAIN

14   CIRCUMSTANCES, AND WHICH LIMIT ITS USEFULNESS, ALTHOUGH I

15   TESTIFIED IT DOESN'T MAKE IT TOTALLY USELESS.

16        AND I THINK I SHOULD ADD A COUPLE THINGS TO

17   THAT.  I MEAN, I THINK, FOR ONE THING, IT DOESN'T MAKE IT

18   TOTALLY USELESS BECAUSE THE PRODUCT IS NOT REALLY

19   PRIMARILY A DATA ENCRYPTION PRODUCT, IN THAT THERE ARE

20   LOTS OF PRODUCTS ON THE MARKET THAT HAVE ENCRYPTION

21   SYSTEMS IN IT WHICH ARE TOTALLY WEAK AND TOTALLY TRIVIAL

22   TO BREAK, FROM A CRYPTO ANALYST'S POINT OF VIEW; AND YET,

23   THOSE FEATURES REMAIN IN THOSE PRODUCTS.

24        AND I MENTION, FOR EXAMPLE, LOTUS 1-2-3,

25   WORD PERFECT, MICROSOFT WORD.  THERE ARE LOTS OF THESE

1    PRODUCTS WHERE THEY HAVE PASSWORD FEATURES THEY ENCRYPT,

2    AND YET, THOSE ENCRYPTION FEATURES, FROM A CRYPTO

3    ANALYST'S POINT, ARE -- THEY'RE EASILY BROKEN.  AND YET,

4    THEY'RE STILL IN THERE.  AND IT'S THE ONLY REASON THEY

5    HAVE SOME UTILITY IS BECAUSE ENCRYPTION IS NOT REALLY THE

6    PURPOSE OF THOSE PRODUCTS.

7         PKZIP HAD AN ENCRYPTION FEATURE THAT HAD SOME

8    VERY UNUSUAL DESIGN REQUIREMENTS IN THAT NAMELY, I DIDN'T

9    WANT SOMETHING THAT WOULD BE AUTOMATICALLY BROKEN, SUCH AS

10   THE ENCRYPTION PROGRAMS IN, I DON'T KNOW, LOTUS 1-2-3, FOR

11   EXAMPLE.

12        AT THE SAME TIME, SINCE PKZIP WAS GOING TO BE

13   PUT OUT AT SHAREWARE AND COPIED ANYWHERE IN THE WORLD,

14   THERE WOULD HAVE BEEN SOME LEGAL PROBLEMS IF I USED A

15   STRONG ENCRYPTION METHOD IN IT.  AND AS A RESULT, THAT IS,

16   THAT IF I PUT AN ENCRYPTION METHOD IN IT THAT THE -- THAT

17   THE NSA COULDN'T BREAK, THEN I COULD CONCEIVABLY BE

18   CHARGED WITH A CRIMINAL OFFENSE FOR BEING AN ACCESSORY TO

19   EXPORTING A MUNITION.

20        AND I KNOW IT SOUNDS RIDICULOUS, BUT THERE ARE

21   LAWS IN THAT AREA THAT I HAD TO WATCH OUT FOR.  AND AS A

22   RESULT, THE ENCRYPTION METHOD WAS NOT AS SECURE AS IT

23   OTHERWISE WOULD BE.

24        THAT'S ALL.

25        THE COURT:  THANK YOU.

1    MR. FLINN:  SPEAKING NOW AS I MUST FOR ALL OF

2  US, WE HAVE NO QUESTIONS.

3    THE COURT:  ALL RIGHT.  FINE.  THANK YOU.

4    MR. FRAM:  NOTHING FURTHER, YOUR HONOR.

5    THE COURT:  OKAY.  THANK YOU, MR. SCHLAFLY.

6    (WITNESS EXCUSED.)

