1    AND I WILL DISCUSS THOSE APPENDICES HERE.

2          BUT I'D LIKE TO SORT OF START ORALLY WITH WHAT I

3    THINK IS THE APPENDIX THAT WE MIGHT PROVIDE TO THE COURT,

4    AND THAT APPENDIX GOES BACK AND STARTS WITH TWO SUPREME

5    COURT CASES WHICH ARE STILL GOOD LAW TODAY AND HAVE NEVER

6    BEEN OVERRULED.  AND THE FIRST OF THOSE IS O'REILLY V.

7    MORSE, MORSE CODE, THE TELEGRAPH.  AND I DON'T BELIEVE --

8    THEY CAN QUIBBLE WITH US IF THEY WOULD LIKE --

9          THE COURT:  WE DON'T HAVE ANY QUIBBLING IN THIS

10   COURTROOM.

11         MR. HASLAM:  WE ONLY DO IT OUTSIDE.  WE ONLY DO

12   IT OUTSIDE, AND THERE IS A MINIMUM OF THAT.  I ARGUE; THEY

13   QUIBBLE.

14         IN MORSE, WHICH WAS, I GUESS, ARGUABLY IF YOU

15   WANT TO THROW THE TERM LOOSELY AROUND, A PIONEERING

16   INVENTION -- ALTHOUGH I'M NOT SURE WHAT THE SIGNIFICANCE

17   OF HAVING SAID THAT IS -- WAS PROBABLY SOMETHING THAT

18   PEOPLE AT THE TIME, AND MAYBE EVEN NOW, WOULD SAY WAS

19   REASONABLY PIONEERING.  THE CLAIM -- AND ADMITTEDLY, THE

20   CLAIMS WERE DRAFTED SOMEWHAT DIFFERENTLY THERE, BUT THE

21   CLAIM THAT THE COURT WAS CONSIDERING WAS THIS.  AND IT'S

22   ON PAGE 35 OF 56 U.S. 62, WHICH I BELIEVE MAY BE A LEXIS

23   CITE.  NO, IT'S 56 U.S. 62.

24         AND I'M READING FROM -- WELL, NOW I TRIED TO

25   MOVE TO THE DIGITAL WORLD.  I'LL GET THE CITE.  I'M

1    READING, OBVIOUSLY, FROM A LEXIS PRINTOUT, AND IT'S NOT

2    PAGINATED THE WAY IT IS IN THE U.S. REPORTS.

3          BUT HERE IS WHAT THE CLAIM SAID, AND WE WILL

4    PROVIDE THE CITE.

5              "I DO NOT PROPOSE TO LIMIT MYSELF TO THE

6              SPECIFIC MACHINERY OR PARTS OF MACHINERY

7              DESCRIBED IN THE FOREGOING SPECIFICATION AND

8              CLAIMS."

9          THAT COULD BE SAID ABOUT CYLINK, HERE.  AND HERE

10   WE GO TO WHAT I THINK TROUBLED THE COURT THERE.

11             "THE ESSENCE OF MY INVENTION BEING THE USE OF

12             THE MOTIVE POWER OF THE ELECTRIC OR GALVANIC

13             CURRENT, WHICH I CALL ELECTROMAGNETISM, HOWEVER

14             DEVELOPED FOR MARKING OR PRINTING INTELLIGIBLE

15             CHARACTERS, SIGNS, OR LETTERS, AT ANY DISTANCES,

16             BEING A NEW APPLICATION OF THAT POWER OF WHICH

17             I CLAIM TO BE THE FIRST INVENTOR OR DISCOVERER."

18         I THINK IN TERMS SIMILAR TO WHAT'S BEING CLAIMED

19   HERE, THAT THE GENERATION OF KEYS AND THE PROCESSING OF

20   MESSAGES, HOWEVER DELINEATED, IS TO GENERATE SECRET OR

21   DECIPHERED MESSAGES I CLAIM FOR MYSELF.

22         AND THE PROBLEM THAT THE SUPREME COURT HAD IN

23   MORSE WASN'T THAT THEY THEY COULDN'T GO TO A DICTIONARY

24   AND UNDERSTAND WHAT "GALVANIC CURRENT" MEANT OR WHAT

25   "ELECTROMAGNETISM" MEANT OR WHAT "INTELLIGIBLE CHARACTERS"

1   OR "SIGNS" OR "LETTERS" OR ANY OTHER WORD, THEIR CONCERN

2   WAS THE OVERBREADTH AND INDEFINITENESS OF THAT CLAIM.

3            AND THEY SAID SUCH THINGS AS THIS, AND I'M,

4   AGAIN, READING FROM PAGE 35:

5            "FOR AUGHT THAT WE NOW KNOW SOME FUTURE

6            INVENTOR, IN THE ONWARD MARCH OF SCIENCE, MAY

7            DISCOVER A MODE OF WRITING OR PRINTING AT A

8            DISTANCE BY MEANS OF THE ELECTRIC OR GALVANIC

9            CURRENT, WITHOUT USING ANY PART OF THE PROCESS

10           OR COMBINATION SET FORTH IN THE PLAINTIFF'S

11           SPECIFICATION."

12   AND THEY GO ON TO SAY:

13           "BUT YET IF IT IS COVERED BY THIS PATENT THE

14           INVENTOR COULD NOT USE IT, NOR THE PUBLIC HAVE

15           THE BENEFIT OF IT WITHOUT THE PERMISSION OF THIS

16           PATENTEE."

17           AND THEY WENT ON TO HOLD THAT THAT CLAIM WAS

18   INVALID BECAUSE IT WAS TOO BROAD AND INDEFINITE.

19           MORSE, I BELIEVE, LIVES TODAY.  ALTHOUGH IT MAY

20   LIVE IN A DIFFERENT SECTION OR A SPECIFIC SECTION OF THE

21   PATENT STATUTE, IN IN RE HYATT, 708 F.2D 712, WHICH WAS A

22   SINGLE MEANS CLAIM, WHICH IS DIFFERENT THAN THE SPECIFIC

23   CLAIMS HERE, THE COURT DID DISCUSS THAT WHAT MORSE STOOD

24   FOR WAS OVERBREADTH, FINDS MEANING AND CONTENT IN THE

25   CURRENT STATUTE AT SECTION 112, PARAGRAPH ONE.

1    AND HERE'S WHAT THEY SAID, AGAIN, CITING AT PAGE

2    THREE OF WHAT I'VE GOT, AND I GUESS IT IS PAGE 708 F.2D

3    714.  TALKING ABOUT MORSE:

4         "THUS, THE CLAIM IS PROPERLY REJECTED UNDER

5         MORSE FOR WHAT USED TO BE KNOWN AS UNDUE BREADTH

6         BUT HAS SINCE BEEN APPRECIATED AS BEING MORE

7         ACCURATELY BASED ON THE FIRST PARAGRAPH OF

8         SECTION 112."

9         THEN IT GOES ON TO SAY, AT THE BOTTOM OF THAT

10   SAME PAGE, 714:

11        "A CLAIM WHICH IS OF SUCH BREADTH THAT IT

12        READS ON SUBJECT MATTER AS TO WHICH THE

13        SPECIFICATION IS NOT ENABLING SHOULD BE REJECTED

14        UNDER THE FIRST PARAGRAPH OF SECTION 112 RATHER

15        THAN THE SECOND."

16        AND IT GOES ON TO SAY, AND I THINK WHAT IS OF

17   PARTICULAR SIGNIFICANCE HERE, THE FINAL PARAGRAPH OF

18   SECTION 112, THAT'S PARAGRAPH SIX:  "SAVES COMBINATION

19   CLAIMS DRAFTED USING MEANS PLUS FUNCTION FORMAT FROM THIS

20   PROBLEM," NOT THE PROBLEM THAT I CAN'T GO TO A DICTIONARY

21   AND FIND A WORD, BUT IT SAVES IT FROM THE PROBLEM OF

22   INDEFINITENESS AND UNDUE BREADTH BY PROVIDING A

23   CONSTRUCTION, WHICH IS WHAT THE COURT DOES IN A MARKMAN

24   HEARING, OF THAT FORMAT NARROW ENOUGH TO AVOID THE PROBLEM

25   OF UNDUE BREADTH IS FORBIDDEN BY THE FIRST PARAGRAPH.

1        SO MORSE, WHICH WAS DECIDED BACK IN 1854, WAS

2   RECENTLY REAFFIRMED IN 1983, AND BROUGHT INTO THE CURRENT

3   PATENT STATUTE.

4        THE SECOND SUPREME COURT CASE WHICH WOULD BE AT

5   THE HEAD OF OUR APPENDIX IS THE HALLIBURTON CASE.  IN

6   HALLIBURTON, THE SUPREME COURT REVIEWED A COMBINATION

7   CLAIM FOR AN APPARATUS COMPRISING A COMBINATION OF

8   ELEMENTS, WHERE ONE ELEMENT WAS WRITTEN IN MEANS PLUS

9   FUNCTION FORM.

10        AND AMONG THE LANGUAGE THAT THE COURT WAS

11   CONCERNED WITH AND DISCUSSING WAS A MEANS ASSOCIATED WITH

12   SAID PRESSURE RESPONSIVE DEVICE FOR TUNING SAID RECEIVING

13   MEANS TO THE FREQUENCY OF ECHOES FROM THE TUBING COLLARS,

14   ET CETERA, AND IT WENT ON.

15        AND THE COURT HELD THAT CLAIM INVALID FOR

16   SIMILAR REASONS.  IT WAS UNDUE BROADNESS, AMBIGUITY, AND

17   WHAT THE SUPREME COURT SAID WAS THE OVERHANGING THREAT OF

18   A FUNCTIONAL CLAIM SUCH AS THAT.

19        AND I WOULD SUBMIT -- THE COURT DOESN'T SUGGEST

20   OR SAY IN HERE -- BUT I WOULD NOTE THAT THAT CLAIM

21   INCLUDES WHAT CYLINK CALLS AN ACTION VERB, TUNING, WHICH

22   I'M SURE IN THAT ART, YOU COULD HAVE GONE TO EITHER A

23   DICTIONARY -- WHICH THIS DEALS WITH SOME SORT OF AN

24   ACOUSTICAL RESONATOR -- YOU COULD HAVE GONE TO PEOPLE AND

25   SAID, "WHAT DOES TUNING IN AN ACOUSTICAL RESONATOR MEAN?"

1    AND THEY PROBABLY SAID, "I UNDERSTAND WHAT THAT

2    MEANS."

3    BUT THAT WASN'T THE CONCERN THAT THE COURT HAD.

4    THE CONCERN WAS THAT YOU WOULD HAVE THIS BROAD, AMBIGUOUS,

5    AND UNDULY FUNCTIONAL CLAIM BECOMING A THREAT.  AND THEY

6    SAID, IN LANGUAGE ON 329 U.S. 1, PAGE 10, THE LANGUAGE I

7    THINK EQUALLY APPLICABLE HERE:

8    (READING)    IN THIS AGE OF TECHNOLOGICAL DEVELOPMENT,

9        THERE MAY BE MANY OTHER DEVICES BEYOND OUR

10       PRESENT INFORMATION WHERE INDEED OUR IMAGINATION

11       WILL PERFORM THAT FUNCTION AND YET FIT THESE

12       CLAIMS.  AND UNLESS FRIGHTENED FROM THE

13       COURSE OF EXPERIMENTATION BY BROAD FUNCTIONAL

14       CLAIMS LIKE THESE, INVENTIVE GENIUS MAY INVOLVE

15       MANY MORE DEVICES TO ACCOMPLISH THE SAME

16       PURPOSE."

17   I WOULD SUBMIT THAT THERE, IN HALLIBURTON, THE

18   SUPREME COURT AGAIN VOICED THE SAME CONCERN THAT IT VOICED

19   IN MORSE, AND STILL ANIMATES THE PATENT LAWS TODAY.  WE

20   WANT TO ENCOURAGE INNOVATION, NOT STIFLE IT.

21   NOW, ADMITTEDLY, HALLIBURTON HAS BEEN AFFECTED

22   BY CONGRESS.  CONGRESS' RESPONSE TO HALLIBURTON WAS TO

23   CARVE OUT AN EXCEPTION.  AND IT OVERRULED THE SPECIFIC

24   HOLDING OF HALLIBURTON.  BUT IT DIDN'T GO TO SAY:  WE

25   DON'T CARE WHETHER CLAIMS ARE WRITTEN IN THAT BROAD

1   FUNCTIONAL LANGUAGE.  IT'S NOT A CONCERN OF CONGRESS' OR

2   THE PATENT STATUTES.

3          WHAT THEY SPECIFICALLY ENDORSED IS:  WE WILL LET

4   YOU WRITE BROAD FUNCTIONAL CLAIMS THAT WOULD, ON THEIR

5   FACE, LIKE THESE, BE INDEFINITE, BUT WE WILL SAVE THOSE

6   CLAIMS BY LIMITING THEM TO WHAT YOU ACTUALLY DISCLOSE AS

7   YOUR INVENTION, OR THE VARIETIES OF YOUR INVENTION AND THE

8   EQUIVALENTS.  AND THAT'S A FAIR TRADE.

9          IF YOU THINK YOU'VE INVENTED, IF

10  PROFESSOR HELLMAN HAD INVENTED MANY VARIOUS SPECIES OF

11  PUBLIC KEY CRYPTOGRAPHY, HE COULD HAVE DISCLOSED THEM ALL,

12  AND HE WOULD HAVE HAD A CLAIM TO EACH ONE OF THOSE AND

13  THEIR EQUIVALENTS.  AND THE NUMBER THAT HE MIGHT HAVE BEEN

14  ENTITLED TO CLAIM MIGHT HAVE BEEN ESSENTIALLY BROADER.

15         BUT HE ONLY INVENTED ONE.  HE INVENTED THE TRAP

16  DOOR KNAPSACK.  AND WHAT HE'S NOW TRYING TO DO IS TO

17  BROADEN IT FAR BEYOND ANYTHING THAT HE CONCEIVED OF AT THE

18  TIME OR INVENTED AT THE TIME.

19         AND I THINK IT'S IMPORTANT TO NOTE THAT

20  CONGRESS, IN PASSING 35 U.S.C. 112, PARAGRAPH SIX, LEFT

21  HALLIBURTON IN PLACE TO THE EXTENT YOU WRITE A CLAIM WHICH

22  IS STILL INDEFINITE AND BROAD, AND YOU DON'T SAVE IT BY

23  112, PARAGRAPH SIX.

24         IN OTHER WORDS, I THINK THAT A PLAINTIFF OR A

25  PATENTEE HAS A CHOICE.  AND I THINK REALLY IT IS NOT A

1    CHOICE, BECAUSE IT'S ONE THAT THE COURT APPLIES, AND THAT

2    IS, THAT IF IT DOES NOT WANT TO BE RESTRICTED TO THE

3    SPECIFICATION AS GIVING CONTENT TO A BROAD FUNCTIONAL

4    CLAIM, THEN IT IS UNDER AN OBLIGATION NOT TO WRITE CLAIMS

5    IN THAT KIND OF BROAD, FUNCTIONAL LANGUAGE.

6            NOW LET'S BRING IT UP TO THE MODERN ERA, IF I

7    CAN, AND THE MOST RECENT PRONOUNCEMENT BY THE FEDERAL

8    CIRCUIT ON THIS.  AND I GUESS BOTH SIDES AGREE THAT AT

9    LEAST A MORE RECENT -- OR ONE OF THE MORE RECENT CASES IS

10   GREENBERG VERSUS ETHICON ENDOSURGERY, INC.  AND THE CITE I

11   HAVE IS 39 U.S. PATENT QUARTERLY 2ND 1783.

12           NOW, CYLINK DOES TELL THE COURT THAT IT'S THE

13   GUIDING CASE, AND IT'S THE MOST RECENT PRONOUNCEMENT ON

14   THE SUBJECT.  AND I BELIEVE THAT THEY ARGUE THAT WHAT

15   GREENBERG SAYS IS:  IF YOU DON'T SEE THE MAGIC WORDS

16   "MEANS FOR" OR "STEP FOR" IN A CLAIM, IT IS NOT A MEANS

17   PLUS FUNCTION CLAIM OR A STEP PLUS FUNCTION CLAIM, AND

18   SHOULDN'T BE READ PURSUANT TO 35 U.S.C. 112.6.

19           BUT I THINK THAT'S NOT A FAIR READING OF WHAT

20   THE COURT IN GREENBERG DID.  ADMITTEDLY, IN GREENBERG, THE

21   COURT REVERSED A DISTRICT COURT ORDER WHICH HAD APPLIED

22   112.6 TO A CLAIM NOT SPECIFICALLY WRITTEN.

23           BUT I THINK FOR PURPOSES HERE, IT'S WHAT THE

24   COURT SAID ON PAGE 1786 WHICH IS OF IMPORTANCE.  AND THEY

25   SAY THAT:  WE DO NOT MEAN TO SUGGEST THAT SECTION 112,

1   PARAGRAPH SIX, IS TRIGGERED ONLY IF THE CLAIM USES THE

2   WORD "MEANS."

3            THE PATENT AND TRADEMARK OFFICE HAS REJECTED

4   THAT ARGUMENT, THAT ONLY THE MEANS WILL INVOKE SECTION

5   112, PARAGRAPH SIX.  AND HERE, I THINK IT'S IMPORTANT,

6   BECAUSE IT DOES GO, I THINK, TO THE CREDIBILITY OF THE

7   CASE AND THE CASE CITATIONS THAT CYLINK HAS MADE TO YOU.

8            THE COURT GOES ON TO SAY, "AND WE AGREE," CITING

9   THE RAYTHEON CASE.  AND THE PARENTHETICAL THAT THEY

10  INCLUDE IS THE CONSTRUING FUNCTIONAL LANGUAGE INTRODUCED

11  BY SOME THAT THE TO BE EQUIVALENT TO MEANS FOR CLAIM

12  LANGUAGE.

13           NOW, CYLINK READS THE RAYTHEON CASE AS STANDING

14  FOR THE PROPOSITION THAT THE COURT APPLIED SECTION 112,

15  PARAGRAPH SIX, IN SPITE OF THE PRESENCE OF "SO THAT"

16  LANGUAGE.

17           THE FEDERAL CIRCUIT IN GREENBERG SAID, NO, IT

18  WAS BECAUSE OF THE "SO THAT" LANGUAGE IN THAT CASE THAT

19  THEY APPLIED SECTION 112, PARAGRAPH SIX.  AND THEY DID IT

20  AGAIN, NOT BECAUSE -- I SUBMIT YOU CAN GO BACK TO THE

21  CLAIM LANGUAGE IN RAYTHEON, AND YOU CAN GO TO A

22  DICTIONARY, AND YOU CAN FIND A MEANING FOR EVERY WORD --

23  THEY DIDN'T MAKE UP ANY HERE -- AND THE COURT STILL SAID:

24  THIS IS TOO FUNCTIONAL; IT'S TOO BROAD; IT'S TOO

25  INDEFINITE; AND THEREFORE, IT'S SUBJECT TO 112, PARAGRAPH

1   SIX.

2            AND SECOND, I THINK THE COURT STRESSED THAT IN

3   THAT CASE, THE DISTINGUISHING FACTOR WAS THAT THE WORD

4   "DETENT MECHANISM" HAD A WELL-UNDERSTOOD STRUCTURAL

5   CONTENT IN THE ART.  AND I THINK HERE THAT THE TESTIMONY

6   IS THAT THAT IS NOT THE CASE HERE.

7            PROFESSOR KONHEIM SAID -- AND I THINK FAIRLY

8   READ, AND I SAT HERE AND LISTENED TO HIS TESTIMONY -- IT

9   WASN'T SO MUCH THAT HE COULDN'T GO TO A DICTIONARY AND

10  FIND ALL OF THE WORDS; IT WAS THAT WHEN HE LOOKED AT WHAT

11  HE HAD AFTER DOING THAT, IT REALLY TOLD HIM WHAT HE WAS TO

12  ACCOMPLISH BUT NOT HOW TO DO IT.

13           AND I'D LIKE TO JUST PUT UP I THINK WHAT ARE TWO

14  OF THE CRITICAL ELEMENTS THAT WE'RE TALKING ABOUT HERE,

15  AND THEY'RE WHAT WE'VE LABELED AS CLAIM ELEMENTS 1(C),

16  WHICH IS GENERATING THE SECRET KEY, AND CLAIM ELEMENT

17  1(E), WHICH IS ENCIPHERING THE MESSAGE.

