Thomas R. Hogan, Esq., California State Bar No. 042048
Phillip E. Maroc, Esq., California State Bar No. 188525
**LAW OFFICES OF THOMAS R. HOGAN**
60 South Market Street, Suite 1125
San Jose, CA  95113-2332
Telephone:  (408) 292-7600

Attorneys for Defendant
**PUBLIC KEY PARTNERS**

*FILED*

JUL 23 1997

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ROGER SCHLAFLY, | ) | No. CV 94 20512 SW (PVT) |
| Plaintiff, | ) | **DECLARATION OF THOMAS R. HOGAN IN SUPPORT OF DEFENDANT PUBLIC KEY PARTNERS' MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56** |
| v. | ) | |
| PUBLIC KEY PARTNERS and RSA DATA SECURITY, INC., | ) | Date:  August 27, 1997 |
| Defendants. | ) | Time:  10:00 a.m. |
| | ) | Ctrm: 4, 5th Floor |
| | ) | Judge: Hon. Spencer Williams |

I, Thomas R. Hogan, hereby declare:

1.    I am counsel of record for the defendant Public Key Partners.  I have personal knowledge of the facts set forth below, and if called upon to do so, could and would competently testify thereto.

2.    Attached hereto as Exhibit A are true and correct copies of pages 734 of the deposition of Roger Schlafly taken on September 28, 1995.

3.    Attached hereto as Exhibit B are true and correct copies of pages 730:21-26 of the deposition of Roger Schlafly taken on September 28, 1995.

1    4.    Attached hereto as Exhibit C are true and correct copies of pages 775-776 of the

2    deposition of Roger Schlafly taken on September 28, 1995.

3    5.    Attached hereto as Exhibit D are true and correct copies of pages 771-777 of the

4    deposition of Roger Schlafly taken on September 28, 1995.

5    6.    Attached hereto as Exhibit E are true and correct copies of pages 793:09-796:01 of

6    the deposition of Roger Schlafly taken on September 28, 1995.

7    7.    Attached hereto as Exhibit F are true and correct copies of pages 798:20-799:17 of

8    the deposition of Roger Schlafly taken on September 28, 1995.

9    8.    Attached hereto as Exhibit G are true and correct copies of pages 799:24-800:02 of

10   the deposition of Roger Schlafly taken on September 28, 1995.

11   9.    Attached hereto as Exhibit H are true and correct copies of pages 800:3-800:07 of the

12   deposition of Roger Schlafly taken on September 28, 1995.

13   10.    Attached hereto as Exhibit I are true and correct copies of pages 609:14-613:9 of the

14   deposition of Roger Schlafly taken on September 22, 1995.

15   11.    Attached hereto as Exhibit J are true and correct copies of pages 68:01-73:19 of the

16   deposition of Roger Schlafly taken on September 11, 1995.

17   12.    Attached hereto as Exhibit K are true and correct copies of pages 154:06-154:21 of

18   the deposition of Roger Schlafly taken on September 28, 1995.

19   I declare under penalty of perjury that the foregoing is true and correct.  Executed at San

20   Jose, California the 23RD day of July 1997.

21

22   _____

23   Thomas R. Hogan

24

25

26

27

28



1    A       I think I learned that in discovery. I don't
2    think I knew that before this case.
3    Q       So it's your understanding now that at least
4    there were allegations that the patents were blocking
5    around the time that PKP was formed; right?
6    A       Yes.
7    Q       Now, from the point of view of persons seeking
8    a PKP license -- strike that.  From the point of view
9    of persons seeking to -- seeking the license to the
10   public key cryptography patents, didn't the formation
11   of PKP essentially make it easier for such a person
12   to license all of the patents?
13   A       Well, I expect PKP to make that argument.  I
14   think it's probably not true, though.
15   Q       All right.  Why do you think it's not true?
16   A       Because I think if PKP has not been formed,
17   there would have been some competition between the --
18   the -- the licensors of the Stanford patents and the
19   licensors of the MIT patents.  And as a result of
20   that competition, I think that -- that both of those
21   camps would have likely ended up with -- with -- with
22   reasonable license policies and it would have ended
23   up being easy for someone to get a license to some or
24   all of the patents.
25   Q       What do you mean by reasonable licensing
26   policies?

$\mathcal{B}$

1  high, in your view?

2  A      To say that a company has monopoly power means

3  as I understand it that they have the capacity or the

4  ability to set prices above or below what would

5  otherwise be the market price, but doesn't

6  necessarily mean that they do it.

7  Q      All right.  Do you have any understanding one

8  way or the other as to whether RSA sets prices

9  artificially high?

