Roger Schlafly, Pro Per
PO Box 1680
Soquel, CA  95073
telephone: (408) 476-3550

FILED

AUG 05 1997

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

In the United States District Court
for the Northern District of California

| | |
|---|---|
| ROGER SCHLAFLY, Plaintiff | ) Case C-94-20512 SW PVT |
| v. | ) Opposition to PKP Motion |
| PUBLIC KEY PARTNERS, and | )  on Antitrust Sum. Judg. |
| | ) Hon. Spencer Williams |
| RSA DATA SECURITY INC., Defendants. | ) 10 am, Aug. 27, 1997 |

Schlafly opposes PKP's motion for summary judgment, in its
entirety.  Before addressing defendants' antitrust arguments, it
is necessary to clear up some factual matters.

Bidzos Declaration

The declaration by D. James Bidzos, president of PKP and RSADSI,
is extremely misleading.  Para. 10 implies that the terms of PKP
licenses were published.  In fact, they were not published, and
PKP has even withheld the license agreements from Schlafly.
Para. 11 implies that he believed in 1990 the Stanford patents to
be valid and broad, that the Stanford patents were some sort of
threat to RSADSI, and that the formation of PKP was merely an
effort to resolve a patent dispute.  However, the facts are as
follows:

OPPOS PKP MOT SUM JUDG                                    page 1

1 &ast; RSADSI knew of the reasons for challenging the Stanford patents

2 back in 1986, as they were described in a patent attorney opinion

3 upon which RSADSI relied.

4

5 &ast; The Stanford/MIT patent dispute was resolved in 1987, and as a

6 result RSADSI received a broad license to the Stanford patents, as

7 well as authority to sublicense them.

8

9 &ast; The formation of PKP in 1990 did not in any way remove any

10 patent infringement threat against RSADSI.  Instead, RSADSI gave

11 up certain patent rights in exchange for reducing competition

12 elsewhere in the market.

13

14 These facts have been undisputed in this litigation.  Even though

15 Cylink/CKC/Stanford vigorously charged RSADSI with direct and

16 contributory infringement of the Stanford patents, they never

17 suggested that there was any infringement in the 1987-90 period,

18 and based their claims solely on rights that RSADSI voluntarily

19 surrendered in the formation of PKP in 1990.  In another

20 declaration, Bidzos said:

21

22 "14. Before the formation of the PKP partnership, RSA also held

23 rights to the Stanford patents.  On February 2, 1987, Stanford

24 had granted MIT a "license to Sublicense" the Stanford patents.

25 CKC P.I. Ex. 9.  On March 30, 1987, MIT sublicensed RSA to the

26 Stanford Patents in a letter referencing Stanford's February 2,

27 1987 license to MIT.  Id. Ex. 10.  RSA received the right to

28 make, have made, use, sell and sublicense the Stanford Patents.

OPPOS PKP MOT SUM JUDG                                    page 2

1    Id." [Exh. GI]

2

3    Later, in para. 47 of Exh. GI, Bidzos said, "Prior to the

4    formation of PKP, RSA unquestionably had unrestricted rights to

5    the Stanford Patents."  An arbitration panel reached the same

6    conclusion:

7

8        "The Panel finds that RSA did have the right to sublicense the

9        Stanford patents prior to April 6, 1990."  [Exh. GC, sect.

10       5.(b)(ii)b), p. 14]

11

12   It was with the formation of PKP in 1990 that RSADSI surrendered

13   its patent sublicensing rights to PKP in order that PKP could

14   become the exclusive sublicensing authority for the Stanford and

15   MIT patents, and thereby monopolize public key cryptography.

16

17   In response to a Cylink interrogatory, RSADSI said,

18

19       "At present, RSA intends to rely upon the advice letters

20       already provided [as a defense against an allegation of willful

21       infringement of the Stanford patents] ... D. James Bidzos

22       received copies of the Cushman Darby and Cushman analysis in

23       1986."  [Exh. GD]  (That analysis is attached as Exh. GH.)

