ROBERT T. HASLAM (Bar No. 071134)
ROBERT D. FRAM (Bar No. 126750)
SARAH E. MITCHELL (Bar No. 187053)
HELLER EHRMAN WHITE & McAULIFFE
525 University Avenue
Palo Alto, California 94301-1900
Telephone (650) 324-7000

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROGER SCHLAFLY,<br><br>            Plaintiff,<br><br>  v.<br><br>PUBLIC KEY PARTNERS, a partnership, and RSA DATA SECURITY, INC., a California corporation,<br><br>           Defendants. | Case No. CV-94-20512-SW (EAI)<br><br>RSA DATA SECURITY, INC.'S AMENDED REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT ON PLAINTIFF'S ANTITRUST CLAIMS<br><br>Date: August 27, 1997<br>Time: 10:00 a.m.<br>Courtroom: 4<br><br>The Honorable Spencer Williams |

TABLE OF CONTENTS

|   |   | Page |
|---|---|---|
| INTRODUCTION | | 1 |
| ARGUMENT | | 2 |
| I. | SCHLAFLY'S FAILURE TO INTRODUCE ANY EVIDENCE PROVING RELEVANT MARKET AND MARKET POWER IS FATAL TO HIS ENTIRE ANTITRUST CASE | 2 |
| | A. Market Analysis Is Essential To Each Of Schlafly's Antitrust Claims | 3 |
| | B. Schlafly Fails To Introduce Any Evidence Showing The Relevant Product Or Geographic Market or Defendants' Market Power | 5 |
| | C. Schlafly Does Not And Cannot Show Market Power | 6 |
| II. | SCHLAFLYS ANTITRUST CLAIMS ALSO FAIL BECAUSE HE CANNOT DEMONSTRATE THAT DEFENDANTS ENGAGED IN THE ALLEGED CONDUCT | 7 |
| | A. Schlafly Cannot Show Unlawful Patent Pooling | 7 |
| | B. The Handguards Claim Must Be Summarily Dismissed | 10 |
| | C. Plaintiff Cannot Establish That Defendant Engaged In Unlawful Price Discrimination | 12 |
| | D. Schlafly Has No Evidence Of Tying | 12 |
| | E. There Was No Boycott Or "Intimidation." | 14 |
| CONCLUSION | | 14 |

TABLE OF AUTHORITIES

Page(s)

CASES

Argus Chemical Corp. v. Fibre Glass-
  Evercoat Co.,
  645 F. Supp. 15 (C.D. Cal. 1986) .......................... 8

Bhan v. ATME Hospitals, Inc.,
  929 F.2d 1404 (9th Cir. 1991), *cert.
  denied*, 502 U.S. 994 (1994) ........................... 3,4

Broadcast Music, Inc. v. Columbia
  Broadcasting Sys., Inc.,
  441 U.S. 1 (1979) ......................................... 3

Brook Group Ltd. v. Brown & Williamson
  Tobacco Corp.,
  509 U.S. 209 (1993) ....................................... 9

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) ....................................... 2

Kaiser Industries Corp. v. Jones &
  Laughlin Steel Corp., 181 U.S.P.Q. 193
  (W.D. Pa. 1974), rev'd on other grounds,
  515 F.2d 964 (3d Cir.), *cert. denied*, 423
  U.S. 876 (1975) ........................................... 6

F.T.C. v. Indiana Fed'n of Dentists,
  476 U.S. 447 (1986) ....................................... 3

Flegel v. Christian Hosp., Northeast
  Northwest,
  4 F.3d 682 (8th Cir. 1993) .............................. 2,5

Handguards, Inc. v. Ethicon, Inc.,
  743 F.2d 1282 (9th Cir. 1984), *cert.
  denied*, 469 U.S. 1190 (1985) ............................. 8

Jefferson Parrish Hospital District 2 v.
  Hyde, 466 U.S. 2 (1984) .................................. 10

K.M.B. Warehouse Distributors, Inc. v.
  Walker Mfg. Co.,
  61 F.3d 123 (2d Cir. 1995) ................................ 7

Levine v. Central Florida Medical
  Affiliates, Inc., 72 F.3d 1538 (11th
  Cir), *cert. denied*, 117 S. Ct. 75, 136 L.
  Ed. 2d 34 (1996) ........................................ 2,5

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Morgan, Strand, Wheeler & Biggs v.
  Radiology, Ltd.,
  924 F.2d 1484 (9th Cir. 1991) .......................... 2,3,4

