PAGES 1-38

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SPENCER WILLIAMS, SENIOR JUDGE

ROGER SCHLAFLY,                    )
                                   )
            PLAINTIFF,             )    CASE NO.   C-94-20512 SW
                                   )
     VS.                           )
                                   )
PUBLIC KEY PARTNERS, ET AL.,       )
                                   )
            DEFENDANTS             )
_____)

                        WEDNESDAY, AUGUST 27, 1997
                        SAN JOSE, CALIFORNIA

            REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES

FOR THE PLAINTIFF              ROGER SCHLAFLY, IN PROPRIA PERSONA
                              P.O. BOX 1680
                              SOQUEL, CALIFORNIA   95073


FOR THE DEFENDANT             HELLER, EHRMAN, WHITE & MCAULIFFE
RSA DATA SECURITY             BY:   ROBERT T. HASLAM AND
                              ROBERT D. FRAM
                              525 UNIVERSITY AVENUE
                              PALO ALTO, CALIFORNIA 94301




REPORTED BY:                  LEE-ANNE SHORTRIDGE
                              OFFICIAL COURT REPORTER, USDC


            APPEARANCES CONTINUED ON NEXT PAGE

            COMPUTERIZED TRANSCRIPTION BY STENOCAT

                                                    1

1    APPEARANCES (CON'T)

2    FOR THE DEFENDANT                LAW OFFICES OF THOMAS R. HOGAN
     PKP                              BY:   THOMAS R. HOGAN
3                                     60 SOUTH MARKET STREET, SUITE 1125
                                      SAN JOSE, CALIFORNIA 95113
4

5    ALSO PRESENT                     PAUL LIVESAY,
                                      DIRECTOR OF LEGAL AFFAIRS
6                                     RSA DATA SECURITY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                        2