7    THE COURT:  NEXT?

8    MR. HASLAM:  I THINK WE'RE AT THE POINT WHERE,

9  IF THE COURT WISHES TO ENTERTAIN ARGUMENT NOW, WE'RE

10  PREPARED TO ARGUE ON SOME OF THE POINTS.  WE CAN DO IT, I

11  WOULD SUGGEST, RATHER THAN START FOR TEN MINUTES OR SO, WE

12  COME BACK AFTER LUNCH, OR IF THE COURT WOULD PREFER TO

13  CONSIDER THE EVIDENCE AND HAVE US COME BACK AT ANOTHER

14  TIME AND ARGUE, WE'RE PREPARED TO DO THAT.

15    THE COURT:  WHY DON'T YOU COME BACK IN ABOUT AN

16  HOUR AND A HALF.  WE'LL DO SOME ARGUMENT, AND WE'LL SEE IF

17  WE HAVE ANY QUESTIONS OR WE NEED FURTHER ARGUMENT.

18    WE WILL NOT BE IN SESSION TOMORROW, BUT WE MIGHT

19  SET DATES FOR ADDITIONAL ARGUMENT OR PAPERS OR --

20    MR. HASLAM:  WE CAN DO THAT AT THE COURT'S

21  CONVENIENCE, AND I KNOW THAT THERE IS ONE MOTION THAT IS

22  ON THE CALENDAR.

23    THE COURT:  YES.

24    MR. HASLAM:  SO I GUESS WE'LL COME BACK AT 1:30.

25  WE CAN DO SOME ARGUMENT ON THE MARKMAN ISSUES, OR WOULD

1    YOU LIKE TO DEAL WITH THE REMAND MOTION FIRST?

2            THE COURT:  LET'S DO THE REMAND MOTION FIRST.

3            MR. HASLAM:  OKAY.  SO WE'LL COME BACK AT 1:30?

4            THE COURT:  1:30.

5            MR. KENNEDY:  YOUR HONOR?

6            THE COURT:  YES.

7            MR. KENNEDY:  ONE OTHER POINT, IF I MIGHT,

8    BEFORE WE RECESS.  I FIND MYSELF SOMEWHAT IN THE SAME

9    POSITION OF WHEN YOUR FAVORITE BALL PLAYER GETS TRADED TO

10   ANOTHER TEAM AND COMES HOME, WHO DO YOU ROOT FOR?

11           AS YOU KNOW, I'VE TRIED TO MAKE VERY CLEAR FROM

12   WHEN WE STARTED YESTERDAY, PERHAPS EXCESSIVELY, THAT I

13   DIDN'T FEEL EXPERT OR LIVE TESTIMONY WAS NECESSARY.  I

14   STILL FEEL THAT WAY.  ON THE OTHER HAND, THERE HAVE BEEN A

15   NUMBER OF REFERENCES TO, "LOOK AT THAT.  THE INVENTOR IS

16   SITTING RIGHT HERE IN THE COURTROOM," AND SUGGESTING THERE

17   IS SOME FOUNT OF KNOWLEDGE THAT WOULD BE OF ASSISTANCE TO

18   THE COURT.

19           THE COURT:  WELL, THERE IS SOME TESTIMONY THAT'S

20   BEEN OFFERED THAT I WOULDN'T ACCEPT AS BINDING ME.  I'D

21   LIKE TO HEAR OTHER PEOPLE'S VIEWS.  I MAKE THE DECISION,

22   AND I HEAR VARIOUS VIEWS AND VARIOUS ARGUMENTS THAT PEOPLE

23   MAKE.  I'M NOT BOUND BY THAT.  I LIKE TO SEE WHAT BOTH THE