18           AND I SAY THAT THESE ARE THE CRITICAL STEPS

19  BECAUSE I THINK THIS IS WHERE YOU FIND, IF ANYTHING, THE

20  LANGUAGE WHICH WAS INTENDED TO TRY TO DISTINGUISH THE

21  PRIOR ART AND WHICH WAS INTENDED TO SET FORTH THE

22  ESSENTIAL RELATIONSHIPS THAT PROFESSOR HELLMAN AND

23  MR. MERKLE PUBLISHED EARLIER AND ATTEMPTED TO PATENT HERE

24  IN THE TRAP DOOR KNAPSACK.

25           1(C) SAYS:  "GENERATING FROM SAID RANDOM NUMBERS

1   A SECRET DECIPHERING KEY AT THE RECEIVER SUCH THAT THE

2   SECRET DECIPHERING KEY IS DIRECTLY RELATED TO AND

3   COMPUTATIONALLY INFEASIBLE TO GENERATE FROM THE PUBLIC

4   ENCIPHERING KEY."

5           I DON'T THINK THERE IS ANY DISPUTE THAT THE

6   LANGUAGE AFTER "SUCH THAT" DOESN'T TELL YOU ANYTHING ABOUT

7   HOW TO ACCOMPLISH THAT RESULT.  IT IS TALKING ABOUT

8   ATTRIBUTES OF SOME OTHER ACT.

9           AND THE OTHER ACT, IF THERE IS TO BE CONTENT

10  HERE, IS, "GENERATING FROM SAID RANDOM NUMBERS A SECRET

11  DECIPHERING KEY AT THE RECEIVER."

12          BUT THAT DOESN'T TELL YOU ANYTHING.  ALMOST THAT

13  SAME LANGUAGE IS IN THE PRIOR ART IN MULTIUSER, EXHIBIT

14  1001.  THE PARADIGM OF PUBLIC KEY CRYPTOGRAPHY WAS

15  DISCLOSED THERE.

16          AND IT WAS DISCLOSED IN A PUBLICATION WHICH THE

17  INVENTORS AND CYLINK THEMSELVES HAD SAID DIDN'T REALLY

18  HAVE ANY ENABLING CONTENT, DIDN'T REALLY DESCRIBE ANYTHING

19  BUT A CONCEPT, DIDN'T REALLY DESCRIBE ANYTHING BUT A

20  FUNCTIONAL RESULT.

21          AND IF IT WAS A FUNCTIONAL RESULT WHEN

22  DESCRIBED, WHEN USED IN MULTIUSER IN 1975, THAT SAME

23  LANGUAGE IN THE PATENT REMAINS AS FUNCTIONAL AND

24  INDEFINITE THERE.

25          JUST NOTE IN EXHIBIT 1001, WE CAN FIND ALMOST

1    THE SAME GENERAL DESCRIPTION AS WE DO IN 1(C).

2         ON PAGE 110 OF EXHIBIT 1001, "WE'RE TOLD THE

3    GENERATION OF THIS E-D," THOSE BEING THE ENCIPHERING AND

4    DECIPHERING KEYS, "IS BEST DONE AT THE USER'S TERMINAL."

5         SO WE'RE GENERATING THIS PAIR THAT ARE GOING TO

6    HAVE SOME FUNCTIONAL RELATIONSHIP.  "THE USER THEN KEEPS

7    THE DECIPHERING KEY D SECRET," SECRET KEY, "AND MAKES THE

8    ENCIPHERING KEY E PUBLIC," A NOTE HE SAYS BY PLACING IT IN

9    A CENTRAL FILE ALONG WITH HIS NAME AND ADDRESS, WHICH, I

10   THINK, IS AUTHENTICATION AND IDENTIFICATION BY ANY OTHER

11   NAME.

12        BUT WE HAVE THERE THE GENERAL CONCEPT OF

13   FUNCTIONAL DESCRIPTION OF GENERATING A SECRET AND A PUBLIC

14   KEY, AND THAT THE SECRET AND THE PUBLIC KEY WILL HAVE SOME

15   FUNCTIONAL RELATIONSHIP.

16        AND IN THE PARAGRAPH ABOVE THAT, ON PAGE 110,

17   WE'RE TOLD THAT:  ALTHOUGH D IS DETERMINED FROM E, IT IS

18   INFEASIBLE TO COMPUTE D, THE PRIVATE KEY FROM THE PUBLIC

19   KEY.

20        SO WE HAVE THE GENERATION OF A KEY PAIR; WE HAVE

21   THE COMPUTATIONAL INFEASIBILITY; WE HAVE EVERYTHING THAT

22   IS SET FORTH HERE; AND YET, AS THEY ADMIT, WE HAVE NO

23   CONTENT.

24        THIS IS SIMPLY A FUNCTIONAL DESCRIPTION OF THE

25   PARADIGM OF PUBLIC KEY CRYPTOGRAPHY, AND IT RUNS FLATLY

1  AFOUL OF THE CONCEPTS I THINK OF RAYTHEON, THE CONCEPTS

2  ANIMATING 112, PARAGRAPH SIX, THE MORSE CASE, THE HYATT

3  CASE, TO SAY THAT WITH THIS KIND OF FUNCTIONAL

4  DESCRIPTION, YOU CAN PATENT THE FUTURE.

5          AND THIS IS NOT AN ISSUE OF SAYING -- I CAN GO

6  TO ANY DICTIONARY.  YOU WON'T GET THE SAME MEANING TO ALL

7  OF THESE WORDS.  NOT EVEN THEIR DICTIONARIES ALL HAD THE

8  SAME MEANINGS.  THEY ARE ALL VARIATIONS.

9          AND PROFESSOR KONHEIM SAID, "IT ISN'T A MATTER

10 THAT 'GENERATING' IS SOME RUSSIAN WORD THAT I DON'T

11 UNDERSTAND; I UNDERSTAND IT, BUT IT STILL DOESN'T GIVE ME

12 ANY CONTENT."  I THINK HE EVEN SAID, "IT IS TOO INDEFINITE

13 TO TELL ME HOW TO BRING ABOUT THIS RESULT."

14          AND I WON'T BELABOR THE POINT, BUT I THINK WHEN

15 YOU GO TO 1(E), WITH THE PROCESSING THE MESSAGE AND THE

16 ENCIPHERING KEY AT THE TRANSMITTER, AND THEN GENERATING AN

17 ENCIPHERED MESSAGE, YOU'RE DOING SOMETHING DIFFERENT DOWN

18 HERE THAN GENERATING AN ENCIPHERED MESSAGE THAN YOU'RE

19 DOING GENERATING UP HERE THE SECRET KEY PAIR.

20          BUT YOU WON'T FIND OUT IN THIS CLAIM LANGUAGE

21 WHAT THAT DIFFERENCE IS.  YOU STILL HAVE SIMPLY A BROAD

22 FUNCTIONAL RELATIONSHIP THAT THE ENCIPHERING

23 TRANSFORMATION IS EASY TO EFFECT BUT COMPUTATIONALLY

24 INFEASIBLE TO INVERT.

25          SO WE'RE TOLD THERE IS SOME RESULT THAT WE WANT

1   TO BRING ABOUT, AND OBVIOUSLY WE KNOW THAT THERE IS SOME

2   ACT THAT WE ARE SUPPOSED TO DO.   BUT 112, PARAGRAPH SIX,

3   SAYS:   YOU EITHER SET FORTH THE ACT WITH ENOUGH

4   SPECIFICITY TO AVOID THE INDEFINITENESS PROBLEM IN THE

5   CLAIM, OR YOU ARE ONLY SAVED FROM INDEFINITENESS BY GOING

6   TO THE STATUTE, BY GOING TO THE SPECIFICATION.

7          AND I WOULD NOTE THAT THE RAYTHEON CASE --

8   AGAIN, I DON'T MEAN TO BELABOR, AND I'M NOT SUGGESTING

9   THAT THE WORDS "SUCH THAT" ARE MAGIC WORDS, THAT I CAN

10  POINT TO THE "SUCH THAT" AND GO HOME.   LIKEWISE, I DON'T

11  THINK THAT THEY CAN POINT TO THE "SUCH THAT" AND SAY I'M

12  NOT THERE.

13         BUT THE RAYTHEON DID SAY EXPRESSLY, AND

14  REAFFIRMING GREENBERG, THAT THE FUNCTIONAL LANGUAGE

15  INTRODUCED AFTER "SO THAT" MEANT THAT THE CLAIM SHOULD BE

16  CONSTRUED ACCORDING TO 112, PARAGRAPH SIX.

17         AND THERE IS NOT SUFFICIENT CONTENT, THERE IS

18  NOT SUFFICIENT SPECIFICITY, OR, IN THE WORDS OF GREENBERG,

19  FROM PROFESSOR KONHEIM, THERE IS NO WELL-UNDERSTOOD

20  MEANING IN THE ART OF WHAT IS "PROCESSING," "GENERATING,"

21  WHEN YOU'RE TALKING ABOUT PROCESSING THE MESSAGE AND THE

22  PUBLIC ENCIPHERING KEY, OR GENERATING AN ENCIPHERED

23  MESSAGE, WHICH DIFFERENTIATES WHAT YOU'RE DOING HERE WITH

24  GENERATING AN ENCIPHERED MESSAGE FROM WHAT YOU'RE DOING UP

25  HERE WHEN GENERATING FROM SAID RANDOM NUMBERS, OR, IN THE

1    OTHER CLAIM ELEMENTS, GENERATING RANDOM INFORMATION OR

2    GENERATING A PUBLIC KEY.  THEY'RE ALL DIFFERENT.

3            BUT YOU CAN'T TELL FROM THE CLAIM LANGUAGE HOW

4    DIFFERENT, OR, MORE IMPORTANTLY, WHAT IT IS THAT YOU'RE

5    SUPPOSED TO DO TO BRING ABOUT THAT DESIRED RESULT.

6            NOW, GREENBERG AND RAYTHEON ARE NOT THE ONLY

7    CASES WHICH I THINK SUPPORT THE PROPOSITION.  AS I NOTED

8    IN THE GREENBERG CASE, THE FEDERAL CIRCUIT EXPRESSLY

9    APPROVED OF THE PATENT OFFICE GUIDELINES, WHICH WERE

10   PUBLISHED A YEAR OR SO AGO, DEALING WITH 35 U.S.C. 112,

11   PARAGRAPH SIX.

12           AND IN THAT CASE, THE PATENT OFFICE SPECIFICALLY

13   SAID THAT THERE ARE NO MAGIC WORDS AND WE DON'T LOOK FOR

14   MAGIC WORDS.  THE TEST IS:  IS IT SET FORTH IN

15   SUFFICIENTLY FUNCTIONAL LANGUAGE THAT THE ONLY WAY TO SAVE

16   THE CLAIM IS TO GO TO THE SPECIFICATION?

17           AND THE PATENT OFFICE GUIDELINES CITE, FOR

18   SUPPORT, TWO CASES, APPLICATION OF ROBERTS, AND EX PARTE

19   ZIMMERLEY.

20           AND I THINK IT IS WORTH SPENDING A LITTLE TIME,

21   BECAUSE I THINK THE TREATMENT OF THESE CASES IN CYLINK'S

22   BRIEF IS SOMEWHAT INCORRECT, OR TOO NARROW A READING, TO

23   BE GENEROUS.

24           THEY STATE IN THEIR BRIEF THAT NEITHER OF THESE

25   CASES DEALT WITH 112, PARAGRAPH SIX.  AND IN THAT, THEY

1    ARE LITERALLY CORRECT, BECAUSE THE STATUTE AT THAT TIME

2    HAD THE LANGUAGE THAT'S NOW IN PARAGRAPH SIX IN PARAGRAPH

3    THREE.

4         BUT THE CASES DEALT WITH PARAGRAPH THREE.  AND

5    THE CASES DEALT WITH WHETHER THESE SHOULD BE MEANS PLUS

6    FUNCTION CLAIMS OR NOT.

7         FOR EXAMPLE, IN APPLICATION OF ROBERTS, WHICH IS

8    470 F.2D 1399, ON PAGE 1402, WHAT WAS THEN THE COURT OF

9    CUSTOMS AND PATENT APPEALS -- THIS IS A 1973 DECISION:

10   "WE HAVE ALSO CONCLUDED THAT THE BOARD'S OTHER VIEWS OF

11   THE CLAIMS UNDER SECTION 112 ARE NOT WELL TAKEN.  THE

12   THIRD PARAGRAPH OF THAT SECTION SPECIFICALLY ALLOWS THE

13   USE OF FUNCTIONAL LANGUAGE TO DEFINE CLAIM LIMITATIONS."

14        AND THEN IT GOES ON WITH A LENGTHY QUOTE FROM

15   ANOTHER COURT.  AND THEN IT GOES ON, ON PAGE 1403, IN

16   ADDRESSING LANGUAGE WHICH SAID:  "REDUCING THE COEFFICIENT

17   OF FRICTION IS NOT A STEP AT THE RESULT OF AN UNSTATED

18   STEP."

19        THE FACT IS THAT BOTH IN ROBERTS AND IN

20   ZIMMERLEY, THE COURT WAS LOOKING AT LANGUAGE WHICH, I

21   WOULD SUBMIT, THAT, WHEN UPON REFLECTION, IS AS BROAD AND

22   FUNCTIONAL AS THE LANGUAGE HERE.  AND THE COURTS IN

23   ZIMMERLEY AND ROBERTS CAME TO THE CONCLUSION THAT THEY

24   WERE SUBJECT TO 112.6, NOTWITHSTANDING, IN ROBERTS, THAT

25   THE CLAIM, I BELIEVE, DID NOT HAVE "STEP" OR "MEANS," AND

1    I DON'T BELIEVE HAD "SUCH THAT" OR "SO THAT" IN IT.

2         I THINK THE CLAIM, CLAIM 5, READ:

3              "THE METHOD OF CORRUGATING POLYETHYLENE

4         TEREPHTHALATE FILM WHICH COMPRISES SHAPING SAID

5         FILM AT A TEMPERATURE IN THE RANGE OF ABOUT 100

6         DEGREES TO 175 DEGREES BY PRESSING SAID FILM

7         BETWEEN TWO COACTING ROTATING SURFACES AND

8         REDUCING THE COEFFICIENT OF FRICTION OF THE

9         RESULTING FILM TO BELOW ABOUT 0.40 AS DETERMINED

10        BY THE BELL TEST."

11        THE LANGUAGE THE COURT WAS TALKING ABOUT WAS

12   REDUCING THE COEFFICIENT OF FRICTION, NOT INTRODUCED BY

13   "SUCH THAT," NOT INTRODUCED BY "SO THAT," NOT INTRODUCED

14   BY "MEANS FOR," NOT INTRODUCED BY "STEPS FOR."

15        BUT NONETHELESS, THE COURT HELD, BROUGHT FORWARD

16   IN THE PATENT OFFICE GUIDELINES, AND I THINK APPROVED BY

17   THE FEDERAL CIRCUIT IN GREENBERG, THAT WHEN YOU LOOK AT

18   THE LANGUAGE OF THE CLAIM, NOT THE SEMANTIC SEARCH FOR

19   DICTIONARY DEFINITIONS, BUT WHEN YOU LOOK AT THE WORDS OF

20   THE CLAIM, DO THEY SWEEP TOO BROADLY AND TOO INDEFINITELY,

21   AND THEY ARE, THEREFORE, FUNCTIONAL, WHICH CAN ONLY BE

22   SAVED UNDER 112, PARAGRAPH SIX.

23        NOW I'D LIKE TO JUST BRIEFLY ADDRESS THE

24   DEFENDANTS' APPENDICES.

25        IN THEIR BRIEF AT ONE POINT, DEFENDANTS STATE

1    THAT THE -- I BELIEVE IT'S AT THEIR REPLY BRIEF, OR

2    RESPONSE BRIEF -- OR I GUESS IT'S THEIR SUPPLEMENTAL --

3    THEIR NEW SUPPLEMENTAL BRIEF, THE LAST ONE THEY FILED, AT

4    LEAST AS OF NOON TODAY -- AT, I THINK, PAGE FOUR, LINES

5    FOUR TO 11, STATE IN THE COURT THAT THE FEDERAL CIRCUIT

6    HAS REPEATEDLY FOUND THAT CLAIMS LIKE THESE AT ISSUE DO

7    NOT INVOKE SECTION 112, PARAGRAPH SIX.

8          NOW, I MUST ADMIT THAT WHEN I SAW THE BRIEFS

9    COME IN AND SAW THESE APPENDICES THERE, I THOUGHT I HAD A

10   PRETTY GOOD GRIP ON THE LAW, AND I WAS SOMEWHAT CONCERNED.

11   AND IT STRUCK ME THAT MAYBE THEY HAD A BETTER LIBRARY THAN

12   OURS.

13         BUT I THOUGHT TO MYSELF, GOING INTO THE

14   RESEARCH, THAT I WOULD BE WILLING TO BET THAT IN NONE OF

15   THOSE CASES WAS THE COURT PRESENTED WITH THE ISSUE THAT IS

16   BEFORE YOU TODAY.  AND THAT IS:  DID ANYONE RAISE THE

17   ARGUMENT, DID ANYONE HAVE CLAIMS WHICH WERE SO BROAD AS

18   THESE, THAT IT WOULD HAVE CALLED FOR THIS ARGUMENT?  WAS

19   IT EVER PRESENTED?

20         AND THE ANSWER IS:  NO.  NOT ONE OF THE CASES

21   THEY'VE CITED TO YOU WAS THE COURT EVER SQUARELY PRESENTED

22   WITH THE ISSUE:  IS A CLAIM LIKE THIS SUBJECT TO 35 U.S.C.

23   112.6.  AND THE COURT, IN ANY KIND OF ANALYSIS, LET ALONE

24   A REASONED ANALYSIS, SAID, NO, IT ISN'T.

25         IN MANY OF THOSE CASES, THE CLAIMS THAT THEY

1   POINT TO WEREN'T EVEN THE SUBJECT OF DISCUSSION.   AND

2   THAT'S LIKE GOING INTO A CASE AND FINDING IN THE FACTUAL

3   BACKGROUND A CASE THAT'S SIMILAR TO YOURS, EVEN THOUGH IT

4   GOES OFF ON A TOTALLY DIFFERENT ISSUE, AND SAY:   HERE IS A

5   CASE IN WHICH THE SAME FACTS WERE THERE AND THEY DIDN'T

6   COME TO THE SAME RESULT.   I DON'T THINK IT'S PARTICULARLY

7   HELPFUL.   THE COURT'S OBVIOUSLY THE ONE THAT'S GOING TO

8   MAKE ITS DECISION ON THAT.

9          I WOULD ALSO COMMEND TO THE COURT THE FACT THAT

10  WHEN YOU LOOK AT MANY OF THOSE CLAIMS, EVEN THOSE WHICH

11  HAD THE WORDS "SUCH THAT" IN THEM, THAT THEY DID NOT HAVE

12  THE SAME PROBLEM THAT WE HAVE HERE.   THERE WAS CONTENT, AS

13  TO IN THE CLAIM ITSELF, AS TO WHAT IT WAS YOU WERE DOING