10  A      No, I don't.

11  Q      Do you have an understanding as to whether RSA

12  sets the prices artificially low?

13  A      No, I don't.

14  Q      Okay.  Let's turn to paragraph 83.  One thing

15  that I'd like probably to clarify first, it says:

16  "Defendant PKP has pooled patents in an attempt to

17  monopolize public key technologies," but later in

18  paragraph 84, you state that PKP was formed by RSA

19  and Cylink.

20          So going back to paragraph 83, which

21  entities in your view have pooled patents?  Is it

22  defendant PKP or is it RSA and Cylink, who formed PKP?

23  A      Well, I'm not sure there's a distinction.  It

24  was RSA and Cylink that decided to pool the patents

25  in forming PKP, and then it was PKP that then had

26  control of the patent pool.



1    license the patent, it's -- it's X dollars, and if

2    you want to license the -- the software and -- and

3    the patent license restricted to use of RSA Data

4    Security software or something, then it's Y dollars.

5    Q    What's your understanding of tying products

6    together in an antitrust sense?  And I know you're

7    not an attorney, but when you wrote this allegation,

8    what did you have in mind?

9    A    Well, what tying refers to me is when a company

10   has two products and they make the purchase of a

11   second -- one product somehow conditional on the

12   purchase of another product.

13   Q    Right.

14   A    Okay.  What -- what motivated the writing of

15   this was the -- was the observation that most of the

16   people who -- in the marketplace who are using -- who

17   are using the RSA patent are also using BSAFE or some

18   RSA Data Security software.  And it seemed to me that

19   that would be unlikely to be the case, unless --

20   unless -- unless RSA Data Security somehow forced or

21   pressured its customers to do it that way.

22   Q    In your own mind, what makes it unlikely?

23   A    Because -- because if there were no such tying,

24   then -- then it would seem to me that you would then

25   license the patent for one price and you can license

26   the patent and some software for another price.  The

1   price for just licensing the patent should be less,

2   and that there would be customers who would decide

3   that they would save a few bucks or whatever by just

4   licensing the patent.

5   Q      If you just licensed the patent, then you still

6   have to develop the software; right?

7   A      Develop it or buy it from someone else.

8   Q      Have you contacted any PKP licensees to confirm

9   your suspicion about tying?

10  A      No.

11  Q      Have you talked AT&T to explore this allegation?

12  A      No.

13  Q      All right.  How have you been injured by this

14  alleged practice of tying licenses -- I'm sorry, PKP

15  patent licenses with the purchase of RSA software?

16  A      Well, if in fact there is such tying, then I

17  would say that -- that I'm injured because if it

18  weren't for such tying, there would be people with

19  RSA patent licenses but needing of RSA software, and

20  maybe I could supply software to address that market.

21  Q      And what steps have you taken to sell RSA

22  software to any entities other than ISC and AT&T?

23  A      None.

24  Q      Has this alleged tying impacted ISC in any way?

25  A      Well, yes, I'd say so, in the same way that I

    said that it impacted me; namely, that -- that if it



1    but they suffered from the same patent pool in that

2    -- in that until the AT&T deal came along, they could

3    not sell to commercial users.

4    Q     And this morning, we already discussed how ISC

5    has suffered from the patent pool; right?

6    A     Yes.

7    Q     Do you have anything to add to your testimony

8    this morning on that subject?

9    A     No.

10   Q     Okay.  Now we'll move on to paragraph 89.  This

11   is where you allege that "PKP ties licensing of its

12   patents to the purchase of software and services from

13   RSA."  Earlier in the deposition, we discussed the

14   basis for that allegation.  I don't want to

15   mischaracterize what you testified to before, so

16   don't let me.  But as I recall what you testified is

17   that the basis of this statement is that some PKP

18   patent licensees also licensed software from RSA;

19   right?  And that's the basis for this allegation in

20   paragraph 89?

21   A     I'm not sure I phrased it that way.  We did

22   discuss this issue.

23   Q     I'm willing to accept any phrasing you would

24   prefer, or I can just ask the question again.  What

25   is the basis for allegations that PKP ties the

26   licensing of patents to purchase of software from

1    RSA?

2    A    My basis for making this allegation is

3    somewhat circumstantial.  It was based on my

4    observation that most of the people who seemed to be

5    using RSA in some sense, either from a license or RSA

6    software, are using software from RSA Data Security.

7    And I've never seen an offer that -- that -- that

8    said something like well, if you want to license the

9    patent, you pay X dollars, or if you want to license

10   the RSA software, you pay Y dollars.  It doesn't seem

11   to be an option that's offered to people.