24

25   Because of the facts that the accused infringement was after 1990,

26   that Bidzos received the invalidity/scope analysis in 1986, and

27   that RSADSI relied on the invalidity analysis as a willful

28   infringement defense, it follows that Bidzos and RSADSI believed

OPPOS PKP MOT SUM JUDG                                          page 3

that the Stanford patents were invalid or of narrow scope when PKP
was formed in 1990.

Thus Mr. Bidzos could not have possibly had a "good faith basis for
believing" that the Stanford patents were valid and broad in 1990,
and even if he did, PKP could not have possibly been a "good faith
solution" to a potential Stanford patent claim against RSADSI.

Murray Declaration

Schlafly objects to the Murray declaration as factually inaccurate
and based on hearsay.  Para. 9 states that the RSA invention was
the first practical implementation of asymmetric key cryptography,
but it has been undisputed in this case that Diffie and Hellman
created one earlier.  Para. 10 says that the first asymmetric key
products appeared in the early 1990s, but the Bidzos declaration
(para. 4) refers to a Lotus product in 1986. There were also other
products in the 1980s, such as Crypt Master [Exh. GA, para. 12]
and MailSafe [Exh. GI, para. 24].  Para. 11 refers to the
"patents" granted to Rivest-Shamir-Adleman, when there is actually
only one.  Para. 12 refers to the effect of "overlapping patents",
but there is no indication that Murray is familiar with the
patents or has any patent expertise, and so would not know whether
or not the patents are overlapping.  Para. 13 expresses an opinion
about the motivations of the defendants in 1990, even though
Murray was not there at the time, and gives no clue as to how he
could have such knowledge.  Para. 15 is so vague and ambiguous to
be meaningless.  Therefore Murray's declaration should be given no

1  weight whatsoever.

2

3  <u>Specific Antitrust Issues</u>

4

5  Schlafly rebuts the PKP arguments below.

6

7  A. Schlafly does not equate a patent with a monopoly in the

8  antitrust sense, as PKP suggests.  If the patents were all valid,

9  he would have no objection to Cylink and RSADSI enforcing them. It

10  is the pooling of patents to stifle competition that is the heart

11  of his antitrust claim.  Patent pools have been found to be

12  antitrust violations many times, including in the famous Standard

13  Oil case (Standard Oil v. United States, 283 US 163 (1931)).  For

14  examples of what is considered lawful and unlawful in this area,

15  see the Antitrust Guidelines for the Licensing of Intellectual

16  Property, issued by the Dept. of Justice and the FTC, supplied

17  here as Exh. GB for the Court's convenience.  (Schlafly is making

18  no attempt here to pick and choose favorable quotes from other

19  cases because the guidelines are more useful as a statement of the

20  law.  The guidelines are actually more favorable to the defendants

21  than much of the case law.)

22

23  According to a Bidzos declaration [Exh. GI, para. 30], the general

24  purpose of PKP was: "Cylink would produce hardware, RSA would

25  produce software, and the patent interests would be pooled." [Exh.

26  GI, para. 30]  This is the worst kind of antitrust patent pool

27  there is.  The partners took two horizontally competing

28  technologies, each controlled by patents, pooled them to

OPPOS PKP MOT SUM JUDG                                    page 5

1   monopolize a market, and then divided the market among themselves.