Rebel Oil Co., Inc. v. Atlantic Richfield
  Co., 51 F.3d 1421 (9th Cir), *cert.
  denied*, 116 S. Ct. 515, 133 L. Ed. 2d 424
  (1995) ................................................ 2,3,4

Scripto-Tokai Corp. v. Gillette Co.,
  1994-2 Trade Cas. (CCH) ¶ 70,821 (C.D.
  Cal. 1994) ............................................. 8,9

Spectrum Sports Inc. v. McQuillan,
  506 U.S. 447 (1993) ...................................... 3

Standard Oil Co. v. United States,
  283 U.S. 163 (1931) ...................................... 6

Thurman Industries, Inc. v. Pay `N Pak
  Stores, Inc.,
  875 F.2d 1369 (9th Cir. 1989) ........................... 2,3

Tunis Bros. Co. v. Ford Motor Co.,
  952 F.2d 715 (3d Cir. 1991) cert denied,
  505 U. S. 1221 (1992) .................................... 7

## STATUTES

Sherman Antitrust Act of 1890
  § 1, 15 U.S.C. § 1 ....................................... 2
  § 2, 15 U.S.C. § 2 ....................................... 3

35 U.S.C. § 271(d)(5) ..................................... 10

# INTRODUCTION

Plaintiff's opposition to defendants PKP and RSA's motion for summary judgment unmasks this case for what it is and has always been, an abstract crusade lacking any foundation in objective, economic fact. It is fundamental to antitrust law that, absent evidence of actual anticompetitive effect, a plaintiff must define the relevant market and demonstrate defendants' economic power in that market. Plaintiff has not even attempted to meet this requirement.

Schlafly fails to adduce any evidence proving the relevant market or defendants' market power. Since such proof is essential to each of his Sherman Act claims, this failure of evidence, alone, defeats his entire antitrust case. Schlafly also fails to introduce sufficient evidence to demonstrate that defendants actually engaged in any of the alleged improper conduct that might give rise to an antitrust claim if he had met his burden of establishing market power.

Schlafly's omission on the crucial issue of relevant market is no mere oversight. To the contrary, his recent deposition confirms that in the three years since this case was filed, Schlafly has not developed a single "market fact" to support his claims. He has developed no evidence showing that public key cryptography was a defined market from 1990 forward and that defendants had power in that market. In fact, the principal encryption technology in 1990 at the time PKP was formed was traditional symmetric key technology dominated by industry giants such as IBM. Plaintiff's contention that defendants had "market power" in that market is simply incredible.

At bottom plaintiff's grievance is that he was unable to develop competing public key products because he could not obtain the necessary licenses. He proffers no evidence of any harm to consumers caused by defendants' alleged conduct not contemplated by the patent laws. The Sherman Act, however, is designed "to protect the public from the failure of the market," not to redress the frustration of a thwarted would-be rival. Moreover, antitrust law simply does not require patentees to license their patents to any or all competitors on the terms they demand. Since Schlafly fails to demonstrate that defendants did anything they were not fully authorized to do by the patent laws, summary judgment for defendants is warranted.

**ARGUMENT**

**I. SCHLAFLY'S FAILURE TO INTRODUCE ANY EVIDENCE PROVING RELEVANT MARKET AND MARKET POWER IS FATAL TO HIS ENTIRE ANTITRUST CASE.**

Even though Schlafly has had three years to take discovery, he fails to meet his burden of showing a relevant market and defendants' power in that market. Each of his antitrust claims therefore fails, warranting dismissal on summary judgment. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433-38 (9th Cir.), *cert. denied*, 116 S. Ct. 515 (1995) (section 2 claims) (failure to demonstrate market power); *Thurman Industries, Inc. v. Pay `N Pak Stores, Inc.*, 875 F.2d 1369, 1373-77 (9th Cir. 1989) (section 1) (insufficient evidence of market power in relevant market); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1488-89 (9th Cir. 1991) (plaintiff's failure to establish a relevant market defeats section 1 claim); *Flegel v. Christian Hosp., Northeast Northwest*, 4 F.3d 682, 689-91 (8th Cir.

1993) (dismissing section 1 claim, finding no evidence to support plaintiff's market definition, no evidence of market share); *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1552-53, 1556 (11th Cir), *cert. denied*, 117 S. Ct. 75, (1996) (dismissing section 1 and 2 claims, finding inadequate definition of relevant market and no evidence of market power).