1   WEDNESDAY, AUGUST 27, 1997

2            THE CLERK:  CALLING FIRST CASE, C-94-20512,

3   ROGER SCHLAFLY VERSUS PUBLIC KEY PARTNERS, ET AL, ON FOR

4   DEFENDANT R.S.A. DATA SECURITY INC.'S MOTION FOR SUMMARY

5   JUDGMENT ON PLAINTIFF'S NON-INFRINGEMENT CLAIM AND DEFENDANT

6   PUBLIC KEY PARTNERS' CLAIM FOR PARTIAL SUMMARY JUDGMENT.

7            COUNSEL, PLEASE STATE YOUR NAME FOR THE RECORD.

8            THE COURT:  MR. SCHLAFLY?

9            MR. SCHLAFLY:  GOOD MORNING, YOUR HONOR.  THIS IS

10  ROGER SCHLAFLY.

11           THE COURT:  OKAY.

12           MR. HASLAM:  GOOD MORNING, YOUR HONOR.

13  ROBERT HASLAM FOR R.S.A. DATA SECURITY.

14           MR. FRAM:  ROBERT FRAM FOR R.S.A. DATA SECURITY.

15           MR. HOGAN:  GOOD MORNING, YOUR HONOR.

16  THOMAS R. HOGAN ON BEHALF OF THE DEFENDANT PUBLIC KEY PARTNERS.

17           MR. HASLAM:  YOUR HONOR, I'LL BE ARGUING THE MOTION

18  ON INFRINGEMENT, AND MR. HOGAN AND MR. FRAM WILL BE ARGUING THE

19  MOTION ON THE ANTI-TRUST BUSINESS TORTS CLAIMS.  WE WEREN'T SURE

20  WHETHER THE COURT HAD IN MIND AN ORDER IN WHICH IT WANTED TO

21  TAKE THOSE OR NOT.

22           THE COURT:  NO, I DON'T.  THIS IS R.S.A.'S MOTION

23  FOR SUMMARY JUDGMENT ON PLAINTIFFS NON-INFRINGEMENT CLAIM.  WE

24  MIGHT AS WELL TAKE THAT FIRST.

25           MR. HASLAM:  OKAY.  I THINK OUR BRIEFS COVER THE

                                                          3

1   SUBJECT FAIRLY WELL, SO I'LL JUST TRY TO MAKE SOME OVERVIEW

2   OBSERVATIONS.

3           I DO WANT TO ADDRESS THE COURT'S RULING WHICH JUST

4   CAME OUT, BECAUSE I THINK IT DOES BEAR ON THIS, ALTHOUGH THEY

5   ARE TWO DIFFERENT TESTS, ONE IS WHETHER IT'S PATENTABLE SUBJECT

6   MATTER, AND THIS ONE IS, QUOTE, "WHEN THERE'S SOME SUBJECT

7   ALGORITHM."

8           BUT I THINK TO ACCEPT MR. SCHLAFLY'S ARGUMENT WOULD

9   BE TO HAVE TO GO BACK AND REJECT WHAT THE COURT HAS ALREADY

10  FOUND IN THAT RULING, BECAUSE THE ISSUES, WHILE DIFFERENT, ARE

11  VERY INTERRELATED SINCE THE 101 MATTER WHICH WAS BEFORE THE

12  OFFICE WHICH THE COURT ANALYZED TURNED VERY MUCH ON THIS, QUOTE,

13  "HYPOTHETICAL ANALYSIS" OF WHETHER THERE WAS OR WAS NOT AN

14  ALGORITHM IN THE PATENTS.

15          AND AS THE COURT FOUND, THE CLAIMED INVENTIONS OF

16  VARIOUS, THE VARIOUS CLAIMS IN THE R.S.A. PATENT HAVE A

17  PRACTICAL USE THAT THEY SEND MESSAGES SECURELY BY TRANSFORMING

18  THE MESSAGES AND SENDING A SIGNAL AND THEN TRANSFORMING IT AND

19  DECODING IT.

20          THAT'S CLAIMED IN A VARIETY OF SYSTEM CLAIMS.  IN A

21  VARIETY OF METHOD CLAIMS AND VARIOUS ASPECTS, THE CODING AND

22  DECODING ARE CLAIMED.  AND, AS THE COURT ALSO FOUND, MANY OF THE

23  CLAIMS ARE SUBJECT TO 1126.

24          WHAT MR. SCHLAFLY IS ESSENTIALLY DOING IS TAKING A,

25  TRYING TO TAKE A SECOND BITE BY COMING BACK AND ARGUING THAT

                                                         4

1   WHATEVER THE CLAIMS MAY MEAN, BECAUSE OF ONE SENTENCE IN A

2   TEN-PAGE REMARK THAT SAYS THE CLAIMS DO NOT EMBODY AN ALGORITHM,

3   THEREFORE, WHAT HE CALLS THE, QUOTE, "R.S.A. ALGORITHM" IS NOT

4   COVERED BY ANY OF THE CLAIMS.

5           NOW, MR. SCHLAFLY DOES NOT REALLY DEFINE WHAT HE

6   MEANS BY THE R.S.A. ALGORITHM, BUT TO ACCEPT WHAT I THINK HE

7   MEANS IS TO SAY THAT THE COURT AND THE PATENT OFFICE FOUND THESE

8   CLAIMS PATENTABLE, BUT THEIR SCOPE IS ZERO, THEY DON'T COVER

9   ANYTHING, AND I THINK THAT'S ABSURD.

10          I THINK HIS READING OF THE ONE SENTENCE OUT OF

11  CONTEXT IS SIMILAR TO THE CASE WE CITED, WHICH WAS SANCTIONABLE

12  ON APPEAL BY AWARDING DOUBLE COSTS.  HE IS CLEARLY TAKING THAT

13  ONE SENTENCE OUT OF CONTEXT.  HE IS NOT DOING WHAT HE'S REQUIRED

14  TO DO, OR WHAT THE COURT IS REQUIRED TO DO, WHICH IS TO TAKE THE

15  PROSECUTION HISTORY AS A WHOLE.

16          I THINK WHEN YOU LOOK AT THE PROSECUTION HISTORY AS

17  A WHOLE, WHAT THE PATENT ATTORNEY MEANT WHEN HE SAID THEY DO NOT

18  EMBODY AN ALGORITHM IS SET FORTH LATER IN HIS REMARKS.

19          NOW, THE ONE THING HE CLEARLY SAYS IS THE CLAIM

20  COVERS THE TRANSFORMATION OF THE MESSAGE TO THE CIPHERTEXT TEXT

21  AND CIPHERTEXT TO THE MESSAGE, AND THAT'S NOT ALGORITHM.  HE

22  DIDN'T SAY THERE'S NO, QUOTE, "R.S.A. ALGORITHM."

23          WHAT HE SAID IS THERE'S NO ALGORITHM EMBODIED IN

24  THAT CLAIM BECAUSE THERE'S THIS TRANSFORMATION OR INFLUENCE, AND

25  MR. SCHLAFLY SAYS THAT'S GOBBLEDYGOOK, BUT I THINK WHAT THE

5

1    PATENT ATTORNEY MEANT WAS WHEN YOU HAVE THE CLAIMED TEXT AND THE

2    CIPHERTEXT, THOSE ARE CLEARLY NOT EQUAL IN THE MATHEMATICAL

3    SENSE BECAUSE ONE IS A TRANSFORMATION OF THE OTHER.  IT'S SIMPLY

4    A BIT STREAM.  THE MESSAGE MAY BE ONE, ONE, ONE, ONE AND THE

5    CIPHERTEXT MAY BE ONE, ZERO, ONE, ONE, ZERO.  THEY CLEARLY ARE

6    NOT EQUAL IN THE MATHEMATICAL SENSE.

7         BUT THEY ARE, AS THE PATENT ATTORNEY SAID, CONGRUENT

8    IN THAT ONE IS RELATED TO THE OTHER PURSUANT TO CERTAIN

9    RELATIONSHIPS OR PARAMETERS WHICH ARE SET FORTH IN THE CLAIMS.

10        I ALSO THINK WHAT'S -- EVEN IF YOU DON'T ACCEPT ANY

11   OF WHAT I'VE SAID BEFORE WAS DISPOSITIVE, I THINK THAT THE

12   PATENT ATTORNEY, AT THE END OF HIS REMARKS, ARGUED AND SET FORTH

13   AN ARGUMENT THAT SAYS "EVEN IF YOU THINK THERE'S AN ALGORITHM IN

14   HERE, THESE CLAIMS DON'T PREEMPT THE ALGORITHM," AND THAT'S

15   PRECISELY WHAT THE COURT FOUND ON PAGE TEN OF ITS ORDER WHERE

16   YOU SAID, "THE CLAIMED INVENTION IS NOT MERELY A DISEMBODIED

17   MATHEMATICAL CONCEPT, BUT RATHER A SPECIFIC MACHINE DESIGNED TO

18   TRANSFORM AND TRANSMIT WORK SERIES."

19        THEN YOU WENT ON TO SAY, "IT'S NOT SO ABSTRACT THAT

20   IT ENTIRELY PREEMPTS THE USE OF ANY APPARATUS USING THE

21   MATHEMATICAL CALCULATIONS CITED THEREIN."

22        THAT'S WHAT WAS ARGUED BY THE PATENT ATTORNEY TO THE

23   PATENT OFFICE.

24        EVEN IF WE DON'T ACCEPT THAT, WHAT IS DISPOSITIVE IS

25   THAT THE EXAMINER DIDN'T RELY ON THE REMARKS THAT WERE MADE.  HE

6

1    CONTINUED HIS REJECTION AND ONLY WITHDREW THE 101 REJECTION WHEN

2    HE, WHEN THE R.S.A. ATTORNEY ADDED TO THE CLAIMS THE WORDS

3    "MESSAGE SIGNAL," THE WORD "SIGNAL" TO CONFIRM, I BELIEVE, THAT

4    WHAT THIS, THE CLAIMS IN THE PATENT IN VARIOUS WAYS THEY'RE

5    CLAIMING IS A REAL WORLD PHYSICAL PROCESS, NOT SOME ABSTRACT

6    DISEMBODIED MATHEMATICAL ALGORITHM OR NOT SOMETHING THAT

7    PREEMPTS THE ENTIRE ALGORITHM.

8           SO I THINK THAT THE ARGUMENT THAT MR. SCHLAFLY

9    PRESENTS BORDERS ON THE ABSURD, IT BORDERS ON THE SANCTIONABLE

10   SIDE IF IT DOESN'T, IN FACT, GO OVER THAT LINE, AND IT IS BASED

11   ON TAKING ONE SENTENCE IN A TEN-PAGE REMARK AND THEN ASSIGNING

12   SOME ABSURD, NONSENSICAL, TOTALLY ILLOGICAL MEANING TO IT.

13          THE COURT:  THANK YOU.

14          MR. SCHLAFLY?

15          MR. SCHLAFLY:  THANK YOU.

16          YOUR HONOR, I DO NOT BELIEVE I TOOK THAT ONE

17   SENTENCE OUT OF CONTEXT.  IF YOU LOOK AT THE PLACE WHERE THAT

18   SENTENCE OCCURS, IT'S UNDERLINED, IT'S EMPHASIZED.

19          THAT SENTENCE WAS THOUGHT ABOUT VERY CAREFULLY BY

20   THAT PATENT LAWYER AND THAT PATENT LAWYER KNEW WHAT HE WAS DOING

21   WHEN HE SAID THAT SENTENCE.  IT WAS NOT AN ACCIDENT.  THAT

22   SENTENCE IS WHAT IT IS.

23          I THINK IT'S VERY ODD FOR MR. HASLAM TO COME HERE

24   AND SAY THAT WITHOUT COVERAGE ON MATHEMATICAL ALGORITHMS

25   THEMSELVES, THE SCOPE IS ZERO, BECAUSE THAT'S ESSENTIALLY SAYING

7

1   THAT THIS IS JUST A PATENT COVERING JUST A PLAIN OLD

2   MATHEMATICAL ALGORITHM.

3             AND IF THAT'S WHAT IT IS, WELL, THAT'S, I DON'T

4   KNOW.  I GUESS THAT'S APPARENTLY WHAT THE EXAMINER THOUGHT IT

5   WAS, BUT THE EXAMINER WAS PERSUADED BY THE APPLICANT

6   SPECIFICALLY DISCLAIMING ANY COVERAGE OF A MATHEMATICAL

7   ALGORITHM, AND IT'S -- IF YOU DISCLAIM, IF YOU SPECIFICALLY

8   DISCLAIM COVERAGE OF SOMETHING IN YOUR PATENT APPLICATION, WELL

9   THEN, THERE'S AN ESTOPPEL CREATED AND YOU DON'T GET COVERAGE OF

10  THAT IN THE PATENT.

11            NOW, THE IDEA THAT THE EXAMINER DIDN'T RELY ON THAT,

12  I DON'T SEE HOW HE CAN SAY THAT.  I MEAN, THE EXAMINER'S

13  COMMENTS ARE VERY MATERIAL.  HE REQUIRED SOME EXTRA LANGUAGE IN

14  THE CLAIM, BUT IT SURE SEEMS TO ME THAT HE WAS, THE EXAMINER WAS

15  VERY CONCERNED ABOUT THE 101 STATUTORY SUBJECT MATTER AND HE WAS

16  VERY LIKELY TO BE PERSUADED.

17            WHAT THE PATENT APPLICANT WAS TRYING TO --

18            THE REPORTER:  YOUR HONOR, MAY I HAVE A MINUTE?  I'M

19  HAVING A PROBLEM WITH MY MACHINE.

20            (PAUSE IN PROCEEDINGS.)

21            MR. SCHLAFLY:  I THINK THE APPLICANT FOR THE PATENT

22  WAS TRYING TO FOOL THE EXAMINER ABOUT WHAT THE PATENT WAS ABOUT,

23  AND HE GIVES THIS ARGUMENT THAT SAYS THAT, "WELL, THESE ARE NOT

24  REALLY MATHEMATICAL FORMULAS BECAUSE THEY USE THESE

25  CONGRUENCES," AND DESPITE WHAT MR. HASLAM SAYS, I JUST DON'T

8

1   THINK THAT ARGUMENT MAKES ANY SENSE.  HE SAYS THAT BECAUSE IT'S

2   A CONGRUENCE, THESE THINGS ARE NOT EQUAL IN A MATHEMATICAL

3   SENSE.

4            WELL, I DON'T KNOW WHAT OTHER SENSE THEY'RE EQUAL IN

5   IF IT'S NOT A MATHEMATICAL SENSE.  I BELIEVE THEY'RE VERY

6   DEFINITELY EQUAL IN A MATHEMATICAL SENSE, AND IN THE -- THEY ARE

7   MATHEMATICAL FORMULAS, AND IF THE APPLICANT CHOOSES TO

8   SPECIFICALLY DISCLAIM THE COVERAGE OF MATHEMATICAL FORMULAS

9   BECAUSE THAT'S WHAT IT TAKES TO GET HIS PATENT THROUGH THE

10  PATENT OFFICE, THAT'S FINE.  HE'S ALLOWED TO DISCLAIM COVERAGE

11  OF CLAIMS.

12           BUT IF IT TURNS OUT LATER THAT THAT ZEROS OUT HIS

13  CLAIM COVERAGE, THEN THAT'S THE APPLICANT'S PROBLEM.  HE CAN'T

14  WITHDRAW SOME SPECIFIC DISCLAIMER THAT HE MADE IN HIS

15  APPLICATION.

16           THE COURT:  THANK YOU.

17           MR. HASLAM?

18           MR. HASLAM:  JUST A FEW BRIEF COMMENTS.  I WAS NOT

19  SURPRISED THAT MR. SCHLAFLY GOT UP HERE AND TRIED TO REFUTE MY

20  ARGUMENT BUT NEVER PUT FORTH WHAT HE SAID THE CLAIMS DO COVER IF

21  HIS ARGUMENT IS TO BE ACCEPTED.

22           HE ALSO STILL HAS NOT TOLD US WHAT HE MEANS BY THE

23  USE OF THE TERM, QUOTE, "R.S.A. ALGORITHM."

24           I THINK WHEN YOU READ AGAIN, AS YOU'RE SUPPOSED TO

25  DO, THE WHOLE ENTIRETY OF THE PROSECUTION HISTORY, WHAT THE

                                                              9

1    PATENT ATTORNEY CLEARLY MEANT, WHAT HE SAID IS THERE'S NO

2    ALGORITHM AND NOT THAT THE CONGRUENT RELATIONSHIP OR WHATEVER

3    YOU WANT TO CALL IT IS NOT CLAIMED IN SOME FASHION IN THE

4    CLAIMS, BUT THAT THERE ARE NO ALGORITHMS CLAIMED FOR HOW YOU

5    ESTABLISH THE VARIOUS RELATIONSHIPS THAT ARE NECESSARY, AND

6    THAT'S MADE CLEAR ON PAGE EIGHT I GUESS IT IS OF THE ATTORNEY'S

7    REMARKS.

8              AND AS FAR AS FOOLING THE EXAMINER AS OPPOSED TO

9    ACTUALLY DISCLAIMING SOMETHING, I BELIEVE THAT THE TEST FOR

10   REVIEWING THE PROSECUTION HISTORY IS FROM AN OBJECTIVE POINT OF

11   VIEW, NOT FORMULATING OR SPECULATING ON WHAT THE EXAMINER MUST

12   OR MUST NOT HAVE THOUGHT, PARTICULARLY WHERE YOU HAVE EVIDENCE,

13   AS THE COURT POINTED OUT IN ITS QUESTION TO MR. SCHLAFLY, THAT

14   THERE IS DIRECT, OBJECTIVE EVIDENCE THAT THE EXAMINER DID NOT

15   ACCEPT THE ARGUMENT UNTIL THE CLARIFICATION WAS ADDED TO ADD

16   SIGNALS.

17             SO IN A SENSE, THE EXAMINER SAID, "I HAVE READ

18   EVERYTHING YOU'VE SAID.  IT MAY GIVE ME SOME COMFORT OR

19   WHATEVER, BUT I WANT THIS SIGNAL IN THERE."

20             AND BACK IN THIS TIME FRAME, THE EXAMINERS GAVE WHAT

21   IS FREQUENTLY CALLED SOMETHING THAT SAYS "THESE ARE THE REASONS

22   FOR ALLOWANCE," AND IN PAGE 2 OF THE AUGUST 6TH, 1989 OFFICE

23   ACTION, HE SAYS, "CLAIMS 1 TO 33 ARE ALLOWED SUBJECT TO

24   APPLICANT'S INSERTION OF THE WORD, QUOTE, 'SIGNAL' CLOSED QUOTE,

25   AND IN LIGHT AS DISCUSSED IN TELEPHONE INTERVIEW IN JULY OF

                                                        10

1    1989."