24   VIEWS ARE AND HOW YOU DESCRIBE THEM AND SO FORTH, AND IT

25   WILL HELP ME MAKE UP MY MIND.

1          BUT I BASICALLY, ON THE EXTRINSIC EVIDENCE AREA,

2     THE EXTRINSIC EVIDENCE COMES IN JUST BECAUSE IT MIGHT BE

3     HELPFUL TO ME, NOT BECAUSE I FEEL BOUND BY IT.

4          MR. KENNEDY:  MY CONCERN IS:  I WANT TO DO

5     WHATEVER IS MOST HELPFUL TO THE COURT, NOT TO MAINTAIN THE

6     PURITY OF MY POSITION.

7          IF THE COURT FEELS THAT HEARING FROM

8     PROFESSOR HELLMAN WOULD BE OF ANY ASSISTANCE, WE WILL

9     REQUEST PERMISSION TO CALL HIM, AT LEAST FOR EXAMINATION

10    BY THE COURT.

11         THE COURT:  HE SAID THINGS IN HIS

12    PRESENTATION -- HE WASN'T UNDER OATH, THAT BUT I ACCEPTED

13    AS TRUE, AND HE MIGHT WANT TO REPEAT SOME OF THAT.  THAT'S

14    SOMETHING ELSE, OR THERE MAY BE SOMETHING ELSE HE CAN ADD.

15         I KNOW THAT THE INVENTOR'S PURPOSES OR HIS

16    THOUGHTS OF INTERPRETATIONS ARE NOT WHAT I GO ON.  I GO

17    FROM WHAT I READ AND EVERYONE ELSE READS IN THE PATENT.

18         SO THAT IT COULD BE HELPFUL.  I DON'T FEEL THAT

19    YOU SHOULD BE BOUND BY IT.  IT MIGHT GIVE ME SOME MORE

20    INSIGHT OR KNOWLEDGE THAT WOULD BE HELPFUL.  THAT'S ALL.

21         MR. KENNEDY:  WHATEVER YOUR HONOR'S PREFERENCE

22    IS.  IF YOU FEEL IT WOULD BE HELPFUL, I'LL FORMALLY

23    REQUEST NOW, IF MR. HASLAM DOESN'T PUSH ME COMPLETELY AWAY

24    FROM THE MICROPHONE, FOR LEAVE TO CALL MR. HELLMAN, AT

25    LEAST TO GO INTO THE QUESTION OF WHAT WAS MEANT BY

1    "COMPUTATIONALLY INFEASIBLE," SINCE THAT SEEMED TO BE THE

2    AREA, IN PARTICULAR --

3         THE COURT:  WHAT HE MEANT OR WHAT HE CONSTRUES

4    IT TO BE AS READ FROM THE DOCUMENT?

5         MR. KENNEDY:  THE PROBLEM I HAVE IS I'M NOT SURE

6    EITHER ONE OF THOSE IS GOING TO HELP YOU, SINCE IT SEEMS

7    TO ME IT'S WHAT GOT WRITTEN RATHER THAN WHAT MAY HAVE BEEN

8    INTENDED.  THAT'S MY VIEW.

9         THE COURT:  WHAT I INTERPRET FROM IT.  BUT ANY

10   INFORMATION THAT WOULD BE HELPFUL ABOUT THE INDUSTRY

11   ITSELF AND HOW IT'S DEALT WITH --

12        MR. HASLAM:  I JUST HAVE ONE COMMENT, AND I'M IN

13   THE AWKWARD POSITION OF -- MR. KENNEDY WAS VERY CLEVER IN