14  TO TRY TO BRING ABOUT THE RESULT.

15          AND THAT'S WHY I SAID -- AND I COME BACK

16  REASONABLY CLOSE HERE, I GUESS, TO MY CLOSE -- THAT THIS

17  IS NOT A SEMANTIC GAME.   THIS IS A GAME LOOKING FOR THE

18  SUBSTANCE OF WHAT IT IS THAT THE PATENT SYSTEM IS ABOUT,

19  AND THE SUBSTANCE OF WHAT IT IS THEY TRIED TO PATENT.

20          AND THAT'S WHY THE LINE MAY NOT BE A BRIGHT

21  LINE, AND THAT'S WHY MAGIC WORDS AND DICTIONARIES ARE ONLY

22  OF LIMITED HELP, BECAUSE HERE, AFTER YOU'VE RESORTED TO

23  ALL THE DICTIONARIES, AND AFTER YOU'VE GONE THROUGH ALL OF

24  THE -- AND I CAN'T TELL WHETHER THEY CALL IT DICTIONARY

25  INTRINSIC OR EXTRINSIC OR WHATEVER, BUT WHEN YOU GO TO ALL

1    THE EVIDENCE THAT THEY SAY IS PROPER AND YOU THROW OUT ALL

2    THE EVIDENCE THAT THEY SAY IS IMPROPER, YOU'RE STILL LEFT

3    WITH THE FACT THAT WHEN I PLUG IN ALL THE DEFINITIONS THAT

4    SAY "GENERATING MEANS OBTAINING," "OBTAINING" DOESN'T TELL

5    ME ANYTHING MORE THAN "GENERATING" DOES.

6         "PROCESSING" -- AND I DON'T EVEN KNOW WHAT THEIR

7    DEFINITION IS -- BUT "PROCESSING" DOESN'T TELL YOU

8    ANYTHING, EITHER.  GENERATING DOWN HERE THE ENCIPHERED

9    MESSAGE, OBTAINING THE MESSAGE, DEVELOPING THE CIPHERED

10   MESSAGE, CREATING THE MESSAGE, THEY STILL WON'T SOLVE THE

11   PROBLEM THAT 112.6 IS ALL ABOUT.

12        THE POINT OF NOVELTY, IF I CAN USE A WORD THAT

13   THE SUPREME COURT USED, I THINK, IN HALLIBURTON, THE

14   ADVICE HERE IS THAT THE PRECISE POINT OF NOVELTY, THE

15   PRECISE THING THAT THEY ARGUE DISTINGUISHED THE PRIOR ART,

16   WHICH IS:  WE HAVE COME UP WITH WHAT WE BELIEVE IS A

17   WORKABLE SYSTEM, IS ALL BURIED HERE IN THE "SUCH THAT," IN

18   BOTH PLACES.

19        THE CRITICAL CONCEPTS OF THIS SYSTEM ARE:  YOU

20   HAVE TO PROTECT TWO AREAS.  ONE, YOU CAN'T COMPROMISE THE

21   PRIVATE KEY FROM THE PUBLIC KEY; AND ONE, (E) HERE, WHICH

22   IS, I THINK, A REQUIREMENT OF ANY SYSTEM, THAT SOMEBODY

23   WHO HAS THE ENCIPHERED MESSAGE CAN'T DETERMINE WHAT THE

24   MESSAGE IS.

25        BUT (E) IS A GENERAL DESCRIPTION OF ANY

1    CRYPTOSYSTEM.  YOU HAVE TO BE ABLE TO PROTECT DECIPHERED

2    TEXT FROM BEING COMPROMISED AND FROM GOING THROUGH THE

3    DECIPHERED TEXT AND THE PLAIN TEXT, BUT THIS DOESN'T TELL

4    YOU ANYTHING ABOUT HOW TO DO IT.

5         I THINK ON THE APPLICATION OF 112, PARAGRAPH

6    SIX, THAT THAT IS PRETTY MUCH IT IN A NUTSHELL.  THE COURT

7    IS FACED WITH A DIFFICULT TASK, ALTHOUGH I WOULD ARGUE

8    THAT IT IS NOT THAT DIFFICULT WHEN ONE RECOGNIZES WHAT IT

9    IS.  IT'S SUPPOSED TO ANIMATE THE PATENT STATUTES.

10        BUT THIS IS A CLAIM WHICH TRULY HAS NO BOUNDS,

11   IS TRULY INDEFINITE, AND TRULY PRESENTS PROBLEMS FOR

12   ANYBODY AFTER THE FACT, WHICH, FROM GOING BACK HERE AND

13   TRYING TO DETERMINE WHERE ARE THE METES AND BOUNDS OF THIS

14   CLAIM.  AND I DON'T THINK YOU'LL FIND THEM THERE.

15        IF I COULD, I'D LIKE TO ADDRESS BRIEFLY NOW AND

16   SWITCH TO A RELATED TOPIC, BUT IT DEALS WITH CLAIM 6, AND

17   THAT IS:  THE PARTIES ARE ATTEMPTING TO STIPULATE TO WHAT

18   IT IS IN THE SPECIFICATION THAT CORRESPONDS TO THE VARIOUS

19   MEANS SHOWN HERE.  AND THE PARTIES ARE TRYING TO IDENTIFY

20   WHAT ACTS CARRY OUT THESE CLAIM ELEMENTS, DEPENDING ON

21   WHAT THE COURT'S DECISION IS.  BUT I WANT TO FOCUS HERE ON

22   CLAIM 6.

23        AS I SAID, THERE IS NO DISPUTE THAT THESE ARE

24   MEANS FOR CLAIMS.  THERE IS A DISPUTE, HOWEVER, AS TO WHAT

25   THAT MEANS ONCE YOU'VE IDENTIFIED WHAT THE STRUCTURAL

1    ELEMENTS IN THE PATENT ARE FOR PERFORMING THE FUNCTION.

2    AND I THOUGHT THERE WAS REALLY NOT MUCH ROOM FOR A

3    DISPUTE.

4              FOR EXAMPLE, IF YOU LOOKED AT THE MEANS FOR

5    GENERATING THE PUBLIC ENCIPHERING KEY AND THE MEANS FOR

6    GENERATING THE SECRET DECIPHERING KEY OF WHAT THE PATENT

7    CALLS THE SECOND EMBODIMENT, WHICH IS THE MULTIPLICATIVE

8    KNAPSACK, IT'S SHOWN IN FIGURE 11 OF THE PATENT.  AND IT

9    IS DESCRIBED IN THE SPECIFICATION.

10             I WOULD HAVE THOUGHT THERE WAS NO DISPUTE THAT

11   WHEN ONE LOOKED AT FIGURE 11 AND YOU SAW THESE VARIOUS

12   GENERIC BLOCK ELEMENTS CONFIGURED AS THEY ARE, THAT THE

13   FAIR APPLICATION OF 112, PARAGRAPH SIX, WOULD BE THAT THE

14   MEANS, IN THAT EMBODIMENT, FOR GENERATING THE PUBLIC

15   ENCIPHERING KEY AND THE SECRET DECIPHERING KEY, ARE THOSE

16   ELEMENTS CONFIGURED TO PERFORM THOSE OPERATIONS.  IN OTHER

17   WORDS, IT IS AN EXPONENTIATOR AND A MULTIPLIER AND THE

18   PRIME TERRITORY, AND ALL THE CONTENT OF THAT, HOOKED UP IN

19   THAT PARTICULAR WAY TO BRING ABOUT THAT PARTICULAR

20   FUNCTION.

21             AND AS PROFESSOR HELLMAN SAID IN HIS TUTORIAL,

22   SOME THINGS ARE COMMUTATIVE AND OTHERS AREN'T.  BUT I

23   BELIEVE WHAT WE HAVE FROM, AS I UNDERSTAND DEFENDANTS'

24   POSITION, IT IS THAT THESE ARE GENERIC STRUCTURAL CIRCUIT

25   ELEMENTS.  AN ADDER AND A MULTIPLIER AND AN EXPONENTIATOR,

1   AND THEY REALLY CAN BE CONFIGURED IN ANY PARTICULAR WAY,

2   FOR PURPOSES OF THIS CLAIM; AND, THEREFORE, THE COURT

3   SHOULDN'T FIND THAT THE ELEMENTS OF FIGURE 11 ARE THOSE

4   CONFIGURED TO PERFORM THE OPERATION SET FORTH HERE, BUT

5   THAT THE COURT SHOULD SIMPLY CONSTRUE THAT THE MEANS FOR

6   CLAIM 6 IS A GENERIC SET OF CIRCUIT ELEMENTS, WHICH COULD

7   BE THOSE SHOWN HERE.

8         AND THE SIGNIFICANCE OF THAT IS NOT NOW, BUT FOR

9   HOW THEY ARE GOING TO TRY TO ARGUE LATER ON THEIR BURDEN

10  OF TRYING TO PROVE THAT THE RSA, WHICH IS A VASTLY

11  DIFFERENT SYSTEM, IS NONETHELESS EQUIVALENT.

12        BUT THE FACT OF THE MATTER IS:  IF YOU TREAT

13  THESE AS GENERIC INTERCHANGEABLE CIRCUIT ELEMENTS, YOU

14  WON'T GET WHAT THE PATENT DESCRIBES AS THE MULTIPLICATIVE

15  KNAPSACK.  IF YOU INTERCHANGE, FOR EXAMPLE, THE ADDER AND

16  THE MULTIPLIER IN FIGURE 11, YOU WILL NOT END UP WITH AN

17  M, THE MODULUS, THE A PRIMES, WHICH ARE THE KNAPSACK

18  NUMBERS IN THE EASY-TO-SOLVE KNAPSACK, OR THE B FROM THE

19  KEY SOURCE THAT IS DESCRIBED IN THE PATENT.  YOU'LL END UP

20  WITH SOMETHING ELSE.  WHATEVER IT IS, I DON'T KNOW.  BUT

21  YOU WON'T END UP WITH THE VARIOUS CONSTRAINTS ON THOSE

22  NUMBERS WHICH THE PATENT DESCRIBES.

23        SO THE WHOLE IMPORT OF MR. DUSSE'S TESTIMONY

24  YESTERDAY WAS TO SAY THAT, YES, THESE CIRCUIT ELEMENTS MAY

25  BE, IN A SENSE, GENERIC; BUT AS SHOWN IN THE PATENT FOR

1   PERFORMING THESE MEANS, THEY ARE CONFIGURED IN A

2   PARTICULAR WAY TO PERFORM A PARTICULAR FUNCTION.

3          AND I THINK THAT THE DIFFERENCE WE'RE ARGUING

4   ABOUT HERE IS ILLUSTRATED WHEN ONE LOOKS AT FIGURES 5 AND

5   6.  THOSE TWO CIRCUITS HAVE THE SAME STRUCTURAL ELEMENTS,

6   TWO AND GATES, TWO EXCLUSIVE OR GATES -- THOSE ARE THE X

7   OR GATES -- A DELAY CIRCUIT, AND AN OR GATE.  BUT

8   CONFIGURED IN FIGURE 4, THEY PERFORM ONE FUNCTION.  AND

9   CONFIGURED IN FIGURE 6, THEY PERFORM ANOTHER FUNCTION.

10  AND YOU CAN'T CONSIDER, THEREFORE, THESE CIRCUIT ELEMENTS

11  WITHOUT CONSIDERING THE FUNCTION THAT THEY ARE CONFIGURED

12  TO PERFORM.

13         AND A FAIR APPLICATION OF 112, PARAGRAPH SIX,

14  IS:  WHEN YOU GO TO THE SPECIFICATION TO DETERMINE THE

15  MEANS OF GENERATING THE PUBLIC KEY AND THE MEANS FOR

16  GENERATING THE SECRET DECIPHERING KEY, ONE, TO BE FAITHFUL

17  TO THAT, HAS TO GO TO THE SPECIFICATION, SEE WHAT IT

18  DESCRIBES AS THE FUNCTION THAT'S BEING PERFORMED, AND THEN

19  TO SEE THE CIRCUITRY AND THE CIRCUIT ELEMENTS THAT PERFORM

20  THAT FUNCTION.

21         AND THE CIRCUITRY HERE, THE STRUCTURE THAT

22  PERFORMS THE FUNCTION, IS NOT THOSE GENERIC LOOSE-CIRCUIT

23  ELEMENTS; IT IS THE STRUCTURE OF FIGURE 11.  THAT IS THE

24  MEANS FOR GENERATING, FOR EXAMPLE, THE SECRET DECIPHERING

25  KEY.  AND AT THE BOTTOM, IN BOX 136, THAT IS THE MEANS FOR

1    GENERATING THE PUBLIC ENCIPHERING KEY.

2         IT IS NOT FAIR TO SAY THAT THE MEANS FOR

3    GENERATING A SECRET DECIPHERING KEY IS SIMPLY AN

4    EXPONENTIATOR, A MULTIPLIER, AN ADDER, AND A PRIME TESTER

5    IN A TABLE OF PRIMES, BECAUSE YOU CAN CONFIGURE THOSE TO

6    COME UP WITH ANY NUMBER, I ASSUME, OF FUNCTIONS.  BUT

7    HERE, IT IS THAT COMBINATION OF ELEMENTS, CONFIGURED IN

8    THAT PARTICULAR WAY, TO ACCOMPLISH THAT FUNCTION, WHICH IS

9    WHAT THE STATUTE SPEAKS TO.

10        AND I THINK THE ONLY TESTIMONY BEFORE THE COURT

11   ON THAT IS THAT YOU HEARD FROM MR. DUSSE, WHICH IS:  WHEN

12   HE GOES, AS A PERSON KNOWLEDGEABLE ABOUT HARDWARE DESIGN

13   AND CIRCUIT DESIGN, AND HE LOOKS AT THIS SPECIFICATION, AS

14   TO HOW YOU PERFORM THE VARIOUS FUNCTIONS STATED THERE, YOU

15   FIND AND ARE LED TO THESE CIRCUIT ELEMENTS, CONFIGURED AS

16   THEY ARE SHOWN, TO PERFORM THOSE FUNCTIONS.

17        UNLESS THE COURT HAS ANY QUESTIONS, THAT

18   CONCLUDES MY COMMENTS ON 112, PARAGRAPH SIX.

19        THE COURT:  VERY WELL, SIR.

20        MR. KENNEDY?

21        MR. KENNEDY:  MAY IT PLEASE THE COURT, STARTING

22   WITH MR. HASLAM'S LAST POINTS, REGARDING CLAIM NUMBER SIX,

23   AS HE INDICATED, THE PARTIES HAVE BEEN IN NEGOTIATION TO

24   TRY TO WORK OUT A STIPULATION IN THAT REGARD.  MR. KRAMER

25   HAS BEEN A MEMBER OF OUR TEAM THAT'S BEEN INVOLVED IN THAT

1   PHASE OF THINGS, AND TO THE EXTENT, IF ANY, THAT THE COURT

2   WISHES TO HEAR THE CYLINK SIDE OF THE CLAIM 6 OR GATES OR

3   WHATEVER IT IS, I'LL HAVE TO DEFER TO MR. KRAMER ON THAT

4   ONE.  I AM, HOWEVER, PREPARED TO ADDRESS THE STEP PLUS

5   FUNCTION ARGUMENT THAT CONSTITUTED THE BULK OF WHAT

6   MR. HASLAM HAD TO SAY.

7           AS HE WAS SPEAKING, I FOUND MYSELF REPEATEDLY

8   LOOKING AT MY WRISTWATCH.  THAT'S NOT BECAUSE I THOUGHT HE

9   WAS TAKING TOO MUCH TIME.  BUT I HAVE A CALENDAR WATCH,

10  AND I WANTED TO MAKE SURE THAT IT WAS STILL OCTOBER 2ND

11  AND NOT OCTOBER 30TH, BECAUSE THAT WAS THE DAY THAT THE

12  VALIDITY HEARING WAS SUPPOSED TO BE ARGUED.

13          AND GOING FROM THE MORSE CASE ON, WE HEARD A LOT

14  OF REASONS AS TO WHY MR. HASLAM THINKS THIS COURT SHOULD

15  FIND CLAIMS, AT LEAST ONE, AND OTHERS, TO BE INVALID.

16  THAT, OF COURSE, IS NOT THE ISSUE BEFORE THE COURT TODAY.

17  AND ON OCTOBER 30TH, WE WILL BE PREPARED TO ADDRESS

18  VALIDITY.

19          AND AT THAT TIME, WE'LL BE SHOWING THE COURT

20  THAT THE PATENT OFFICE DID ALL THOSE THINGS THAT

21  MR. HASLAM SAID COULDN'T HAPPEN WHEN THEY FOUND THAT THIS

22  WAS A VALID PATENT, BECAUSE, OF COURSE, AT THE TIME THAT

23  THIS PATENT WAS APPLIED FOR, A SEPARATE 112.6 ANALYSIS

24  WASN'T APPLIED.  THAT DIDN'T COME INTO PLAY UNTIL 1994.

25  SO THIS WAS FOUND TO BE A VALID, FUNCTIONING PATENT UNDER

1    THE OLD SECTION 2 STANDARD.

2              AND WE'RE GOING TO GO FURTHER.  WE'RE GOING TO

3    SHOW THAT THIS IS ONE OF THOSE RELATIVELY RARE PIONEERING

4    PATENTS THAT REALLY REPRESENTED A BREAKTHROUGH, AND THAT

5    PUBLIC KEY CRYPTOLOGY, LIKE FLYING, WAS SOMETHING PEOPLE

6    HAD DREAMED ABOUT FOR A LONG TIME, BUT IT TOOK MERKLE AND

7    PROFESSOR HELLMAN TO ACTUALLY GET A WORKING EMBODIMENT.

8              THEY GOT THE KITTY HAWK, AND THEY GOT IT OFF THE

9    GROUND, AND TO BE SURE, AS WITH AIRPLANES, THERE HAVE BEEN

10   A LOT OF IMPROVEMENTS ON THE KITTY HAWK SINCE, BUT WE'LL

11   BE SHOWING YOU THEY HAD THE PIONEERING PATENT AND THE

12   FIRST ENABLEMENT.

13             I THINK THE KEY STARTING POINT IS TO REMEMBER

14   THAT SECTION 112.6 PROVIDES THE PATENTEE WITH AN OPTION.

15   IT'S THE PATENTEE'S PREROGATIVE TO DECIDE WHETHER HE OR

16   SHE WANTS TO EXPRESS A CLAIM IN SECTION 112 FORM.  AND AS

17   WE'RE TOLD, ORDINARILY, WHEN A PATENT HOLDER WANTS TO DO

18   THAT, WHEN THEY HAVE COMPETENT PATENT COUNSEL, THEY KNOW

19   EXACTLY HOW TO DO SO.  THEY SAY STEP FOUR.

20             AND HERE, IF I MIGHT PUT UP -- MS. GOLD CAN HELP

21   ME GET CLAIM 1 UP.  AND IN FACT, WE CAN PUT IT RIGHT NEXT

22   TO CLAIM 6 SO WE CAN GET THE EASELS ADJACENT TO EACH

23   OTHER.  I THINK THAT MIGHT HELP.

24             IN THIS CASE, OF COURSE, IT'S UNDISPUTED THAT

25   CLAIM 1 NOWHERE USES THE PREFERRED LANGUAGE OF "STEPS

1   FOR."  IN FACT, CLAIM 1 NOWHERE EVEN USES THE WORD

2   "STEPS."