12   Q    I'm afraid I'm a little confused by that

13   answer.  Are you saying that it is not an option that

14   is offered to people that you get -- that the

15   potential patent licensee gets a discount on the

16   patent license if they also purchase RSA software?

17        You know, I may have framed the question

18   in the negative, which makes me concerned about

19   whether or not your answer will make sense, so let me

20   phrase the question more affirmatively.  Have you

21   ever heard that potential PKP licensees get a

22   discount on the PKP patent license if they also

23   purchase RSA software?

24   A    Well, not directly.  But I'm not sure that

25   customers are given the choice.

26   Q    All right.  Given what choice?

1    A      The choice of licensing the patent or licensing
2    the software.

3    Q      You better explain that answer.

4    A      Okay.  In the process of going through
5    discovery documents, I saw an exchange of
6    correspondence between Mobius Encryption Technologies
7    and -- and -- and I guess it was some representative
8    of RSA Data Security.  In that correspondence,
9    somebody from Mobius said that their position -- that
10   is, their market was such that they have several
11   encryption products and for some things, they'd like
12   to get an RSA patent license, and then -- and then
13   for purposes of -- of making their own RSA product of
14   some sort.  For other purposes, they'd rather use
15   BSAFE and license that.  And this letter said in a
16   pretty straightforward way, I thought, that we have
17   different products, we have some needs to go each
18   way, and we'd like to know the -- what the prices are
19   of each so we can make our own decision.

20             And the response from RSA Data was that
21   Mobius was rebuffed on this.  That is, RSA Data
22   essentially said -- said, no, that's -- that's not
23   the way we operate.  You either -- we either have
24   customers who negotiate a license or we have
25   customers who -- who -- that is, we either have
26   customers who negotiate a patent license or we have

```
 1    customers who negotiate a software license, and it's
 2    kind of an either/or situation.  And -- and you know,
 3    once you decide -- once we come to a decision, that's
 4    -- that's -- which way it is, then we negotiate on
 5    that basis, but we're not going to give you a choice
 6    about the matter.
 7              And I'll say that's my interpretation of
 8    the letter.  The letter's on the record somewhere and
 9    you're welcome to read it for yourself and put your
10    own interpretation on it.
11    Q    As I understand what you just said, purchase of
12    RSA software is separate and independent from
13    purchase of a PKP patent license; right?
14    A    Separate and independent?  I don't know what
15    you mean by that.  I mean, when you do license their
16    BSAFE Toolkit or something, you have to get some kind
17    of license that -- some kind of implied license to
18    the RSA patent.
19    Q    All right.  But this allegation is that a PKP
20    patent license is tied to the purchase of software.
21    And as I understand your statement regarding Mobius,
22    RSA at least treats those issues as independent;
23    right?
24    A    Well, no, I'd say if they're really
25    independent, then RSA would have come back and said
26    -- said look, here's the deal.  If you want to just
```

Deposition of Roger Schlafly - Volume VII

1   license the patent, it's -- it's X dollars, and if

2   you want to license the -- the software and -- and

3   the patent license restricted to use of RSA Data

4   Security software or something, then it's Y dollars.

5   Q      What's your understanding of tying products

6   together in an antitrust sense?  And I know you're

7   not an attorney, but when you wrote this allegation,

8   what did you have in mind?

9   A      Well, what tying refers to me is when a company

10   has two products and they make the purchase of a

11   second -- one product somehow conditional on the

12   purchase of another product.

13   Q      Right.

14   A      Okay.  What -- what motivated the writing of

15   this was the -- was the observation that most of the

16   people who -- in the marketplace who are using -- who

17   are using the RSA patent are also using BSAFE or some

18   RSA Data Security software.  And it seemed to me that

19   that would be unlikely to be the case, unless --

20   unless -- unless RSA Data Security somehow forced or

21   pressured its customers to do it that way.

22   Q      In your own mind, what makes it unlikely?

23   A      Because -- because if there were no such tying,

24   then -- then it would seem to me that you would then

25   license the patent for one price and you can license

26   the patent and some software for another price.  The

Deposition of Roger Schlafly - Volume VII

1   price for just licensing the patent should be less,

2   and that there would be customers who would decide

3   that they would save a few bucks or whatever by just

4   licensing the patent.

5   Q    If you just licensed the patent, then you still

6   have to develop the software; right?

7   A    Develop it or buy it from someone else.

8   Q    Have you contacted any PKP licensees to confirm

9   your suspicion about tying?