2   Even today, 20 years after the Stanford and MIT inventions, all of

3   the popular public key technologies in commercial use today can

4   trace their lineage directly to either the Stanford or MIT

5   inventions.  For many applications, the Stanford-based and MIT-

6   based technologies are interchangeable.  (See Exh. GA.  See also

7   Exh. GE where the MIT-based "RSA" and Stanford-based "DSS" are

8   called the most popular digital signature methods by Bidzos.)  An

9   agreement between Stanford and MIT had guaranteed that the patents

10  were not blocking and the technologies could compete in the

11  marketplace.  But when the patents were pooled in 1990, PKP itself

12  proclaimed its monopoly by saying, "These patents cover all known

13  methods of practicing the art of Public Key".  [Am. Compl. Exh. R]

14  RSADSI's part of the deal was that it got to monopolize

15  cryptography software.  According to a Bidzos declaration, "Over

16  the last ten years, the RSA technology has become the de facto

17  standard for encryption technology use on the Internet, and for

18  commercial institutions across the country."  [Exh. GI, para. 63]

19

20  B. PKP defends its patent pool on various technicalities, but is

21  unable to give an explanation for how the pool could possibly be

22  pro-competitive.  The best it has to offer is a self-serving and

23  unsupported statement by Bidzos that the pool was "intended" to be

24  "convenient and low-cost".  If that argument were enough, then

25  every merger would be approved.  The fact remains that the patent

26  pool eliminated competition between the Stanford and MIT

27  technologies from the market, and delivered no actual market

28  benefits to which the defendants can point.

OPPOS PKP MOT SUM JUDG                                    page 6

As one of its technicalities, PKP argues that PKP cannot be a
conspiracy, because it is just one entity.  However, PKP is a
partnership.  It is the vehicle by which the partners, RSADSI and
Cylink, conspired to control the crypto market.

Unfortunately, some of the language on the record is a little
imprecise on this point.  Sometimes Schlafly has said "PKP" when
it might have been more precise to say "partners RSADSI and
Cylink".  The legal distinction between the partners and the
partnership is not a sharp one.  Practical distinction is further
made difficult by the fact that Jim Bidzos was the president of
both RSADSI and PKP.

The point is that RSADSI and Cylink were separate entities who
conspired to form PKP, and then RSADSI, Cylink, and PKP all
conspired to monopolize the crypto market.  Each of these three
entities had a separate economic interest.  The Copperweld
doctrine that a company cannot have an antitrust conspiracy with a
wholly-owned subsidiary does not apply.

C. PKP argues that Schlafly cannot prove patent misuse because
defendants did not exaggerate the patents.

Because of the settlement, Schlafly is no longer asking that the
Court judge the Stanford patents to be invalid.  However, he still
maintains that is was patent misuse for PKP and RSADSI to enforce
patents that it believed to be of dubious scope and validity.  As
explained above, RSADSI knew about the problems with the Stanford

patents back in 1986.   (Or at least all of the problems except the
Diffie-Hellman preprint problem.   According to RSADSI in Exh. GD,
p. 4, they learned about that problem in 1992.   They continued to
enforce the patents after 1992.)   The patent scope exaggeration
allegation also refers to the MIT and Schnorr patents.   RSADSI has
claimed that the MIT patent covers the "RSA algorithm" (the
subject of a parallel motion) and that the Schnorr patent covers
the Digital Signature Algorithm (a point which RSADSI recently
conceded that there is no such coverage).   The latter position was
more than "potentially" misleading.   RSADSI issued a press release
saying,

> "RSA Data Security, Inc. today announced that it is now
> licensing patents for the Digital Signature Standard (DSS), the
> U.S. government standard for digital signatures."   [Exh. GE,
> Oct. 12, 1995]

The press statement is a total lie.   There is a patent on DSS (ie,
DSA) that PKP had tried to get, and also which RSADSI never got.
Cylink argued that the Stanford patents cover DSS, but they were
out of RSADSI's control by that date.   DSS is not covered by any
patents that RSADSI has.

D. PKP argues that PKP licenses and RSADSI products were sold
independently, and therefore could not be tied.   Understanding why
this argument is wrong requires a deeper understanding of the
defendants' businesses.   In Exh. GJ, a potential customer wrote to
RSADSI asking for prices on an MIT patent license and on RSADSI

OPPOS PKP MOT SUM JUDG                                              page 8

1   BSAFE software.   The writer had business reasons for getting the

2   patent license and software priced separately, as he explained in

3   his letter.   Jim Bidzos rebuffed him, explaining that the license/

4   software pricing alternative is not available from RSADSI.   If he

5   had his own software, then he would have to get a patent license

6   from PKP.