Because Schlafly has the burden of proof in defining the market and in establishing market power, and because he has failed to introduce any evidence on these issues, his claims must be dismissed on summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### A. Market Analysis Is Essential To Each Of Schlafly's Antitrust Claims.

Schlafly states claims against defendants for attempted monopolization under Section 2 of the Sherman Act such as tying and patent misuse. He also alleges unreasonable restraints of trade under Section 1 such as improper patent pooling and group boycott. Market analysis, found nowhere in Schlafly's papers, is essential to both sets of claims.

In the wake of the Supreme Court's decision in *Spectrum Sports*, there can be no doubt that Schlafly's attempted monopolization claims require proof of the relevant market and market power. *Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (attempted monopolization requires inquiry into the relevant product and geographic market and the defendants' economic power in that market); *Rebel Oil*, 51 F.3d at 1433-34.[1]

---

[1] Attempted monopolization includes three elements: (1) predatory or exclusionary conduct; (2) specific intent to
*(footnote continued...)*

Nor is there any dispute that Schlafly's Sherman Act § 1 claims also require such a showing given that they all implicate the rule of reason, not a per se analysis.[2] *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986) (in the absence of evidence of restricted output or supra-competitive prices, plaintiff must show that the defendant possessed market power in a relevant market).[3]

The first step in market analysis is defining the relevant market. *See Rebel Oil*, 51 F.3d at 1434 ("without definition of the relevant market, it is impossible to determine market power"). Market definition in turn has product and geographic dimensions. A relevant product market consists of the "pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability of use and crosselasticity of demand." Thurman, 875 F.2d at 1374; Morgan, 924 F.2d at 1489. A geographic market encompasses the "area of effective competition where buyers can turn for alternate sources of supply." *Morgan* at 1490; see *Bhan*, 929 F.2d at 1413.

---

*(continued from previous page)*
monopolize; and (3) a dangerous probability of success in achieving monopoly power. *Spectrum Sports*, 506 U.S. at 456.

[2] Courts evaluate the reasonableness of a restraint under the per se rule or the rule of reason. Per se offenses consist of naked restraints, such as price fixing or market allocation agreements, which history and analysis show `always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 19-20 (1979); see *Bhan v. ATME Hospitals, Inc.*, 929 F. 2d 1404, 1410 (9th Cir. 1991), *cert. denied*, 502 U.S. 994 (1994).

[3] Only if a plaintiff is able to show actual detrimental effects or market power does the burden shift to the defendant to demonstrate pro-competitive effects. The plaintiff may then show that any such legitimate objectives can be achieved in a substantially less restrictive manner. *Bhan*, 929 F.2d at 1413.

Once the market is defined, the next step is to determine the defendants' share of that market. "Measurement of market share is necessary to determine whether the defendant possesses sufficient leverage to influence marketwide output." *Rebel Oil*, 51 F.3d at 1437.

### B. Schlafly Fails To Introduce Any Evidence Showing The Relevant Product Or Geographic Market or Defendants' Market Power.

Schlafly does not clearly identify his definition of the market, much less provide sufficient evidence to create a triable issue. He suggests that the relevant product market consists of "public key technologies in commercial use." His unsupported assertion, however, does not carry his burden of introducing evidence defining the market. In particular:

- He presents no proof whatsoever that public key encryption technology constitutes a market distinct from encryption technology in general, including traditional symmetric lay technology.

- He provides no evidence that encryption products are not part of a larger computer security market that includes PIN numbers and password systems.

Schlafly's dearth of evidence on this dispositive issue is far from accidental. As his July 25, 1997 deposition underscores, this part of his case remains unresearched, and unprovable. For example, Schlafly confirmed that, unlike his opposition papers, his Amended Complaint alleges a "cryptography software market" which includes "public key cryptography software." Depo. at

50:14-51:15.[4] Even though market definition must be proven by "market facts," Schlafly concedes that the only information he has regarding these markets is based on his perusal of Internet and press reports, none of which is competent evidence. *Id.* at 51:16-52:3; 67:10-69:1.[5] Even though he recognizes that market definition is a subject for expert opinion, Schlafly has not sought the views of an independent expert, *id.* at 52:4-53:16 and vigorously sought to disqualify his own testimony regarding market definition or market power. *id* at 64:6-69:10 (objecting to questions as calling for expert testimony).