2              I THINK WE COME BACK TO WHAT THE COURT HAS ALREADY

3    FOUND.  THESE ARE NOT DISEMBODIED MATHEMATICAL CONCEPTS.  THESE

4    ARE CLAIMS OPERATING ON REAL WORLD SIGNALS AND DO NOT PREEMPT

5    WHATEVER ALGORITHMS MAY OR MAY NOT BE CITED IN THEM.

6              SO I COME BACK TO WHERE I STARTED, WHICH IS THE

7    ARGUMENT THAT I THINK IT IS ABSURD AND I THINK IT RESTS ON

8    BLATANT DISREGARD FOR THE ENTIRELY OF THE PROSECUTION HISTORY.

9              THE COURT:  THANK YOU.  MOTION GRANTED.

10             WHO'S GOING TO ARGUE THE NEXT MATTER ON THE MOTION

11   FOR SUMMARY JUDGMENT ON ANTI-TRUST AND UNFAIR BUSINESS

12   PRACTICE?

13             MR. FRAM:  YOUR HONOR, AS SOON AS WE FIGURE OUT THE

14   SHUFFLE ON THE MICROPHONE, I'LL BE ARGUING THE ANTI-TRUST

15   PORTION OF THE MOTION, AND THEN MR. HOGAN WILL BE ARGUING THE

16   STATE LAW AND UNFAIR COMPETITION CLAIMS.

17             THE COURT:  OKAY.

18             MR. FRAM:  YOUR HONOR, THE PLAINTIFF HAS A WIDE

19   VARIETY OF ANTI-TRUST CLAIMS, AND I'LL TOUCH ON THE PRINCIPLE

20   ONES BRIEFLY HERE.

21             BUT THERE'S AN OVERARCHING FLAW, AND I THINK THAT IS

22   REALLY WHERE WE START AND WHERE WE END.  THE OVERARCHING FLAW IS

23   THIS: THAT ALL OF THE ANTI-TRUST CLAIMS ALLEGED, WHETHER THEY

24   ARE SECTION TWO CLAIMS, SUCH AS THE ALLEGED TYING CLAIM, OR A

25   PATENT MISUSE CLAIM, HANDGARDS CLAIM, OR THE SECTION ONE CLAIM,

                                                              11

1   THE PATENT POOLING CLAIM, THEY ALL REQUIRE, ON THESE

2   ALLEGATIONS, SOME SHOWING OF MARKET POWER, SOME DEFINITION OF A

3   MARKET, SOME SHOWING OF ACTUAL AFFECT ON A DEFINED MARKET.

4           THAT COMES THROUGH IN THE REQUIREMENT UNDER SECTION

5   TWO OF A DANGEROUS PROBABILITY OF SUCCESSFULLY MONOPOLIZING A

6   MARKET FOR THE SECTION TWO CLAIMS, OR TO THE RULE AND REASON

7   ANALYSIS THAT APPLIES TO THE SECTION ONE CLAIM.  WHAT WE DO NOT

8   HAVE HERE ARE PER SE VIOLATIONS ALLEGED.

9           NOW, IN THE FACE OF THIS REQUIREMENT, WHAT THE

10  PLAINTIFF HAS DONE HERE IS COMMITTED WHAT WE RESPECTFULLY

11  SUGGEST IS A CLASSIC ERROR.  WHAT THE PLAINTIFF HAS DONE IS

12  SUGGESTED THAT BECAUSE THERE IS A PATENTED PRODUCT OR PROCESS,

13  IN THIS CASE PUBLIC KEY ENCRYPTION, THAT THAT PATENTED PRODUCT

14  MUST BE A MARKET ONTO ITSELF.

15          THE LAW IS QUITE CLEAR, IT HAS BEEN QUITE CLEAR FOR

16  SOME TIME, THAT THAT ASSUMPTION IS NOT LEGALLY SUPPORTABLE.  THE

17  DEPARTMENT OF JUSTICE ANTI-TRUST INTELLECTUAL PROPERTY

18  GUIDELINE, ON WHICH THE PLAINTIFF RELIES, CLEARLY STATES IN

19  PARAGRAPH 2.2, AS FAR AS THE DEPARTMENT OF JUSTICE IS CONCERNED,

20  THEY WILL NOT PRESUME, IF YOU HAVE A PATENT ON A PRODUCT, THAT

21  THAT IS A SEPARATE MARKET.

22          THERE COULD BE A MARKET FOR PENS OR FOR ENCRYPTION

23  OR GASOLINE.  IF YOU COME UP WITH A NEW PEN, A BLACK PEN WITH A

24  SPECIAL ROLLER POINT, IT STILL MUST COMPETE WITH THE OLD PENS

25  UNLESS THE PLAINTIFF CAN PROVE A SEPARATE MARKET.  THE MERE FACT

                                                                12

1   THAT THERE IS A PATENTED PRODUCT DOES NOT BY ITSELF GIVE YOU A

2   SEPARATE MARKET.

3           SO WHAT DO WE HAVE HERE?  WHAT WE HAVE HERE IS AN

4   ASSERTION THAT THERE MUST BE A PUBLIC KEY ENCRYPTION MARKET.

5           WHAT'S WRONG WITH THAT?  WHAT'S WRONG WITH THAT IS

6   THAT THERE IS A BROADER MARKET FOR COMPUTER SECURITY PRODUCTS,

7   AND CERTAINLY A MARKET FOR ENCRYPTION PRODUCTS.  INDEED, BEFORE

8   PUBLIC KEY ENCRYPTION CAME ON THE SCENE AS A COMMERCIALLY VIABLE

9   PRODUCT, THERE WAS ALREADY IN PLACE NON-PUBLIC KEY ENCRYPTION,

10  WHAT WAS CALLED SYMMETRIC KEY ENCRYPTION, AND IT WASN'T A

11  FLY-BY-NIGHT OPERATION.  THERE WAS A DOMINANT PLAYER, IT WAS

12  CALLED I.B.M., AND THEY HAD A WELL ESTABLISHED PRODUCT CALLED

13  THE D.E.S. PRODUCT.

14          SO INDEED, WHEN P.K.P. CAME ON THE SCENE, WHAT WAS

15  THE DOMINANT PRODUCT?  WE DON'T HAVE TO PROVE THAT HERE.  UNDER

16  CELOTEX, IT IS THE PLAINTIFF'S BURDEN TO SHOW THE MARKET, TO

17  DEFINE THE MARKET TERMS, TO SHOW OUR MARKET SHARE, TO SHOW

18  MARKET POWER.

19          WE HAVE PUT THAT EVIDENCE IN THE RECORD AS TO WHAT

20  THE ACTUAL MARKET FACTS WERE, SO THERE'S NO QUESTION WHAT'S

21  GOING ON HERE.  WE'RE NOT HIDING BEHIND A TECHNICALITY.  WE WANT

22  TO BE VERY CLEAR, UNDER CELOTEX UNDER SUMMARY JUDGMENT, WE

23  PREVAIL BECAUSE OF THE PLAINTIFF'S FAILURE ON ALL OF THE

24  ANTI-TRUST CLAIMS.

25          WHAT IS REMARKABLE IS THAT THE PLAINTIFF, WHEN YOU

                                                              13

1   GET RIGHT DOWN TO IT, WHEN YOU GET BEYOND THE ASSERTIONS, WHEN

2   YOU GET TO THE PLAINTIFF'S ACTUAL FACTS, DOES NOT REALLY DISPUTE

3   OUR VIEW OF THE MARKET.

4          WE TOOK HIS DEPOSITION JUST THIS JULY, JULY 25TH,

5   AND A COPY OF THE TRANSCRIPT IS ATTACHED AS AN EXHIBIT TO

6   MR. HOGAN'S DECLARATION.

7          WHAT'S INTERESTING IN THAT DEPOSITION, I MIGHT JUST

8   DRAW THE COURT'S ATTENTION TO PAGES 50 AND 51, THE PLAINTIFF

9   ADMITS THAT PUBLIC KEY TECHNOLOGY IS PART OF A LARGER ENCRYPTION

10  MARKET.  HE ADMITS THAT, QUOTE, "WITHIN ENCRYPTION IN 1990, THE

11  DOMINANT TECHNOLOGIES WERE THE TRADITIONAL SYMMETRIC KEY

12  SYSTEMS."  THAT'S AT PAGE 63, LINES 1 THROUGH 4.

13         HE ADMITS WHEN HE COMES TO LOOK AT WHAT IS THE

14  DEFENSE MARKET SHARE, WHAT IS THEIR POWER IN WHATEVER MARKET,

15  THAT HE REALLY HAS NO IDEA OF THE SALES VOLUME, THE PUBLIC KEY

16  CRYPTOGRAPHY AS A WHOLE, THAT'S AT 65 AND 66, AND HE ADMITS THAT

17  HE HAD NO IDEA OF R.S.A.'S UNIT SALES.  THAT'S PAGES 110 THROUGH

18  112.