14   THE WAY HE DID THIS, IN INVITING THE COURT TO CALL HIS

15   WITNESS.  BUT WE HAVE RULES.  AND I THINK THE COURT HAS

16   SAID ANYTHING WE CAN AGREE ON, THE PARTIES, THE COURT

17   WOULD BE WILLING TO DO.  BUT WE DO HAVE A SET OF RULES.

18        TWICE, IN TWO DIFFERENT ORDERS, THE COURT SAID:

19   IF YOU WANT TO CALL EXPERTS -- AND THAT'S WHAT HE'S JUST

20   ASKED YOU TO DO, IS TO CALL EXPERTS -- TO DESIGNATE THEM.

21        WE DESIGNATED, BACK IN AUGUST,

22   PROFESSOR KONHEIM.  THEY DIDN'T DESIGNATE ANYONE.  HAD

23   THEY BEEN SURPRISED BY THAT, WHEN WE CONTINUED THE MARKMAN

24   HEARING, WE HAD ANOTHER TIME AT WHICH WE COULD DESIGNATE

25   IT.  THEY THOUGHT WE HAD SURPRISED THEM BY DESIGNATING

1   PROFESSOR KONHEIM.  THEY COULD HAVE DESIGNATED

2   PROFESSOR HELLMAN AT THAT POINT IN TIME.

3            WE ASKED THEM AND WE HAVE BEEN ASKING THEM.  AS

4   LATE AS THIS MORNING BEFORE WE CAME HERE, WE SAID, "ARE

5   YOU GOING TO PUT PROFESSOR HELLMAN ON THE STAND?"

6            AND THEY SAID "NO."

7            AND TO DO THIS NOW I THINK IS -- MY HAT IS OFF.

8   I'VE LEARNED SOMETHING FROM MR. KENNEDY HERE TODAY.  AND I

9   RECOGNIZE THAT IF THE COURT ULTIMATELY THINKS THERE IS

10  SOMETHING TO BE GAINED BY HAVING PROFESSOR HELLMAN COME ON

11  THE STAND, THAT HE'S GOING TO DO IT.  BUT I DO WANT TO

12  REGISTER MY SHARP PROTEST, THAT THERE ARE RULES, AND WE

13  ARE SETTING THE STAGE HERE FOR WHAT THE RULES ARE GOING TO

14  BE THAT WE'RE GOING TO PLAY BY IN LATER HEARINGS AND

15  TRIALS.

16           AND I THINK THAT THIS IS UNFAIR.  IT SHOULD HAVE

17  BEEN DONE BEFORE.  THEY SHOULD HAVE TOLD US LAST NIGHT.

18  THEY SHOULD HAVE TOLD US THIS MORNING.  AND TO DO THIS AT

19  THE 12TH HOUR I THINK IS JUST --

20           THE COURT:  I THOUGHT THERE WAS A REQUEST.

21  WASN'T THERE A REQUEST THE DAY BEFORE?

22           MR. KENNEDY:  YES, YOUR HONOR.  WE'VE TOLD THEM

23  FROM THE VERY BEGINNING THAT WE INTENDED TO CALL

24  PROFESSOR HELLMAN, NOT AS AN EXPERT, BUT AS A PERCIPIENT

25  WITNESS.  THEY'VE KNOWN ABOUT THAT FOR WEEKS.

1          I CONTINUE TO FEEL, WHETHER IT'S EXPERT OR

2    PERCIPIENT, HE DOESN'T HAVE ANYTHING THAT'S GOING TO HELP