3           AND TO BE SURE, AS MR. HASLAM HAS POINTED OUT,

4   THAT'S NOT THE END OF THE ANALYSIS.  THE NEXT STEP IS TO

5   LOOK THROUGH THE PROSECUTION HISTORY AND TO SEE IF THERE

6   IS ANY OBJECTIVE EVIDENCE THAT THE PATENT HOLDER, IN THE

7   COURSE OF PROSECUTING THE PATENT, INDICATED AN INTENT TO

8   EXERCISE 112.6.

9           AND, AGAIN, THERE IS NO DISPUTE, AND WE HEARD

10  NOTHING FROM HASLAM THAT THERE IS A SINGLE WORD IN THE

11  FILE WRAPPER THAT SUGGESTS THAT.

12          FOR EXAMPLE, THERE WAS NEVER A POINT WHERE, IN

13  RESPONSE TO A REJECTION, HELLMAN CAME BACK AND SAID:  "NO,

14  NO, I CAN GET AROUND THE PRIOR ART ON THE BASIS OF SOME

15  UNIQUE CHARACTERISTIC OF THE TRAP DOOR KNAPSACK."  THAT

16  SIMPLY NEVER HAPPENED.

17          NOW, IN ADDITION TO NOT HAVING THE WORDS "STEPS

18  FOR" IN CLAIM 1, AND IN ADDITION TO NOT HAVING ANY

19  OBJECTIVE EVIDENCE ANYWHERE IN THE PROSECUTION HISTORY, WE

20  HAVE THE FURTHER RULE THAT, IN A PATENT WITH MULTIPLE

21  CLAIMS, EACH CLAIM IS PRESUMED TO BE DIFFERENT.  AND WE

22  CITED THE UNIROYAL VERSUS RUDKIN, R-U-D-K-I-N, CASE FOR

23  THAT, 837 F.2D 1044, AT 1054-55.

24          AND THAT'S THE REASON WE'VE PUT CLAIM 6 UP, YOUR

25  HONOR, SINCE WE HAVE BOTH A DIFFERENT CLAIM, AND, IN CLAIM

1    6, AN OBVIOUS EXAMPLE OF THE PATENT HOLDER'S INTENT AND

2    DESIRE TO EXERCISE THE 112.6 OPTION.   CLAIM 6 IS

3    UNQUESTIONABLY A MEANS OR "STEP FOR" CLAIM, NO QUESTION

4    ABOUT IT.

5            SO IN ORDER TO ACCEPT RSA'S ARGUMENT AND BE

6    CONSISTENT WITH THE IDEA THAT ONE MEANS GO SOMETHING

7    DIFFERENT THAN SIX, THE COURT'S FACED WITH THE CHALLENGE

8    OF:   HOW AM I GOING TO READ THE WORDS "STEPS FOR" INTO

9    CLAIM 1 WITHOUT ENDING UP WITH SOMETHING THAT'S AN EXACT

10   DUPLICATION OF CLAIM 6?   AND TO THAT, I SUBMIT, THERE IS

11   NO GOOD ANSWER.

12           SO TWO POINTS.   ONE, NO INDICATION ON THE CLAIM

13   ITSELF, OR ANYWHERE IN THE PROSECUTION HISTORY, THAT

14   MR. HELLMAN INTENDED TO EXERCISE HIS 112.6 OPTION; AND, IN

15   ADDITION TO THAT, WE HAVE ABUNDANT EVIDENCE IN CLAIM 6 AND

16   ELSEWHERE THAT MR. HELLMAN AND HIS PATENT COUNSEL KNEW HOW

17   TO EXERCISE THAT OPTION WHEN THEY WANTED TO DO SO, AND, IN

18   FACT, DID SO IN THIS PARTICULAR CLAIM.

19           AND AS THE GREENBERG CASE INSTRUCTS, WHEN THERE

20   IS AN ABSENCE OF OBJECTIVE EVIDENCE, THEN THERE IS A

21   PRESUMPTION THAT THE INVENTOR DIDN'T INTEND TO PROCEED IN

22   THAT WAY, AND THAT WORDS DON'T GET LIMITED DOWN.

23           NOW, IN RESPONSE TO THOSE HURDLES, RSA HAS

24   OFFERED A NUMBER OF DIFFERENT ARGUMENTS.   FIRST, THEY TOLD

25   US THAT ANY ONE WORD, SINGLE VERB THAT'S EXPRESSED AS A

1    FUNCTION, CLEARLY INDICATES "STEP PLUS FUNCTION" LANGUAGE.

2    AND IN ONE OF THOSE MULTIPLE BRIEFS THAT WE JUST GOT

3    CRITICIZED FOR FILING, WE POINTED OUT THE LEGIONS OF CASES

4    TO THE CONTRARY.  SO THAT ARGUMENT HAS NOW BEEN DROPPED

5    AND THEY CAME UP WITH NEW ARGUMENTS, WHICH WERE WHAT

6    PROMPTED THE NEW BRIEF.

7            AND IN PARTICULAR, THEY ARE NOW SAYING THAT,

8    "WHILE EVEN THOUGH YOU DON'T USE THE WORDS 'STEPS FOR' AND

9    EVEN THOUGH WE CAN'T FIND ANY OBJECTIVE EVIDENCE OF AN

10   INTENT ANYWHERE IN THE PROSECUTION HISTORY TO EXERCISE

11   112.6, THE COURT SHOULD, NONETHELESS, CONCLUDE THAT THAT

12   WAS THE INTENT HERE, BECAUSE THE WORDS 'STEPS' DO APPEAR

13   IN THIS PATENT."

14           WELL, THE FIRST PROBLEM IS:  "STEPS," WITH OR

15   WITHOUT AN ACCOMPANYING PREPOSITION, LET ALONE THE KEY

16   PREPOSITION, "FOR," THE WORD "STEPS" DOESN'T APPEAR

17   ANYWHERE IN CLAIM 1; THE WORD "STEPS" DOESN'T APPEAR

18   ANYWHERE IN CLAIM 2.

19           WE HAVE CLAIMS 3, 4 AND 5 -- AND PERHAPS IF WE

20   CAN GET THOSE PUT UP, I APPEAL TO MR. FLINN FOR SOME

21   ASSISTANCE HERE.  MAYBE WE CAN JUST PUT THEM ON --

22           I DON'T MEAN TO HAVE YOU LOOK LIKE SOMETHING OUT

23   OF ALICE IN WONDERLAND.

24           MR. FLINN:  MEANER THINGS HAVE BEEN SAID ABOUT

25   ME.

1          THE COURT:  SEE HOW SMALL MY PATENT IS?

2          MR. KENNEDY:  IN 3 AND 4 AND 5, WE DO HAVE

3   EITHER THE WORDS "STEPS" OR "STEPS OF" THAT APPEAR, IN

4   VARIOUS PLACES.

5          AGAIN, AS GREENBERG TELLS US, COMPETENT COUNSEL

6   THAT WANTS TO INVOKE 112.6 USES "STEPS FOR" AS THE

7   LANGUAGE.  HERE, RSA HAS TOLD US, "WELL, WE DON'T EXACTLY

8   HAVE 'STEPS FOR,' BUT WE'VE GOT SOMETHING THAT'S AWFULLY

9   CLOSE, SO WE OUGHT TO ASSUME THAT THAT'S WHAT DID THE

10  TRICK.

11         AND THAT WAS THE REASON WHY WE CITED THOSE MANY

12  CASES THAT ARE INCLUDED IN THE APPENDIX.  AND

13  MR. HASLAM IS ABSOLUTELY RIGHT, THAT IN THOSE CASES,

14  NOBODY CAME FORWARD AND SAID "STEPS" OR "STEPS OF" MAKE

15  SOMETHING INTO A 112.6 CLAIM.

16         AND THAT WAS OUR POINT, AND I'M SORRY HE

17  MISUNDERSTOOD IT.  WE CITED THE CASES FOR THE PROPOSITION

18  THAT:  HOW IS IT THAT ALL OF THE RESOURCEFUL PATENT

19  LAWYERS IN THOSE CASES, WHO WERE RAISING EVERY ARGUMENT

20  THEY COULD FIND, IN MANY CASES, TO TRY TO INVALIDATE A

21  PATENT, DIDN'T TUMBLE ON THIS OBVIOUS ARGUMENT THAT WE'RE

22  NOW TOLD THAT "STEPS," "STEPS OF," AND "STEPS FOR" ALL

23  MEAN THE SAME THING.  AND HOW WAS IT THAT ALL THOSE

24  FEDERAL CIRCUIT PANELS THAT WERE GRAPPLING WITH THESE

25  CASES DIDN'T FIND THAT THEY HAD, IF I CAN USE THE PHRASE

1    "TRAP DOOR," SHORTCUT TO DISPOSE OF THESE MATTERS BY

2    SAYING, "OH, THIS IS EASY.  THIS IS A 112.6 KIND OF CASE"?

3            OUR POINT WAS NOT THAT IT WAS RESOLVED IN THOSE

4    ISSUES.  BUT IF IT'S SO APPARENT, WHY HAS IT BEEN MISSED

5    AND NOT RECOGNIZED UP UNTIL NOW?

6            AND I THINK THE CASE THAT'S MOST ILLUSTRATIVE IN

7    THAT REGARD IS THE ARRHYTHMIA RESEARCH DECISION, WHICH IS

8    CITED IN THE BRIEF, OF COURSE, AND IT APPEARS AT 958 F.2D

9    1053.  WHAT I FIND SIGNIFICANT THERE IS THAT ARRHYTHMIA

10   INVOLVED TWO DIFFERENT CLAIMS.  ONE WAS A METHOD CLAIM,

11   AND THE OTHER WAS AN APPARATUS CLAIM.

12           AND THE COURT WENT TO CONSIDERABLE LENGTH TO

13   ANALYZE THE METHOD CLAIM, WHICH WAS PHRASED IN TERMS OF

14   COMPRISING THE STEPS OF, SAME EXACT LANGUAGE THAT WE'VE

15   GOT HERE.  AND THE COURT HAD NO TROUBLE ANALYZING THAT AS

16   A METHOD CLAIM AND FINDING IT TO BE VALID.

17           THE COURT THEN TURNED TO THE APPARATUS CLAIM AND

18   SAID, ON PAGE 160, NOW WE'RE DEALING WITH A CLASSIC 112.6

19   CLAIM AND SUBJECTED IT TO A WHOLLY DIFFERING ANALYSIS.

20           AND MY POINT IS:  WHY DID THE COURT SPEND EIGHT

21   PAGES TALKING ABOUT THIS METHOD CLAIM WITH "STEPS OF" IF,

22   IN FACT, IT WAS JUST ANOTHER 112.6 CLAIM?  AT A MINIMUM,

23   THEY COULD HAVE TRUNCATED IT, AT AN ABSOLUTE MINIMUM,

24   RSA'S COUNSEL, OR AT LEAST THE FIRST PEOPLE, TO EVER MAKE

25   THE ARGUMENT THAT "STEPS," "STEPS OF," OR "SUCH THAT,"

1   WHICH IS THEIR OTHER ARGUMENT, CAN BE TREATED AS THE

2   EQUIVALENT OF "STEPS FOR."

3           TURNING NEXT TO "SUCH THAT" AND THE RAYTHEON

4   DECISION, LET ME JUST LET THE OPINION SPEAK FOR -- WE CAN

5   TAKE THOSE DOWN, THANKS.

6           READING DIRECTLY FROM THE RAYTHEON OPINION, AT

7   957:

8           "THOUGH, AS DISCUSSED ABOVE, THE PHRASE IS BASED

9           ON TORREY'S ERRONEOUS THEORY RESPECTING THE

10          ABSENCE OF WAVEGUIDE FOULING, AND THOUGH THE

11          FUNCTIONAL LANGUAGE IS INTRODUCED BY 'SO THAT',

12          WE MUST READ THE PHRASE AS THE EQUIVALENT OF ONE

13          SPECIFYING AS AN ELEMENT IN THE CLAIM 'MEANS FOR

14          CONTINUING CONVECTION DURING AUTOIGNITION.'"

15          AND, AGAIN, THE COURT OBVIOUSLY CAN READ AND

16  UNDERSTAND THAT AS WELL OR BETTER THAN ANYBODY ELSE.  I

17  READ THAT AS A COURT SAYING, NOT THAT "SO THAT" IS MEANS

18  LANGUAGE -- WE'VE GOT TWO OF THOSE IN THERE -- AND DISPUTE

19  THAT THE COURT GOES AHEAD AND FINDS, ON THE PARTICULAR

20  FACTS OF THAT CASE, THAT IT CONSTITUTED MEANS LANGUAGE.

21          AND FINALLY, WE GET TO ROBERTS AND ZIMMERLEY.

22  AND I THINK THIS IS ABSOLUTELY CRUCIAL, SINCE SO MUCH

23  EMPHASIS HAS BEEN PLACED ON THEM.  THE KEY DISTINGUISHING

24  FACTOR:  IN BOTH ROBERTS AND ZIMMERLEY, THE PATENT OFFICE

25  HAD REFUSED TO ISSUE A PATENT.  AND THE APPLICANT WAS IN

1    BEFORE THE COURT SEEKING TO GET A PATENT.

2           AND ALTHOUGH THE RECORD IN ROBERTS AND ZIMMERLEY

3    IS SOMEWHAT SCANT, AND WE DON'T HAVE THE BRIEFS, THE CLEAR

4    IMPORT OF THOSE CASES SEEMS TO BE THAT THE PATENT HOLDER

5    WAS ARGUING, AT A MINIMUM, "I'VE MET THE 112.6" -- OR THEN

6    THE 112.2 -- STANDARD.  I MEAN, THERE ARE ONLY TWO PARTIES

7    TO THOSE CASES, THE PATENT OFFICE AND THE APPLICANT, SO IT

8    ISN'T THE PATENT OFFICE THAT'S GOING TO BE IN SAYING,

9    "EVEN THOUGH WE'VE REJECTED THIS CLAIM, GEE, YOU OUGHT TO

10   TAKE A LOOK AT IT.  MAYBE IT WOULD SUFFICE UNDER 112.6."

11          WHAT THE UNARTICULATED BUT OBVIOUS PREMISE IN

12   BOTH OF THOSE CASES IS:  THE APPLICANT WAS SAYING, "I

13   INTENDED TO INVOKE 112.6.  AND MAYBE I'M NOT ENTITLED TO A

14   METHOD CLAIM, BUT I WOULD AT LEAST BE ENTITLED TO SOME

15   SMALLER CLAIM UNDER 112.6."

16          IN CONTRAST -- AND HE'S BEEN HERE

17   CONSPICUOUSLY -- THERE IS NOT A DECLARATION OR ANY

18   TESTIMONY FROM PROFESSOR HELLMAN SAYING, "I INTENDED TO

19   INVOKE 112.6."

20          AND THAT BECOMES WHAT I THINK IS MOST

21   SIGNIFICANT HERE.  THIS COURT IS BEING ASKED TO DO

22   SOMETHING THAT, AS FAR AS I KNOW, NO COURT HAS EVER BEEN

23   ASKED TO DO BEFORE, AND CERTAINLY NO COURT HAS EVER DONE,

24   AND THAT'S TO DO THE FOLLOWING:  TO TAKE CLAIMS THAT DO

25   NOT USE THE WORDS "STEPS FOR" IN A CASE WHERE THE

1    PROSECUTION HISTORY IS SILENT REGARDING ANY INDICATION TO

2    INVOKE 112.6.

3              AND, AGAIN, 112.6 IS SOMETHING THE PATENTEE GETS

4    TO INVOKE, IN A CASE WHERE, IN OTHER CLAIMS, THE PATENT

5    HOLDER DID INVOKE 112.6, AND MOST IMPORTANT OF ALL, WHERE

6    THE PATENT HOLDER IS MAKING NO PLEA TO THE COURT SAYING,

7    "SAVE ME.  IF YOU CAN'T FIND THIS AS A METHOD CLAIM, AT

8    LEAST GIVE ME A 112.6 CLAIM."  THAT PLEA IS NOT BEING MADE

9    HERE.

10             YES, WE ARE PUTTING OUR EGGS IN THE VALIDITY

11   BASKET, AND WE ARE PREPARED TO DEFEND THE VALIDITY OF

12   THESE CLAIMS AS METHOD CLAIMS.  AND SO WE GET TO THIS

13   IRONIC SITUATION THAT MR. HASLAM IS SOMEHOW TRYING TO SAVE

14   US FROM OURSELVES AND IS SAYING, "DON'T GO THAT FAR.  I'M

15   TRYING TO COME UP WITH A WAY WHERE YOU, PROFESSOR HELLMAN,

16   WILL STILL HAVE A VALID CLAIM AT THE END OF THE DAY."

17             WELL, WE KNOW MR. HASLAM IS A VERY DECENT HUMAN

18   BEING.  UNDER ADVERSARIAL LITIGATION, I THINK WE CAN

19   ASSUME THAT IT'S NOT A FAVOR THAT'S COMING FROM THAT SIDE

20   OF THE TABLE.  WHATEVER IT IS, WHATEVER ITS MOTIVATION, WE

21   DON'T WANT IT.  WE'RE NOT ASKING FOR IT.

22             AND I'M UNAWARE OF ANY LAW THAT SAYS WHEN THE

23   HOLDER OF THE PATENT IS PREPARED TO TEST VALIDITY ON A

24   METHOD BASIS, THAT THE COURT HAS THE OBLIGATION OR EVEN

25   THE RIGHT TO SAY, "I'M GOING TO THROW YOU A LIFE PRESERVER

1    EVEN THOUGH YOU DIDN'T ASK FOR ONE, AND I'M GOING TO

2    REINTERPRET YOUR CLAIM, AND TO DO THAT, I'M GOING TO HAVE

3    TO PHYSICALLY READ WORDS IN HERE," AND I SAY I THINK END

4    UP WITH A CLAIM THAT I THINK IS INDISTINGUISHABLE FROM

5    SIX, IN VIOLATION OF WHAT'S PERMITTED THERE.

6            SO THESE ARE A NUMBER OF FIRSTS THAT ARE BEING

7    ASKED FOR, THAT, AS FAR AS I KNOW, HAVE NEVER BEEN

8    REQUESTED, LET ALONE PROVIDED BY THE COURT.

9            NOW, THERE ARE A NUMBER OF OTHER CASES THAT HAVE

10   OBVIOUSLY BEEN DISCUSSED.  BUT I THINK WHAT I JUST SAID IS

11   THE KEY FOR THE ANALYTICAL PURPOSE HERE.

12           AND I WANT TO MAKE VERY CLEAR WHAT WE'RE DOING

13   BY NOT ASKING FOR 112.6 PROTECTION, IF I CAN CALL IT THAT,

14   AT THIS POINT:  I UNDERSTAND WE'RE IRREVOCABLY WAIVING IT

15   FOR ALL TIME.  AND IF, ON THE 30TH, YOUR HONOR ANNOUNCES A

16   TENTATIVE DECISION THAT SAYS, WE DON'T THINK THIS CLAIM IS

17   VALID, I'M NOT GOING TO BE ABLE TO SLITHER UP HERE THEN

18   AND SAY, "JUDGE, COULD WE REVISIT THE 112.6 THING?  WE'D

19   AT LEAST LIKE TO HAVE A CHANCE ON THAT."

20           IT'S GONE FOR ALL TIME.  WE DON'T THINK IT WAS

21   EVER IN THE RECORD TO START WITH.  BUT WE ARE NOT ASKING

22   FOR IT NOW.

23           SO THE DECISION BEFORE THIS COURT TODAY

24   OBVIOUSLY IS NOT VALIDITY.  THAT'S TO COME LATER.  THE

25   QUESTION BEFORE THIS COURT IS AGAINST THAT RECORD, WITH

1   THAT LACK OF OBJECTIVE EVIDENCE, AND THAT LACK OF A

2   REQUEST BY THE PLAINTIFF -- EXCUSE ME, BY THE PATENT

3   HOLDER FOR 112.6 CONSTRUCTION, DOES THE COURT HAVE ANY

4   BASIS FOR READING 112.6 LIMITATIONS INTO THE LANGUAGE.

5           NOW, THERE OBVIOUSLY ARE A NUMBER OF OTHER

6   CASES, MODINE, ET CETERA, THAT HAVE BEEN CITED.  I THINK

7   EVERY DISTINCTION THAT SHOULD BE MADE AND SOME THAT

8   PROBABLY HAVEN'T ARE ALREADY BEFORE THE COURT.

9           IF THERE ARE ANY OTHER PARTICULAR POINTS,

10  THOUGH, THAT THE COURT WOULD LIKE COMMENT OR ATTEMPTED

11  RESPONSE, I'D BE PLEASED TO ADDRESS THOSE.  OTHERWISE,

12  WE'RE PREPARED TO SUBMIT AT THIS POINT.

13          THE COURT:  NO.  THAT'S ALL.  THANK YOU.

14          MR. KRAMER:  KARL KRAMER.

15          ADDRESSING THE SECOND POINT MR. HASLAM RAISED,

16  IT IS CORRECT THAT THE PARTIES ARE WORKING ON A

17  STIPULATION TO TRY TO DETERMINE THE SPECIFIC EMBODIMENTS

18  IN THE PATENT THAT MATCH UP WITH CERTAIN OF THE CLAIM

19  LANGUAGE.

20          AND I WANT TO MAKE CLEAR THAT FOR CLAIM 6, UNDER

21  THE LAW, THE COMPARISON THE COURT MUST MAKE IS TO LOOK AT

22  THE LANGUAGE OF THE CLAIM AFTER THE WORDS "MEANS FOR" AND

23  DETERMINE WHETHER THAT LANGUAGE IS MET AND THEN COMPARE

24  THE STRUCTURE IN THE PATENT WITH THE STRUCTURE OF THE

25  ACCUSED DEVICE.

1          WE TOOK THE DEPOSITION OF MR. DUSSE, RSA'S

2     EXPERT.  WE ARE WILLING TO STIPULATE TO THAT DEPOSITION

3     TESTIMONY AS TO THE STRUCTURES.  AND I RECOMMEND THE

4     DEPOSITION TO THE COURT FOR ITS READING, AND WE WILL

5     SUBMIT IT.

6          THE STRUCTURES WERE IDENTIFIED IN THAT

7     DEPOSITION, AND WE SUBMITTED A PROPOSAL TO RSA THAT IS

8     TAKEN VERBATIM FROM THAT TESTIMONY.  AND I'M SURPRISED TO

9     SEE MR. HASLAM ARGUING THAT IT'S DIFFERENT THAN THAT, BUT

10    HE'S REALLY ARGUING WITH MR. DUSSE, NOT WITH US.

11         THE COURT:  THANK YOU.

12         MR. SCHLAFLY?

13         MR. SCHLAFLY:  I JUST HAVE A COUPLE COMMENTS,

14    BECAUSE I'LL TRY NOT TO DUPLICATE THE ARGUMENTS THE OTHERS

15    HAVE MADE.

16         AND I JUST WANT TO SAY THAT ALL OF THIS 112,

17    SECTION 6 STUFF IS BASED ON SOME THEORY THAT THE FEDERAL

18    CIRCUIT HAS COOKED UP IN THE LAST TWO YEARS.  AND WE HAVE

19    TO LIVE WITH IT, THAT'S TRUE.

20         BUT IT'S A THEORY THAT WAS NOT APPLICABLE TO THE

21    PATENT OFFICE AT THE TIME THIS PATENT WAS APPLIED FOR.

22    AND WHEN THESE CLAIMS WERE EXAMINED, THESE WERE EXAMINED

23    UNDER AN ENTIRELY DIFFERENT THEORY, AND THAT IS, THE

24    PATENT OFFICE WOULD GIVE THE CLAIMS THE BROADEST POSSIBLE

25    READING, AND THEY WOULD NOT BE SUBJECT TO THESE 112.6

1    LIMITATIONS THAT THE FEDERAL CIRCUIT HAS COOKED UP IN THE

2    LAST COUPLE OF YEARS.

3                 OKAY.  THE OTHER POINT I'D LIKE TO MAKE IS THAT

4    IF YOU LOOK AT CLAIM 1 AND CLAIM 6, I MEAN, THE PROBLEM WE

5    HAVE HERE TODAY IS THAT THE LITERAL READING OF THESE

6    CLAIMS WOULD SEEM TO COVER ALL OF PUBLIC KEY.  AND THAT'S

7    JUST -- THAT'S JUST THE WAY IT IS.  AND THE QUESTION -- I

8    MEAN, THE REAL QUESTION WE HAVE IS:  IS THERE SOME LEGAL

9    THEORY UNDER WHICH THE LEGAL INTERPRETATION OF THOSE

10   CLAIMS IS NARROWER.

11               THE COURT:  112.6 OR SOMETHING ELSE.

12               MR. SCHLAFLY:  WHETHER UNDER 112.6 OR SOMETHING

13   ELSE, THAT'S THE REAL QUESTION.

14               THANK YOU.

15               THE COURT:  OKAY.

16               MR. HASLAM:  I HAVE JUST A FEW QUICK CONCLUDING

17   REMARKS.

18               THE COURT:  YES.

19               MR. HASLAM:  JUST ON THE CLAIM 6 ISSUE FOR A

20   MOMENT, WE HEARD THE TESTIMONY HERE FROM MR. DUSSE.  AND

21   IF THEY THOUGHT IT WAS WORTHWHILE CROSS-EXAMINING HIM TO

22   POINT OUT THE STRUCTURES, THEY COULD HAVE.

23               WE HAVE SUBMITTED, AND I WOULD ASK, I GUESS

24   RHETORICALLY, THE SAME QUESTION TO MR. KRAMER THAT HE

25   TRIED TO PUT TO ME:  THEIR INTERROGATORY RESPONSES, WHEN

1   WE PUT THOSE IN THE STIPULATION, THEY WEREN'T PREPARED TO

2   STIPULATE TO THAT.

3          AND I BELIEVE IT'S BECAUSE WHEN THEY PREPARED

4   THEIR INTERROGATORY RESPONSES, THEY MORE FAITHFULLY

5   FOLLOWED THE DICTATES OF PARAGRAPH 112, SECTION 112,

6   PARAGRAPH SIX, AND THEY INCLUDED IN THE INTERROGATORY

7   RESPONSES NOT ONLY THE STRUCTURAL ELEMENTS AS DEPICTED IN

8   THE FIGURES, BUT THE SPECIFICATION CITES WHICH SHOW THAT

9   THAT CIRCUIT ELEMENT WAS CONFIGURED AND HOOKED UP IN A

10  CERTAIN WAY TO ACHIEVE THE SPECIFIED FUNCTION.

11         TURNING TO JUST A FEW COMMENTS ON WHAT

12  MR. KENNEDY SAID, AND ONE THING THAT MR. SCHLAFLY SAID,

13  FIRST OF ALL, THE DOCTRINE OF CLAIM DIFFERENTIATION IS

14  OFTEN CITED BOTH WAYS.  BUT IT REALLY IS -- AND THE COURT

15  HAS SAID IN LAITRAM, AND I BELIEVE IN THE TANDEM CASE --

16  IT'S A HELPFUL AID, BUT IT REALLY HAS ITS LIMITED

17  UTILITIES.  IF, IN FACT, THE INVENTOR HAS INVENTED ONE

18  THING, IT DOESN'T MATTER HOW MANY DIFFERENT WAYS HE TRIES

19  TO CLAIM IT; HE'S LIMITED TO CLAIMING THAT ONE INVENTION.

20         SO CLAIM DIFFERENTIATION, MR. KENNEDY FINDS

21  CASES THAT SAY IT'S HELPFUL, AND I FIND CASES WHERE IT'S

22  BEEN REJECTED.  AND IT REALLY IS, I THINK, THE PROVERBIAL

23  NOSE OF WAX.  IT ISN'T GOING TO DO YOU ANY GOOD HERE.

24         I ALSO DISAGREE THAT 112.6 IS AN OPTION.  THE

25  LANGUAGE IN THE STATUTE MAY -- I THINK IS PERMISSIVE AT

1   THE CLAIM DRAFTING PHASE.  IT ISN'T SOMETHING YOU CAN DO

2   AFTER THE FACT AND SAY, "I CAN ELECT IT OR NOT ELECT IT."

3   THE ELECTION MR. KENNEDY SPOKE ABOUT IS ONE THAT THEY MADE

4   WHEN THEY GOT THE PATENT, NOT ONE THAT HE CAN MAKE TODAY.

5        THE OPTION, IF THERE IS ONE, IS THAT YOU CAN

6   DRAFT IT UNDER 112.6 OR YOU CAN PUT IT IN THE CLAIM

7   LANGUAGE.  IF YOU DON'T PUT IT IN 112.6 OR YOU DON'T

8   CONSTRUE IT SUBJECT TO 112.6, YET YOU, NONETHELESS, ARE

9   FUNCTIONAL, YOU DON'T HAVE AN OPTION.  THE CASE LAW SAYS

10  THAT THE CLAIM IS INVALID.

11       AND THE POINT THAT MR. SCHLAFLY MADE AT THE END,

12  TWO POINTS, ONE IS WRONG, AND THE OTHER IS, PERHAPS,

13  RIGHT.  THIS IS NOT SOMETHING THAT THE FEDERAL CIRCUIT HAS

14  COOKED UP IN THE LAST TWO YEARS.

15       THE RAYTHEON CASE WAS DECIDED IN 1983.  AND

16  THERE WAS NO EVIDENCE THERE WHICH WOULD SATISFY THE

17  GREENBERG TEST, NO EVIDENCE OF PROSECUTION HISTORY, NO

18  EVIDENCE ON INTENT.  THEY COULD HAVE PUT MR. HELLMAN ON

19  THE STAND IF THEY THOUGHT HIS INTENT WAS THAT IMPORTANT ON

20  THIS ISSUE; THEY COULD HAVE BROUGHT OTHERS HERE AND PUT

21  THEM ON IF THEY THOUGHT THAT INTENT WAS THAT IMPORTANT.

22       BUT I WOULD SUBMIT THAT BACK IN 1976, WHEN THESE

23  CLAIMS WERE PROSECUTED, IS THE ONLY EVIDENCE BEFORE THE

24  COURT RIGHT NOW ON WHAT THE PATENT OFFICE DID.

25       THIS IS THE ROBERTS CASE.  THAT WAS DECIDED IN

1   1973.  AND REGARDLESS OF WHO ASKED FOR WHAT, IN THE

2   ROBERTS CASE, THE COURT SAID:  WHEN YOU GET CLAIMS LIKE

3   THIS, YOU CAN'T REJECT THEM, NOT UNDER 112, PARAGRAPH

4   THREE.  ALTHOUGH THAT'S AN ISSUE, YOU CAN'T REJECT THEM ON

5   OVERBREADTH WITHOUT AT LEAST EXAMINING WHETHER OR NOT THEY

6   COMPLY WITH 112, PARAGRAPH THREE.

7          AND I WOULD SUBMIT THAT THE EVIDENCE IS THAT IF

8   YOU WANT TO GO BACK NOW AND TRY TO DETERMINE WHAT THE

9   PATENT OFFICE THOUGHT IT WAS DOING, IT PROBABLY APPLIED

10  BECAUSE IT WAS ONLY HANDED DOWN THREE YEARS BEFORE BY THE

11  COURT OF CUSTOMS AND APPEALS, THE ROBERTS CASE.

12         AND IT SAID:  YES, BEFORE ROBERTS, WE WOULD HAVE

13  REJECTED THIS CLAIM AS BEING TOO BROAD AND INDEFINITE.

14  BUT ROBERTS SAYS WE CAN'T DO THAT UNTIL WE'VE CHECKED 112,

15  PARAGRAPH THREE.  AND IF, UNDER 112, PARAGRAPH THREE, THE

16  SPECIFICATION PROVIDES CONTENT FOR ALL THIS, THEN YOU

17  CAN'T REJECT IT.

18         AND THAT'S WHAT THE PATENT OFFICE WAS PROBABLY

19  DOING WHEN IT EXAMINED THIS.

20         THE COURT:  THANK YOU.

21         MR. KENNEDY:  VERY BRIEFLY, YOUR HONOR.

22         ON ROBERTS -- AND IT BECOMES PIVOTAL TO THE

23  COURT'S ANALYSIS -- I REALLY THINK THE TWO PARAGRAPHS IN

24  THE CASE, PARTICULARLY, ON PAGE 1403, ARE SIGNIFICANT.

25  THE COURT, AS I READ IT, SAYS THEY ARE DISAGREEING WITH

1    THE BOARD'S ENTIRE CHARACTERIZATION OF THE LANGUAGE, IN

2    JUST SAYING WE DON'T AGREE WITH ANYTHING YOU'VE DONE HERE.

3         BUT HERE IS THE KEY POINT.  ROBERTS IS A 1973

4    CASE.  ZIMMERLEY IS A BOARD CASE FROM 1967.  GREENBERG IS

5    1996.  GREENBERG TELLS US:  WHEN "STEPS FOR" DOESN'T

6    APPEAR IN THE CASE, THERE HAS GOT TO BE SOME OBJECTIVE

7    EVIDENCE OF INTENT TO INVOKE 112.6.

8         NOW, EITHER THERE WAS SUCH OBJECTIVE EVIDENCE IN

9    ROBERTS AND ZIMMERLEY, IN WHICH CASE THEY ARE NOTHING BUT

10   PRECURSORS OF GREENBERG, OR, ALTERNATIVELY, SUCH OBJECTIVE

11   EVIDENCE WAS LACKING, IN WHICH CASE THEY'RE SIMPLY BAD

12   LAW, IN LIGHT OF THE FEDERAL CIRCUIT'S MORE RECENT

13   PRONOUNCEMENT IN GREENBERG.

14        BUT AGAIN, IN NONE OF THOSE CASES -- AND I'M

15   SURE YOUR HONOR ISN'T GOING TO FIND IT -- IS THERE EVER A

16   CASE THAT SAYS:  EVEN WHEN THE PATENT HOLDER IS MAKING NO

17   CLAIM OF A DESIRE TO INVOKE 112.6, AND EVEN THOUGH THERE

18   IS NO OBJECTIVE EVIDENCE OF IT, THE COURT CAN READ WORDS

19   INTO A CLAIM -- AND THAT'S WHAT'S GOING TO REQUIRE HERE,

20   ACTUALLY PASTING IN "STEPS FOR" TO MAKE THIS COMPLY IN

21   THAT REGARD.  AND THAT'S NEVER HAPPENED.

22        AND FINALLY, AS LONG AS MR. SCHLAFLY IS TALKING

23   BLUNTLY, LET ME DO THE SAME.  OBVIOUSLY, THE CONCERN HERE

24   IS:  THESE FOLKS DON'T THINK THEIR VALIDITY ATTACK IS AS

25   STRONG AS THEY WOULD LIKE IT TO BE.  THEY'VE GOT SOME

1    CONCERNS ABOUT WHAT'S GOING TO HAPPEN UNDER A CLEAR AND

2    CONVINCING STANDARD ON OCTOBER 30; AND THEREFORE, UNDER

3    THIS GUISE OF BEARING GIFTS, THEY'VE COME UP WITH THIS

4    MARVELOUS WAY AS TO HOW THEY CAN SAVE OUR PATENT FROM US.

5            AGAIN, THAT'S WHAT'S GOING ON HERE.  WE DON'T

6    WANT THE GIFT.  IT'S AN UNRECOGNIZED THEORY.  AND LET'S

7    TAKE THE CLAIMS THE WAY THEY'RE PLEADED NOW AND GET ON

8    WITH THE BUSINESS OF DETERMINING WHETHER THEY'RE VALID OR

9    NOT.

10            THEY ARE VERY BROAD; THERE IS NO QUESTION ABOUT

11   IT.  IT'S OUR POSITION PIONEERING PATENTS ARE GENERALLY

12   BROAD, BUT THAT'S AN ISSUE FOR THE 30TH, NOT FOR TODAY.

13            THANK YOU.

14            THE COURT:  THANK YOU.  WE'LL TAKE A RECESS NOW,

15   AND THEN WE'LL COME BACK AND WE'LL ARGUE THE MOTION TO

16   REMAND.  TWENTY MINUTES.

17            (RECESS TAKEN AT 2:49 P.M.)

18            (PROCEEDINGS RESUMED AT 3:16 P.M.)