10  A    No.

11  Q    Have you talked AT&T to explore this allegation?

12  A    No.

13  Q    All right.  How have you been injured by this

14  alleged practice of tying licenses -- I'm sorry, PKP

15  patent licenses with the purchase of RSA software?

16  A    Well, if in fact there is such tying, then I

17  would say that -- that I'm injured because if it

18  weren't for such tying, there would be people with

19  RSA patent licenses but needing of RSA software, and

20  maybe I could supply software to address that market.

21  Q    And what steps have you taken to sell RSA

22  software to any entities other than ISC and AT&T?

23  A    None.

24  Q    Has this alleged tying impacted ISC in any way?

25  A    Well, yes, I'd say so, in the same way that I

26  said that it impacted me; namely, that -- that if it

Deposition of Roger Schlafly - Volume VII

1  weren't for this alleged tying, that there would be

2  -- there would be more of a market for software to

3  people who just have patent licenses but no software,

4  and that ISC could address that market.

5  Q     What attempts has ISC made other than its deal

6  with AT&T to sell RSA software to -- well, to sell

7  any of its software to PKP patent holders?

8  A     You mean PKP patent licensees?

9  Q     Correct.

10  A     None that I know of.  I mean, unless you --

11  unless you consider the U.S. government a patent

12  licensee.

13  Q     Well, they are, but I did intend my question to

14  be directed to commercial PKP patent licensees.  Is

15  your answer any different?

16  A     None -- none that I know of.  It's possible

17  that they made some attempts, but none that I know of.

18  Q     I've asked this question before in other

19  contexts.  But if ISC has been injured by this

20  practice, then you would in turn suffer damages

21  because of lower royalties paid to you from ISC;

22  correct?

23  A     Correct.

24  Q     Okay.  Let's move on to paragraph 90.  Here you

25  allege that by the defendants' attempt to get their

26  technology to be declared a draft standard --

E

Deposition of Roger Schlafly - Volume VII

1    Q      And as a result of that, your royalties from

2    ISC for the DSA products are less than what you

3    believe they might be; is that true?

4    A      Yes.

5    Q      Have you suffered any other sort of damage as a

6    result of the patent controversy surrounding DSA?

7    A      Just that otherwise, I might have had

8    opportunities to sell to other companies.

9    Q      I understand.  Okay.  Let's get into paragraphs

10   92 through 94, which describe an alleged secondary

11   boycott of competitors.

12   A      Yes.

13   Q      Now, the statement there is that defendants

14   have organized an illegal secondary boycott of

15   competitors, but then you add that RSA has publicly

16   distributed a "Sink Clipper" poster.  Is it your

17   contention that the defendants organized the

18   secondary boycott or RSA organized the secondary

19   boycott?

20   A      Well, it's -- it's -- it's -- it's a little

21   fuzzy.

22   Q      How is it fuzzy?

23   A      Well, paragraph 93, the picture of Bidzos

24   wearing one of these T shirts appeared in New York

25   Times Magazine.  Mr. Bidzos is president of RSA Data

26   Security and he's also president of Public Key

1     Partners.  So then you have to ask, well, was he

2     wearing the T shirt in the capacity of RSA Data

3     Security or Public Key Partners?

4     Q      What's your understanding?

5     A      Well, I don't know.  Probably RSA Data

6     Security, but who knows?

7     Q      Have you seen anything directed from PKP by

8     which it advocated a secondary boycott of RSA's

9     competitors?

10    A      On PKP stationery or --

11    Q      Or anyone officially acting in the capacity of,

12    a PKP spokesperson.

13    A      Well, Bidzos is president of PKP.

14    Q      Let's ask the earlier question.  Anything on

15    PKP stationery?

16    A      No.

17    Q      Anything on which Mr. Bidzos is identified as

18    the president of PKP in which he advocates a

19    secondary boycott of competitors, an alleged

20    secondary boycott of competitors?

21    A      Well, my evidence on this subject is presented

22    here in its entirety.

23    Q      All right.

24    A      I could go back to the New York Times Magazine

25    article and search through that article for exactly

26    how Bidzos is identified, but this is it.  This is my

1   evidence.

2   Q   Skip to paragraph 94, which alleges that you

3   have been developing software for the Fortezza, also

4   known as Tessera card.  And I believe that we

5   discussed this in your deposition prior, in our last

6   session; right?

7   A   Yes.

8   Q   Let me ask this.  Have you made any attempt to

9   market software using Clipper chip technology outside

10  of your relationship with ISC?

11  A   No.

12          MR. MOORE:  Let's take a break.

13          (Whereupon, a recess was taken from 2:53

14  to 3:14 p.m.)