7

8   At first glance, this example seems to support defendants'

9   contention that the patent licenses and products are sold

10   separately.   But it is actually evidence of tying.   RSADSI was in

11   the business of selling two products, patent licenses and

12   software.   It normally sold the two together, as a bundle.   If

13   someone wanted the patent license without the software, he would

14   be referred to PKP.   If someone had a PKP patent license and

15   wanted to buy RSADSI software, he would still have to pay for an

16   RSADSI patent license.   Thus the RSADSI patent licenses and

17   software are tied.

18

19   RSADSI might argue that it is under no obligation to sell

20   unbundled patent licenses (ie, patent licenses without software)

21   because a patentee is entitled to use his patent to protect his

22   product line.   Indeed, that might be the case if RSADSI never

23   formed PKP to offer patent licenses as a separate product.   Once

24   the patent license and the software became distinct products (ie,

25   unbundled), then they cannot be tied back together if the seller

26   has monopoly power in the market.

27

28   RSADSI might also argue that PKP was its patent licensing arm, so

OPPOS PKP MOT SUM JUDG                                                page 9

1   there was no need for RSADSI to sell patent licenses without

2   software.  But PKP was not selling equivalent patent licenses.

3   PKP patent licenses were difficult to get, and had conditions not

4   present in the patent licenses which accompanied RSADSI software.

5   PKP appears to have existed more to deter patent licenses than to

6   promote patent licenses.

7

8   Now that PKP is no longer issuing patent licenses, RSADSI is

9   apparently offering patent licenses, but the patent license

10  agreement has a specific clause forbidding the customer from

11  buying software from anyone other than RSADSI.   (See Exh. GF,

12  discussed in greater detail below.)

13

14  As for whether RSADSI software involves substantial commerce,

15  RSADSI itself estimates that its software is on 75 million

16  computers.   (See Exh. GA.)   That is substantial.

17

18  E. PKP argues that letters to private organizations, ANSI and

19  IEEE, are somehow excusable under the Noerr-Pennington doctrine.

20  That doctrine shelters petitioning the government, not private

21  industry groups.

22

23  F. PKP has withheld the documents that show the different royalty

24  rates for patent licensees, but then criticize Schlafly for not

25  having the facts.  It appears that there are indeed wide

26  disparities, though.  The Lemcom license (which has been

27  published) has a royalty of 5% on the net sales of software

28  products, with a minimum per unit.  Netscape and Microsoft are

OPPOS PKP MOT SUM JUDG                                    page 10

both manufacturing and selling licensed products and giving them
away free, apparently without paying any royalty or minimum per
unit.   The AT&T royalty rate is apparently somewhere in between.

Price discrimination by a patentee can be an antitrust violation
if it has an anti-competitive effect in a relevant market.   In
this case one of the anti-competitive effects is that Netscape and
Microsoft can saturate the market with their cryptographic
products by giving them away over the Internet, while competitors
are saddled with per-unit royalties.   The price discrimination by
the defendants is more egregious than what is in the cited cases,
because (1) defendants pooled patents, and therefore had an
obligation to have pro-competitive licensing policies, and (2)
defendants publicly promised a nondiscriminatory licensing policy.

California Unfair Business Act

Schlafly's allegation that defendants have violated the California
Unfair Business Act is based largely on their deceptive patent
exaggerations outlined above, and their promise of a reasonable
and nondiscriminatory licensing policy.