C. **Schlafly Does Not And Cannot Show Market Power.**

Even if Schlafly did prove a relevant market, however, defendants would still be entitled to summary judgment because he adduces no evidence showing defendants' share of any alleged market. *Levine*, 72 F.3d at 1553; *Flegel*, 4 F.3d at 691; *Morgan*, 924 F.2d at 1491. He ignores the fact that, as he later acknowledges, companies other than RSA are licensed under the Stanford and RSA patents to develop and market public key products. Schlafly's charges of monopoly fail to account for these licensees' respective shares of any purported public key or cryptography software markets.

---

[4] Citations to the deposition of plaintiff taken on July 25, 1997 are simply designated as "Depo."; the transcript is attached as an exhibit to the Reply Declaration of Thomas Hogan submitted with PKP's reply brief.

[5] Similarly, he confirms Bidzos' testimony that, in 1990, the computer security market included "passwords, pin numbers as well as encryption and other technology." While he denies that these products were "substitutes," *id.* at 62:13-26; 108:21-109:13, when pressed, he admitted that he has never posed this question to customers or otherwise conducted any market studies. *id.* 109:14-110:5.

Schlafly's evidentiary failure on this front is again not mere oversight. At his recent deposition, Schlafly admits that the only data he has on this subject are "crude estimate[s]." *Id.* at 65:15-69:1. He further admits that "within encryption in 1990 the dominant technologies were the traditional symmetric key systems" (when measured in dollar volume), *id.* at 63:1-4, that he has no idea of what the dollar sales volume was for public key cryptography, *id.* at 65-66, and that his understanding of the size of the public key cryptography sales is only "a guess." Id. at 67; *id.* Depo. at 110-112 (admitting that he had no idea of RSA's unit sales volume on software tool revenue in 1990).

## II. SCHLAFLY'S ANTITRUST CLAIMS ALSO FAIL BECAUSE HE CANNOT DEMONSTRATE THAT DEFENDANTS ENGAGED IN THE ALLEGED CONDUCT.

### A. Schlafly Cannot Show Unlawful Patent Pooling.

Schlafly fails to introduce any evidence tending to support his allegation that PKP was an unlawful patent interchange. Contrary to Schlafly's suggestion, patent interchanges are not per se unlawful, but subject to the rule of reason. Standard Oil Co. v. United States, 283 U.S. 163, 171 (1931) (finding patent pool among competing oil companies lawful under the rule of reason); Kaiser Industries Corp. v. Jones & Laughlin Steel Corp., 181 U.S.P.Q. 193, 223 (W.D. Pa. 1974), *rev'd on other grounds*, 515 F. 2d 964 (3d Cir.), *cert. denied*, 423 U.S. 876 (1975).[6] Because

---

[6] In fact, as Schlafly aptly notes, the Department Of Justice Intellectual Property Guidelines recognize that such arrangements can be entirely procompetitive:

These arrangements may provide procompetitive benefits by integrating complementary technologies, reducing transaction costs, clearing blocking positions and avoiding costly infringement litigation. By promoting the dissemination of

*(footnote continued...)*

Schlafly has failed to carry his burden of showing market power, his pooling claim must be dismissed.

The only possible exception is when such arrangements serve as an umbrella for naked price-fixing or market allocation agreements. While Schlafly conclusorily asserts that RSA and Cylink "divided the market" for public key cryptography, the available facts do not support such a conclusion. Schlafly adduces no evidence showing that, as part of the formation of PKP, RSA or Cylink agreed to refrain from selling their respective patented products to different sets of actual or potential customers. Nor does the fact that RSA was in the software business, while Cylink was in the hardware business, create any such inference. The partners specialized in those respective businesses before PKP and continued to do so during PKP; Schlafly presents no evidence that the partnership caused them to change their independent business strategies.

Schlafly further fails to demonstrate how PKP actually restrained competition or afforded RSA any greater economic rewards than its patents would individually justify. *See K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129-30 (2d Cir. 1995) (showing of market power alone insufficient to establish rule of reason violation); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 727 (3d Cir. 1991) *cert. denied*, 505 U. S. 1221 (1992) (must show that defendant "exercised" market power).

---

*(continued from previous page)*
technology, cross-licensing and pooling arrangements are often procompetitive. Guidelines, para. 5.5.

First, Schlafly falsely suggests that PKP increased industry concentration by "pooling two horizontally competing technologies." This view confuses PKP's exclusive sublicensing rights to the PKP patents with a monopoly over a hypothetical "public key" market, and is contrary to fact. PKP was not a merger of RSA and Cylink. Nor did it eliminate competition between Stanford and MIT-based technologies. RSA and Cylink continued to compete after PKP just as before.