19         WHEN ASKED HIS UNDERSTANDING OF THE SIZE OF THE

20  PUBLIC KEY CRYPTOGRAPHY MARKET, HE SAID AT PAGE 67 THAT HIS

21  ESTIMATES ARE ONLY, QUOTE, "A GUESS."

22         WELL, YOUR HONOR, WE SUBMIT THAT ONE CANNOT BRING AN

23  ANTI-TRUST CLAIM BASED UPON A GUESS ABOUT MARKET FACTS, MARKET

24  DEFINITION AND MARKET POWER, NOT FOR THESE CLAIMS.SO ON THAT

25  BASIS ALONE, WE BELIEVE WE'RE ENTITLED TO SUMMARY JUDGMENT RIGHT

                                                    14

1  THERE.

2           WE GO FURTHER.  EVEN IF THE PLAINTIFF HAD SHOWN,

3  WHICH HE HAS NOT, MARKET SHARE, MARKET DEFINITION, MARKET

4  EFFECT, THE ACTUAL CONDUCT ALLEGED IS NOT --

5           THE COURT:  THE ACTUAL WHAT?

6           MR. FRAM:  THE ACTUAL CONDUCT ALLEGED IS NOT THE

7  KIND OF INAPPROPRIATE CONDUCT THE ANTI-TRUST LAWS CONDEMN.

8           I'LL BRIEFLY TOUCH ON HIS MAIN CLAIMS.  WE'VE GONE

9  THROUGH THEM IN OUR PAPERS IN MORE DETAIL, BUT I'D LIKE TO START

10 WITH THE PATENT POOLING CLAIM, THAT P.K.P. WAS AN ILLEGAL PATENT

11 POOL.

12          AGAIN, PATENT POOLING IS NOT ILLEGAL PER SE.  THE

13 DEPARTMENT OF JUSTICE IN THEIR ANTI-TRUST GUIDELINES, PARAGRAPH

14 5.5, THE AUTHORITY ON WHICH THE PLAINTIFF RELIES, IS VERY CLEAR

15 IT IS NOT ILLEGAL PER SE.

16          MORE TO THE POINT, THE STANDARD OIL CASE ON WHICH HE

17 ALSO RELIES SAYS ONE HAS TO LOOK AT THE MARKET FOR A PATENT IN A

18 PATENT POOL AND SEE WHETHER THERE'S AN ANTI-COMPETITIVE ACT.

19 THE FACTS THERE ARE STRIKINGLY SIMILAR HERE.

20          STANDARD OIL OBVIOUSLY DID NOT INVOLVE THE INTERNET,

21 IT WAS A 1931 CASE, IT WAS THE AUTOMOBILE REVOLUTION, AND IT

22 INVOLVED TECHNOLOGY FOR A BETTER WAY TO EXTRACT GASOLINE OUT OF

23 CRUDE OIL.  THERE HAD BEEN A TRADITIONAL WAY OF EXTRACTING

24 GASOLINE, JUST AS THERE HAD BEEN A TRADITIONAL WAY TO DO

25 ENCRYPTION.  A NEW PROCESS CLAIM ALLOWING, YOU HEAT UP THE CRUDE

                                                          15

1  OIL, PUT IT UNDER PRESSURE, GET MORE GAS.  THESE HAD A PATENT

2  PROCESS IN THE 20'S AND THEY POOLED THEIR PATENTS.

3          THE UNITED STATES DEPARTMENT OF JUSTICE CHALLENGED

4  IT IN THE STANDARD OIL CASE AND IN THE DISTRICT COURT THEY

5  PREVAILED.  BUT THEY PREVAILED ON THE THEORY THAT THEIR NEW

6  TECHNOLOGY, THEIR CRACKING, HERE PUBLIC KEY'S ENCRYPTION, BUT

7  THE NEW TECHNOLOGY WAS A NEW MARKET ONTO ITSELF.

8          THE SUPREME COURT, AT THE VERY END OF ITS OPINION,

9  SAID ONE OF THE BASES FOR REVERSING THE DISTRICT COURT AND

10  FINDING THIS PATENT POOL TO BE LEGAL WAS THE FACT THAT THE

11  DISTRICT COURT HAD ASSUMED THE NEW PATENTED PROCESS, THE

12  CRACKING PROCESS, WAS A SEPARATE MARKET.

13          IT SAYS, "YOU CAN'T DO THAT.  WE'VE BEEN MAKING

14  GASOLINE FOR AWHILE.  YOU HAVE TO SHOW THIS NEW CRACKING

15  GASOLINE IS NOT COMPETITIVE WITH THE TRADITIONAL GASOLINE.

16  PLAINTIFF LOSES."

17          SAME WAY HERE, YOUR HONOR.  THE PLAINTIFF HERE IS

18  INVITING THE COURT TO MAKE THE SAME ERROR THE DISTRICT COURT

19  MADE IN THE STANDARD OIL CASE.  YOU CAN'T JUST ASSUME PUBLIC KEY

20  ENCRYPTION IS A NEW MARKET.  THERE'S TRADITIONAL ENCRYPTION.

21  PLAINTIFF HAS THE BURDEN OF PROVING IT.

22          WHAT THE PLAINTIFF ALSO MISSES ABOUT THE PATENT

23  POOL, HOWEVER, IS THIS PATENT COMBINATION EXCHANGE P.K.P.

24  ACTUALLY DID.  EVEN ASSUMING THERE WAS SOME MARKET POWER, EVEN

25  ASSUMING THAT, WHAT DID IT DO?  IT ISSUED A DOZEN LICENSES TO

16

1   COMPETITORS TO COME INTO THE MARKET AND CREATE THEIR OWN PUBLIC

2   KEY ENCRYPTION ALTERNATIVES.  THEY DID NOT HAVE TO BUY R.S.A.'S

3   OR ANY OF THE P.K.P. PARTNERS' PRODUCT.  WE'RE NOT TALKING ABOUT

4   SMALL EMPLOYERS.  WE'RE TALKING ABOUT A.T.&T. AND I.B.M.

5           MR. SCHLAFLY KNOWS THAT BECAUSE HE HAS BEEN ABLE TO

6   SELL HIS PUBLIC KEY PRODUCTS THROUGH A.T.&T. BECAUSE THEY'VE GOT

7   A LICENSE.

8           THE DEPARTMENT OF JUSTICE GUIDELINES SHED SOME LIGHT

9   HERE.  THE LAW IS VERY CLEAR.  THESE PATENT HOLDERS HAD NO

10  OBLIGATION AT ALL TO ISSUE A PATENT LICENSE TO ANYONE, PARAGRAPH

11  2.2 OF THE GUIDELINES.