3    THIS COURT INTERPRET A WRITTEN DOCUMENT.  BUT I HAVE BEEN

4    WRONG BEFORE.  AND IF THE COURT FEELS OTHERWISE --

5    OBVIOUSLY, THE GOAL HERE IS NOT GAMESMANSHIP; IT'S TO GIVE

6    THE COURT WHATEVER ASSISTANCE WOULD BE HELPFUL.  IF THE

7    COURT HAS QUESTIONS FOR PROFESSOR HELLMAN, HE'S HERE.

8          THE COURT:  THANK YOU VERY MUCH.

9          NO, I BELIEVE THAT WE SHOULD HAVE RULES AND

10   ENFORCE THEM, TOO.  I AM NOT AS STRICT AS OTHERS.  I'M

11   GOING TO WEIGH THE PREJUDICE OF A MISTAKE, IF THAT'S WHAT

12   IT WAS, AGAINST OPENING UP A LITTLE BIT AND NOT APPLYING

13   THE RULES EXPLICITLY, BECAUSE SOMETIMES A PERSON CAN MAKE

14   A MISTAKE, AND IT WOULD BE VERY PREJUDICE IN THE CASE NOT

15   TO HAVE IT GO FORWARD.

16         IN THIS CASE, I DON'T THINK IT WOULD BE TERRIBLY

17   PREJUDICIAL NOT TO HAVE MR. HELLMAN ON THE STAND.  HE'S

18   MADE A PRESENTATION WHICH IMPRESSED ME, AND I THINK I

19   UNDERSTAND MUCH OF WHAT HE SAID.  AND WHAT I DIDN'T

20   UNDERSTAND, I'LL PROBABLY GET IT BEFORE THE CASE IS OVER.

21         BUT THE FEW THINGS THAT YOU THINK MIGHT BE

22   HELPFUL TO ME, NOT GO THROUGH THE WHOLE ROUTINE AGAIN, I

23   WOULD SAY THAT I WOULD BEND THE RULE.  LET ME THINK ABOUT

24   IT DURING THE RECESS.  BECAUSE THERE MAY BE SOMETHING

25   SPECIFIC HE COULD ASK HIM AND THEN LIMIT THAT RATHER THAN

1    A FULL BORE OR FULL RANGE OF CROSS-EXAMINATION.

2            MR. KENNEDY:  THANK YOU, YOUR HONOR.

3            MR. SCHLAFLY:  YOUR HONOR, I'D LIKE TO MAKE A

4    SEPARATE OBJECTION --

5            THE COURT:  ALL RIGHT.

6            MR. SCHLAFLY:  -- WHICH YOU CAN THINK ABOUT.

7            I HAVE KIND OF MIXED VIEWS ON THIS BECAUSE I SIT

8    HERE ON THE STAND SPECULATING ABOUT WHAT HELLMAN SAYS, AND

9    IF THE PLAN WAS TO --

10           THE COURT:  I VIEW IT AS SPECULATION.  THAT'S

11   THE WEIGHT I'LL GIVE IT.

12           MR. SCHLAFLY:  AND OBVIOUSLY, HERE'S THE SOURCE

13   RIGHT HERE.

14           ON THE OTHER HAND, I DEPOSED PROFESSOR HELLMAN

15   ABOUT A YEAR AGO NOW.  AND IN THAT DEPOSITION, I ASKED HIM

16   VERY SPECIFIC QUESTIONS ABOUT WHAT HE MEANT BY

17   "COMPUTATIONALLY INFEASIBLE" AND WHAT WAS MEANT AT THE

18   TIME BY "COMPUTATIONALLY INFEASIBLE."