19            THE COURT:  PLEASE BE SEATED.

20            THIS IS A MOTION TO REMAND THE ISSUES FROM THE

21   ARBITRATION PANEL.  WHO IS GOING TO ARGUE THE MATTER?

22            MR. FLINN:  PATRICK FLINN FOR THE DEFENDANTS,

23   YOUR HONOR.

24            MR. HAWK:  I'M A NEW FACE, YOUR HONOR.

25   ROBERT HAWK FROM THE HELLER, EHRMAN FIRM, AND I'LL BE

1    ADDRESSING THIS.

2         THE COURT:  THANK YOU.

3         MR. FLINN:  YOUR HONOR, IN THE STATE WHERE I

4    PRACTICE NOW, IN GEORGIA, THE FEDERAL COURTS DO NOT HAVE

5    ORAL ARGUMENT AS A RULE ON PRETRIAL MOTIONS AT ALL.  AND

6    SO I HAVE COME, SINCE I MOVED TO ATLANTA, TO VIEW THIS AS

7    VERY MUCH A PRIVILEGE THAT I DON'T WANT TO OVERSTAY, SO

8    I'LL TRY AND SAY AS LITTLE AS POSSIBLE IN THIS PROCESS.

9         AND WHAT I REALLY THOUGHT WOULD BE USEFUL AT

10   ALL, SINCE I AM, I THINK, THE ONLY PERSON IN THE ROOM WHO

11   WAS AT ALL OF THE ARBITRATION SESSIONS THAT HAVE TAKEN

12   PLACE SO FAR, IS TO GIVE YOU SOME IDEA OF WHAT HAS GONE ON

13   THERE.

14        I THINK IT'S NOT -- JUST SO YOUR HONOR IS AWARE

15   OF WHAT'S BEEN GOING ON IN THE ARBITRATION SINCE SEPTEMBER

16   OF LAST YEAR, AS YOU MAY KNOW, ONE OF THE ISSUES DECIDED

17   BACK IN SEPTEMBER WAS:  WOULD CYLINK GET A LICENSE TO

18   PRACTICE THE RSA PATENT?

19        AND SINCE SEPTEMBER, THERE HAVE BEEN NO FEWER

20   THAN FOUR FURTHER RULINGS FROM THE ARBITRATORS ON THAT

21   QUESTION.  AND MOST RECENTLY, LAST WEEK, RSA HAS RAISED A

22   NEW MOTION TO THE ARBITRATORS, A WHOLE NEW QUESTION ABOUT

23   OUR LICENSE.  SO THERE IS STILL A VERY MUCH ALIVE AND

24   ONGOING ARBITRATION PROCEEDING.  THE PANEL IS THERE AND

25   READY TO DECIDE IT.

1      THE OTHER RELEVANT FACTS THAT I THINK MAKE THE

2   MOST DIFFERENCE ARE THAT THIS IS UNDISPUTEDLY -- THE ISSUE

3   THAT YOUR HONOR FRAMED IN YOUR SUMMARY JUDGMENT RULING OF

4   MAY 17, 1996, WHAT YOU REFERRED TO ON PAGE SEVEN AS THE

5   DISPOSITIVE ISSUE, IS UNQUESTIONABLY ARBITRABLE WITHIN THE

6   SCOPE OF THE ARBITRATION CLAUSE, AND THEY DON'T DISPUTE

7   THAT.  AND EQUALLY CLEAR IS THAT IT IS A MANDATORY RULE

8   UNDER THE FEDERAL ARBITRATION ACT.  IT IS NOT SOMETHING

9   THAT IS DISCRETIONARY.

10      THE OTHER THING THAT IS PROBABLY WORTH

11   MENTIONING IS THAT THE PATENT STATUTE ITSELF CONTEMPLATES

12   THAT EVEN ISSUES AS CENTRAL AS VALIDITY AND ENFORCEABILITY

13   CAN BE ARBITRATED UNDER SECTION 294 OF THE PATENT ACT.

14      NOW, WE ARE NOT IN THAT SITUATION, BUT THERE IS

15   SUGGESTION IN THE RSA PAPERS THAT PATENT ISSUES OR ISSUES

16   THAT ARE CLOSE TO PATENT QUESTIONS CANNOT BE ARBITRATED IS

17   SIMPLY WRONG.  AND I THINK THAT IS A RELEVANT FACT.

18      THE OTHER ISSUES ABOUT WAIVER, WE THINK WE HAVE

19   DOCUMENTED.  THERE ARE REPEATED TIMES WE HAVE COME INTO

20   THIS COURT AND SAID, IF IT HASN'T ALREADY BEEN DECIDED, IT

21   IS ARBITRABLE, OR DOCUMENTED.  AND I DON'T THINK AT ANY

22   POINT DID WE DO ANYTHING THAT COMES WITHIN THE HEAVY

23   BURDEN THAT RSA MUST SHOW TO SHOW WAIVER OF THIS MANDATORY

24   RIGHT.

25      AND THE CASES ARE LEGION IN WHICH CERTAIN ISSUES

1 THAT ARE ARBITRABLE ARE DECIDED INDEPENDENTLY OF THE

2 COURT.  AND THAT HAPPENS ALL THE TIME.

3  WE COME DOWN TO THE FACT THAT YOUR HONOR HAS

4 IDENTIFIED WHAT YOU REFERRED TO AS A DISPOSITIVE ISSUE.

5 IT TURNS ON THE PKP RELATIONSHIP, WHAT THE PARTIES AGREED

6 TO, HOW THAT BUSINESS OPERATED DURING ITS OPERATION,

7 SOMETHING THE PANEL HEARD MANY DAYS OF TESTIMONY ON, AND

8 THEY ARE STANDING BY AND WAITING.

9  RSA ASKED THEM TO WAIT FOR YOUR HONOR TO RULE

10 BEFORE THEY DID ANYTHING, AND THEY HAVE ACCEPTED THAT.

11 THEY ARE WAITING TO RESPOND TO YOUR DIRECTION IN THIS

12 MATTER.  AND ASSUMING THAT YOUR HONOR GRANTS THE MOTION,

13 THEY CAN THEN TAKE THE MATTER UP.  AND IF THERE IS SOME

14 PROBLEM THEY SEE WITH THEIR JURISDICTION, THEN THEY CAN

15 RAISE IT AT THAT TIME.

16  THANK YOU, YOUR HONOR.

17  THE COURT:  OKAY.

18  MR. HAWK:  YOUR HONOR, WHAT I WOULD PROPOSE TO

19 DO IS ADDRESS JUST A COUPLE OF THE POINTS THAT COUNSEL

20 JUST RAISED, AND THEN DISCUSS A COUPLE OF THE ISSUES THAT

21 WERE IN OUR BRIEF OPPOSING THIS MOTION TO REMAND AND RAISE

22 SOME MATERIAL THAT WASN'T IN THOSE BRIEFS.

23  FIRST OF ALL, AS MR. FLINN POINTED OUT, THERE

24 HAVE BEEN FURTHER PROCEEDINGS IN THE ARBITRATION BELOW.

25 AND ALTHOUGH I HAVEN'T BEEN A PART OF THOSE ARBITRATION

1    PROCEEDINGS, I HAVE READ THE TRANSCRIPTS IN THE MIT CASE.

2    AND THAT'S THE CASE THAT HE'S REFERRING TO, THAT CERTAIN

3    ACTIVITIES IN THAT CASE RESULTED IN ISSUES BEING REMANDED

4    BACK DOWN TO THE ARBITRATION PANEL.

5         AND I CAN TELL YOU FROM READING THOSE

6    TRANSCRIPTS THAT JUDGE LETTS WAS VERY, VERY UPSET WITH THE

7    ENTIRE PROCESS.  HE WAS VERY UPSET WITH THE LAWYERS.  WHAT

8    HE WAS UPSET ABOUT IS BECAUSE THE LAWYERS WOULD GET A

9    DECISION OF THE ARBITRATION PANEL AND THEY WOULD COME TO

10   THE COURT, AND THEY WOULD MAKE ARGUMENTS ABOUT WHAT THAT

11   ARBITRATION DECISION MEANT.

12        AND THE JUDGE GOT VERY UPSET WITH THEM BECAUSE

13   THEY WEREN'T ABLE TO AGREE.  I THINK HE WAS ALSO VERY

14   UPSET BECAUSE THE ARBITRATION PANEL WASN'T SENDING

15   ABSOLUTELY CLEAR MESSAGES.

16        AND WHAT HAPPENED IS HE ORDERED THE LAWYERS TO

17   GO BACK DOWN A SECOND TIME, AND I THINK MAYBE EVEN A THIRD

18   TIME, AND GET ANOTHER CLARIFICATION FROM THE ARBITRATION

19   PANEL OF WHAT WAS GOING ON.

20        AND WITH ALL RESPECT, YOUR HONOR, IN THIS CASE,

21   I THINK IF YOU CAN AT ALL AVOID THAT SCENARIO, YOU OUGHT

22   TO AVOID IT.  YOU HAVE ALREADY PREVIOUSLY IN THIS CASE HAD

23   TO UNDERTAKE THE TASK OF TRYING TO GET BEHIND AN

24   ARBITRATION RULING, WHEN THERE IS A SUMMARY JUDGMENT ON

25   THE RES JUDICATA COLLATERAL ESTOPPEL ISSUE EARLIER IN THIS

1    CASE, AND HAD TO DO SOME VERY CLOSE READING OF WHAT -- AND

2    WHAT YOUR CONCLUSION WAS ABOUT WHAT THE ARBITRATION PANEL

3    DID AND DID NOT DECIDE.

4            RATHER THAN DOING THAT AGAIN IN THIS CASE, YOUR

5    HONOR, WE THINK YOU OUGHT TO KEEP IT HERE.  AND I'LL TELL

6    YOU THE REASONS WHY RSA BELIEVES YOU CAN KEEP IT HERE

7    LEGALLY, AND, IN FACT, MUST KEEP IT HERE LEGALLY.

8            BUT AS A PRACTICAL MATTER, I DON'T THINK THIS

9    COURT WANTS TO GO THROUGH THAT AGAIN, WHAT JUDGE LETTS HAS

10   GONE THROUGH AND WHAT THIS COURT HAS HAD TO STRUGGLE WITH

11   BEFORE.

12           THE SECOND ISSUE MR. FLINN RAISES IS THAT RSA

13   DOESN'T DISPUTE THE ARBITRABILITY OF THE ISSUES

14   IDENTIFIED.  THAT'S NOT CORRECT IN TWO SENSES.  THE FIRST

15   SENSE IS THAT WE DO DISPUTE THE ARBITRABILITY OF THE

16   SPECIFIC CORE PATENT INFRINGEMENT DEFENSES THAT ARE BEFORE

17   YOUR HONOR IN THIS CASE.  THOSE CORE DEFENSES OF EQUITABLE

18   ESTOPPEL, LACHES, IMPLIED LICENSE, PATENT EXHAUSTION, ARE

19   JUST NOT ARBITRABLE BECAUSE THE PARTIES DID NOT AGREE TO

20   ARBITRATE THEM.

21           THERE MAY BE SOME ISSUES -- AND WHAT CYLINK DID

22   WAS BREAK OUT A COUPLE OF ISSUES BASED ON YOUR PRIOR

23   ORDER, A COUPLE OF FACT ISSUES, AND SAY:  WELL, THESE HAVE

24   GOT TO BE ARBITRABLE.

25           BUT WHAT DOES IT STATE HERE, YOUR HONOR?  AND

1   THE QUESTION HERE IS WHETHER YOU STRIP OUT CORE PATENT

2   INFRINGEMENT DEFENSES, REMAND THOSE, ESSENTIALLY, TO THE

3   ARBITRATION PANEL TO DECIDE, STOP ALL DISCOVERY, STOP

4   RSA'S PREPARATION OF THOSE DEFENSES TO PRESENT IN THIS

5   CASE, BUT LET CYLINK PROCEED AHEAD WITH ITS PATENT

6   INFRINGEMENT CLAIMS.

7          THAT SEEMS LIKE, I GUESS, THE ULTIMATE CASE OF

8   CYLINK HAVING ITS CAKE AND EATING IT, TOO.  THEY GET TO

9   STOP OUR DEFENSES; THEY GET TO REMAND THEM TO ANOTHER

10  FORUM TO DECIDE; BUT THEY GET TO GO ON IN THIS FORUM WITH

11  THEIR PATENT INFRINGEMENT CLAIMS.

12         AND THE POINT WE MADE -- ONE OF THE POINTS THAT

13  WE MADE IN OUR BRIEF WAS THAT THERE WAS ABSOLUTELY NO

14  AUTHORITY OUT THERE FOR DOING SUCH A THING.  THERE IS NO

15  AUTHORITY THAT THEY CITE WHERE A COURT HAS STRIPPED AWAY

16  DEFENSES AND SENT THEM TO ARBITRATION BUT ALLOWED THE

17  UNDERLYING CLAIMS TO GO FORWARD BEFORE THE COURT.

18         WHAT I'D LIKE TO DO, THOUGH, IS TAKE MAYBE THREE

19  OR FOUR MINUTES TO REDUCE THE LEVEL OF ABSTRACTION ABOUT

20  WHAT WE'RE ARGUING ABOUT.

21         WHAT I'D LIKE TO DO IS JUST SHOW THE COURT TWO

22  OR THREE PIECES OF EVIDENCE, THE EVIDENCE THAT GOES TO

23  EQUITABLE ESTOPPEL, THE EVIDENCE THAT GOES TO LACHES THAT

24  CYLINK DOES NOT WANT YOU TO CONSIDER.  THEY DON'T WANT YOU

25  TO CONSIDER THESE ISSUES.

1    THEY WANT TO SEND IT BACK, AND THEY WANT

2   ESSENTIALLY THE ARBITRATION PANEL TO OVERRULE YOUR EARLIER

3   RULING THAT THEY HADN'T RULED ON, IF THE ARBITRATION PANEL

4   HADN'T RULED ON IT.  AND THEN IF THE ARBITRATION PANEL IS

5   NOT PREPARED TO DO THAT, CYLINK ALTERNATIVELY SAYS:   "GO

6   AHEAD AND DECIDE IT ON THE RECORD BEFORE YOU.  YOU DON'T

7   NEED TO HAVE ANY OF THE EVIDENCE THAT HAS BEEN DISCOVERED

8   IN THE LITIGATION.  YOU HAVE ENOUGH TO DECIDE THIS ISSUE

9   BEFORE.  YOU HAVE ENOUGH EVIDENCE TO DECIDE THIS ISSUE

10   RIGHT NOW."

11    BUT LET ME SHOW YOU WHAT SOME OF THE EVIDENCE

12   IS, AND THIS EVIDENCE INCLUDES BOTH EVIDENCE THAT WAS IN

13   THE ARBITRATION, BUT MORE IMPORTANTLY, ALSO EVIDENCE THAT

14   HAS COME TO LIGHT IN THIS CASE, IN DISCOVERY IN THIS CASE,

15   AND EVIDENCE THAT CYLINK NEVER WANTS TO SEE THE LIGHT OF

16   DAY.

17    THE FIRST THING, YOUR HONOR, IS A NEWS

18   RELEASE --

19    THE COURT:  WAIT A SECOND.

20    MR. HAWK:  -- A PRESS RELEASE ISSUED BY RSA AND

21   CYLINK BACK IN 1988, ANNOUNCING A JOINT MARKETING

22   AGREEMENT BETWEEN RSA AND CYLINK.

23    AND THE REASON, YOUR HONOR, THAT THIS IS SO

24   IMPORTANT, IS THAT IT IS FROM EIGHT YEARS AGO, AND IT

25   TALKS ABOUT, THAT THIS JOINT MARKETING AGREEMENT BETWEEN

1   RSA AND CYLINK COVERED THE BSAFE PRODUCT, THE OEM TOOLKIT

2   THAT IS AT THE VERY HEART OF THE INFRINGEMENT CLAIMS THAT

3   CYLINK IS BRINGING.  AND WHAT IT DOES IS ESTABLISH THAT

4   CYLINK HAD TO KNOW EIGHT YEARS AGO WHAT BSAFE WAS, HOW IT

5   WAS USED, AND KNOW THE BASIS OF ITS CONTRIBUTORY

6   INFRINGEMENT CLAIMS THAT IT DIDN'T BRING UNTIL EIGHT YEARS

7   LATER, OR ALMOST EIGHT YEARS LATER, LATE LAST YEAR.

8           BUT WHAT DOES THE NEWS RELEASE SAY?  IT TALKS

9   ABOUT:

10              "RSA DATA SECURITY AND CYLINK CORPORATION

11              TODAY ANNOUNCED THAT THEY SIGNED A WORLDWIDE

12              JOINT MARKETING AGREEMENT COVERING NEW AND

13              EXISTING PRODUCTS OF BOTH COMPANIES.  THE

14              PRODUCTS COVERED BY THE AGREEMENT INCLUDE RSA'S

15              MAILSAFE AND BSAFE SOFTWARE PACKAGES, AND

16              CYLINK'S NEW PC ENCRYPTOR."

17          BUT IT NOT ONLY POINTS OUT BSAFE, IT ACTUALLY

18   SAYS -- LET'S SEE IF I CAN GET IT A LITTLE CLEARER -- IT

19   SAYS WHAT BSAFE IS.

20          ADDITIONALLY, BSAFE OEMS CAN SUPPORT HIGH-SPEED

21   DATA PRIVACY AND AUTHENTICATION APPLICATIONS.  ACCORDING

22   TO JIM BIDZOS, PRESIDENT OF RSA:

23              "BSAFE PROVIDES AN API (APPLICATION

24              PROGRAMMING INTERFACE) FOR DEVELOPERS TO

25              INTEGRATE PRIVACY AND AUTHENTICATION

1          CAPABILITIES INTO THEIR PRODUCTS."

2          SO, IN OTHER WORDS, BACK IN '88, CYLINK KNOWS

3   ABSOLUTELY THEY'RE HELPING THE MARKET BE SAFE.  THEY KNOW

4   EXACTLY WHAT IT'S FOR EIGHT YEARS AGO.

5          YOU GO DOWN TO THIS PARAGRAPH:  "RSA ALSO OFFERS

6   BSAFE, A CRYPTOGRAPHIC TOOLKIT FOR OEMS."

7          THIS IS WHAT CYLINK DOES NOT WANT YOU TO

8   CONSIDER WHEN YOU'RE CONSIDERING THE EQUITIES OF THIS

9   INFRINGEMENT CLAIM; I.E., THAT EIGHT YEARS AGO, CYLINK

10  KNEW EXACTLY WHAT RSA WAS UP TO.

11         THE COURT:  BUT THAT FELL APART AND THEY

12  COULDN'T WORK IT OUT, AND TRYING TO TAKE PKP APART, THEN

13  IT WENT BACK TO ARBITRATION, AND IT DIDN'T RESOLVE ALL THE

14  PROBLEMS, APPARENTLY.

15         MR. HAWK:  THAT'S RIGHT, YOUR HONOR.  PKP --

16         THE COURT:  DO YOU FEEL THAT THE ARBITRATORS

17  MISSED SOMETHING?

18         MR. HAWK:  I'M SORRY, YOUR HONOR?

19         THE COURT:  DO YOU FEEL THAT THE ARBITRATION

20  PANEL MAY HAVE MISSED SOME THINGS THAT THEY WOULD HAVE

21  HANDLED DIFFERENTLY; IT WOULDN'T HAVE HAPPENED THE WAY

22  THAT IT DID, IF THEY GOT A CHANCE TO LOOK AT IT?  THEY'VE

23  HAD THE EXPERTS; THEY'VE HAD A LOT OF TIME AND EXPERIENCE

24  WITH IT.

25         AND THESE ARE ARBITRABLE MATTERS THAT WE ARE

1    TALKING ABOUT, AND I'M NOT RULING RIGHT NOW, BUT I'M

2    SAYING THE REASON FOR IT IS THAT MAYBE THEY COULD CLARIFY

3    A LOT OF THINGS THAT THEY WERE AMBIGUOUS AND WEREN'T

4    HANDLED PROPERLY AS A RESULT OF THE SOLVING --

5            MR. HAWK:  WHAT I DON'T THINK THEY COULD