15          Q BY MR. MOORE:  Let's get back on the

16  record.  All right.  Mr. Schlafly, we are going to

17  continue our course through the antitrust causes of

18  action in the amended complaint.  Paragraph 95 refers

19  to defendants' conduct and tactics with regard to the

20  PKP patents and that it constitutes patent misuse,

21  for which you provide the example that defendants

22  knew the Hellman-Merkle patent to be invalid.

23          I understand that it's your position that

24  the Hellman-Merkle patent is invalid.  On what do you

25  base the contention that defendants know it to be

26  invalid?

F

1  other competitors.

2  Q    So the damages stemming from the alleged patent

3  misuse has already basically been covered in your

4  deposition today; right?

5  A    Yes.

6  Q    Just to make sure that we're on the same

7  wavelength, because suddenly I'm not sure that we

8  are, I just want to be sure you have nothing new to

9  add in terms of how you've been injured, that is, as

10 a result of patent misuse that's in any way different

11 from the things that we've already discussed today.

12 A    Not that I can think of.

13 Q    All right.  Let's move on to paragraph 96.  In

14 that paragraph, you allege that the defendants have

15 engaged in price discrimination due to the defendants

16 charging different royalties to different patent

17 licensees.  You are talking about patent licensees in

18 this paragraph, aren't you?

19 A    Yes.

20 Q    How have the defendants used price

21 discrimination to bolster their alleged monopoly?

22 A    Well, I've still been unable to determine just

23 what fees or royalties are being charged to different

24 defendants, because those documents aren't available

25 to me.  My suspicion, though, is that there are

26 different royalties to different licensees, and that

1  defendants -- that the defendants are using those

2  differences to bolster their business position; that

3  is, a potential licensee might get a favorable rate

4  or an unfavorable rate, depending on how this company

5  or that company's plans fit in with the defendants'

6  business plans.

7  Q    Do you have any evidence to support that?

8  A    I don't have any direct evidence.  Indirect

9  evidence is that I think that if everyone were paying

10  the same royalty, that figure would be known and

11  published and available to people, because you know,

12  word would have gotten out because enough people are

13  doing it.  But that figure's not out, and all the

14  people with PKP licenses seem to have secrecy clauses

15  and the payments are closely guarded secrets, and

16  that kind of implies to me that there are different

17  terms.

18  Q    Do you recall Mr. Bidzos' testimony at the

19  evidentiary hearing regarding the pricing terms of

20  PKP licensing?

21  A    I kind of remember him touching on this subject.

22  Q    Do you recall what he said?

23  A    No.

24  Q    Okay.  With respect to ISC's attempt to acquire

25  a PKP license, do you have any understanding that PKP

26  was attempting to charge either more or less to ISC



1  defendants -- that the defendants are using those

2  differences to bolster their business position; that

3  is, a potential licensee might get a favorable rate

4  or an unfavorable rate, depending on how this company

5  or that company's plans fit in with the defendants'

6  business plans.

7  Q     Do you have any evidence to support that?

8  A     I don't have any direct evidence.   Indirect

9  evidence is that I think that if everyone were paying

10  the same royalty, that figure would be known and

11  published and available to people, because you know,

12  word would have gotten out because enough people are

13  doing it.  But that figure's not out, and all the

14  people with PKP licenses seem to have secrecy clauses

15  and the payments are closely guarded secrets, and

16  that kind of implies to me that there are different

17  terms.

18  Q     Do you recall Mr. Bidzos' testimony at the

19  evidentiary hearing regarding the pricing terms of

20  PKP licensing?

21  A     I kind of remember him touching on this subject.

22  Q     Do you recall what he said?

23  A     No.

24  Q     Okay.  With respect to ISC's attempt to acquire

25  a PKP license, do you have any understanding that PKP

26  was attempting to charge either more or less to ISC

1    than any other PKP licensee?

2    A       I have no evidence either way.

3    Q       AT&T holds a PKP license; right?

4    A       Yes.

5    Q       Do you know if that license is more expensive

6    or less expensive than other PKP licenses?

7    A       I don't know what the AT&T terms are.

8    Q       All right.  And how has this alleged price

9    discrimination impacted you?

10   A       Well, I guess mainly that it's because it has

11   strengthened RSA Data Security's position in the

12   marketplace and made it harder for somebody else to

13   compete.

14   Q       All right.  And have you suffered damages as

15   a result of this price discrimination?

16   A       I'd say my damages are it's fewer sales because

17   it's harder to compete.

18   Q       Fewer sales through ISC; correct?

19   A       Fewer sales through ISC.

20   Q       Now, ISC never did end up with a PKP license,

21   did they?