RSADSI has been moderately successful in getting its technology
adopted in industry standards by claiming a reasonable and
nondiscriminatory licensing policy.   The various standards groups,
such as ANSI and IEEE, require such a policy in the rare cases
when they cannot agree on an unpatented technology.   RSADSI will
no doubt argue that patentees are not required to have any

OPPOS PKP MOT SUM JUDG                                    page 11

licensing policy at all, much less a reasonable one.  But the
situation is different when a patentee publicly proclaims to have
a reasonable and nondiscriminatory licensing policy, uses that
proclamation to get commercial advantages for its products over
its competitors, and then fails to live up to that promise.
RSADSI's licensing policy is not reasonable because it refuses to
license the patent for certain applications which do not fit into
its business model.  When Schlafly asked RSADSI if he could get a
license for a toolkit product, it explained:

> "RSA's basic business is creating toolkit products; that is how
> we make our living.  We ensure that a multitude of end user
> applications using the patented technology are available by our
> licensing both toolkits and the patent.  We will continue to
> negotiate licenses that enable others to create end user
> products in this manner, but we will not license you to make a
> toolkit product."  [Exh. GG, September 18, 1996 letter from
> Paul O. Livesay, Director of Legal Affairs, RSADSI.]

This refusal to license toolkits is also expressed in RSADSI's
published "Patent License Agreement", which was posted on its web
page on February 9, 1996.

> "1.2 "Licensed Product" means ... A Licensed Product may not be
> a software toolkit product which, for the purposes of this
> Agreement, shall mean any product consisting of the software
> modules that can be incorporated into another product, such
> modules which have as their primary purpose accessing

1    cryptographic algorithms (including, without limitation, public
2    key encryption or decryption, key generator and signature
3    certification) and performing the cryptographic algorithm."
4    [Exh. GF]

6  Furthermore, it was not possible for Schlafly's customers to get
7  licenses either.  The RSADSI license includes a provision that the
8  licensee not use software from another supplier:

10    "2.2 Have Made Rights. All Licensed Products shall be
11    developed, engineered or otherwise created by Licensee.
12    Licensee's "have made" rights granted in Section 2.1 above are
13    limited to include, for production purposes only, the right to
14    authorize one or more third parties to manufacture (in the case
15    of hardware) and/or reproduce (in the case of software)
16    Licensed Products for Sales and distribution thereof, and such
17    "have made" rights otherwise specifically exclude the right to
18    outsource the development of, or acquire from third parties,
19    the Licensed Products."  [Exh. GF]

21  Thus I cannot make a toolkit product which competes directly with
22  RSADSI's toolkit.  I cannot get a patent license for it, and
23  RSADSI patent licensees are prohibited from buying my product.

25  RSADSI's licensing policy is also highly discriminatory.  Some
26  strategic allies (such as Netscape and Microsoft) pay no
27  royalties, while others (such as Lemcom and its successors) have
28  to pay a per-user royalty.

OPPOS PKP MOT SUM JUDG                                    page 13

1   Other California businesses do not behave this way.  When a company

2   that claims a reasonable and nondiscriminatory licensing policy

3   and gains a commercial advantage over its competitors by virtue of

4   that claim, it is only fair to expect that company to actually

5   have such a policy.  Schlafly contends that PKP and RSADSI have

6   not had such a policy, and therefore maintains his allegation that

7   they are in violation of the California Unfair Business Act.

8

9   Conclusion

10

11   PKP's motion for partial summary judgment is wholly without merit.

12   It's strongest point is that Schlafly does not have all of the

13   evidence assembled regarding defendant's secret licensing

14   agreement, but that is only because the defendants have withheld

15   those documents from discovery.  Schlafly has provided ample

16   evidence of unlawful antitrust patent pooling, tying, price

17   discrimination, patent misuse, and unfair business practices.  PKP

18   has offered no facts to justify defendants' actions except for the

19   blandest generalities.

20

21   Dated:   August 4, 1997

22

23   By: _____

24   Plaintiff, Roger Schlafly

25

26

27

28

OPPOS PKP MOT SUM JUDG                                    page 14