Second, Schlafly cannot demonstrate that PKP restrained any competition in any patent rights market. To the contrary, defendants' evidence shows that PKP was formed to promote the dissemination of this fledgling, unproven technology by serving as a "one-stop shopping center" for potential patent licensees thus reducing transactions costs. Bidzos Decl. ¶¶6-7; Murray Decl. ¶¶12-13.[7] See Intellectual Property Guidelines, para. 5.5. (reducing transactions cost procompetitive justification for patent interchanges). As such, PKP existed to create -- not eliminate -- new choices for consumers. While Schlafly believes PKP should have granted more patent licenses at lower prices, he still fails to explain why PKP would grant any patent licenses if its true purpose were to eliminate competition in his proposed market.

---

[7] Schlafly challenges the competence of the testimony of William Murray by criticizing minor aspects of his declaration. The Court need not even address this issue, however, to decide in defendants' favor. It is Schlafly, not defendants, who carries the burden of proof and his case fails, as a matter of law. Moreover, the core point of Mr. Murray's declaration -- that defendants have no market power -- stands completely unrebutted by the plaintiff.

RSA's AMENDED REPLY MEMO IN SUPPORT OF
SUMMARY JUDGMENT ON ANTITRUST CLAIMS
CASE NO. CV-94-20512-SW (EAI)                    - 9 -

B.  **The Handguards Claim Must Be Summarily Dismissed.**

Defendants can only be held liable for patent misuse under Handguards if clear and convincing evidence shows that the patents at issue were invalid or over-reaching, that defendants knew of the defects in the patents, and that defendants had sufficient market share to suggest a "dangerous probability of success." See *Handguards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1288 (9th Cir. 1984) *cert. denied*, 469 U.S. 1190 (1985); *Argus Chemical Corp. v. Fibre Glass-Evercoat Co.*, 645 F. Supp. 15, 17 (C.D. Cal. 1986), *aff'd*, 812 F.2d 1381 (Fed. Cir. 1987) (elements of a Handguards claim also include specific intent to monopolize a relevant market and dangerous probability of success). Schlafly fails on all three counts.

First (and dispositively), Schlafly does not even attempt to establish a relevant market that defendants could have a dangerous probability of success in monopolizing. Nor does he introduce any evidence suggesting that defendants' market share was such that a serious probability of monopolization existed. On that basis alone, his claim must fail.

Second, none of the evidence cited by Schlafly shows that RSA or PKP knew the Stanford patents were invalid or of exaggerated scope.[8] While the 1985 letter from patent counsel for Racal-Milgo to Stanford, of which RSA received a copy in 1986, sets forth various theories regarding the validity and/or scope of the

---

[8] Schlafly asserts that his *Handguards* claim also relates to the MIT and Schnorr patents, but he adduces no admissible evidence even remotely suggesting that RSA or PKP even doubted the validity of these patents. Schlafly's unsupported convictions are not RSA's or PKP's.

Diffie-Hellman and Hellman-Merkle patents, the subjective beliefs of a third party's patent counsel are not probative of RSA's or PKP's state of mind. *See Scripto-Tokai Corp. v. Gillette Co.*, 1994-2 Trade Cas. (CCH) ¶ 70,821, at 73,539-40 (C.D. Cal. 1994) (knowledge of third party patent opinion concluding that patents were invalid does not establish defendant's knowledge of such invalidity). The fact that RSA cited the opinion as a defense to willful infringement does not prove otherwise.

Nor does the fact that RSA learned, in 1992, about the potential Diffie-Hellman preprint problem establish that RSA actually knew the Diffie-Hellman patent was invalid. Third parties informed RSA that it was their view that the invention was disclosed in a printed publication. At best, this evidence suggests that RSA had reason to question the Diffie-Hellman patent. Reason to question, however, does not provide clear and convincing evidence of actual knowledge of invalidity. *Scripto Tokai*, 1994-2 Trade (CCH) Cas. at 73,539-40. This is particularly true here given that the MIT/Stanford License Agreement gave RSA a reason to believe -- not doubt -- Cylink's contentions Bidzos Decl. ¶11.

Finally, Schlafly's patent misuse claim fails for the simple reason that he is not asking this Court to rule that the Stanford patents are invalid or broader than Cylink/CKC contended. Schlafly gave up his efforts to obtain such a determination as part of his settlement of his claims against Cylink/CKC. At his deposition Schlafly admitted that as a result of that settlement he is no longer seeking a determination from this Court in this case that the Stanford patents are invalid or any narrower than

Cylink contends them to be. See Depo. at 102-104. Absent such a determination that the Stanford patents are invalid and/or narrower than Cylink has contended, it is impossible to understand how defendants can be liable for patent misuse on these grounds.