12          YET THEY FORMED THIS COMBINATION FOR THE EXPRESS

13  PURPOSE OF ISSUING PATENT LICENSES.  MR. SCHLAFLY SUGGESTS,

14  ALMOST ARGUES, THAT THE POINT OF P.K.P. WAS TO COMBINE THE

15  PATENT AND THEN GIVE PATENT LICENSES TO NO ONE.

16          BUT THE OPPOSITE HAPPENED.  HE'S TURNED P.K.P.

17  UPSIDE DOWN.  THE PATENT MISUSE, ONCE AGAIN, HANDGARDS IS THE

18  LEADING CASE, THERE'S NO DISPUTE ON THAT, IT REQUIRES A

19  DANGEROUS PROBABILITY OF SUCCESSFULLY MONOPOLIZING THE MARKET.

20  NO MARKET PROOF, NO MARKET SHARE, NO PROOF OF SUCCESSFUL,

21  DANGEROUS PROBABILITY OF SUCCESS, SUMMARY JUDGMENT IS CALLED

22  FOR.

23          INDEED, IN THE HANDGARDS CASE, IT SAID A QUOTE OF

24  "MARKET DEFINITION WAS ESSENTIAL" AND THAT WAS IN HANDGARDS I,

25  601 F.2D 993, FOOTNOTE 13, AND ALSO CITED IN THE AMERICAN

17

1    HOIST CASE IN OUR PAPERS.  THAT'S AT 725 F.2D AT 1366.

2               AND, OF COURSE, IN HANDGARDS ITSELF, THE DEFENDANT

3    CONTROLLED 90 PERCENT OF THE RELEVANT MARKET, AND THAT WAS

4    ESTABLISHED BY THE PLAINTIFF, A FAR CRY FROM WHAT WE HAVE HERE.

5               BUT BEYOND THAT, EVEN IF THERE WERE A SHOWING OF

6    MARKET POWER, EVEN IF THE MARKET HAD BEEN DEFINED, WHAT WE HAVE

7    HERE IS A MERE SUGGESTION THAT THERE MIGHT BE PROBLEMS WITH SOME

8    OF THESE PATENTS BROUGHT TO THE PARTNERS' ATTENTION BY THIRD

9    PARTIES.

10              HE SAYS IN 1986, HE RECEIVED A LETTER FROM A PATENT

11   ATTORNEY, NOT R.S.A.'S OWN ATTORNEY, SOME THIRD PARTY'S

12   ATTORNEY DETAILING CERTAIN PROBLEMS IN SOME OF THE STANFORD

13   PATENTS.

14              IN THE GILLETTE CASE WHICH WE CITE, IT'S VERY CLEAR

15   IF A THIRD PARTY COMES TO YOU AND SAYS "THERE'S PROBLEMS WITH

16   THE PATENT," THAT DOES NOT CONSTITUTE THE KIND OF BAD FAITH

17   THAT'S REQUIRED FOR A PATENT MISUSE CLAIM, AND IT COULDN'T,

18   BECAUSE IN EVERY PATENT ENFORCEMENT CASE, SOMEBODY HAS AN

19   ARGUMENT OR A THEORY THAT THERE'S THIS PROBLEM OR THAT PROBLEM

20   IN THE PATENT.  THE MERE FACT THAT THERE'S INFORMATION OUT THERE

21   AND IT'S BEEN BROUGHT TO YOUR ATTENTION BY SOMEONE ELSE'S LAWYER

22   DOES NOT, AS A MATTER OF LAW, SATISFY THE PLAINTIFF'S BURDEN OF

23   PROOF.  AND AGAIN, THAT'S THE GILLETTE CASE.

24              UNTYING, OF COURSE, UNDER JEFFERSON PARISH, AS FAR

25   AS THE TYING CLAIM IS CONCERNED, THE SUPREME COURT HAS SAID

                                                              18

1  THERE MUST BE MARKET POWER, AND I WILL NOT BELABOR THE POINT

2  I'VE BEEN MAKING ABOUT THE PLAINTIFF'S FAILURE.

3            THERE'S, OF COURSE, ANOTHER FAILURE.  THE ARGUMENT

4  HERE IS THAT R.S.A., THIS IS THE PLAINTIFF'S THEORY AS OF THIS

5  POINT IN ITS EVOLUTION, HE STARTED OUT IN THE COMPLAINT SAYING

6  P.K.P. WAS TYING, NOW IT'S R.S.A. WAS TYING, THAT R.S.A. TIED

7  THE SOFTWARE SALES TO TAKING A PATENT LICENSE.

8            YOUR HONOR, DURING THE EXISTENCE OF P.K.P., R.S.A.

9  WAS NOT SELLING PATENT LICENSES.  THAT WAS THE WHOLE POINT OF

10  THE PARTNERSHIP.  IT'S AS IF I AM, I HAVE A DAIRY AND I'M IN THE

11  EGGS AND BUTTER BUSINESS AND I GIVE UP THE BUTTER BUSINESS.  YOU

12  CAN'T SUE ME FOR TYING, AND I DON'T THINK THERE'S A CAUSE OF

13  ACTION FOR UNTYING.  IT'S JUST GONE.

14            WHEN WE ASKED HIM AT HIS DEPOSITION, "WHAT IS YOUR

15  PROOF THAT THERE'S TYING," HE SAID "MAYBE IN THE MICROSOFT

16  CASE."  BUT WHEN YOU GOT DOWN TO THE DEPOSITION AT PAGE 77, HE

17  HAD NO PROOF.  "NETSCAPE," HE SAID "THERE MIGHT HAVE BEEN SOME

18  TYING," PAGE 86.  NO PROOF OVERALL ON PAGE 82.

19            THOSE ARE THE THREE CITES I MIGHT SUGGEST THE COURT

20  MIGHT WANT TO CONSIDER.

21            FINALLY, ON PRICE DISCRIMINATION, THERE HAS TO BE

22  HARM TO CONSUMERS.  HE CONCEDES THAT IN HIS OPPOSITION.  THE

23  U.S.M. CASE, 694 F.2D AT 512 CLEARLY HOLDS YOU MUST DEFINE A

24  MARKET  THE 7TH CIRCUIT SO HELD, TO SHOW DISCRIMINATION CLAIM.

25            BUT, OF COURSE, YOU ALSO HAVE TO SHOW THERE'S PRICE

19

1   DIFFERENTIAL, THE ELEMENTARY LEVEL.  AT HIS DEPOSITION, WE ASKED

2   THE PLAINTIFF, "DO YOU KNOW WHAT WAS CHARGED NETSCAPE," BECAUSE

3   THAT'S ONE OF HIS EXAMPLES OF PRICE DISCRIMINATION.

4        AT PAGE 106 AND 107, HE DIDN'T KNOW.  HE DIDN'T KNOW

5   NETSCAPE'S PRICE OR MICROSOFT'S PRICE.  THIS IS 1995 AND THESE

6   ARE EXHIBITS C, D AND E OF THE HOGAN DECLARATION.

7        HE WAS ASKED, "DO YOU KNOW THE PRICE OR TERMS OF

8   THESE LICENSES THAT YOU SAY ARE SO DISCRIMINATORY," AND HE SAID

9   HE DIDN'T KNOW.

10        AND WHAT IS THE EVIL HE COMPLAINS OF?  HE COMPLAINS

11   THAT NETSCAPE AND MICROSOFT HAVE BEEN GIVING AWAY THE SOFTWARE

12   FOR FREE.  HOW THAT IS ANTI-COMPETITIVE AND HARMING CONSUMERS IS

13   ANYONE'S GUESS, AND THAT'S WHAT ANTI-TRUST LAW IS SUPPOSED TO

14   DO, PROTECT CONSUMERS.  HERE HE'S PROTECTED FROM GETTING FREE

15   PRODUCTS.

16        I'M NOT GOING TO ADDRESS THE BOYCOTT OR INTIMIDATION

17   CLAIM.  I THINK A FAIR READING IS HE'S NOT PURSUING THAT AT THIS

18   TIME.

19        IN CONCLUSION, WE'D SUGGEST THAT WHILE LITIGATING IS

20   ALWAYS COSTLY, LITIGATING AGAINST A PLAINTIFF THAT HAS NO PROOF

21   IS WASTEFUL.  THIS HAS GONE ON FOR FOUR YEARS.  HE'S HAD AMPLE

22   OPPORTUNITY TO DEVELOP THIS, DEVELOP MARKET FACTS, DEVELOP PROOF

23   OF INAPPROPRIATE CONDUCT.

24        WE RESPECTFULLY REQUEST THAT OUR ANTI-TRUST MOTION

25   AND MOTION ON UNFAIR BUSINESS PRACTICE CLAIMS BE GRANTED AND

20

1    THESE CLAIMS BE DENIED SO THAT THIS LONG, DRAWN OUT EXERCISE CAN

2    COME TO A CLOSE.  THANK YOU.

3              THE COURT:  THANK YOU.

4              MR. SCHLAFLY, WHAT IS THE MARKET WE'RE TALKING

5    ABOUT?

6              MR. SCHLAFLY:  THERE ARE TWO MARKETS SPECIFIED IN MY

7    COMPLAINT, PUBLIC KEY CRYPTOGRAPHY AND CRYPTOGRAPHY SOFTWARE.

8              THE COURT:  WHAT'S THE MARKET POWER?  CAN YOU

9    DESCRIBE THAT, EVIDENCE OF MARKET POWER, OR DO YOU HAVE JUST

10   CONCLUSIONS?

11             MR. SCHLAFLY:  THE EVIDENCE OF MARKET POWER IS THAT

12   DEFENDANTS P.K.P. CONTROLLED THE PATENT FOR ALL OF PUBLIC KEY

13   CRYPTOGRAPHY, AND THAT, AND THAT PUBLIC KEY CRYPTOGRAPHY IS

14   ESSENTIAL FOR ALL OF, YOU KNOW, MODERN SECURE COMMUNICATIONS.

15             THE COURT:  OKAY.

16             MR. SCHLAFLY:  YOU KNOW, IN ADDITION TO THAT, LET ME

17   JUST SAY THAT I THINK THAT FURTHER EVIDENCE OF THEIR MARKET

18   POWER IS THE FACT THAT THEY'VE BEEN ABLE TO GET AWAY WITH SOME

19   OF THESE, SOME OF THESE MONOPOLISTIC TACTICS THAT I'VE

20   DESCRIBED.

21             THE COURT:  DESCRIBE THEM AGAIN FOR ME, PLEASE.