19           AND I GOT NOTHING OUT OF IT.  I MEAN, HE EITHER

20   SAID THAT HE DIDN'T REMEMBER, OR MR. FLINN, YOU KNOW,

21   INSTRUCTED HIM NOT TO ANSWER.  AND I GOT NOTHING OUT OF

22   HIM ON THIS SUBJECT.

23           AND I WOULD HAVE LIKED TO HAVE HAD SOME ADVANCE

24   NOTICE AS TO WHAT HE'S SAYING IN THE DEPOSITION, AND I

25   THINK IT'S A LITTLE UNFAIR FOR HIM TO COME AND TESTIFY NOW

1    WHEN HE DIDN'T --

2          THE COURT:  AND NOT BE ENLIGHTENED OF ME WHEN I

3    ASKED THOSE QUESTIONS?

4          MR. SCHLAFLY:  WELL, IF YOU WANT TO ASK HIM, GO

5    AHEAD.  I WOULD JUST LIKE TO SAY I THINK --

6          THE COURT:  NO.  IF THE WITNESS DOESN'T HAVE ANY

7    KNOWLEDGE AT THE TIME AND THEN COMES UP AND ANSWERS LATER,

8    THEN THEY CAN ALWAYS WONDER WHY AND ASK QUESTIONS OF HOW

9    COME AT ONE TIME YOU COULDN'T REMEMBER OR COULDN'T ANSWER

10   QUESTIONS AND NOW YOU CAN, IF THAT'S WHAT THE DEPOSITION

11   ACTUALLY DEMONSTRATES.

12         MR. FLINN:  YOUR HONOR, I WAS THERE AT THE

13   DEPOSITION.  I DEFENDED PROFESSOR HELLMAN.

14         THAT IS NOT WHAT HAPPENED AT THE DEPOSITION.

15   AND THE SUGGESTION THAT SOMEHOW PROFESSOR HELLMAN FEIGNED

16   SOME LACK OF RECALL IN THAT DEPOSITION, WHICH, AS I

17   UNDERSTAND THE IMPORT OF MR. SCHLAFLY'S COMMENT, IS

18   UNTRUE.

19         IF THAT WERE TRUE, HE HAD THE RECORD OF THE

20   DEPOSITION.  HE COULD HAVE BROUGHT IT AT THIS TIME.  HE

21   GOT THE DEPOSITION; THEY WERE THERE.  THAT IS NOT A

22   CORRECT CHARACTERIZATION, YOUR HONOR, OF WHAT HAPPENED AT

23   THE DEPOSITION.

24         THE COURT:  FINE.  OKAY.

25         ALL RIGHT.  WE WILL COME BACK TO THE SPECIFIC

222

1   AREAS, IF I DO WISH TO HEAR FROM HIM, SPECIFIC AREAS THAT

2   I'M INTERESTED IN.  I'LL ACCEPT IT NOT AS GOSPEL TRUTH OF

3   WHAT IT IS; I MAKE THAT DECISION; BUT I'D LIKE TO KNOW

4   WHAT THE ATTITUDE IS AND THE INTERPRETATION MIGHT BE OF

5   OTHER PEOPLE.  AND I CAN BE SPECIFIC AS I WANT HERE.

6        AND IF THERE IS INCONSISTENCY WITH WHAT HE SAID

7   IN A DEPOSITION, THEN YOU CAN BRING IT UP.  OKAY?

8        MR. SCHLAFLY:  OKAY.

9        THE COURT:  OKAY.  1:30.

10        (LUNCH RECESS TAKEN AT 11:57 A.M.)

11        (PROCEEDINGS RESUMED AT 1:37 P.M.)