6    CLARIFY, YOUR HONOR, NUMBER ONE, THEY WOULDN'T HAVE ALL OF

7    THE EVIDENCE BEFORE THEM THAT HAS BEEN DEVELOPED IN THIS

8    CASE.  AND I THINK THAT'S CRITICAL.

9            CYLINK HAS ASKED THEM NOT TO CONSIDER ANY OF

10   THAT.  AND I THINK THAT DOES A GREAT DISSERVICE, AND, IN

11   FACT, IS FUNDAMENTALLY UNFAIR TO RSA AT THIS POINT IN

12   TIME.

13           AND I WANT TO TALK ABOUT THAT ON THE WAIVER

14   POINT, BECAUSE I DO BELIEVE THERE IS AN ABSOLUTELY, JUST A

15   VERY, VERY STRONG GROUND FOR WAIVER IN THIS CASE.

16           THE COURT:  WHAT WOULD BE THE TIME ELEMENT

17   INVOLVED IN A REMAND?

18           MR. HAWK:  WHAT WOULD BE THE TIME ELEMENT

19   INVOLVED?

20           THE COURT:  THEY WOULD HAVE A HEARING --

21           MR. HAWK:  I THINK THAT'S UNCLEAR AT THIS POINT,

22   YOUR HONOR.  THERE IS NO WAY THAT THE COURT CAN REALLY

23   CONTROL OR THE PARTIES CAN CONTROL WHAT'S GOING TO HAPPEN.

24           AND THERE IS NO WAY THAT THIS COURT CAN

25   GUARANTEE, EVEN IF THE TWO ISSUES WERE REMANDED BACK DOWN,

1    THE TWO ISSUES AS THEY HAVE BEEN FRAMED BY CYLINK, IF

2    THOSE TWO ISSUES WERE REMANDED, YOU DON'T KNOW WHAT KIND

3    OF ANSWER YOU'RE GOING TO GET.

4         THE COURT:  NO.

5         MR. HAWK:  YOU DON'T KNOW IF IT'S GOING TO BE

6    SATISFACTORY; YOU DON'T KNOW IF IT'S GOING TO BE ENOUGH

7    FOR YOU TO BE ABLE TO THEN APPLY THESE DEFENSES.

8         AND WHAT COULD BE INVOLVED IS EXACTLY WHAT

9    HAPPENED TO JUDGE LETTS, IS THAT HE DIDN'T GET A CLEAR

10   ANSWER AT ALL.  THE PARTIES WERE ARGUING ABOUT WHAT IT

11   MEANT, AND IT CAUSED A LOT OF DELAY IN THE CASE.

12        BUT LET ME MOVE ON, THEN, TO REALLY A MORE

13   IMPORTANT POINT.  AND THAT POINT IS, IS THAT BECAUSE THERE

14   IS NO LAW OUT THERE, WHERE COURTS HAVE ACTUALLY STRIPPED

15   AWAY DEFENSES, THERE IS A VERY GOOD REASON FOR THAT,

16   PARTICULARLY IN THE REALM OF PATENT INFRINGEMENT DEFENSES.

17        THE REASON IS, IS THAT THOSE DEFENSES HAVE TO BE

18   DECIDED IN THE CONTEXT OF THE CLAIMS THEMSELVES.  NOBODY

19   IN THIS CASE IS ARGUING THAT THE INFRINGEMENT CLAIMS

20   THEMSELVES SHOULD BE REMANDED BACK DOWN TO THE

21   ARBITRATORS.  THE AGREEMENTS DON'T PROVIDE FOR ARBITRATION

22   OF INFRINGEMENT CLAIMS.

23        BUT WHAT WE HAVE HERE IS AN ATTEMPT TO TRY AND

24   BREAK OUT CORE PATENT INFRINGEMENT DEFENSES.  AND WHAT IS

25   PECULIAR ABOUT PATENT INFRINGEMENT DEFENSES, OR MAYBE IT'S

1    NOT PECULIAR TO THEM, BUT IT'S PECULIAR TO EQUITABLE

2    DEFENSES, IS THAT THE COURT HAS TO WEIGH THE EVIDENCE ON

3    BOTH SIDES.   IT HAS TO WEIGH THE EVIDENCE THAT WOULD

4    ESTABLISH THE DEFENSES THEMSELVES; AND THEN IT HAS TO

5    WEIGH THAT AGAINST THE EQUITIES OF THE CLAIMS THAT

6    CYLINK -- THE INFRINGEMENT CLAIMS THAT ARE BEING MADE.

7         YOUR HONOR IS BEING ASKED TO IMPOSE AN

8    INJUNCTION THAT WOULD VERY SERIOUSLY INJURE OUR CLIENT,

9    RSA.   AND --

10        THE COURT:   IN WHAT SENSE?   IN WHAT SENSE WOULD

11   I BE IMPOSING AN INJUNCTION?

12        MR. HAWK:   THAT'S WHAT THEY'RE ASKING FOR, YOUR

13   HONOR.   THAT'S PART OF THE ULTIMATE RELIEF BECAUSE OF THE

14   PATENT INFRINGEMENT CLAIMS --

15        THE COURT:   UNTIL THE ARBITRATION IS COMPLETED,

16   YOU MEAN.

17        MR. HAWK:   THE ULTIMATE RESULT OF WHAT THESE

18   PATENT INFRINGEMENT CLAIMS BROUGHT BY CYLINK IS, IS TO ASK

19   FOR AN INJUNCTION.   THEY'RE ASKING FOR DAMAGES, BUT

20   THEY'RE ALSO ASKING FOR AN INJUNCTION.

21        AND BECAUSE THEY'RE ASKING FOR EQUITABLE RELIEF,

22   THERE ARE EQUITABLE DEFENSES.   EQUITABLE ESTOPPEL,

23   OBVIOUSLY IT'S AN EQUITABLE DEFENSE; LACHES, OBVIOUSLY AN

24   EQUITABLE DEFENSE.

25        AND WHAT THE AUCKERMAN CASE SAYS -- AND YOUR

1   HONOR MAY REMEMBER THIS CASE, BECAUSE IT WAS BEFORE YOU IN

2   THE TRIAL COURT AND THEN WENT UP TO THE FEDERAL CIRCUIT --

3   THE AUCKERMAN FEDERAL CIRCUIT CASE SAYS THAT IN

4   DECIDING -- AND IT WAS TALKING ABOUT EQUITABLE ESTOPPEL,

5   WHICH IS A DEFENSE IN THIS CASE -- "THE COURT MUST

6   CONSIDER ANY EVIDENCE AND FACTS REGARDING THE EQUITIES OF

7   THE PARTIES IN ADDITION TO EVIDENCE BEARING ON SPECIFIC

8   ELEMENTS OF THE DEFENSE."

9          THE POINT I'M TRYING TO MAKE, YOUR HONOR, IS

10  THAT YOU'RE NOT GOING TO BE ABLE TO JUST POSE A "YES" OR

11  "NO" QUESTION BACK DOWN TO THESE ARBITRATORS.  BECAUSE OF

12  THE VERY NATURE OF THE DEFENSES THAT ARE AT STAKE HERE,

13  THE EQUITABLE ESTOPPEL AND THE LACHES, IT'S NOT A "YES" OR

14  "NO" ISSUE.  IT IS AN ISSUE THAT YOU NEED TO HEAR THE

15  EVIDENCE; YOU NEED TO HEAR EVIDENCE AND SEE EVIDENCE LIKE

16  I JUST PUT UP THERE ON THE SCREEN.  YOU NEED TO DECIDE HOW

17  STRONG THAT EVIDENCE IS, OR HOW WEAK THAT EVIDENCE IS, AND

18  THEN YOU NEED TO WEIGH IT AGAINST THE EQUITIES OF THE

19  INFRINGEMENT CLAIMS.

20         AND YOU HAVE TO DO THAT BEFORE YOU COULD EVEN

21  CONSIDER GRANTING THE EQUITABLE INJUNCTION THAT CYLINK IS

22  ASKING FOR.  THAT IS REALLY THE MAIN PROBLEM WITH THIS

23  PARTICULAR BRAND OF ARBITRATION REMAND THAT CYLINK IS

24  ASKING FOR.

25         LET ME MOVE ON, THOUGH, IF I CAN, TO THE WAIVER,

1    UNLESS YOU HAVE SOME MORE QUESTIONS ON THIS POINT.

2          THE COURT:  WELL, ONE COULD SORT OF WONDER

3    WHETHER THIS WOULD DELAY THE FINAL RESOLUTION OR SPEED UP

4    THE FINAL RESOLUTION.

5          MR. HAWK:  IF YOU WERE TO REMAND IT?

6          THE COURT:  YES.

7          MR. HAWK:  WELL, I DON'T KNOW THE ANSWER --

8          THE COURT:  THERE COULD BE A DIFFERENCE OF

9    OPINION ON THAT, BUT I'M JUST CURIOUS WHAT EACH WOULD SAY.

10         I WOULD LIKE TO SEE THE PROBLEM RESOLVED AS

11   EQUITABLY AND RAPIDLY AS POSSIBLE.  IT IS A VERY DIFFICULT

12   PROBLEM AND A VERY SERIOUS ONE TO YOUR COMPANIES AND TO

13   THE INDUSTRY, AND THE MORE STALLED, THE WORSE IT IS.  BUT

14   I WOULD LIKE TO HAVE SOMETHING THAT WOULD EXPEDITE THE

15   MATTER, IF THIS WILL DO THAT, AND PERHAPS NARROW SOME OF

16   THE ISSUES.

17         NOW, IF THAT'S GOING TO CONFUSE IT AND NOT DO

18   THAT, IT MIGHT BE A BAD MOVE.  IF THERE WAS AGREEMENT,

19   THAT MIGHT BE HELPFUL.

20         MR. HAWK:  WELL, I THINK THERE IS CERTAINLY A

21   VERY GOOD CHANCE, IF YOU LOOK AT THOSE MIT CASE

22   TRANSCRIPTS AND WHAT JUDGE LETTS WENT THROUGH IN THAT

23   CASE, THAT IT'S NOT GOING TO ADVANCE THE BALL AT ALL;

24   THAT, FIRST OF ALL, YOU'RE GOING TO GET A DECISION OUT OF

25   THE ARBITRATORS.  IT'S GOING TO BE A "YES" OR "NO"

1    DECISION, AT BEST.

2            AND THE "YES" OR "NO" DECISION, IF YOU CAN

3    DIVINE THAT OUT OF THE DECISION -- AND THAT IS A TASK, AS

4    YOUR HONOR KNOWS, BECAUSE YOU HAD TO TRY AND DO IT

5    BEFORE -- IF THERE IS A "YES" OR "NO" DECISION, AT BEST,

6    THAT IS STILL NOT GOING TO KEEP YOUR HONOR FROM HAVING TO

7    WEIGH THE EVIDENCE.

8            YOU'RE GOING TO HAVE TO CONSIDER ALL THE

9    EVIDENCE.  RSA IS JUST GOING TO HAVE TO BE ENTITLED TO

10   DEVELOP EVIDENCE ON THESE ISSUES IN THIS CASE.

11           WE OUGHT TO BE ENTITLED TO DEVELOP EVIDENCE ON

12   LACHES, BECAUSE THAT'S AN EQUITABLE DEFENSE BEFORE YOUR

13   HONOR, AND THAT'S A DEFENSE WHERE YOU NEED TO HEAR AND

14   WEIGH THE EVIDENCE AGAINST THE EQUITIES ON THEIR SIDE.

15           SO, YOU KNOW, I CAN'T SEE AT ALL HOW THIS IS

16   LIKELY TO SPEED THINGS ALONG, HOW IT'S LIKELY TO SIMPLIFY

17   THINGS.

18           I THINK YOU'RE JUST GOING TO BE FACED WITH A

19   SITUATION LIKE YOU WERE BEFORE, WHERE YOU'RE TRYING TO

20   DIVINE WHAT THE ARBITRATION MEANT.  AND THEN YOU'RE GOING

21   TO HAVE TO END UP WEIGHING THE EVIDENCE YOURSELF ANYWAY.

22           BUT IF I COULD MAKE THE POINT ON WAIVER, YOUR

23   HONOR, I DON'T REALLY HAVE A LOT TO ADD TO THE PAPERS, BUT

24   I THINK REALLY THE OVERARCHING STANDARD IN BOTH THE

25   FEDERAL AND THE STATE CASES, APPEARS TO TURN ON A REAL

1    COMMON SENSE INQUIRY.  AND THAT IS:  DO THE FACTORS OF

2    DELAY -- AND THERE HAS BEEN DELAY IN THIS CASE, IN MAKING

3    THIS MOTION FOR REMAND -- AND OTHER ACTS INCONSISTENT WITH

4    ARBITRATION, DO THOSE FACTORS MAKE AN ORDER TO ARBITRATE

5    NOW UNFAIR?  AND I THINK THE CLEAR ANSWER TO THAT IS YES,

6    YOUR HONOR.

7            THE DELAY IN THIS CASE HAS BEEN VERY

8    SIGNIFICANT, BECAUSE OF THE CONTEXT OF THE SCHEDULE IN

9    THIS CASE.

10           AS YOUR HONOR WILL RECALL, CYLINK HAS PRESSED

11   VERY, VERY HARD -- AND MAYBE THEY HAVE GOOD REASONS FOR

12   PRESSING HARD -- BUT THEY PRESSED HARD FOR AN EARLY TRIAL

13   DATE AND A COMPRESSED PRETRIAL AND DISCOVERY SCHEDULE.

14           BUT HAVING PRESSED FOR THAT, IT OUGHT TO BE

15   INCUMBENT ON CYLINK, AND IT SHOULD HAVE BEEN INCUMBENT ON

16   CYLINK TO EARLY ON, IF THEY WERE GOING TO TRY AND CHANGE

17   THE LANDSCAPE OF THIS CASE RADICALLY, WHICH IS WHAT

18   THEY'RE TRYING TO DO RIGHT HERE BY PUTTING OUT FOUR CORE

19   PATENT INFRINGEMENT DEFENSES AND HAVING THEM THROWN DOWN

20   TO THE ARBITRATORS, IF THEY WERE GOING TO DO THAT, THEY

21   SHOULD HAVE DONE IT MUCH, MUCH EARLIER THAN THEY DID IN

22   THIS CASE.

23           THE REASON THAT THE DELAY IS SO SIGNIFICANT IS

24   THAT IT COMES FOUR MONTHS AFTER YOUR HONOR RULED THAT

25   THERE WAS NO RES JUDICATA OR COLLATERAL ESTOPPEL EFFECT OF

1   THAT EARLIER ARBITRATION DECISION.  AND THAT IS WHAT

2   CYLINK RELIES SO HEAVILY ON.  THEY SAY, "OH, WE'VE ALWAYS

3   TAKEN THE POSITION, YOUR HONOR, THAT ARBITRATION IS IN

4   THIS CASE, AND THAT WE THOUGHT THESE ISSUES WERE

5   ARBITRABLE."

6          BUT THERE IS A BIG DIFFERENCE IN SAYING THAT THE

7   ISSUES HAVE ALREADY BEEN DECIDED BY ARBITRATION ON THE ONE

8   HAND, AND THEN SAYING, "WELL, YOU KNOW, WE LOST THAT ONE,

9   AND NOW WE'VE WAITED FOUR MONTHS AND NOW WE WANT TO REMAND

10  THEM ALL TO ARBITRATION."

11         AND THEY'RE NOT ONLY SAYING THAT, YOUR HONOR,

12  THEY'RE SAYING IT AFTER HAVING ARGUED THE MERITS OF THE

13  PARTICULAR LICENSE DEFENSES IN THIS CASE, AND HAVING LOST

14  ESSENTIALLY ON TWO OF THE THREE MOTIONS ON THE MERITS.

15  THEY NOW WANT TO CHANGE THE RESULT.  BUT LET ME GET TO

16  THAT IN JUST A MINUTE.

17         THE DELAY IS ALL THE MORE SIGNIFICANT IN THIS

18  CASE, YOUR HONOR, BECAUSE, IN THE DEFENDANTS' CASE

19  MANAGEMENT STATEMENT, WHICH CAME AFTER YOUR HONOR'S RULING

20  THAT THERE WAS NO RES JUDICATA OR COLLATERAL ESTOPPEL

21  EFFECT, WHAT CYLINK TOLD THE COURT AND TOLD RSA WAS THAT

22  THE CORE PRINCIPAL ISSUES IN THIS CASE INCLUDE LACHES,

23  INCLUDE EQUITABLE ESTOPPEL.

24         AND THAT'S THE ONLY OTHER OVERHEAD THAT I'LL PUT

25  UP, YOUR HONOR, IS I JUST WANT YOU TO SEE WHAT WAS SERVED

1    BACK IN APRIL IN THIS CASE, AND WHAT RSA HAS PROCEEDED

2    BASED ON, AND WHAT THE LOCAL RULES TELL US THAT WE CAN

3    PROCEED BASED ON, IN PREPARING OUR DEFENSES.

4             IT WAS IN APRIL, THE DEFENDANTS' CASE MANAGEMENT

5    STATEMENT AND PROPOSED ORDER, THE SECTION STARTING ON PAGE

6    TWO DOWN HERE, THE PRINCIPAL LEGAL ISSUES WHICH THE

7    PARTIES DISPUTE.  AND THEN LISTING THOSE PRINCIPAL LEGAL

8    ISSUES, CYLINK TELLS US THAT ONE OF THE ISSUES, THE 1(C),

9    WHETHER CKC/CYLINK'S INFRINGEMENT CLAIMS ARE BARRED OR

10   LIMITED BY THE DOCTRINES OF EQUITABLE ESTOPPEL, FIRST

11   SALE-PATENT EXHAUSTION, OR IMPLIED LICENSE.

12            THEY ALSO, DOWN IN (H), LIST:  "WHETHER

13   CYLINK/CKC'S CLAIMS ARE BARRED BY LACHES."

14            IT'S NOT UNTIL THREE MONTHS LATER THAT THEY COME

15   INTO THIS COURT AND SAY, "WELL, WE DON'T REALLY HAVE AN

16   EXPLANATION OF WHY WE TOLD YOUR HONOR AND WHY WE TOLD RSA

17   THAT THESE ISSUES WERE IN THE CASE.  WE'RE NOW GOING TO

18   TRY AND GET THEM OUT OF THE CASE AND SEND THEM DOWN TO

19   ARBITRATION."

20            AND IN THAT INTERVENING THREE-MONTH PERIOD, A

21   LOT OF WATER PASSED UNDER THE BRIDGE, YOUR HONOR, AND WE

22   ARE NOW VERY CLOSE TO A NOVEMBER 22ND CUTOFF.  AND THE

23   SIMPLE FACT IS, IS THAT CYLINK OUGHT TO BE HELD TO WHAT

24   THEY SAID IN THIS CASE MANAGEMENT STATEMENT.

25            THEY CAN'T SAY THEY WERE SURPRISED, BECAUSE THEY

1    ALREADY KNEW THAT YOUR HONOR HAD RULED THAT THERE WAS NO

2    RES JUDICATA OR COLLATERAL ESTOPPEL EFFECT.   AND, IN FACT,

3    THERE WAS NO EXPLANATION IN THEIR PAPERS OF WHY THEY

4    SERVED SUCH A DOCUMENT AFTER YOUR HONOR RULED THAT, AND

5    THEN WHY THEY SHOULD NOW BE PERMITTED TO GO BACK ON THAT.

6         I REALLY DON'T THINK THAT THERE IS, AMONG THE

7    CASES THAT ARE CITED, THERE IS NOT ANY STRONGER BASIS FOR

8    WAIVER THAN THAT, YOUR HONOR, THE DELAY, AND THEN TELLING

9    THE COURT AND RSA SPECIFICALLY THAT THESE ISSUES ARE IN

10   THE CASE, AND THEN NOT BEING ABLE TO EXPLAIN WHY THEY THEN

11   WAITED OR WHY THEY SERVED THAT EARLIER PAPER.

12        REALLY THE FINAL POINT I WANTED TO MAKE, THOUGH,

13   IS PERHAPS THE MOST IMPORTANT.   AND THAT IS:   WHAT IS