22   A       Correct.

23   Q       And --

24   A       When I say ISC, I mean ISC through AT&T.

25   Q       So is it your belief that AT&T pays more for

26   its license than other PKP licensees?

H

1  than any other PKP licensee?

2  A    I have no evidence either way.

3  Q    AT&T holds a PKP license; right?

4  A    Yes.

5  Q    Do you know if that license is more expensive

6  or less expensive than other PKP licenses?

7  A    I don't know what the AT&T terms are.

8  Q    All right.  And how has this alleged price

9  discrimination impacted you?

10  A    Well, I guess mainly that it's because it has

11  strengthened RSA Data Security's position in the

12  marketplace and made it harder for somebody else to

13  compete.

14  Q    All right.  And have you suffered damages as

15  a result of this price discrimination?

16  A    I'd say my damages are it's fewer sales because

17  it's harder to compete.

18  Q    Fewer sales through ISC; correct?

19  A    Fewer sales through ISC.

20  Q    Now, ISC never did end up with a PKP license,

21  did they?

22  A    Correct.

23  Q    And --

24  A    When I say ISC, I mean ISC through AT&T.

25  Q    So is it your belief that AT&T pays more for

26  its license than other PKP licensees?



1    clipping is attached to your amended complaint as an

2    exhibit; isn't that right?

3    A       Yes, I believe so.

4    Q       And where did you get it?

5    A       From ISC.

6    Q       Is it ISC's practice to forward press clippings

7    of this nature to you?

8    A       Yes.

9    Q       And what is the purpose of their doing that?

10   A       Just to help keep me informed of the industry,

11   as far as I know.  And when Venn sees an article

12   about SecretAgent or something like that, he often

13   forwards it to me.

14   Q       All right.  Now, I take it that this particular

15   article is attached to your complaint because of its

16   reference in the center article to the headline and

17   the story, "NIST Approves DSS Despite Threat of a

18   Patent Lawsuit."  Is that right?

19   A       Yes.

20   Q       Would you describe for me to the extent you

21   know the controversy with NIST and the DSS, the

22   digital signature standard?

23   A       Well, there were several controversies.  The

24   one in particular that's mentioned in this article is

25   the claim that PKP apparently views the practice of

26   the DSS as an infringement of PKP patents.  And the

1   government, specifically NIST, approved the DSS as a

2   standard, with a statement that use of the standard

3   is -- is royalty-free and in their opinion, free of

4   patents, except for their own patent, which they're

5   not charging a royalty on.

6   Q    This article -- oh, strike that.  What's your

7   understanding of which PKP patents form the basis of

8   the dispute with NIST, if you have such an

9   understanding?

10  A    My understanding is that it's based on the

11  Diffie-Hellman patent, the Hellman-Merkle patent and

12  the Schnorr patent.

13  Q    Not the RSA patent, correct, to your knowledge?

14  A    That is my understanding.

15  Q    All right.  The focus of this article appears

16  to be that NIST went ahead and approved DSS as a

17  federal information processing standard, despite the

18  controversy with PKP.  Is that a correct reading of

19  this article?

20  A    Yes.

21  Q    What's your understanding of the present status

22  of that?

23  A    It hasn't changed since this article, as far as

24  I know.

25  Q    So NIST is proceeding, despite PKP's patent

26  threats; is that right?

1    A      Well, it is -- it is still a -- a FIPS

2    standard.   FIPS stands for Federal Information

3    Processing Standard.

4    Q      You designed software for ISC which

5    incorporated the DSS some time ago; isn't that right?

6    A      Yes.

7    Q      Has ISC to your knowledge ever refrained from

8    selling any of its DSS products because of the

9    controversy with -- between NIST and PKP?

10   A      I don't know.

11   Q      These DSS products are now part of the products

12   that AT&T is selling to end users; is that right?

13   A      Yes.

14   Q      To your knowledge, has AT&T ever refrained from

15   selling any DSS products because of the controversy

16   between NIST and PKP?

17   A      I'm not sure.   There -- there -- there was a

18   point where AT&T was -- was doing some sort of --

19   well, I think they were doing some sort of legal

20   investigation of the DSS patent issues.   It's

21   possible they delayed some sales somewhat.   I'm not

22   sure.