C. **Plaintiff Cannot Establish That Defendants Engaged In Unlawful Price Discrimination.**

Schlafly's description of the "anticompetitive effect" caused by defendants' alleged discriminatory royalties highlights the flawed assumption that underpins his entire antitrust case, that the antitrust laws are designed to protect disadvantaged competitors not consumers. According to Schlafly, RSA harms competition by ostensibly not charging Netscape and Microsoft royalties, which supposedly allows them to "giv[e] [software] away over the Internet," to the detriment of competitors who are saddled with per-unit royalties." Even if this story did not consist of inadmissible hearsay, Schlafly's evidence would still fall far short. All he shows is that some competitors have been disadvantaged; consumers, in fact, benefit. See Brook Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (1993)(below cost pricing not anticompetitive in itself because it reduces aggregate industry prices for consumers).[9]

D. **Schlafly Has No Evidence Of Tying.**

As with his other claims, Schlafly's complete failure of proof on the issue of market analysis dooms his tying claim, which requires proof of sufficient economic power in the tying product

---

[9] Again, Schlafly's lack of evidence here is no oversight, for at his deposition he admitted he does not know the price Microsoft or Netscape were actually charged for their allegedly favorable licensing terms. Depo. at 106-107.

to coerce unwarranted sales of the tied product. *Jefferson Parrish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 25-29 (1984). *See also* 35 U.S.C. § 271(d)(5) (no liability under the patent laws for tying absent proof of market power in the relevant market for the patent or patented product on which the sale is conditioned). Nor does Schlafly introduce any evidence of improper tying that might give rise to a claim if he had carried his burden of defining the relevant market.

The fact that RSA referred a potential licensee of the MIT patent to PKP does not establish that RSA tied patent licenses to software sales. On the contrary, it establishes a complete absence of tying. It is undisputed that, after the formation of PKP, RSA had no right to sublicense the MIT patent; only PKP had such rights. Schlafly's suggestion that RSA tied sales of software to patent licenses (or vice versa) confuses a patent license (the right to develop an implementation of the MIT patent) with a software license (the right to copy RSA code). During the existence of PKP RSA sold software (copyright) licenses; it did not grant patent licenses as that was the function of PKP. *See* Schlafly Ex. GI (Jan. 10, 1996 Bidzos Decl. ¶ 19)

After PKP dissolved, RSA did start to license patent rights again. When it did so, however, it took the clear position that its software and patent licenses were separately available and were not tied together. Thus, in the very letter Schlafly cites regarding his own request for a license, RSA clearly stated that either form of license (software or patent) was available. *See* Schlafly Ex. GG (page 2, ¶ 11).

Not surprisingly, Schlafly admitted in his deposition that he has never been told by anyone, or even read an account on the Internet or in the trade press of anyone, who ever said that RSA required them to purchase RSA software as the price of obtaining a patent license. Depo. at 84-85, 87-88, 91. And for good reason: it never happened.

### E. There Was No Boycott Or "Intimidation."

Schlafly also fails to introduce any evidence showing that RSA or PKP engaged in an unlawful boycott. The fact that PKP lobbied ANSI and IEEE to adopt certain standards demonstrates the forces of competition at work, not the opposite. Nothing in antitrust law precludes a competitor from competing by promoting its products.

## CONCLUSION

Schlafly has completely failed to carry his burden of proof on the most essential elements of his antitrust claims. Most notably he has failed to put forward any evidence of defendants' market power, relying on unsubstantiated assertions regarding a "public key cryptography" market, a "market" he has completely failed to define or distinguish from the market for cryptography in general or other forms of computer security. Nor has he

produced any evidence of any wrongdoing that might support an antitrust claim if he had introduced evidence of market power. Thus, for the reasons set forth above, Schlafly's antitrust claims should be dismissed.[10]

Dated: August 14, 1997

HELLER EHRMAN WHITE & McAULIFFE

By: *Robert D Fram (SEM)*
ROBERT D. FRAM
Attorneys for
RSA DATA SECURITY, INC.

---

[10] RSA hereby joins in the reply brief submitted by PKP and, for the reasons set forth in that paper and in defendants' opening brief, further requests that Schlafly's state law unfair competition claims be summarily dismissed as well.