22             MR. SCHLAFLY:  OKAY, I'LL DO THAT.

23             NOW, LET ME -- LET ME JUST SAY, FIRST OF ALL, THAT

24   THE DEFENDANTS MAKE A BIG POINT ABOUT HOW I DON'T KNOW THE EXACT

25   TERMS WITH NETSCAPE AND MICROSOFT AND SOME OF THESE OTHER

21

1    LICENSEES AND I DON'T KNOW THE DEFENDANT'S ACTUAL SALES.

2              I'D LIKE TO EXPLAIN THAT, BECAUSE I REQUESTED

3    THOSE IN THE PROCESS OF DISCOVERY WITH THE DOCUMENTS ON THOSE,

4    AND THEY REFUSED TO GIVE THEM TO ME AND THAT'S WHY I DON'T

5    KNOW.

6              I THOUGHT THEY WERE RELEVANT AND I ASKED FOR THEM.

7    I DIDN'T GET THEM, AND I TRIED TO GET SOME RELIEF FROM THE

8    MAGISTRATE.  I DIDN'T GET IT.  BUT THAT'S WHY I DON'T KNOW.  I

9    PURSUED THOSE AS BEST I CAN.

10             AND I DO THINK THAT THOSE DOCUMENTS WOULD BE VERY

11   USEFUL IN HELPING ME, HELPING ME PROVE MY CASE AND ASSESSING

12   DAMAGES, BUT I DON'T THINK IT'S NECESSARY TO PROVE MY CLAIM.

13             LET ME SHOW YOU WHAT I DO KNOW AND WHAT I CAN

14   PROVE.  I CAN PROVE THAT THE DEFENDANTS POOLED TWO COMPETING,

15   HORIZONTALLY COMPETING TECHNOLOGIES WHEN THEY POOLED THE PATENTS

16   ON THE STANFORD AND M.I.T. TECHNOLOGIES.  THOSE ARE THE LEADING

17   TECHNOLOGIES IN USE TODAY AND AT THAT TIME, AND THEY'RE IN

18   DIRECT COMPETITION AND THEY, THEY'RE INDEPENDENT TECHNOLOGIES IN

19   THAT ONE DOES NOT BLOCK THE OTHER.

20             NOW, THE PRECEDENCE FOR POOLING PATENTS, THAT'S JUST

21   STANDARD OIL AND UNDER THE GUIDELINES, I THINK THE GUIDELINES IS

22   PROBABLY BETTER TO LOOK AT THAN STANDARD OIL, YOU LOOK FOR SOME

23   PRO-COMPETITIVE BENEFITS, SUCH AS IF THE PATENTS ARE BLOCKING;

24   THAT IS, YOU CAN'T USE ONE WITHOUT THE OTHER.

25             BUT AS I'VE SHOWN IN THE EVIDENCE, THEY WERE NOT

1    BLOCKING; THAT IS, THAT EVEN -- ONE THAT IS THAT THE M.I.T. HAD

2    A SETTLEMENT WITH STANFORD IN THAT SOMEONE COULD PRACTICE,

3    SOMEONE COULD GET LICENSED ON THE M.I.T. PATENT OR THE STANFORD

4    TECHNOLOGY INDEPENDENTLY AND WOULD NOT HAVE TO LICENSE THE OTHER

5    ONE IN ORDER TO PRACTICE THE ART.

6            OKAY.  THAT'S ONE THING THAT I CAN PROVE, THAT THEY

7    PATENTED HORIZONTALLY COMPETING TECHNOLOGY, AND THAT THEIR

8    PURPOSE WAS TO MONOPOLIZE THE MARKET, NAMELY, THE PUBLIC KEY

9    CRYPTOGRAPHY MARKET.

10           AND I CAN PROVE THAT THEY INTENDED TO DIVIDE THE

11   MARKET BETWEEN HARDWARE AND SOFTWARE.  I HAVE A SWORN STATEMENT

12   FROM THE PRESIDENT OF P.K.P. AND R.S.A. SAYING THAT R.S.A. WAS

13   GOING TO TAKE THE SOFTWARE PART OF THE MARKET AND THAT CYLINK

14   WAS GOING TO TAKE THE HARDWARE PART OF THE MARKET.

15           OKAY.  WHAT ELSE CAN I PROVE?  I CAN ALSO PROVE THAT

16   WHEN THEY POOLED THESE PATENTS, THEY PROMISED A REASONABLE AND

17   NON-DISCRIMINATORY LICENSING POLICY, AND THAT'S, THAT'S

18   PRESUMABLY SUPPOSED TO BE THE PRO-COMPETITIVE BENEFITS TO

19   POOLING THE PATENTS.

20           HOWEVER, I CAN PROVE THEY DIDN'T DO THAT BECAUSE I

21   CAN PROVE THAT THEY REFUSED TO GRANT --

22           THE COURT:  ARE THESE ARGUMENTS OR ARE THEY BACKED

23   BY EVIDENCE TO SUPPORT YOUR ARGUMENTS?

24           MR. SCHLAFLY:  I HAVE A LETTER FROM R.S.A. DATA

25   SECURITY SAYING THEY'RE REFUSING TO LICENSE THE PATENTS FOR THE

                                                              23

1    PURPOSES OF DOING TOOL KITS.

2            THE COURT:  IS THAT IT?

3            MR. SCHLAFLY:  THAT'S MY BEST EVIDENCE FOR THAT

4    PARTICULAR POINT.

5            OKAY.  WHAT ELSE CAN I PROVE?  I CAN PROVE THEY TIED

6    SOFTWARE LICENSES TO PATENT LICENSES, AND I THINK THAT TAKES

7    SOME EXPLANATION BECAUSE MR. FRAM, I THINK, CONFUSED THAT POINT

8    A LITTLE BIT.

9            HE SAYS THAT DURING THE TIME PERIOD THAT P.K.P. WAS

10   ISSUING PATENT LICENSES, R.S.A. WAS NOT ISSUING PATENT LICENSES,

11   AND I DON'T THINK THAT'S TRUE.

12           WHAT THEY WERE DOING IS THEY WERE ISSUING PATENT

13   LICENSES THAT WERE TIED TO SOFTWARE LICENSES, AND THEY ISSUED

14   MAYBE 100 OF THOSE AT THE TIME.  IN FACT, THAT WAS, THAT WAS

15   THEIR WHOLE BUSINESS MODEL, THAT WAS THE MAJORITY OF THEIR

16   REVENUES.  THAT WAS HOW THEY MADE THEIR MONEY, AND I DON'T THINK

17   THAT CAN BE DISPUTED.

18           I MEAN, THEY CAN ARGUE LEGALISTICALLY WHAT WAS, WHAT

19   WAS UNDER, WHAT WAS ALLOWED UNDER THOSE CONTRACTS OR SOMETHING,

20   BUT THEY WERE OFFERING PATENT LICENSES ALONG WITH THOSE SOFTWARE

21   LICENSES.  THE SOFTWARE WOULD BE USELESS WITHOUT A PATENT

22   LICENSE TO GO WITH IT.

23           I CAN ALSO PROVE PRICE DISCRIMINATION BECAUSE SOME

24   CUSTOMERS WERE REQUIRED TO PAY ROYALTIES, MOST CUSTOMERS WERE,

25   BUT SOME CUSTOMERS WERE NOT REQUIRED TO PAY ROYALTIES.

24

1              AGAIN, I DON'T KNOW THE EXACT TERMS OF ALL THESE

2    LICENSES, BUT I DO KNOW THAT NETSCAPE AND MICROSOFT WERE GIVING

3    AWAY FREE PRODUCTS, SO THEY'RE OBVIOUSLY NOT PAYING ANY

4    ROYALTIES, WHEREAS MOST OTHER PEOPLE ARE PAYING ROYALTIES.

5              YOU CAN ARGUE THAT THE PUBLIC BENEFITS FROM FREE

6    PRODUCT, BUT THAT'S THE ARGUMENT YOU CAN ALWAYS MAKE IN THE CASE

7    OF PRICE DISCRIMINATION.

8              IN THE CASE OF PRICE DISCRIMINATION, SOME PEOPLE ARE

9    OFFERED A LOWER PRICE THAN OTHERS AND SOMEONE, IF YOU CAN,

10   SOMEONE, THE MONOPOLIST, COULD ALWAYS JUSTIFY THAT AND SAY,

11   "WELL, WE'RE GIVING SOME PEOPLE A SPECIAL PRICE BREAK.  WE'RE

12   DOING THEM A FAVOR.  WHAT CAN BE WRONG WITH THAT?"

13             BUT THERE IS SOMETHING WRONG WITH THAT BECAUSE IT'S

14   ANTI-COMPETITIVE.  IT MEANS THAT I CANNOT COMPETE IN THE

15   MARKETPLACE USING THE BUSINESS MODEL THAT NETSCAPE AND MICROSOFT

16   DO BECAUSE THEY ARE ABLE TO GIVE AWAY FREE SAMPLES OF THEIR

17   PRODUCT ON THE INTERNET AND I CAN'T.

18             OKAY.  NEXT I CAN PROVE THAT R.S.A. DATA OFFERED

19   PATENT LICENSES WHICH EXCLUDED THE CUSTOMER FROM USING MY

20   SOFTWARE, AND FOR THAT I HAVE THE PATENT LICENSE, IT'S ONE OF MY

21   EXHIBITS.  I HAVE THE PATENT LICENSE THAT THEY USED, AND IT

22   SPECIFICALLY SAYS THAT THEY CANNOT BUY SOFTWARE FROM AN R.S.A.

23   COMPETITOR.  THEY CAN -- THEY CAN USE THEIR OWN OR THEY CAN BUY

24   IT FROM R.S.A., BUT THEY CANNOT BUY IT FROM A COMPETITOR.

25             THIS, I CLAIM, IS AN ANTI-COMPETITIVE PRACTICE, AND

                                                              25

1   I NOW KNOW OF AT LEAST ONE COMPANY THAT THAT ACTUALLY APPLIES

2   TO.  I WOULD HAVE INCLUDED IT IN MY PAPERS, BUT I JUST GOT THE

3   INFORMATION ON IT YESTERDAY.  CAN I DISTRIBUTE THIS

4   (INDICATING)?