12        THE COURT:  I DON'T BELIEVE I NEED ANY MORE

13   TESTIMONY AT THIS TIME.  SO WE WILL DISPENSE WITH FURTHER

14   TESTIMONY.  IF I NEED ANY MORE EXTRINSIC EVIDENCE, I MAY

15   CALL YOU.  BUT I THINK THAT WE'RE SATISFIED NOW.

16        I WOULD LIKE TO ARGUE IT, THOUGH, ON THE

17   APPLICATION OF SECTION 112, PARAGRAPH SIX, TO THE CLAIMS

18   IN THIS CASE.  NOTHING CRITICAL TO UNDERSTAND THAT.  SO I

19   WELCOME ARGUMENT ON THAT.

20        AFTER WE CONCLUDE THAT, I WILL HEAR THE MOTION

21   FOR REMAND.

22        MR. HASLAM?

23        MR. HASLAM:  THE COURT HAS ASKED US TO ADDRESS

24   THAT, AND I THINK THAT THERE WAS ONE POINT THAT THE BRIEFS

25   MADE CLEAR, THE VOLUMINOUS BRIEFS MADE CLEAR, WAS THAT THE

1    APPLICATION OF 35, 112, PARAGRAPH SIX TO THIS CASE, IS ONE

2    OF THE PRINCIPAL ISSUES THAT WE'RE HERE TO DECIDE.

3            THE COURT:  RIGHT.

4            MR. HASLAM:  AND THE SIGNIFICANCE OF THAT IS

5    PLAINLY THIS:  IF THE CLAIMS, IN PARTICULAR, CLAIMS 1 TO

6    5, ARE SUBJECT TO THAT -- BECAUSE THERE IS NO DISPUTE THAT

7    CLAIM 6 IS SUBJECT TO 35, 112, PARAGRAPH SIX -- THEN THE

8    INVENTION IS LIMITED TO THE DISCLOSED EMBODIMENTS, OR

9    THEIR EQUIVALENTS.  AND HERE, THAT WOULD BE THE TRAP DOOR

10   KNAPSACK, OR ITS EQUIVALENTS, IF THERE ARE ANY.

11           WHAT WE REALLY ARE DISCUSSING HERE ARE REALLY

12   MATTERS OF SUBSTANCE, AND I THINK TO SOME EXTENT, LOST IN

13   THE RHETORIC, AND PERHAPS DESIGNEDLY SO, BY CYLINK, TO

14   TREAT IT REALLY AS A SEMANTIC ISSUE AND ONE OF WHETHER

15   MAGIC WORDS APPEAR OR NOT.  AND I WILL GET LATER TO WHAT I

16   THINK THE COURTS HAVE SAID ABOUT THE SIGNIFICANCE OF THAT.

17           BUT I THINK WHAT WE'RE REALLY DEALING WITH HERE

18   IS:  IT IS AN UNDERLYING PRINCIPLE OF THE PATENT LAW THAT

19   GOES BACK TO THE MORSE CASE, AND IS STILL GOOD LAW TODAY,

20   AND IT'S A MORE FUNDAMENTAL CONCERN.  AND IT'S NOT THE

21   SEMANTIC CONCERN OF:  CAN I GO TO A DICTIONARY AND FIND

22   THE DEFINITION OF A PARTICULAR WORD.

23           IT IS:  ARE THE CLAIMS, WHEN SO CONSTRUED, ARE

24   THE CLAIMS, WHEN YOU'VE GONE TO THE DICTIONARY, OF SUCH

25   INDEFINITENESS OR BREADTH, DO THEY TALK MORE ABOUT THE

1    DESIRED RESULT THAN REALLY HOW TO DO IT, DO THEY SWEEP TOO

2    BROADLY.  THAT'S WHAT WE'RE REALLY TALKING ABOUT HERE.

3              AND I WILL BE THE FIRST TO ADMIT THE LINE IS NOT

4    A BRIGHT LINE, AS IT FREQUENTLY ISN'T.  IN MANY AREAS OF

5    THE LAW, AND I WOULD VENTURE TO SAY IN THE PATENT AREA,

6    THERE ARE MANY DICTUMS THAT THE COURTS LAY DOWN.  WHEN

7    YOU, AT THE TRIAL LEVEL, HAVE TO APPLY THEM, THEY AREN'T

8    AS EASY AS THEY SEEM AT THE APPELLATE LEVEL.

9              BUT I DO BELIEVE HERE THAT WE'VE PRESENTED A

10   CONVINCING CASE, AND I WILL ARGUE IT, THAT ON THIS ONE, WE

11   CLEARLY ARE ON THE OTHER SIDE OF THE LINE.

12             THESE CLAIMS, IF THEY MEAN NOTHING MORE THAN

13   WHAT CYLINK SAYS, REALLY DO SEEK TO PATENT THE FUTURE.

14   THEY REALLY ARE INIMICAL TO THE PURPOSES OF THE PATENT

15   STATUTE, WHICH ARE TO FOSTER INNOVATION RATHER THAN TO

16   STIFLE IT.

17             NOW, THE CASE LAW -- AND WE'LL TURN TO THE CASE

18   LAW -- IS NOT NEARLY AS VOLUMINOUS AS CYLINK WOULD HAVE

19   YOU BELIEVE.  NOW, THEY DID A VERY IMPRESSIVE JOB OF

20   BRIEFING AND REBRIEFING AND SUPPLEMENTALLY BRIEFING THE

21   ISSUE OF 112.6, AND THEY HAVE GIVEN THE COURT MANY

22   APPENDICES OF CASES.

23             AND WE WILL, TO THE EXTENT NECESSARY, WE HAVE

24   GONE THROUGH THEM, AND WE CAN PROVIDE A SUMMARY RECITATION

25   OF WHAT THOSE CASES REALLY STAND FOR.  AND WE CAN DO THAT,