14   GOING ON HERE IS UNABASHED FORUM SHOPPING.

15        WHAT HAPPENED IS THAT CYLINK CAME INTO THIS

16   COURT AND MOVED YOUR HONOR FOR A PRELIMINARY INJUNCTION.

17   RSA CAME BACK AND HAS SAID, ONE OF THE REASONS YOUR HONOR

18   SHOULDN'T GRANT THAT PRELIMINARY INJUNCTION IS BECAUSE WE

19   HAVE LICENSE DEFENSES, AND, IN FACT, WE HAVE QUITE

20   COMPELLING EVIDENCE THAT SHOWS THAT CYLINK KNEW WHAT WAS

21   GOING ON IN '88, KNEW WHAT WAS GOING ON IN 1990, WHEN THAT

22   PUBLIC KEY PARTNERSHIP WAS FORMED, AND ALSO, EVEN AS LATE

23   AS 1995, WAS SAYING THAT WE DON'T HAVE ANY PROBLEM WITH

24   THESE OEM LICENSES.

25        AND ALL OF THAT EVIDENCE WAS IN THE PAPERS.   AND

1   WHAT CYLINK DID, IN RESPONSE TO THAT -- FIRST OF ALL, THEY

2   SAID, "YOUR HONOR, IT'S ALREADY BEEN DECIDED BY THE

3   ARBITRATORS."

4           YOUR HONOR LOOKED AT THAT, SAID, "NO, I'M SORRY,

5   YOU'RE WRONG.  IT HASN'T BEEN DECIDED."

6           BUT CYLINK ALSO ARGUED ON THE MERITS OF THOSE

7   LICENSE DEFENSES.

8           AND WE POINT OUT IN OUR PAPER, BOTH THE ARGUMENT

9   AND THE EVIDENCE SUBMITTED, THEY ALSO DEPOSED RSA'S

10  PRESIDENT, JIM BIDZOS, ON THE MERITS OF THE LICENSE

11  DEFENSES.  THEY TOOK THEIR SHOT.  THEY WON IN THE

12  PRELIMINARY INJUNCTION.  THEY TOOK THEIR SHOT ON THE

13  MERITS OF THE LICENSE DEFENSES, BOTH THERE AND IN OPPOSING

14  RSA'S SUMMARY JUDGMENT MOTION ON THE LICENSE DEFENSES, AND

15  THEY LOST, IN ESSENCE, ON THE PRELIMINARY INJUNCTION.

16  THEY DID NOT CONVINCE YOUR HONOR THAT THE LICENSE DEFENSES

17  WERE WITHOUT MERIT, DESPITE THREE ATTEMPTS TO DO SO.

18          AND, IN FACT, YOUR HONOR'S ORDER DENYING THE

19  PRELIMINARY INJUNCTION CITES THE LICENSE DEFENSES AS ONE

20  OF THE REASONS THAT YOU WERE FINDING THE WAY YOU DID ON

21  LIKELIHOOD OF SUCCESS.

22          SO, THE CASES PLAINLY ESTABLISH THAT WHEN YOU

23  HAVE JUDICIAL LITIGATION ON THE MERITS, THAT IS AN

24  UNEQUIVOCAL CASE FOR WAIVER.  AND WHAT HAS HAPPENED IN

25  THIS CASE IS THAT YOU HAVE HAD -- WE ALL HAVE HAD JUDICIAL

1    LITIGATION ON THE MERITS; CYLINK HAS TRIED TO TEST THE

2    WATERS.  THEY DIDN'T LIKE THE FEEL OF THE WATERS.  THEY

3    SAT AROUND FOR A WHILE HOPING, PRESUMABLY, THAT MAYBE THEY

4    COULD REVERSE YOUR HONOR ON THE ISSUE OF RES JUDICATA

5    COLLATERAL ESTOPPEL.

6          THEY FINALLY DECIDED, JUST LESS THAN A MONTH

7    AGO, THAT MAYBE THAT WASN'T THE BEST STRATEGY; MAYBE IT'S

8    BEST TO CHANGE HORSES, SO TO SPEAK, RIGHT NOW, YOUR HONOR;

9    MAYBE IT'S TIME TO CHANGE FORUMS AND KICK THESE ISSUES

10   BACK DOWN TO THE ARBITRATORS, WHERE THEY HOPE THEY WILL

11   HAVE A BETTER CHANCE.

12         YOUR HONOR SHOULDN'T LET THEM DO THAT.  IT'S

13   FUNDAMENTALLY UNFAIR, AND IT'S FUNDAMENTALLY CONTRARY TO

14   THE CASES THAT SAY YOU CAN'T FORUM SHOP.  ONCE THERE HAS

15   BEEN A LITIGATION ON THE MERITS OF DEFENSES OR ISSUES, YOU

16   CAN'T THEN CHANGE THEM AND KICK THEM DOWN TO ARBITRATION.

17         THE COURT:  THANK YOU.

18         MR. FLINN:  I HOPE MR. HAWK WILL LEAVE THESE

19   THINGS.

20         MR. HAWK:  SURE.  WHAT DO YOU NEED?

21         MR. FLINN:  ALL OF THEM, ALL THREE OF THEM.

22         LET ME JUMP TO THE SPEED ISSUE, YOUR HONOR.

23         THE COURT:  DO YOU CONTEMPLATE THAT YOU WILL BE

24   REOPENING ISSUES THAT HAVE BEEN RESOLVED IN THE

25   ARBITRATION?

1    MR. FLINN:  NO.  I ASSUME THEY WILL TELL US WHAT

2  THEY'VE ALREADY DECIDED AND ONLY REOPEN THINGS THAT THEY

3  NEED TO DECIDE.

4    NUMBER TWO, WE DON'T PROPOSE TO, YOU KNOW -- IF

5  YOUR HONOR REMANDS, THE ARBITRATORS WILL CONSIDER WHAT

6  OTHER EVIDENCE RSA CAN PERSUADE THEM THEY OUGHT TO HEAR.

7    AND INTERESTINGLY, THIS DOCUMENT THAT MR. HAWK

8  PUT UP, IT WAS CERTAINLY FAMILIAR TO ME BECAUSE IT WAS AN

9  EXHIBIT IN THE ARBITRATION.  AND RSA'S LAWYER IN THE

10  ARBITRATION SPENT A FAIR AMOUNT OF TIME ASKING CYLINK

11  WITNESSES ABOUT WHAT THEY KNEW IN 1988.  SO FROM US NOT

12  WANTING THE ARBITRATORS TO SEE THAT, THE ARBITRATORS SAW

13  IT.  BUT THEY CAN SEE IT AGAIN, IF THERE IS A NEED TO DO

14  THAT.

15    SIMILARLY, IF THERE IS SOME NEED FOR ADDITIONAL

16  DISCOVERY, WE DID DISCOVERY THE FIRST TIME AROUND IN

17  ARBITRATION, AND IF THERE IS ADDITIONAL THAT NEEDS TO BE

18  DONE IN DISCOVERY, THEY CAN DO THAT.

19    BUT ON THE ISSUE OF SPEED, IT'S NOT CITED IN THE

20  BRIEFS, BECAUSE IT WASN'T RAISED THIS WAY, BUT IF WE, AS

21  THE PARTY SEEKING ARBITRATION, DO NOT DO WHATEVER NEEDS TO

22  BE DONE TO EXPEDITE IT, YOUR HONOR DOES HAVE THE RIGHT TO

23  PULL IT BACK.  SO IF WE ARE OBSTREPEROUS OR UNCOOPERATING,

24  NOT DOING WHAT WE NEED TO DO TO GET THIS CASE DECIDED

25  PROMPTLY IN THE ARBITRATION PANEL IN THE MATTER OF THE

1   NEXT FEW MONTHS, THEN YOUR HONOR CAN TAKE IT BACK.

2          BUT I THINK THAT THERE IS NO REASON AT THIS

3   POINT TO BELIEVE THAT IT CAN'T BE DONE QUITE

4   EXPEDITIOUSLY, AND WE BELIEVE THE ARBITRATION PANEL HAS --

5   WE SHOULD AT LEAST HEAR FROM THEM AS TO WHETHER THEY THINK

6   THIS CAN BE DONE IN A PROMPT MANNER.

7          I WAS ALSO STRUCK BY THIS WAIVER ISSUE BY THIS

8   PARTICULAR DOCUMENT, THIS DEFENDANTS' CASE MANAGEMENT

9   STATEMENT.  THIS PARTICULAR PAGE WAS ONLY ON FOR A SECOND.

10         BUT I THINK WE WANT TO TAKE A LOOK AT IT.  IT

11   SAYS "PRINCIPAL LEGAL ISSUES WHICH THE PARTIES DISPUTE."

12   THE VERY FIRST STATEMENT IS BASED UPON INFORMATION THAT

13   RSA HAS PROVIDED, DEFENDANTS IDENTIFIED.  WE WERE SIMPLY

14   LISTING HERE FOR YOUR HONOR'S CONVENIENCE ALL THE THEORIES

15   WE UNDERSTOOD THEM TO BE PROPOUNDING.

16         BEAR IN MIND THIS DOCUMENT WAS ALSO SUBMITTED AT

17   A TIME IN WHICH WE HAD CONTENDED AND YOUR HONOR HAD TAKEN

18   UNDER SUBMISSION THE PROPOSITION THAT THOSE ISSUES HAD

19   ALREADY BEEN DECIDED.  IT WOULD BE A LITTLE UNUSUAL FOR

20   US, HAVING ARGUED AND YOUR HONOR NOT HAVING RULED, THAT WE

21   OUGHT TO SEND SOMETHING TO ARBITRATION WHEN OUR POSITION

22   HAS BEEN THAT THE MATTER HAS ALREADY BEEN ARBITRATED.

23         ON A RELATED QUESTION, MR. HAWK, I DON'T

24   BELIEVE, WAS IN THE ROOM AT THE TIME, BUT I REMEMBER

25   VIVIDLY STANDING HERE IN FRONT OF YOUR HONOR ON THAT

1   PRELIMINARY INJUNCTION MOTION, AND DID I DO ANYTHING THAT

2   SUGGESTED THAT I DIDN'T THINK THESE ISSUES ARE ARBITRABLE?

3   WHAT I SAID TO YOUR HONOR, AND I BELIEVE WE QUOTED THE

4   TRANSCRIPT IN OUR PAPERS, WAS:  "IF THESE ISSUES HAVE NOT

5   ALREADY BEEN ARBITRATED," I SAID TO YOUR HONOR, "THEY ARE

6   ARBITRABLE."  AND WE HAVE SAID THAT CONSISTENTLY

7   THROUGHOUT.

8        NOW, WE HAVE DEALT WITH SOME COMPLICATED

9   SCIENTIFIC SUBJECTS IN THE LAST THREE DAYS, BUT I DO

10  BELIEVE WE HAVE NOT CHANGED THE RULES OF TIME AND SPACE,

11  AND IT HAS NOT BEEN FOUR MONTHS SINCE YOUR HONOR'S MAY

12  17TH DECISION FOR US TO MAKE THE REMAND MOTION.  THE

13  CORRECT DATES ARE MAY 17TH AND AUGUST 21ST.

14       AND TO EXPLAIN A LITTLE BIT OF THAT DELAY, THE

15  TIME WAS TAKEN UP FIRST BY UNDERSTANDING AND ANALYZING

16  YOUR HONOR'S DECISION; IT WAS TAKEN UP BY THE EVALUATION

17  OF WHETHER OR NOT TO GO BACK TO THE ARBITRATORS FIRST, TO

18  GO TO YOUR HONOR FIRST, OR TO DO BOTH, AS WE ULTIMATELY

19  DECIDED; IT WAS TAKEN UP BY DETERMINING WHETHER OR NOT WE

20  WANTED TO WAIVE ARBITRATION; AND, FRANKLY, IT WAS TAKEN UP

21  BECAUSE MANY OF THE PRINCIPAL LAWYERS INVOLVED IN THIS

22  COMPLICATED DECISION TOOK VACATIONS DURING THAT PERIOD.

23       THIS WAS THE SUMMER MONTHS.  AND A PERIOD OF

24  ABOUT 12 WEEKS ELAPSED BETWEEN YOUR HONOR'S RULING AND OUR

25  MOTION, IN WHICH ALL OF THOSE THINGS, INCLUDING WRITING

1    ALL THE BRIEFS BOTH TO THE ARBITRATION PANEL AND TO YOUR

2    HONOR, WERE PREPARED.  AND THAT, I BELIEVE, IS NOT THE

3    SORT OF DELAY THAT IS AT ISSUE HERE.

4            IN THE FINAL ANALYSIS, IF YOU REMAND THIS BACK

5    TO THE ARBITRATORS, WHAT YOU DESCRIBED AS THE DISPOSITIVE

6    ISSUE, WHEN YOU DENIED THE SUMMARY JUDGMENT MOTION,

7    THEY'RE WAITING TO HEAR FROM YOU, AND THEY COULD TELL YOU,

8    "WE WON'T DECIDE IT.  WE CAN'T DECIDE IT.  WE DON'T WANT

9    TO DECIDE IT," YOU MAY HAVE SOME OTHER INFORMATION.

10           BUT I SUBMIT TO YOUR HONOR IF THEY SAY THEY ARE

11   READY, WILLING AND ABLE TO TAKE THIS ISSUE, HAVING ALREADY

12   HEARD A LOT OF THE EVIDENCE AND HEARING WHAT OTHER

13   EVIDENCE RSA CAN CONVINCE THEM THEY NEED TO HEAR, YOUR

14   HONOR WILL HAVE COMPLIED WITH THE FEDERAL ARBITRATION ACT,

15   AND YOUR HONOR WILL HAVE ADVANCED THE RESOLUTION OF THIS

16   CASE SUBSTANTIALLY.

17           THANK YOU.

18           MR. HAWK:  YOUR HONOR, MAY I BE HEARD BRIEFLY

19   HERE?

20           THE COURT:  YES.

21           MR. HAWK:  ON JUST THE PRACTICAL ISSUE OF

22   WHETHER OR NOT THIS WILL MOVE THINGS ALONG OR WHETHER OR

23   NOT THIS WILL COMPLICATE AND DELAY THINGS, I THINK IT'S

24   ABSOLUTELY CLEAR, DEMONSTRABLY CLEAR, THAT THE CHANCES

25   THAT IT'S GOING TO DELAY THINGS AND IT'S GOING TO MAKE

1   YOUR JOB HARDER ARE VERY MUCH GREATER THAN IT'S GOING TO

2   BE THE OTHER WAY AROUND.

3            FIRST OF ALL, YOUR HONOR, YOU DECIDED EARLIER IN

4   THIS CASE THAT THE LICENSE DEFENSES HAD NOT BEEN DECIDED

5   BY THE ARBITRATORS, AND FURTHER, THAT THE EVIDENCE WASN'T

6   THERE FOR THE ARBITRATORS TO DECIDE THEM.

7            MR. FLINN JUST TELLS US RIGHT NOW THEY'RE NOT

8   WORRIED ABOUT DISCOVERY, THAT THERE WAS DISCOVERY TAKEN

9   BEFORE ON THE LICENSE ISSUES, PRESUMABLY DISCOVERY COULD

10  BE TAKEN AGAIN IN THE ARBITRATION ON THE LICENSE ISSUES,

11  IF THERE WAS A NEED FOR THAT.

12           IF WE'RE GOING TO GET INTO DISCOVERY, A SECOND

13  TRACK OF ARBITRATION DISCOVERY, YOU KNOW, I THINK THE

14  CHANCES, AGAIN, THAT IT'S GOING TO UNCOMPLICATE THINGS AND

15  SPEED THINGS ALONG ARE MINUSCULE.

16           IF YOU REMAND THIS, WHAT IS GOING TO HAPPEN IS

17  THAT IF THERE IS DISCOVERY ALLOWED -- AND I WILL TELL YOUR

18  HONOR THAT CYLINK HAS ASKED THAT THERE BE NO DISCOVERY

19  ALLOWED BECAUSE THEY DON'T WANT ANY DISCOVERY -- BUT, YOU

20  KNOW, SAY WE WERE ABLE TO QUOTE BACK AT THEM BEFORE THE

21  ARBITRATORS THIS STATEMENT BY MR. FLINN THAT WE COULD HAVE

22  SOME DISCOVERY -- AFTER YOU COMPLETE THAT DISCOVERY,

23  YOU'RE GOING TO HAVE TO GET THE SCHEDULES OF THE THREE

24  ARBITRATORS TOGETHER; YOU'RE GOING TO HAVE TO GET THE

25  SCHEDULES OF THE TRIAL COUNSEL, THE ARBITRATION COUNSEL

1    INVOLVED.

2            AND WITH A FEBRUARY 6TH TRIAL DATE, YOUR HONOR,

3    IT'S CLEAR TO ME -- AND I THINK IT SHOULD BE CLEAR TO

4    EVERYONE -- THAT THIS IS NOT GOING TO SPEED THINGS ALONG.

5    IT'S ONLY GOING TO DELAY THINGS, AND IT'S ONLY GOING TO

6    DELAY THINGS BECAUSE YOUR HONOR IS THEN GOING TO HAVE TO

7    DECIDE, IS GOING TO HAVE TO LOOK AT THE EVIDENCE ANYWAY.

8            THE ONLY OTHER POINT I WANTED TO ADDRESS WAS THE

9    POINT ABOUT THE DEFENDANTS' CASE MANAGEMENT STATEMENT.

10   FIRST OF ALL, WHAT MR. FLINN TRIES TO DO IS TO SAY THAT,

11   WELL, ALL WE WERE DOING WAS JUST REGURGITATING BACK TO THE

12   COURT WHAT RSA WAS TELLING US.

13           THAT'S NOT WHAT THE LOCAL RULES REQUIRED THEM TO

14   DO IN A CASE MANAGEMENT STATEMENT.  IT REQUIRES THEM TO

15   IDENTIFY WHAT THEY SAY, AND IF THE PARTIES CAN'T AGREE,

16   AND THE PARTIES DIDN'T AGREE IN THIS CASE TO FILE A

17   COMBINED CASE MANAGEMENT STATEMENT, THEY NEED TO TELL US

18   WHAT THEY THINK THE ISSUES IN THE CASE ARE.

19           AND ONE NOTABLE OMISSION FROM WHAT THEY SAID IN

20   THAT CASE MANAGEMENT STATEMENT WAS THAT THERE WAS NO

21   MENTION, SOME THREE MONTHS AGO, OF ANY POSSIBILITY THAT

22   THEY WOULD BE SEEKING TO REMAND THE ISSUES THAT WERE

23   LISTED, THE LACHES ISSUE AND THE OTHER ISSUES.

24           CYLINK SHOULD BE HELD TO THAT CASE MANAGEMENT

25   STATEMENT, YOUR HONOR.  IT WAS NOT DONE -- AND THE EXACT

1    DATES ARE IN THE PAPERS THAT WE SUBMITTED TO THE COURT --

2    YOUR HONOR'S DECISION, MAKING CLEAR THAT THERE WAS NO RES

3    JUDICATA OR COLLATERAL ESTOPPEL EFFECT, HAD ALREADY BEEN

4    DECIDED AT THE TIME THAT CASE MANAGEMENT STATEMENT WAS

5    FILED.

6              THE COURT:  THANK YOU.

7              THE MATTER IS SUBMITTED.  OKAY.  I'LL GET IT OUT

8    AS SOON AS POSSIBLE, I ASSURE YOU.

9              MR. HAWK:  THANK YOU, YOUR HONOR.

10             (PROCEEDINGS ADJOURNED AT 3:54 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, SARA L. LERSCHEN, CERTIFIED SHORTHAND
REPORTER NO. 6213 FOR THE STATE OF CALIFORNIA, DO HEREBY
CERTIFY THAT THE FOREGOING TRANSCRIPT, VOLUME 2, PAGES
NUMBERED 148 THROUGH 296, INCLUSIVE, CONSTITUTES A TRUE,
FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS
SUCH CERTIFIED SHORTHAND REPORTER OF THE PROCEEDINGS
HEREINBEFORE ENTITLED, AND REDUCED TO TYPEWRITING TO THE
BEST OF MY ABILITY.

SARA LERSCHEN, CSR, RPR, CM, CRR