23   Q      You don't know; is that your testimony?

24   A      Yes.

25   Q      What is your understanding or impression of the

26   impact of the dispute between NIST and PKP on the

```
1    cryptography market?
2    A     I think it's likely that the -- the threat of a
3    lawsuit that's mentioned in this article deterred
4    others from using the DSS.
5    Q     But it did not deter you; is that right?
6    Because you designed products that featured DSS.
7    A     That's correct.
8    Q     As a matter of fact, when NIST approved DSS,
9    despite the threat of the lawsuit, you, ISC and AT&T
10   were in the unique position of already having
11   products that it could sell; correct?
12   A     Unique that we were the only ones --
13   Q     Yes.
14   A     -- that had products?
15   Q     Well, let me revise the question.  One of only
16   a few other companies in the cryptography market that
17   had DSS products.
18   A     Yes, that's correct.
19   Q     Would it be fair to say that the patent
20   controversy because NIST disregarded PKP's patent
21   threats actually gave ISC and AT&T and you a jump on
22   the competition?
23   A     Well, first of all, I wouldn't say that NIST
24   disregarded the threats.  I mean, they apparently
25   took them seriously and negotiated with PKP for some
26   period of time.
```

1    Q      Right.  And then NIST went ahead, despite the

2    patent threats; correct?

3    A      Eventually, yes, after -- after a couple of

4    years or so.

5    Q      And to the best of your knowledge, isn't the

6    fact that ISC and AT&T are one of the few companies

7    that has DSS products prominently featured in AT&T

8    marketing literature?

9    A      Yes.

10           MR. MOORE:  All right.  Let's move on to

11   Clipper.  And just to give ourselves a point of

12   reference here, I'd like to have this marked as

13   Exhibit 66.

14           (Whereupon, Defendant's Exhibit 66 was

15   marked for identification.)

16           THE WITNESS:  Okay.

17           Q BY MR. MOORE:  Mr. Schlafly, again,

18   this is one of the documents that's attached to your

19   amended complaint; isn't that right?

20   A      Yes.

21   Q      And where did you get a copy?

22   A      I believe I got it from RSA Data Security.

23   Q      How did you go about doing that?

24   A      I believe they mailed it to me.

25   Q      Did you call and ask for a copy?

26   A      No.



```
 1          CONFIDENTIAL RECORD - ATTORNEYS' EYES ONLY
 2   Q      And what other people in your mind were
 3   rejected as potential licensees by PKP?
 4   A      Information Security Corp.
 5   Q      Anyone else?
 6   A      The question being --
 7   Q      Anyone else that you understand has been
 8   rejected as a potential licensee by defendant PKP.
 9   A      Oh, I think there are probably lots of people
10   who are rejected.
11   Q      I'm concerned with what you know.
12   A      With what I know --
13   Q      Do you have any information?
14   A      With what I know firsthand?
15   Q      Any way you know it.
16              MR. MOORE:  Secondhand works, too.
17              Q BY MR. HOGAN:  Yes.  Any basis upon
18   which you have any belief that organizations were
19   rejected as potential licensees.  And at this point,
20   I'm asking for names of any who you believe have been
21   rejected as potential licensees in addition to ISC.
22   A      You're asking for any information that I might
23   have of people who might have been rejected?
24   Q      No.  Let me rephrase my question.  I believe
25   you've testified that you understand that entities
26   other than yourself as you've described it in this
```

Weber & Volzing, Inc.

1    deposition have been rejected by PKP after they

2    requested licenses.  You mentioned one organization

3    was ISC.

4             My question now is: Do you have any

5    information about any other organizations that have

6    been rejected?  So I'm asking for names of

7    organizations or individuals, entities of any type

8    to your belief or understanding that have been

9    rejected as licensees.

10   A     Yes.  I've heard that others have been

11   rejected.

12   Q     And who are those others?  Do you have any

13   names?

14   A     Yes.  But you're asking for this information,

15   even if it's hearsay?

16   Q     On any basis that you believe that it's true,

17   yes.

18             MR. MOORE:  This is discovery, Roger.

19   That means that we get to find out what you have

20   heard.  Then we can go out and -- to these others and

21   find out one way or the other.  That's why the

22   question is proper.

23             THE WITNESS:  Okay.  I've heard that Phil

24   Zimmerman was rejected.

25             Q BY MR. HOGAN:  Anyone else?

26   A     I've heard that -- that -- that some PGP users

CONFIDENTIAL
ATTORNEYS ONLY

1    were rejected.

2    Q      Anyone else?

3    A      I heard that Larry Leyton was rejected.

4    Q      Anyone else?

5    A      I heard that -- yeah, I think there are

6    probably others.  I heard -- I heard that Tandem

7    Computers was rejected.

8    Q      Anyone else?

9    A      I heard that -- let me think.  Let me think.

10           Let's see.  I'm going to ask that this

11   answer be designated attorneys' eyes only.