5            THE COURT:  SURE.  IT'S ENTITLED FORM 10K FOR

6   MINNOWS TECHNOLOGY CORPORATION?

7            MR. SCHLAFLY:  RIGHT.  THAT'S A PUBLIC COMPANY AND

8   THIS IS FROM THEIR 10K, WHICH IS A STATEMENT THEY'RE REQUIRED TO

9   FILE WITH THE SECURITY AND EXCHANGE COMMISSION EVERY YEAR.

10           IT'S ABOUT 50 PAGES LONG.  I PULLED IT OFF THE

11  INTERNET AND IT'S VERY LONG.  I DIDN'T INCLUDE THE WHOLE THING,

12  BUT IT INCLUDES A SECTION THAT DESCRIBES THEIR LICENSE AGREEMENT

13  WITH R.S.A., AND IF YOU SKIP DOWN TO THE VERY LAST SENTENCE ON

14  THE PAGE, IT SPECIFICALLY SAYS THEIR LICENSE AGREEMENT REQUIRES

15  THEM, REQUIRES THEM TO USE THE R.S.A. TECHNOLOGY AND FORBIDS

16  THEM FROM USING ANYTHING ELSE, FROM USING A COMPETITOR'S

17  PRODUCT.

18           SO THE RESULT IS I CAN'T SELL TO THIS COMPANY

19  BECAUSE R.S.A. HAS SUCCESSFULLY LOCKED THEM INTO A LICENSE

20  AGREEMENT THAT FORBIDS IT.

21           AND I ALSO SUGGEST THAT AGREEMENTS LIKE THIS ARE

22  FURTHER EVIDENCE OF THEIR MARKET POWER.  ONLY IF YOU HAVE MARKET

23  POWER ARE YOU ABLE TO FORCE A LICENSEE TO SIGN AN AGREEMENT WITH

24  CONDITIONS THAT THEY DON'T BUY FROM COMPETITORS.

25           THE COURT:  OKAY, THANK YOU.  ANYTHING ELSE?

                                                          26

1          MR. SCHLAFLY:  WELL, A COUPLE OF POINTS.  THERE ARE

2    A COUPLE OTHER POINTS I'D LIKE TO MAKE WHILE I'M HERE.

3          THE DEFENDANTS' EVIDENCE THAT THEY PUT FORWARD ON

4    THIS IS, I MEAN, SINCE IT'S THEIR MOTION, THEY'RE SUPPOSED TO

5    PUT FORWARD SOME EVIDENCE, AND THE EVIDENCE THEY PUT FORTH

6    CONSISTS PRIMARILY OF TWO DEPOSITIONS, AND ONE DEPOSITION WAS

7    FROM THEIR PRESIDENT, JIM BIDZOS, WHO DECLARES THAT P.K.P. WAS

8    FORMED AS A BONA FIDE EFFORT TO SETTLE A PATENT DISPUTE.  I

9    THINK THE RECORD IS CLEAR FROM THE DOCUMENTS I'VE FILED THAT

10   THERE WAS NO PATENT DISPUTE, THAT R.S.A. DATA ALREADY HAD A

11   LICENSE TO THE STANFORD PATENTS AT THAT TIME AND THAT THERE WAS

12   NO DISPUTE AND THAT THAT DEPOSITION IS NOT TRUTHFUL.

13         THEREFORE, YOU HAVE TO ASK, JUST WHAT ARE THE

14   PRO-COMPETITIVE BENEFITS OF THESE PATENT POOLS?  I MEAN, THE

15   GUIDELINES SAY THAT, YOU KNOW, THEY DON'T ALWAYS SAY THAT IT'S A

16   RULE OF REASON ANALYSIS.  THAT HAS TO BE -- THERE HAS TO BE SOME

17   PRO-COMPETITIVE BENEFITS, THERE HAS TO BE SOME PRO-COMPETITIVE

18   BENEFITS THAT ARE GOING TO BALANCE OUT THE ANTI-COMPETITIVE

19   EFFECTS, AND IF SOMETHING IS JUST PLAINLY ANTI-COMPETITIVE, THEN

20   IT CAN BE FOUND TO BE AN ANTI-TRUST VIOLATION ON A PER SE

21   APPROACH, AND I BELIEVE THAT SEVERAL OF THESE VIOLATIONS THAT

22   I'VE GIVEN YOU ARE JUST SIMPLY AND PLAINLY ANTI-COMPETITIVE.

23         THE OTHER DECLARATION WAS FROM A MR. MURRAY, AND IT

24   TALKS ABOUT THE PURPOSE OF P.K.P., BUT I DON'T SEE HOW THAT CAN

25   HAVE ANY WEIGHT BECAUSE HE WASN'T THERE.  HE HASN'T READ THE

27

1   PATENTS, HE DOESN'T KNOW THE LICENSING SITUATION, AND HIS

2   DECLARATION IS ENTIRELY HEARSAY.

3           THE COURT:  OKAY, THANK YOU.

4           MR. FRAM?

5           MR. FRAM:  I WAITED FOR THE ANSWER TO YOUR HONOR'S

6   QUESTION AS TO WHAT THE PROOF WAS OF THE MARKET, AND I DID NOT

7   HEAR IT.

8           AS TO WHY PUBLIC KEY IS SEPARATE FROM ENCRYPTION IN

9   GENERAL OR, INDEED, COMPUTER SECURITY IN GENERAL, PLAINTIFF SAYS

10  IT'S DEFENDANTS' MOTION, THEREFORE, WE MUST HAVE SOME PROOF.

11          AS THE COURT IS WELL AWARE, UNDER CELOTEX, THE

12  NON-MOVEMENT IN THIS CONTEXT, AN ANTI-TRUST CLAIMANT, MUST COME

13  FORWARD AND CARRY THE BURDEN OF PROOF, AND THOSE ELEMENTS AND

14  THE LAW PLACE IT ON HIM.

15          THE SUGGESTIONS REGARDING DISCOVERY ISSUES I THINK

16  ARE OBVIOUSLY NOT BEFORE THE COURT, BUT I WILL SIMPLY RESPOND TO

17  WHAT WAS RAISED BY THE PLAINTIFF.

18          PLAINTIFF BROUGHT NOT ONE MOTION, BUT TWO MOTIONS TO

19  MAGISTRATE JUDGE INFANTE ON THIS ISSUE, AND BOTH WERE DENIED TO

20  OBTAIN MORE DISCOVERY.

21          ON THE SECOND MOTION, MAGISTRATE JUDGE INFANTE SAID

22  THAT THE PLAINTIFF HAD FAILED TO SHOW GOOD CAUSE. SO WHEN THE

23  PLAINTIFF SAYS THAT HE'S DONE HIS BEST, MAGISTRATE JUDGE INFANTE

24  DISAGREED.

25          THERE WERE FOUR YEARS TO TAKE DISCOVERY, TO COME UP

                                                            28

1    WITH SOME PROOF OF THE MARKET AND NOT SIMPLY HAVE CIRCULAR

2    STATEMENTS SUCH AS THESE WE'VE JUST HEARD THAT THERE MUST BE A

3    MARKET BECAUSE THEY'VE DONE THESE THINGS.   THAT DOES NOT PROVE A

4    MARKET.

5              ON THE THINGS THAT DEFENDANTS ARE ALLEGED TO HAVE

6    DONE, THE STATEMENT WAS MADE THAT TECHNOLOGY WAS POOLED.

7              WELL, R.S.A. MADE SOFTWARE BEFORE P.K.P., DURING

8    P.K.P., AND AFTER P.K.P.   C.K.C CYLINK MADE HARDWARE BEFORE,

9    DURING AND AFTER.   THEY DID NOT POOL THEIR TECHNOLOGY.   THEIR

10   PRODUCTS CONTINUED TO BE OUT IN THE MARKET.

11             IF THE PLAINTIFF IS REFERRING TO THE PATENTS, HE

12   COULD NOT BE REFERRING TO THE HELLMAN-MERKLE EMBODIMENT.   THAT

13   DIDN'T WORK BEFORE P.K.P., DURING OR AFTER, SO WE DON'T SEE

14   WHERE PLAINTIFF IS PROVING ANYTHING BY THAT ALLEGATION.

15             THE SUGGESTION IS MADE THAT DEFENDANTS MUST COME

16   FORWARD WITH SOME PRO-COMPETITIVE JUSTIFICATION OF A POOL.

17             AGAIN, THE LAW REQUIRES PLAINTIFF SHOW THE MARKET

18   BEFORE WE GET TO THAT ISSUE.

19             THE SUGGESTION IS ALSO MADE IF THE POOL DOES NOT

20   INVOLVE BLOCKING PATENTS, IT MUST BE IMPROPER.   BUT IN FACT, THE

21   DEPARTMENT OF JUSTICE GUIDELINES CLEARLY STATE, PARAGRAPH 5.5,

22   THAT A POOL THAT REDUCES TRANSACTION COSTS, BE IT LITIGATION

23   COSTS OR OTHERWISE, HAS IN IT A PRO-COMPETITIVE JUSTIFICATION.

24   WE DON'T THINK WE HAVE TO PUT THAT ON AS PART OF OUR BURDEN ON

25   SUMMARY JUDGMENT, BUT ONE NEED LOOK NO FURTHER THAN THE

                                                              29

1  AUTHORITY CITED BY PLAINTIFF.

2          THE ISSUE THAT'S DISCUSSED REGARDING R.S.A. SELLING

3  PATENT LICENSES DURING P.K.P. AND THAT 100 WERE DONE, PLAINTIFF

4  WOULD HAVE TO PUT ONE OF THEM IN EVIDENCE.  THERE IS NONE.

5          I THINK WHAT HE'S REFERRING TO IS THE FACT THAT AS A

6  MATTER OF LAW, CERTAIN PATENT RIGHTS MIGHT BE IMPLIED, AND THERE

7  WAS A LARGE DISCUSSION BEFORE THIS COURT ON IMPLIED RIGHTS

8  DURING THE LITIGATION BETWEEN R.S.A. AND CYLINK.

9          BUT IT CANNOT BE THE CASE THAT EVERY TIME SOMEONE

10  SELLS SOFTWARE WITH AN IMPLIED RIGHT TO PRACTICES ONE'S PATENT,

11  THAT IS A TIE.  MY CLIENT WOULD HAVE UNWITTINGLY HAD AN

12  ANTI-TRUST VIOLATION BECAUSE THE LAW IMPOSES A RIGHT UPON ITS

13  CUSTOMERS TO USE ITS PRODUCT.

14          THE THING THAT MR. SCHLAFLY SEEMS TO BE MOST

15  FOCUSSED ON AT THIS POINT IS THIS QUESTION OF THE RESTRICTION IN

16  THE R.S.A. LICENSE, THAT IT NOT LET OTHERS GO INTO THE TOOL KIT

17  BUSINESS.

18          THIS IS POST-P.K.P.  HE'S NOT SUGGESTING THIS WAS IN

19  THE P.K.P. LICENSE.  HE'S SAYING IT'S IN THE R.S.A. LICENSE.

20  THAT'S THE EVIDENCE HE PUT FORWARD AT THE TIME HE FILED HIS

21  COMPLAINT.  I'M NOT SURE, UNLESS HE'S CLAIRVOYANT, WHERE THIS

22  FITS IN.

23          PUTTING THAT TO THE SIDE, MR. SCHLAFLY IS SUGGESTING

24  AN ANTI-TRUST VIOLATION IF A PATENTEE HOLDS ONTO A NITCH

25  MARKET.  THE PATENTEE HAS NO OBLIGATION TO LICENSE ANYONE, AND

30

1   THE DEPARTMENT OF JUSTICE, I BELIEVE IT'S IN PARAGRAPH 2.3 OF

2   THE GUIDELINES, SAYS THAT IF A PATENTEE HOLDS ONTO A NITCH

3   MARKET, THAT'S NOT A BAD THING.  THAT'S ACTUALLY A GOOD THING.

4   IT'S PRO-COMPETITIVE BECAUSE IT ENCOURAGES THE LINCESOR TO

5   LICENSE ITS TECHNOLOGY BECAUSE IT KNOWS IT CAN HOLD ONTO SOME.

6   THE LAW DOESN'T REQUIRE THE LINCESOR TO MAKE AN EITHER/OR

7   CHOICE, GIVE UP ALL OF YOUR TECHNOLOGY SO I.B.M. CAN PUT YOU OUT

8   OF BUSINESS, OR GIVE UP NONE OF IT.

9          THEY SAY, "IF YOU'D LIKE TO COME FORWARD AND HAVE A

10  NITCH MARKET," THOSE ARE THE WORDS OF THE DEPARTMENT OF JUSTICE

11  IN THE GUIDELINES, "IF YOU WANT TO HOLD ONTO THAT AND PUT THAT

12  RESTRICTION IN YOUR LICENSE, THAT'S PRO-COMPETITIVE."

13         AS FAR AS ANTI-TRUST IS CONCERNED, WE DON'T THINK WE

14  HAVE TO TOUCH THAT TO CARRY THE BURDEN, BUT I THINK SINCE THAT'S

15  THE CENTERPIECE OF HIS CLAIM, IT'S WORTH NOTING.

16         IT CAN'T BE THE FACT THAT THE EXPERTS ON

17  COMPETITION, THE ANTI-DIVISIONS SAYS THAT'S A GOOD THING AND WE

18  WOULD HAVE LIABILITY FOR THAT UNDER A STATE UNFAIR COMPETITION

19  CLAIM.

20         THAT'S ALL WE HAVE, YOUR HONOR.

21         THE COURT:  THANK YOU.  MATTER SUBMITTED.

22         MR. SCHLAFLY:  COULD I JUST SAY A COUPLE MORE WORDS

23  TO RESPOND TO WHAT HE SAID?

24         THE COURT:  WE HAVEN'T FINISHED UP HERE YET.

25         MR. SCHLAFLY:  OH, OKAY.

                                                              31

1          MR. HOGAN:  GOOD MORNING AGAIN, YOUR HONOR.  I

2     GUESS I'LL ASK THE QUESTION.  AM I ON?

3          THE COURT:  YES.

4          MR. HOGAN:  GOOD.  I'LL BE BRIEF.

5          YOUR HONOR, THIS IS THE UNFAIR BUSINESS PRACTICES

6     ASPECT, AND AS THE COURT IS AWARE, MUCH OF THAT RELATES AT LEAST

7     TO SOMEHOW TIE INTO THE ANTI-TRUST BECAUSE THERE HAS TO BE SOME

8     PREDICATE ACT OF UNLAWFUL OR UNFAIR CONDUCT THAT THE PLAINTIFF

9     CAN SHOW THAT WAS ENGAGED IN BY ANY OF THE DEFENDANTS.

10         I'LL TRY NOT TO REPEAT WHAT HAS BEEN SAID BEFORE,

11    BUT AS HAS BEEN SAID, WHEN WE ASKED MR. SCHLAFLY, AFTER SOME

12    FOUR YEARS, WHAT EVIDENCE HE HAD TO SUPPORT ANY OF HIS

13    ALLEGATIONS IN HIS RECENT DEPOSITION JUST ABOUT A MONTH AGO,

14    THERE WAS NOTHING.

15         WE ASKED HIM ABOUT HIS ALLEGATIONS THAT P.K.P. HAD

16    BEEN DISCRIMINATORY IN LICENSING.  HE REFERRED TO NEWSPAPER

17    ARTICLES, WHAT HE READ ON THE INTERNET, WHAT AND HE HEARD ABOUT

18    WHAT MICROSOFT'S LICENSE MIGHT HAVE BEEN.  THERE WAS NO