12   Q      That's fine.

13   A      So going back to cover the list of everyone

14   I've mentioned.

15   Q      Right.  Oh, you want this whole answer that --

16   including what you've already said?

17   A      Including what I've already said.

18   Q      Okay.  I understand.

19   A      Can we do that?

20   Q      Yes, of course.

21   A      Okay.  The -- and I've heard Mobius was

22   rejected.

23   Q      I'm sorry.  Say that again?

24   A      Mobius, M-O-B-I-U-S.  I've heard -- I've heard

25   that there are also companies that -- that -- I've

26   heard also that there are companies that have

1    licenses, but which -- but whose licenses are unduly

2    restricted.  I don't know whether you want to call

3    those rejections or not.

4    Q       These are companies that have licenses as you

5    understand it from PKP, but the license itself is

6    unduly restrictive; is that correct?

7    A       Yes.

8    Q       And to your understanding, who are those

9    companies?

10   A       Well, I've heard that -- that -- I've heard

11   Microsoft is one.  I've heard possibly Spyglass.

12   Q       Anybody else that falls into this

13   restrictive --

14   A       And possibly also Secureware.  I should say, I

15   don't actually know whether or not these companies

16   have PKP licenses, only that I've heard that they

17   can't get the licenses to do what they want to do.

18   Q       Okay.  Anybody else fall into that category?

19   A       There might be, but that's all I can think of

20   offhand.

21   Q       And have you exhausted your memory with respect

22   to companies or entities or individuals that you

23   believe have been rejected by PKP as potential

24   licensees?

25   A       That's all I can think of offhand.

26           MR. MOORE:  Can I interject?

1          MR. HOGAN:  Sure.

2          MR. MOORE:  Mr. Schlafly, does the word

3    Cylink refresh your memory?

4          THE WITNESS:  Oh, yes, yeah.

5          MR. MOORE:  And in what sense does it

6    refresh your recollection?

7          THE WITNESS:  They filed a lawsuit in

8    which they claimed that they have been denied a

9    license.

10          MR. MOORE:  Just thought we should get

11    the obvious one.

12          THE WITNESS:  Good thinking there.

13          Q BY MR. HOGAN:  Would you identify for

14    us the company that you've described -- or the word I

15    think you used was Mobius, M-O-B-I-U-S.

16    A     Yes, Mobius.  I think the full name is Mobius

17    Encryption Technologies or something like that.

18    They're a Canadian company.

19    Q     Other than what you've told me already in

20    response to my questions, Mr. Schlafly, have you made

21    any other applications or requests for licenses in

22    the cryptography field where you believe your

23    application was rejected?

24    A     Before we go into that, I think Gemplus is in

25    this category, too, also.

26    Q     And which category is that?

1   A       Denied a license.

2   Q       Okay.  Jim -- how do you spell the last name?

3   A       G-E-M-P-L-U-S.  It's a French company.  Denied

4   a lawsuit in cryptology?  I don't know.  You could

5   view my lawsuit against NIST as being a denial in

6   some sense.  It depends on what you mean by the

7   question.

8   Q       Well, in any circumstance where you requested

9   of somebody you believed was a license holder and you

10  wanted to make use of any of the technology of the

11  license holder by becoming a licensee, were there any

12  circumstances other than what you've already

13  described where you sought to make use of a license

14  or licensed product as a licensee where you were

15  rejected?

16  A       You could view the NIST lawsuit in that context.

17  Q       Okay.  Any others, other than what you've

18  already described?

19  A       I can't think of one offhand.

20              (Whereupon, the confidential record

21  resumed.)

22

23

24

25

26





```
 1   A       It appears to be.

 2   Q       Take a moment and look at the letter and then

 3   I'll ask a question.

 4                   (Pause while witness examines document.)

 5                   THE WITNESS:  Okay.

 6                   Q BY MR. HOGAN:  And it's based on this

 7   letter that you make the allegation in paragraph 12

 8   of your amended complaint that the accusation of a

 9   violation of the injunction was directed towards you;

10   is that correct?

11   A       Correct.

12   Q       All right.  Is your name mentioned in this

13   letter anywhere?

14   A       Not directly.

15   Q       Is the word Schlafly to be found anywhere in

16   the letter?

17   A       Not directly, but it's implied.

18   Q       And the inference is drawn by you; correct?

19   A       Well, the inference -- that's the way

20   implications work.  The inference is drawn by the

21   reader.

22   Q       And that's the way you read it; correct?

23   A       Yes.

24   Q       And it asserts in this letter that "ISC is the

25   successor in interest to a partnership known as

26   Digital Signature."
```