19    EVIDENCE, NONE WHATSOEVER.

20         AND THAT WAS TRUE WITH RESPECT TO EACH AND EVERY ONE

21    OF THE REMAINING ASSERTIONS ABOUT THE UNFAIR BUSINESS PRACTICES.

22         I WANT, YOUR HONOR, TO POINT OUT ONE PARTICULAR

23    THING, AND THAT IS THAT MR. SCHLAFLY ALLEGES IN HIS AMENDED

24    COMPLAINT, I BELIEVE IT'S PARAGRAPH 29, THAT CYLINK, IN AN

25    UNRELATED LAWSUIT, HAD ALLEGED THAT AN R.S.A. PATENT WAS

                                                              32

1  INVALID, AND THEREFORE, HAVING ALLEGED THAT, HOW IN THE WORLD

2  COULD THEY BE SUGGESTING THAT ITS PATENTS COULD BE LICENSED?

3          FIRST OF ALL, OF COURSE, IT'S AN UNRELATED LAWSUIT.

4  IT'S AN AVERSION.  IT'S NOT UNDER PENALTY OF PERJURY, SO IT'S

5  SIMPLY, AGAIN, NOT EVIDENCE AT ALL THAT'S ADMISSIBLE IN THIS

6  CASE.

7          IN ADDITION, I WOULD POINT YOUR HONOR TO THE COPPER

8  WELD CASE HAVING TO DO WITH SECTION ONE VIOLATIONS, AND IN THAT

9  CASE, THE COURT FOUND THAT IT'S NOT THE CONSPIRACY.

10          AGAIN, IF PLAINTIFF WERE ABLE TO SHOW THAT THE

11  PARTIES HAD IN ANY WAY ENGAGED IN CONDUCT THAT RESTRAINED

12  COMPETITION, THEN HE WOULD BE ABLE TO ARGUE THAT THERE WAS SOME

13  SORT OF A CONSPIRACY.

14          BUT EVEN UNDER THAT CASE, EVEN WERE PLAINTIFF ABLE

15  TO DO THAT, THE CONSPIRACY ITSELF, I.E., PUBLIC KEY PARTNERS,

16  WOULD NOT BE LIABLE.  THAT ONLY ADDRESSES, SECTION ONE ONLY

17  ADDRESSES THE CONSPIRATORS.

18          HAVING SAID THAT, YOUR HONOR, UNLESS YOU HAVE ANY

19  QUESTIONS?

20          THE COURT:  NO.

21          MR. HOGAN:  I WOULD JOIN MY COLLEAGUES IN

22  REQUESTING THAT THE SUMMARY JUDGMENT BE GRANTED.

23          THE COURT:  THANK YOU.

24          MR. SCHLAFLY?

25          MR. SCHLAFLY:  I'D JUST LIKE TO ADDRESS A COUPLE OF

                                                          33

1    NEW POINTS THAT GOT RAISED.

2              FIRST OF ALL, I DON'T THINK -- SURE I'VE DONE SOME

3    OF MY RESEARCH IN NEWSPAPERS AND ON THE INTERNET.

4              THE COURT:  THAT'S HEARSAY.  YOU CAN'T RELY ON THAT

5    FOR MAKING A CASE.

6              MR. SCHLAFLY:  I CAN'T RELY ON IT AS ADMISSIBLE

7    EVIDENCE.

8              THE COURT:  YOU HAVE TO GET THE EVIDENCE ON WHICH

9    THE ALLEGATION IS MADE AND FIND OUT IF IT'S ACCURATE.  THE

10   ASSERTION IN THE NEWSPAPER IS NOT EVIDENCE OF THE FACT THAT IT

11   HAPPENED.  THAT'S THE POINT THEY'RE MAKING.

12             MR. SCHLAFLY:  OKAY.  WELL, I BELIEVE I HAVE

13   SUFFICIENT EVIDENCE JUST IN TERMS OF DOCUMENTS I'VE GOTTEN FROM

14   R.S.A. AND DECLARATIONS, WHICH ARE ADMISSIBLE, AND SOME THINGS

15   LIKE, I DON'T KNOW, THAT 10K I JUST GAVE YOU WAS -- SURE, I GOT

16   IT OFF THE INTERNET, BUT IT'S A FILING WITH THE SECURITY AND

17   EXCHANGE.  I'M SURE I CAN --

18             THE COURT:  STUFF OFF THE INTERNET IS NOT EVIDENCE

19   OF WHAT IT SAYS.  IT SAYS IT, BUT THAT'S NOT PROOF AND EVIDENCE

20   OF WHAT THEY ASSERT.

21             MR. SCHLAFLY:  I UNDERSTAND.

22             LET ME GO ONTO SOME OTHER POINTS.  MR. FRAM ARGUED

23   THAT I HAVEN'T SUFFICIENTLY ARGUED THAT THERE'S A DIFFERENT

24   MARKET, AND IN FACT, HE SAYS THAT I CONCEDED THAT THE PUBLIC KEY

25   CRYPTOGRAPHY MARKET IS A PART OF SOME BROADER SECURITY MARKET.

                                                          34

1          YEAH, SURE, SOME MARKETS ARE PART OF OTHER MARKETS.

2    THE COMPUTER SECURITY MARKET IS PART OF THE BROADER COMPUTER

3    MARKET.   THE COMPUTER MARKET IS PART OF THE --

4          THE COURT:  YOU HAVE TO GO TO THE MARKET YOU'RE

5    COMPETING IN AND SEE HOW THE MARKET IS BEING CONTROLLED AND SEE

6    IF THERE'S A MONOPOLY.

7          MR. SCHLAFLY:  EXACTLY.

8          THE COURT:  SO WE HAVE TO KNOW WHAT THE MARKET IS

9    THAT YOU'RE TALKING ABOUT, NOT JUST ALLEGATIONS.  WE NEED

10   EVIDENCE.

11         MR. SCHLAFLY:  EXACTLY.  AND I BELIEVE THAT PUBLIC

12   KEY CRYPTOGRAPHY AND CRYPTOGRAPHY SOFTWARE ARE DEFINED MARKETS

13   AND THE GOODS IN THOSE MARKETS ARE NOT INTERCHANGEABLE WITH

14   GOODS IN SOME BROADER MARKET.  THEY HAVEN'T ALLEGED THAT THEY

15   ARE.  I MEAN, THEY HAVEN'T -- WELL, ANYWAY.

16         OKAY.  NEXT MR. FRAM TALKS ABOUT HOW EVEN ACCORDING

17   TO THE GUIDELINES, PATENT POOLS OR VARIOUS OTHER ACTIONS CAN BE

18   CONSIDERED OKAY IF THERE ARE PRO-COMPETITIVE BENEFITS, SUCH AS

19   AVOIDING A LAWSUIT OR SOMETHING ELSE, BUT THEY HAVEN'T POINTED

20   TO ANY TANGIBLE PRO-COMPETITIVE BENEFITS TO MOST OF MY

21   ALLEGATIONS, SUCH AS THE PATENT POOLING.

22         THE ONLY ONES THEY POINTED TO, THEY CLAIM THE PATENT

23   POOL AVOIDED A LAWSUIT, BUT I DO GO TO DOCUMENTS THAT SHOW THAT

24   THERE WAS NO PENDING LEGAL ACTION.

25         THE COURT:  THEIR ALLEGATIONS -- THE MOTION IS THAT

                                                              35

1    YOU HAVE NOT DESCRIBED THE MARKET, THE MARKET SHARE OR THE

2    MARKET POWER, SO THAT IT'S AN INADEQUATE PLEADING AT THIS

3    POINT.  THAT'S THEIR MOTION FOR SUMMARY JUDGMENT.  YOU HAVE TO

4    COME UP WITH THE PROOF TO SUPPORT YOUR ALLEGATIONS, AND THEY SAY

5    YOU HAVEN'T DONE ENOUGH ON THAT.  HOWEVER, IT'S SOMETHING THAT

6    I'LL HAVE TO THINK ABOUT.

7            MR. SCHLAFLY:  OKAY.  I'D LIKE TO EXPLAIN JUST A

8    COUPLE OTHER POINTS.

9            ONE HAS TO DO WITH THE SOFTWARE LICENSES THAT R.S.A.

10   GRANTED.  NOW, IT'S TRUE THAT ANY TIME YOU SELL A PRODUCT AND

11   THERE'S, AND IT'S A PATENTED PRODUCT, THEN THERE'S AN IMPLIED

12   LICENSE TO USE THAT PATENT IN ORDER TO USE THAT PRODUCT.

13           MR. FRAM MADE THE ARGUMENT THAT, WELL, IF THAT'S

14   TYING, THEN EVERY PATENT PRODUCT IS TIED.

15           THE DIFFERENCE IN THIS CASE IS THAT THE R.S.A.

16   PATENT, THE M.I.T. PATENT WAS SOLD AS A SEPARATE ITEM.  IT WAS

17   LICENSED AS A SEPARATE ITEM, AND ONCE THAT HAPPENS, ONCE THE

18   MARKET, A PRODUCT GETS DIFFERENTIATED INTO TWO PRODUCTS, THEN

19   IT'S TYING TO PUT THEM BACK TOGETHER.

20           FOR EXAMPLE, I MEAN, THERE ARE LOTS OF PRODUCTS THAT

21   ARE, YOU KNOW -- IF YOU JUST TAKE THIS TELEPHONE OR SOMETHING,

22   PEOPLE SELL THAT PRODUCT TOGETHER AND THERE'S LOTS OF DIFFERENT

23   COMPONENTS IN IT, AND THERE'S NOTHING ILLEGAL ABOUT SELLING A

24   PRODUCT WITH LOTS OF DIFFERENT COMPONENTS.

25           BUT IF YOU DIFFERENTIATE THAT INTO SEPARATE

                                                              36

1   PRODUCTS, SELL THEM SEPARATELY, BUT THEN COME ALONG AND SAY TO

2   CERTAIN CUSTOMERS, "YOU CAN ONLY BUY ONE IF YOU BUY ANOTHER,"

3   THEN IT'S TYING.

4         OKAY, ONE MORE POINT.  I WANT TO ADDRESS THIS

5   QUESTION OF WHETHER, WHETHER A PATENTEE HAS NO OBLIGATION TO

6   LICENSE AND THAT THEY HAVE A RIGHT TO HANG ONTO A NITCH MARKET.

7         IN GENERAL, THAT'S TRUE.  HOWEVER, I THINK THERE'S

8   TWO DIFFERENCES IN THIS CASE.  FIRST OF ALL, --

9         THE COURT:  A PATENTEE HAS AN OBLIGATION TO LICENSE

10  OTHER PEOPLE TO USE THE PATENT AND GO INTO THE MARKET WITH IT.

11        MR. SCHLAFLY:  USUALLY THERE'S NO OBLIGATION TO

12  LICENSE THE PATENT.  YOU CAN NOT SELL ANY PRODUCTS IF YOU WANT.

13        THE COURT:  A PATENT IS A LEGAL MONOPOLY THAT PEOPLE

14  CAN USE TO MAKE LOTS OF MONEY AND NOT HAVE LICENSES.

15        MR. SCHLAFLY:  CORRECT.  WHAT'S DIFFERENT IN THIS

16  CASE IS THAT, FIRST OF ALL, THEY TOOK THE PATENTS AND POOLED

17  THEM FOR SOME ALLEGEDLY PRO-COMPETITIVE BENEFITS, AND IF THOSE

18  PRO-COMPETITIVE BENEFITS ARE THE LICENSES THAT ARE AVAILABLE,

19  THEY HAVE TO ACTUALLY GRANT LICENSES AND MAKE THOSE AVAILABLE.

20        IF THEY'RE NOT DOING THAT, WELL, THAT'S NOT ONE OF

21  THE PRO-COMPETITIVE BENEFITS OF THE POOL.

22        BUT THERE'S A SECOND POINT CONNECTED TO THAT THAT

23  HAS TO DO WITH, IT'S KIND OF MORE CONNECTED WITH MY UNFAIR

24  BUSINESS PRACTICE CLAIM, AND THAT IS THAT THE DEFENDANTS HAVE

25  GONE TO VARIOUS STANDARD COMMITTEES AND SAID, "OH YES, WE HAVE A

37

1   REASONABLE AND NON-DISCRIMINATORY LICENSING POLICY," AND BASED

2   ON THAT PROMISE, THEY'VE MANAGED TO GET SOME OF THEIR TECHNOLOGY

3   ADOPTED AS A STANDARD.

4          NOW, I DON'T THINK -- IF THEY WANTED TO HOLD ONTO IT

5   AS A NITCH MARKET, THEY SHOULDN'T BE GOING AROUND PROMISING THAT

6   THEY HAVE THIS REASONABLE AND NON-DISCRIMINATORY LICENSING

7   POLICY, BECAUSE IT THEN BECOMES AN UNFAIR BUSINESS PRACTICE TO

8   ME BECAUSE I HAVE A HARD TIME COMPETING WITH THAT BECAUSE THEY

9   GET THEIR STUFF ADOPTED AS THE STANDARD ON THESE PROMISES, BUT

10  IF THEY DON'T HAVE THE LICENSING POLICY AND THEY'RE HANGING ONTO

11  THE NITCH MARKET, THEN I'M UNFAIRLY LOCKED OUT BECAUSE I CAN'T

12  COMPLY WITH THE STANDARD.

13          THE COURT:  OKAY.

14          MR. SCHLAFLY:  THAT'S ALL.  THANK YOU.

15          THE COURT:  MATTER SUBMITTED.

16          MR. HOGAN:  YOUR HONOR, IF I MAY, AS THE COURT IS

17  AWARE, WE DO HAVE A TRIAL DATE IN OCTOBER.

18          THE COURT:  WE HAVE A SCHEDULING PROBLEM.  WE'RE

19  GOING TO HAVE TO SET NEW DATES.  YOU WANT TO -- WE'LL SEND YOU

20  INFORMATION ON PROPOSED DATES AND YOU LET US KNOW.

21          MR. HOGAN:  VERY GOOD, YOUR HONOR.  THANK YOU.

22          MR. SCHLAFLY:  THANK YOU.

23          THE COURT:  WE'LL TAKE ABOUT A FIVE-MINUTE RECESS.

24          (PROCEEDINGS CONCLUDED.)

25

38

1

2

3

4                         CERTIFICATE OF REPORTER

5

6

7

8           I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

9    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

10   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

11   HEREBY CERTIFY:

12           THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE,

13   CONSTITUTES A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND

14   NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

15   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

16   TRANSCRIPTION TO THE BEST OF MY ABILITY.

17

18

19

20

21

22   LEE-ANNE SHORTRIDGE, C.S.R.
     CERTIFICATE NUMBER 9595

23

24

25